# *IN THE UNITED STATES DISTRICT COURT*

# *NORTHERN DISTRICT OF CALIFORNIA*

| | |
|---|---|
| In re | **CASE NO.** |
| ROBERT DALTON RUSH,<br><br>Petitioner,<br><br>vs.<br><br>BEN CURRY, Acting Warden<br><br>Respondent<br><br>On Habeas Corpus.<br>_____________________________/ | [San Bernardino Co. Sup. Ct. # SCR 44594; Cal. Ct. of App. Case] #E042268; Cal. Supreme Ct. Case #S150438] |
| BOARD OF PRISON TERMS,<br>ARNOLD SCHWARZENEGGER,<br>Governor,<br><br>Real Parties In Interest<br>_____________________________/ | |

---

## *PETITION FOR WRIT OF HABEAS CORPUS*

---

STEVE M. DEFILIPPIS, Esq.
State Bar No. 117292
PICONE & DEFILIPPIS, APLC
625 N. First Street
San Jose, California 95112
(408) 292-0441

Attorneys for Petitioner
ROBERT DALTON RUSH

TABLE OF CONTENTS

TABLE OF CONTENTS....i
TABLE OF AUTHORITIES....ii
PETITION....1
JURISDICTION....2
INTRODUCTION....3
STATEMENT OF THE CASE....7
LEGAL CLAIMS....16
DENIAL OF DUE PROCESS....16
REQUEST FOR EVIDENTIARY HEARING....21
SUPPORTING EXHIBITS....22
PRAYER....22
VERIFICATION....24

STATE CASES

In re Ramirez (2001) 94 Cal. App. 4th 549 .................... 16, 17, 18
In re Rosenkrantz [Rosenkrantz IV] (2002) 95 Cal.App.4th 358 .................... 3, 17
Penal Code §3041. (See In re Dannenberg (2002) 102 Cal. App. 4th 95 .................... 16
People v. Rosenkrantz [Rosenkrantz I], 198 Cal.App.3d 1187 .................... 3

FEDERAL STATUTES

18 USC §2254 .................... 2

STATE REGULATIONS

Cal. Code Regs., tit.15, § 2402(d) .................... 18
Cal. Code Regs., tit.15, §2400 .................... 20
Cal. Code Regs., tit.15, §2401(d) .................... 18
Penal Code §3041 and Cal. Code Regs., tit.15, 2402 .................... 19

STEVE M. DEFILIPPIS
State Bar #117292
TRACI S. MASON
State Bar #237663
PICONE & DEFILIPPIS, APLC
625 N. First Street
San Jose, CA 95112
(408) 292-0441

Attorneys for Petitioner,
ROBERT DALTON RUSH

***IN THE UNITED STATES DISTRICT COURT***
***NORTHERN DISTRICT OF CALIFORNIA***

| | |
|---|---|
| In re<br><br>ROBERT DALTON RUSH,<br>Petitioner,<br>vs.<br>BEN CURRY, Acting Warden,<br>Respondent,<br>On Habeas Corpus.<br>______________________/<br><br>BOARD OF PAROLE HEARINGS,<br>ARNOLD SCHWARZENEGGER,<br>Governor,<br>Real Parties In Interest.<br>______________________/ | **Case No.**<br><br>[San Bernardino Co. Sup. Court Case # SCR44594; Cal. Ct of App. Case # E042268; Cal. Supreme Ct. Case # S150438]<br><br>***PETITION FOR WRIT OF HABEAS CORPUS (28 U.S.C § 2254)*** |

Petitioner, Robert Dalton Rush, a state prison inmate, currently has a Writ of Habeas Corpus challenging the denial of parole at his 2003 parole consideration hearing pending before this Honorable Court.

Since the most recent filing, Petitioner had one (1) more subsequent parole consideration hearing on October 11, 2005, which is the subject of these proceedings. Originally, this hearing was scheduled for August 12, 2005. Although all the necessary parties were present, the hearing could not take place because one of the board members wanted to "catch a plane flight" out of town. Instead of a hearing, two (2) of the victim's family members gave statements on the record, but nothing else of substance occurred. Two months later, on October 11, 2005, Mr. Rush's ***fifth*** actual hearing took place.[1] Once again, at this hearing, Mr. Rush was denied parole based solely upon the immutable factors surrounding the commitment offense.

***JURISDICTION***

This petition is addressed to this Court's original habeas corpus jurisdiction because the issues raised are of Federal Constitutional dimension, questioning the legality of the Petitioner's confinement and any subsequent release on parole, pursuant to 28 *United States Code [USC]* § 2254. On May 9, 2007, Petitioner exhausted his state remedies when the California Supreme Court's denial of review became final. No other federal challenge has been filed to the 2005 Board hearing that is at issue herein with this Court. Mr. Rush filed a Petition for Writ of Habeas Corpus in the San Bernardino County Superior Court on November 8, 2006. Exh. QQQ. His petition was subsequently denied on November 30, 2006. In denying Mr. Rush's petition, the court failed to address the arguments made by Petitioner and simply denied the petition by reciting the circumstances of the offense, without any further explanation or evaluation of his exemplary rehabilitation and without providing a nexus between Mr. Rush, ***twenty one (21) years after*** the commitment offense and the allegation that he currently poses a risk of danger if released. Exh. QQQ. Subsequently, Mr. Rush filed a writ of habeas corpus in the California Court of Appeal, Fourth District on January 31, 2007, and a summary denial was rendered on February 14, 2007. Exh. RRR. On February 23, 2007, Mr. Rush filed a timely Petition for Review with the California Supreme Court. The Petition was summarily denied on May 9, 2007. Exh. SSS. These decisions fail to follow clearly established federal law, as articulated by the United States Supreme Court, and were based on rulings that were made upon a deficient and literally non-existent fact finding process. As such, the ruling by the state courts resulted in patently arbitrary, unreasonable and wrong findings

---

[1] The second subsequent (3rd actual) hearing was originally heard on August 19, 2002. However, because of a claim that two (2) separate and independent tapes malfunctioned and could not be transcribed the hearing was reheard on March 5, 2003. Thus, the most recent hearing was actually the fifth time Mr. Rush's parole eligibility was brought

when applied to the applicable principles of clearly established federal law, in violation of Fourteenth Amendment Due Process protections. Thus, this petition is cognizable under federal question jurisdiction, pursuant to 28 *U.S.C.* § 2254, and is timely filed under those same provisions.[2]

