# IN THE UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

In re

ROBERT DALTON RUSH,

Petitioner,

vs.

BEN CURRY, Acting Warden

Respondent

On Habeas Corpus,

_____/

BOARD OF PRISON TERMS,
ARNOLD SCHWARZENEGGER,
Governor,

Real Parties In Interest

_____/

CASE NO. **C07 03990 CRB**

[San Bernardino Co. Sup. Ct. #
SCR 44594; Cal. Ct. of App. Case]
#E042268; Cal. Supreme Ct. Case
#S150438]

Filed

AUG -2 2007

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

## MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS

STEVE M. DEFILIPPIS, Esq.
State Bar No. 117292
PICONE & DEFILIPPIS, APLC
625 N. First Street
San Jose, California 95112
(408) 292-0441

Attorneys for Petitioner,
ROBERT DALTON RUSH

TABLE OF CONTENTS

TABLE OF CONTENTS…………………………………………………………………………..i

TABLE OF AUTHORITIES…………………………………………………………………….iv

MEMORANDUM OF POINTS AND AUTHORITIES……………………………………….1

STATEMENT OF FACTS……………………………………………………………………….1

    A. THE CIRCUMSTANCES OF THE OFFENSE………………………………………1

    B. INSTITUTIONAL RECOGNITION FOR ACCOMPLISHMENTS…………………...2

    C. SOCIAL HISTORY………………………………………………………………………...2

        (1) Personal Background……………………………………………………………….2

    D. ADVANCES DURING INCARCERATION…………………………………………….3

        (1) Education………………………………………………………………………….3

        (2) Work/Vocation…………………………………………………………………….4

        (3) Self-Help Programs……………………………………………………………….4

        (4) Disciplinary Record……………………………………………………………….5

    E. PAROLE CONSIDERATION HEARING HISTORY………………………………….5

        (a) 1996 Initial Through 2003 Parole Consideration Hearings [4 Hearings]………5

        (b) Fourth Subsequent Parole Consideration Hearing, October 11, 2005…………5

    E. STATE COURT LITIGATION ………………………………………………………...7

        (1) The Superior Court Habeas Proceedings………………………………………...7

        (2) The Court of Appeals Decision…………………………………………………...10

        (3) The California Supreme Court Decision………………………………………….10

SUMMARY OF GROUNDS FOR RELIEF…………………………………………………10

LEGAL ARGUMENT………………………………………………………………………….13

    I.     HABEAS CORPUS IS THE PROPER REMEDY BY WHICH TO TEST THE

         PROPRIETY OF A PAROLE DENIAL BY THE BOARD……………………….13

    II.    PETITIONER HAS A FEDERALLY PROTECTED LIBERTY INTEREST IN

         PAROLE………………………………………………………………………….15

    III.   THE STATE COURT'S DETERMINATION WAS BOTH  UNREASONABLE

         AND WRONG…………………………………………………………………...17

A.  THE STATE'S FACT FINDING PROCEDURE CANNOT SURVIVE
    THE INTRINSIC REVIEW.....................................................18

B.  THE STATE'S FINDINGS CANNOT BE PRESUMED TO BE
    CORRECT.................................................................19

C.  BY REPEATEDLY RELYING ON THE COMMITMENT OFFENSE IN
    THE FACE OF CLEAR EVIDENCE OF REHABILITATION, THE
    BOARD IS VIOLATING PETITIONER'S RIGHT TO DUE PROCESS OF
    LAW......................................................................20

        1.  Scott II.........................................................24

        2.  Willis v. Kane....................................................26

        3.  Martin v. Marshall................................................28

        4.  Sanchez v. Kane...................................................29

        5.  Rosenkrantz v. Marshall...........................................31

        6.  In re Lee.........................................................34

        7.  In re Elkins......................................................36

        8.  Summary of Recent Cases...........................................38

D.  THE FACT THAT PETITIONER WAS A JUVENILE AT THE TIME OF
    THE COMMITMENT OFFENSE FURTHER DIMINISHES ITS
    PREDICTIVE VALUE IN DETERMINING HIS CURRENT THREAT TO
    SOCIETY..................................................................38

E.  THE BOARD OF PRISON TERMS DEPRIVED MR. RUSH OF HIS
    FEDERALLY PROTECTED LIBERTY INTEREST AND VIOLATED
    HIS FIFTH AND FOURTEENTH AMENDMENT RIGHT TO DUE
    PROCESS BY MAKING FINDINGS AND DECISIONS UNSUPPORTED
    BY SOME RELEVANT, RELIABLE EVIDENCE......................................40

        1.  The Commitment Offense............................................41

F.  THE EVIDENCE FAILS TO SUPPORT ANY OF THE REMAINING
    SUITABILITY FACTORS......................................................48

G.  RELYING ON THE DISTRICT ATTORNEY AND NEXT OF KIN'S
    OPPOSITION IS WHOLLY UNWARRATNED.........................................49

IV.  THE STATE COURT'S DECISIONS APPLYING THE PRINCIPLES OF

1

2   DANNENBERG WERE CONTRARY TO CLEARLY ESTABLISHED

3   SUPREME COURT LAW IN VIOLATION OF PETITIONER'S PROTECTED

    LIBERTY INTEREST IN PAROLE……………………………………………..50
4
         A.    THE BOARD'S DENIAL OF PAROLE BASED ON THE
5
               COMMITMENT OFFENSE RELIED ON REGULATORY LANGUAGE
6
               THAT IS UNCONSTITIONALLY VAGUE…………………………...51
7
    V.   THE BOARD OF PAROLE HEARINGS HAS IMPLEMENTED A PRACTICE
8
         OF DENYING PAROLE TO INDETERMINATE-TERM PRISONERS AND
9
         THIS POLICY HAS EVEN MORE DIRECTLY ADVERSELY AFFECTED
10
         PETITIONER'S CONSTITUTIONAL RIGHT TO DUE PROCESS…………58
11  CONCLUSION………………………………………………………………………..59

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FEDERAL CASES

| | |
|---|---|
| 444 F. Supp.2d 1063 (C.D. Cal. 2006) | passim |
| 461 F.3d 1123 (9th Cir. 2006) | passim |
| 479 F. 3d 658, 665 (2007) | 11, 23 |
| Baumann v. Arizona DOC, 754 F.2d 841, 844 (9th Cir. 1985) | 52 |
| Biggs v. Terhune 334 F.3d 910 (2003) | passim |
| Biggs, supra, 334 F.3c at 317 | 19, 24, 32, 42 |
| Board of Pardons v. Allen, 482 U.S. 369, 376-78 (1987) | 18, 51, 52 |
| Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist., 149 F.3d 971, 982 (9th Cir. 1998) | 18 |
| Eddings [v. Oklahoma (1982) 455 U.S. 104], at 115, 102 S.Ct. 869 | 41 |
| Godfrey v. Georgia (1980) 442 U.S. 420 | 58, 59 |
| Godfrey v. State of Georgia (1980) 446 U.S. 420, 428 | 57, 58 |
| Greenholtz v. Nebraska Penal Inmates 442 U.S. 1, 12 (1979) | 13 |
| Greenholtz v. Nebraska Penal Inmates, 442 U.S. 1, 12 (1979) | 13, 18, 51, 52 |
| Gurley v Rhoden, 421 U.S. 200, 208 (1975) | 16 |
| Hill, supra, 472 U.S. 445 | 22, 23 |
| Irons v. Carey [Irons II], 476 F.3d 658, at 665 (9th Cir. 2007) | 25 |
| Johnson v. Finn (E.D. Cal. 2006) 2006 WL 195159 | 34, 35 |
| LaJoie v. Thompson, 217 F.3d 663, 669 n.7 (9th Cir. 2000) | 16 |
| Little v. Hadden (1980) 504 F. Supp. 558, 562 | 48 |
| Lockyer v. Andrade, 538 U.S. 63, 75 (2003) | 16 |
| Martin v. Marshall 431 F.Supp.2d 1038 (N.D. Cal. 2006) | passim |
| Maynard v. Cartwright (1988) 486 U.S. 356, 361-364 | 57, 58 |
| McQuillion v. Duncan, 306 F.3d 896, 900 (2003) | 18, 19, 51 |
| Mullaney v. Wilbur, 421 U.S. 684, 691 (1975) | 16 |
| Peltier v. Wright, 15 F.3d 860, 862 | 16 |
| Roper v. Simmons, 543 US 551, 561-562 (2005) | 16, 35, 40, 41 |
| Sanchez v. Kane 444 F.Supp.2d 1049(C.D. Cal. 2006 | 12 |
| Sanchez, supra, 444 F.Supp.2d 1049 | 25, 26, 31 |
| Schwartz Miller v. Gardner (9th Cir. 1984) 752 F.2d 1341, 1346 | 54 |
| Shell v. Mississippi (1990) 498 U.S. 1, 3 | 58 |
| Stanford[v. Kentucky (1989) 492 U.S. 361], at 395, 109 S.Ct. 2969 | 41 |
| Taylor v. Maddox, 366 F.3d 992, 1000-1 (9th Cir. 2004) | 16, 19, 20, 21 |
| Thompson[v. Oklahoma (1988) 487 U.S. 815], at 835, 108 S.Ct. 2687 | 41 |
| United States v. Doremus (9th Cir. 1989) 888 F.2d 630, 634 | 54 |
| Williams v. Rhoades, 354 F.3d 1101, 1106 (9th Cir. 2004) | 16 |
| Williams v. Taylor, 529 U.S. 362 (2000) | 15 |
| Willis v. Kane, __ F.Supp.2d __, 2007 WL 1232060 (N.D. Cal. 2007) | passim |
| Wisconsin v. Mitchell, 113 S.Ct. 2194, 2199 (1993) | 16 |
| Wolff v. McDonnell, 418 US 539, 558 (1974) | 15 |
| Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991) | 16 |

STATE CASES

| | |
|---|---|
| 133 Cal.App.4th 573 (2005) | passim |
| 15 CCR 2402(c)(1) | 46 |

18." Id. 543 U.S. at 574                                                                                    41
505. In 2005                                                                                                 38
582-585. In 2004                                                                                            27
Brentwood Assn. for No Drilling, Inc. v. City of Los Angeles, 134 Cal.App. 3d 491 (1982)    21
Ernest Smith, supra, 114 Cal.App.4th 343 (2003)                                                      passim
In re Barker 151 Cal.App.4th 346                                                                          12
In re Burns, 136 Cal.App.4th 13118 (2006)                                                              36
In re Dannenberg, 34 Cal.4th 1061, at 1094                                                         44, 53, 56
In re DeLuna (2005) 126 Cal.App.4th 585                                                                 49
In re Elkins 144 Cal.App.4th 475 (2006)                                                                passim
In re Gray 151 Cal.App4th 379                                                                             12
In re Lawrence 150 Cal.App.4th 1511                                                                    12
In re Lee 143 Cal.App.4th 1400 (2006)                                                                passim
In re Lowe (2005) 130 Cal.App.4th 1045                                                                 49
In re Lowe, 130 Cal. App.4th 1405 (2005)                                                              36
In re Mark Smith (2003) 109 Cal.App.4th 489, 504, 506                                             45
In re Mark Smith, 109 Cal.App.4th 489, 504, 506 (2003)                                           45, 46
In re McClendon, 113 Cal.App.4th 315 (2003)                                                          36
In re Ramirez, supra, 94 Cal.App.4th 549                                                              passim
In re Rosenkrantz [Rosenkrantz II] 80 Cal.App.4th 409 (2000)                                     12
In re Rosenkrantz [Rosenkrantz IV] (2002) 95 Cal.App.4th 358                                     12
In re Rosenkrantz [Rosenkrantz IV] 95 Cal.App.4th 358 (2002)                                     12
In re Rosenkrantz 29 Cal.4th 616 (2002)                                                               passim
In re Scott [Scott I], 119 Cal.App.4th 871, 891 (2004)                                             36, 37, 45
In re Seabock (1983) 140 Cal.App.3d 29 at 37-38                                                      43
In re Van Houten, 116 Cal.App.4th 339 (2004)                                                         36
In re Weider, 145 Cal.App.4th 570, 589 (2006)                                                      43, 51, 58
Matori Brother Distributors v. Agricultural Labor Relations Bd, 29 Cal.3d 721 (1981)         21
People v. Rosenkrantz [Rosenkrantz I], 198 Cal.App.3d 1187                                         12
Scott II, supra, 133 Cal.App.3d 573, 594-595                                                         25, 26
Superior Court of Santa Clara County v. Engert (1982) 31 Cal.3d 797, 805                         58

FEDERAL STATUTES

28 U.S. C. §2254                                                                                         4, 5, 6
28 U.S.C. § 2254(a)                                                                                       15
28 U.S.C. § 2254(d)                                                                                       15
28 U.S.C. § 2254(d)(1)                                                                                    13
28 U.S.C. § 2254(d)(2)                                                                                 16, 19, 20
28 U.S.C. 2253                                                                                             17
Penal Code § 3041                                                                                         19
Penal Code §3041                                                                                        18, 23, 44
Penal Code §3041(a)                                                                                       55
Penal Code §3041(b)                                                                                       60
Penal Code §3041.5                                                                                        22
Penal Code §3041.5(b)(2)                                                                                 22
U.S. CONST. Amends. V                                                                                     18

v

STATE STATUTES

California Penal Code §3041                                          13, 14
hearing in 2003                                                      7, 8, 9

FEDERAL RULES

Doremus (9th Cir. 1989                                               54
Irons v. Carey (9th Cir. 2007                                        11

STATE RULES

Code of Civil Procedure §§632                                       22

STATE REGULATIONS

Cal. Code Regs. tit. 15 §2403(c)                                    48
Cal. Pen. Code §§ 3042                                              51
Pen. Code, §3000                                                    43

1  STEVE M. DEFILIPPIS
   State Bar #117292
2  TRACI S. MASON
3  State Bar #237663
   PICONE & DEFILIPPIS, APLC
4  625 N. First Street
5  San Jose, CA 95112
   (408) 292-0441
6
   Attorneys for Petitioner,
7
   ROBERT DALTON RUSH
8

9                    *IN THE UNITED STATES DISTRICT COURT*

10                   *NORTHERN DISTRICT OF CALIFORNIA*

11

12  In re                                      **Case No.**

13

14  ROBERT DALTON RUSH,                        [San Bernardino Co. Sup. Court Case #
                                               SCR44594; Cal. Ct of App.
15           Petitioner,                       Case # E042268; Cal. Supreme Ct.
                                               Case # S150438]
16           vs.

17                                             ***MEMORANDUM OF POINTS &***
    BEN CURRY, Acting Warden,                  ***AUTHORITIES IN SUPPORT OF***
18                                             ***PETITION FOR WRIT OF***
19           Respondent,                       ***HABEAS CORPUS***
                                               *(28 U.S.C § 2254)*
20           On Habeas Corpus.
                                    /
21

22  BOARD OF PAROLE HEARINGS,
    ARNOLD SCHWARZENEGGER,
23  Governor,

24           Real Parties In Interest.

25  __ ___ _____ ___ ___ ___ ___ /

26                         *STATEMENT OF FACTS*

27  *A. THE CIRCUMSTANCES OF THE OFFENSE*

28       The facts of the commitment offense remain unchanged, and therefore, Petitioner

                                         -1-

1   incorporates herein by reference the materials from section 1 of the Statement of Facts contained in

2   the Memorandum of Points and Authorities portion of the Petition filed on October 7, 2005, at

3   pages 1-2, as though set forth in full.  Those facts will not be restated herein and the reader's

4   attention is directed to that filing in the prior proceeding for this information.

5   While even the Board recognizes that the facts surrounding the commitment offense have

6   not changed since it occurred in 1986 and will never change, these same facts have been now used

7   five (5) times to deny parole.  With this mindset, no amount of outstanding programming will ever

8   satisfy the Board, and obviously, absent court intervention, nothing ever will change.

## *B. INSTITUTIONAL RECOGNITION FOR ACCOMPLISHMENTS*

9   Since the 2003 hearing, Mr. Rush's exceptional performance has continued to be

10  recognized.  Numerous chronos in Mr. Rush's file indicate he has continued to positively

11  participate in Alcoholics Anonymous and has been since coming to prison, and that he is a

12  contributing member that understands all aspects of the twelve step program.[1]  Exh. AAA, p. 39.

13  He received multiple chronos for his assistance with the Central Education Department's

14  Graduation and Promotion Ceremony, where he was one of the original organizers and "dedicated

15  considerable time and energy to the project."  Exh. BBB, pp. 339, 344.  Mr. Rush also received a

16  chrono from G. Sansbury, an academic teacher, who described him as "a major component in the

17  delivery of Basic Education to male felons."  Exh. BBB, p. 344.  In addition, this teacher stated

    Mr. Rush is often the "saving grace" for classroom participation and effective lesson plans. *Id.*  Mr.

18  Rush was commended for helping make questionnaires for the CTF Education Department's

19  Distance Learning Center and also volunteers for the CTF Video Reports Program and is "greatly

20  appreciated."  Exh. BBB, p. 335, 337.  He devotes a significant amount of his free time to various

21  programs throughout the facility and has clearly been acknowledged for his hard work and

22  dedication

23  *C. SOCIAL HISTORY*

24  **(1)   Personal Background**

25  Mr. Rush's social history remains unchanged,[2] and therefore, Petitioner incorporates herein

26  by reference the material from section 2(a) and (b) of the Statement of Facts contained in the

27

28  [1]   Although Mr. Rush has been involved in AA since 1993, he has never had a drinking problem. Exh. AAA, p. 54-
    55.  He uses the program for his basic life skills. Exh. AAA, p. 55.
    [2]   Petitioner is now forty two (42) years old.

-2-

1 Memorandum of Points and Authorities portion of the Petition filed on October 7, 2005, at page 3-

2 4, as though set forth in full. Those facts will not be restated herein and the reader's attention is

3 directed to that filing in the prior proceeding for this information.

4

5 ### D. ADVANCES DURING INCARCERATION

6 Mr. Rush's pre-2003 advances remain unchanged, and therefore, Petitioner incorporates

7 herein by reference the material from section 3(a) through (d) of the Statement of Facts portion of

8 the Memorandum of Points and Authorities portion of the Petition filed on October 7, 2005, at

9 pages 4-7, as though set forth in full. Those facts will not be restated herein and the reader's

attention is directed to that filing in the prior proceeding for this information.

10 **(1) Education**

11 Since the 2003 hearing, Mr. Rush has continued to improve his already significant

12 educational background. The 2005 Board even commended him for doing "very well

13 educationally." Exh. AAA, p. 89. Even this is an extreme understatement, as he has received AA,

14 BA and masters degrees, all with high honors, since coming to prison. Additionally, Mr. Rush

15 continually stays up do date with the Computer Assisted Drafting (CAD) software. Exh. AAA, pp.

16 52-53. He made an arrangement with a teacher in the Educational Department so he could

17 intermittently work with the CAD system a couple times a month. Exh. AAA, pp. 52-53. Mr. Rush

has worked hard to keep his knowledge of CAD up to date because that program is used in the

18 architectural and engineering fields. Exh. AAA, p. 32. Upon release, Mr. Rush intends to pursue a

19 career as a cartographer, and as such, his proficiency with the CAD system will greatly increase his

20 employment opportunities.

21 Additionally, Mr. Rush spends a significant amount of his time helping other inmates

22 obtain an education. For example, he is involved with the CTF Video Reports Program. Exh.

23 BBB, p. 337. This program broadcasts educational videos to the general population. Exh. AAA,

24 p. 59. Specifically, Mr. Rush reviews the videos and formulates questionnaires so the inmates that

25 do not have access to the Education Department can watch the videos, fill out the questionnaire,

26 and still receive credit. *Id.* Further, Mr. Rush volunteered multiple times for the Central Education

27 Department's Graduation and Promotion Ceremony. Exh. BBB, pp. 339, 344. He was even one of

the original organizers of the commencement exercises. Exh. BBB, p. 339. Because of Mr.

