*SUPERIOR COURT OF THE STATE OF CALIFORNIA*

*IN AND FOR THE COUNTY OF SAN BERNARDINO*

In re

ROBERT DALTON RUSH,

        Petitioner,

     On Habeas Corpus.

_____/

BOARD OF PAROLE HEARINGS,
ARNOLD SCHWARZENEGGER,
Governor,

     Real Parties In Interest.

_____/

CASE NO.

[Commitment Offense
San Bernardino Co. Sup.
Court No. SCR 44594]

---

*APPENDIX "A" Vol. III AAA-PPP TO*
*PETITION FOR WRIT OF*
*HABEAS CORPUS*

---

STEVE M. DEFILIPPIS, Esq.
State Bar No. 117292
TRACI S. MASON, Esq.
State Bar No. 237663
PICONE & DEFILIPPIS
625 N. First Street
San Jose, California 95112
(408) 292-0441

Attorneys for Petitioner,
ROBERT DALTON RUSH



SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )
Term Parole Consideration )
Hearing of: )     CDC Number D-73321
)
ROBERT RUSH )
)
_____)

# INMATE COPY

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

OCTOBER 11, 2005

1:00 p.m

PANEL PRESENT:
Mr. Tom Sawyer, Presiding Commissioner
Mr. John Weaver, Deputy Commissioner

OTHERS PRESENT:
Mr. Robert Rush, Inmate
Mr. Steve Defilippis, Attorney for Inmate
Mr. Harold Wilson, Deputy District Attorney
Mr. Raymond Heinz, Father of victim
Ms. Helen Heinz, Mother of victim
Mr. Mark Perlite, Husband of Theresa
Ms. Theresa Perlite, Sister of victim
Ms. Maura Castaneza, Sister of victim

Correctional Officers Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

      _____    No       See Review of Hearing
      _____    Yes      Transcript Memorandum

**Jennyfer Osecheck, Peters Shorthand Reporting**

ii

## INDEX

PAGE

Proceedings...................................... 1

Case Factors..................................... 17

Pre Conviction Factors........................... 18

Post Conviction Factors.......................... 35

Parole Plans..................................... 21

Closing Statements............................... 57

Recess........................................... 84

Decision......................................... 85

Transcriber Certification........................ 91

--oOo--

1

1     **P R O C E E D I N G S**

2         **PRESIDING COMMISSIONER SAWYER:**  Ok, this is

3     a Subsequent Parole Consideration Hearing for

4     Robert Rush, D-73321.  Today's date is Tuesday

5     October 11, 2005.  We are located at the

6     Correctional Training Facility in Soledad.  The

7     inmate was received on December 17, 1987 from

8     the county of San Bernadino.  Murder in the

9     second degree with use of a firearm, case number

10    CR44594, count one of 187 with 12022.5 Penal

11    Code Section as well.  17 years to life is the

12    term.  And the minimum eligible parole date is

13    November 30, 1997.  This hearing is being tape

14    recorded for the purpose of voice identification

15    each one of us is required to state our first

16    and last names, spelling our last name, when it

17    comes to your turn Mr. Rush if you would spell

18    your last name and also give us your CDC Number.

19    I'll start and go to my left, Tom Sawyer, S-A-W-

20    Y-E-R, Commissioner.

21        **DEPUTY COMMISSIONER WEAVER:**  John Weaver,

22    W-E-A-V-E-R, Deputy Commissioner.

23        **MS. HEINZ:**  Helen Heinz, H-E-I-N-Z, mother

24    of the victim.

25        **MR. HEINZ:**  Raymond Heinz, H-E-I-N-Z,

26    father of the victim.

27        **MR. PERLITE:**  Mark Perlite, P-E-R-L-I-T-E,

1  husband of Theresa.

2      **MS. CASTANEZA:**  Maura Castaneza, C-A-S-T-A-

3  N-E-Z-A, sister of the victim.

4      **MS. PERLITE:**  Theresa Perlite, P-E-R-L-I-T-

5  E, sister of the victim.

6      **DEPUTY DISTRICT ATTORNEY WILSON:**  Harold

7  Wilson, W-I-L-S-O-N, Deputy District Attorney

8  San Bernardino County.

9      **ATTORNEY DEFILIPPIS:**  Steve Defilippis, D-

10  E-F-I-L-I-P-P-I-S, I am the attorney for Mr.

11  Rush.

12      **INMATE RUSH:**  Robert Rush, R-U-S-H, D-

13  73321.

14      **PRESIDING COMMISSIONER SAWYER:**  Ok, thank

15  you.  Also let the record reflect that we have

16  three correctional peace officers in the room

17  for security purposes.  The record reflects that

18  you signed a BPT Form 1073 which is a reasonable

19  accommodations notice and request in accordance

20  with the provisions of the Americans

21  Disabilities Act.  You checked the box on this

22  form that says you do not have a disability.

23  And it is dated November 19, 2004.  I am going

24  to pass that to Mr. Defilippis if you will look

25  at that.  And I do notice that you are wearing

26  glasses sir.  Are those for reading purposes?

27      **INMATE RUSH:**  No.

1      **PRESIDING COMMISSIONER SAWYER:**  For

2   distance?

3      **INMATE RUSH:**  For distance.

4      **PRESIDING COMMISSIONER SAWYER:**  You can

5   read everything all right you don't have any

6   problems seeing anyone here or reading.  Any

7   other disabilities you may have that would

8   hinder you in this hearing?

9      **INMATE RUSH:**  None.

10     **PRESIDING COMMISSIONER SAWYER:**  Is

11  everything on that form correct and current?

12     **INMATE RUSH:**  Yes.

13     **PRESIDING COMMISSIONER SAWYER:**  Mr.

14  Defilippis can we waive reading the rest of the

15  reading of the ADA?

16     **ATTORNEY DEFILIPPIS:**  So waved.

17     **PRESIDING COMMISSIONER SAWYER:**  This

18  hearing is being conducted pursuant to Penal

19  Code Section 3041 and 3042 in the rules and the

20  regulations of the Board of Prison Terms

21  governing parole consideration hearings for life

22  inmates.  The purpose of today's hearing is to

23  consider your suitability for parole.  In doing

24  so we will consider the number and nature of

25  crimes you have been committed for you're your

26  prior criminal and social history, your behavior

27  and programming since your commitment.  We have

4

1   had an opportunity to review your Central File

2   and your prior hearing transcript.  You will be

3   given an opportunity to correct and clarify the

4   record.  We will consider your progress since

5   your commitment and since your last hearing.

6   Your updated counselors report, psychological

7   report will also be considered.  Any change in

8   your parole plans should be brought to our

9   attention.  We will reach a decision today and

10  inform you whether or not we find you suitable

11  for parole and the reasons for our decision.  If

12  you are found suitable for parole, the length of

13  your confinement will be explained to you.  This

14  hearing will be conducted in two phases, I will

15  discuss with you the crime you are committed

16  for, prior criminal and social history, your

17  parole plans and any letters of support or

18  opposition that may be in your file.  Deputy

19  Commissioner Weaver, will discuss with you your

20  progress since your commitment, your counselor's

21  reports and your psychological evaluation.  Once

22  this is concluded the District Attorney, and

23  your attorney will be given an opportunity to

24  ask you questions.  Questions from the District

25  Attorney shall be answered back to this panel.

26  Do you understand?

27      **INMATE RUSH:**  Yes.

5

1      **PRESIDING COMMISSIONER SAWYER:**  Ok, before
2   we recess for deliberations the District
3   Attorney, your Attorney and you will be given an
4   opportunity to make a final statement regarding
5   your parole suitability.  Your statement should
6   be directed as to why you feel you are suitable
7   for parole.  The victim's next of kin will have
8   the opportunity to give a statement regarding
9   the crime and your responsibility.  We will then
10  recess clear the room and deliberate.  Once we
11  have completed our deliberations we will resume
12  the hearing and announce our decision.
13  California code of regulations states that
14  regardless of time served a life inmate shall be
15  found unsuitable for parole and denied parole if
16  in the judgment of the panel the inmate would
17  pose an unreasonable risk of danger to society
18  if released from prison.  You have certain
19  rights those rights include a timely notice of
20  this hearing a right to review your Central
21  File, the right to present relevant documents.
22  Has the inmates rights been met, counsel?
23      **ATTORNEY DEFILIPPIS:**  Yes they have.
24      **PRESIDING COMMISSIONER SAWYER:**  Thank you,
25  you also have a right to be heard by an
26  impartial panel.  Is there any objection to this
27  panel?

6

1      **INMATE RUSH:**  No.

2      **PRESIDING COMMISSIONER SAWYER:**  You will

3   receive a copy of the written tentative decision

4   today that decision is subject to review by the

5   decision review unit and by the entire board

6   meeting as a body.  It will become effective

7   within 120 days.  It is subject to review by the

8   governor.  A copy of the tentative decision and

9   a copy of the transcript will be sent to you.

10  As of May 1, 2004 there were major changes

11  limiting your former right to appeal board

12  decisions or actions directly to the board.  The

13  old board regulations were repealed the current

14  policy is entitled administrative appeals

15  correspondence and grievances concerning prison

16  board term decisions. It is available at the

17  prison law library.  You are not required to

18  admit your offense or discuss your offense if

19  you do not wish to do so.  However this panel

20  does accept as true the findings of the court

21  and you are invited to discuss the facts and

22  circumstances of this offense if you desire.

23  The board will review and consider any prior

24  statements you have made regarding the offense

25  in determining your suitability for parole.  Is

26  there any confidential material that will be

27  used in this hearing today Commissioner?

7

1    **DEPUTY COMMISSIONER WEAVER:**  There is a

2    number of documents that are considered

3    confidential some are due to the fact that there

4    were addresses of the authors of that report.  I

5    haven't seen any confidential documents that I

6    feel would have a bearing on suitability or

7    unsuitability.

8    **PRESIDING COMMISSIONER SAWYER:**  Ok, thank

9    you, so none will be used?

10   **DEPUTY COMMISSIONER WEAVER:**  Not as far as

11   I am concerned at this point and time.

12   **PRESIDING COMMISSIONER SAWYER:**  Now what

13   Commissioner Weaver is talking about is we have

14   got some petitions and those petitions had

15   addresses on them, I will not be using those

16   addresses.  We will certainly use the petition

17   or parts of the petitions but the addresses is

18   the confidential information that he is talking

19   about.

20   **ATTORNEY DEFILIPPIS:**  Are we, are these the

21   petitions I was provided with this afternoon?

22   **PRESIDING COMMISSIONER SAWYER:**  I believe

23   so.

24   **ATTORNEY DEFILIPPIS:**  Ok so there are no

25   materials that are in the confidential section

26   of the file that I have not received.

27   **PRESIDING COMMISSIONER SAWYER:**  In fact you

1  did not receive the ones I am talking about, you

2  received them but you will notice that some of

3  them that had addresses like that one.

4      **ATTORNEY DEFILIPPIS:**  Right, those are

5  blacked out.  And I have no problem with that I

6  just want to make sure that I have copies of all

7  the documents that are being utilized.  I have a

8  series of seven petitions.

9      **PRESIDING COMMISSIONER SAWYER:**  Seven

10  petitions and whatever was in the board report.

11  There were petitions in that as well.

12      **ATTORNEY DEFILIPPIS:**  Oh I am sorry in the

13  lifer-hearing packet?

14      **PRESIDING COMMISSIONER SAWYER:**  Yes, there

15  was two packets.  Did you not receive, I got to

16  this is one.

17      **ATTORNEY DEFILIPPIS:**  I received one

18  packet.  And it has got all seven sections.  And

19  it looks like my one is not even the size of

20  your one.

21      **PRESIDING COMMISSIONER SAWYER:**  Ok I am

22  going to call a recess right now and I am going

23  to afford you the opportunity to compare our

24  packets and see what extraneous information I

25  have in my packet, and Commissioner Weaver has

26  got what appears to be the same packet I have.

27  And you have a smaller packet.  So lets do that,

1   go off the record the time is 1:45.  Ok,
2   everyone has returned to the room it is 1:55,
3   the reason we went of the record was to compare
4   notes and make sure that everyone has the same
5   information.  Apparently Mr. Defilippis inmate
6   counsel did not have some of the letters and let
7   the record reflect they have been supplied.  I
8   have a hearing checklist.  If I could have this
9   passed over to the attorney's.  If you could
10  check those against your records.

11      **ATTORNEY DEFILIPPIS:**  Apparently there are
12  opposition letters but there are none listed on
13  this.  But I have now been provided that stack
14  of about an inch thick of opposition letters for
15  the first time.  Which most of them appear to
16  have been submitted in connection with the
17  originally scheduled date of August 12, I don't
18  know why the board or the facility did not
19  provide those to me.  There are support letters
20  and I did verify those are in your file.  And I
21  have copies of those as well.  But they are not
22  checked here.  There are letters offering
23  employment that is not checked here.  The
24  appellate decision is contained within the file
25  that's not checked here.  There is a notice of
26  motion apparently in the file, it wasn't put
27  into my file.  It ahs to do with a civil case it

1  doesn't appear to be relevant to these

2  proceedings and I am not sure why they put it in

3  there.  Mostly I am not sure why they put it in

4  order to deny petition in writ of habeas corpus

5  either.  Since it has nothing to do with

6  suitability, there are some certificates of

7  completion of self-help programs, but I think

8  that is probably covered in the chronos for

9  self-help.  And I am not sure what other non

10 specific pertinent information developed since

11 the date of the last hearing is, if you could --

12     PRESIDING COMMISSIONER SAWYER:  Your guess

13 is as good as mine.