***INTRODUCTION***

This case arises out of Mr. Rush's ***fifth*** parole denial by the Board in the face of a period of incarceration that *far exceeds* his minimum term, despite clear evidence of suitability. Mr. Rush was convicted of 2nd degree murder, which occurred when he was just twenty one (21) years of age. He was sentenced to seventeen (17) years to life and has been incarcerated for over ***twenty one (21)*** years despite his full rehabilitation. Furthermore, new cases have come down in the state and federal courts that expand upon the concept that repeated parole denials violated federal due process. See *Rosenkrantz v. Marshall* [hereafter "*Rosenkrantz VI*"][3] 444 F. Supp.2d 1063 (C.D. Cal. 2006), *Sanchez v. Kane* 444 F.Supp.2d 1049 (C.D. Cal. 2006), *Martin v. Marshall* 431 F.Supp.2d 1038 (N.D. Cal. 2006), *Willis v. Kane* __ F.Supp.2d __, 2007 (N.D. Cal. 2007), *In re Lee* 143 Cal.App.4th 1400 (2006), and *In re Elkins* 144 Cal.App.4th 475 (2006), *Brown v. Kane* Slip Copy [2007 WL 1288448] (N.D. Cal. 2007); *In re Lawrence* 150 Cal.App.4th 1511 [59 Cal.Rptr.3d 537, at 561-567] (2007); *In re Gray* 151 Cal.App4th 379 [59 Cal.Rptr.3d 724, 740-741] (2007); *In re Barker* 151 Cal.App.4th 346 [59 Cal.Rptr.3d 746, at 760] (2007). Additionally, despite the California Supreme Court's analysis in the case of *In re Rosenkrantz* [hereinafter "*Rosenkrantz V*"] (2002) 29 Cal.4th 616 of the proof submitted by that petitioner, two federal courts have now found, based on additional proof, that the Executive Branch in fact does have an institutional bias and an unlawful blanket policy against parole for inmates convicted of life term offenses. (See Exh. FFF[4],

---

before the Board.

[2] Pursuant to *Carey v. Saffold*, 536 U.S. 214, 221-223 (2002) and *Nino v. Galaza*, 183 F.3d 1003, 1006 (9th Cir. 1999), all time is tolled from the filing of the first state habeas petition through the denial by the California Supreme Court.

[3] The *Rosenkrantz* petitioner has been involved in six (6) decisions. *People v. Rosenkrantz* [*Rosenkrantz I*], 198 Cal.App.3d 1187, *In re Rosenkrantz* [*Rosenkrantz II*] 80 Cal.App.4th 409 (2000), *Davis v. Superior Court* (*Rosenkrantz*) [*Rosenkrantz III*], (Feb. 22, 2001, B146421) [non pub. opn.], *In re Rosenkrantz* [*Rosenkrantz IV*] 95 Cal.App.4th 358 (2002) , *In re Rosenkrantz* [*Rosenkrantz V*] 29 Cal.4th 616 (2002) , and the recent federal district court decision in *Rosenkrantz v. Marshall* [*Rosenkrantz VI*]) 444 F.Supp.2d 1063 (C.Dist. Cal. 2006).

[4] Petitioner has filed an Appendix concurrently herewith containing all of the relevant materials from the 2005 hearing, and the materials necessary to address the claims in this petition. However, previous Appendices were filed in connection with the prior proceeding, and thus, Petitioner will utilize a somewhat different numbering scheme herein. Exhibits "A" through "Z" and "AA" through "AO" were submitted with the previous Petition, filed on October 7, 2005,

*Coleman v. Board of Prison Terms*[5], Eastern Dist. CA, Case No. CIV S-96-0783 LKK, May 19, 2005; Exh. GGG, *Martin v. Marshall* (N.D.Cal. 2006) 431 F.Supp.2d 1038.

Despite having programmed in a perfect manner throughout the last twenty one (21)[6] years of incarceration, his having received extensive support for being paroled, and having been confined almost ten (10)[7] years past his minimum term, Mr. Rush has now been denied a parole date at each of his five (5) consecutive parole hearings, a result that is directly contrary to the facts of his case, and violates his due process rights in light of his unquestionable rehabilitation. More to the point, Mr. Rush has been incarcerated longer than would be appropriate for any second degree murder. These denials of parole have put the state in breach of its legal and constitutional obligations.

Additionally, what seems to be repeatedly ignored in this case is the fact that Mr. Rush was only twenty-one (21) years of age at the time of the commitment offense. Recently, in *Roper v. Simmons* 543 U.S. 551 (2005), the Supreme Court went through a comprehensive analysis of why juveniles who commit crimes should be treated in a much more lenient fashion than adults, with a focus on rehabilitation rather than punishment. In fact, the court in the recent decision, *Rosenkrantz VI,* 444 F. Supp.2d at 1085, applied the concepts from *Roper* to an eighteen (18) year old murder defendant, like Mr. Rush, who had served just under twenty (20) years for his crime. The court, in *Rosenkrantz VI*, concluded the defendant's age at the time of the offense further diminished the reliability of the facts of the crime as a predictor of his current dangerousness. *Id.* at 1085. Clearly, these concepts apply to Mr. Rush herein.

The purpose of this Petition is to provide the Court with the additional circumstances occurring at the last subsequent parole hearing, so that those facts may be considered in connection with the accompanying request for judicial notice of the prior proceedings on Petitioner's application for relief herein. Although this petition challenges a new parole hearing, the October 2005 hearing, many of the issues will be the same as with the 2002 and 2003 hearings, with the primary difference being that Mr. Rush had another two and a half (2 ½) to three (3) years of exemplary programming. In other words, extensive further briefing will not be necessary. The differences raised by this current petition include the following:

---

Petitioner has separately requested judicial notice be taken of said documents. Further exhibits will continue in the same alphabetical sequence, commencing with AAA. References to Exhibits A through Z and AA through AO are to the exhibits to the original petition.

[5] *Coleman* is not cited as precedent, but for its factual showing of the Executive Branch's unlawful policy.

[6] Nineteen (19) years at the time of the 2005 hearing.

1. At the 2005 hearing, unlike previous hearings, the commissioner stated Mr. Rush has done a "great job" since incarceration and he has "certainly prove[n] [him]self." Exh. AAA, p. 91.. However, immediately thereafter, the presiding commissioner rationalized their denial by pointing out a lot of people had been victimized (i.e. victim's family), Mr. Rush had remedies other than pulling out a gun, and then he stated to Mr. Rush "you were convicted of second degree murder, sir" (each of these comments concern immutable factors that do not relate to the egregiousness of the offense or Mr. Rush's current dangerousness to the public).

2. Since Mr. Rush filed his previous petition on May 13, 2005, *Rosenkrantz VI* was decided, applying the Supreme Court's recent decision, *Roper v. Simmons, supra*, 543 U.S. 551, which was also published after the petition was filed. *Ropers* gave a comprehensive analysis of why juveniles who commit crimes should be treated in a much more lenient fashion than adults, with a focus on rehabilitation rather than punishment. See *Rosenkrantz VI, supra*, 444 F.Supp.2d at p. 1085, citing *Ropers, supra*, 453 U.S. at pp. 561-562. Although the defendant in *Rosenkrantz VI* was not legally a minor, the court still concluded that the evidentiary and predictive value of his conduct was diminished because he was eighteen (18). Like the defendant in *Rosenkrantz VI*, Mr. Rush was young at the time of the offense, barely twenty-one (21). As such, the evidentiary and predictive value of his conduct is diminished due to his age at the time of the offense.