28 Rush's valuable work, he became a teacher's assistant for the drafting program and assisted

-3-

students for several years after he completed his own certificates. Exh. AAA, p. 52. In the past, Mr. Rush also tutored students to help them obtain their GED's. Exh. AAA, p. 51. Thus, throughout Mr. Rush's twenty one (21) years of incarceration, he has consistently and successfully improved his education and assisted other inmates to improve theirs as well.

**(2) Work/Vocation**

After the 2003 hearing, Mr. Rush continued to work as a clerk in the Education Bridging Program. This program helps inmates that are eligible for work time credits get extra time off their sentence by participating in self-help and life skills study. Exh. AAA, p. 58. Basically, he helps inmates prepare for release. Exh. AAA, p. 58.[3] Mr. Rush always maintains exceptional work reports, obtaining above average ratings in all categories. Exh. AAA, p. 37-38. However, two (2) weeks prior to the 2005 hearing, Mr. Rush changed jobs and is now a clerk in the library. Exh. AAA, p. 43.

**(3) Self-Help Programs**

Since the 2003 hearing, Mr. Rush has continued to devour all available self-help courses in the institutional setting. He continues to actively attend and positively participate in Alcoholics Anonymous and Narcotics Anonymous which utilizes the twelve step model. Exh. BBB, p. 335, 336. Mr. Rush participated in Dr. Thomas Gordon's Family Effectiveness Training/Harmony in the Home self-help program. Exh. AAA, p. 40. This program consists of six two hour sessions including the following topics: A Credo for Your Relationships; Participative Rule-Setting; Solving Problems You Own; The Pitfalls of Punishments and Rewards; Helping Others Find Solutions to Their Own Problems; Resolving Conflicts Peacefully; Dealing with Values, Collusions, and Courage for Learning the Skills-Rewards for Using Them. Exh. BBB, p. 332. Mr. Rush also completed "How to Become a Father and Not Get Angry." Exh. BBB, p. 334. Additionally, he completed a course in the cause, prevention, treatment, and management of hepatitis. Exh. AAA, p. 40-41. At his previous hearing in 2003, the Board recommended Mr. Rush continue with self-help programs. Exh. AAA, p. 39. Consequently, the Board, in 2005, acknowledged that Mr. Rush had accomplished this goal and did not give a similar recommendation. Exh. AAA, p. 39.

---

[3] It is more than ironic that Mr. Rush prepares inmates by teaching them how to be successful when released, yet the Board claims he himself is an unreasonable risk of danger. Obviously the state's utilization of Mr. Rush's skills belies the Board's findings.

-4-

### (4) Disciplinary Record

Since the 2003 hearing, Mr. Rush has continued to maintain his perfect disciplinary record, having not so much as a non-disciplinary CDC 128 A counseling chrono since his minor CDC 128 A in 1988 for showing up early to work.[4] Nonetheless, Mr. Rush is surrounded by potential for violence, but he makes a conscious effort to avoid putting himself in bad situations or when such situations occur he tries to diffuse them. Exh. AAA, p. 56-57. As a result, his unblemished disciplinary history now continuously spans the entirety of his incarceration, a period of twenty one (21) years.

### E. PAROLE CONSIDERATION HEARING HISTORY

#### (a) 1996 Initial Through 2003 Parole Consideration Hearings [4 Hearings]

The details of these hearings are set out in section 4(a) through (d) of the Statement of Facts contained in the Memorandum of Points and Authorities portion of the Petition filed on October 7, 2005, at pages 8-22, and the same is incorporated herein by reference as though set forth in full. Those facts will not be restated herein and the reader's attention is directed to that filing in the prior proceeding for this information.

#### (b) Fourth Subsequent Parole Consideration Hearing, October 11, 2005

Initially, Mr. Rush's third subsequent (fifth actual) parole consideration hearing was scheduled for August 12, 2005.[5] Exh. AAA, p. 37. Although all relevant parties were present, the hearing was rescheduled because one of the board members had scheduled a flight out of town too early to complete the hearings scheduled for that week. Thus, the hearing was held two months later on October 11, 2005. See generally Exh. AAA. At that point, it was seven (7) months late, measured from the March 2003 hearing, and fourteen (14) months late, measured from the August 2002 hearing.

Once again, the Board concluded Mr. Rush was an unreasonable risk of danger to society, and as such, unsuitable for parole. In relying solely on the commitment offense for their conclusion, the Board characterized the crime as "particularly cruel and callous." Exh. AAA, p.

---

[4] On November 10, 1988, Mr. Rush received a CDC 128 A because he showed up to work early and was technically out of bounds. Even Presiding Commissioner Sawyer indicated he did not understand the write-up, other than he was "technically" out of bounds. Exh. AA A, p. 90.

[5] The second subsequent (3rd actual) hearing was originally heard on August 19, 2002. However, because of a claim that two (2) separate and independent tapes malfunctioned and could not be transcribed the hearing was reheard on March 5, 2003. Thus, the most recent hearing was actually the fifth time Mr. Rush's parole eligibility was brought before the Board.

-5-

88. Presiding Commissioner Sawyer then stated the crime was "certainly dispassionate and didn't have to happen." Exh. AAA, p. 88. He went on to briefly describe the offense and conclude there was a "callous disregard for human suffering." Exh. AAA, p. 88. Immediately thereafter, the Board went on to acknowledge Mr. Rush's success during incarceration.

First, the Board acknowledged he had absolutely no record prior to the commitment offense, juvenile or adult. Exh. AAA, p. 88. The presiding commissioner admitted Mr. Rush has "done very well since he has been in custody," and is at the "lowest classification level." *Id.* He went on to acknowledge the importance of the Bridging Program and the "exceptional" reports Mr. Rush has received while clerking there. Exh. AAA, p. 88-89. The commissioner also noted some of Mr. Rush's marketable skills, mechanical drafting and architectural drawing, and stated he has "done very well educationally." Exh. AAA, p. 89. He went on to note Mr. Rush's AA from Hartnell, BA from San Jose State and his Masters in Humanities from Dominguez Hills, all of which were completed during his incarceration. *Id.* The commissioner then acknowledged the numerous self-help programs he has been involved in, including, Alcoholics Anonymous, anger management, fatherhood training, a health program, the Hepatitis C health program, and the CTF Video Reports Program. *Id.* The Board then congratulated Mr. Rush because he has "clearly behaved since he has been in custody." *Id.* He has had only one 128 A in 1988, because he was early to work and "technically" out of bounds, and absolutely no 115's in his twenty one (21) year disciplinary history. *Id.*

The Board then addressed Mr. Rush's psychological reports. Exh. AAA, p. 90. His latest doctor was Dr. Talbott who did an update on August 28, 2005. *Id.* He adopted most of Dr. Terrini's 1999 psychiatric report. *Id.* As with the previous doctors, he concluded Mr. Rush's "violence potential is less than that of the average level II inmate" and his "potential for violence within the free community is no more than that of the average citizen." Exh. BBB, p. 156. Upon release, Mr. Rush plans to live with his father in San Bernardino County. Exh. AAA, p. 90. His father has written a very supportive letter indicating he is able to assist him with any financial requirements he has upon release, including a home, food, clothing, medical and dental care, a car, and any other financial assistance he needs during the transition into the workforce. Exh. BBB, p. 235. In addition, Mr. Rush has been offered a position at the Mellinger Construction Company in Lake Arrowhead. Exh. BBB, p. 284. He plans to work there and then pursue a career as a cartographer, where his knowledge the CAD system will be extremely beneficial. Exh. AAA, p.

-6-

1  90. The Board acknowledged he has marketable skills and an acceptable employment plan upon
2  release. *Id.*

3      The presiding commissioner then stated Mr. Rush has done "a great job since [he has] been
4  in custody for the last 19 years" and has "certainly prove[n] [him]self." Exh. AAA, p. 91.
5  However, the commissioner then referred to the commitment offense in stating he had victimized
6  a lot of people, he had remedies other than using a gun, and stated "[y]ou were convicted of
   second-degree murder, sir." *Id.* After another brief synopsis of the crime he was complimented
7  again for his accomplishments during incarceration. *Id.* The Board even concluded Mr. Rush was
8  a "good role model" while in custody. *Id.* Immediately thereafter, the commissioner inexplicably
9  stated, "I don't know what you would be like on the outside" and denied his parole for another two
10 (2) years. *Id.*

11     Thus, the Board acknowledged Mr. Rush's numerous accomplishments and his exceptional
12 behavior during his nineteen (19) years of incarceration simply to ignore his progress, and once
13 again, rely solely upon the unchanged facts of the commitment offense to deny parole for another
14 two (2) years.

15 **E. STATE COURT LITIGATION**

16     **(1) The Superior Court Habeas Proceedings**

17     On November 8, 2006, Mr. Rush's Petition for Writ of Habeas Corpus was filed in the
   Superior Court of California for the County of San Bernardino. Exh. QQQ, p. 474. His petition
18 was subsequently denied on November 20, 2006. *Id.* In rendering its decision, the court directly
19 insulted Petitioner's education and his counsel's ability to attend to the applicable law, misstated
20 Petitioner's arguments, and then offered no explanation for its decision other than a brief recitation
21 of the circumstances of the offense.

22     After wholly misstating one of Petitioner's arguments the court stated,

23     "[t]he Petitioner desires that the Court intervene and assume the duties and
24     responsibilities of the parole officials and the Executive Branch of the State
25     government.  Apparently Petitioner did not attend to his civic classes nor has
26     Petitioner's counsel attended to the applicable law." Exh. QQQ, p. 474.

27     This condescending statement by the court lacks justification for several reasons. First, the
28 court wholly ignores the fact that it is the judiciary's responsibility to intervene when a citizen's

constitutional rights have been violated by another branch of the government, as Mr. Rush's due process rights have been violated by the Board in the present case. Despite the court's contention, this is precisely what would have been taught in someone's "civic classes." Petitioner does not request that the court assume the duties and responsibilities of the Executive Branch. Instead, he requests that the court ensure the Board, an arm of the Executive Branch, upholds the due process rights required by the United States Constitution. Without such a check on the Executive Branch, the Board can continually deny parole, despite denying inmates their federally protected liberty interest in parole. Second, directly insulting the education of man who has been incarcerated for twenty one (21) years, nearly half of his life, neither explains the court's denial nor serves any purpose other than to attack the dignity of a man who has worked diligently throughout his twenty one (21) years of incarceration to rehabilitate himself. In fact, in doing so Mr. Rush has, by the Board's own admission, "done very well educationally," by achieving an AA from Hartnell, a BA from San Jose State and his Masters in Humanities from Dominguez Hills. Exh. AAA, p. 89. Finally, in stating that Petitioner's counsel did not attend to the applicable law, the court failed to cite or even mention any law that should have been addressed in the petition. As will be shown herein, the court cited only one case and offered no explanation, other than a brief recitation of the facts, as to why the petition was denied or how the Board's characterization of the offense supported a conclusion that Mr. Rush was a current and unreasonable threat to society.

The court also misstated several of Petitioner's arguments. For example, in an attempt to summarize Petitioner's argument that the parole hearing was improper the court stated, "[h]e has been incarcerated too long than would be appropriate for a second degree murder." Exh. QQQ, p. 474. Assuming the court was attempting to say the Petitioner's argument is that he has been incarcerated longer than is appropriate for a second degree murder, the court wholly misstates Petitioner's contention. Instead, Petitioner contends that given the circumstances of *his* offense, not just any second degree murder, and *his* exemplary behavior during his twenty one (21) years of incarceration, he is not an unreasonable threat to society, and as such, should be deemed suitable for parole. The issue concerns his dangerousness, twenty one (21) years after the offense, not the length of his punishment for second degree murder, because he has already been sentenced and that sentence includes the possibility of parole, so long as he is not a current and unreasonable threat to society. Thus, the sole issue is whether the Board properly concluded he was a *current* and unreasonable threat to society. That conclusion is what Petitioner contends is improper.

-8-

1    The only case the court cited in its denial was *In re Rosenkrantz* 29 Cal.4[th] 616 (2002).

2 The Board used this case as support for the conclusion that its only inquiry was whether "some

3 evidence" in the record before the Board supported the parole denial, based upon factors specified

4 by statute and regulation. Exh. QQQ, p. 475. The court also alleged that Petitioner requested that

5 the court "reweigh" the evidence. Although Petitioner argues that the preponderance of evidence

6 standard is the appropriate standard of review, reweighing the evidence before the Board is not

7 necessary to establish there was a due process violation, because no evidence supports the Board's

8 conclusion that Mr. Rush is a current and unreasonable threat to society. Petitioner merely

requests that the court examine the Board's denial for a due process violation.

9    The court then tersely summarized the remainder of Petitioner's arguments. As far as an

10 explanation for the court's denial, it hastily acknowledged Petitioner's argument that repeated

11 denials, based solely on the commitment offense, after clear evidence of rehabilitation is a due

12 process violation. In doing so, the court merely stated, "[i]t is clearly the law that the gravity of

13 the commitment offense alone may justify a denial of parole. By 'gravity of the offense' is meant

14 particularly egregious." Exh. QQQ, p. 475. Of course, the court did not cite any law as support

15 for this "clearly" established law nor did it address how the predictive value of the gravity of the

16 offense is impacted after twenty one (21) years of exemplary rehabilitation. See *Biggs v. Terhune*

17 334 F.3d 910 (2003), *Irons v. Carey* (9th Cir. 2007) [hereinafter "*Irons II*"] 479 F. 3d 658, 665

18 (2007), *In re Scott* [hereinafter "*Scott II*"][6] 133 Cal.App.4th 573 (2005), *Rosenkrantz v. Marshall*

[hereafter "*Rosenkrantz VI*"][7] 444 F. Supp.2d 1063 (C.D. Cal. 2006), *Sanchez v. Kane* 444

19 F.Supp.2d 1049(C.D. Cal. 2006), *Martin v. Marshall* 431 F.Supp.2d 1038 (N.D. Cal. 2006), *In re*

20 *Lee* 143 Cal.App.4[th] 1400 (2006), and *In re Elkins* 144 Cal.App.4[th] 475 (2006), *In re Lawrence*

21 150 Cal.App.4[th] 1511 [59 Cal.Rptr.3d 537, at 561-567] (2007); *In re Gray* 151 Cal.App4th 379

22 [59 Cal.Rptr.3d 724, 740-741] (2007); *In re Barker* 151 Cal.App.4[th] 346 [59 Cal.Rptr.3d 746, at

23

---

24 [6] There are two "(2004) *Scott*" decisions. The first was the reversal of the Board's denial of parole, *In re Scott [Scott I]* 119 Cal.App.4th 871 . The second was the reversal of the Governor's action taking Scott's parole date granted at

25 the hearing after the decision in *Scott I*. *In re Scott [Scott II]* 133 Cal. App.4[th] 573 (2005). They will be differentiated herein by the roman numeral designations I & II. It should be noted that *Scott II* was subsequent to *Dannenberg*, and

26 the Supreme Court not only denied review, but they refused the Governor's request to depublish that opinion.

[7] The *Rosenkrantz* petitioner has been involved in six (6) decisions. *People v. Rosenkrantz* [*Rosenkrantz I*]*,* 198

27 Cal.App.3d 1187, *In re Rosenkrantz* [*Rosenkrantz II*] 80 Cal.App.4th 409 (2000), *Davis v. Superior Court (Rosenkrantz)* [*Rosenkrantz III*], (Feb. 22, 2001, B146421) [non pub. opn.], *In re Rosenkrantz* [*Rosenkrantz IV*] 95

28 Cal.App.4th 358 (2002) , *In re Rosenkrantz* [*Rosenkrantz V*] 29 Cal.4th 616 (2002) , and the recent federal district court decision in *Rosenkrantz v. Marshall* [*Rosenkrantz VI*]) 444 F.Supp.2d 1063 (C.Dist. Cal. 2006).

-9-

760] (2007). The only other explanation given by the court was a brief recitation of the circumstances of the offense. Exh. QQQ, pp. 475-476. The court seemed to reweigh the evidence by making additional findings, such as Mr. Rush showing a "lack of remorse," which was never cited by the Board as a purported justification for denying parole. In concluding that sufficient evidence existed to justify a finding of unsuitability, the court did not acknowledge Mr. Rush's exemplary programming, educational achievements, twenty (20) year record of discipline free behavior, or his unprecedented rehabilitation. In fact, although the Court stated it was required to inquire whether "some evidence" supported the Board's denial based upon "the factors specified by statute and regulation," the only factor mentioned by the Court was the commitment offense. The court did not reference, in any way, the fact that no other unsuitability factors applied to Mr. Rush, nor did it acknowledge the many suitability factors that do apply to his case. As a result, the court simply denied Mr. Rush's petition.

**(2) The Court of Appeals Decision**

Subsequently, Mr. Rush filed his Petition for Writ of Habeas Corpus in the Court of Appeals of the State of California Fourth District. Exh. RRR. This petition was summarily denied on February 14, 2007. The court provided no factual findings or substantive analysis of why relief was denied.

**(3) The California Supreme Court Decision**

Mr. Rush then filed a timely petition for review in the California Supreme Court, exhausting all of the claims that are now before this Court. On May 9, 2007, that Court summarily denied review. Exh. SSS. That Court made no factual findings, and provided no substantive analysis of why relief was denied.

### SUMMARY OF GROUNDS FOR RELIEF

As will be seen, Petitioner's claim for federal habeas corpus relief is premised upon both prongs of the standards under the Antiterrorism and Effective Death Penalty Act (hereinafter, referred to as "AEDPA"), 28 U.S.C. § 2254(d)(1) and (2). The Court's jurisdiction is premised on the Board's violation of Mr. Rush's due process rights, since the phrasing of *California Penal Code* §3041 creates a liberty interest in parole. As noted by the Supreme Court in *Greenholtz v. Nebraska Penal Inmates*, 442 U.S. 1, 12 (1979), under a federal due process analysis, the use of the mandatory "shall-unless" language in a parole statute creates a presumption that parole will be granted, absent the inmate falling into the statutory exception. See also *McQuillion I, supra*, 306

-10-

1    F.3d at 904-5; *Rosenkrantz v. Marshall* [hereafter "*Rosenkrantz VI*"], 444 F.Supp.2d 1063

2    (C.D.Cal. 2006); *Sass v. California Bd. of Prison Terms* [hereafter "*Sass II*"], 461 F.3d 1123 (9th

3    Cir. 2006); *In re Ramirez, supra*, 94 Cal.App.4th 549, *Rosenkrantz V, supra*, 29 Cal.4th 616, 654

4    ["Accordingly, parole applicants in this state have an expectation that they will be granted parole

5    unless..."].   This gives rise to a due process interest in parole, and absent a crime that is

6    particularly egregious, as compared with other similar offenses, the crime by itself cannot be a bar

7    to a finding of suitability.   At a bare minimum, the Board's crime based findings must be

8    supported by some evidence in the record which reasonably establishes that the inmate is currently

     dangerous. *Scott II, supra*, 133 Cal. App. 4th at 594-595.

9          Yet, here, the Board has repeatedly and arbitrarily relied on the facts of the crime, despite

10   knowledge that the acts of Mr. Rush were not particularly egregious.  Given Petitioner's two (2)

11   decades of positive programming, and his excellent profile, the offense simply can no longer be

12   relied on to support a finding that he falls into the public safety exception to suitability.  Moreover,

13   the last reasoned opinion was the Superior Court decision that improperly relied on a "finding"

14   based on the commitment offense, without any nexus to Mr. Rush's current dangerousness.  Thus,

15   with respect to the substantive issue of the propriety of denying parole, Petitioner will show his

16   entitlement to relief under both the "contrary to" and the "unreasonable determination" prongs of

17   the AEDPA.  Under the "contrary to" analysis, Petitioner will show that the state courts failed to

18   apply the correct controlling United States Supreme Court authority in denying Petitioner's habeas

19   claim despite the lack of factual support in the record.  Under the "unreasonable determination"

20   clause, a two part analysis will be employed.  Initially, the state court fact finding process will fail

21   to satisfy the required intrinsic review analysis.  The *Dannenberg* formulation requires that the

22   state courts defer to claimed "findings" of the Board that have never been subjected to any

23   meaningful appellate level review, and have imposed a standard that effectively negates the

24   burden of the Board to make findings that overcome the presumption required by principles of

25   federal due process under *Greenholtz* and *McQuillion I*.  Even if the state court's fact finding

26   procedure could be said to survive the intrinsic review, the determination below was so patently

27   unreasonable and lacking in support in the record that no rational court could have concluded that

     Mr. Rush *currently* presents a threat of danger or that his crime was so egregious that a parole date

28   could not be set. *Scott II, supra*, 133 Cal.App.4th at 594-595.