14     ATTORNEY DEFILIPPIS:  Well in my file I do

15 not have any nonspecific but pertinent

16 information developed since the last hearing.

17     PRESIDING COMMISSIONER SAWYER:  Ok.

18     DEPUTY COMMISSIONER WEAVER:  Excuse me I

19 did put a folder in your place counsel that was

20 indicated of updated material.

21     ATTORNEY DEFILIPPIS:  That only has seven

22 of the petitions there is probably I would

23 venture a guess that there is at least a 150 to

24 200 documents in the stack I was just provided.

25     PRESIDING COMMISSIONER SAWYER:  Well I am

26 guessing because it is not specific in the

27 checklist that we gave you an addendum in terms

11

1   of his the addendum that updates his placement

2   custody, academic work, vocation, group

3   activities, treatment, prison behavior and

4   others dated December 22, 2004 to September 16,

5   2005.  That should be in the packet that you

6   received today.

7       ATTORNEY DEFILIPPIS:  What's the date on

8   that?

9       PRESIDING COMMISSIONER SAWYER:  December

10  22, 2004 to September 16, 2005.

11      ATTORNEY DEFILIPPIS:  Nope.

12      PRESIDING COMMISSIONER SAWYER:  That should

13  be in that packet right there.

14      ATTORNEY DEFILIPPIS:  Nope it is not.  All

15  I have in here is petitions.

16      PRESIDING COMMISSIONER SAWYER:  Do you have

17  one?

18      DEPUTY COMMISSIONER WEAVER:  Yes I do.

19      PRESIDING COMMISSIONER SAWYER:  Why don't I

20  give, this is the area you are going to be

21  dealing with.

22      DEPUTY COMMISSIONER WEAVER:  I can give him

23  mine that is fine.

24      PRESIDING COMMISSIONER SAWYER:  No I will

25  give him mine, cause you are going to be using

26  that more than I will and then in deliberations

27  we will share.  Mr. Wilson do you have that

12

1  information?

2      **DEPUTY DISTRICT ATTORNEY WILSON:**  No

3  Commissioner.

4      **PRESIDING COMMISSIONER SAWYER:**  There isn't

5  a lot of information in it but it is a document.

6      **ATTORNEY DEFILIPPIS:**  I will share it with

7  him.

8      **PRESIDING COMMISSIONER SAWYER:**  Ok, thank

9  you.  I am just trying to find where the

10  unspecific, the pertinent information developed

11  at the last, since the date of the last hearing.

12  I am guessing is that document.

13      **ATTORNEY DEFILIPPIS:**  Ok.

14      **PRESIDING COMMISSIONER SAWYER:**  And if we

15  happen to stumble upon anything else, I am sure

16  you will bring it to my attention.  Are there

17  any additional documents to be submitted Mr.

18  Defilippis?

19      **ATTORNEY DEFILIPPIS:**  I did provide a copy

20  of the private probation report that was

21  submitted, I think that already should be in the

22  Central File anyway, and a number of chronos

23  which should be in the Central File just so you

24  would have those handy.  Those would be all the

25  chronos since the last hearing.  There was a few

26  irrelevant documents that apparently my

27  secretary copied or tacked to the end of that,

13

1   what I meant to provide you was just the

2   chronos.

3       PRESIDING COMMISSIONER SAWYER:  We wont

4   consider the irrelevant documents in our

5   deliberations.

6       ATTORNEY DEFILIPPIS:  Ok.

7       PRESIDING COMMISSIONER SAWYER:  Are there

8   any preliminary objections?

9       ATTORNEY DEFILIPPIS:  On the March 2005 CC1

10  report the summary, section six A, there is a

11  statement in there that is clearly inappropriate

12  for a CC1 to be making.

13      PRESIDING COMMISSIONER SAWYER:  Which page

14  is that?

15      ATTORNEY DEFILIPPIS:  Page three of the

16  report.  The summary, section A of the summary.

17      PRESIDING COMMISSIONER SAWYER:  Ok.

18      ATTORNEY DEFILIPPIS:  He is talking about

19  what appears to be his psychological opinion.  I

20  would move to strike that from the record.

21      PRESIDING COMMISSIONER SAWYER:  I will

22  strike it.  They can't recommend, and

23  particularly they can't recommend therapy

24  programs.

25      ATTORNEY DEFILIPPIS:  The other is simply

26  as to these opposition letters, these all appear

27  to be letters that should have been provided

14

1   well in advance of the August 12th hearing when


1   well in advance of the August 12th hearing when

2   we showed up for that, and ready to go.  And

3   they have not been provided to me, they were not

4   contained in the lifer-hearing packet that I

5   received.  I would object to them on the grounds

6   of untimely ness, I would also object to them on

7   the grounds that what we have is, and they are

8   just to voluminous to go through.  But the vast

9   majority of these are petitions, they are all in

10  a virtual identical format.  It appears to be

11  somewhat of a preprinted form that has

12  circulated throughout the country.  They are

13  coming from Houston Texas, Michigan, from Ohio,

14  there is numerous areas throughout New

15  Hampshire, Arizona, Texas, and they are just all

16  over the place.  And first of all, persons other

17  than the victim's next of kin should not be

18  providing commentary regarding the situation

19  that they just don't have any of the factual

20  knowledge to, to give comments upon.  So we

21  don't have nothing showing a foundation for them

22  or knowledge to be giving an opinion in this one

23  way or the other.  Furthermore citizens from

24  outside the, if they are citizens we don't know

25  that, individuals from outside the state of

26  California certainly don't have any standing on

27  commenting upon a preceding within the state of

15

1  California.  It is a matter of state law, not

2  something of a nationwide concern.  So I would

3  object to all these letters being considered.

4      PRESIDING COMMISSIONER SAWYER:  Are you

5  specifically objecting to the petitions or

6  because they are if you notice in your file

7  there.

8      ATTORNEY DEFILIPPIS:  There are a couple of

9  personal letters, I saw a letter from the

10  parents of John Heinz, which would appear to be

11  appropriate and they are also here to speak.

12  Charles Holtz which would appear to be a cousin

13  of John Heinz.  Family friend I am not objecting

14  to that.

15      PRESIDING COMMISSIONER SAWYER:  And I have

16  a nephew, a letter from a nephew.

17      ATTORNEY DEFILIPPIS:  But as far as the

18  petitions are what troubles me.  And there is

19  just literally appears to be hundreds of them.

20      PRESIDING COMMISSIONER SAWYER:  Ok, since

21  you have already noted the petitions are in the

22  file, I will sustain that part of the objection

23  and on the petitions only.  I will however enter

24  into the record as many of the opposition

25  letters that are of more of a personal nature.

26      ATTORNEY DEFILIPPIS:  Thank you.

27      PRESIDING COMMISSIONER SAWYER:  Ok,

16

1  anything else?

2      ATTORNEY DEFILIPPIS:  Not at this time.

3      PRESIDING COMMISSIONER SAWYER:  Ok, will

4  the inmate be speaking with the panel today?

5      ATTORNEY DEFILIPPIS:  Yes he will, he will

6  not be discussing the commitment offense but he

7  will be discussing all other issues.

8      PRESIDING COMMISSIONER SAWYER:  Ok.

9      ATTORNEY DEFILIPPIS:  We will submit the

10  issue on the commitment offense based on his

11  prior testimony at the prior hearings and to all

12  the counselors and psychologists.

13      PRESIDING COMMISSIONER SAWYER:  Ok, raise

14  your right hand, Mr. Rush.  Do you solemnly

15  swear or affirm the testimony you are about to

16  give at this hearing will be the truth, the

17  whole truth and nothing but the truth?

18      INMATE RUSH:  I do.

19      PRESIDING COMMISSIONER SAWYER:  Thank you.

20  I am going to be reading from the July 2002

21  because the subsequent reports were just

22  updates.

23      ATTORNEY DEFILIPPIS:  Will you be including

24  the prisoner's version as well?

25      PRESIDING COMMISSIONER SAWYER:  Yes.

26      ATTORNEY DEFILIPPIS:  Thank you.

27      PRESIDING COMMISSIONER SAWYER:  At sometime

17

1   before July 1, 1986, at their residence John

2   Heinz, victim, and his roommate Robert Rush,

3   subject, had an argument and a physical

4   altercation over household responsibilities.

5   Robert Rush shot John Heinz numerous times with

6   a 22-caliber rifle.  Following the murder

7   another roommate Marcus Hoy, codefendant,

8   arrived at the residence.  Rush and Hoy cleaned

9   the house of incriminating evidence and placed

10  the victims body in plastic bags in a sleeping

11  bag.  Rush and Hoy drove the body to Dover

12  Canyon area where they buried the victim.  The

13  buried victims wallet and identification in a

14  separate location.  Rush and Hoy later took and

15  left the victims truck in Riverside.  Rush and

16  Hoy used the victim's money to go drinking.  The

17  source of this was the probation officers report

18  pages one through three.  The prisoner's version

19  Rush states that he and the victim were

20  roommates along with a couple of other college

21  students.  On the day of the incident Rush and

22  Heinz got into an argument over the household

23  issues.  Heinz then physically attacked Rush by

24  pushing him to the ground and beating, kicking

25  and verbally mocking him.  Rush felt scared and

26  helpless and went looking for a weapon to

27  protect himself.  Rush grabbed a 22 rifle from

18

1   underneath his bed.  Rush then stepped into the

2   hallway on the way to the bathroom to clean up

3   his bloody nose.  Rush was carrying the rifle

4   and cocked it and told Heinz to back off.  Heinz

5   then lunged towards him, Rush flinched and the

6   gun went off.  Rush state that he was shocked at

7   what had occurred and didn't know what to do.

8   Just as then his roommate Hoy came and told him

9   what had happened, and asked him what to do.

10  Hoy suggested they hide the body, so that no one

11  would ever know what happened.  Rush states that

12  he was frightened and ashamed for what he has

13  done.  He also went along with the plan to hide

14  the body, they buried the body, Rush did his

15  best to go on as if nothing happened.  Rush

16  states that he did tell his other roommate

17  Galloway what happened.  Several weeks after

18  that he was arrested after Galloway turned him

19  in.  Rush does not blame Galloway but wishes he

20  had come forward immediately after the incident.

21  Ok, Mr. Rush I am going to talk about first of

22  all according to our board report you don't have

23  any convictions or any arrests?

24      **INMATE RUSH:**  That's true.

25      **PRESIDING COMMISSIONER SAWYER:**  As a

26  juvenile or an adult?

27      **INMATE RUSH:**  That's true.

19

1    **PRESIDING COMMISSIONER SAWYER:** Could we
2    pull that mike a little bit up to him he is
3    somewhat soft spoken and I don't want to, thank
4    you. You graduated from Rim of the World High
5    school in 1983?

6    **INMATE RUSH:** Yes.

7    **PRESIDING COMMISSIONER SAWYER:** That is a
8    school that is right up on top of by Arrowhead?

9    **INMATE RUSH:** Right.

10   **PRESIDING COMMISSIONER SAWYER:** Between
11   Arrowhead and Big Bear?

12   **INMATE RUSH:** Right.

13   **PRESIDING COMMISSIONER SAWYER:** I know
14   where that is. Can't get much taller than that
15   can you?

16   **INMATE RUSH:** No.

17   **PRESIDING COMMISSIONER SAWYER:** You also
18   attended the California State University San
19   Bernadino for a time, at the time of the
20   offense. And noted you had a certificate of
21   completion of vocational drafting and
22   architectural courses at that school?

23   **INMATE RUSH:** Uh no, I got that from the
24   vocational program here at Soledad. I had
25   majored in geography at Cal State but I had not
26   obtained a degree yet.

27   **PRESIDING COMMISSIONER SAWYER:** And what is

1   your, do you have a degree now?

2       **INMATE RUSH:**  Yes I got a degree in social

3   science from San Jose State, and a masters in

4   humanity from Cal State Dominguez Hills, while

5   incarcerated.

6       **PRESIDING COMMISSIONER SAWYER:**  Ok, that is

7   all by mail?

8       **INMATE RUSH:**  Yah, the program for San Jose

9   State the professors actually came here to the

10  prison and lectured and had a course.  But the

11  master's degree was by correspondence.

12      **PRESIDING COMMISSIONER SAWYER:**  How many

13  units did you earn while you were in prison?

14      **INMATE RUSH:**  I earned 30 units at

15  Hartnell, 60 at San Jose, to complete my

16  bachelors.  And then another 30 from Cal State

17  Dominguez Hills for my masters.

18      **PRESIDING COMMISSIONER SAWYER:**  And was

19  your masters on correspondence?

20      **INMATE RUSH:**  Yes it was.

21      **PRESIDING COMMISSIONER SAWYER:**  How did you

22  pay for that?

23      **INMATE RUSH:**  My parents did.

24      **PRESIDING COMMISSIONER SAWYER:**  Ok, it says

25  here that you had worked at Stickles, as a

26  painter until the time of your arrest.  Prior

27  employment also consisted of working at Wyle

1    Woods conference center as a maintenance

2    employee.  Ok, did you have any other jobs while

3    you were going to school or after you graduated

4    from high school?

5         INMATE RUSH:  I worked summers as a

6    dishwasher at the yacht club in Lake Arrowhead.

7    After high school I worked for three years at

8    Wyle Woods which is right on the rim, a ways

9    away from the high school.  And the summer of

10   this incident I had just got a job as a painter.

11        PRESIDING COMMISSIONER SAWYER:  Was that a

12   house painter?

13        INMATE RUSH:  Yah as a house painter.

14        PRESIDING COMMISSIONER SAWYER:  Ok, it says

15   here your future plans have remained the same as

16   in previous reports with the exception that the

17   inmate's father changed addresses.  How old is

18   your father now?