3. The Board's 2005 crime-based findings did not include a "finding" that the offense was "dispassionate and calculated" as it did for the first time in 2003. Instead, the Board stated it was "dispassionate and didn't have to happen." Exh. AAA, p. 88.;

4. The 2005 Board did not rely on the claim that the motive for the crime was trivial and inexplicable as the 2003 Board did. Instead, the Board stated the motive was an argument and "that just doesn't cut it." Exh. AAA, p. 88. No explanation was given why it did not "cut it" or whether any motive for murder could "cut it";

5. Unlike all the previous hearings, the 2005 Board gave no recommendations for further therapy or self-help. In 2003, the Board recommended that Mr. Rush "continue to participate in self-help in order to face, discuss, understand and cope with stress in a nondestructive manner," otherwise he would be an unpredictable threat to others. Exh. BBB, p. 173-174. However, at the 2005 hearing, the Board acknowledged that Mr. Rush accomplished the aforementioned recommendation and gave no similar recommendations.

[7]Eight (8) at the time of the 2005 hearing.

Exh. AAA, p. 38-39.;

6. Unlike all the previous hearings, the 2005 Board did not conclude Mr. Rush was an "unpredictable" threat. For example, in 2003 the Board relied upon a correctional counselor's report to conclude Mr. Rush would pose an "unpredictable degree of threat to the public," therefore requiring more observation and evaluation of him before he could be suitable for parole.[8] Exh. BBB, p. 176. Conversely, in 2005, the Board made no such determinations. Not only did they make no recommendations regarding self-help or therapy, when denying parole the commissioner merely stated "I don't know what you would be like on the outside" and then denied parole for another two (2) years. Exh. AAA, p. 91.;

7. There was an additional two (2) and one half to three (3) years of exclusively positive programming; and

8. Since Mr. Rush filed his previous petition on May 13, 2005, many courts have reversed parole denials that repeatedly rely on the commitment offense. For example, in *Rosenkrantz VI* the court concluded seven (7) parole denials and nearly twenty (20) years of incarceration was too much, in *Martin* five (5) denials and twenty-three (23) years of incarceration was too much, in *Scott II* five (5) denials and eighteen (18) years of incarceration was too much, in *Sanchez* four (4) denials and fourteen (14) years of incarceration was too much, and in *Lee* six (6) denials and almost twenty (20) years was too much. Mr. Rush has been denied more times and incarcerated longer than nearly every one of those cases. Currently, he has been denied parole five (5) times and has been incarcerated for twenty one (21) years.

Of course, all of the same excellent programming, discipline free behavior, comprehensive self-help courses, unparalleled educational and vocational achievements, and extensive support for parole by institutional and custodial staff, as well as family and friends in the community, with solid parole plans, that existed for the 2003 hearing were likewise part of the record at the 2005 hearing. There was absolutely ***no*** evidence submitted that would support a finding of unsuitability.

---

[8] A counselor's risk assessment can no longer be relied upon by the Board or Governor. See Exhibit H, *In re Javier Cortez* (Los Angeles Sup. Ct. 2003) Case No. BH001953, where the court prohibited counselors from opining about an inmate's "risk of threat" because the Department of Operations Manual required such evaluations be performed by either a psychologist or psychiatrist. See also Exhibit I, an August 5, 2004 internal memorandum from the CDC that removed a counselor's requirement to assess an inmate's threat.

## *STATEMENT OF THE CASE*

### I.

Petitioner, Robert Dalton Rush previously filed a Petition for Writ of Habeas Corpus, in which he challenged the legality of his continued confinement for the previous sixteen (16) years on a seventeen (17) year to life sentence for Second Degree Murder. Since incarceration, Mr. Rush has undertaken the enormous task of turning his life around and has programmed in a perfect manner. Despite his dramatic and unprecedented turnaround, and in the face of having received extensive support for being paroled, at the time of filing the prior petition, Mr. Rush had been denied a parole date at each of four (4)[9] consecutive hearings. Since the denial of the original Petition, on June 1, 2005, Mr. Rush received his third (3rd) subsequent (5th actual) hearing. He has again been denied a parole date for two (2) years.

### II.

On November 8, 2006, Petitioner filed a petitioner for writ of habeas corpus, Case No. SWHSS-9037, with the County of San Bernardino Superior Court, in which he alleged the same claims raised herein. On November 30, 2006, that court denied any relief, finding that the Board's denial of parole was appropriate. Exh. QQQ. On January 31, 2007, Petitioner filed a writ of habeas corpus with the California Court of Appeal, which was summarily denied on February 14, 2007. Exh. RRR. A timely Petition for Review was filed with the California Supreme Court on February 23, 2007. The Petition was summarily denied on May 9, 2007. Exh. SSS. For all of the reasons stated herein this petition, Petitioner alleges that the State Court's rulings were erroneous and failed to comply with statutory and case law as stated herein.

### III.

Since the 2003 hearing, Mr. Rush continues to be housed at the California Correctional Training Facility in Soledad, part of the State of California Department of Corrections (CDC). Mr. Rush has continued to be housed at CTF in the general population with Medium custody. Exh. AAA, p. 37. Based upon an assessment of Mr. Rush's lack of dangerousness, he has never spent any time in a level four institution and since 1993 he has been housed in the lowest level he could

---

[9] The second subsequent (3rd actual) hearing was originally heard on August 19, 2002. However, because of a claim that two (2) separate and independent tapes malfunctioned and could not be transcribed the hearing was reheard on March 5, 2003. Thus, the delay in hearing effectively gave Mr. Rush a three (3) year parole denial even though the

be housed in, a level two institution. This aspect of how the state is classifying and housing Mr. Rush constitutes a direct admission by the state that he does not present an unreasonable risk of danger to society if paroled. *Cal. Code Regs.*, tit. 15, §2402(a). He has also continued his unblemished disciplinary record that now spans the last twenty one (21) years while incarcerated. The only write-up Mr. Rush has ever received during his twenty one (21) years of incarceration was a 128 A on November 10, 1988, for showing up early for work. He was only given this write-up because he was "technically" out of bounds.[10] Since then, Mr. Rush has avoided even the slightest write-up. His programming has been impeccable, being entirely disciplinary free and immersing himself in self-help courses and volunteer work where he not only betters himself, but helps to better the plight of those around him.

**IV.**

On October 11, 2005, Petitioner attended his fourth (4th) Subsequent Parole Consideration Hearing. Including his initial parole consideration hearing, and the two (2) hearings of the second (2nd) subsequent, this is the fifth (5th) time the Board has considered the issue of Mr. Rush's suitability for parole.[11] Since the hearing at issue in the petition, he has continued to program positively. He actively attends and positively participates in Alcoholics Anonymous and Narcotics Anonymous, both being Twelve Step based Programs.[12] Exh. BBB, p. 335-336. Mr. Rush participated in Dr. Thomas Gordon's Family Effectiveness Training/Harmony in the Home self-help program. Exh. AAA, p. 40. This program consists of six (6), two (2) hour sessions including the following topics: A Credo for Your Relationships; Participative Rule-Setting; Solving Problems You Own; The Pitfalls of Punishments and Rewards; Helping Others Find Solutions to Their Own Problems; Resolving Conflicts Peacefully; Dealing with Values, Collusions, and Courage for Learning the Skills-Rewards for Using Them. Exh. BBB, p. 332. Mr. Rush also completed "How to Become a Father and Not Get Angry." Exh. BBB, p.334.