-11-

1  Not only has Mr. Rush personally shown his suitability for parole, but *California Penal*

2  *Code* §3041 also requires that a parole date normally be set for parole eligible prisoners serving

3  term-to-life sentences. In the present case, throughout his twenty one (21) years of incarceration,

4  Mr. Rush has undertaken steps to improve his life, pay his debt to society, and prepare himself for

5  eventual release. Mr. Rush has been forthcoming and remorseful about his crime. However,

6  despite the overwhelming evidence showing Mr. Rush's rehabilitation, the Board panels have

7  continuously and arbitrarily denied him a parole date and the findings by the California courts that

   these denials can be upheld even in the absence of supporting facts are both unreasonable and

8  wrong. In sum, the evidence was unrefuted that Mr. Rush poses no significant risk of danger if

9  paroled. Indeed, at the October 11, 2005 hearing, at issue herein, all of the evidence showed that

10  Mr. Rush was suitable in all respects, but he was again denied a date for parole, and no contrary

11  showing was made.

12  In addition, the Board and subsequently, the state courts, violated Petitioner's due process

13  rights by allowing the Board to rely on unconstitutionally vague terms in order to deny parole. As

14  presented in *Rosenkrantz V*, "the nature of the prisoner's offense, alone, *can* constitute a sufficient

15  basis for denying parole." *Rosenkrantz V, supra*, 29 Cal.4[th] at 682 (emphasis added). However,

16  the California Supreme Court's subsequent *Dannenberg* decision has been relied on by the Board

17  as changing the standard set forth in *Rosenkrantz V*, allowing the Board to deny parole based on

   the commitment offense if the inmate's crime was "more than minimally necessary to convict him

18  of the offense for which he is confined," a standard devoid of definition in statute or regulation.

19  *Dannenberg, supra*, 34 Cal.4[th] at 1095. As noted by the dissent in *Dannenberg*, this standard is

20  *completely* unreviewable. *Id*. at 1102 (emphasis added). Thus, the application is arbitrary in

21  violation of due process of law, as it depends on the subjective and personal opinions of the Board

22  members. *Wolff v. McDonnell*, 418 US 539, 558 (1974) ["the touchstone of due process is

23  protection of the individual against arbitrary action of the government."]. As such, the Board has

24  fully exploited and abused this carte blanche language to repeatedly deny parole based on the

25  nature of the commitment offense, by effectively deeming **all** crimes exceptionally "heinous,

26  atrocious and cruel." As will be seen, this has been done to improperly and arbitrarily deny Mr.

   Rush parole.

27

28

-12-

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## *LEGAL ARGUMENT*

## *I. HABEAS CORPUS IS THE PROPER REMEDY BY WHICH TO TEST THE PROPRIETY OF A PAROLE DENIAL BY THE BOARD.*

This Court can entertain a petition for writ of habeas corpus "on behalf of a person in custody pursuant to the judgment of a state court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Here, Petitioner's Due Process rights have been violated by the State Board of Parole Hearing's repeated refusal to grant parole despite Petitioner's federally protected liberty interest in parole.

This Court may grant Petitioner relief if it finds that the state court's adjudication on the merits "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas Court may grant the writ if the state court fails to apply to apply the correct controlling Supreme Court authority or it arrives at a conclusion opposite to that reached by [the Supreme] Court on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362 (2000). Under the "reasonable application clause," relief is proper if the state court's application of clearly established law was both incorrect and unreasonable. *Id.* at 411. The Supreme Court has determined that the "objectively unreasonable" standard is more deferential than review for clear error. *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003).

The Ninth Circuit recently presented a two-part analysis when evaluating the state court's fact-finding under the "unreasonable determination" clause of § 2254(d)(2). First, an intrinsic review by the federal courts must be done to examine the state court's fact finding process. *Taylor v. Maddox*, 366 F.3d 992, 1000-1 (9th Cir. 2004). If the state court's fact-finding process fails this test, the state court decision is not accorded any weight, and the federal court is free to fully re-evaluate the factual issues. It is only where state court's fact finding survives the intrinsic review, that the state court's findings are presumed to be correct. *Id.* at 1000. Even if the presumption of correctness applies, in applying 28 U.S.C. § 2254(d)(2), a federal court may still grant the writ if it concludes that the state court's adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings." 28 U.S.C. § 2254(d)(2). Thus, a petitioner can rebut the presumption of state court correctness by a showing

-13-

based on clear and convincing evidence. *Id.* at 2254(e)(1).

Ordinarily, "a State's highest court is the final judicial arbiter of the meaning of state statutes." *Gurley v Rhoden*, 421 U.S. 200, 208 (1975). However, an exception to this is when it appears that the State's interpretation is an obvious "subterfuge" to evade the consideration of a federal issue. *Peltier v. Wright*, 15 F.3d 860, 862 (citing *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975). The Supreme Court has further held that "[o]nce ambiguities as to the meaning of the statute are resolved, [the federal courts] may form [their] own judgment as to its operative effect." *Wisconsin v. Mitchell*, 113 S.Ct. 2194, 2199 (1993).

In applying § 2254 (d)(1) & (2) criteria, a federal court looks to the decision of the highest state court to have addressed the merits of a petitioner's claim in a reasoned decision. *LaJoie v. Thompson*, 217 F.3d 663, 669 n.7 (9th Cir. 2000). It also looks to any lower court decision examined and adopted by the highest state court to address the merits. *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991); *Williams v. Rhoades*, 354 F.3d 1101, 1106 (9th Cir. 2004). Here, the Superior Court simply cited re-stated the crime to find that Mr. Rush is unsuitable for parole. Exh. QQQ. The court did not address any of Petitioner's due process claims, including in particular, the lack of evidence for the Board's findings, the impropriety of what is now five (5) crime based denials, and the failure to address the U.S. Supreme Court's rule that juvenile offenders cannot be treated the same as their adult counterparts. *Roper v. Simmons*, 543 US 551, 561-562 (2005). The Court also misstated several of Petitioner's arguments. For example, in an attempt to summarize Petitioner's argument that the parole hearing was improper the Court stated, "[h]e has been incarcerated too long than would be appropriate for a second degree murder." Exh. QQQ, p. 474. Assuming the Court was attempting to say the Petitioner's argument is that he has been incarcerated longer than is appropriate for a second degree murder, the Court wholly misstates Petitioner's contention. Instead, Petitioner contends that given the circumstances of *his* offense, not just any second degree murder, and *his* exemplary behavior during his twenty one (21) years of incarceration, he is not an unreasonable threat to society, and as such, should be deemed suitable for parole. The issue concerns his dangerousness, twenty one (21) years after the offense, not the length of his punishment for second degree murder, because he has already been sentenced and that sentence includes the possibility of parole, so long as he is not a current and unreasonable threat to society. Thus, the sole issue is whether the Board properly concluded he was a *current* and unreasonable threat to society. That conclusion is what Petitioner contends is improper.

-14-

1  The only case the Court cited in its denial was *In re Rosenkrantz* (2002) 29 Cal.4th 616.
2  The Board used this case as support for the conclusion that its only inquiry was whether "some
3  evidence" in the record before the Board supported the parole denial, based upon factors specified
4  by statute and regulation. Exh. QQQ, p. 475. The Court also alleged that Petitioner requested
5  that the court "reweigh" the evidence. Although Petitioner argues that the preponderance of
6  evidence standard is the appropriate standard of review, reweighing the evidence before the Board
7  is not necessary to establish there was a due process violation, because no evidence supports the
   Board's conclusion that Mr. Rush is a current and unreasonable threat to society. Petitioner
8  merely requests that the Court examine the Board's denial for a due process violation.

9  Subsequently, both the California Court of Appeal and the California Supreme Court
10 summarily denied the petitions. See Exh. RRR, Exh. SSS. There were no factual findings by any of
11 the state courts to which the presumption of correctness of §2254 could be attached. As will be seen,
12 all of the state court determinations were unreasonable and wrong. The court simply misapplied clear
13 authority, and upheld the Board's determination on an erroneous and factually unsupported theory.
14 Clearly, there was no proof connecting any finding by the Board to a legitimate concern regarding
15 future dangerousness.

16 This Court has proper jurisdiction pursuant to 28 U.S.C. 2253, as Petitioner is currently
17 housed in Monterey County. Additionally, Petitioner has exhausted all state remedies. On May 1,
   2004, the BPT repealed the provisions for filing administrative appeals concerning Board actions and
18 decisions, *Cal. Code Regs.*, tit. 15, §§ 2050-2056. Mr. Rush's petition to the state superior court was
19 denied on November 20, 2006. Exh. QQQ. Summary denials were subsequently issued by the
20 California Court of Appeal and California Supreme Court on February 14, 2007 and May 9, 2007,
21 respectively. Exh. RRR; Exh. SSS.

22 ## II.   PETITIONER HAS A FEDERALLY PROTECTED LIBERTY INTEREST
   ## IN PAROLE.
23
   The Board violated Petitioner's due process rights by failing to find him suitable for parole,
24 thus depriving him of a liberty interest. The Fifth and Fourteenth Amendments prohibit the
25 government from depriving an inmate of life, liberty or property without due process of law. U.S.
26 CONST. Amends. V, XIV. In order to prove a violation of due process, an inmate must prove two
27 distinct elements: (1) a deprivation of a constitutionally protected liberty or property interest, and (2)
28 a denial of adequate procedural protections. *McQuillion v. Duncan*, 306 F.3d 896, 900 (2003)
   [hereafter "*McQuillion I*"]; *Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*, 149 F.3d 971,

-15-

982 (9th Cir. 1998).

The United States Supreme Court in *Greenholtz v. Inmates of Nebraska Penal & Corr. Complex*, 442 U.S. 1, 7 (1979) concluded that a state's statutory parole scheme, if it uses mandatory language, may create a presumption that parole release will be granted when or unless certain designated findings are made, and such language gives rise to a constitutionally protected liberty interest in parole being granted. See also *Board of Pardons v. Allen*, 482 U.S. 369, 376-78 (1987) [Montana's parole statute which uses language that the board "shall" release prisoner, absent falling within the listed exceptions, creates a due process liberty interest in release]. Similarly, the Supreme Court found that the language of Nebraska's parole statute gives rise to a liberty interest in release on parole. *Greenholtz, supra*, 442 U.S. at 11-12 [concluding the use of "shall" in Nebraska's parole statute creates a due process liberty interest in release on parole]. Thus, where certain language is used that gives rise to a liberty interest in parole, a prisoner gains a legitimate expectation in parole and this liberty interest cannot be denied without adequate procedural due process protections. *Allen, supra*, 482 U.S. at 373-81; *Greenholtz, supra*, 442 U.S. at 11-16.

In California, it has been determined that *Penal Code* §3041, the statute that controls parole for life prisoners, uses mandatory language and is virtually identical to the language and schemes used in *Allen* and *Greenholtz*, thereby creating a protected liberty interest in parole release. *McQuillion I, supra*, 306 F.3d at 902. Section 3041, subsection (b) is the substantive standard which states:

> "The panel or board ***shall*** set a release date ***unless*** it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of the current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting." Emphasis added.

Accordingly, under the clearly established framework provided by the Supreme Court in *Allen* and *Greenholtz, Penal Code* § 3041 creates a liberty interest in parole. *McQuillion I, supra*, 306 F.3d at 902; see also *Biggs v. Terhune*, 334 F.3d 910, 915-16 (9th Cir. 2003). In fact, the Ninth Circuit has recently and unequivocally confirmed that California inmates continue to have a constitutionally protected liberty interest in parole even after *Dannenberg*. *Sass v. California Bd. of Prison Terms*, 461 F.3d 1123, 1125 (9th Cir. 2006). The court, in *Sass*, relied upon the Supreme Court's reasoning in *Greenholtz* and *Allen* to conclude that a statute's mandatory language creates a presumption that parole will be granted, and as such, a cognizable liberty interest exists. *Id.* at 1127.

In doing so, it confirmed the decisions in *McQuillion I* and *Biggs* when it concluded "California's parole scheme gives rise to a cognizable liberty interest in release on parole" and a "liberty interest is created, not upon the grant of a parole date, but upon the incarceration of the inmate." *Id.* at 1127 [citing *McQuillion, supra*, 306 F.3d at 902; *Biggs, supra*, 334 F.3c at 317].

Thus, because California prisoners have a constitutionally protected liberty interest in parole release, neither the Board nor the Governor can decline to grant a parole date or rescind an already granted date, without proper and sufficient procedural protections required by due process. In denying Mr. Rush parole for the fifth time, the Board denied him a cognizable liberty interest. As a result, he has clearly satisfied the first element in his claim, showing that he has been deprived a constitutionally protected liberty interest.

### III.    THE    STATE    COURT'S    DETERMINATION    WAS    BOTH    UNREASONABLE AND WRONG.

Under 28 *U.S.C.* § 2254(d)(2), a federal court may grant habeas relief if a state court's findings resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the proceedings in that court. 28 *U.S.C.* § 2254(d)(2). As held by the Ninth Circuit, the state court's decision must be both wrong and unreasonable. *Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004) [citing *Lockyer v. Andrade*, 528 U.S. 63, 75 (2003)]. Here, the actual fact finding is in the Board of Parole Hearings proceedings. No additional fact finding occurred at the superior court level, or in the court of appeal. Of course, no factual findings are possible in the California Supreme Court on a petition for review. To the extent that the California superior court engaged in "fact finding" of any type, it did so without the benefit of any process by which the parties could even participate.

In *Maddox*, the Ninth Circuit presented a two-part analysis under § 2254(d)(2). The Court stated that first, federal courts must undertake an "intrinsic review" of the state court's fact finding procedure. *Taylor v. Maddox, supra*, 266 F.3d at 1000.[8] If the state court's fact-finding process fails this test, the state court decision is not accorded any weight, and the federal court is free to fully re-evaluate the factual issues. The second part of the analysis is utilized only where state court's fact finding survives the intrinsic review, and then the state court's findings are presumed to be correct.

---

[8] The Court noted that the challenges to state court proceedings may be brought in a number of ways, for instance, "where the state court should have made a finding of fact but neglected to do so[;]…where the state court does make factual findings, but does so under a misapprehension as to the correct legal standard[;]…and, where the fact finding process itself is defective." *Taylor v. Maddox, supra*, 366 F.3d at 1000-01.

-17-

1  *Id.* at 1000. However, even if the presumption of correctness applies, in applying 28 *U.S.C.* §

2  2254(d)(2), a federal court may still grant the writ if it concludes that the state court's adjudication of

3  the claim "resulted in a decision that was based on an unreasonable determination of the facts in light

4  of the evidence presented in the state court proceedings." 28 *U.S.C.* § 2254(d)(2).

5
### *A.     THE STATE'S FACT FINDING PROCEDURE CANNOT SURVIVE THE INTRINSIC REVIEW.*

6  In the present case, the fact finding procedure fails the *Maddox* intrinsic review on multiple

7  levels. The courts did not conduct any fact finding during the prior state habeas proceedings. As

8  presently applied, the Board is required to only point to "some evidence" in order to support a

9  finding of unsuitability, and if the reviewing court finds facts that are "more than the minimum

10  necessary to sustain a conviction," even if the Board relied on other, separate and factually

11  unsupported findings, the decision is upheld.

12  Here, the superior court in its decision found that the Board had some evidence to support

13  its decision, based solely upon the twenty one (21) year old crime without any relation to Mr.

14  Rush's current dangerousness. Exh. QQQ, p. 476. The California Court of Appeal and the

15  California Supreme Court upheld this determination without any legal analysis. The Board is

16  charged with making a determination of whether the inmate *currently* presents an unreasonable

17  risk of danger to society if paroled, and the Superior Court seemed to simply lose sight of this

central issue.

18  The next way the State's fact finding process fails the *Maddox* intrinsic review is that the

19  fact finding process itself is defective. As described above, the Board no longer has any type of

20  check and balance system in place in order to ensure an accurate fact finding procedure, and the

21  State simply defers to their findings. The standard which the Board employs, the "some evidence"

22  standard, allows them to effectively rely on any type of information including the mere fact of the

23  conviction, in order to deny the due process right to parole. In addition, the Board quite

24  frequently, as it did in Mr. Rush's case, requires evaluations by their own formally trained CDC

25  psychologists, but when those doctors make findings favorable to the inmate, concluding that he

26  or she is no longer a threat to society and needs no therapy or self-help, they deliberately ignore

those determinations.[9]  The Board, instead, makes wholly unsupported "findings" that the inmate

27

28
---
[9] The Board frequently ignores the psychologist's reports and instead make their own "findings" which are contrary to the trained psychologist's findings. However, in the absence of any rational basis for disbelieving the reports, an

-18-

"currently poses a threat" and needs more therapy or self help, despite directly contrary statements of the psychological evaluator. This, of course, is then utilized by the State courts to support the Board's finding. Here, neither the Board's fact finding process, nor that utilized by the California courts can survive scrutiny under this level of analysis, since there is no evidence to sustain the Board's findings, and an inadequate level of review was utilized in the California courts. Obviously, this process did not give Mr. Rush's case the proper level of review required. Under any standard, the only reasonable conclusion is that there is no evidence supporting the finding that Mr. Rush *currently* poses a danger if released. As such, the Board's fact finding process is both unreasonable and wrong.

## *B.    THE STATE'S FINDINGS CANNOT BE PRESUMED TO BE CORRECT.*

As shown by the intrinsic review, there simply was no fact finding conducted by the state courts, and even if the actions of those courts could be properly characterized as engaging in fact finding, as applied, it is both unreasonable and wrong. Thus, where a state court's fact finding does not survive an intrinsic review process, the state court's findings cannot be dressed in a presumption of correctness. *Taylor v. Maddox, supra*, 366 F.3d at 1000. As such, the "findings" made by both the Board and the California courts[10] clearly do not overcome the presumption that a parole date will be set, absent a finding which must be supported by *evidence* that the inmate poses a current risk of danger to society if released. *Cal. Code Regs.*, tit. 15, § 2402(a); *Penal Code* §3041.5(b)(2);[11] *Rosenkrantz V, supra,* 29 Cal.4th at 655-656; *Scott II, supra*, 133 Cal.App.4th at 594-595.

In short, the Board's rules make it clear that the focus of the inquiry in any suitability hearing is whether the inmate presents an unreasonable risk of committing further violent acts. Thus, this Court's review must focus on whether the evidence at the hearing established that Mr. Rush presents a current, unreasonable risk of violently re-offending. Because the intrinsic fact finding process is both unreasonable and wrong, the State's determination cannot be presumed to

---

agency must accept as true the intended meaning of the report. *Matori Brother Distributors v. Agricultural Labor Relations Bd*, 29 Cal.3d 721 (1981); *Brentwood Assn. for No Drilling, Inc. v. City of Los Angeles*, 134 Cal.App. 3d 491 (1982).

[10]  As previously discussed, it is Petitioner's contention that the state courts did not conduct any fact finding whatsoever, and therefore, there is nothing to which the "presumption of correctness" can attach. Thus, this issue need only be reached to the extent that the decision of the superior court is viewed as making factual findings.

[11] *Penal Code* §3041.5 (b) (2) requires the Board to give a written statement of reasons for denial, which obviously includes stating what evidence supports its decision. The purpose of a written statement is so that the basis for the decision can be evaluated and reviewed. See e.g., *Code of Civil Procedure* §§632 and 634. Thus, a full statement of reasons, with supporting evidence, is required.