19        INMATE RUSH:  He is 64, I think.

20        PRESIDING COMMISSIONER SAWYER:  And you

21   mothers --

22        INMATE RUSH:  My mother passed away four

23   years ago.

24        PRESIDING COMMISSIONER SAWYER:  Ok, and he

25   lives in Grass Valley in Lake Arrowhead?

26        INMATE RUSH:  Yes.

27        PRESIDING COMMISSIONER SAWYER:  Ok, tell me

22

1  about your job offers?

2      INMATE RUSH:  I have a letter from the

3  Melengers who are family friends who run their

4  own home construction business and they have

5  offered me a position working with them in

6  whatever capacity they have at the time.  That

7  is the only concrete job offer I am able to get

8  at this time.  I also have a letter from Walter

9  Esrick who is a friend from college, a fellow

10  geography major and he assures me that there are

11  jobs available using my drafting skills in the

12  cartographic field that he works in.  And he

13  will take me around and help me find a job,

14  which is what I want to pursue as a career.

15      PRESIDING COMMISSIONER SAWYER:  As a

16  Cardiographer?

17      INMATE RUSH:  Cartographer, mapmaker

18  basically.

19      PRESIDING COMMISSIONER SAWYER:  And what

20  was his name?

21      INMATE RUSH:  Walt Eschrich.

22      PRESIDING COMMISSIONER SAWYER:  And where

23  is his business located?

24      INMATE RUSH:  In the Redlands I believe.

25      PRESIDING COMMISSIONER SAWYER:  And the

26  Mellingers where do they have their place?

27      INMATE RUSH:  In Lake Arrow Head.

23

1    **ATTORNEY DEFILIPPIS:** Just for the record

2    that is Mellinger, there should be in the

3    support letters a copy of the letters from both

4    Mellingers and Mr. Eschrich.

5    **PRESIDING COMMISSIONER SAWYER:** Thank you.

6    And has there been any talked with either of

7    these two job offers as to what kind of money

8    you will be making?

9    **INMATE RUSH:** Walt assures me that within

10   the field, within a couple of years once I prove

11   my skills, I can be making up to 40,000 dollars

12   a year. The Mellingers I haven't spoken with

13   them directly about how much they will pay.

14   That's basically just a short-term job until I

15   can get my foot in the door somewhere else.

16   **PRESIDING COMMISSIONER SAWYER:** So that

17   would be more manual labor than skilled labor?

18   **INMATE RUSH:** Yah they do their own

19   drafting so I would do some drafting for them,

20   but a lot of it would be manual labor or

21   whatever jobs they have available.

22   **PRESIDING COMMISSIONER SAWYER:** When did

23   you receive your certification for drafting?

24   **INMATE RUSH:** I believe it was in 1995 or

25   1994.

26   **PRESIDING COMMISSIONER SAWYER:** Have you

27   gone back for any updates?

24

1    **INMATE RUSH:**  I continued to go back
2   whenever I had the opportunity and brush up on
3   my skills.  Working within the education
4   department but I speak by phone with Walt as I
5   believe he mentions in his letter.  And they
6   still use the same software called AutoCAD for
7   drafting programs on the street, so it would not
8   be a big stretch for me.
9    **PRESIDING COMMISSIONER SAWYER:**  It hasn't
10   changed much through the years?
11   **INMATE RUSH:**  No it hasn't.
12   **PRESIDING COMMISSIONER SAWYER:**  Ok.
13   **ATTORNEY DEFILIPPIS:**  Just so you know he
14   actually stayed a few years extra in the program
15   being on obtaining the certification.
16   **INMATE RUSH:**  Yah I worked in the drafting
17   as a teacher's aide, teaching other students
18   drafting until 1999.
19   **PRESIDING COMMISSIONER SAWYER:**  Ok, it
20   appears that we have a large volume of letters
21   and I am going to do my very best to summarize
22   on both sides.  It appears to be a letter-
23   writing contest here.  With over an inch of both
24   opposition letters and letters of support.  And
25   I am going to try and be fair with everyone
26   because of, we will get to the essence I will
27   deal with the essence as opposed to reading

1  every letter in.  If there was only two or three

2  letters on each side we would certainly deal

3  with that.  I have a letter from Connie Chamlee

4  and she has known your family for over 20 years.

5  Do you know who Connie Chamlee is?

6      **INMATE RUSH:**  Yes, I believe she is a

7  friend of my mothers.

8      **PRESIDING COMMISSIONER SAWYER:**  Ok, I have

9  a letter from July 5, 2005 from Kevin M.

10  Chantry.

11      **INMATE RUSH:**  Canty I don't believe there

12  is an R.

13      **PRESIDING COMMISSIONER SAWYER:**  And do you

14  know this person?

15      **INMATE RUSH:**  The Canty's are my father's

16  cousins.

17      **PRESIDING COMMISSIONER SAWYER:**  So your

18  second cousins?

19      **INMATE RUSH:**  Yes.

20      **PRESIDING COMMISSIONER SAWYER:**  And I have

21  a letter from July 6, 2005 and this is from John

22  Warnecke, captain in the U.S. Navy.  Do you know

23  that person?

24      **INMATE RUSH:**  Also my fathers family.

25      **PRESIDING COMMISSIONER SAWYER:**  Ok another

26  letter of support.  And I have a letter from a

27  Presbyterian pastor and a navy chaplain, Robert

26

1   E. Williams from Walnut Creek on July 8, 2002 of

2   support.  June 29, 2005 a letter from Martha

3   Hansen.  She is a friend of your mother?

4       INMATE RUSH:  Yes.

5       PRESIDING COMMISSIONER SAWYER:  Another

6   letter of support from June 28, 2005 another

7   letter from Paul E. Canty, another friend.  I

8   have a letter from Martin A. Nicholas in Bend

9   Oregon.  He knew you when you were at the Rim of

10  the World High school.

11      INMATE RUSH:  He was one of my teachers.

12      PRESIDING COMMISSIONER SAWYER:  A letter of

13  support a letter from your father obviously

14  supportive dated June 28, 2005 it talks about

15  what you have been doing while you have been in

16  custody.  He indicates family support, a place

17  to live.  A letter from Doctor William Stanley

18  the III, from June 28, 2005, a letter of

19  support.  A letter dated June 27, 2005 from

20  Luann Landgraf, says she knows your father. Do

21  you know her?

22      INMATE RUSH:  She is dating my father

23  currently, she has written to me several times.

24      PRESIDING COMMISSIONER SAWYER:  Have you

25  ever met her?

26      INMATE RUSH:  Not yet.

27      PRESIDING COMMISSIONER SAWYER:  Ok, a

1  letter of support then I have a letter from

2  Wendy Landham, residence of San Bernadino this

3  is dated June 2002 and there is a note on the

4  bottom of it this information has not changed

5  signed Wendy Landham.  She knows your parents?

6      **INMATE RUSH:**  Yes.

7      **PRESIDING COMMISSIONER SAWYER:**  And then I

8  have a letter of job offers from June 24, 2005

9  from Mellinger, L. Mellinger from

10  (indiscernible) Forest California.  It is up

11  near Arrow Head and Big Bear?

12      **INMATE RUSH:**  Yes.

13      **PRESIDING COMMISSIONER SAWYER:**  And updated

14  letter from 2002 to 2005 continued support for

15  your release and this is signed by Terry Moore.

16  A letter from Blue Jay from June 24, 2005 from

17  Charlene Wells.  Another one from Daryl and

18  Patricia or rather Daryl and Lucille Steelwell,

19  a note on that letter of support.  Diane Poarch,

20  again noted on here updated letter from 2002 of

21  support.  Evan Ross (indiscernible) from the

22  First Presbyterian Church in Burbank.  And it is

23  a letter of support.  Angie Rush--

24      **INMATE RUSH:**  My sister in law.

25      **PRESIDING COMMISSIONER SAWYER:**  Stafford

26  Virginia and who is she married to?

27      **INMATE RUSH:**  My brother, I believe there

1  is a letter from his also.

2      PRESIDING COMMISSIONER SAWYER:  And Billy

3  Weiss, June 22, 2005 has known you since you

4  were 15 a letter of support.  And another letter

5  of support from Darlyne Hopkins, June 19, 2005 a

6  friend of your father and mother.

7      INMATE RUSH:  Yes.

8      PRESIDING COMMISSIONER SAWYER:  Talks about

9  what you have done in prison and is supportive.

10 A letter from Roy E. Holes June 17, 2005

11 supportive.  And this is your brother Brian?

12     INMATE RUSH:  Brian Rush yes.

13     PRESIDING COMMISSIONER SAWYER:  Brian Rush

14 who is a major in the U.S. Marine Corps.  A

15 letter of support.  Iris and Matt Riggs, Running

16 Springs California, in June 2005 a letter of

17 support.  And another letter from Joan, help me

18 on this one, Raese, from Wanachi Washington.

19     INMATE RUSH:  Yes that is my mother's

20 cousin.

21     PRESIDING COMMISSIONER SAWYER:  Ok, a

22 letter of support from Marjory Eide.  A letter

23 of support, a hand written letter from Thomas

24 Raese.

25     INMATE RUSH:  My mothers cousin.

26     PRESIDING COMMISSIONER SAWYER:  A letter

27 from Bruce and Carl Wagner, June 16, 2005.  A

1   letter of support from Linda West of Cedar land

2   in June 18, 2002.  With an update.  She now

3   lives in Hermosa Beach.  Lodeyk and Pamela

4   Zubko, and it is a letter of support.  Ionwraese

5   Boulder Colorado a letter of support.  Another

6   letter of support from Walter Raese an uncle.

7        **INMATE RUSH:**  From West Virginia.

8        **PRESIDING COMMISSIONER SAWYER:**  NO date on

9   that.  William Roberts, he retired and the boss

10  at Blue jay June 2005.  A letter of support Anna

11  and Ralph Bouer, June 15, 2005.  A support

12  letter from Catherine W. Long, on February 13,

13  2005.  A support letter from June 13, 2005

14  William Freuler.  A letter of support an updated

15  letter from 2002 from Cheryl Moxely-Shaw.  A

16  letter of support and Lee Bandenberg June 10,

17  2005.  A letter of support, Tom Ottoson, an

18  updated letter from 2000.  The only date on it

19  is updated June 9, 2005.  Another letter from

20  the Bandenbergs.  Margaret Dickson, retired

21  school teacher a letter from June 2005.  Another

22  2005 June letter is Monica Dam, (indiscernible).

23  Rowland Hoffman and Mary Hill Hoffman, June 7,

24  2005.  A letter of support, Patricia Ottoson, an

25  updated letter of June 9, 2005 from 2002.  A

26  letter of support John W. Raese, a letter of

27  support from 2002.  Now I am starting to run

1    into some duplicates.  Here is one from 2002
2    Acuna, Manuel and Barbara Acuna.  A letter of
3    support here is the one I was looking for.  This
4    is date March 6, 2005 Walter Escherich, he works
5    for a 100 year old civil engineering firm.  And
6    he is the program metric arm of the operation.
7    It says that he is 40 years old spend 40 hours a
8    week working for a 100-year-old civil
9    engineering firm.  And holds down the program
10   metric arm of the operation.
11       **INMATE RUSH:**  That is a typo, it is
12   photogramentor.
13       **PRESIDING COMMISSIONER SAWYER:**  Ok.
14       **INMATE RUSH:**  Essentially map making from
15   aerial photography.
16       **PRESIDING COMMISSIONER SAWYER:**  He first
17   met you as a college freshman and he talks about
18   how you have learned engineering and
19   architecture software package called AutoCAD.
20   You know it very well.  Has he been up to visit
21   with you?
22       **INMATE RUSH:**  I talk to him on the phone
23   regularly.
24       **PRESIDING COMMISSIONER SAWYER:**  He feels
25   that you have a valuable skill that would lend
26   itself heavily into the credential as a team
27   member in any architecture or engineering firm.

31

1   He says he as some pull in his office, he

2   doesn't own this company?

3       **INMATE RUSH:**  No he doesn't.

4       **PRESIDING COMMISSIONER SAWYER:**  In terms of

5   personnel, how many people do they hire or do

6   they have working?

7       **INMATE RUSH:**  I think they are a small firm

8   with maybe a dozen people working in the shop.