---

prior Board only gave him a two (2) year denial.

[10] The court in *In re Mark Smith* 109 Cal.App.4th 489, 501 fn. 5 (2003), concluded "counseling chronos" and "discipline" are two entirely different things. The court cited *Cal. Code Regs.*, tit. 15, §§ 3000, 3312, subd. (a)(2) indicating a "counseling chrono [is] used for 'minor misconduct' only and entails no discipline, only counseling" and it also cited § 3312, subd. (a)(3) emphasizing that "disciplinary procedures [are] for 'serious misconduct.'" *Id.* Thus, Mr. Rush's counseling chrono, for arriving early to work, would not constitute disciplinary action, and as such, he has remained discipline free for the entire duration of his incarceration, twenty one (21) years.

[11] See footnote 1.

[12] Although Mr. Rush was a casual drinker, he has never had a drug or alcohol problem. Exh. AAA, p. 54. He participates in AA and NA because the Twelve Step Program helps with his basic life skills and helps him to be a

Additionally, he completed a course in the cause, prevention, treatment, and management of hepatitis. Exh. AAA, p. 40-41. Mr. Rush has continued to receive numerous positive work/performance evaluations since the last hearing, consistently getting above average to exceptional ratings. Exh. AAA., p. 42.

In short, Mr. Rush has continued to both excel in the work environment, and spends his free time participating in all available self-help programs at the institution that are applicable to him, and additionally volunteering his time to help out less fortunate inmates. For example, he works as a clerk for the Bridging Program. This program helps inmates prepare for release, by improving their basic life skills. Exh. AAA, p. 58. He was also commended for volunteering for the CTF Video Reports Program, a program that broadcasts educational videos for the general population. Exh. AAA, p. 59; Exh. BBB, p. 337. Mr. Rush reviews the videos and prepares questionnaires so that inmates that do not have access to the Education Department can watch the videos, fill out the questionnaire, and still obtain credit for it. *Id.* He also volunteered his time and organizational skills to provide support for the Central Education Department's Graduation and Promotion Ceremony on multiple occasions. Exh. BBB, p. 339, 344. In fact, at his 2005 hearing, the Board commended Mr. Rush for being a "good role model," despite finding that this role model whose behaviors other inmates should emulate, presents an "unreasonable risk of danger" to society if paroled. Exh. AAA, p. 91. At this point, Mr. Rush has maintained ***perfect*** programming for twenty one (21) years, has received supportive psychological reports, is considered a "role model" by the Board, but received a two (2) year denial at his 2005 Board hearing.

**V.**

Throughout his incarceration, Mr. Rush has proven to be a low threat of dangerousness. The CDC has rated his security threat as low since his reception, starting him by giving a Level III override to avoid placing him with criminally sophisticated individuals. His initial counselor's recommendation summary stated that "...in view of his age and not being systems-sophisticated, he may fall easy prey to his more sophisticated delinquent peers." Exh. BBB, p. 99. Thereafter, he was quickly moved to lower custody levels. Since 1993, he has been housed in a Level II facility,

---

better person. Exh. AA A, pp. 54-55.

which is not allowed for a lifer if the crime involves "unusual violence." *Cal. Code Regs.*, tit. 15 §3375.2(a)(7)(A). The Department has dropped his classification points every year by the maximum allowable amount, and since January of 1996, he has remained at the lowest possible score of zero, until the CDC revised the policy and raised all lifers to a score of nineteen (19).[13] Exh. AAA, p. 45. Mr. Rush has not had any serious disciplines (CDC 115's) at any time during his incarceration, and his only minor non-disciplinary write-up (CDC 128-A, minor counseling chrono) was for being out of bounds, in November of 1988, because he showed up early for work. Exh. AAA, pp. 89-90. Thus, he has remained disciplinary free for his entire twenty (20) year incarceration and has programmed perfectly throughout that time. He has never been involved in an act of violence other than the commitment offense. He has made dramatic strides educationally, earning his AA degree in 1989 from Hartnell College, making the President's Honor Roll both semesters and maintaining a GPA of 3.826. Exh. AAA, p.39. He then began taking college courses at San Jose State University, completing his Bachelor of Arts degree in 1991, with a 3.9 GPA. *Id.* He even completed a Masters of Science degree in Humanities at California State University, Dominguez Hills, earning a 3.68 GPA. *Id.* He has consistently stayed active in all of the available self-help programs that apply to him while incarcerated, taking Dr. Bakeman's Life Skills Program and the Entrepreneurial Development class, and despite not even having a drug or alcohol problem, he has regularly participated in Alcoholics Anonymous since 1993. Exh. AAA, p. 44, 55. He has also excelled in acquiring work skills, successfully completing the vocational drafting programs, and spending additional time in that trade teaching new entrants. Exh. AAA, p. 52. Because Mr. Rush's work was so valuable he assisted with the program as a teacher's assistant for several years. Exh. AAA, p. 52. His work participation ratings have consistently been strongly positive, always receiving the highest available marks, such as "exceptional" or A's when grades are given. Exh. AAA, p. 42. Mr. Rush's improvement and suitability for parole has remained clear throughout his incarceration, and is even more apparent today, despite the Board's repeated denials of parole.

---

[13] The CDC's "classification score" is a measure of the security risk attributed to a prisoner by the CDC. Every prisoner is received into the CDC with a score determined by offense and certain other statistics and then is either raised or lowered depending upon the prisoner's incarceration history. The lowest and most favorable classification was previously zero (0), and now is nineteen (19), due to a CDC policy change applicable to all life and term to life prisoners.

## VI.

While in custody, Mr. Rush's behavior has been exemplary. His disciplinary history has been nonexistent, and his psychological evaluations have been consistently favorable, all indicating that he has programmed well, has no current mental illness or serious psychological problems, and poses a low threat of danger to the public if released on parole. Exh. BBB, pp. 154-155. Despite having repeated positive psychiatric evaluations beginning with his 1996 initial life prisoner parole hearing before the Board, Mr. Rush has been continually denied parole. However, this has not discouraged Mr. Rush, who has continued his positive programming and represents the quintessential model inmate. At his most recent parole hearing, on October 11, 2005, no adverse evidence was presented and an additional favorable psychological evaluation by Dr. Talbott was provided, but parole was again denied. See generally Exh. BBB, pp. 154-155. However, unlike previous hearings, the Board did not attempt to base its decision on Mr. Rush's "need" for more therapy and/or psychological analysis. They did not even recommend more therapy or self help programming. Instead, the Board referenced the recommendations, given to him on March 2, 2003. First, in 2003, the Board recommended Mr. Rush continue to remain discipline free, and second, that he continue participating in self-help programs in order to "face, discuss, understand and cope with stress in a nondestructive manner," otherwise he would be an "unpredictable" threat to others. Exh. AAA, p. 38-39; Exh. BBB, p. 174-175. Conversely, at the most recent hearing in 2005, the Board simply acknowledged that Mr. Rush accomplished both of the recommendations given to him in 2003 and did not make any further recommendations. Exh. AAA, p. 38-39. In fact, the Board admitted Mr. Rush has "certainly prove[n] [him]self." Exh. AAA, p. 91. Nonetheless, despite Mr. Rush's "great job" since incarceration, his status as a "good role model," and his accomplishing all previous recommendations given by the Board, he was again denied parole for two (2) years, based on a finding that he allegedly presents an "unreasonable risk of danger" to society if released. *Id.* The Board, therefore, used solely the commitment offense, not necessarily its egregiousness, to not only deny parole, but did so for another two (2) years.