-19-

be accurate. Furthermore, as shown *infra*, there is no evidence supporting the State court's determination that the Board's finding was supported by "some evidence."

### *C. BY REPEATEDLY RELYING ON THE COMMITMENT OFFENSE IN THE FACE OF CLEAR EVIDENCE OF REHABILITATION, THE BOARD IS VIOLATING PETITIONER'S RIGHT TO DUE PROCESS OF LAW.*

Regarding the commitment offense, assuming arguendo, some evidence existed to support a finding that primary reliance on the commitment offense was sufficient for parole denial, due process still prohibits repeated reliance on those unchanging circumstances as grounds for finding an inmate unsuitable for parole. Accordingly, the Board in this case failed to address the appropriate legal concepts governing parole decisions under the United States Constitution. The assertion that a finding is supported by "some evidence" is not necessarily sufficient, and does not end the inquiry. As the *Ramirez* court concluded,

"The United States Supreme Court had made it clear the 'some evidence' standard discussed in *Hill, supra*, 472 U.S. 445, is *only one aspect of judicial review for compliance* with minimum standards of due process. [Citation] … The court explained that the 'some evidence' standard applied only to questions of evidentiary sufficiency. It is *an additional requirement of due process, not a substitute for other established due process requirements*. [Citation.]"

"Accordingly, were the Board to determine whether inmates are suitable for parole by flipping a coin, it could not insulate its proceedings from judicial correction simply by identifying 'some evidence' in the record to support each result." *Id.* pp. 563-564 [emphasis added].

In circumstances similar to the case at bar, the *Ramirez* court dealt with this precise issue, and held that more is required than to simply create the appearance of satisfying due process. There, that Court rejected the Board's contention that due process is satisfied by the mere fact that the hearing panel goes through the right litany of phrases and buzz words, divides the hearing into the relevant statutory and regulatory categories, and discusses the evidence relating to the individual inmate. The *Ramirez* court described the Board's argument as follows:

"The Board … claims that 'due consideration' of [Ramirez's parole] application is demonstrated by the [Board's] references in its decision to the nature of Ramirez's

-20-

1

2

3

4

5

crimes, his previous criminal record, his failure to correct his criminality ..., his unstable social history, his need for therapy, and his 'institutional programming.' The Board argues that 'some evidence' supported its findings, because the record before it was replete with evidence relating to the factors relied on in the decision." *Id.* at 568.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

However, in the face of the claim, the court concluded that the Board's decision "...was arbitrary in the sense that the Board failed to apply the controlling legal principles to the facts before it" and that the lack of support for the findings "supports Ramirez's claim that his parole hearing was a sham." *Id.* at 571. *Penal Code* §3041 requires that the factors relied upon, and supported by some evidence, must be factors that indicate a legitimate concern that the prisoner currently poses a threat to public safety if released. *See Ernest Smith, supra*, 114 Cal.App.4th 343 (2003); see also *Scott I, supra,* 119 Cal. App. 4th at 890-892 and *Scott II, supra,* 133 Cal.App.4th at 594-595. The *Ramirez* Court acknowledged that there will always be "some evidence" to support a finding that a prisoner committed the underlying offense. Those facts alone, however, do not justify the denial of parole. See *Willis v. Kane*, __ F.Supp.2d __, 2007 WL 1232060 (N.D. Cal. 2007). Thus, while finding that there was factual support for the findings as to the crime and priors, the *Ramirez* Court still found the Board's decision arbitrary since there had been multiple hearings, nine (9) years had passed beyond the minimum term, and it was 17 years after entering prison. *Id.* at 571. Likewise, the Ninth Circuit's decision in *Irons II*, makes it clear that "indefinite detention based solely on an inmate's commitment offense, regardless of the extent of his rehabilitation, will at some point violate due process, given the liberty interest in parole that flows from the relevant California statutes." *Irons v. Carey*, 479 F.3d 658, 665 (9th Cir. 2007). This decision was based on the Ninth Circuit's decision in *Biggs* that held, despite the fact that there may remain evidence to support a finding of egregiousness of the crime:

24

25

26

27

"A continued reliance in the future on an unchanging factor, the circumstances of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." *Biggs, supra,* at 916-917.

28

Since the petition was filed in the prior habeas proceedings, several opinions have been published, clarifying that the caution in *Biggs v. Terhune, supra*, 334 F.3d at 917, is in fact the

-21-

1   standard. However, the rule is asserted in terms of how the passage of time depletes the probative
2   value of the crime based evidence to establish current dangerousness when weighed against years
3   of positive in prison behavior. The probative value of the offense in predicting current and future
4   dangerousness diminishes over time until the predictive value is nonexistent. See discussion *infra*.
5   Here, assuming *arguendo* that the commitment offense was "heinous, atrocious or cruel" as
6   intended by section 2402(c)(1), too much time has passed, and too many other relevant factors
7   have intervened during Mr. Rush's incarceration, effectively nullifying the predictive value of the
    offense to show current dangerousness.[12]

8       While the commitment offense may have indicated Mr. Rush's present dangerousness for a
9   period of time – and in the past fulfilled the "some evidence" requirement – that is no longer true.
10  A series of recent cases have concluded that the Board cannot continuously rely on the crime as
11  the basis for denying parole. Mr. Rush's denial by the Board falls squarely within these cases.
12  What those cases show is that there is no set amount of time that must pass before the crime loses
13  its probative value, no litmus test as to the number of hearings that must pass before relief is
14  appropriate, and no set pattern of behavior that must be met by the inmate to show rehabilitation.
15  Instead, it is the dramatic nature of the change undergone by the inmate that distances them from
16  the crime, not just temporally, but in the sense of no longer being the person who committed the
17  offense, and no longer being subject to the issues that led to its commission. However, the one
    point that simply cannot be disputed here is that Mr. Rush has not just distanced himself from the
18  crime temporally, but he has so effectively dealt with every underlying issue that led him to
19  commit the offense that the fact of its commission no longer has any meaning in assessing his
20  current dangerousness, a rating that every professional assigns the lowest possible level to.

21      The Board's denial entirely fails to comply with the rules originally stated in *Biggs* as they
22  relate to current dangerousness and the "some evidence" standard of *Hill*. (*Sass, supra,* 461 F.3d
23  at 1129; see also *Willis, supra*, 2007 WL 1232060, pp. 3-4.) "*Superintendent v. Hill's* standard
24  might be quite low, but it does not require that the decision *not* be arbitrary, and reliance on only
25  the facts of the crime might eventually make for an arbitrary decision." *Willis, supra*, 2007 WL
26  1232060, at p. 4. Accordingly, an examination of *Biggs*, *Sass*, and *Irons II* clarifies the connection

27

28

[12]   As set forth previously, Mr. Rush maintains his argument that the commitment offense does not satisfy the finding that the crime was "heinous, atrocious or cruel," and concedes this point only for this argument.

between continued reliance on the commitment offense to deny parole and an inmate's current dangerousness.

In *Irons II*, the Ninth Circuit recently clarified its rules. Specifically, the court stated, "[a]ll we held in those cases [*Biggs* and *Sass*] and all we hold today, therefore, is that, given the particular circumstances of the offenses in these cases, due process was not violated when these prisoners were deemed unsuitable for parole prior to the expiration of their minimum term." *Irons v. Carey [Irons II],* 476 F.3d 658, at 665 (9th Cir. 2007). Thus, although the Ninth Circuit concluded the petitioner in *Irons II* was not entitled to relief, they did so based on the severity of that particular offense and considered the expiration of his minimum term, factors that clearly would not apply here. *Id.* Immediately thereafter, the court specifically noted that

"in *Sass* and in the case before us there was substantial evidence in the record demonstrating rehabilitation. In both cases, the California Board of Prison Terms appeared to give little or no weight to this evidence in reaching its conclusion that Sass and Irons presently constituted a danger to society and thus were unsuitable for parole. We hope that the Board will come to recognize that in some cases, indefinite detention based solely on an inmate's commitment offense, regardless of the extent of his rehabilitation, will at some point violate due process, given the liberty interest in parole that flows from the relevant California statutes." *Id.,* citing *Biggs, supra*, 334 F.3d at 917.

Therefore, the Ninth Circuit made it clear that continued reliance on the commitment offense, despite clear evidence of rehabilitation can still violate an inmate's due process rights. Several recent published opinions have further clarified this rule. See *Willis, supra*, 2007 WL 1232060, *Martin, supra*, 431 F.Supp.2d 1038, *Sanchez, supra*, 444 F.Supp.2d 1049, *Rosenkrantz VI, supra*, 444 F.Supp.2d 1063, *Scott II, supra*, 133 Cal.App.3d 573, 594-595, *Lee, supra*, Cal.App.4th 1400, 1409, and *Elkins, supra*, 144 Cal.App.4th 475. Due process prohibits the denial in the face of overwhelming evidence of rehabilitation, where due to the passage of time, there is no longer a nexus established between the crime and the inmate's current level of dangerousness. Accordingly, the Board in this case failed to address the appropriate legal concepts governing parole decisions under the United States Constitution.

-23-

Furthermore, this Court has recently examined all three Ninth Circuit opinions, *Biggs*, *Sass*, and *Irons II*. *Willis, supra*, 2007 WL 1232060. In *Willis*, the court concluded that the message from those cases was that the Board could look at immutable events, such as the commitment offense, to predict whether an inmate is currently suitable for parole even after the initial denial. *Willis, supra*, 2007 WL 1232060, at p. 4. However, "the weight to be attributed to those immutable events should decrease over time as a predictor of future dangerousness as the years pass and the prisoner demonstrates favorable behavior." *Id.* Additionally, this court found:

> "*Sass* did not dispute the principle that, other things being equal, a murder committed 50 years ago is less probative of a prisoner's current dangerousness than one committed 10 years ago. Not only does the passage of time in prison count for something, exemplary behavior and rehabilitation in prison count for something according to *Biggs* and *Irons*." *Id.*, emphasis in original.

Thus, recent case law has expanded on the rule of *Biggs*, showing that the Board cannot rely upon unchanging facts, such as the commitment offense, as the basis for denying parole, without there being proof of a nexus between those facts and the sole issue in a parole hearing, whether the inmate ***currently*** presents an unreasonable risk of danger if released, within the meaning of *Cal. Code Regs.*, tit.15, §2402(a). *Willis, supra*, 2007 1232060, *Martin, supra,* 431 F.Supp.2d 1038, *Sanchez, supra*, 444 F.Supp.2d 1049 and *Rosenkrantz VI, supra,* 444 F.Supp.2d 1063, *Scott II, supra,* 133 Cal.App.4th at 594-595, *Lee, supra,* 143 Cal.App.4th at 1409, and *Elkins, supra,* 144 Cal.App.4th 475. Mr. Rush has now been before the Board five (5) times with twenty one (21) years in custody, and a far more mitigated crime than each of the recent cases, which was committed when he was a barely twenty one (21) years old. Those cases, and the decisions underlying the rules they state, such as *Scott II, supra*, will each be separately discussed herein. As will be seen, the courts in these cases, on far more egregious facts than what are present here, concluded that immutable characteristics, such as those being relied upon by the Board in this case, cannot be repeatedly utilized without violating federal due process principles. Thus, for the reasons outlined above, and upon these authorities, Petitioner is entitled to relief herein.

### *I. Scott II*

Several cases were noted as underlying the rationale in *Martin* and *Rosenkrantz VI*, including the case of *In re Scott* [*Scott II*], 133 Cal. App. 4th 573 (2005). The court in *Scott II* was mindful of the due process problems of relying on the commitment offense to deny parole. Scott was convicted of second degree murder in 1986 and sentenced to fifteen (15) years to life plus two (2) years for use of a firearm. Suspecting that his wife was with an individual named

-24-

Bradford with whom she confessed to having an affair, Scott confronted them in the street in front of Bradford's residence. *Id.* at 579. As Scott approached them with a .22 caliber handgun, Bradford pushed Scott's wife away to confront Scott. *Id.* Scott told Bradford, "Get away. I'm going to shoot you." *Id.* He then fired two or three rounds, striking Bradford in the head and thigh, killing him. *Id.* at 579-580. During his incarceration, like Mr. Rush, Scott received pages of laudatory chronos for his work and behavior. *Id.* at 582. Again like Mr. Rush, the psychological evaluations agreed that he presented no more than an average threat to the community, and his offense was the product of significant stress. *Id.* at 582-585. In 2004, the Board found Scott suitable for parole, but the Governor reversed, citing the nature of the offense. *Scott II, supra*, 133 Cal.App.4th at 586-588.

The court granted Scott's petition for writ of habeas corpus. The court expressed concern that the Governor's reliance on the commitment offense failed to accurately indicate Scott's present danger. "Reliance on such an immutable factor 'without regard to or consideration of subsequent circumstances' may be unfair." *Scott II, supra*, 133 Cal. App. 4th at 595 citing *In re Ernest Smith*, 114 Cal. App. 4th 343, 372 (2003). Accordingly "[t]he commitment offense can negate suitability only if circumstances of the crime reliably established by evidence in the record rationally indicate that the offender will present an unreasonable public safety risk if released from prison." *Scott II, supra*, 133 Cal.App.4th at 595. The Governor in *Scott II* failed to make any rational connection between the offense and Scott's danger to the community. In other words, the offense offered no predictive value to determine Scott's current threat to the community. Without that nexus, there was no evidence to support the Governor's conclusion.

That missing nexus exists in Mr. Rush's case as well. He has done everything he can since incarceration to rehabilitate himself. Mr. Rush made tremendous gains toward rehabilitation, received favorable psychological reports, and has matured immensely. Like *Scott II*, there is no connection between Mr. Rush's offense, and his present dangerousness, particularly in light of intervening twenty one (21) years. That is, the offense no longer yields any predictive value of current dangerousness. As such, there was no evidence to support the Board's denial.

Furthermore, a disturbing corollary exists between *Scott II* and Mr. Rush. The Board concluded that primary reliance on the gravity of the offense was sufficient for the denial of parole, despite the exemplary efforts of Mr. Rush during his imprisonment. The

-25-

*Scott II* court was faced with a nearly identical argument from then Governor Davis. "The Governor states in his decision that the gravity of Scott's offense is alone a sufficient basis 'on which to conclude that his release from prison *at this time* would pose an unreasonable public-safety risk.'" *Scott II, supra,* 133 Cal.App.4th at 595, n. 8. (Italics in original.) Of course, the problem with such a position is "*[t]hat statement could be repeated annually until Scott dies or is rendered helpless by the infirmities of sickness or age.*" *Id.* (emphasis added). Just as *Scott II* foreshadowed, Mr. Rush has in fact been subjected to annual statements of that same type as the subject denial was the fifth time the Board relied on the crime to avoid its duty to set a parole date.

### 2. *Willis v. Kane*

In *Willis v. Kane,* __ F.Supp.2d __, 2007 WL 1232060 (N.D. Cal. 2007), the petitioner had been convicted of second degree murder in 1985 and was sentenced to fifteen years to life. *Id.* at 1. Willis killed his 19-month old daughter in 1983 when he hit her several times in the head and failed to obtain medical treatment when she exhibited signs of distress. *Id.* Initially, he reported that his daughter had been kidnapped, but later confessed to the killing. *Id.* At his 2003 parole suitability hearing, the Board concluded Willis was not suitable for parole relying primarily on his commitment offense and also stating he had not participated in sufficient self-help and therapy and did not have realistic parole plans. *Id.* This Court specifically addressed the most recent Ninth Circuit decisions addressing parole suitability hearings, *Biggs, Sass,* and *Irons II. Id.* pp. 3-4. In doing so, this Court concluded that the Board can look at immutable circumstances, such as the commitment offense, but the value of those circumstances as a predictor of future dangerousness will diminish over time. *Id.* at p. 4. This Court also noted that exemplary institutional behavior and rehabilitation are also relevant to a determination of current dangerousness. *Id.* Accordingly, the court stated, "*Superintendent v. Hill*'s standard might be quite low, but it does require that the decision *not* be arbitrary, and reliance on only the facts of the crime might eventually make for an arbitrary decision." *Id.*

In granting Willis' petition, this Court concluded that none of the factors cited by the Board were supported by any evidence. *Id.* at 6. First, the court concluded that in light of the petitioner's favorable psychological reports and the absence of any mention of a need for further therapy or self-help, the Board's allegation that Willis needed further self-help programming and therapy was not supported by the evidence. *Id.* Second, this Court

-26-

1

concluded Willis' parole plans were realistic, as he planned to enter a transitional home or

2

move to Florida with his parents. He also had several marketable skills and thus the record

3

supported the inference that he would succeed if paroled. *Id.* Finally, this Court concluded

4

that the commitment offense did not provide any evidence that Willis was unsuitable. *Id.* at 9.

5

In analyzing whether the commitment offense still provided evidence of unsuitability after

6

numerous years, this Court stated,

7

8

9

10

11

12

"[t]he facts of that crime will be just as terrible 20 years from today as they are today and as they were 20 years ago. Notwithstanding the terrible nature of the crime, the critical question the BPH was supposed to decide at the parole suitability hearing was whether 'consideration of the public safety requires a more lengthy period of incarceration for this individual.' [Citation]. When the totality of circumstances are considered, Willis' 1983 crime did not provide sufficient evidence to find him unsuitable for parole in 2003. Willis' case is the kind of case *Biggs* and *Irons* cautioned about: the continued reliance on immutable events of the crime to deny parole for present dangerousness despite the candidate's exemplary behavior in prison, favorable current psychological reports, and the absence of any other violence or criminal record." *Id.*

13

14

Thus, this Court concluded the Board's arbitrary reliance on the commitment offense after

15

eighteen (18) years violated due process and the state court's decision was an unreasonable

16

application of *Superintendent v. Hill. Id.* at 10. Here, in contrast to *Willis*, the commitment

17

offense is far less egregious, with an adult victim, as opposed to a small child who is incapable

18

of defending against the assault. Mr. Rush offense arose in the context of an altercation with

19

an adult male, when he was disabled due to a motorcycle injury. Willis, on the other hand,

20

beat his helpless 19 month old daughter to death. But in both cases, due to the passage of

21

time, the offense clearly no longer presents any evidence that Mr. Rush is a current and

22

unreasonable risk to society, as Mr. Rush, like Willis, has established a lengthy pattern of

23

positive programming in the last two (2) decades of his incarceration. Additionally, both Mr.

24

Rush and Willis received positive psychological evaluations, with no indication that there was

25

any need for further self-help programming or therapy. As the court in *Willis* concluded, the

26

Board's reliance on only the facts of the crime can make for an arbitrary decision. *Willis,*

27

*supra*, at 4. Thus, like *Willis*, the predictive value of the commitment offense no longer

provides any evidence that Mr. Rush is a current and unreasonable threat to society, and as

such, he is entitled to relief.

28

-27-

### 3. *Martin v. Marshall*

In *Martin v. Marshall*, 431 F.Supp.2d 1038 (N.D. Cal. 2006), a double murder case, parole applicant Martin was convicted of second degree murder for shooting to death Acosta, a person with whom he shared a prior drug dealing relationship, killing one innocent bystander and injuring another innocent bystander with the gunfire. *Id.* at 1040. Fearing that he would be harmed as Acosta approached him in a restaurant, Martin shot Acosta seven times, and continued firing the gun after he "lost it," resulting in the death and injury to the bystanders. *Id.* He was sentenced to fifteen (15) years-to-life, plus a five (5) year enhancement. *Id.* At his fifth parole hearing, twenty-three (23) years later, the Board granted Martin parole. *Id.* at 1041. Governor Gray Davis reversed the grant of parole, stressing in part the gravity of the offense that he found demonstrated a callous disregard for human life and lack of remorse. *Id.* To support this assertion, Governor Davis cited Martin's flight from the scene without securing medical help, and his involvement with drugs at the time he committed the offense. *Id.* at 1046.