9       **PRESIDING COMMISSIONER SAWYER:**  Ok, he

10  feels you would fit well, fit in well, sees no

11  reason why you cant be employed as a CAD

12  operator draftsman.  (indiscernible).  A letter

13  from Roy E. Holes, from 2002 I am now seeing

14  duplications from 2002.  In the area of

15  opposition letters is as I discussed with the

16  inmates counsel we are not considering petitions

17  and there are a lot of petitions here.  Someone

18  went to a lot of work to get these petitions

19  done.  A letter of reference from a cousin to

20  John R. Heinz, Charles A.m. Holtz, this is

21  August 2005.  A letter of opposition it talks

22  about the crime.  A letter from Roland Estrada,

23  in opposition.  A letter from Martha S. Coker,

24  dated July 28, 2005 has known the mother of John

25  Raymond Heinz for 57 years, the father for 50.

26  And is opposed to a parole date.  A letter from

27  Jean and Joe Pascale, talks about the crime and

32

1    is strongly opposed to an early release.  I have
2    a letter from Raymond Heinz and Helen Heinz
3    mother and father who are represented here
4    today.  Opposed to an early release.  I have a
5    letter of opposition from Father Jerome Karcher,
6    from the St. Vincent Depaul Roman Catholic
7    Church on August 8, 2005.
8        ATTORNEY DEFILIPPIS:  Actually for the
9    record that does state an conditional opposition
10   unless there has been some serious and real
11   rehabilitation.
12       PRESIDING COMMISSIONER SAWYER:  My letter
13   says, I think it is important to support justice
14   for this crime and unless there has been some
15   real and serious rehabilitation he would be a
16   threat to society.
17       ATTORNEY DEFILIPPIS:  Correct.
18       PRESIDING COMMISSIONER SAWYER:  Is that
19   what you meant?
20       ATTORNEY DEFILIPPIS:  Yes.
21       PRESIDING COMMISSIONER SAWYER:  A letter
22   from July 24, 2005 from John Heinz's cousin,
23   Edith I. West.  Respectively requests Robert
24   Rush not be granted parole.  A letter received
25   on August 8th from John Eric Heinz, a cousin in
26   opposition.  A letter from July 19, 2005 from
27   Jim and Dorothy Weitzel, from Washington State,

33

1  they knew the family and Jim and Raymond Heinz
2  served together in the National Guard.  They
3  attended the same church in Mariposa.  A letter
4  from Marie Higgins, dated July 31, 2005 would be
5  opposed to parole.  A letter July 30, 2005
6  opposed to parole from Elaine it looks like it
7  is spelled Dabriuer, anybody know that name.
8  Ok, that is a aunt, that is an aunt.  A letter
9  from Cecelia Duckworth, this is July 26, 2005,
10  asking us to oppose deny parole of Robert Rush.
11  This is another aunt.  Ok August 3, 2005 a
12  handwritten note asking for a denial of parole
13  by Bob and Donna Azeveda.  And another
14  handwritten letter, July 25, 2005 asking us to
15  deny parole for Mr. Rush.  And this is by
16  Francis Fischbeck and family.  A letter from
17  Spencer Heinz, July 25, 2005, a cousin of the
18  victim John Heinz.  Says I strongly urge us to
19  consider denying parole.  Very strong opposition
20  for parole for Robert Rush by Catherine Holtz
21  that is dated July 24, 2005.  A letter from Paul
22  Weitzel, friends of the Heinz family, and please
23  do not ever release Robert Rush.  July 22, 2005
24  Janine Mills and Marian Mills asking for a
25  denial.  And a letter from July 21, 2005,
26  friends of the family, that is illegible I cant
27  read it, it is a copy.  A poor copy machine but

1    it is an opposition letter.  A letter from Eva

2    Brown dated July 20, 2005, second cousin to John

3    Raymond Heinz, Rush should not be paroled.

4    Another letter asking for request of parole be

5    denied at this time by Carl J. Heinz, July 20,

6    2005.  Carl M. Carcher, Carl's Junior asking

7    that he be denied parole.  And this letter is

8    dated July 18, 2005.  Another one on July 18,

9    2005 was Margaret M. Carcher, sister of Ray

10   Heinz.  Opposition hand written letter from aunt

11   to John Heinz, Lori is it Hainer, Hanes.  Thank

12   you.  This was July 17 opposed to parole.  Lucy

13   and Frank Carcher dated July 16, 2005 deny

14   parole.  Elvera Holtz, July 15, 2005, John Heinz

15   was her nephew and is opposing parole.  Another

16   opposition letter dated July 13, 2005 from James

17   and Carrie Anderson.  I have an undated letter

18   from Tommy Iebrit, Britan.  It is handwritten.

19   A letter of opposition uncle to John Raymond

20   Heinz, is it Clemen Heinz?  Clemence Heinz

21   opposition letter.  Joseph and Eleanor Heinz,

22   July 11, 2005 strongly request parole not be

23   given.  July 11, 2005 a letter urging or oppose

24   to parole for Robert D. Rush from Marie Patin.

25   Ok another letter from Helen and Ray Heinz this

26   one was dated July 6th.  And I get to the bottom

27   of the letters, thank you for bearing with me.

35

1    And we had a few letters in this case.   At this
2    time I will turn it over to Deputy Commissioner
3    Weaver.

4        **DEPUTY COMMISSIONER WEAVER:**   Thank you sir.
5    Mr. Rush you last appeared before the board on
6    March 5, 2003.   There was an attempt to a
7    hearing on August 12, 2005 but at that time
8    outside statements from the victims the hearing
9    was essentially continued and so consequently
10   the final decision of March 5, 2003 was the last
11   full hearing you participated in.   The board
12   report that was done for this hearing it was
13   (indiscernible) there was an addendum that was
14   completed dated September 16, 2005 by counselor
15   DeGuzman, and that just indicates that you
16   remain here at Soledad with custody in Medium A
17   and you are a clerk in the education bridging
18   program.   Prior to that a report was submitted
19   by a counselor Arno, Arno signed it of December
20   22, 2004 and it was dated, the report was dated
21   March of 2005.   And it indicates that with
22   regard to post conviction factors that you have
23   remained here at CTF and in the general
24   population with a Medium custody.   That you have
25   had exceptional work reports and in December of
26   2003 you were reassigned as the bridging program
27   clerk and received above average ratings in all

36

1  categories of work reports.  It also indicates
2  that you have been involved in AA since the time
3  of the last report.  And that you have completed
4  Doctor Thomas Gordon's family effectiveness
5  training-harmony in the home self-help program.
6  And it says that you received laudatory chronos
7  for your assistance with the CTF video reports
8  program and that you were participating in the
9  anger management and fatherhood lecture series.
10 Under disciplinary history the, it says you have
11 been disciplinary free during this period,
12 however your record does not indicate any
13 disciplinaries in terms of 115's.  There is one
14 128 a in the record indicating that you
15 apparently went to an assignment early and you
16 were chastised for being at that assignment
17 early.
18      **ATTORNEY DEFILIPPIS:**  Excuse me sir what
19 was the date of that 128?
20      **DEPUTY COMMISSIONER WEAVER:**  For going to
21 work early, or going to his assignment early?
22 In November 10, 1988.  The record goes on the
23 say that the March 5, 2003 hearing that you were
24 denied parole for two years and in the
25 recommendations were to remain disciplinary
26 free, the counselor indicates that, that was
27 accomplished and that you were to continue to

37

1   participate in self-help programs, that was

2   accomplished.  The counselor, counselor Arno

3   indicates that there was a interview with you

4   that lasted approximately an hour and a half.

5   And a file review lasting three hours.  The

6   overall record indicates that you have been

7   involved in a number of programs at one point

8   and time I believe you worked for industries for

9   a short period of time.  On some type of

10  stitching machine.  However the primary area

11  that you functioned in is participating in the

12  drafting program, and you not only completed

13  that but you stayed on as a class tutor or

14  whatever to assist other students in that

15  particular program.  There are a number of

16  chronos in the file indicating that you have

17  participated a number of years in the AA program

18  and that you are a contributing member and that

19  you have positively participated and shown his

20  ability to understand and comprehend all aspect

21  of the 12 steps program.  And that is signed by

22  Mr. Rodriguez who has been a sponsor for a

23  lengthy period of time.  Did you learn the

24  steps?

25       **INMATE RUSH:**  Yes I did.

26       **DEPUTY COMMISSIONER WEAVER:**  What's the

27  fourth step?

38

1      **INMATE RUSH:**  The fourth step is to make a

2  searching and fearless moral inventory.

3      **DEPUTY COMMISSIONER WEAVER:**  Have you done

4  that?

5      **INMATE RUSH:**  Yes I have.

6      **DEPUTY COMMISSIONER WEAVER:**  Mr. Rodriguez

7  has numerous chronos in here going back for

8  many, many quarters of participation in AA.

9  There is also a laudatory chrono for June 24,

10  2004 for, as the counselor mentioned, your

11  participation with the CTF Video reports program

12  and self-study program, that involves the

13  broadcast of educational videos for the

14  (indiscernible) facility.  There is a chrono by

15  the senior librarian.  Cauntay, indicating that

16  you have successfully completed Doctor Thomas

17  Gordon's family effectiveness training / harmony

18  in the home self-program.  That chrono is dated

19  February 7, 2004.  And it says it consists of

20  six two-hour sessions covering the following

21  topics.  And there is a number of topics listed

22  including resolving conflicts peacefully.  Then

23  it says the program is recognized by CTF

24  psychology staff as an beneficial limited

25  instruction self-help program.  There is a

26  chrono dated March 13, 2003 and that had to do

27  with completing a course in the cause prevention

1  treatment and management of hepatitis.  With

2  regard to academic endeavors, the record

3  indicates that you were an honor student at

4  Hartnell College?

5      INMATE RUSH:  Yes.

6      DEPUTY COMMISSIONER WEAVER:  Initially and

7  then you went on and received a Bachelors Degree

8  from San Jose State and you also received a

9  Masters degree from Cal State Dominguez Hills,

10  is that correct?

11      INMATE RUSH:  That is correct.

12      DEPUTY COMMISSIONER WEAVER:  And you have

13  taken some other classes.  There are

14  certificates in the file, indicating that in

15  addition to the ones that I have mentioned you

16  have taken a HIV AIDS class in 2000.  You

17  completed an entraupanur development class in

18  1999.  The Masters degree is dated May 24, 1997.

19  Is that correct?

20      INMATE RUSH:  That is correct.

21      DEPUTY COMMISSIONER WEAVER:  And then there

22  is a certificate of completion for the

23  vocational drafting / mechanical drafting class

24  and I don't see a date on that.

25      INMATE RUSH:  There should be one on the

26  back.

27      ATTORNEY DEFILIPPIS:  April 2, 1997.

1    **DEPUTY COMMISSIONER WEAVER:** Thank you.
2    And the Bachelors degree from San Jose State
3    which was dated December 28, 1990. Impact
4    program certificate dated February 26, 2001.
5    And your Hartnell AA degree was dated August
6    1989. It doesn't have a specific date on it I
7    believe. And you were on the Presidents honor
8    role at Hartnell, correct?
9    **INMATE RUSH:** That is correct.
10   **DEPUTY COMMISSIONER WEAVER:** You have been
11   involved in some other programs, the children's
12   holiday festival you participated in and I
13   believe that there were some other endeavors
14   that were noted. And I want to see if I can
15   locate that. You've had work reports, CDC one-
16   work reports from Mr. Brombach, and that is a
17   (indiscernible) clerk with all exceptional to
18   average grades. And that chrono is dated June
19   3, 2004. Most all the work reports that have
20   been submitted, and I believe that your counsel
21   handed copies of these laudatory ones which are
22   validated in the Central File. I will indicate
23   grades one or two which is exceptional or above
24   average. Is there anything that I have failed
25   to mention regarding your endeavors? Either at
26   Soledad?
27   **INMATE RUSH:** I don't believe so, I think

41

1  you have covered everything.  For the record I

2  recently changed jobs and I am now a clerk in

3  the library.  This happened two weeks ago.

4      **DEPUTY COMMISSIONER WEAVER:**  Ok, the chrono

5  from Mr. Brombach, the CDC 101 was dated

6  December 1, 2004 is the most recent one that is

7  in the Central File so you may have some other--

8      **INMATE RUSH:**  There as one that was

9  completed when I changed jobs but I believe it

10 hasn't made it into the file yet.

11     **DEPUTY COMMISSIONER WEAVER:**  Ok, that is

12 often the case.

13     **ATTORNEY DEFILIPPIS:**  I think there was

14 also a couple of laudatories for participation

15 in the education department graduation programs

16 over the years.

17     **INMATE RUSH:**  Oh, yes that is correct.

18     **DEPUTY COMMISSIONER WEAVER:**  All right I

19 believe that I did see those.  Anything else

20 counsel?

21     **ATTORNEY DEFILIPPIS:**  Nothing I can think

22 of thank you.

23     **ATTORNEY DEFILIPPIS:**  Did you mention the

24 fatherhood and anger management course?

25     **DEPUTY COMMISSIONER WEAVER:**  Yes, with

26 regard to the most recent psychological report

27 that is in the file, the psychological report is

1    dated June 28, 2005.  And it was done by Doctor

2    Talbott, and Doctor Talbott primarily refers to

3    the previous report done by Doctor Terini.  That

4    was done in 1999.  How long did Doctor Talbott

5    interview you Mr. Rush?

6        INMATE RUSH:  I meet with him I believe

7    three or four times for maybe up to an hour.

8        DEPUTY COMMISSIONER WEAVER:  It doesn't

9    indicate in the report the length or the

10   frequency of interviews.  Doctor Talbott

11   repeatedly refers to Doctor Terini's 1999 report

12   and says there have been no changes.  Under

13   substance abuse history it says that he used

14   alcohol first at 18, drinking socially at some

15   parties in college.  Went on to say he had also

16   used marijuana but only about three times.  Have

17   you ever had an alcohol problem?

18       INMATE RUSH:  No.

19       DEPUTY COMMISSIONER WEAVER:  Did you drink

20   about the time this offense occurred?

21       INMATE RUSH:  No.

22       DEPUTY COMMISSIONER WEAVER:  What about

23   prior to the life crime had you been drinking

24   prior to that?

25       INMATE RUSH:  No.

26       DEPUTY COMMISSIONER WEAVER:  No, all right

27   under diagnostic impressions Doctor Talbott says

43

1   no contributory clinical disorder on AXIS I or

2   on and on AXIS II no contributory personality

3   disorder.  He gives you a GAF score of 85.  And

4   Doctor Talbott's indicates that I am in

5   agreement with Doctor Terini's his violence

6   potential (indiscernible) is less than that of

7   an average level two inmate.  I also agree with

8   Doctor Terini that the inmates potential for

9   violence within the free community is no more

10  than that of the average citizen.  You are not

11  level two are you?