**VII.**

The 2005 denial was based solely on the commitment offense. This decision was made despite the fact that the most recent and his previous psychiatric evaluations concluded Mr. Rush was a "very good candidate for parole." Exh. BBB, p. 156. On June 28, 2005, a psychological report was completed by Dr. Talbott. Exh. AAA, p. 44. Dr. Talbott primarily referred to the previous report completed by Dr. Terrini in 1999. *Id.* The 1999 psychological evaluation by Dr. Steven Terrini found no history of a drug or alcohol problem, found that his parole plans are "quite viable and his prognosis for community living is very positive," found no clinical disorder or personality disorder, described his judgment as "sound," and stated that he had "good insight into his commitment offense." Exh. BBB, pp. 158-161. Dr. Terrini also found that Mr. Rush was remorseful in a way that was "quite appropriate and genuine," and concluded that his lack of criminal history and "greater maturity and greater education" make his "violence potential within a controlled setting…to be significantly below average relative to this Level II inmate population." *Id.*, emphasis added. Dr. Terrini further opined that Mr. Rush was a "very good candidate for parole." (*Id.*, emphasis added.) In fact, he stated, "I do not believe [Mr. Rush] would ever commit a violent act again." Exh. BBB, p. 161. The same viewpoint goes all the way back to his first psychological evaluation in 1990 by Dr. Bruce Bakeman, who found absolutely no psychopathology, felt he needed no mental health treatment before or after release, and described the commitment offense as being the result of situational stress. Exh. BBB, p. 168-169. Likewise, in 1993, Dr. Ronald Kitt found no mental disorder, noted increased psychiatric maturity, and below average violence potential in the community. Exh. BBB, p. 166-167. Dr. Kitt even recommended Mr. Rush's removal from special psychiatric evaluation calendars (i.e., Category X) because "psychopathology is not significantly related to future criminal behavior and psychiatric opinion will not contribute towards a release decision." *Id.* Dr. Kitt noted that Mr. Rush now had two reports that were "favorable for release" and expressed his agreement with the prior report. (*Id.*)[14] Dr. Bakeman again saw him in 1996, noting ongoing improvement, and confirming his previous opinions. Exh. BBB, pp. 164-165.

---

[14] Pursuant to the standards set by the Mental Health Department of CDC, as agreed to by the Board, an inmate is to be removed from the Category X psychiatric evaluation process if they have two (2) consecutive reports that are favorable for release.

Thus, the reality of the "findings," from previous hearings, was that a vicious cycle was created, since the Board would not parole Petitioner without "treatment" and CDC would not give the treatment since not only was it psychologically unnecessary in Petitioner's case, but CDC does not even offer it to general population lifers such as Mr. Rush. See Exh. BBB, p. 90. Those "findings" therefore appear to be, at best, another effort to direct psychological treatment of inmates, and at worst, is an insidious method of preventing a well deserved parole. The practice of directing psychiatric treatment is one that the Board has been repeatedly told by the CDC mental health staff is inappropriate, and which they have previously agreed to cease doing.[15] However, the Board at Mr. Rush's most recent hearing, in 2005, made no such "finding." No recommendation for further "therapy" was given. In fact, the Board seemed to concede therapy was no longer necessary by stating Mr. Rush had "certainly prove[n] [him]self." Exh. AAA, p. 91. In the face of this concession and facts clearly showing Mr. Rush's suitability, the Board again denied parole. This action was taken despite a complete absence of evidence in the record to support the decision. The result of that decision is that Mr. Rush has now served beyond even the most aggravated amount of time that the matrix has established for his subject offense.

**VIII.**

At his fifth (5th) hearing, on October 11, 2005, the Board acknowledged Mr. Rush's numerous letters of support (Exh. BBB, pp. 223-284), his lack of prior adult or juvenile criminal history, his vocational training for drafting, the Bachelors and Masters degrees he earned during incarceration, his realistic parole plans, his marketable skills, his exceptional programming, and his discipline free record while incarcerated.[16] However, when the Board delivered their decision, Presiding Commissioner Sawyer, once again, stated Mr. Rush would pose an "unreasonable risk of danger to society." Exh. AAA, p. 87. To justify their decision, the presiding commissioner gave a brief recitation of the facts of the commitment offense. *Id.* These facts have remained unchanged for

---

15 See the attached letters from CDC staff psychologists, Dr. Steven Terrini and Dr. Lyons, Exhibit AL pp. 783-787, which refer to the notice given to the Board that they may not direct psychological treatment of lifers. This issue also came up in the case of *In re Rosenkrantz* (2000) 80 Cal.App.4th 409, 426-427, where the Court noted that the Board cannot ignore the psychological evidence and substitute their own opinions as to what is best for the inmate's psychological care. Likewise, in *Ramirez*, the Board was chastised for ignoring the psychological evidence and suggesting that the inmate "needs therapy." *In re Edward Ramirez* 94 Cal.App.4th 549, 571(2001) .

16 The only disciplinary action taken against Mr. Rush was the 128A for being early to work in 1988. Presiding Commissioner Sawyer admitted he did not understand it other than he was "technically" out of bounds. Exh. AAA, p.

twenty (20) years. The Board, next, characterized the offense as "particularly callous and cruel," "dispassionate and [it] didn't have to happen," and it was carried out with a "callous disregard for human suffering." Exh. AAA, p. 88. The Board gave no explanation why the offense was characterized in this manner. Likewise, no explanation was given as to why Mr. Rush's numerous accomplishments during incarceration did not outweigh the immutable factors surrounding the commitment offense. The presiding commissioner simply told Mr. Rush he had done a "great job" since incarceration and he has "certainly prove[n] [him]self." Exh. AAA, pp. 90-91.