This Court found that the Governor's reliance on the unchanging circumstances of the crime and pre-prison conduct as grounds to reverse the Board's decision violated Martin's right to due process. This Court reasoned that Martin's offense was impulsive in part, he had exceeded his sentence by approximately six years, and he had exemplary behavior and evidence of rehabilitation. *Id.* at 1047. Given the static nature of the offense compared against the evidence of Martin's rehabilitation and behavior that indicated no present threat, the court found the commitment offense provided no evidence to support the Governor's reversal. Implicit in the court's reasoning was a theme expressed in other similar decisions: the commitment offense no longer possessed a predictive value of Martin's current threat to the community if released. Instead, like the other cases discussed herein, the court looked beyond the vacuum of the commitment offense to the number of denials, and the parole applicant's behavior while in prison.

In the instant matter, Mr. Rush has exceeded his minimum term by nearly ten (10) years, four (4) more than Martin. In addition, Mr. Rush far exceeds Martin in terms of his behavior during incarceration, due to his unprecedented institutional behavior, programming and rehabilitation throughout his twenty one (21) years of incarceration. For example, Martin had a minor history of misconduct while in prison, whereas Mr. Rush has remained completely

-28-

1   discipline free. Mr. Rush also has participated in all available self-help and therapy programs, has

2   excellent psychological evaluations, has continuously improved his education, obtaining

3   Associate's Bachelors and Masters degrees, all with high honors, he has excellent parole plans,

4   familial and community support, and other than the commitment offense, which was committed

5   under severe stress, he has absolutely no history of violence, or even minor criminality. Thus, the

6   predictive value of the offense as an indicator of Mr. Rush's present threat to the community if he

7   was paroled is now non-existent and under the standards enunciated in *Martin*, Mr. Rush is

    entitled to the requested relief.

### 4. Sanchez v. Kane

9   In *Sanchez v. Kane*, 444 F.Supp.2d 1049 (C.D. Cal. 2006), parole applicant

10  Sanchez was convicted of one count of second degree murder in 1989 and sentenced to sixteen

11  (16) years-to-life. *Id.* at 1051. On May 5, 1988, Sanchez was involved in an argument with

12  Gonzalez Ruiz, a member of "The Magicians Club" (the TMC gang), after Sanchez honked at

13  Ruiz's girlfriend to get her attention. *Id.* After arguing with Sanchez, Ruiz got a steel bat and

14  swung it at Sanchez, shattering his car window. *Id.* Later that evening, while at a Crazy Rider

15  gang hangout, Sanchez stated he wanted revenge against the TMC gang. *Id.* Upon leaving,

16  Sanchez got into his car with "Lazy" and drove to an apartment where another Crazy Rider

17  lived and obtained a cut off 30/30 Winchester rifle. *Id.* Twenty (20) to thirty (30) minutes

18  after Ruiz assaulted Sanchez, two shots were fired from Sanchez's car, near the scene of the

19  prior assault, with the sawed off rifle. *Id.* at 1052. The victim, who was not a TMC gang

    member, was sitting in the car when he was shot in the head. *Id.*

20  On December 2, 2002, at his fourth parole consideration hearing after only fourteen (14)

21  years of incarceration, the Board concluded that Sanchez "would not pose an unreasonable risk

22  of danger to society or a threat to public safety if released from prison." *Id.* at 1052-1053.

23  However, on May 2, 2003, former Governor Gray Davis reversed the Board's decision. *Id.* at

24  1054. In reversing the Board's decision, the Governor gave several reasons: "(1) the callous

25  nature and circumstances surrounding the commission of the crime; (2) petitioner

26  demonstrates a lack of any remorse; (3) petitioner's continued minimization of his role in the

27  murder; and (4) the Board's Investigations Unit lack of confirmation of petitioner's parole

28  plans in the event he is paroled into California rather than deported to Guatemala." *Id.* at

    1061. Noting that the Governor's finding that Sanchez minimized his role in the murder and

-29-

denied gang involvement was taken from a 1989 Probation Report, rather than his statements at the hearing, the court concluded "some evidence" did not exist to support that finding. *Id.* Similarly, the court concluded the Governor's reliance on Sanchez's "lack of remorse" did not provide "some evidence" to support his finding. *Id.* at 1062. In coming to this conclusion, the court reasoned that the Governor relied on the fact that Sanchez painted his car after the offense to evade apprehension, however, the Board relied on the fact that Sanchez made statements taking responsibility and indicating he was sorry. *Id.* The Governor's conclusion was drawn from immutable factors from fifteen (15) years earlier, whereas, remorse should be mutable over time. *Id.* Thus, "some evidence" did not support his conclusion. *Id.*

Finally, the Governor relied on the "callous nature and circumstances of the crime." *Id.* He stated, "[the crime] was a planned and calculated and cold-blooded murder demonstrating exceptionally callous disregard for human suffering...and it involved particularly egregious acts beyond the minimum necessary to sustain a conviction of second-degree murder." *Id.* The court, however, concluded that the nature of the offense was not "some evidence" of Sanchez's suitability, and as such, the Governor's reversal was a due process violation. *Id.* at 1063. In rendering its decision, the court extensively discussed the reasoning in *Biggs, supra*. *Id.* at 1062-1063. The Board, in determining Sanchez was suitable for parole, concluded that the circumstances surrounding the crime were "unchanging." *Id.* at 1062. Accordingly, the court explained that "the Board or Governor is 'initially justified' in relying on the gravity of an inmate's offense in denying parole," however, continued reliance on unchanging factors, such as the commitment offense and conduct prior to imprisonment, "runs contrary to the rehabilitation goals espoused by the prison system and could result in a due process violation." *Id.* [citing *Biggs, supra*, 334 F.3d at 916-917].

In sum, the court concluded that after four (4) parole hearings, and in the face of his continuous demonstrations of "exemplary behavior and evidence of rehabilitation," "positive institutional behavior," and "significant and proven self-control," the predictive value of his commitment offense was near zero. *Id.* Here, Mr. Rush's conviction was for second degree murder. He, has faced five (5) parole suitability hearings. A parole applicant's suitability cannot be assessed in a vacuum, and requires looking to a parole applicant's subsequent existence in prison. Simply stated, there is *nothing* in the last twenty-one (21) years of Mr. Rush's incarceration that suggest he is currently unsuitable for parole. In fact, all the criteria

-30-

are exclusively in his favor. Taking the commitment offense from over two (2) decades ago, and comparing them to prison events, compels one result: Mr. Rush is not a present threat to the community. The predictive value of the offense is now stale and useless, thus providing no evidence of a current threat.

### 5. *Rosenkrantz v. Marshall*

In *Rosenkrantz VI, supra*, 444 F.Supp.2d 1063, the petitioner was sentenced to fifteen (15) years to life plus a two (2) year gun use enhancement for second degree murder committed when he was eighteen (18) years old in 1985. *Rosenkrantz VI, supra*, 444 F.Supp.2d at 1065-1071. Rosenkrantz, a homosexual, was confronted by his brother and his brother's friend, Redmond, who wished to prove that Rosenkrantz was gay. *Id.* While Rosenkrantz was at the family beach house on Friday with friends, his brother and Redmond, kicked in the door, calling the occupants "faggots," struck Rosenkrantz with a flashlight breaking his nose, and burned his hands with a stun gun. *Id.* Rosenkrantz's father was then told that he was homosexual, causing the father to kick him out of the house. *Id.* Three days after the incident at the beach house, Rosenkrantz went to a shooting range where he rented an Uzi semiautomatic, nine-millimeter carbine gun, and contemplated committing suicide. *Id.* at 1072. He ordered an Uzi from a sporting goods store on Monday that would be ready for pick-up on Wednesday.

On Tuesday, Rosenkrantz went to work, where he informed one coworker that he had purchased a gun and planned to kill his brother. *Id.* He also told another coworker that his brother and Redman had humiliated Rosenkrantz, and that he was obtaining a gun. *Id.* Rosenkrantz picked up the gun on Wednesday, where he also purchased 250 rounds of ammunition. *Id.* On Thursday night, Rosenkrantz went to the condominium complex where Redmond lived, and attempted to locate his car. *Id.* Unable to locate his car, Rosenkrantz slept in his car overnight near the complex, waiting for Redmond to exit the premises. *Id.* When Redmond was exiting the complex the next morning, Rosenkrantz blocked him with his own car. *Id.* After a brief exchange where Redmond refused to recant his statements that he made to Rosenkrantz's father, he shot him at least ten (10) times, including six (6) wounds to the victim's head. *Id.* Rosenkrantz fled for approximately one month before turning himself in. *Id.* at 1073.

1    After several previous denials, under court order, he was granted parole in 2000, only to
2    have it reversed by the Governor. *Id.* at 1069-1070. The superior court granted Rosenkrantz'
3    subsequent writ of habeas corpus, which was affirmed by the court of appeal, but reversed by
4    the California Supreme Court that ultimately found that there was "some evidence" to support
5    the Governor's reversal. *Id.* Rosenkrantz' habeas challenge in the United States District Court
6    was based on his subsequent 2004 parole suitability hearing, where the Board found him
7    unsuitable solely on the gravity of his commitment offense. *Id.* at 1070-1071. Rosenkrantz
     had served just under twenty (20) years in prison, had not committed any violent acts while in
8    custody, earned a B.S. in computer science, completed all therapy and self-help programs that
9    were available, received excellent work reports and opinions from correctional counselors that
10   he presented no more of a risk to the community than the average person. *Id.* at 1065-1066.
11   He had realistic parole plans, familial and community support, and the trial judge, various
12   legislators, the arresting officer and the victim's only living relative all supported his release.
13   *Id.*

14   Relying on *Biggs* and *Scott II*, the *Rosenkrantz VI* court made two points. "First, continued
15   reliance upon the unchanging facts of petitioner's crime makes a sham of California's parole
16   system and amounts to an arbitrary denial of petitioner's liberty interest." *Id.* at 1082.
     Following The *Rosenkrantz* court held that the Board's choice to ignore just under two
17   decades of positive programming in favor of immutable facts was an arbitrary and capricious
18   method of converting a minimum term into a life sentence. Mr. Rush has every bit as strong a
19   background of programming as Rosenkrantz achieved. Both Rosenkrantz and Mr. Rush share
20   many of the same features: They have similar crimes and since the commitment offenses,
21   worked diligently to reform themselves. Both far exceeded their minimum terms, both
22   remained disciplinary free, both received multiple parole denials and by all accounts,
23   presenting no current threat to the community. Likewise, upholding the Board's denial here
24   will result in a *de facto* life sentence.

25   Second, the court concluded the predictive value of the crime was so diminished that it
26   could not serve as "some evidence" to support the Board's finding of parole unsuitability. As
27   the Court noted,

28   > While relying upon petitioner's crime as an indicator of his dangerousness may be
     > reasonable for some period of time, in this case, continued reliance on such
     > unchanging circumstances-after nearly two decades of incarceration and half a

-32-

1
2
3

dozen parole suitability hearings-violates due process because petitioner's commitment offense has become such an unreliable predictor of his present and future dangerousness that it does not satisfy the "some evidence" standard. *After nearly twenty years of rehabilitation, the ability to predict a prisoner's future dangerousness based simply on the circumstances of his or her crime is nil.*

4
5
6
7
8

(*Id.* at 15 citing *Johnson v. Finn* (E.D. Cal. 2006) 2006 WL 195159 ["[T]he seriousness of the crime had predictive value for the dangerousness of petitioner's release for the first, second, perhaps third suitability hearing. But as the years go by, this factor loses its predictive value in light of the growing experience to the contrary (assuming petitioner's record in prison is exemplary)], emphasis added.

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Additionally, the *Rosenkrantz VI* court concluded that the defendant's age at the time of the offense further diminished the reliability of the facts of his crime as a predictor for his current dangerousness. *Id.* at 1085. At the time of the offense, the defendant in *Rosekrantz VI* was barely eighteen (18). *Id.* Accordingly, the court concluded that less culpability should be attached to juveniles, and someone who was only eighteen at the time of the offense deserves the same deference. *Id.*, citing *Roper v. Simmons*, 543 U.S. 551, 561-562 (2005). This is because they are more susceptible to immature and irresponsible behavior, that is not as morally reprehensible, and a greater possibility exists for a younger person to reform his or her character deficiencies. *Id.* (citations omitted). That is precisely what Mr. Rush has done here. Mr. Rush has programmed successfully. He has achieved exactly what the prison system espouses as its goal: rehabilitation. Furthermore, Mr. Rush was barely twenty one (21) at the time of the commitment offense. The Board's failure to acknowledge this important factor does not negate its significance. Instead, the Board's avoidance of the issue, despite its evident impact on Mr. Rush's suitability, demonstrates the arbitrariness of their decision. Therefore, despite the Board's avoidance of the issue, the predictive value of the commitment offense should be even further diminished due to Mr. Rush's age, as it was in *Rosenkrantz VI*. Thus, in the face of Mr. Rush's age and his clear rehabilitation, the commitment offense utterly fails to indicate Mr. Rush's dangerousness over two (2) decades later. Accordingly, the Board's denial is a due process violation.

26
27
28

-33-

1

### 6. *In re Lee*

2

3

4

5

6

7

8

9

10

In *In re Lee* (2006) 143 Cal.App.4th 1400, the petitioner pled guilty to second degree murder and attempted premeditated murder in 1989 and was sentenced to seventeen (17) years to life with the possibility of parole. *Id.* at 1404. The petitioner, Wen Lee, sold his restaurant to Johhny Soong in return for Soong's promise to make periodic payments. *Id.* Soong repeatedly failed to make his payments, which caused Lee hardship because he planned to support his retirement with the sale proceeds. *Id.* As a result, Lee was forced to renegotiate Soong's debt on several occasions in meetings that were very heated. *Id.* On the night of the commitment offense, Lee went to the restaurant armed with a gun and a box of ammunition. He decided to kill Soong and then himself if he refused to pay. *Id.* When Soong did refuse to pay, Lee shot five times. *Id.* Soong was hit twice and survived, but his wife was killed by one of the bullets. *Id.*

11

12

13

14

15

16

17

18

19

20

21

22

In 2005, at Lee's sixth (6th) parole hearing and after nearly sixteen (16) years of incarceration, the Board concluded he would "not pose an unreasonable risk of danger to public safety if he were released," and as such found him suitable for parole. *Id.* However, the Governor reversed the Board's decision in 2005. *Id.* at 1405. He concluded Lee was unsuitable for parole for two (2) reasons. First, he viewed the offense as "'atrocious' and beyond 'the minimum necessary to sustain' his convictions," and second, Lee's acceptance of responsibility for the offense, less than a year earlier, was too recent. *Id.* Subsequently, the court determined that the Governor had erred. *Id.* at 1408. In rendering its decision, the court explained that the test for analyzing the Governor's reversal is "not whether some evidence supports the *reasons* the Governor cites for denying parole, but whether some evidence indicates a parolee's release *unreasonably endangers public safety.*" *Id.*, emphasis in original. Some evidence of a particular factor does not necessarily equate to some evidence that the parolee's release poses an unreasonable risk to public safety. *Id.* at 1408, fn 4.

23

24

25

26

27

28

Accordingly, the court examined the Governor's two reasons in the context of all the suitability factors that must be considered to determine whether the inmate posed an unreasonable risk to public safety. *Id.* at 1409. First, the court noted that, other than the commitment offense, Lee had led a crime-free life, the offense occurred almost twenty (20) years ago, and Lee was eighty-two (82) years old and in a poor health. Second, the court analyzed the Governor's two reasons for reversal. His first cited reason was the nature of Lee's crimes. *Id.* To determine what constituted an "especially heinous, atrocious, or cruel" offense, the court compared the facts of

-34-

Lee's offense to that of recent case law to decipher whether the nature of Lee's crime was "atrocious," as claimed by the Governor. *Id.* at 1409-1411.[13] In making its comparison, the court concluded the circumstances in Lee's case were "no more atrocious than whenever one human being kills another-and were not committed 'in an especially heinous, atrocious or cruel manner.'" *Id.* at 1409 (citing *In re Scott [Scott I]*, 119 Cal.App.4th 871, 891 (2004)). "The measure of atrociousness is not general notions of common decency or social norms, for by that yardstick all murders are atrocious," and therefore, the court concluded the facts of Lee's offense were "more commonplace than egregious." *Id.* (citing *Scott I, supra*, 119 Cal.App.4th 871, 891 (2004)).

In coming to this conclusion the court noted that the commitment offense in *Lee* was a result of "significant stress," which tends to show suitability. *Id.* at 1412. Additionally, although Lee had a fifteen (15) minute drive to ponder the offense and he brought an extra box of ammunition, the court noted that "[p]ondering what one is about to do is the essence of premeditation, and Lee's premeditation was not elaborate or prolonged." *Id.* Accordingly, Lee's conduct "involved no more than was necessary to commit his crimes. *Id.* (citing *Rosenkrantz V, supra*, 29 Cal.4th at 683). Furthermore, the court rejected the Attorney General's contention that the People could have prosecuted Lee for first degree murder under the doctrine of transferred intent, but instead he was sentenced to second degree murder only because of a plea bargain, and therefore the circumstances were more than the bare minimum needed to commit second degree murder. *Id.* at 1413. In rejecting that argument, the court first noted that the Board and Governor must focus on whether the prisoner poses an unreasonable risk to society and a legal construct, such as transferred intent, has no obvious intersection with such a practical inquiry. *Id.* The court next noted that "focusing on how the People could have pled a crime, instead of how Lee committed it, risks potentially odd results." *Id.* As such, the bare minimum test must be applied to how the inmate "actually committed his crimes, not to how the People could have pleaded them." *Id.* Not only did the court conclude the crime was not "especially atrocious, heinous, or callous," it also concluded the crime had "little, if any, predictive value." *Id.* at 1412. "Simply from the passing of time, Lee's crimes almost 20 years ago have lost much of their usefulness in

---

[13] The court compared the offense to the facts in *Rosenkrantz V; Dannenberg*; *In re McClendon*, 113 Cal.App.4th 315 (2003); *In re Burns*, 136 Cal.App.4th 13118 (2006); *In re Van Houten*, 116 Cal.App.4th 339 (2004); *In re DeLuna*, 126 Cal.App.4th 585 (2005); *In re Lowe*, 130 Cal. App.4th 1405 (2005); and *In re Morall*, 130 Cal.App.4th (2002) and concluded the facts from *Lee* were less egregious. The court concluded the facts were more comparable to those in *In re Ernest Smith, supra*, 114 Cal.App.4th 343, and as such, warranted the same relief, release.

foreseeing the likelihood of future offenses." *Id.* (citing *In re Scott* [*Scott II*], 133 Cal. App.4th 573, 595 (2005)).

The Governor's second reason for denying parole, that his acceptance of responsibility was too recent, was similarly rejected by the court. *Id.* at 1414. It noted that Lee had necessarily acknowledged his guilt when he pled guilty. *Id.* Additionally, his years of stating he was not responsible referred to the accidental nature of the death of Soong's wife. *Id.* Irregardless, his acceptance of responsibility for his crimes was complete by his last parole hearing. *Id.* The timing of an acceptance of responsibility, longstanding or recent, does not matter as long as that acceptance is genuine. *Id.* Thus, because the Governor only cited the timing of the acceptance, not the genuineness, the Governor's claim provided no evidence of Lee's current threat to public safety. *Id.*

In the instant case, Mr. Rush's offense similarly has no predictive value concerning his current dangerousness. The court in *Lee* concluded simply the passage of time diminishes the predictive value of the commitment offense. In Mr. Rush's case, the offense was committed twenty one (21) years ago. Additionally, both Lee and Rush had multiple parole denials (6 in *Lee*, 5 in *Rush*.) Thus, continued reliance on immutable factors, despite decades of positive programming and incalculable maturation, provides absolutely no support for parole denial, and as such, the Board's denial is a due process violation.