12      **INMATE RUSH:**  Yes.

13      **DEPUTY COMMISSIONER WEAVER:**  And what is

14  your classification score right now, is zero.

15      **INMATE RUSH:**  Yes but you are not in a

16  institution with commensurate with the

17  classification score are you?

18      **INMATE RUSH:**  Yes, Central here is a level

19  two facility.

20      **ATTORNEY DEFILIPPIS:**  Lifers can't go to

21  level one, so even though he has a zero they now

22  give him a bottom score of 19 for housing

23  purposes.  So that they stay level two.  He has

24  been at zero since 1997.

25      **INMATE RUSH:**  I think so.

26      **ATTORNEY DEFILIPPIS:**  I think it is 1997.

27      **DEPUTY COMMISSIONER WEAVER:**  In looking at

44

1   the prior psychiatric report of Doctor Terini,

2   that Doctor Talbott referred to, Doctor Terini

3   in part said under current mental status

4   treatment needs that there was evidence of a

5   motor thought disorder.  And under review of

6   life crime Doctor Terini indicated that inmate

7   Rush described the circumstances surrounding his

8   commitment offense as his description was quite

9   similar to that given in past BPT psychological

10  evaluations.  He acknowledged showing poor

11  judgment in deciding to bury the victim's body.

12  He stated in past BPT reports that his fear of

13  the victim was a significant factor in his

14  crime.  Remorse that he expressed was quite

15  appropriate and genuine.  And also Doctor Terini

16  in under second 15 number three, it does not

17  appear that this man ever had a significant drug

18  or alcohol program and so there are no

19  recommendations in this area.

20      **ATTORNEY DEFILIPPIS:**  Problem.

21      **DEPUTY COMMISSIONER WEAVER:**  Pardon me?

22      **ATTORNEY DEFILIPPIS:**  Problem, you said

23  program.

24      **DEPUTY COMMISSIONER WEAVER:**  Alcohol

25  problem, so there are no recommendations in this

26  area in the documents that your attorney gave me

27  it indicates that after the motorcycle accident

1  which occurred prior to life crime, you are

2  quoted as saying I was very depressed and in

3  constant pain.  I layed around the house,

4  watched television drank beer, and I gave up on

5  myself and felt very hopeless.  And this is in

6  the document that and a sentencing memorandum

7  that your attorney gave me.  Is that a true

8  statement?

9      **INMATE RUSH:**  Yes that refers to the period

10  between the accident and the crime.

11      **DEPUTY COMMISSIONER WEAVER:**  Yah it says I

12  was depressed and in constant pain, layed around

13  the house, watched television, and drank beer.

14  I give up on myself and felt hopeless.  Other

15  places in this document, it talks about

16  significant depression, regression, and physical

17  and mental state.  That you started back to

18  school (indiscernible) you got the first F you

19  had ever received in a college class.  Is that

20  correct?

21      **INMATE RUSH:**  That is true.

22      **DEPUTY COMMISSIONER WEAVER:**  Well I didn't

23  see anything in the report by Doctor Terini or

24  the other doctors that talked about the issue of

25  depression.  And did you ever talk to the doctor

26  about that?

27      **INMATE RUSH:**  Yah we spoke about it in the

1  interview.  But I think, you know it was a

2  temporary kind of thing that came about as a

3  result of the accident.  And I don't think that

4  qualifies as like a psychological disorder, of

5  course I am not a psychologist.  But it was a

6  temporary state during the recovery from the

7  accident.  If uh in the back of this report in

8  appendix A, there is a note from a report from

9  the psychologist who came to interview me in the

10 hospital.  And she refers to an interview she

11 made with me.  And concluded that I was going

12 through the normal grief and process after

13 loosing a friend in the accident and almost

14 being so badly hurt myself.  But she doesn't

15 refer to you know depression as a disorder or as

16 a you know psychological condition.  And she

17 says that after the one interview she says that

18 I could call her, I think it says here.  If

19 problems continued get back in contact with her.

20 But if I feel the need for additional

21 assistance, so I don't think she clearly thought

22 I didn't need any initial assistance.

23     **DEPUTY COMMISSIONER WEAVER:**  But when you

24 talked to Doctor Terini as well as other

25 clinicians since you have been incarcerated have

26 you fully discussed these changes you were going

27 through with the doctors?

1     **INMATE RUSH:** Yes.

2     **DEPUTY COMMISSIONER WEAVER:** Well Doctor

3     Bakeman you ran a program with Doctor Bakeman

4     and Doctor Bakeman did an evaluation in 1990 and

5     Doctor Bakeman says inmate Rush does not appear

6     to have any psychopathology which was

7     contributory to his offense. And it goes on to

8     give some statements in support of that. But in

9     the sentencing memorandum it repeatedly talks

10    about statements that you allegedly made, I

11    wasn't thinking straight, I was in a state of

12    shock, I was like watching TV I didn't feel a

13    part of it. I went through a lot of mood

14    swings. My mind couldn't take it anymore.

15    **INMATE RUSH:** During the altercation and

16    the cover-up and the period prior to my arrest.

17    **ATTORNEY DEFILIPPIS:** Also you left our a

18    portion of Doctor Bakeman's statement where he

19    talks about the inmate felt afraid an confused

20    at the time, his subsequent actions were a

21    result of that situational fear and confusion.

22    I think the same thing is being talked about in

23    that report.

24    **DEPUTY COMMISSIONER WEAVER:** Well it may be

25    I don't know it doesn't specifically address

26    some of these issues in the sentencing

27    memorandum that you submitted to the panel

48

1  counsel.  And the one of the things I am

2  considering is that there was a significant

3  lapse of time between the time of the life crime

4  and when Mr. Rush was arrested for it.  And of

5  course you said he is not going to make any

6  statements today but I am a little bit concerned

7  about what was going on in his mind, between

8  when this happened and when he ultimately was

9  held accountable for it.  It is probably an

10  unanswered question.

11      **ATTORNEY DEFILIPPIS:**  Actually it has been

12  covered in the four prior board hearings.

13  Covered at length.  I have all those

14  transcripts.

15      **DEPUTY COMMISSIONER WEAVER:**  Yah I have

16  read some of the transcripts.  All right with

17  regards to post conviction aspects I think it

18  has been covered so I will ask you to return

19  your attention to the chair, Commissioner

20  Sawyer.

21      **PRESIDING COMMISSIONER SAWYER:**  Thank you.

22  Do you have any questions you would like to ask

23  the inmate?

24      **DEPUTY COMMISSIONER WEAVER:**  No.

25      **PRESIDING COMMISSIONER SAWYER:**  Mr. Wilson?

26      **DEPUTY DISTRICT ATTORNEY WILSON:**  I

27  understand the inmate is not speaking about the

49

1   life crime today?

2       **PRESIDING COMMISSIONER SAWYER:** That is

3   correct.

4       **DEPUTY DISTRICT ATTORNEY WILSON:** Then no

5   questions.

6       **PRESIDING COMMISSIONER SAWYER:** Mr.

7   Defilippis?

8       **ATTORNEY DEFILIPPIS:** Over the years you

9   started working in the education program is that

10  correct?

11      **INMATE RUSH:** That is correct.

12      **ATTORNEY DEFILIPPIS:** And you were involved

13  in tutoring inmates that were attempting to get

14  GED's?

15      **INMATE RUSH:** Yes.

16      **ATTORNEY DEFILIPPIS:** And then you went

17  into the drafting program you obtained, as I

18  understand it, two certificates in that program?

19      **INMATE RUSH:** That is correct.

20      **ATTORNEY DEFILIPPIS:** That would be the

21  mechanical curriculum and the architectural.

22  And that qualifies you to do what?

23      **DEPUTY COMMISSIONER WEAVER:** Excuse me

24  counsel I believe that we are running out of

25  tape again. This is side one tape two in the

26  case of Robert Rush.

27      **ATTORNEY DEFILIPPIS:** In case we missed it

0051

1   on the last tape you got the two certificates in

2   the drafting program, the mechanical curriculum

3   and the architectural curriculum?

4        INMATE RUSH:  That is correct.

5        ATTORNEY DEFILIPPIS:  And part of that

6   involves the use of therapy CAD software the

7   computer assisted drafting software?

8        INMATE RUSH:  Yes it does.

9        ATTORNEY DEFILIPPIS:  And that is the same

10  software that you were talking about that Walt

11  Escherich is still being used in the field?

12       INMATE RUSH:  Yes it is.

13       ATTORNEY DEFILIPPIS:  And you continued in

14  that program for a number of years working with

15  the students is that correct?

16       INMATE RUSH:  That is correct.

17       ATTORNEY DEFILIPPIS:  As a teachers

18  assistant?

19       INMATE RUSH:  That is right.

20       ATTORNEY DEFILIPPIS:  And then during that

21  time period you also did work yourself on the

22  CAD program to keep yourself up to date on that?

23       INMATE RUSH:  Yes I did.

24       ATTORNEY DEFILIPPIS:  And then since that

25  time because you have still been connected to

26  the educational department you have made some

27  arrangements with the teacher to be able to go

51

1   back and refresh yourself with the use of that
2   program?
3       INMATE RUSH:  Yes I have.
4       ATTORNEY DEFILIPPIS:  So you have done that
5   on an intermittent couple of times a month
6   basis?
7       INMATE RUSH:  Yes.
8       ATTORNEY DEFILIPPIS:  So that keeps you up
9   to date on the use of that software?
10      INMATE RUSH:  Yah I keep my skills current.
11      ATTORNEY DEFILIPPIS:  And since that time
12  you have gotten involved in the pre release
13  program, is that correct?
14      INMATE RUSH:  That is correct.
15      ATTORNEY DEFILIPPIS:  And part of that, you
16  did an overhaul of the parenting course?
17      INMATE RUSH:  Right.
18      ATTORNEY DEFILIPPIS:  Rewrote the
19  curriculum for that?
20      INMATE RUSH:  That's right.
21      ATTORNEY DEFILIPPIS:  And that is
22  documented in the chronos that are in your
23  files?
24      INMATE RUSH:  That is correct.
25      ATTORNEY DEFILIPPIS:  Ok and we talked
26  about a number of the self-help programs that
27  you have done, and I just wanted to clear

52

1  something up.  There was a mention in that
2  report of drinking beer during the time sitting
3  around drinking beer how frequently were you
4  drinking?
5      INMATE RUSH:  I was drinking weekends,
6  basically that refers to the fact that being
7  immobile from that accident.  Instead of going
8  out and partying with friends and things like
9  that I would stay home on Saturday night, Friday
10  night, and drink and occasionally drink after
11  school or work.  And times like that.
12     ATTORNEY DEFILIPPIS:  And was it ever
13  something that created a problem in your life?
14     INMATE RUSH:  No.
15     ATTORNEY DEFILIPPIS:  Was it anything that
16  was atypical for the college atmosphere you were
17  in?
18     INMATE RUSH:  No.
19     ATTORNEY DEFILIPPIS:  Did you ever have
20  blackouts, or problems like that?
21     INMATE RUSH:  No.
22     ATTORNEY DEFILIPPIS:  Drinking in the
23  morning anything like that?
24     INMATE RUSH:  No.
25     ATTORNEY DEFILIPPIS:  But you have
26  participated for quite a number of years in the
27  AA program, is that correct?

53

1       INMATE RUSH:  Yah.

2       ATTORNEY DEFILIPPIS:  How many years have

3   you been involved in that?

4       INMATE RUSH:  Since 1993 I believe, so that

5   will be 12 years.

6       ATTORNEY DEFILIPPIS:  Ok, and you use that

7   for just helping you with basic life skills?

8       INMATE RUSH:  Yah.

9       ATTORNEY DEFILIPPIS:  A lot of the step

10  work involves how to basically be a better

11  person correct?

12      INMATE RUSH:  That is correct.

13      ATTORNEY DEFILIPPIS:  And in the strike

14  that.  When you came to prison we are talking

15  about the level two, level three, when an inmate

16  comes in on a life crime, the regular assignment

17  you get is a level four institution to start

18  with.  You did not go to a level four

19  institution.

20      INMATE RUSH:  No I didn't.

21      ATTORNEY DEFILIPPIS:  In fact you had level

22  four points but you were given and override to

23  go to a level three institution.

24      INMATE RUSH:  Yes I was.

25      ATTORNEY DEFILIPPIS:  And you have never

26  spent any time in a level four institution?

27      INMATE RUSH:  No I haven't.

54

1      **ATTORNEY DEFILIPPIS:**  And as I understood

2  that was an assessment based on your lack of

3  dangerousness determined that you were able to

4  go to a level three to start with?

5      **INMATE RUSH:**  Yah the counselor at the

6  reception center said that I wasn't level four

7  material.  And recommended that I be sent to

8  medium security.

9      **ATTORNEY DEFILIPPIS:**  And then when did you

10  move from level three to level two?

11      **INMATE RUSH:**  In 1993 at the time this

12  facility transitioned from a level three to a

13  level two.  My points dropped so I remained in

14  here.

15      **ATTORNEY DEFILIPPIS:**  And so you have been

16  in a level two institution now for 12 years?

17      **INMATE RUSH:**  Yes I have.

18      **ATTORNEY DEFILIPPIS:**  And throughout the

19  time you have been in prison you have never had

20  a CDC 115?

21      **INMATE RUSH:**  No.

22      **ATTORNEY DEFILIPPIS:**  Have you ever had

23  situations where there has been a potential for

24  violence?