Immediately thereafter, Commissioner Sawyer pointed out that many people had been victimized, Mr. Rush had remedies other than using a gun, and stated "you were convicted of second-degree murder, sir." Exh. AAA, p. 91. None of these facts have changed since the commitment offense and none of these facts explain why the offense was exceptionally egregious. In fact, absent a finding that the crime was "especially, heinous, atrocious or cruel," Mr. Rush's conviction for second degree murder, alone, cannot be used to continually deny his parole. As such, a blanket statement that Mr. Rush was convicted should not affect the Board's suitability determination. However, it clearly did. The Board gave no further explanation for their conclusion. They simply relied on the commitment offense without providing any support for its conclusion that the offense was so egregious that the facts, alone, could render Mr. Rush a current and unreasonable risk. This conclusion was made despite twenty one (21) years of contrary behavior. Mr. Rush has behaved exceptionally since his incarceration, and as such, not a scintilla of evidence corroborated the Board's decision that he was still an unreasonable risk to society today. Nonetheless, the presiding commissioner listed a few immutable facts about the offense, he concluded by again complementing Mr. Rush on what he has accomplished since incarceration, acknowledging that he is a "good role model," but then stating "I don't know what you would be like on the outside" and then denied parole for another two (2) years. Exh. AAA, p. 91.

**IX.**

At the 2005 hearing, Mr. Rush fully accepted responsibility for his conduct in the offense, exhibited appropriate levels of remorse, and showed appropriate insight into the causes of his behaviors and a recognition of how to respond positively to forces in his life in the future. Likewise, the various reports submitted found full acceptance of responsibility and appropriate and sincere

---

90.

remorse. No facts were submitted to the Board that would justify the denial of a parole date. However, the Board still found Mr. Rush unsuitable. Not one of these alleged justifications for the Board's decision speaks to Mr. Rush's ***current*** suitability. The Board's characterization of the crime does not, in any way, indicate it was so egregious as to render Mr. Rush a current risk to society. Furthermore, the fact people were victimized, namely the victim's family, also does not speak to his current dangerousness, nor does the fact Mr. Rush had remedies other than the use of a gun, since not committing the offense is always an available option. One thing is true, Mr. Rush was convicted of second degree murder. However, the Board failed to acknowledge the fact that he was already sentenced for that offense. That sentence was a parole eligible sentence, not life without the possibility of parole. As such, the mere fact Mr. Rush was convicted is not a permissible justification for lengthening his sentence to life without possibility of parole by continuous and arbitrary denials of parole.

**X.**

The Board's reliance on the nature of the commitment offense to deny parole is grossly unfounded. The commitment offense is a second degree murder, and Mr. Rush's actions were a result of significant stress in his life. Shortly before the offense, he was a passenger in a fatal motorcycle accident, where he was severely injured and his friend was killed. Exh. DDD, p. 361. Mr. Rush was thrown from the motorcycle when it was hit after a semi-truck drove through a stop sign. *Id.* He sustained a severe concussion, dislocated ankle, broken ribs, punctured/collapsed lung, fractured right tibia and fibula, neurological injuries, contusions, abrasions, and a chipped tooth. *Id.* He was in the hospital for over two (2) weeks and then confined to a bed for an additional month. *Id.* The stress from this accident had an enormous impact on Mr. Rush's life, he experienced depression and nervousness and was unable to function independently due to his injuries. At the time of the offense, Mr. Rush had not fully recovered from his weakened physical and mental state when he was assaulted by his larger and far more fit roommate. These circumstances of the life term offense must be considered, and it must be done in a way that meaningfully addresses whether he continues to present an unreasonable risk of danger to society if paroled. *In re Scott [Scott II]* 133 Cal.App.4th 573, at 594-595 (2005); *In re Ernest Smith* 114 Cal.App.4th 343 (2003).) Under this type of evaluation, the conclusion is inescapable that this life offense is not "particularly egregious" or among the "gravest" of such offenses, especially when viewed from the standpoint of Mr. Rush's mental state at the time of the crime, and considering his dramatic transformation the last twenty one (21)

years. No evidence supports the conclusion that the crime, alone, makes Mr. Rush a current danger to society if paroled. *Scott II, supra,* 133 Cal.App.4th 573. Thus, the Board has failed to tie the facts of the offense to proof of current dangerousness. *Id.* In this case, the *Code of Regulations* Matrix shows that Mr. Rush should receive a date of between seventeen (17) and nineteen (19) years, before reduction for post-conviction custody credits under *Cal. Code Regs*, tit. 15, §2410. It has now been twenty one (21) actual years, and Mr. Rush credits surpass the top end of the second degree murder matrix, yet the Board has not even set a ***future*** parole date. By giving another two (2) year denial, they are once again ignoring the presumption of suitability, and shirking their responsibility to set a date. *McQuillion v. Duncan* 306 F. 3d 896, at 901-902 (2002); *In re Ramirez* 94 Cal. App. 4th 549 (2001).

## LEGAL CLAIMS

### *DENIAL OF DUE PROCESS*

### XI.

"The touchstone of due process is protection of the individual against arbitrary action of the government." *Wolff v. McDonnell, supra*, 415 U.S. 558. Absent a factually supported showing that he ***currently*** represents an unreasonable risk of danger to society, after a full and proper consideration of all relevant factors set forth in the parole statutes and regulations, there is no basis upon which parole can be denied. *Greenholtz v. Nebraska Penal Inmates* 442 U.S. 1, 12 (1979); *Board of Pardons v. Allen*, 482 U.S. 369, 376-378 (1987); *McQuillion I, supra*, 306 F.3d 895, 901; *In re Ramirez, supra,* 94 Cal.App.4th 549, 569; *Sanchez, supra*, 444 F.Supp.2d 1049; *Rosenkrantz VI, supra*, 444 F. Supp.2d 1063; *Martin, supra*, 431 F.Supp.2d 1038; *Elkins, supra*, 144 Cal.App.4th 475; and *Lee, supra*, 143 Cal.App.4th 1400 *Scott II, supra,* 133 Cal.App.4th at 597-595; *Cal. Pen. Code* §3041.[17] That was precisely the situation with Mr. Rush in this case. The Board's actions, and the

---

[17] Even if the decision in *Dannenberg, supra*, 34 Cal.4th 1061 is applicable, this expectation is not lessened nor removed by the ruling therein. Regardless of the inadequacies of the standard enunciated by that court, at a minimum, the *Dannenberg* Court held that the Board must point to factors ***beyond*** the minimum elements of the crime before denying parole, and must be supported by competent evidence. *Id.* at p. 1084. Respondent filed petitions for review in both *Scott II* and *Elkins*, and also filed a request for depublication of *Scott II* and for a stay of the decision in *Elkins* to preclude the release of Elkins. All of these requests were denied by the California Supreme Court in Case

subsequent failures to act by the California courts, have arbitrarily denied him these rights in contravention of due process of law.

**XII.**

Mr. Rush has submitted extensive points and authorities in support of this petition, which detail the legal basis upon which relief is sought, and the same is incorporated herein by reference as though set forth in full.