### 7. *In re Elkins*

In *In re Elkins*, 144 Cal.App.4th 475 (2006), the petitioner was convicted of first degree murder and robbery, with use of a deadly weapon and was sentenced to twenty-five (25) years to life. *Id.* at 504. Elkins and the victim were high school classmates and drug dealing associates. *Id.* at 505. The victim was having difficulty paying Elkins for some drugs he purchased. *Id.* Therefore, at a party in July 1979, Elkins entered a room where the victim was sleeping, intending to rob him. *Id.* When he entered the room he hit the victim with a baseball bat once, but continued to hit him, until he was dead, simply because the victim kept moving. *Id.* at 505-506. After the murder, Elkins took the victim's wallet, money and drugs, dumped his body down a steep grade, continued to steal from the victim's storage unit and his girlfriend's home over several days and then fled the state. *Id.* at 505.

In 2005, at his eleventh (11th) parole hearing, the Board concluded Elkins did "not pose an unreasonable risk of danger to society or public safety if released from prison." *Id.* at 507.

Although the Board stated it was an "extremely vicious crime," they concluded the suitability factors outweighed the commitment offense. *Id.* Nonetheless, the Governor subsequently reversed the Board's decision. *Id.* In rendering his decision, the Governor characterized the offense as "atrocious" and Elkins's actions after the murder as "cold and calculated." *Id.* 509-510. The Governor then claimed the gravity of the offense, alone, was sufficient for him to conclude Elkins was an unreasonable risk to public safety. Although Elkins had been incarcerated for twenty-six (26) years and made "creditable gains," the Governor decided the offense outweighed all the positive factors supporting his release. *Id.*

The Governor's decision relied on two (2) factors. *Id.* at 515-516. First, he stated that Elkins's acceptance of full responsibility, over a decade ago, was too recent. *Id.* at 517. The court, however, concluded no minimum time requirement existed. *Id.* Instead, acceptance of responsibility works in favor of release "'no matter how longstanding or recent it is,' so long as the inmate 'genuinely accepts responsibility.'" *Id.* (quoting *Lee, supra*, 143 Cal.App.4th 1400). Since the Governor did not express any concern about the sincerity of the acceptance, no rational support existed to show Elkins's acceptance did not weigh in favor of parole. *Id.* at 518. Second, the Governor relied on the gravity of the commitment offense to reverse the Board's decision. *Id.* He characterized it as "atrocious" or "especially brutal," noting that the offense "alone" was sufficient support for denial. *Id.* Initially, the court noted that Elkins's ability to rob the victim without hitting him or hitting him just once does not shed any light on whether the murder was "especially brutal." *Id.* Such action may show an especially brutal robbery, but not necessarily an especially brutal *first degree murder*. *Id.* (emphasis in original). Accordingly, the court concluded the Governor could not rely on the fact that Elkins could have avoided the killing to show the murder was especially brutal, because such action could not be considered "more aggravated or violent than the minimum necessary to sustain a conviction for that offense." *Id.* (citing *Scott II, supra*, 133 Cal.App.4th at 598).

Furthermore, the court determined robbery was the motive and there was never a plot to kill the victim, things just "had gotten out of hand." *Id.* at 519. The court, thus, concluded it would be irrational to conclude murder, rather than the robbery, was carried out in a calculated manner. *Id.* at 519. The court also rejected the Governor's rationale that Elkins's actions *after* the murder demonstrated those of a cold-blooded, dispassionate killer and thus he was an unreasonable risk to society. *Id.* at 520. Ultimately, the court concluded "[g]iven the lapse of 26

years and the exemplary rehabilitative gains made by Elkins over that time, continued reliance on these aggravating facts of the crime no longer amount to 'some evidence' supporting denial of parole." *Id.* In delivering its decision, the court discussed extensively *Rosenkrantz VI* and *Martin*, focusing on the fact that continued reliance on unchanging circumstances to deny parole, despite years of positive institutional behavior, has no predictive value, and thus, such reliance is a due process violation. *Id.* at 521-523. Thus, the Board's denial lacked "some evidence" that Elkins currently posed "an unreasonable risk of danger to society." *Id.* at 523 (citations omitted.)

Here, Mr. Rush's case poses an even more compelling need for relief. First, Elkin's crime is far more egregious. Elkins, was convicted of first degree murder for beating a man. Elkins, did so while the victim was sleeping and it was not the result of significant stress. Second, Elkins had some serious disciplinary violations early in his incarceration. Mr. Rush's discipline record is above reproach. *Elkins, supra*, 144 Cal.App.4th at 509. Thus, reliance on immutable factors to continually deny parole, at this point, is a clear due process violation.

### *8. Summary of Recent Cases*

These cases establish that courts are no longer permitting the Board to deny parole based solely on the commitment offense or other immutable factors when they are stale and can no longer indicate a present dangerousness, especially when juxtaposed against the factual reality of the subsequent years of positive programming while incarcerated. In such a case, the crime simply fails to constitute competent evidence that rationally shows current dangerousness. Mr. Rush's commitment offense happened twenty one (21) years ago. Since then, he has rehabilitated himself as much as possible within the confines of prison. At forty two (42) years of age, Mr. Rush has matured immensely since he committed the offense as an immature twenty one (21) year old. As such, it is a clear violation of due process for the Board to continue to deny Mr. Rush's parole on the grounds that his commitment offense evidences that he is a current danger to the community.

### D. THE FACT THAT PETITIONER WAS YOUNG AND UNSOPHISTICATED AT THE TIME OF THE COMMITMENT OFFENSE FURTHER DIMINISHES ITS PREDICTIVE VALUE IN DETERMINING HIS CURRENT THREAT TO SOCIETY.

As previously noted, Mr. Rush was young at the time of the commission of the subject offense, barely twenty one (21) years of age. When received at prison, the authorities noted his youtfulness and unsophistication in ordering less restrictive housing for him. Exhibit BBB, p.99.

-38-

1    Yet, the Board wholly failed to address the importance of this fact in evaluating Mr. Rush's

2    offense, in light of the concerns raised in *Ropers v. Simmons, supra*, 543 U.S. 551 that youthful

3    offenders are more forgivable and are more prone to rehabilitation. The United States Supreme

4    Court has addressed the caution that must be exercised when dealing with harsh sentences for the

5    young, highlighting the significant differences between juveniles and adults, stating,

6        Three general differences between juveniles under 18 and adults demonstrate that
         *juvenile offenders cannot with reliability be classified among the worst offenders*.

7        First, as any parent knows and as the scientific and sociological studies respondent
         and his *amici* cite tend to confirm, '[a] *lack of maturity and an underdeveloped*

8        *sense of responsibility* are found in youth more often than in adults and are more

9        understandable among the young. These qualities *often result in impetuous and ill-
         considered actions and decisions*.' [citations omitted]. It has been noted that

10       'adolescents are overrepresented statistically in virtually every category of reckless

11       behavior.' [citation omitted]. In recognition of the comparative immaturity and
         irresponsibility of juveniles, almost every State prohibits those under 18 years of

12       age from voting, serving on juries, or marrying without parental consent. [citation
         omitted].

13

14       The second area of difference is that juveniles are *more vulnerable or susceptible to
         negative influences and outside pressures, including peer pressure*. *Eddings [v.*

15       *Oklahoma* (1982) 455 U.S. 104], at 115, 102 S.Ct. 869 ('[Y]outh is more than a
         chronological fact. It is a time and condition of life when a person may be most

16       susceptible to influence and to psychological damage'). This is explained in part by

17       the prevailing circumstance that juveniles have less control, or less experience with
         control, over their own environment. [citation omitted.]

18

19       The third broad difference is that the *character of a juvenile is not as well formed*
         as that of an adult. The personality traits of juveniles are more transitory, less

20       fixed. [Citation omitted]. *These differences render suspect any conclusion that a
         juvenile falls among the worst offenders*. The susceptibility of juveniles to

21       immature and irresponsible behavior means '*their irresponsible conduct is not as
         morally reprehensible as that of an adult*.' *Thompson[v. Oklahoma* (1988) 487

22       U.S. 815], at 835, 108 S.Ct. 2687 (plurality opinion). Their own vulnerability and

23       comparative lack of control over their immediate surroundings mean *juveniles
         have a greater claim than adults to be forgiven for failing to escape negative*

24       *influences in their whole environment*. See *Stanford[v. Kentucky* (1989) 492 U.S.
         361], at 395, 109 S.Ct. 2969 (Brennan, J., dissenting). The reality that juveniles

25       still struggle to define their identity means it is *less supportable to conclude that*

26       *even a heinous crime committed by a juvenile is evidence of irretrievably
         depraved character*. From a moral standpoint it would be *misguided to equate the*

27       *failings of a minor with those of an adult, for a greater possibility exists that a
         minor's character deficiencies will be reformed*. Indeed, '[t]he relevance of youth

28       as a mitigating factor derives from the fact that the *signature qualities of youth
         are transient*; as individuals mature, *the impetuousness and recklessness that may*

-39-

*dominate in younger years can subside.*'" *Roper v. Simmons, supra,* 543 U.S. at 553-570 (emphasis added).

The *Roper* Court noted that the "qualities that distinguish juveniles from adults do not disappear when an individual turns 18." *Id.* 543 U.S. at 574. Here, Mr. Rush committed his offense when he was barely twenty one (21) years old, and has now been incarcerated for half of his life.. The Board at the 2005 hearing, however, wholly failed to address this fact in rendering their decision.

Under the analysis mandated by the United States Supreme Court, the repeated use of these immutable facts in the case of an individual such as Mr. Rush, who was young and unsophisticated at the time of the commitment offense is even more inappropriate. The existence of these unchangeable facts are being used as evidence tending to show that his character is such that he is more likely to be violent at this point, twenty one (21) years later, when the Court in *Roper* has made it clear that a youthful offender's character is not yet developed, their conduct not as morally reprehensible, and their prospect for rehabilitation far greater. As the evidence showed, Mr. Rush's had suffered severe injuries from a motorcycle accident. He was temporarily disabled and was frustrated by his inability to have full function of his body. His lack of maturity and frustration impacted the way he dealt with his roommate when they got into an altercation. However, since the commitment offense, Mr. Rush has worked hard to rehabilitate himself. He is clearly a mature, responsible man, who understands limits and is capable of controlling his emotions. Accordingly, the Board wholly ignored the significance of Mr. Rush's age when they denied him parole for two (2) years at his 2005 hearing.

In short, considering Mr. Rush's youthfulness at the time of the commitment offense this is clearly a situation where repeated use of these unchanging facts to support the denial of parole, is a violation of due process. *Biggs, supra, Roper, supra,* and *Scott II.* As such, the Board's decision must be set aside.

### E. THE BOARD OF PRISON TERMS DEPRIVED MR. RUSH OF HIS FEDERALLY PROTECTED LIBERTY INTEREST AND VIOLATED HIS FIFTH AND FOURTEENTH AMENDMENT RIGHT TO DUE PROCESS BY MAKING FINDINGS AND DECISIONS UNSUPPORTED BY SOME RELEVANT, RELIABLE EVIDENCE.

An indeterminately sentenced prisoner can be denied parole only when sufficient, reliable evidence establishes that one or more of the Board's regulatory provisions, *Cal. Code Regs.*, tit. 15, §2402(c) shows unsuitability by rationally showing that he is currently an unreasonable danger

-40-

to society. The use of non-regulatory factors, or their unsupported use, to deny parole would violate the inmate's rights under the Due Process Clause of the Federal Constitution, as is occurring in this case.   n addition, when reviewing the Board's parole denial, "[t]he test is not whether some evidence supports the *reasons* the [Board] cites for denying parole, but whether some evidence indicates a parolee's release *unreasonably endangers public safety*." *In re Lee, supra*, 143 Cal.App.4th 1400, 1408 (emphasis in original).  Some evidence of the existence of a particular unsuitability factor does not necessarily equate to some evidence that the inmate's release currently poses an unreasonable danger to public safety. *Id.* at 1409.  Thus, "some evidence" which merely supports the *reasons* cited by the Board in denying parole, cannot be the basis for affirming the denial. *Id.* at 1408 (emphasis in original.)  Instead, the reasons given by the Board must be viewed "within the context of the other [suitability] factors" to determine whether the inmate is a current and unreasonable risk to society. *Id.* at 1409 (citing *Scott II, supra*, 133 Cal.App.4th at pp. 594-595).  The Board "must remain focused not on the circumstances that may be aggravating in the abstract, but, rather, on facts indicating that release currently poses 'an unreasonable risk of danger to society.'" *Elkins, supra*, 144 Cal.App.4th 475, 521.  Accordingly, "the overarching consideration in the suitability determination is whether the inmate is currently a threat to public safety." *In re Weider*, 145 Cal.App.4th 570, 589 (2006).  Here, the Board cited circumstances that could be aggravating in the abstract, without adequately considering whether those facts actually do render Mr. Rush an unreasonable danger to society, *today*.  However, when honestly examining those circumstances in terms of current dangerousness, it is apparent that no evidence exists to support the conclusion that Mr. Rush is a current and unreasonable risk to society.

### 1. The Commitment Offense.

While "the gravity of the commitment offense or offenses alone *may* be a sufficient basis for denying a parole application," that can only be the case where the Board considers all other relevant factors. *In re Ramirez*[14], *supra*, 94 Cal.App.4th at 549, citing *In re Seabock* (1983) 140 Cal.App.3d 29 at 37-38; see also *In re Rosenkrantz* [*Rosenkrantz V*], 29 Cal.4th 616 (2002).  The

---

[14]   The California Supreme Court disapproved only of that portion of the *Ramirez* decision that requires a comparative, proportionality analysis of the crime with other similar offenses.  The balance of the *Ramirez* decision was not overruled.  However, it is Petitioner's contention that, under principles of Federal Due Process, the analysis in *Ramirez* is the correct one, but even if not on the proportionality issue, a general level of comparative analysis on the issue of egregiousness of the crime is not only proper, but is required by the Constitution to avoid the regulatory

1  *Ramirez* court emphasized that, while the gravity of the offense *may* be enough, that must be the
2  *exception* to the rule, and the Board cannot *normally* deny parole based on the gravity of the
3  offense. *Id.,* see *Rosenkrantz V, supra.* at 683. As the *Ramirez* court noted, "a life term offense or
4  any other offenses underlying an indeterminate sentence *must be particularly egregious to justify*
5  *the denial of a parole date*." *Ramirez, supra,* 94 Cal.App.4th at 570 (emphasis added). These
6  principles were affirmed in *Rosenkrantz V, supra,* 29 Cal.4th at 683. The *Ramirez* court explained
   the legislative policy of parole for violent offenses, stating,
7

8       "[T]he circumstances of *any* past offense, even any murder, are not necessarily a
        sufficient ground for the Board to refuse to set a parole release date. All violent
9       crime demonstrates the perpetrator's potential for posing a grave risk to public safety,
        yet parole is mandatory for violent felons serving determinate sentences. (Penal
10      Code, §3000, subd. (b)(1).) And the Legislature has clearly expressed its intent that
        when murderers who are the *great majority* of inmates serving indeterminate
11      sentences approach their minimum eligible parole date, the Board '*shall normally set*
12      *a parole release date*.' Penal Code §3041, subd. (a). The Board's authority to make
        an exception based on the gravity of a life term inmate's current or past offenses
13      *should not operate so as to swallow the rule that parole is 'normally' to be*
14      *granted*." *Id.* at p. 570 (emphasis added).

15      See also *Rosenkrantz V, supra,* 29 Cal.4th at 683 [quoting the above language in relevant
16  part, and specifically adopting these rules]. Therefore, it is simply fundamental that in order to
    overcome the rule that parole is "normally" to be granted, the Board must find that the
17  commitment offense is among the gravest of offenses. The California Supreme Court's analysis
18  in the case of *In re Dannenberg*, 34 Cal.4th 1061, at 1094, preserved these doctrines, stating that
19  they were not overruling *Rosenkrantz V*.

20      Furthermore, under the regulatory criteria, in determining if the crime is "particularly
21  egregious" under those standards, due process demands that a comparative analysis be done with
22  other similar offenses in order to avoid the entire regulatory scheme becoming unconstitutionally
23  vague. This is true because the entire regulatory setup uses comparative terminology, such as
24  "*especially* heinous, atrocious and cruel" or an "*exceptionally* callous disregard" for human life.
    *Cal. Code Regs.,* tit. 15, §2402(c)(1). Similarly, the California Court of Appeal, First District,
25  recently clarified the rules for applying the regulatory criteria of unsuitability. The Court
26  explained:
27

28  _____

    language being unconstitutionally vague.

    -42-

"The commitment offense is one of only two factors indicative of unsuitability a prisoner cannot change (the other being his 'Previous Record of Violence'). Reliance on such an immutable factor 'without regard to or consideration of subsequent circumstances' may be unfair (citation omitted), and runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation."

"The commitment offense can negate suitability only if circumstances of the crime reliably established by the evidence in the record rationally indicate that the offender will present an unreasonable public safety risk if released from prison. Yet, the predictive value of the commitment offense may be very questionable after a long period of time. [citaions ommitted]. Thus, denial of release solely on the basis of the gravity of the commitment offense warrants especially close scrutiny." *In re Scott*, [*Scott II*], 133 Cal.App.4th 573, 584 (E.D.Cal. 2005) (citing *Biggs v. Terhune, supra*, 334 F.3d at 917).

As noted, in order to ensure that the exception does not swallow the rule, the commitment offense must be "***particularly egregious*** to justify the denial of a parole date." *Ramirez, supra,* 94 Cal.App.4th at p. 570 (emphasis added); *Rosenkrantz V, supra,* 29 Cal.4th at 683. Accordingly, "the Board must weigh the inmate's criminal conduct not against ordinary social norms, but against other instances of the same crime or crimes." *Id.*;[15] see also *Lee, supra,* 143 Cal.App.4th at 1409. The case of *In re Ernest Smith,* a murder stemming from defendant shooting his spouse three times in the head, is instructive. There, the court of appeal found that these facts did not render the offense a "particularly egregious" crime. *In re Ernest Smith,* 114 Cal.App.4th 343 (E.D.Cal. 2005). Particularly, the Court found it dispositive that Smith had not done anything to prolong the victim's suffering, or to cause untoward pain beyond the act of killing. Certainly, the same can be said about the murder in this case. Likewise, as previously discussed, the murder in *Elkins, supra,* was even more egregious than the facts of this crime, yet it was determined that the crime simply was not extraordinary when compared to other first degree murders.

Recently, in *Scott I, supra,* 119 Cal. App. 4th 871, the court found that a defendant who shot his wife's lover to death in front of her and their son did not constitute a "particularly egregious crime." *Scott I, supra,* 119 Cal.App.4th at 890-92. As the *Ernest Smith* court noted,

---

[15] As is discussed *infra,* the Supreme Court in *Dannenberg* only overruled the rule of *Ramirez* that a comparison is done for purposes of achieving proportionality of terms. However, on the question of egregiousness, as distinguished from proportionality, *Rosenkrantz V* preserved the need to compare the inmate's offense with other similar crimes to determine the pivotal questions of whether the crime is "especially heinous...," involves an "exceptionally callous disregard...," has a "trivial" motive, or is "particularly egregious." *Rosenkrantz V, supra,* 29 Cal.4th at 682, 683.

1

2

3

4

5

"There is no evidence that Smith acted with cold, calculated, dispassion; or that he tormented, terrorized, or injured [victim] before deciding to shoot her; or that he gratuitously increased or unnecessarily prolonged her pain and suffering...Was the crime callous? Yes. However, are the facts of the crime some evidence that Smith acted with exceptionally callous disregard for [victim's] suffering; or do the facts distinguish this crime from other second degree murders as exceptionally callous? No." *Id.* at 673 (citing *In re Mark Smith*, 109 Cal.App.4th 489, 504, 506 (2003).