25      **INMATE RUSH:**  Certainly this is prison I am

26  surrounded with it.  But I have made a conscious

27  effort to avoid putting myself in situations

55

1    when situations are happening to diffuse them.
2    And to every lifer here has to walk a tightrope
3    between not looking week or not backing down but
4    at the same time not getting into fights or
5    altercations.  And I think I have worked very
6    hard to walk that tightrope.
7         ATTORNEY DEFILIPPIS:  And you have done a
8    number of self-help courses and has that helped
9    you to understand basically yourself and why you
10   committed this crime?
11        INMATE RUSH:  Yes it has.
12        ATTORNEY DEFILIPPIS:  And what is different
13   about you today from what you were when you came
14   into prison?
15        INMATE RUSH:  Well 19 years ago I was
16   immature, shortsighted, kind of an
17   underachiever.  Didn't really apply myself.  And
18   since that time I think I have grown up a lot, I
19   have been forced to grow up.  And I think that I
20   have kept my eyes on the prize, so to speak.
21   Focused on the future, and rather than letting
22   what is happening in front of me get the best of
23   me, and I have also learned to apply myself and
24   that I can excel when I really apply myself.
25   Which is something I never did before.
26        ATTORNEY DEFILIPPIS:  I noticed that in
27   your transcripts, I think they were attached to

56

1  the private probation report that you were

2  basically a B and C student at San Bernadino

3  College?

4      INMATE RUSH:  Yes I was.

5      ATTORNEY DEFILIPPIS:  And since you have

6  been in prison in the AA program, the BS program

7  and the Masters program you have maintained

8  close to a A- A average, correct?

9      INMATE RUSH:  Yes I have.

10     ATTORNEY DEFILIPPIS:  Honors in almost

11  everyone of those programs?

12     INMATE RUSH:  Yes I have.

13     ATTORNEY DEFILIPPIS:  What is the, what

14  does a bridging clerk do?

15     INMATE RUSH:  The bridging program is to

16  help those inmates that are eligible for work

17  time credits.  And can get extra time off of

18  their sentence.  Earn that credit by doing self-

19  help study is basically on a life skills getting

20  them ready for release.  That kind of

21  curriculum.

22     ATTORNEY DEFILIPPIS:  And is this the video

23  program I have seen some chronos that show that

24  you have been assisting in running that program

25  in the prison?

26     INMATE RUSH:  No that is a separate program

27  that I just volunteer for.  That program is just

1  for broadcasting educational videos for the

2  general population.  For those who don't have

3  access to the educational department.  They can

4  watch educational videos and fill out

5  questionnaires and send them in and get credit

6  for that.  And I have been reviewing the videos,

7  and formulating the questionnaire.

8      **ATTORNEY DEFILIPPIS:**  So it sounds like a

9  significant aspect of what you have been doing

10  during the time you have been in prison is to

11  facilitate or help other inmates that are trying

12  to get education?

13      **INMATE RUSH:**  Yes.

14      **ATTORNEY DEFILIPPIS:**  That is all I have.

15      **PRESIDING COMMISSIONER SAWYER:**  Thank you.

16  Mr. Wilson would you like to close?

17      **DEPUTY DISTRICT ATTORNEY WILSON:**

18  Commissioner I have had an opportunity to review

19  this file on separate occasions.  At the August

20  hearing and at that time I reviewed the file

21  fully including the police reports.  And again

22  prior to today's hearing.  And the reason I

23  bring this up is I really can't make heads or

24  tails out of this case.  Most cases I am not

25  sure how the Commissioners do a case, but you

26  look for a motive or a reason why a crime

27  occurred.  Why the murder occurred.  Because

58

1   once you can figure out what the motive was or

2   the reason then you can take those next steps

3   and say has that aspect of that individuals life

4   been corrected.  Has self-help been given to

5   that individual so that if released into the

6   community they no longer pose a significant risk

7   or an unreasonable risk to the community at

8   large?  And I think that is where we are at, at

9   this point.  The burden this board has is does

10  this inmate pose a unreasonable risk of harm to

11  this community at large.  And it is the District

12  Attorney position that this inmate still does

13  pose a very real and significant unreasonable

14  risk to the community.  I will start off first

15  with just the crime itself.  The inmate didn't

16  talk about the crime today, and I am somewhat

17  troubled why the version that has been presented

18  in the prisons version to the board.  And sense

19  that it doesn't match and it is not credible, if

20  I could just segway for a second, Commissioner

21  Weaver brought up the point about drinking.

22  Through a prior psychological report and the

23  reason I think that is important is, it is how

24  this inmate has through time minimized or

25  softened the reality of what has occurred.  The

26  inmate indicated that yah it was after his

27  motorcycle accident that he was drinking beer,

59

1   on further questioning, but it was like yah on
2   the couch, on weekends, after work, if you look
3   at the 2005 psychological report by Doctor
4   Talbott under substance abuse he says, inmate
5   Rush said he used alcohol at 18 drinking
6   socially at some parties in college.  Again he
7   is not talking about drinking on weekends, after
8   work, drinking of the couch if he is bored, I
9   only bring it up because credibility is an issue
10  here.  Because if we cant believe the inmate at
11  this time, what he is saying, then we cant
12  believe him in the future, what he would do out
13  in the community.  And that is going through the
14  crime itself.  The flavor of how this inmate
15  relays a crime is one of self-defense.   In
16  essence this was a very cold, calculated and
17  brutal crime, which complete disregard for an
18  individuals life.  And this person the one we
19  are talking about John Heinz.  John Heinz was a
20  roommate along with several other individuals
21  who lived in this house up by Cal State.  At
22  some point it is agreed upon there was some kind
23  of disagreement between John Heinz and the
24  inmate.  But I think what this board needs to
25  pay particular attention to as this disagreement
26  was going on the other roommates were present.
27  But for some reason this inmate felt threatened

60

1    by Mr. Heinz.  He went to his bedroom and under

2    his bed he had a 22 rifle.  The inmate claims he

3    had that rifle, was familiar with that rifle

4    because he involved himself in target practice.

5    I think what the logical conclusion is that the

6    inmate is familiar with that weapon.  Somehow we

7    go from the loaded weapon being loaded, the

8    inmate stepping out of the safety of his

9    bedroom, confronting the victim.  The evidence

10   that is thought the file is the victim was

11   confronted after he was lying in his bed in his

12   bedroom.  But taking the prisoners version I

13   might just refer to one part here it says Rush

14   was carrying a rifle and cocked it and told the

15   victim quote back off.  Heinz then lunged

16   towards him and Rush flinched and the gun went

17   off.  I will tell you why that is not credible.

18   Because the gun went off at least nine times.

19   Ok, this is not mere self-defense, as this

20   inmate is trying to portray here.  He flinched

21   and the gun went off, well that is no insight

22   into what happened in this case.  This inmate

23   unloaded a ten round clip or nine rounds emptied

24   his weapon, why nine shots.  And the autopsy was

25   (indiscernible) on John Heinz, the wounds

26   weren't to the leg or to the arm, they were to

27   the vital organs of the body.  To the liver, to

1  the heart, and to the head.  If this inmate was

2  truly going out there just to scare off or

3  frighten John Heinz, there would have been

4  different actions.  And the reason I bring this

5  up is it hasn't been explained.  There is no

6  insight as to what happened.  And until this

7  board understands or believes this inmate has

8  insight as to why he acted, why he murdered

9  John, then he cant be trusted.  Because you are

10  putting him back into the same situation.  And

11  again getting to the callousness of this crime,

12  after the murder, the inmate involved his other

13  roommates to take John out, dump him out into

14  the mountains.  The basically bury him, steal

15  from him they take money from his wallet they

16  take his wallet and bury it in a separate

17  location, they take a ring off of his finger,

18  and they later his crime partner later pawns

19  that ring and at a later date, which shows kind

20  of the lack of remorse, they pawn that ring and

21  split the money together.  After they dump

22  John's body that night, what do they do?  They

23  took Johns car which they transported John in to

24  the dumpsite, they went out to Riverside and

25  then they partied, drank again getting back to

26  drinking, they drank and partied on Johns money.

27  Ok and how that is remorseful shows a complete

62

1   disregard and again it goes back to what was

2   this individual's motivation.  What was his

3   insight, he hasn't touched upon that at all.

4   There are many elements in this but it is that

5   one.  I think I just want to leave the board

6   with just the coldness and the callousness that

7   leaving this victims family for 30 days to

8   wonder what happened to their son and their

9   brother.  This inmate actively concealed the

10  location, (indiscernible) told his family I

11  don't know where he is.  He took off maybe he is

12  in Mexico.  All the while he knew what had

13  happened.  He knew where John was buried.

14  Counsel asked his client how is he different

15  today than 19 years ago when he committed this

16  murder, I think that is the key question here.

17  Because you need to see a difference you need to

18  feel a level of trust, does this inmate deserve

19  parole can we trust him out there.  Is he a

20  risk.  And the answer is he is not worth that

21  risk.  His answer to am I different and this is

22  how he answered, I know I was immature, I am no

23  longer shortsighted, and I am not an

24  underachiever.  I don't know how that relates to

25  committing murder.  I mean this man 19 years ago

26  he was above average.  He had a good family, he

27  didn't have the normal things we see with the

63

1    life inmates here.  He didn't have a narcotics

2    problem, doing drugs, he wasn't a raging drunk,

3    he didn't have social issues, he was from an

4    intact family.  He was in school, he was a

5    college student.  He is not one of these guys we

6    seen inside here (indiscernible) and say hey get

7    an education.  Hey try to better yourself.  He

8    has everything going for him.  So when he sits

9    here today and says he has a Masters degree now

10   or I am in touch with people, I have a potential

11   job.  Out of all of those things he had back 19

12   years ago.  So I ask how is he different?  He is

13   not different.  He is still that average type

14   person, an average type person that committed a

15   murder.  And I am looking at the psychological

16   report and excuse me, where the closing line is

17   we believe the inmates potential for violence

18   within the community is no more than that of an

19   average citizen.  I don't know how the

20   psychologist comes across this because I would

21   bet the psychologist clinician looked at this

22   inmate 19 years ago when he was an average

23   person, when he was a student, when he had

24   roommates, when he had a job, and a caring

25   family.  They would have said the same thing,

26   that he is no more dangerous than the average

27   person in the community.  But Commissioner he is

1   not the average person in the community because
2   he is a cold blooded murderer and he cannot be
3   trusted to be put back into the community.   And
4   based upon that I believe a multi year denial is
5   appropriate at this time.
6       PRESIDING COMMISSIONER SAWYER:   Thank you.
7   Mr. Defilippis?
8       ATTORNEY DEFILIPPIS:   Mr. Commissioner I
9   would ask that I be allowed to speak after the
10  victims give their statements.   In order that I
11  can address the issues relevant to the
12  proceedings.
13      PRESIDING COMMISSIONER SAWYER:   I will
14  overrule you one that.   We have a process, and
15  this process is the same and we try to be fair
16  to everyone.
17      DEPUTY DISTRICT ATTORNEY WILSON:   I would
18  (indiscernible) to 343.6 which gives the next of
19  kin that last right.
20      ATTORNEY DEFILIPPIS:   I would object to the
21  statements of counsel, because counsel is
22  specifically precluding by law from giving legal
23  advice to the board.
24      PRESIDING COMMISSIONER SAWYER:   Yes I
25  understand that.   I will sustain that objection.
26      ATTORNEY DEFILIPPIS:   And I understand the
27  board's protocol but what I am urging is that we

65

1   don't go with that protocol, I have always

2   objected that protocol.  I don't think it is an

3   appropriate one considering that purpose of

4   presentation of counsel is to address all the

5   issues and not knowing what the next of kin are

6   going to say I don't have the ability to do that

7   in the proceeding.  Well it appears that counsel

8   has taken issue with not just the last

9   psychological report but also the report of

10  Doctor Bakeman which is a favorable report.  He

11  has taken issue with the report of Doctor Kit in

12  1993 also a favorable report.  Second report of

13  Doctor Bakeman in 1996 the report of Doctor

14  Terini in 1999 as well as the report of Doctor

15  Talbott in 2005.  So we have had a total of five

16  reports that have been prepared on this inmate.

17  He has been evaluated from every psychological

18  standpoint that he can be evaluated.  The issue

19  of does he understands the causes of the

20  commitment offense does he have insight into

21  that commitment offense, which has been

22  addressed over and over by the psychologists.