**XIII.**

*Penal Code* §3041 creates a presumption of parole suitability, absent a factual showing that the inmate currently presents an unreasonable risk of danger of committing a violent act. *McQuillion I, supra,* 306 F.3d at 902 ["The scheme 'creates a presumption that parole release will be granted' unless the statutorily defined determinations are made"]; *Cal. Code Regs.*, tit. 15 § 2402(a). Parole decisions by the Board or Governor must be rendered within the limitations set forth in applicable statutes and guidelines in the *Penal Code* and Title 15, *California Code of Regulations*, including application of the regulatory factors of suitability and unsuitability, and the statutory requirement that terms must be set with uniformity and proportionality. On these issues, under the California Supreme Court's decisions in *Rosenkrantz V* and *Dannenberg*, the state courts unreasonably defer to the Board's unilateral and violative conversion of Petitioner's parole eligible term to a life sentence without parole, by simply arbitrarily finding that the evidence is "more than minimally necessary to convict," even in the face of the Board's crime based findings being without factual support in the record. *Dannenberg, supra,* 34 Cal.4th at 1095; Exh. AAA, pp. 87-88. As noted by the dissent, this standard is "meaningless" (*Dannenberg, supra*, 34 Cal.4th at 1103), and as applied to a parole decision-making process that refuses to grant parole to deserving inmates like Mr. Rush, and which provides a wholly unfair and arbitrary procedure, it simply serves to facilitate a system that routinely violates the due process rights of inmates.

---

#S147840 (Elkins), and Case #138430 (Scott II), obviously showing the Court's acceptance of the rules announced in those cases. Here, the Board has not and cannot point to factors beyond the minimum elements of first degree murder that can justify denying Mr. Rush a parole date after twenty one (21) years.

**XIV.**

Furthermore, the Board's criteria for establishing suitability under *Cal. Code Regs.*, tit.15, § 2402(d) include that the inmate: "(1) does not possess a record of violent crime committed while a juvenile; (2) has a stable social history; (3) has shown signs of remorse; (4) committed the crime as the result of significant stress in his life, especially if the stress has built over a long period of time; (5) committed the criminal offense as a result of battered women syndrome; (6) lacks any significant history of violent crimes; (7) is of an age that reduces the probability of recidivism; (8) has made realistic plans for release or has developed marketable skills that can be put to use upon release; and (9) has engaged in institutional activities that indicate an enhanced ability to function within the law upon release." With the exception of the obviously inapplicable criteria relating to battered woman syndrome, Mr. Rush is indisputably suitable under each of these criteria. No evidence was presented at the hearing to support a contrary finding under any of these criteria.

**XV.**

In the present case, Mr. Rush had a legitimate expectation that the government would set a parole release date before his eventual release date had passed, fixing the length of his sentence in accordance with his minimum term and the guidelines of uniform terms based on the circumstances of his conviction for first degree murder. *McQuillion I, supra*, 306 F.3d 895, 930, *Penal Code* §3041, *Cal. Code Regs.*, tit.15, §2402 et seq., and *In re Ramirez, supra,* 94 Cal.App.4th at p. 549. In Mr. Rush's case, the evidence indisputably established suitability under *Cal. Code Regs.*, tit.15, § 2402(d), based upon his youthfulness at the time of the crime (see *Roper, supra*),the positive evidence of his programming, the long passage of time since the crime, and the circumstances surrounding his commitment offense. Here, the Board's finding of unsuitability on a repeated and long standing basis fails to fall within the limits imposed by applicable law, thereby denying due process. In short, in its decision, the Board has acted unlawfully, arbitrarily and capriciously and without supporting evidence, and the state courts misapplied clearly established federal law and made findings that are both unreasonable and wrong in failing to grant habeas corpus relief. No evidence exists to show that Mr. Rush is currently dangerous and thus factually unsuitable for parole, within the meaning of *Penal Code* § 3041 and *Cal. Code Regs.*, tit.15, 2402(c). To the contrary, as discussed *supra*, he is suitable under each of the relevant criteria under *Cal. Code Regs.*, tit.15, § 2402(d). Thus, the denial of parole amounts to a violation of Mr. Rush's liberty interest under the due process clause. No

reasonable reviewing court could have properly concluded that the Board's decision was lawful. In short, the fact finding and review processes of the Board and California courts were wholly inadequate, and therefore, there is no presumption of correctness that attaches to any finding by the Board or those courts.

**XVI.**

The Board has a duty to make all recommendations "sufficiently clear" to inform Mr. Rush what conduct will result in a grant of parole. *U.S v. Guagliardo*, 278 F.3d 868, 872 (9th Cir. 2002) [citing *Graynet v. City of Rockford*, 408 U.S. 104, 108-109 (1972).][18] Thus, the onus is on the Board to clearly and specifically state what conduct will warrant a finding of suitability. It follows that there is only one way to interpret the recommendations given to Mr. Rush at each of the five (5) hearings.[19] These recommendations constitute the Board's "clear instructions" as to what Mr. Rush must do to be found suitable. It is must be noted that ***no recommendations*** were given by the Board at Mr. Rush's 2005 hearing. Exh. AAA, pp. 89-91. This in effect means that there is nothing left for Mr. Rush to do to become suitable, and he must be released. The Board's lack of recommendations, coupled with a two (2) year denial makes it clear that either the Board's recommendations, or lack thereof, are nothing more than a ruse, or they are in violation of the "sufficiently clear" mandate.

**XVII.**

The unavoidable logical consequence of the Board's failure to grant a parole date is an impermissible conversion of Mr. Rush's parole-eligible sentence into a sentence of life without the possibility of parole, subject only to an arbitrary potential that a subsequent Board Panel may conclude that the crime is not a bar to a finding of suitability. Furthermore, the Executive Branch's position is also in violation of the statutes and regulations setting out the factors that the Governor and the Board must consider in determining parole suitability. *Penal Code* § 3041, *et seq.*; *Cal. Code Regs.*, tit.15, §2400, et seq. If an inmate "continue[s] to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of [his] offense and prior conduct would raise serious questions involving his liberty interest in

---

[18] A prisoner's due process rights are violated if parole conditions are not made "sufficiently clear" so as to inform him of what conduct will result in his being returned to prison. Likewise, the Board of Prison Terms has a duty to make recommendations for parole eligibility "sufficiently clear" so as to inform the inmate of conduct that will warrant a finding of suitability. See *U.S. v. Guagliardo, supra*, 278 F.3d 868.

parole." *Biggs v. Terhune, supra*, 334 F.3d at p. 910; see also *Rosenkrantz VI, supra*, 444 F.Supp.2d 1063; *Scott II, supra*, 133 Cal.App.4th at 594-595. As noted by the court in *Scott II*,

> "The commitment offense is one of only two factors indicative of unsuitability a prisoner cannot change (the other being his "Previous Record of Violence"). Reliance on such an immutable factor "without regard to or consideration of subsequent circumstances" may be unfair (citation omitted), and "runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." (Citation omitted). The commitment offense can negate suitability only if circumstances of the crime reliably established by evidence in the record rationally indicate that the offender will present an unreasonable pubic safety risk if released from prison. Yet the predictive value of the commitment offense may be very questionable after a long period of time. (Citation omitted) Thus, denial of release solely on the basis of the gravity of the commitment offense warrants especially close scrutiny."