6

7

8

9

10

11

12

13

14

15

Therefore, a finding that the crime prevented the Board from setting a date at five (5) separate hearings over a twenty one (21) year period of incarceration, and nearly ten (10) years after Mr. Rush's minimum term, is legally unsupportable. At Mr. Rush's 2005 hearing, the Board claimed that he posed an unreasonable risk to society. Exh. AA, p. 92. To justify their decision, the Board simply characterized the offense as "particularly callous and cruel," "dispassionate and [it] didn't have to happen," and it was carried out with a "callous disregard for human suffering." Exh. AAA, p. 88. Not only, does the offense not constitute an offense that is so egregious as to render Mr. Rush an unreasonable risk to society, twenty-one (21) years later, the Board's own findings and explanations of their decision wholly contradict their claim that the commitment offense, alone, is sufficient to render Mr. Rush unsuitable for parole.

16

17

18

19

20

21

22

23

24

25

26

27

28

First, Mr. Rush's offense is immediately recognizable as being of a far lesser order than most murders, as he was acting under extreme stress, due to the circumstances of the incident. Mr. Rush did not plan the murder, and there was absolutely no evidence of premeditation or deliberation. It was actually the result of an argument, which became physical, between Mr. Rush and his roommate. At the time of the murder, Mr. Rush was recovering from a motorcycle accident where he was severely injured and his friend died. Exh. DDD, p. 361. His injuries left him in a weakened physical and mental state, and the fact that the victim was significantly bigger and stronger than he was left him with a feeling of helplessness. *Id.* When the argument became physical, Mr. Rush was fearful because his injuries would not allow him to withstand a physical fight. *Id.* Mr. Heinz had already slammed him against the wall. *Id.* Mr. Rush grabbed his gun for safety and when his roommate lunged at him, he shot without thinking. Obviously, these elements played a significant role in the life factors that led to the commitment offense. In context, the commitment offense must be viewed as being the result of these combined factors. Ultimately, Mr. Rush's role in this offense simply cannot be said to be dramatically more heinous than most other murders.

-44-

1

2

3

4

5

6

7

Second, the Board cannot ignore the indisputable evidence merely by asserting that the unchanging facts of the commitment offense makes Mr. Rush an unreasonable risk of danger to the community if paroled, without making a connection to explain how the crime still shows a *current* propensity for violence. *Scott II, supra,* 113 Cal.App.4[th] at 594-595. While the commitment offense is tragic, in order for the Board to rely upon it as the sole reason for denying parole, it must be clear from the facts that the crime is "*especially* heinous, atrocious or cruel" in a way that sets it apart from the vast majority of other second degree murders as among the gravest of those offenses. *Cal. Code Regs.,* tit. 15, §2402(c)(1), emphasis added; see *Ramirez, supra,* 94 Cal.App.4[th] at p. 570.

8

9

10

11

12

13

14

15

16

17

This follows from the regulations own use of the word "especially" which connotes a heightened level *beyond* what normally is present in a finding of actual or implied malice. (*Cal. Code Regs.,* tit. 15, 2402(c)(1).) As the facts indicate, Mr. Rush's case does not fall under any of the factors provided by *Cal. Code Regs.,* tit. 15, §2402, indicating that he is unsuitable for parole. Nowhere does the Board attempt to describe how the crime is factually egregious under the regulatory factors, or point to actual, reliable evidence supporting any finding under an actual regulatory factor that rationally shows that Mr. Rush is currently an unreasonable risk of danger to society if paroled. Instead, they just state their "findings" in conclusory terms. As discussed in *Scott II, supra,* 133 Cal.App.4[th] at 594-595, the evidence must rationally show current dangerousness.

18

19

20

21

22

Mr. Rush's case is similar to a case recently decided by this Court in *Brown v. Kane*, WL 1288448 2007 (N.D. Cal.), p. 6.   In *Brown*, a young man shot his friend over a gambling debt. After twenty five (25) years of incarceration and positive programming, this Court found that Brown's second degree murder conviction did not provide "some evidence" that Mr. Brown would pose a risk of danger to society if released, 25 years after the crime, which was a single act of poor judgment.

23

24

25

26

27

> "Petitioner's commitment offense would be a sufficient basis to deny his parole if it indicated a risk of re-offending and of a danger to society. It does not. What underlies petitioner's commitment offense is a series of exercises in poor judgment...Whether petitioner is currently dangerous enough to society to preclude his parole depends on whether his judgment is likely to fail him as gravely as it did when he embarked on the series of events that led him to kill McLucas in 1979. By itself, however, Brown's exercise of poor judgment at age 22 is not probative, absent any more recent indicators, of his exercise of

28

-45-

1

2

poor judgment again at his nearing the age of 50." *Brown v. Kane*, WL 1288448 2007 (N.D. Cal.), p. 6.[16]

3

4

5

Here, Mr. Rush's crime similarly was a single act of poor judgment that occurred when he, like Brown, was young. There is no indication that Mr. Rush still poses a risk of danger twenty one (21) years after the commitment offense.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

Here, the Board made a finding that the crime was dispassionate. However, under *Cal. Code Regs.*, tit. 15, §2402(c)(1)(B), such a finding requires a determination that the "offense was carried out in a dispassionate and calculated manner, *such as an execution style murder*." Emphasis added. That terminology has no application to a case such as this. Instead, it is designed for a murder that occurs in a distinct factual pattern, one showing a particular dangerousness on the part of the defendant who commits an act of executing a victim. Because the prisons have to implement Board regulations that use this identical terminology in their housing of inmates who have committed murders See *Cal. Code Regs.*, tit. 15, §3375.2(a)(7)(A), the term "execution style murder" has a particularized meaning in prison jargon, and a CDC memorandum was actually issued to define it as "those crimes wherein the victim was shot in the head after being bound or cuffed, made to kneel, made to lie down, or made to face a wall." See Exh. LLL. No such actions occurred factually in this case. Even if the Board could properly rely on a bare finding of the crime being "dispossinate," here, the offense was in the heat of an altercation, the result of highly changed emotions, not the lack of emotion. Accordingly, that finding was wholly unsupported by the evidence.

20

21

22

23

24

25

26

27

The finding that the crime was "cruel and callous" and committed with a callous disregard for human suffering (*Cal. Code Regs.*, tit. 15, §2402(c)(1)(A)), is equally unsupported, as an exceptional level of callousness was not present here. See *In re Ernest Smith, supra*, 114 Cal. App. 4th at 366. Clearly, this murder is not dramatically more heinous than most other murders. To the contrary, as discussed above, it is much closer to a self defense case, but without enough force to excuse Mr. Rush's actions. As compared with other second-degree murders, and in light of the rules announced in *Scott I, supra,* and *Ernest Smith, supra*, this crime is not "particularly egregious." As in the *Ernest Smith* case, nothing was done to prolong the victim's suffering or to cause untoward pain beyond that inherent in the act of any murder.

28

[16] The decision has been stayed pending appeal to the Ninth Circuit.

-46-

A distinction must be drawn here between a murder that is "aggravated" and one that is "particularly egregious" within the meaning of the parole statutes and regulations. The matrix already provides for "aggravated" offenses, giving a mitigated, middle and aggravated term for each type of murder covered there under. Aggravated circumstances are factors to consider in determining which of the three matrix terms to select as the appropriate sentence for the inmate. They would not be enough by themselves to support a finding of unsuitability. That finding would require a determination that the crime is "particularly egregious."

This approach is based upon common sense. Absent facts that make the offense "particularly egregious," it is simply irrational to use the circumstances of that crime to hold a prisoner beyond the term prescribed under the matrix. See *Cal. Code Regs.* tit. 15 §2403(c). This approach is logical since it is the circumstances of the offense that went into making that matrix in the first place. See *Little v. Hadden* (1980) 504 F. Supp. 558, 562 ["'It is simply irrational for seriousness of the offense to be used first to determine the appropriate [matrix] period and then to be used again as the stated reason for confining a person beyond that guideline.'"]. The *Ramirez* decision stands for the principle that the term served by an offender should not be more than the term prescribed for the offense for which he stands convicted. The Board's treatment of Mr. Rush ignores these principles. In fairly characterizing Mr. Rush's offense and comparing it with other second-degree murders, it simply cannot be said that the present case involves the type of *especially* callous disregard beyond that necessary in any conviction for second-degree murder, and certainly does not justify characterizing this offense as being more egregious than that found in cases of first-degree murder. As stated by the *Scott II* court, "[t]he circumstances of [Rush's] offense shown by the record, which bear no resemblance to the circumstances of the homicides in *Rosenkrantz*, *Lowe* and *DeLuna* cannot reasonably be considered more aggravated or violent than the minimum necessary to sustain a conviction of second degree murder." *Scott II, supra*, 133 Cal.App.4th at 598; see also *In re Lowe* (2005) 130 Cal.App.4th 1045; *In re DeLuna* (2005) 126 Cal.App.4th 585.

As such, there was no evidence to support any of the actual regulatory criteria. Thus, the crime simply does not support the Board's finding of unsuitability.

-47-

## F.  THE EVIDENCE FAILS TO SUPPORT ANY OF THE REMAINING SUITABILITY FACTORS.

For the Board to deny Mr. Rush parole in this case, in addition to the commitment offense, the Board must be able to point to other circumstances defined in §2402(c) that tend to indicate Mr. Rush would pose an "unreasonable" degree of threat and danger to the public if released. *Scott II*, *supra*, 133 Cal.App.4[th] at 595. A legitimate, impartial review of those criteria reveals that none of the factors of unsuitability prescribed under *Cal. Code Regs.*, tit. 15 §2402(c) apply to Mr. Rush. As defined by the Regulations, other circumstances that tend to show unsuitability include:

> "(2) Previous record of violence. The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age (3) Unstable social history. The prisoner has a history of unstable or tumultuous relationships with others (4) sadistic sexual offenses…(5) Psychological factors. The prisoner has a lengthy history of severe mental problems related to the offense. (6) Institutional behavior. The prisoner has engaged in serious misconduct in prison or jail."

Here, Mr. Rush has no previous record of violence, or any criminality whatsoever. Nor does he have subsequent acts of violence. During twenty one (21) years of incarceration, he has not received a single 115, has only one nineteen (19) year old 128 A for being overeager and showing up for work early. He certainly has never exhibited any violent behavior. In fact, Mr. Rush is surrounded by potential for violence, but he makes a conscious effort to avoid putting himself in bad situations or when such situations occur he successfully diffuses them. Exh. AAA, p. 56-57. Mr. Rush does not have an unstable social history. He comes from an intact and very supportive family and has shown no signs of having unstable or tumultuous relationships. He has never been convicted or accused of any sexual offenses, sadistic or otherwise. Furthermore, Mr. Rush does not have a history of severe mental problems. He was under stress at the time of the offense, but since incarceration he has had no psychological problems.   In fact, Mr. Rush repeatedly has positive psychological evaluations where the doctors have consistently determined he is a "very good candidate for parole." Exh. BBB, pp. 156, 161. Finally, Mr. Rush has had exceptional institutional behavior. Clearly, not a single factor that tends to show unsuitability applies to Mr. Rush.

In short, the real basis for the Board's denial, Mr. Rush's crime itself, if allowed to stand, would justify denying parole for the rest of his life, no matter how well he conducts himself during

-48-

1  his continued incarceration and no matter how many years he remains incarcerated past the term

2  deemed appropriate ("uniform") by the Legislature and Board's own rules.

3  ### G.  *RELYING ON THE DISTRICT ATTORNEY AND NEXT OF KIN'S OPPOSITION IS WHOLLY UNWARRATNED.*

4  The Board also referenced the fact that the San Bernardino County District Attorney and

5  next of kin opposed parole. Exh. AAA, p. 90. However, reliance on such opposition is improper

6  here as it provides no evidence that Mr. Rush is a current and unreasonable threat to society for

7  several reasons. First, opposition by the District Attorney or next of kin does not speak to Mr.

8  Rush's current dangerousness. As discussed previously, the Court must examine whether "some

9  evidence" exists to support the Board's conclusion that the inmate currently and *unreasonably*

10 *endangers public safety*, not whether "some evidence" supports the *reasons* stated by the Board.

11 *In re Lee, supra*, 143 Cal.App.4th at 1408 (emphasis in original). Some evidence of the existence

12 of opposition by the District Attorney or next of kin, does not necessarily equate to some evidence

that the inmate's release poses an unreasonable danger to public safety. *Id.* at 1409. Therefore,

13 reliance on the aforementioned opposition must be based solely upon their ability, if there in fact

14 is any, to show Mr. Rush's current dangerousness, not simply upon "some evidence" that the

15 oppositions in fact existed. The Board did not discuss, or even mention, how that opposition

16 factually supported a rational conclusion that Mr. Rush is currently unreasonably dangerous. In

17 fact, no such conclusion could be reached from the evidence. Thus, as Board simply relied on the

18 fact that the opposition was made to support their denial, that conclusion is contrary to the

19 standards espoused in *Lee* and *Elkins*, which are likewise supported by the focus on the current

20 dangerousness in *Rosenkrantz VI* and *Martin*. Since the opposition by the District Attorney or

21 next of kin does not lend any more insight into Mr. Rush's dangerousness than does the

22 commitment offense, reliance on those oppositions as "some evidence" to support the Board's

23 denial is a due process violation.

24 Furthermore, this issue was put to rest when the court in *Weider* specifically addressed the

relevance of victim and District Attorney opposition. *Weider, supra*, 145 Cal.App.4th at 590. It

25 noted that the court is bound to consider such opposition (*Cal. Pen. Code* §§ 3042, 3043), but then

26 concluded that "the opposition cannot add weight where there is no evidence of unsuitability to

27 place in the balance." *Id.* Thus, because the record provided no evidence of unsuitability, the

28 opposition by the District Attorney and the victim's next of kin provided no weight to that

evidence. *Id.* Likewise, in the present case, the opposition given by the District Attorney and the

-49-

victim's next of kin cannot provide any weight to justify denying parole, because no evidence exists to support the conclusion that Mr. Rush is a current and unreasonable danger to society.

## IV.    THE STATE COURT'S DECISIONS APPLYING THE PRINCIPLES OF DANNENBERG WERE CONTRARY TO CLEARLY ESTABLISHED SUPREME COURT LAW IN VIOLATION OF PETITIONER'S PROTECTED LIBERTY INTEREST IN PAROLE.

As explained *supra*, the Supreme Court has prescribed principles of due process that plainly govern Petitioner's claim. *Greenholtz, supra*, 442 U.S. at 7; *Allen, supra*, 482 U.S. 369; see also *McQuillion I, supra*, 306 F.3d at 901. *Greenholtz* and *Allen* held that a state's statutory scheme, if it uses mandatory language, "creates a presumption that parole release will be granted" unless certain findings are made. *Greenholtz, supra*, 442 U.S. at 12. The Ninth Circuit held that the California parole scheme uses this precise type of mandatory language, and is virtually identical to the schemes found in both *Greenholtz* and *Allen*, thereby giving rise to such an interest. As found by the Ninth Circuit, "[t]he scheme 'creates a presumption that parole release will be granted' unless the statutorily defined determinations are made." *McQuillion I, supra*, 306 F.3d at 902 (citing *Allen, supra*, 482 U.S. at 378 [quoting *Greenholtz, supra*, 442 U.S. at 12]. Thus, under California's parole scheme, this creates a cognizable liberty interest in release on parole. *Greenholtz, supra*, 442 U.S. at 7;[17] see also *Sass, supra*, 461 F.3d at 1127-1128. As such, as recognized by the Ninth Circuit in *McQuillion I, Biggs, Irons II* and *Sass*, there can be no question that the California parole scheme creates a protected liberty interest for prisoners. The Board's authority is limited in that it must usually grant parole, must do so at the initial hearing, and only has authority to deny it in "particularly egregious" cases, or the gravest of murders. *In re Ramirez*, 94 Cal.App.4th 549, 560 (2001); *Rosenkrantz V , supra*, 29 Cal. 4th 616 ["parole applicants in this state have an expectation that they will be granted parole unless the Board finds, in their exercise of its discretion, that they are unsuitable for parole in light of the circumstances specified by statute and by regulations."] *Id*. at 654.

It is under the above authority that the State court was to review Mr. Rush's writ of habeas corpus and the Board's failure to give him a parole date. However, in its denial of Mr. Rush's writ, the California courts failed to apply the correct controlling United States Supreme Court authority, and instead relied on State court authority which they misconstrued under clearly established United

---

[17] When a state's statutory or regulatory scheme is set forth in mandatory language, it has created a protected liberty interest in parole for prisoners. *Greenholtz, supra*, 442 U.S. at 12; *Allen, supra*, 482 U.S. at 374-75; see also *Baumann v. Arizona DOC*, 754 F.2d 841, 844 (9th Cir. 1985)

States Supreme Court law.

### *A.* *THE BOARD'S DENIAL OF PAROLE BASED ON THE COMMITMENT OFFENSE RELIED ON REGULATORY LANGUAGE THAT IS UNCONSTITIONALLY VAGUE.*

In evaluating an inmate's suitability for parole, the Board is only permitted to come to a finding of unsuitability if the inmate currently presents an unreasonable risk of danger to society if paroled. (*Cal. Code Regs.*, tit. 15, §2402(a); *Scott II*, *supra*, 133 Cal. App. 4th at 594-595.) The regulations only permit such a finding to be based on the crime if the offense is "especially heinous, atrocious or cruel." *Cal. Code Regs.*, tit. 15, §2402(c)(1). That term is further defined by the regulatory criteria as applying only when the murder is of a particularly egregious type, fitting certain defining principles set out in the regulations.[18] As will be discussed, these criteria are overly vague, leaving inmates unable to determine if the criteria should properly apply to their particular offense. However, in defending its actions in these cases, the Board and Governor take the position that the standard enunciated in the case of *In re Dannenberg* (2005) 34 Cal. 4th 1061 somehow allows them to ignore even these rules, authorizing the denial of parole to be based solely on the crime so long as it has facts which are "more than minimally necessary to convict" the inmate of the offense in question, irrespective of whether the offense actually meets the regulatory criteria for particularly egregious murders under 2402(c)(1).

Such an interpretation, if adopted, would render the regulatory criteria so unconstitutionally vague as to literally read them right out of the books. Of course, as the appellate court noted in *Scott II, supra,* 133 Cal. App. 4th at 594-595, not only must the Board's findings fit within the regulatory criteria, but they must rationally and reliably show that the inmate is currently dangerous. Here, there was no factual support for any of the Board's crime based findings, yet the Board's decision attempts to rationalize a fifth denial of parole based on the crime, under the theory that the offense involved facts which were more than the "minimum necessary to sustain a conviction" for second degree murder. Here, the Board denied Mr. Rush parole at his 2005 hearing based solely upon the commitment offense, characterizing it as

---

[18] Section 2402(c) goes on to define the categories of sufficiently egregious offenses as being ones where "(A) multiple victims were attacked, injured or killed in the same or separate incidents. (B) the offense was carried out in a dispassionate and calculated manner, such as an execution-style murder. (C) The victim was abused, defiled or mutilated during or after the offense. (D) The offense was carried out in a manner, which demonstrates an

"dispassionate." "The motive in this crime was an argument. That just doesn't cut it. It certainly was a callous disregard for human suffering." Exh. AAA, p. 88. While purporting to be "findings" about the crime, the use of these phrases without explanation shows that the Board was doing nothing more than reading off of the denial from, BPT 1000a, rather than coming to some definitive conclusion about the pertinent offense factors. See Exh. J.

Note that the second finding, that of a "dispassionate" manner, fails to accurately apply the full regulatory criteria.[19] Even if the regulatory criteria was properly modified in that fashion, in the face of a crime that was clearly committed under significant stress, while perhaps not sufficient to reduce it to a manslaughter, the use of the term "dispassionate" simply has no application, and no inmate in Mr. Rush's position would expect that this criteria would apply to him. Nor is the first criteria in the actual regulatory terms, and the third is simply the defining principle for what constitute an offense that is "especially...cruel." See *Cal. Code Regs.,* tit. 15, §2402(c)(1)(D. As such, no inmate would anticipate the application of the first or third stated criteria, particularly in these circumstances and in light of the applicable rules defining what it means for a crime to be "especially...cruel." *In re Ernest Smith* (2003) 114 Cal.App.4th 343 ["There is no evidence that Smith acted with cold, calculated, dispassion; or that he tormented, terrorized, or injured (the victim) before deciding to shoot her; or that he gratuitously increased or unnecessarily prolonged her pain and suffering"].) As will be discussed below, this characterization by the Board of the crime to support the denial of parole, relies on wholly vague and amorphous terms, and the decision is therefore contrary to clearly established United States Supreme Court law and violative of fundamental due process.