23  Each and every one of them have stated that he

24  has excellent insight into the commitment

25  offense that he has a full understanding of the

26  causative factors, and this goes back to the

27  inception where he talked about how he is doing

66

1   things to better himself.  How he is making
2   gains during his incarceration and he should be
3   able to maintain these gains.  This is back in
4   1990.  His insight and judgment are good.  He
5   has obviously thought about this crime a great
6   deal and was fairly candid about the fear and
7   confusion that he felt at the time.  Going on to
8   1993 he's already being considered to having a
9   violence potential of less than the inmate
10  population that he is put in with.  Now as of
11  1993 if he had been put into the institution
12  with his normal point score the way that it was
13  he would have gone into a level four
14  institution.  He instead was at a level three
15  institution then down to a level two institution
16  by 1993.  So he is being compared at that point
17  with the least, the least dangerous of
18  individuals that are in prison and he is showing
19  favorably as to them as of 12 to 15 years ago.
20  There are no psychological issues that are found
21  and I understand what Mr. Weaver was saying
22  earlier about the depression.  And this is an
23  issue that often has gotten into because of the
24  fact that people throw around the word
25  depression and that report is not written by a
26  psychologist.  It is written by a correctional
27  specialist.  And they are using the term

67

1    depression in there to talk about a situational
2    type of feeling blue of feeling down of having
3    difficulty dealing with the loss of a friend
4    that sort of thing.  That is different from a
5    DSM IV diagnosis of clinical depression that has
6    a certain number of criteria that has to be met.
7    And it doesn't sound like from anything I have
8    read anywhere that Mr. Rush ever had what would
9    be deemed a diagnosis of clinical depression.
10   And that is clear as of 1990 when he sees Doctor
11   Bakeman there is no diagnosis of depression made
12   at that time, 1993 no diagnosis made, 1996 no
13   diagnosis, 1999 no diagnosis, and in 2005 no
14   diagnosis.  So it appears that, that was a
15   situational incident that was involving the time
16   frame following the motorcycle accident.  The
17   reports that I provided, the reason I provided
18   that is that it gives and excellent scenario of
19   background and helps to understand the factors
20   that lead to the life crime.  The scenario that
21   needs to be understood and there is some fairly
22   significant documentation that I provided to the
23   board as well.  That includes a lot of
24   transcripts of you will see some transcripts and
25   things you have of prior hearings.  The
26   preliminary hearings of the trial.  All of that
27   material was provided for fairly specific

68

1    reasons.   There is discussion about you know how
2    the crime occurred.   Counsel said that Mr. Heinz
3    was lying down in the bedroom when it happened.
4    The is not the way it happened.   You have the
5    coroner testimony in there that talks about the
6    fact that Mr. Heinz had to be up and moving
7    around to have the shots occur in the pattern
8    that they happened.   So it was not a situation
9    where he we was lying down at the time.   The
10   background of this is you have a young man who
11   gets in a very serious motorcycle accident and
12   he also had a car accident I think it was a year
13   or two earlier.   Where he was very seriously
14   injured.   And his buddy in that was also very
15   seriously injured.   And then both of them
16   recovered.   And then he ahs the motorcycle
17   accident where he was on the back of a
18   motorcycle with his friend and then roommate at
19   the time.   They get hit by a truck he is very
20   seriously injured and his roommate is actually
21   killed.   So he goes through a very long period
22   of depression as a result of that, it is also
23   the first time in his life that he has
24   essentially had his physical abilities
25   significantly impaired.   He has always been a
26   physically active youngster always had the
27   physical abilities and suddenly that is taken

69

1   away from him.  He is, he is in the hospital I

2   think for about 30 plus days, he goes home he is

3   essentially in home nursing care for up to two

4   months.  He finally goes back to school and goes

5   back to his roommates but what he does at that

6   time he takes off, he bites off a little more

7   than he can chew.  He is going back to school he

8   is still physically hurting, he is depressed, he

9   is having to work because his financial

10  situation is such that he needs the money so he

11  is working a lot of hours trying to make enough

12  money to support himself, he has now taken on

13  the responsibility of the house, where he has to

14  do work around the house.  Where he has to take

15  care of things and he is not always able to do

16  that.  And so altercations start to develop

17  between the new roommate which has come in,

18  which is John Heinz.  And apparently Mr. Heinz

19  gets upset with him on a number of occasions

20  over what he perceives as Mr. Rush being quote

21  on quote lazy.  Because he is not doing enough

22  work around the place.  There is apparently a

23  long history that is documented in the records

24  of Mr. Heinz badgering Mr. Rush over that time

25  frame.  There is a physical size discrepancy

26  between the two.  About a 185 pounds is what has

27  been documented in the file previously on Mr.

70

1  Heinz.  150 pounds Mr. Rush.  I believe 6'1 for
2  Mr. Heinz and 5'8 or 5'9 for Mr. Rush.
3  Significant size discrepancy that exists there.
4  On the day in question there apparently was some
5  information from one of the other roommates
6  telling Mr. Rush that his dog has been attacked,
7  by Mr. Heinz dog, and that Mr. Heinz had
8  actually sicked the dog on Mr. Rush dog.  There
9  was problems with other items around the house
10 that created an argument.  And at what happened
11 with that argument was that it started off with
12 Mr. Heinz pushing Mr. Rush to the floor.  Now at
13 that point Mr. Rush was having severe back
14 problems as a result of the accident he had,
15 had, he is in a depressed condition he is not
16 physically up to the task to begin with.  If he
17 was facing somebody his own size.  But now he is
18 facing somebody who has him by 35 or 40 pounds
19 and he is getting pushed around.  He gets pushed
20 around several times he gets grabbed on one
21 occasion and essentially rammed into a wall.
22 Significant enough that it breaks the plaster in
23 the wall.  That is documented in the file that
24 the other roommates saw that indentation in the
25 wall.  He gets hit a number of times in the face
26 he ends up with a bloody nose and a bloody lip.
27 And then Mr. Heinz lets him go and he goes back

71

1  into his room.  And he retreats into his room.
2  Now during the next period of time, there is
3  some taunting that goes on where Mr. Heinz is
4  essentially taunting him and chastising him and
5  telling him if this happens anymore you are
6  going to get more of this.  And this goes on for
7  a period of time.  Mr. Rush then picks up the
8  gun because he is going to the bathroom to wash
9  up.  And this is where he makes the stupid
10  decision.  The counsel talks about this as self-
11  defense.  You wont hear self-defense come out of
12  my mouth you are not going to hear it come out
13  of Mr. Rush's mouth.  We are not talking about
14  self-defense he was convicted of second-degree
15  murder.  What we are talking about here is
16  putting the crime in its true perspective.  Not
17  putting the crime into a perspective counsel
18  intends to utilize of trying to mischaracterize
19  it as something more than what occurred.  Mr.
20  Rush was acquitted of first-degree murder, he
21  wasn't convicted of first-degree murder.  He was
22  convicted of second-degree murder.  And the
23  circumstances of that were that he took the gun
24  with him, the absolutely most foolish decision
25  he could make, to arm himself.  Thinking it will
26  just scare this guy and he will back down.  But
27  what his statement is that it didn't scare and

72

1   it didn't back him down.  And that is when Mr.

2   Heinz came at him and he flinched and fired the

3   first shot.  He didn't fire nine shots or ten

4   shots with that one flinch.  No he continued to

5   shoot after that.  Because what he had done and

6   it talks about that in the report he essentially

7   backed himself into a corner.  He had taken a

8   gun and when you use a gun like that you put

9   yourself in a situation where if an incident

10  like this happens what do you do.  Now you have

11  created the killer be killed situation.  And it

12  is his fault, because he created that situation

13  by taking the gun into the bathroom with him

14  like that.  And he is responsible for the

15  resulting actions of what happened.  And he has

16  never since after this happened he certainly

17  took the steps to cover up the crime, there is

18  no question about that.  And he has, since he

19  ahs been arrested for this he has admitted that

20  he took those steps to cover it up.  He hasn't

21  attempted to blame Mr. Hoy even though if you

22  look factually at what happened and including

23  all the testimony at the trial, Mr. Hoy was the

24  one who actually suggested the disposal of Mr.

25  Heinz's body.  But Mr. Rush has always taken

26  responsibility for that and said this was my

27  crime I was responsible for what we did.  If you

73

1    look at the circumstance of what he has done
2    since then you see, what you see is a very
3    dramatic turn around.   And I like counsels
4    approach of saying basically well he had a good
5    background and so because he had a good
6    background that I am not sure exactly what he
7    said but it somehow changes the crime in his
8    mind.   And it makes it much worse and he is not
9    like one of these guys that you normally see in
10   here that have a drug problem or come from a
11   disadvantaged background.   None of that matters
12   the situation happened as it did because of the
13   circumstances that surrounded it that lead up to
14   the occurrence of the fight and the altercation.
15   If you look just character logically at the
16   participants in this, the testimony at the trial
17   of Galloway, was that Galloway was the roommate
18   that brought forth this crime to the police.
19   The testimony of Galloway was on one or more
20   occasions he actually had to pull Heinz off of
21   another individual in a fight.   That it was
22   fairly common for Heinz to be in fights.   His
23   testimony about Rob Rush was that Mr. Rush is I
24   think he described him as the mellowest person
25   he has ever known.   Though clearly there was
26   something that happened in that situation as a
27   result of all the different circumstances that

74

1  occurred, that led to a break and caused him to
2  commit the crime.  That he did and I don't think
3  you will find anyone that is sorrier for what he
4  did than Rob Rush.  And his actions put him
5  here, his actions have caused him to be
6  incarcerated and he is the first one to admit
7  that.  But when you talk about what he has done
8  since then he has spent his entire time trying
9  to better himself and others.  And what more can
10 be done in an institutional setting than what
11 has been done over the last 19 years.  This man
12 has come to prison he has shown himself to be
13 the least dangerous of people that are in here.
14 He has been given overrides of going from level
15 four to level three.  He was given an override
16 from three to two and has constantly stayed in
17 the level two for the last 12 years.  I cant
18 imagine being in prison and not at least facing
19 some type of potential for confrontation on I
20 will be conservative how about a weekly basis.
21 You know we don't see it in our normal life out
22 in the street.  We don't have the type of
23 confrontation that you have inside the prison
24 walls.  But on a literally daily basis but at
25 least a weekly basis you are going to be faced
26 with confrontational types of situations.  And
27 this man has been able to spend the last 19

75

1    years in prison without any problems whatsoever.
2    I will take the guy working for me that picks up
3    a 128 for showing up for work early.  That you
4    know yah he was considered to be technically out
5    of bounds for what he did, but what he was doing
6    was he was showing enthusiasm for what he was
7    trying to do.  The work he was doing in the
8    educational program.  Everything he has done
9    since he has been in prison has shown that this
10   man I doing what he can to rehabilitate himself.
11   That's the goal of this process.  That is what
12   an indeterminate sentence for is to look and see
13   have you achieved rehabilitation.  If you look
14   at 2402a and you look at the standard that is
15   stated in there, it is does he present an
16   unreasonable risk of danger to society if
17   released at this time.  You have multiple
18   psychological evaluations you have at least five
19   of them.  That in 1993, 1996, 1999, 2005 all of
20   which say that he presents less danger than the
21   average individual out in the streets.  And you
22   know I hear District Attorney's complain about
23   that characterization all of the time, but what
24   they don't understand or what they apparently
25   have blindfolded themselves to is that an
26   individual who has, that is why murder ahs the
27   least residuum rate of any of the crimes.  When

76

1   lifers are released there situational crimes and
2   they wont commit them again.  And one of the
3   reasons they don't is because unlike a lot of
4   people don't really understand their internal
5   workings and become violent on a particular
6   occasion.  That individual has had that happen
7   to them.  Has seen it has gone through it and
8   has learned from it.  That is what he has taken
9   into his life as a result of the last 19 years.
10  He has learned from the situation that he was
11  involved in, learned how that got out of
12  control, learned how to diffuse that so that it
13  doesn't happen to him again in the future.  And
14  he has been able to do that on a day-to-day
15  basis in a volatile environment.  Where violence
16  is just a standard form of day-to-day business
17  in here.  Yes the crime is serious yes it is a
18  second degree murder, but when you look at this
19  and you say to yourself is this the kind of guy
20  you want to be able to release to the community,
21  this is your potential success story.  The
22  people that get released on term to life crimes
23  these days have been success stories, if you
24  look at the individuals that have gone out in
25  the last few years they are doing great.  They
26  are succeeding out in the streets because so few
27  of them and it is the cream of the crop that is

77

1  getting released.  This is one of those guys.
2  This is one of the guys that top layer guys that
3  aren't going to be a trouble to society, that
4  aren't going to recommit offenses.  This is a
5  man who no longer has any issue of
6  dangerousness, there is nothing in his file that
7  shows that he will continue to be a kind of a
8  danger to society.  So I would urge the board to
9  grant parole at this time.  And I am not going
10  to discuss where he belongs in the matrix it
11  really doesn't matter.  You have a 21-year cap
12  on the matrix for second-degree murder and he
13  has served every one of those terms.  He now has
14  I think approximately 27 years of credits when
15  you give him is 2410 credits and his pre prison
16  credits with his 4019 time.  It comes out to I
17  think it is about 26 actually is where he falls.
18  He is actually into the first-degree murder
19  matrix at this point.  So it really doesn't
20  matter where you set him.  The appropriative
21  thing to do at this time is to give this man a
22  date.  He is suitable for parole you have had
23  that basically told to you since 1999.  Where
24  Doctor Terini says he is a very good candidate
25  for parole consideration and Doctor Talbott
26  reiterates that again saying he is a good
27  candidate for parole.  That is not a common

78

1  statement that you see among the psychologist.

2  This is man who deserves a parole date thank

3  you.

4      **PRESIDING COMMISSIONER SAWYER:** Thank you.

5  Mr. Rush can you, would you like to tell us if

6  you feel you are suitable for parole and why?

7      **INMATE RUSH:** I just would like to say I am

8  not the same person I was 19 years ago. And

9  that I never believed I was capable of

10 committing an act like this. And having done so

11 has been a very humiliating, humbling

12 experience. I am very ashamed of what I have

13 done. And I am very sorry for what I have did.

14 I am aware that I have irreparably harmed the

15 Heinz family I know there can be nothing worse

16 for a parent than the death of a child. And I

17 know that their sisters miss their brother, that

18 he was nor just a brother to them but a friend

19 as well. I also victimized my only family, my

20 mother died not knowing that I would ever get

21 out of prison. My father ahs to deal with this

22 place to come up and visit me. I am, I made up

23 my mind early on to do everything I could to

24 make something positive come of this and I have

25 spent my incarceration in the education

26 department. Trying to use what gifts or

27 abilities I have to help the people around me.

1  To try to in some way make amends for what I

2  have done even though I know there is no way I

3  can ever take it back.  And there is no way I

4  can ever make it better.  I only ask that you

5  look at me for who I am now a forty-year-old man

6  and not a 21 year old kid who overreacted.  And

7  that I think I can still contribute to the

8  community in whatever capacity if I am released

9  and I am just very sorry for everything I have

10  done.  And I can assure you nothing like this

11  will ever happen again.  Thank you.