See also *Willis, supra*; Sanchez, *supra*, 444 F.Supp.2d 1049; *Rosenkrantz VI, supra*, 444 F. Supp.2d 1063; *Martin, supra*, 431 F.Supp.2d 1038; *Elkins, supra*, 144 Cal.App.4th 475; and *Lee, supra*, 143 Cal.App.4th 1400. Here, the facts of the commitment offense, although admittedly serious, are insufficient to justify the findings of unsuitability, and the failure to set a parole release date, particularly in the repeat basis that has occurred here, violates due process within the meaning of *Biggs*, *Scott II*, *Willis, Sanchez*, *Rosenkrantz VI*, *Martin*, *Elkins*, and *Lee.* Repeated reliance on the commitment offense as a reason to deny parole and the California courts' upholding of the Board's action, in the face of crime based findings that were factually unsupported, is both unreasonable and wrong, constituting a clear violation of Mr. Rush's liberty interest in parole.

**XVIII.**

Petitioner has no other plain, speedy or adequate remedy in the ordinary course of the law. This petition is addressed to this Court's original habeas corpus jurisdiction because the issues raised are of federal constitutional dimension, questioning the legality of the Petitioner's confinement. There are no longer any applicable administrative remedies. As stated *supra*, both

the intrinsic and extrinsic review processes, as conducted in the Board proceedings and subsequently applied in the state courts, are flawed and have resulted in violations of clearly established United States Supreme Court law. Petitioner previously filed a petition in the San Bernardino Superior Court challenging the same denial of parole, and that petition was denied. A true and accurate copy of the order denying the Superior Court petition is attached hereto as Exhibit QQQ. Petitioner then filed in the Fourth District Court of Appeal and the petition was summarily denied. A true and accurate copy of the summary denial by the Court of Appeal is attached hereto as Exhibit RRR. A timely petition for review was filed in the California Supreme Court, and was summarily denied on May 9, 2007. A true and accurate copy of the denial from the California Supreme Court is attached hereto as Exhibit SSS. Thus, this petition is timely under the A.E.D.P.A. statute of limitations. 28 *U.S.C.* § 2254. Thus, this matter is ripe for determination by this Court.

***REQUEST FOR EVIDENTIARY HEARING***

**XIX.**

Here, an evidentiary hearing would be appropriate to resolve the question of whether the Board is applying the regulatory terms in a manner that is unconstitutionally vague. A simple test can be done to illustrate the vagueness of the regulations as they are currently being applied, as well as the existence of the "no parole" policy. This Court can order Respondent to produce the decisions by the parole Board during the ninety (90) days before and after Mr. Rush's hearing, along with the Governor's decisions regarding any case where parole was granted by the Board (or en banc decision or rulings by the Decision Review Unit that changed or modified the decision), and as to any inmate that was actually released, any prior decisions of the Board denying parole as to that inmate. Petitioner anticipates that this evidence would show that in 100% of all murder cases, the crime has been found to be "especially heinous, atrocious, or cruel" at some point, so that even if the inmate is later actually paroled, his or her crime was at least once found to be within the "public safety" exception of *Penal Code* §3041(b). Alternatively, the Board can be directed to produce any decision in a murder case within the last ten (10) years where the inmate was found suitable at his or her initial hearing, and actually released without ever being found unsuitable or having the decision reversed by Decision Review, en banc hearing or Governor's review. Again, it is anticipated that there would be no such decision in existence. These facts would show precisely what the California Supreme Court was talking about when it cautioned that

the exception cannot be interpreted in a manner so as to "swallow the rule" that parole dates "shall normally" be granted, since there would be no case that has never been found to fit in the exception. *Rosenkrantz V, supra,* 29 Cal.4th at 683. Thus, as applied, the phrase would be violative of federal due process, in that it can fit any crime, and has lost the ability to distinguish crimes that truly are particularly egregious.

Petitioner is in possession of the extensive exhibits utilized to support the finding of the District Court in the *Coleman* case (Exh. FFF) and which likewise relied on in *Martin, supra*, but has not submitted those as they span more than 1500 pages, and include numerous depositions of past Board members. Petitioner is also in possession of the testimony of Albert Leddy, former Board Commissioner, from the evidentiary hearing in the Marin County Superior Court in the case of In re John Dannenberg, case # SC112688A, all of which show how the Board applies the regulations in a manner that renders tem unconstitutionally vague. Petitioner is also in possession of all of the Governor's reports of reviews conducted since 2000. Finally, Petitioner has a set of over 200 declarations showing a pattern of crime based denials, and is informed and believes that further discovery has been ordered in other cases that will bear upon the patterns and practices of the Executive Branch to refuse to grant parole. Petitioner will have all of this material available for submission to the Court at a duly scheduled evidentiary hearing, and therefore requests that one be set forthwith.

***SUPPORTING EXHIBITS***

**XX.**

Petitioner has concurrently lodged an appendix with this Court containing the documents supporting this petition and the same are incorporated herein by reference as though set forth in full. The Appendix contains a complete record of the Board proceedings at issue herein.

***PRAYER***

Wherefore, Petitioner respectfully requests that this Court:

1. Issue a writ of habeas corpus or order to show cause to the Warden of the Correctional Training Facility in Soledad, the Director of the Department of Corrections, the Governor and the Board of Parole Hearings to inquire into the legality of the Petitioner's incarceration;

2. Order the immediate release of the Petitioner, or alternatively, order the Board to hold a new parole hearing within forty five (45) days at which Mr. Rush shall be found suitable and to set a date for release or alternatively, conduct a hearing and if no new information is presented that establishes that Petitioner poses a present threat of future violence, to find petitioner suitable for parole and set a release date;

3. Conduct an evidentiary hearing if necessary to resolve any disputed factual issues, and after the hearing, issue an order directing the Board to act as set forth in paragraph 2, above;

4. Discharge Petitioner free from both actual and constructive custody, or alternatively, apply any excess time in custody beyond the proper term for his offense against his maximum period of parole; and

5. Grant such other and further relief as justice may require.

Dated: August 1, 2007

Respectfully Submitted,

LAW OFFICE OF PICONE & DEFILIPPIS

By: ____________________
STEVE M. DEFILIPPIS
Attorneys for Petitioner,
ROBERT DALTON RUSH

**VERIFICATION**

I am the attorney for Petitioner in the above-entitled matter, and my practice is located in Santa Clara County. Petitioner, Robert Dalton Rush is currently in custody in Monterey County. Additionally, I am personally familiar with the facts and circumstances underlying the present Petition, and for these reasons, am providing this Verification in accordance with the *California Code of Civil Procedure* § 446. I have read the foregoing Petition for Writ of Habeas Corpus and know the contents thereof. The same is true of my own personal knowledge, except as to those matters stated upon my information and belief, and as to those matters I believe them to be true.

I declare under of perjury that the foregoing is true and correct, executed this 2nd day of August, 2007, in the City of San Jose, County of Santa Clara, State of California.

STEVE M. DEFILIPPIS