A statute (or regulation) is void for vagueness "if it fails to give adequate notice to people of ordinary intelligence concerning the conduct it proscribes, or if it invites arbitrary and discriminatory enforcement." *United States v. Doremus* (9th Cir. 1989) 888 F.2d 630, 634. In addressing a vagueness challenge, the first question is "whether to scrutinize the statute for intolerable vagueness on its face or whether to do so only as the statute is applied in a particular case." *Schwartz Miller v. Gardner* (9th Cir. 1984) 752 F.2d 1341, 1346. As will be discussed herein, the factors set forth in *Cal. Code Regs.*, tit. 15, § 2402(c) used by the Board to determine

exceptionally callous disregard for human suffering. (E) The motive for the crime is inexplicable or very trivial in relation to the offense."

19   See *Cal. Code Regs.,* tit. 15, §2402(c)(1)(B) ["The offense was carried out in a dispassionate *and calculated*

whether the crime was committed in an especially heinous, atrocious or cruel manner, as applied both generally and as to Mr. Rush, are purely subjective, and unconstitutionally vague. As such, these factors are not easily understood or explained, and thus, Mr. Rush did not have notice that they would apply to his crime.[20]

The Court in the matter of *In re Rosenkrantz [Rosenkrantz V]* (2002) 29 Cal. 4th 616 held that "the nature of the prisoner's offense, alone, *can* constitute a sufficient basis for denying parole." *Rosenkrantz V, supra*, 29 Cal. 4th at 682, emphasis added. The *Rosenkrantz V* decision employed conditional language that the offense "can" constitute such a basis, but only if the crime could reasonably be considered *more* aggravated or violent than the minimum necessary to sustain a conviction for that offense, meaning the crime had to be particularly egregious compared to other murders so that the exception of 3041(b) would not "swallow the rule" that parole "shall normally" be granted. *Id.* at 683, emphasis added. Although the *Rosenkrantz V* language itself, if not properly tempered by the rules addressed in *Scott II, supra,* 133 Cal. App. 4th at 594-595, can lead to the regulations being interpreted in a manner that would render them unconstitutionally vague, the Court in that decision did at least state a directive that sole reliance on the commitment offense will violate the prisoners' due process rights pursuant to *Penal Code* §3041(a) in situations where the offense "could [not] be considered *more* aggravated or violent than the minimum necessary to sustain a conviction for that offense" and therefore was not "particularly egregious." *Rosenkrantz V, supra*, 29 Cal.4th at 683. The language requiring that the offense be "particularly egregious" was understood to mean that the offense stood out among murders as being significantly more violent. See *e.g., In re Ernest Smith, supra.* This requires increased violence in the actions utilized to kill the victims, not a measurement in hindsight of how much suffering actually occurred unless the evidence shows that inmate specifically intended for that suffering to occur. Here, there was neither proof of actual suffering or an intent to prolong suffering.

However, under the Board's interpretation of *Dannenberg*, the standard set forth in *Rosenkrantz V* is dramatically changed, allowing them to deny parole based on the commitment

---

*manner, such as an execution-style murder.*"] Emphasis added.

[20] It is important to note at the outset that the California Supreme Court has determined in cases involving the death penalty or life without the possibility of parole, the virtually identical terms to those found in §2402(c)(1), "especially heinous, atrocious, or cruel, manifesting exceptional depravity," are unconstitutionally vague and violative of fundamental due process. *Superior Court of Santa Clara v. Engert* (1982) 31 Cal. 3d 797, 805.

-53-

1  offense, without regard for its comparative egregiousness, solely because they can "point to some
2  evidence" that the crime was merely "more than minimally necessary to convict him of the
3  offense for which he is confined." (*In re Dannenberg, supra*, 34 Cal.4th at 1095.)[21]  Of course,
4  the *Dannenberg* majority made it explicitly clear that they were not overruling *Rosenkrantz V* or
5  watering down its rules. This interpretation urged by the Board would fundamentally alter the
6  standard by removing the focus from determining whether the crime was "especially heinous,
7  atrocious and cruel" so long as there is simply more evidence than "minimally necessary to
   convict." This formulation would then take the place of determining whether the crime was
8  egregious under the regulatory standards of *Cal. Code Regs.,* tit. 15, §2402(c)(1), on which
9  inmates routinely rely to evaluate whether their particular crime could potentially take them
10 outside the regulatory standards of suitability, which the Court expressly required the Board to
11 base its decision on in *Rosenkrantz V, supra,* 29 Cal. 4th at 653, 654 and 658. This requirement of
12 relying on the regulatory standards has been routinely ignored by the Governor and the Board. In
13 fact, as has been argued by the Board and Governor in other cases, their decision must be upheld
14 under this standard, ***even if the evidence does not show that the inmate currently presents an***
15 ***unreasonable risk of danger*** if released, as is expressly required by *Cal. Code Regs*., tit. 15
16 §2402(a). See *Scott II, supra,* 133 Cal. App. 4th at 594-595. Obviously addressing this very
17 argument, *Scott II, supra*, clarified the basic holding in *Dannenberg*, concluding that the crime
18 "***can***" justify a parole denial, but only where it rationally shows current dangerousness, in light of
   the reduced probative value that the crime based evidence naturally has after the passage of time.
19 Of course, the Board did not extend to Mr. Rush the benefit of the wisdom of *Scott II*.

20     As noted by the dissent in *Dannenberg*, utilizing this standard in the way suggested by the
21 Board and Governor, without the caveat of *Scott II*, makes the decision in this case ***completely***
22 unreviewable. (*Id*. at 1102.)  What may be callous or heinous, under this view of the standard, to
23 one Board member or Governor may not be such to another. However, the Court made it clear in
24 *Dannenberg* that they were not intending to alter the standard of *Rosenkrantz V. Dannenberg,*
25 *supra,* 34 Cal. 4th at 1094. *Scott II* helped to clarify that crime based denials still needed to be
26 closely monitored, and that the law still retained the fundamental requirement that the focus be on
27 the regulatory standards and their ability to show, despite the passage of time, that the inmate is

28 ──────────────
[21] As the dissent in *Dannenberg* pointed out, viewing the standard in this light makes it completely unreviewable.

*currently* still presenting an unreasonable risk of danger to society if paroled. *Scott II, supra,* 133 Cal. App. 4th at 594-595. The Board's narrow view of the basic holding in *Dannenberg* sees it as effectively amending the standard in a way where every murder could fit into the category of "more than minimally necessary to convict" by virtue of the simple fact that the inmate was convicted and thus the evidence is presumptively greater than the "minimum necessary to convict."

This application is wholly arbitrary and depends on the subjective, personal opinions and whims of the Governor and various Board members. Of course, the Board has fully adopted this stance, thus abusing its ruling by treating *Dannenberg* as carte blanche language to repeatedly deny parole based *solely* on the nature of the commitment offense, by simply mouthing the words "especially heinous, atrocious, and cruel." This position permits a conclusion that can easily be reached by those Governors or Board members who want to claim that the facts of any murder are more than those minimally necessary for conviction. Since the *Dannenberg* Court dispensed with the requirement that the offense be compared to other murders *for proportionality purposes*, the Board and Governor seize on that language to avoid comparisons for *any* purpose, even evaluating whether the crime fits under the indisputably comparative language of the regulations, §2402(c)(1) ("*especially* heinous..." or "*exceptionally* callous disregard...," etc., emphasis added). Thus, under their view, the standard can be said to fit any murder, including accomplice liability, DUI based car accident, non-intentional (implied malice) killings, and the like.

An example can easily illustrate the unworkability of this view of the *Dannenberg* standard, where the caveat of *Scott II* is ignored. Assume two separate murders committed in an identical fashion by first time offenders. In each case, the perpetrator contemplates the idea of killing just long enough to satisfy the element of premeditation and deliberation, and both harbor express malice, i.e., intent to kill. However, the jury in defendant A's case decides to credit some psychological evidence on mental state and finds only a second degree murder, while the jury in defendant B's case rejects the identical evidence and convicts of first degree. Under the Board's view of the *Dannenberg* formulation, only defendant A's crime, the second degree murder, exhibits evidence that is "more than minimally necessary" to convict, since premeditation is a required element of defendant B's first degree murder offense. Thus, defendant B would be

---

*Dannenberg, supra,* 34 Cal. 4th at 1102.

1  entitled to have his parole date fixed at his initial hearing, absent adverse in-prison behavior, as the

2  evidence of premeditation is simply one of the elements of his crime. However, under the Board's

3  view of *Dannenberg*, they would be free to repeatedly deny parole to defendant A, based on the

4  evidence of premeditation that was rejected by the jury.[22]  In other words, all other facts being

5  equal, the Governor's and Board's view of the *Dannenberg* formulation results in the second

6  degree murder being treated as more serious than the identical first degree offense, committed by

   an identical offender. Such a rule flies in the face of due process.

7
       Applying the rule explained by the United States Supreme Court, there is nothing in the

8  language and descriptions used in § 2402(c)(1) ["exceptionally heinous, atrocious and cruel"] that

9  standing alone "implies any inherent restraint on the arbitrary and capricious" denial of parole

10 suitability. *Godfrey v. State of Georgia* (1980) 446 U.S. 420, 428. That Court found that a

11 "person of ordinary sensibility could fairly characterize almost every murder as [especially

12 heinous, atrocious, cruel or callous]." *Id*. at 429. The Court thus determined that for death penalty

13 purposes, the terms "especially heinous, atrocious or cruel" are unconstitutionally vague.

14 *Maynard v. Cartwright* (1988) 486 U.S. 356, 361-364. As applied to death penalty cases, the

15 Supreme Court felt that terms such as "heinous" and "atrocious" could be used by any reasonable

16 person to characterize every murder so as to fall into those categories. *Shell v. Mississippi* (1990)

17 498 U.S. 1, 3; *Maynard v. Cartwright, supra*, 486 U.S. at 363; *Godfrey v. Georgia, supra*, 446

18 U.S. 420, 428-429. As previously discussed, the California Supreme Court has also found that in

19 *both* death penalty or life imprisonment without possibility of parole, the terms "especially

   heinous, atrocious, or cruel, manifesting exceptional depravity" are unconstitutionally vague and

20 violative of fundamental due process. *Superior Court of Santa Clara County v. Engert* (1982) 31

21 Cal.3d 797, 805. However, the paroling authority is using those terms to repeatedly deny parole,

22 effectively converting parole eligible sentences into an LWOP. As such, the use of those terms

23 here is even more insidious, as these offenses are indisputably parole eligible, and the repeated use

24 is effectively allowing terms that are unconstitutional when used to impose an LWOP sentence to

25 be used to achieve that same result, effectively turning these parole eligible cases into LWOP

26 sentences. In other words, the same result occurs without the same protections.

27

28 [22]  The constitutionality under federal law of the California Supreme Court's allowance of this in *Rosenkrantz V*, where the offense was *de facto* treated as a first degree murder, despite an express acquittal of that charge by the jury, is not at issue here, as there is indisputably no evidence of premeditation. Should the Court deem that to be an issue

Undoubtedly, Respondent will contend, as they do in all these cases, that the use of the phrase "especially heinous, atrocious, or cruel" is not unconstitutionally vague, as it is defined by the factors set out in *Cal. Code Regs.*, tit. 15 § 2402(c)(1). Of course, this argument fails to acknowledge the clearly established Supreme Court authority to the contrary. See *Maynard v. Cartwright* (1988) 486 U.S. 356, 363 and *Godfrey v. Georgia* (1980) 442 U.S. 420. However, this logic also fails for several reasons. First, respondent has always contended that the unsuitability factors are non-exhaustive. However, if the list is non-exhaustive, the Board could then cite any reason for claiming the offense was "especially heinous, atrocious, or cruel," in which case, the purpose of listing factors to explain the otherwise unconstitutionally vague phrase would be defeated.

Second, while this position might have some superficial appeal, the manner in which the Board and Governor apply the five (5) listed factors negates their narrowing purpose. For example, the factor for "multiple victims" is used when ever multiple victims are present, even when there was no intent to injure the second person. See *Martin, supra*, and *Weider, supra*. As such, the criteria for "multiple victims" does not in any way narrow the term "especially heinous, atrocious or cruel" to only encompass the clearly more dangerous criminals who deliberately attack more than one person. Likewise, the factor that "the offense was carried out in a manner demonstrating an exceptionally callous disregard for human suffering" fails to provide any guidance as to how it renders a particular offense "especially heinous, atrocious, or cruel." The courts have attempted to give that phrase some meaning, through decisions such as *Ernest Smith*, which analyzed the extent that the inmate induced terror before the killing, caused untoward suffering, or unnecessarily prolonged the ordeal. However, the Board has ignored these qualifying criteria, and applied the regulation in a manner that fits the malice present in any murder, despite the lack of presence of gratuitous violence in those cases. See *Scott II, supra, Lee, supra, Martin, supra*, and *Rosenkrantz VI, supra*. This is also true regarding the criterion of an "inexplicable" or "trivial motive." Here, the Board and Governor routinely improperly use this criterion, calling a motive both "inexplicable" and "trivial" despite those being mutually exclusive terms. See *Scott I, supra*. Additionally, if a motive is required to be justified or proportionate to the offense, then the motive for every murder could be described as trivial, thereby invoking the phrase "especially

herein, leave is requested to further brief that point.

heinous, atrocious, or cruel" in any murder case. *Id.* This is true because requiring a justified motive requires the inmate to be innocent of the offense, a scenario that is never the case, since the inmate was convicted and therefore has no excusable or justifiable motive as a matter of law. Thus, although respondent will likely allege that the limiting criteria renders the regulation constitutional, the Board failed to properly employ the criteria in the present case, and the historical use of those terms to cover any murder highlights the arbitrary and capricious nature of any decision relying on those regulatory criteria.

## V. AN EVIDENTIARY HEARING IS NECESSARY TO ESTABLISH HOW THE BOARD IS APPLYING THE REGULATORY CRITERIA IN AN UNCONSTITUTIONALLY VAGUE MANNER.

Here, an evidentiary hearing would be appropriate to resolve the question of whether the Board and Governor are applying the regulatory terms in a manner that is unconstitutionally vague. A simple test can be done to illustrate the vagueness of the regulations as they are currently being applied, as well as the existence of the "no parole" policy. This Court can order respondent to produce the decisions by the parole Board during the ninety (90) days before and after Mr. Rush's hearing, along with the Governor's decisions regarding any case where parole was granted by the Board (or any en banc decision or rulings by the Decision Review Unit that changed or modified the decision), and as to any inmate that was actually released, any prior decisions of the Board denying parole as to that inmate. Petitioner anticipates that this evidence would show that in 100% of all murder cases, the crime has been found to be "especially heinous, atrocious, or cruel" at some point, so that even if the inmate is later actually paroled, his or her crime was at least once found to be within the "public safety" exception of *Penal Code* §3041(b). Additionally, the Board can be directed to produce any decision in a murder case within the last ten (10) years where the inmate was found suitable at his or her initial hearing, and actually released without ever being found unsuitable or having the decision reversed by Decision Review, en banc hearing or Governor's review. Again, it is anticipated that there would be no such decision in existence.

These facts would show precisely what the California Supreme Court was talking about when it cautioned that the exception cannot be interpreted in a manner so as to "swallow the rule" that parole dates "shall normally" be granted, since there would be no case that has never been found to fit in the exception. *Rosenkrantz V, supra,* 29 Cal.4th at 683. Thus, as applied, the phrase

-58-

1   would be violative of federal due process, in that it can fit any crime, and has lost the ability to

2   distinguish crimes that truly are particularly egregious.[23] As such, the Board's characterization of

3   the offense relies on clearly unconstitutionally vague language, contradicts the claim of

4   unsuitability, and highlights the arbitrariness of the decision. Thus, the anticipated position that

5   the unconstitutionally vague language is saved by the limiting criteria has no merit and cannot

6   make the arbitrary and capricious decision by the Board constitutional.

## *CONCLUSION*

7   Based on the foregoing, it is clear that Petitioner is both eligible and suitable for parole,

8   and the continuous denial of a parole date amounts to the deprivation of Mr. Rush's constitutional

9   and statutory rights. Accordingly, it is respectfully requested that this court issue a writ of habeas

10  corpus, or order to show cause, directed to the Board, to inquire into the legality of Petitioner's

11  incarceration, and after briefing and an evidentiary hearing, if necessary, issue an order to release

12  Mr. Rush and direct such further relief as is appropriate under the circumstances.

13

14  Dated: *August 1, 2007*                Respectfully submitted,

15

16                                         LAW OFFICES OF PICONE & DEFILIPPIS

17

18                                         By:

19                                         STEVE M. DEFILIPPIS
                                           Attorneys for Petitioner,
20                                         ROBERT DALTON RUSH

21

22

23

24

25

26

27

28
    ---
    [23] This is exactly what this Court found in the case of *In re Viet "Mike" Ngo*, a copy of which is attached hereto as Exhibit "T".

-59-

STEVE M. DEFILIPPIS
State Bar No. 117292
PICONE & DEFILIPPIS, A.P.L.C.
625 N. First Street
San Jose, CA 95112
Telephone: 408/292-0441
Fax: 408/287-6550

Attorneys For Petitioner
ROBERT DALTON RUSH

## *IN THE UNITED STATES DISTRICT COURT*

## *NORTHERN DISTRICT OF CALIFORNIA*

| | |
|---|---|
| ROBERT DALTON RUSH, | **Case No.** |
| Petitioner, | [Commitment Offense - San Bernardino |
| vs. | Co. Sup. Ct. Case #SCR44594; Cal. |
| Ben Curry, Acting Warden, | Ct. of App. Case #E042268; Ca. Supreme |
| Respondent, | Ct. Case #S150438] |
| On Habeas Corpus. | *CERTIFICATE OF SERVICE* |
| _____/ | |
| BOARD OF PAROLE HEARINGS, | |
| ARNOLD SCHWARZENEGGER, | |
| Governor, | |
| Real Parties In Interest. | |
| _____/ | |

CERTIFICATE OF SERVICE

STATE OF CALIFORNIA      )      In Re ROBERT DALTON RUSH
                         )      Federal Court, Case No.
COUNTY OF SAN FRANCISCO)

    I am now and at times herein mentioned have been a citizen of the United States, over the age of eighteen years, employed in Santa Clara County, California, and not a party to the within action or cause; that my business address is 625 North First Street, San Jose, California 95112; that I served copies of the:

**PETITION FOR WRIT OF HABEAS CORPUS AND MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS**

by placing said copies in an envelope addressed to:

Supreme Court  (Petition Only)
Attn: Clerk's Office
350 McAllister Street, Rm 1295
San Francisco CA 94102

Court of Appeals (Petition Only)
Division Two
3389 12th Street
Riverside CA 92501

San Bernardino Superior Court (Petition Only)
Attn: Clerk's Office
351 North Arrowhead Ave.
San Bernardino CA 92415

Attorney General's Office (Petition Only)
Attn: Scott Colin Mather
455 Golden Gate Ave., Ste. 11000
San Francisco, CA 94102-3664

which envelope was then sealed and, with postage fully prepaid thereon, was on August 2 , 2007, deposited in the United States mail at San Jose, California; that there is delivery service by the United States mail at the place so addressed, or that there is regular communication by mail between that place of mailing and the place so addressed.
    I declare under penalty of perjury that the foregoing is true and correct.
Executed on August 2 , 2007 at San Jose, California.

LUZBEI PALOMINO