12       PRESIDING COMMISSIONER SAWYER:  Ok, thank

13  you.  The record shows that we have the Heinz

14  family here.  And you have the right to

15  adequately and reasonably express your views

16  concerning the crime and the person responsible.

17  Who will speak first?

18       ATTORNEY DEFILIPPIS:  Commissioner just for

19  the record are we going to be limited to two.

20       PRESIDING COMMISSIONER SAWYER:  I will take

21  care of it, I will take care of it yah.  We have

22  already pre agreed on it.

23       ATTORNEY DEFILIPPIS:  All right thank you.

24       PRESIDING COMMISSIONER SAWYER:  Who will

25  speak first?

26       MS. PERLITE:  Me.

27       PRESIDING COMMISSIONER SAWYER:  Would you

80

1  identify yourself, first of all move the

2  microphone up close and would you identify

3  yourself.

4      MS. PERLITE:  Theresa Perlite John's oldest

5  sister.

6      PRESIDING COMMISSIONER SAWYER:  Ok.

7      MS. PERLITE:  My parents decided not to

8  speak today so my sister and I are going to.  I

9  usually talk about my three sons that they have

10  grown up without their uncle.  But today I have

11  decided to talk about my parents.  They are

12  wonderful people, and they opened their house to

13  all of John's friends, including you Rob.  My

14  father is a very strong and religious man who I

15  never saw cry until his son was taken away in a

16  vicious murder.  Why my brother was missing no

17  one knew where he was except for you Rob.  My

18  father would follow city busses thinking he

19  spotted a blond headed boy on the bus thinking

20  it was my brother.  But after everyone got off

21  my dad returned home once again broken hearted.

22  After the police found my dead brothers body in

23  a shallow grave, were animals deserve a better

24  grave than that, my dad found out this location

25  and of the grave and on a bright beautiful day

26  my dad blessed the shallow grave.  In the

27  mountains with holy water.  Sorry, my mother how

81

1  can you loose a child and survive, you have no

2  idea how strong my mother is.  When John was

3  missing I would go over and spend the night with

4  them and I would wake up in the middle of the

5  night only to hear my mother sobbing and my

6  father trying to console her.  There was times

7  my mother couldn't eat or drink or talk because

8  of her grief.  My mother now wears a gold

9  bracelet on her left wrist where she has not

10  taken it off since my brother's death.  You not

11  only murdered my brother you buried him in the

12  hot desert and then went and partied with his

13  money on beer.  It is amazing how to me any

14  human can do such a sickening crime.  I don't

15  care how sorry you are because if you were sorry

16  you would not have buried him and let him lay in

17  a hot desert for six weeks.  While we begged you

18  and the roommates to help us find him.  We would

19  go to the house where you and John were living

20  we would look around for anything that would

21  help us find him.  You looked at us like a deer

22  in the headlights.  You acted like you had no

23  clue.  You murdered my brother, buried him in

24  the desert, and then let him sit in a plastic

25  bag where he rotted for six weeks.  That six

26  weeks of agony, you stole his money, you hocked

27  his jewelry and then you partied.  Amazing the

82

1  world has changed a lot since Rob has been in

2  Soledad.  We have cell phones, faxes, internet,

3  blackberries, palms, terrorism, war, gas prices,

4  all the stresses of everyday life we go through.

5  Is Rob ready for that?  Could he handle a

6  argument with, eh couldn't even handle an

7  argument with his roommate.  How is he going to

8  handle and argument with an employer, family,

9  spouse, children will he snap again?  With some

10  other victim a couple of classes here and there

11  can never get you ready for today's living.  I

12  often wonder what my brother felt, if he felt

13  any pain.  If he bleed to death or died

14  instantly.  What were my brother's last thoughts

15  was he asking you to stop shooting at him.  You

16  had an argument if you were afraid of my brother

17  why didn't you call one of the other roommates.

18  My brother went back to his room, Rob you went

19  to your room and got your gun.  And you shot him

20  at least nine times.  My brother had never had a

21  chance, he didn't have a gun he had nothing.

22  You shot my brother, you murdered him, you

23  murdered my brother in cold blood.  Thanks.

24      **PRESIDING COMMISSIONER SAWYER:**  Thank you.

25  Thank you very much move the mike up.  And

26  identify yourself.

27      **MS. CASTANEZA:**  I am Maura Castaneza John's

83

1    sister.  This never gets easier.  That is the
2    amazing thing.  A bloom so early gathered with
3    all of its beauty shown humbly presents himself
4    before gods thrown.  These are the words that my
5    dad carved on John's gravestone.  What a waste
6    he was so young, such a vibrant loving person.
7    Just starting his life.  I still can't
8    comprehend that my little brother is no longer
9    here and was brutally murdered in such a brutal
10   way.  His body disposed in such a way, in no
11   respect for human life or his loved ones.  I
12   only wish I could have been there that day.  I
13   would have protected him he was my little
14   brother.  I think of all the things we missed
15   out on in our lives without John here.  And all
16   the wonderful experiences in life that John
17   never had the opportunity to experience.
18   Completion of his education, to be a policeman,
19   marriage, our huge family reunions, of all the
20   kids, the ultimate gift in life having children.
21   He was amazing with children he never even got
22   to see my precious son Tyler.  He would have
23   been such a great uncle and friend to him.  Just
24   the overall sharing of his fun living and
25   inspiring self with all of his family and
26   friends.  We will never know what else John
27   could have given to this world.  He never had

1  the opportunity to acquire a bunch of degrees
2  but one things for sure he never would have had
3  the callous personality to murder someone.  If
4  only John could be here to give the scenario.  I
5  treasure forever the little time we did have
6  with him and our childhood memories.  Rob cannot
7  take that away.
8      **PRESIDING COMMISSIONER SAWYER:**  Hold it
9  please, excuse us.
10     **MS. CASTANEZA:**  I treasure forever the
11  little time we had with him and our childhood
12  memories. Rob can't take that away.  I still
13  dream about John he just smiles and laughs.  As
14  if to say he is ok.  I miss him so I hope my
15  dreams never stop.  That's it.
16     **PRESIDING COMMISSIONER SAWYER:**  Ok, thank
17  you.  It is five minutes after 4:00 in the
18  afternoon.  And we will recess for
19  deliberations.
20                  **R E C E S S**
21                    --oOo--
22
23
24
25
26
27

1    **CALIFORNIA BOARD OF PAROLE HEARINGS**

2    **D E C I S I O N**

3    **PRESIDING COMMISSIONER SAWYER:**  Tapes back

4    on in the Rush matter.   The time is 4:36.   The

5    panel has reviewed all the information received

6    from the public and relied upon the following

7    circumstances in concluding that the prisoner is

8    not suitable for parole and would pose an

9    unreasonable risk of danger to society or threat

10   to public safety if he was released from prison.

11   A summery of the crime is read before sometime

12   before July 1, 1986 at their residence John

13   Heinz the victim and his roommate Robert Rush

14   had an argument and physical altercation over

15   the household responsibilities.  Robert Rush

16   shot John Heinz numerous times well I should say

17   nine times, with a 22 caliber rifle following

18   the murder.  Another roommate Marcus Hoy also

19   the codefendant arrived at the residence.   Rush

20   and Hoy cleaned the house of incriminating

21   evidence placed the victims body in a plastic

22   bags and a sleeping bag.  Rush and Hoy then

23   drove to the Dover canyon area where they buried

24   the victim.  The victim, they buried the

25   victim's wallet and identification in a separate

26   location.  Rush and Hoy later took and left the

27   **ROBERT RUSH D-73321  DECISION PAGE 1  10/11/2005**

1   victims truck in Riverside.  Rush and Hoy then
2   used the money, the victim's money to go
3   drinking.  I find this particularly callous and
4   cruel.  The man was, Mr. Rush created this whole
5   mess because he got his gun, he armed himself it
6   was loaded.  He shot him nine times the crime
7   itself was certainly dispassionate and didn't
8   have to happen.  There was an argument people
9   argue all the time.  But it doesn't result in
10  homicide.  We also feel that this offense was
11  carried out in a dispassionate manner knowing
12  what had happened but left the family suffer for
13  a month.  And had not Galloway come forth we
14  don't know what would have transpired in this
15  whether he would have ever been found or whether
16  there would have been a commitment offense.  We
17  find it also very dispassionate the fact that
18  the, they went out and partied with the victims
19  money.  With Mr. Heinz's money.  The motive in
20  this crime an argument.  That just doesn't cut
21  it.  It certainly was a callous disregard for
22  human suffering.  Rush does not have a previous
23  record.  And whether as an adult or juvenile.
24  He is also done very well since he has been in
25  custody.  He is at the lowest classification
26  level, has been a clerk in the bridging program
27  **ROBERT RUSH D-73321   DECISION PAGE 2   10/11/2005**

1    an important program.  He is now a library

2    clerk, with exceptional reports from the

3    Bridging program.  He has done his mechanical

4    drafting, his architectural drawing, he got

5    certified.  He has been certified in those.  He

6    has been done very well educationally.  1989

7    received, some units, is that your AA from

8    Hartnell?

9        INMATE RUSH:  Yes.

10       PRESIDING COMMISSIONER SAWYER:  His AA in

11   Hartnell, San Jose state he received his BA and

12   then his masters in humanity in 1997 from

13   Dominguez hills.  He has been in AA for 12 years

14   knew step four when Commissioner Weaver asked

15   him that question.  He knew it well.  He has

16   been in the family effectiveness program since

17   his last hearing.  Anger management, fatherhood,

18   health program the HIV or Hep C health programs.

19   CTF video program inside for inmates to do video

20   work and in impact.  He is clearly behaved since

21   he has been in custody.  His disciplinary

22   history is no 115's and you are to be

23   congratulated for that sir.

24       INMATE RUSH:  Thank you.

25       PRESIDING COMMISSIONER SAWYER:  128's one

26   in 1988.  And I agree with counsel that for

27   ROBERT RUSH D-73321  DECISION PAGE 3  10/11/2005

1   getting to work early.  I don't understand it

2   but he was technically out of bounds.

3   Psychological factors they are good, by Doctor

4   the latest by Doctor R. Talbott.  And he did an

5   update in August 28, 2005.  After Doctor

6   Terini's 1999 psychiatric report.  And they

7   indicate that he is no more dangerous in the

8   community.  His parole plans with his father to

9   go live with his father and back in San

10  Bernadino County.  Richard Rush, he has gotten a

11  Lake Arrowhead job in construction job from the

12  Mellinger family.  That would probably be just a

13  kind of laborer or minimum wage type of job.  He

14  has indicated that he would do that just to get

15  him on his feet but what he really wants is this

16  cartographer job with a civil engineering firm.

17  And he had a letter to the effect that they

18  would do what they could, although it is a small

19  firm.  It might take some time it certainly is a

20  marketable skill.  And certainly acceptable

21  employment plan.  His opposition from Mr.

22  Heinz's family was represented here today.  As

23  well as opposition from the San Bernadino

24  District Attorney office, Deputy District

25  Attorney Wilson represented the office.  And I

26  want to tell you, you are doing a great job

27  **ROBERT RUSH D-73321  DECISION PAGE 4  10/11/2005**

89

1    since you have been in custody for the last 19
2    years.  You have certainly proved yourself but
3    you victimize an awful lot of people in this
4    crime.  The crime was horrific.  Like I said
5    before you know this man was shot nine times
6    over an argument about dog food or domestic
7    problems that roommates have with each other.
8    And if he is beating you up there is pick up the
9    phone and call the cops.  I mean there was other
10   remedies to this other than you getting a loaded
11   22-caliber riffle and shooting him.  You were
12   convicted of second-degree murder sir.  'But I
13   want to complement you again on what you have
14   done here.  And being a good, from the sounds of
15   it you are even a good role model why you are
16   here in custody.

17       **INMATE RUSH:**  Thank you.

18       **PRESIDING COMMISSIONER SAWYER:**  What would
19   be, I don't know what you would be like on the
20   outside but at this time we are going to deny
21   your parole for two years.  Do you have anything
22   you would like to say Commissioner?

23       **DEPUTY COMMISSIONER WEAVER:**  No I think you
24   have covered it quite well.

25       **PRESIDING COMMISSIONER SAWYER:**  Ok, good
26   luck to you sir.  This concludes the hearing and
27   **ROBERT RUSH D-73321  DECISION PAGE 5  10/11/2005**

1   the time is 4:44.

2          **INMATE RUSH:**  Thank you.

3          **PRESIDING COMMISSIONER SAWYER:**  Thank you.

4                        --oOo--

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23   **PAROLE DENIED TWO YEARS:**        FEB - 8 2006

24   **THIS DECISION WILL BE FINAL ON:**_____

25   **YOU WILL BE PROMPLTY NOTIFIED IF, PRIOR TO THAT**

26   **DATE, THE DECISION IS MODIFIED**

27   **ROBERT RUSH D-73321  DECISION PAGE 6  10/11/2005**

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, JENNYFER OSECHECK, a duly designated transcriber, PETERS SHORTHAND REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 -90, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING OF ROBERT RUSH, CDC NO. D-73321, ON OCTOBER 11, 2005, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape to the best of my ability.

I hereby certify that I am a disinterested party in the above-mentioned matter and have no interest in the outcome of the hearing.

Dated  October 31, 2005, at Sacramento, California.

JENNYFER OSECHECK
TRANSCRIBER
**PETERS SHORTHAND REPORTING**