

# NATIONAL CENTERon INSTITUTIONS& ALTERNATIVES

Western Regional Office
Suite 802
527 West 7th Street
Los Angeles, California 90014
Telephone (213) 688-7731

**File Copy**

Confidential

A

Sentencing Memorandum

for

Robert Dalton Rush
Case No.  SCR 44594

Submitted to:

Honorable Robert N. Krug
San Bernardino County Superior Court
San Bernardino, California

November, 1987

# NATIONAL
# CENTER on
# INSTITUTIONS &
# ALTERNATIVES

Western Regional Office
Suite 802
527 West 7th Street
Los Angeles, California 90014
Telephone (213) 688-7731
  Administrator: Joel A. Sickler

President
JEROME G. MILLER

Advisory Board Members

AL BRONSTEIN
*National Prison Project*
*Washington, D.C.*
LARRY BROWN
*School of Public Affairs*
*Harvard University*
JUDI CHAMBERLIN
*Mental Patients Liberation Front*
*Boston, Massachusetts*
ROBERT DRINAN
*Law Center*
*Georgetown University*
PETER EDELMAN
*Attorney*
*Washington, D.C.*
SISTER FALAKA FATAH
*Pres./Founder, House of Umoja*
*Philadelphia, Pennsylvania*
SISTER M. ISOLINA FERRE
*Director, Playa Ponce*
*Ponce, Puerto Rico*
JAY HALEY
*Family Therapy Institute*
*Chevy Chase, Maryland*
CHARLENE HARRINGTON
*Nursing Home Evaluator*
*Sacramento, California*
HERB KUTCHINS
*Division of Social Work*
*California State University*
*Sacramento, California*
JOHN McKNIGHT
*Center for Urban Affairs*
*Northwestern University*
LLOYD OHLIN
*Center for Criminal Justice*
*Harvard Law School*
DAVID ROTHENBERG
*New York, New York*
DAVID ROTHMAN
*Center for Social Policy*
*Columbia University*
ANDREW RUTHERFORD
*University of Southampton*
*Southampton, England*
PETER SANDMANN
*Attorney*
*San Francisco, California*
ROBERT VINTER
*School of Social Work*
*University of Michigan*
THOMAS WINSHIP
*Gannet Center for Media Studies*
*New York, New York*
FRED WISEMAN
*Documentary Filmmaker*
*Boston, Massachusetts*
MARVIN WOLFGANG
*Department of Sociology*
*University of Pennsylvania*
CLAIRE WOMPIERSKI
*Department of Social Work*
*Virginia Commonwealth University*
ROBERT L. WOODSON
*National Center for Neighborhood*
*Enterprise*
*Washington, D.C.*

National Offices
  Alexandria, VA
  gional Offices in:
  Los Angeles/San Francisco, CA
• Atlanta, GA
• Syracuse/New York City, NY
• Chicago, IL
• Dallas, TX

November 18, 1987

Honorable Robert N. Krug
Department 1
San Bernardino County Superior Court
351 N. Arrowhead Avenue
San Bernardino, California  92415-0240

RE:  PEOPLE v. ROBERT DALTON RUSH
Case No.  SCR 44594

Dear Judge Krug:

    This report is written in reference to the sentencing hearing pending before your Court in *People v. Rush*. This report was prepared at the request of defense counsel, Grover Porter.

    This report is designed to provide the Court with a profile and understanding of the defendant and his background. Based upon this information, we offer a recommendation in terms of the duration of incarceration and the resources available within the state prison system.

Sincerely,


Lori Andersen, M.A.               Wendy Lacko
Director                          Case Assistant

0358

# TABLE OF CONTENTS

## SENTENCING MEMORANDUM FOR ROBERT DALTON RUSH

|  |  | Page |
|---|---|---|
| I. | INTRODUCTION | 1 |
| A. | Offense Behavior | 1 |
|  | 1. Prior Arrest Record | 1 |
|  | 2. Circumstances Surrounding the Istant Offense | 1 |
| B. | Social History | 7 |
|  | 1. Family Background | 7 |
|  | 2. Education and Employment | 9 |
|  | 3. Medical History and Substance Abuse | 10 |
|  | 4. Present Attitude | 10 |
|  | 5. Adjustment While in Custody | 11 |
|  | 6. Community Support | 11 |
|  | a) Darrold Hert, pastor | 11 |
|  | b) Dennis Roddy, former employer | 12 |
|  | c) Chris Beakman, friend | 13 |
|  | d) Harold Eichelt, soccer coach | 13 |
|  | e) Marty Nicholas, former teacher | 14 |
| C. | Research Findings | 14 |
|  | 1. The Relation of Physical and Mental Health to Homicide | 14 |
|  | 2. Recidivism | 16 |
| D. | Evaluative Summary | 16 |
|  | 1. Case Synopsis | 16 |
|  | 2. Sentencing Objectives | 18 |
| II. | SENTENCING RECOMMENDATION | 19 |
| A. | Duration of Incarceration | 19 |
| B. | Resources and Services Available Within the Department of Corrections | 21 |

SENTENCING MEMORANDUM
ROBERT DALTON RUSH
Case No.  SCR 44594


I.  INTRODUCTION

Robert Rush, age 21, was taken into custody on July 31, 1986 as a suspect in the murder of John Heinz.  Mr. Rush was formally charged with murder in the first degree (P.C. 187) with use of a firearm (P.C. 12022.5).

Mr. Rush was subsequently convicted of murder in the second degree (P.C. 189) with use of a firearm (P.C. 12022.5).  Mr. Rush now appears before the Court for sentencing in this matter.

A.  Offense Behavior

    1.  Prior Arrest Record

        Juvenile:   none
        Adult:      none


    2.  Circumstances Surrounding the Instant Offense

In September, 1983, Robert Rush enrolled as a full-time student at Califronia State University at San Bernardino.  For the first two years he lived in the college dormitory and for his third year he moved into a  house located at 1883 Virginia Street in San Bernardino.  Robert shared the house with three other young men:  Patrick Galloway, Russell Weatherly, and Walt Esrich.  All of the young men had been anxious to leave the dormitory and become more independent.  They set up a system of sharing expenses which relied upon a foundation of teamwork.  They shared expenses equally and if one person was short of money, another person would provide financial help.  Robert stated that the fact that all the roommates were "strapped for money" brought them closer together and they became best friends.  With close friends and a new found independence, Robert was happier than he had ever been before in his life.

In November, 1985, approximately two months after moving into the Virginia Street house, Robert was involved in a very serious motorcycle accident.  Russell (one of the house-mates) had just purchased a motorcycle for transportation.

The day Russell brought the motorcycle home from the dealer he and Robert went to a college establishment called The Pub. The Pub was on the grounds of CSU San Bernardino and maintained a snack bar, beer garden, live band, and video arcade. On the way home from the Pub, a semi-truck drove through a stop sign directly in front of Russell and Robert and the two vehicles collided. Both boys were thrown from the motorcycle and Russell sustained fatal injuries.

Robert was seriously injured with a severe concussion, dislocated ankle, broken ribs, punctured/collapsed lung, fractured right tibia and fibula, neurological injuries, contusions, abrasions, and a chipped tooth. Robert was taken to the emergency room at San Bernardino Medical Center and hospitalized from November 14, 1985 to November 24, 1985. He was also hospitalized at Mountains Community Hospital from November 24, 1985 to November 30, 1985. After Robert was released from the hospital, he lived with his parents in Lake Arrowhead and received outpatient medical care from a home nursing service. He remained confined to bed until January, 1986.

In addition to physical injuries, it has been noted that the accident caused Robert to experience depression, nervousness, and personality disorders. His physician referred him for a psychological evaluation and he was seen once by Olivia Brown, M.S., as part of his hospital treatment. Her brief report does indicate that Robert felt a great loss over the death of Russell, and his inability to function independently due to his injuries. Her report is attached as **Exhibit A**.

Mr. Rush's weakened physical and mental state played a major role in in his subsequent outburst against Mr. Heinz. In the words of Mr. Rush:

> The motorcycle accident set the stage for all the things that came after. I had smashed up my body, and my spirit was broken. I was mad at the world because Russell had been killed. I was very depressed and in constant pain. I laid around the house, watched television, and drank beer. I gave up on myself and felt very hopeless.

By all accounts, Robert Rush was not the same person he had been before the accident. His friends noticed a significant depression and regression in his physical and mental state. He withdrew from many people, felt confused about his direction, and was in mourning for Russell's death.

While Mr. Rush was recouperating at his parents' home, Walt Esrich and Patrick Galloway were trying to support the rental home by themselves. This was financially impossible so they acquired two other roommates, John Heinz and Eric Loveing, to take the place of Russell and Robert. John Heinz had been an acquaintance of Russell Weatherly (killed in the motorcycle accident) prior to moving into the house.

Approximately three months after his accident, Robert returned to the rental house and began the 1986 spring semester at CSU San Bernardino. He did not feel strong, either physically or mentally, and in fact received his first "F" in a class after returning for the spring semester. However, Robert wanted to be with his friends and attempt to get his life back in order.

Robert's first impression of the new house-mate, John Heinz, was that he was a likeable fellow. He stated:

> John had a reputation of being a fighter - I had heard of him getting into fist fights at parties. When he first moved into our house, however, he was kind of easy going. As time went on, he started to come across as a guy who was used to having his own way. He was 19 years old and acted pretty immature. He wanted to put forth a tough guy image.

Relations between the original roomates and John Heinz became strained and eventually Walt Esrich moved out of the house. Mark Hoy moved into the house to take the place of Walt. The roommates now consisted of Robert, John Heinz, Eric Loveing, and Mark Hoy.

Robert found himself the object of criticism from John Heinz. Because John and Russell had been friends, John blamed Robert for Russell's death. Because Robert had become inactive, John criticized him as being lazy and sloppy. It was Robert's nature to refrain from responding to John's criticism. Robert's non-responsiveness seemed to continually infuriate John Heinz and he became increasingly critical of Robert's habits. This critical harping went on for several months and eventually evolved into aggression.

Robert did not rise to the challenge of "having it out" with John, rather he made plans to move out of the residence. In Robert's words:

> I set my sights on the end of the summer to move out of the house. Mark, Eric, Walt, and I looked for an apartment or house. They were also upset about Russell's death and the Virginia Street house seemed to have a black cloud hanging over it after he died. We had all been his friends and it didn't seem right that he wasn't there. We all wanted a fresh start for that reason and I really had to get away from John. We didn't have it in our finanical means to establish a new rental until later on in the year. We were all going to save the money we earned from jobs.

By July 1986, Robert had been the object of John's continued criticism and demeaning name-calling for over four months. Compounding this situation was the fact that Robert was still in physical pain, still struggling to overcome depression and was still forced to be dependent upon his parents. The happiest time in his life - when he and his friends gained independence and first rented the house - was quickly deteriorating. John Heinz was not only destroying the original bond between the roomates but he was destroying the only dignity which Robert had left - his self-respect.

On July 28, 1986, Robert's mental state was aggravated when he was given an orthopedic back brace by his physician. He anticipated that the brace would be a permanent necessity and it was very difficult for Robert to accept his physical limitations.

Robert returned to the rental house after his doctor's appointment. At this time, Mark was at the residence with his girlfriend, Eric was sleeping, and John was also present. Shortly after Robert arrived, Mark and his girlfriend left the residence. It was at this time that Robert noticed puncture wounds in his dog's back and suspected that John's pit bulldog had inflicted the injury.* The events which followed this discovery were told to us by Robert and are as follows.

John entered Robert's room and Robert confronted him with the proof that his dog had been in a fight, probably with John's pit bulldog. John and Robert argued and at that time John's dog came into the room. Robert told John he did not want his dog in the room and began to lead the dog out. John reacted by pushing Robert down. Robert stood up, and John pushed him down again. Robert and John then began to wrestle in the hallway, with John clearly the larger and stronger of the two boys. John slammed Robert into the wall, causing a hole in the plasterboard.

John secured Robert with a head-lock and began punching him in the face. Robert stopped fighting as he knew he was not physically able to compete with John. John eventually released him and Robert retreated to his room. John remained in the hallway and taunted Robert with demeaning names and challenged Robert to fight with him. John stepped inside his own room, and continued to yell and badger Robert.

-----------------------------------

* Robert had previously suspected John of instigating fights between his dog and other dogs in the house but he had not confronted John about it.

Robert was simultaneously both angry and frightened and in great pain from the assault by John. At this moment he felt very alone, and vulnerable to John's temper. He grabbed his rifle* from underneath his bed with the idea that it would scare John when he came back. He had a bloody nose and walked into the bathroom to wash his face. He took the rifle with him to the bathroom because he was afraid of John. As he entered the bathroom, John approached Robert and Robert pulled the gun up and demanded that John move out of the house that day. John laughed at Robert and attempted to grab the rifle out of his hands. Robert panicked and pulled the trigger. Both boys were surprised and jumped back, and John said "ouch". Robert feared that John would get the gun and kill him. Feeling trapped, Robert began to repeatedly pull the trigger, killing John.

When the ammunition was depleted, Robert quickly left the room. He was on the brink of a nervous collapse. He went to his own room and comtemplated suicide. Several minutes later, Mark and his girlfriend returned to the residence. Robert told Mark what had just occurred.

Robert was extremely nervous, shaking, and scared. He felt relieved when Mark took charge of the situation. It was decided that they would attempt to cover up the death of John Heinz.

Mark and Robert buried the body in a nearby canyon area and disposed of the evidence. The disappearance of John Heinz came to the attention of the Heinz family and the police were notified. Robert and Mark confided in their house-mate, Patrick Galloway, and Mr. Galloway later notified the police that John Heinz was deceased.

---------------------------------

* Robert had been given the rifle by his parents as a gift when he was 16 years old. He and his friends enjoyed target shooting at the rifle range in the desert.

Robert's emotional reaction to his act is described as follows:

> I was too scared to think about turning myself in. I wasn't thinking straight - I was in a state of shock. It was like watching T.V. - I didn't feel a part of it.

> The next day I tried to convince myself that it was a nightmare that happened. I went through a lot of mood swings. I would try to block it out of my mind and go on with my life. Then someone would mention John's name and what I had done would come crashing back. In retrospect, I wish I had gone to the police right away, but I was too scared.

In hindsight, Mr. Rush regrets not getting professional counseling to cope with the physical and mental trauma of the motorcycle accident and Russell's death. Robert stated, "For several months I was trying to get through the most painful period of my life; John kicked me when I was down. The physical attack was the last straw - my mind couldn't take anymore."

## B. Social History

### 1. Family Background

Robert Rush was born on May 7, 1965 in Denver, Colorado, to Richard and Ann Rush. Robert has one brother, Brian, age 16 years. The Rush family moved from Denver in 1979 and relocated to Lake Arrowhead, California. Mrs. Rush is a third grade teacher at Rim of the World Unified School District in Lake Arrowhead. Mr. Rush is currently managing a small business while in the process of obtaining his teaching credential. Both Mr. and Mrs. Rush are devoted to the field of education.

Their views about the family and Robert's situation
are as follows:

Brian and Rob have an unusual brotherly
relationship because they get along well. Rob
has never hit Brian although they have had
occasional verbal agruments. Rob has always
been a quiet child. When we lived in Denver,
Rob was active in boy scouts and cub scouts.
He kept busy making model planes when he was
younger. He wanted to be a pilot for as long
as I can remember. He worked real hard in
school. Then in fifth grade he found out he
needed glasses, so that ruined his chance of
becoming a pilot.

Robert would never strike out when frustrated -
sometimes when he was really angry he would hit
pillows. One time Rob wanted to watch a movie
on T.V., but I told him he couldn't because
Brian was there. I turned on the T.V. and he
turned it back on - this went back and forth.
Finally I disconnected the cable and Rob went
to his room.

Rob never had a lot of friends but he had a few
close friends who he would stick with. Russell
was a very good friend. Rob was very depressed
after the accident. Not only for Russell but
also for himself. Rob had been very good in
sports and well-coordinated. This ability gave
him an asset which others looked up to. His
biggest fear was of being crippled. After the
motorcycle accident, he felt crippled. I had
to lift him in and out of bed, bathe him, wash
his hair. Mentally he was having problems. He
was very depressed about everything. He knew
he could never run or play sports again - he
would always be restricted in his mobility.

Robert was scared to death of John Heinz. John
was much larger and stronger than Rob. Rob was
scared of being put back in the hospital if
John injured him in a fight. John really
zeroed in on Rob's weaknesses. He called him
lazy and took advantage of his weakened state.
Rob was very sensitive about his injuries and
it was very hard for him to accept losing his
physical abilities. He couldn't run or even
compete with John.

I know Rob didn't intend to kill John. He felt
he needed something between himself and John –
something to scare John away. Only John wasn't
scared and then Rob felt trapped.

## 2. Education and Employment

Robert Rush graduated from Rim of the World High
School, Lake Arrowhead, in June of 1983. Robert had
recently moved from Denver, Colorado, and found it
difficult to make friends. He described himself as
"somewhat shy" and did not like the typical high school
crowd. Robert felt that the students who were popular
came from wealthy families and were arrogant. He made a
few friends with other students who were also outsiders
to the popular school crowd.

He became close friends with a few boys through
joining the band and the Board Game Club. Robert
achieved average grades and was not a highly motivated
individual. Robert stated, "I took it day to day, I
wasn't too serious – I mainly tried to enjoy myself."

Robert views his high school years as having "good
and bad aspects." He explained:

The good times were the few close friends I
had. We spent time doing what we liked to do.
I got average grades and enjoyed the
activities. On the bad side, I did feel
somewhat alienated from the popular crowd. My
friends and I were teased sometimes about
things – like the clothes we wore and riding
the school bus. The crowd wore all the latest
styles and had cars but we didn't have money
for that.

While in high school, Robert worked various jobs for
minimum wage. In an effort to make more money Robert and
several friends began a yard maintenance business which
proved to be fairly productive. They quit the business,
however, because people would agree to pay them a certain
amount and then when the job was completed they paid
less.

Robert entered Cal State San Bernardino the September following his graduation from high school (June 1983). He began as an undeclared major and subsequently declared physical geography as a major. Robert wanted to work in the field of environmental protection and conservation.

Once again, Robert did not fit into the typical college crowd. He made a few close friends with people he met in the dormitory. Robert received student loans for his college tuition and worked as much as possible. His jobs continued to pay minimum wage and he worked as a traffic monitor, maintenance man, and house painter.

Robert averaged a full load of classes in college, except for the winter and spring semester, 1986. This was the term which followed Robert's accident in November, 1985. His depression affected his ability to concentrate and he had a difficult time re-adjusting to college. Robert received an "F" in a class for the first time in his life. Transripts from CSU San Bernardino are attached as <u>Exhibit B</u>.

### 3. Medical History and Substance Abuse

Robert Rush has had only two major medical traumas. The first occurred in 1984 when he "rolled" a truck which he was driving. The passenger, his friend, was very seriously injured and almost died. Both Robert and his friend did recover from injuries. The second accident was the motorcycle crash in November, 1985, in which Robert was seriously injured and Russell Weatherly was killed.

Robert reported no history of substance abuse. He does drink beer and his consumption increased after the motorcycle accident in 1985.

### 4. Present Attitude

Robert Rush is visibly shaken and saddened by his involvement in the instant offense. Although he believes he was provoked by John Heinz, he realizes that his actions are not justified. Mr. Rush appears to accept the situation as final and does not blame anyone but himself. He does believe that his physical and mental health were weakened by the motorcycle accident and that he was in a vulnerable state for several months while mentally contending with John Heinz.

Mr. Rush has accepted the inevitability of state prison and plans to make productive use of his time. He realizes the need for psychological counseling once he is released – both for the effects of prison and for gaining a better understanding of his violent reaction to John Heinz.

### 5. Adjustment While in Custody

Mr. Rush has been detained at the San Bernardino County Jail since July 31, 1986. To our knowledge, there have been no disciplinary reports of any kind.

Mr. Rush told us that he is in a dormitory cell with less than ten other prisoners. He usually sleeps during the day and stays awake at night reading books and newspapers. He is allowed outside to exercise at least once a week for one hour.

### 6. Community Support

Several people wrote letters on behalf of Robert Rush. These letters are attached as **Exhibit C**. The following people were interviewed by NCIA:

### a. Darrold Hert, pastor

Mr. Hert became acquainted with Robert when Robert was in his early teen years. Robert was active in Mr. Hert's youth group and was a member of the music group; he played the saxaphone and trombone. Robert was well respected, especially by the younger children. Although he had many friends, he did not seem to seek close relationships. Mr. Hert observed that Robert generally used humor if frustrated or angry.

Mr. Hert is aware of the two serious automobile accidents in which Robert has been involved. Because of the first accident, Mr. Hert believes that the motorcycle mishap was "almost too much for Robert to handle." Robert was very withdrawn, melancholy, and questioned his desire to go on living. Mr. Hert stated:

> When Robert went back to the rental house (8-10 weeks after the accident) he was very depressed and lonely – he was still on crutches. He improved very slowly. He went back to school too soon, but because of his depression his parents thought it would be good. But it wasn't the same. Before the accident, Rob had really enjoyed school and his roommates.

In regard to the instant offense, Mr. Hert stated:

> After the shooting Rob was very shaken. He did not know what to do to fix the situation. It was Mark's idea to hide the whole thing and Rob agreed.

> Rob seems to be in better spirits now. Like a weight has been lifted off. He is coping as well as possible. He can deal with punishment and will do well after he's released.

**b. Dennis Roddy, former employer**

Robert was approximately 17 years old when he was employed by Mr. Roddy. Mr. Roddy manages the Presbyterian Conference Center in the Wylie Woods Mountains. Robert worked as a handyman for one summer and continued to work occasionally for about three years.

> Mr. Roddy stated:

> Rob and I spent a lot of time together and Rob was always quiet and mild-mannered. A couple times I chewed him out for being late and he took it well and never got mad. I didn't view him as very emotional, just quiet.

Rob has taken responsibility for what happened.
I'm concerned about his ability to deal with
prison. Because of his injuries and lack of
aggression, he would be subjected to some rough
things (people). His mother is also
overprotective, and that may have an effect.

### c. Chris Beakman, friend

Chris and Robert have been friends for approximately
six years - they met as freshman in high school. After
school they spent time together playing board games such
as Dungeons and Dragons. Chris knew that the Rush family
had financial problems, but Robert never spoke about
these personal matters.

Regarding the instant offense, Mr. Beakman stated:

Rob was very hurt by Russell's death. He was upset
at the hospital about Russell and didn't really
think about himself.

I've heard from other people how violent John was,
how he beat people up and had to be pulled off them
at times. I know Rob was terrified of Heinz. Rob
is one of the most mellow people I've ever known.

### d. Harold Eichelt, soccer coach

Mr. Eichelt has known Robert since Rob was 15 years
old. He was Robert's soccer coach when Rob was 15, 16,
and 17 years old.:

Mr. Eichelt stated:

Rob was rather shy and very unaggressive. The
reason Rob was a good soccer player was because
he was consistent. I was always trying to get
him to be more aggressive. Rob understood the
game but would never fight back when other
players would shoulder him off the ball. He
never retaliated.

Rob was very helpful - he always got the soccer
balls or water before a game. I feel what
happened to Rob was out-of-character.

### e. Marty Nicholas, former teacher

Mr. Nicholas became acquainted with Robert Rush when Robert was a freshman in high school. Robert was in several of Mr. Nicholas' classes and was a teachers aide for Mr. Nicholas.

Mr. Nicholas stated:

Rob got along with everyone. I was very surprised by the shooting and the verdict. I felt it was not in Rob's nature to hurt anyone. He was always very passive. Rob changed after the motorcycle accident and was very depressed.

## C. Research Findings

### 1. The Relation of Physical and Mental Health to Homicide

NCIA would like to present the Court with the following information regarding weakened physical and mental abilities and the relation to homicide.

Rosembaum, M.D., and Bennett, M.S.W.: Homicide and Depression. American Journal of Psychiatry 143:3, March 1986.

In dynamic terms, the homicidal depression would be considered narcissistic (a reaction to situations that produced hurt pride, shame, and humiliation) rather than anaclitic (a reaction to the loss of an object on who the patient was dependent through death or a real or threatened separation). The use of 'dynamic' does not negate the well known biologic and genetic factors of depression.

It appears that the feeling of shame and humiliation which result from these narcisstic injuries not only lead to a serious loss of self-esteem and resulting depressive affect, but produce intense aggressive impulses which may erupt explosively in violent and homicidal behavior. Campbell noted that 'in depression there may be episodes of destructive fervor during which ideas of jealousy and retaliation may be acted upon impulsively.' Frazier emphasized the importance of a 'series of hurts, fantasized or real, plus repeated and memorable humilitations accompanied by feelings of shame' in murderers.

Prepared Statement of Dr. Charles Patrick Ewing: Women Who Kill. Presented to the U.S. House of Representatives, Washington D.C., September 16, 1987.

Current self-defense law equates 'self' with only physical life and bodily integrity. But outside the law, 'self' is commonly understood to encompass not only those corporeal aspects of existence, but also psychological functions, attributes, processes, and dimensions of experience that give meaning and value to physical existence.

Furthermore, it has long been understood that harm to the psychological aspects of the self can be just as detrimental as injury to the physical or bodily aspects of the self...They kill to prevent their batterers from damaging, if not destroying, psychological aspects of the self that give meaning and value to their lives. In short, they kill in what I have chosen to call psychological self-defense.

Paul Chance, Ph. D.: Life After Head Injury. Psychology Today, October 1986.

> Physical disabilities such as paralysis and deafness are often less troublesome than impairments in intellectual and social behavior. Some of the greatest difficulties involve social behavior. Head injury victims are often irritable, quarrelsome, anxious, easily depressed and excitable.

> Head injury can also cause a kind of inertia. They may spend long hours watching television or sitting idly in a chair. They often have difficulty reasoning and solving problems. Academic skills also suffer.

### 2. Recidivism

NCIA referred to a U.S. Department of Justice survey of new crimes committed by a group of 6,835 male homicide offenders paroled from state institutions over a five year period. The results of this survey reveal a total recidivism rate of less than 5%, and a repeat homicide rate of less than one-half of one percent over a three year follow-up period. A chart on these statistics is attached as Exhibit D.

## D. Evaluative Summary

### 1. Case Synopsis

Robert Rush presents the case of a youth who has committed a seemingly episodic act of violence.

By all accounts, Robert Rush was a passive, law-abiding individual. Between the years of 1984 and 1986, Robert experienced some of the worst, and best, times of his life. He made a successful transition from high school to a state university. He gained independence and close friendships by sharing a house with several college friends. He suffered through two traumatic vehicular accidents – the latter one left him permanently injured and killed his best friend.

It is the latter accident which seems to have greatly reduced Robert's mental strength. There are several undisputed facts which attest to the fact that the motorcycle accident dealt Robert a great psychological blow: Robert's best friend, Russell Weatherly, was killed in the accident; Robert sustained serious physical injuries, including a head injury; Robert will be restricted in his future physical mobility; Robert was very depressed following the motorcycle accident and was forced to be dependent upon his parents for care; he was forced to adjust his lifestyle to match his physical limitations and this proved to be a great struggle.

Under ideal circumstances, such a life altering event may have been successfully navigated by professional counseling, support from family and friends, and time. Robert did not obtain counseling but he did have support from his family and friends. This support, however, was not sufficient enough to mend Robert's sense of growing frustration and hopelessness.

Several months after the accident, Robert Rush encountered a great deal of pressure. He re-entered college before he was physically recovered; he re-entered the rental house where he had friends but also had more obligations than when at his parent's home; he began working as a house painter to earn money.

He reacted to these pressures as one might expect, given his depressed mental state. He received an "F" in a college course (he had never before earned an "F"); he was not always able to actively do chores in the house; and he suffered a great deal of back pain from painting. In general, his condition began to deteriorate and he felt completely out of control of his own life. For the first time, Robert felt at the mercy of his physical and mental limitations.

By all accounts, it appears as if John Heinz was not well liked in the rental house and Robert and John especially had tense relations. John was much larger and stronger than Robert and seemed to take the attitude of a disciplinarian even though he was two years younger than Robert. For five months, John badgered Robert about his personal habits and greatly insulted Robert's ability to defend himself. Robert did not respond to John's verbal harassment and withdrew into himself. He became more sensitive about his physical limitations, but repressed any anger he felt toward John. Robert was very scared that John would physically hurt him if he pursued an agrument.

Robert's fear and emotions eventually came to a peak when John physically attacked him and beat him with his fists. Not only was Robert physically injured, he was also humiliated and afraid. He grabbed a weapon which he felt would scare John away. But John was not scared away and Robert had trapped himself in a situation where he had to incapacitate John or risk being very seriously hurt or killed by John in retaliation.

## 2. Sentencing Objectives

It is not our intention to excuse or justify Robert Rush for killing John Heinz. It is our purpose to examine the circumstances surrounding Robert's involvement in the instant offense and apply the meaning of the information towards sentencing. Based on the information we obtained, we have concluded that the primary sentencing issues in this case are punishment and rehabilitation. The issue of deterrance and incapacitation are considered less important, since crimes such as this are not primarily motivated by rational, utilitarian concerns, and they are not as likely to be prevented by sentencing measures.

Furthermore, while Mr. Rush's actions were quite dangerous, it is unlikely they will be repeated. We state this because of the provocation involved and Mr. Rush's mental weakness at the time. While no one can prevent provocation, we hope that Mr. Rush will receive the services he needs to successfully adjust to his limitations and past trauma. It is also very evident that he has strong support form family and friends to make a successful transition.

## II.  SENTENCING RECOMMENDATION

### A.  Duration of Incarceration

NCIA contacted the California Youth Authority regarding Welfare and Institutions Code section 1731.5 (committment to the CYA).  Mr. Hal Baker, Intake and Court services, verified that Robert Rush is not eligible for placement at the youth authority because he was not under 21 years of age when the crime occured.

Should the Court accept this proposal, we respectfully recommend that Mr. Rush be given a minimum state prison sentence.  By limiting the length of his incarceration, the Court will be providing for greater rehabilitative opportunities.

We would ask the Court to consider the circumstances for mitigation and strike the additional punishment as prescribed under Penal Code Section 12022.5.  A minimum sentence for Mr. Rush would allow an earlier eligibility for a medium security placement.  In terms of rehabilitation this type of placement would focus more on advanced rehabilitative opportunities and less on high security.

Mr. Rush has indicated that he wants to use his period of confinement and subsequent parole supervision as an opportunity to obtain vocational training and, if possible, psychological services.  As mentioned earlier, statistics show a very low recidivism rate for this type of offense.  It would, therefore, seem crucial to administer punishment that does not go beyond the point of rehabilitation.

Support for minimization of the amount of time in confinement has been put forth by the National Council on Crime and Delinquency, the American Bar Association, and the U.S. Advisory Commission on Criminal Justice Standards and Goals.  All urged the de-emphasis of confinement when doing so is appropriate for both the offender and the community.

According to the American Bar Assocation in its *Standards Relating to the Administration of Criminal Justice*:

> Certainly it is one of the major goals of sentencing that an offender be dealt with in the manner that is most likely to avoid the commission of a new offense at some future time. The advisory commission is pursuaded that the best hopes of achieving these objectives are offered by programs which minimize the dislocation of the offender from the community and make a maximum effort to readjust him to it. For that reason it is recommended that the sentence imposed in each case would involve the minimum amount of custody or confinement that is consistent with the multiple goals which are served by sentencing.

Furthermore, recent empirical research in the field of corrections has found that the length of incarceration is associated with an individual's ability to successfully return to society as a productive and crime-free member. The preponderance of the research indicates that the *shorter* the time of incarceration, the *greater* the likelihood of success once released.**

---

** See for example, Don Gottfredson, et. al. "The Served and Parole Outcomes Among Parole Risk Categories", *Journal of Criminal Justice*, 5 (1971) 1-12. See also James L. Beck and Peter B. Hoffmann, "Time Served and Release," *Journal of Research on Crime and Delinquency*, (July 1976) 127-137, Don Gottfredson et. al., *Four Thousand Life Times: A Study of Time Served And Parole Outcomes*, Davis, California, NCCD, 1973.

**B.    Resources and Services Available Within the Department of Corrections**

We understand that the Court can not designate Mr. Rush to a specific facility, however, we would like to suggest that a recommendation be entered into the Court minutes. We anticipate that Mr. Rush's classification score will place him in a level IV facility. In this regard, we would recommend the following institution or its equivalent:

California Correctional Institution
Tehachapi, California

If placed in the Tehachapi prison, Mr. Rush will be significantly closer to his family who live in Lake Arrowhead. The location of the other two level IV facilities, San Quentin and Folsom, would realistically prevent Mr. and Mrs. Rush from visiting their son on a regular basis.

Tehachapi currently has two level IV units as well as low security inmates. Programs include academic education through junior college, job training, and industrial enterprises. Frequent staff-inmate meetings seek to improve the level of communication. Tehachapi also has a variety of self-help programs with a high degree of participation.

EXHIBIT A

## CONSULTATION RECORD

DATE 12/4/85

NAME Robert Rush     ATTENDING PHYSICIAN Dr. Cibelli

Pertinent Information by attending Physician: _____

_____

_____

_____

Referred by Dr. Cibelli     to Dr. O'Brien, M.S.

CONSULTANT'S REPORT AND ADVICE:     DATE 12/4/85

Referral by Dr. Cibelli who is treating pt. for injuries incurred while a motorcycle passenger, struck by truck. Driver of cycle, Rob's friend & roommate, was killed in the accident. Concern was for Rob's apparent depression & inability to adjust.

Pts. attitude was cooperative. He was willing to discuss his situation & his feelings re same. Losses he has had to face include his friend, ability to function independently at this time, & his "carefree ness." However, he is feeling more hopeful & looking forward to going home Friday. Assured him that his feelings of loss, anger, hurt & guilt are to be expected & will re-appear from time to time. Encourag'd 'im talk with friends, family when this occurs to facilitate working through process. & left my card & asked him to call to talk should he feel the need for additional assistance.

Consultant's Signature    O'Brien
                          M.S.C.P.

HS 0382

EXHIBIT B

**NAME (L. F. M)**   RUSH, ROBERT DALTON    **SEX** M   **BIRTH** 05-07-65   **PEN** 834-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

**ADDRESS AT ADMISSION**   P.O. BOX 1314    **CITY** BLUE JAY    **STATE** CA   **ZIP** 923

**DATE MATRICULATED** 09/22/83   **MAJOR** GEOGRAPHY    **STATUS** UNDERGRADUATE

## GRADING SYSTEM:

Grade Performance Per Quarter Hour

| Symbols | Level | Gr. Pts./Prog. Pts. | |
|---|---|---|---|
| A | Excellent | 4.0 | 4.0 |
| A- | | 3.7 | 3.7 |
| B+ | | 3.3 | 3.3 |
| B | Good | 3.0 | 3.0 |
| B- | | 2.7 | 2.7 |
| C+ | | 2.3 | 2.3 |
| C | Satisfactory | 2.0 | 2.0 |
| C- | | 1.7 | 1.7 |
| D+ | | 1.3 | 1.3 |
| D | Passing | 1.0 | 1.0 |
| D- | | 0.7 | 0.7 |
| F | Failing | 0.0 | 0.0 |
| U | Unauthorized Incomplete | 0.0 | 0.0 |
| *CR | Credit (A,B,C) | | 2.0 |
| NC | No Credit (D,F) | | 0.0 |

The following administrative grades carry no grade points or progress points and are, therefore, not used to determine a student's grade-point average or progress toward the degree. However, it should be pointed out that the "incomplete" will be counted as an "F" if not removed within one calendar year from the date it was assigned.

   I   Incomplete Authorized
   RD   Report Delayed
   SP   Satisfactory Progress
   W   Withdrawal
   AU   Audit

## UNIT OF CREDIT:

Represents 50 minutes of lecture or recitation per week during an 11-week week.

## COURSE NUMBERING:

   1-99   Non Credit courses
   100-299   Lower Division
   300-499   Upper Division
   500-599   Upper Division which also gives grad. credit for grad. students
   600-699   Graduate courses

## PROGRAM IDENTIFICATION:

   X   Extension courses
   X800-X899   Extension courses only
   IP100-IP699   International Programs courses
   E   Credit earned in a continuing education program (extension or summer session) for residence credit pursuant to an External Degree Program
   PG or PB   Denotes post-baccalaureate credit
   Credit grades awarded in 600-level courses will reflect B levels of competence

TRANSCRIPT SENT

1-Sep 6     11-17-87

### Transfer Credit Table

| DEGREE GRANTED | DATE | MAJOR | | | |
|---|---|---|---|---|---|
| MEMORANDA | | | QTR UNITS ATTEMPTED | QTR UNITS EARNED | GRADE POINTS | G.P |

| DISCIPLINE | COURSES NUMBER | COURSE TITLE | UNITS ATTEMPTED | UNITS EARNED | GRADE | GRADE POINTS | PROG PO |
|---|---|---|---|---|---|---|---|
| | | 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 RUSH, ROBERT DALTON   FALL   1983   A | | | | | |
| ENG | 101 | FRESHMAN COMP | 5.0 | 5.0 | C+ | 11.5 | |
| MUS | 180 | STUDIES IN MUSIC | 5.0 | 5.0 | B+ | 16.5 | |
| PHIL | 190 | STUDIES IN PHILOS | 5.0 | 5.0 | B | 15.0 | |
| PE | 101 | RACQUETBALL | | 2.0 | CR | | |
| | | | 15.0 | 17.0 | | 43.0 | 2. |
| | | 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 RUSH, ROBERT DALTON   WINTER   1984   A | | | | | |
| CSCI | 125 | INTRO BASIC PROGR | 2.5 | 2.5 | B | 7.5 | |
| PHIL | 105 | ARGUMENT, EVIDENCE | 5.0 | 5.0 | B | 15.0 | |
| PE | 101 | RACQUETBALL | | 2.0 | CR | | |
| SSCI | 142 | WORLD CIVIL II | 5.0 | 5.0 | B | 15.0 | |
| | | | 12.5 | 14.5 | | 37.5 | 3. |
| | | 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 RUSH, ROBERT DALTON   SPRING   1984   A | | | | | |
| HSCI | 120 | HLE SOC: ECOL APRCH | 5.0 | 5.0 | B- | 13.5 | |
| PHIL | 465 | PHILOSOPHY OF LAW | 5.0 | 5.0 | B | 15.0 | |
| PE | 137 | SKIN DIVING | | 2.0 | CP | | |
| PSCI | 203 | AMERICAN GOVERNMT | 5.0 | 5.0 | D | 5.0 | |
| | | | 15.0 | 17.0 | | 33.5 | 2. |
| | | 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 RUSH, ROBERT DALTON   FALL   1984   A | | | | | |
| NSCI | 100 | DESCRIP ASTRONOMY | 5.0 | 5.0 | B | 15.0 | |
| PHIL | 301 | GREEK & ROMAN PHIL | 5.0 | 5.0 | C | 10.0 | |
| PSCI | 310 | CLASSICL POL THGT | 5.0 | 5.0 | C | 10.0 | |
| | | | 15.0 | 15.0 | | 35.0 | 2. |
| | | 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 RUSH, ROBERT DALTON   WINTER   1985   A | | | | | |
| ENG | 110 | WORLD LIT I | 5.0 | 5.0 | C+ | 11.5 | |
| GEOG | 350 | CONSERVENATL RES | 5.0 | 5.0 | C | 10.0 | |
| GEOG | 380 | POPULATION GEOG | 5.0 | 5.0 | C+ | 11.5 | |
| | | | 15.0 | 15.0 | | 33.0 | 2. |
| | | | 72.5 | 78.5 | | 182.00 | |

ENTERED TO HUNDREDTH OF UNITS UNLESS OTHERWISE INDICATED    STUDENT COPY    SEE PAGE 2

PERMANENT RECORD ORB   Case 3:09-cv-00990-ORB   Document 30   CALIFORNIA STATE COLLEGE, SAN BERNARDIN  Filed 08/02/2007   Page 30 of 45

CALIFORNIA STATE COLLEGE, SAN BERNARDINO
5500 STATE COLLEGE PARKWAY
SAN BERNARDINO, CA 924

RUSH, ROBERT DALTON

MEMORANDA

| DISCIPLINE | COURSE NUMBER | COURSE TITLE | UNITS ATTEMPTED | UNITS EARNED | GRADE | GRADE POINTS | PROG PO |
|---|---|---|---|---|---|---|---|
| | | 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  RUSH,ROBERT DALTON   SPRING   1985  A | | | | | |
| GEOG | 360 | CLIMATE&VEGETATN | 5.0 | 5.0 | C | 10.0 | |
| MATH | 80 | FNDAMNTL ALGEBRA | | | B | | |
| NSCI | 314 | THE COSMOS | 5.0 | 5.0 | C+ | 11.5 | |
| | | | 10.0 | 10.0 | | 21.5 | 2 |
| | | 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  RUSH,ROBERT DALTON   FALL   1985  A | | | | | |
| GEOG | 103 | PHYSICAL GEOG | | | W | | |
| PSYC | 100 | INTRO TO PSYCH | | | W | | |
| NSCI | 312 | SCI CTR&ASCNT MAN | | | W | | |
| | | 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  RUSH,ROBERT DALTON   WINTER   1986  A | | | | | |
| GEOG | 309 | SOVIET UNION | 5.0 | 5.0 | B- | 13.5 | |
| GEOG | 440 | URBAN GEOGRAPHY | 5.0 | | F | | |
| | | | 10.0 | 5.0 | | 13.5 | 1 |
| | | 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  RUSH,ROBERT DALTON   SPRING   1986  A | | | | | |
| PSYC | 100 | INTRO TO PSYCH | 5.0 | 5.0 | C | 10.0 | |
| GEOG | 470 | HYDROLOGY/WATER | 5.0 | 5.0 | C+ | 11.5 | |
| | | | 10.0 | 10.0 | | 21.5 | 2. |
| | | | 102.5 | 102.5 | | 238.5 | 2. |

TRANSCRIPTS SENT

ENTITLED TO HONORABLE DISMISSAL
UNLESS OTHERWISE NOTED

EXHIBIT C

# Lake Arrowhead Community Presbyterian Church

P.O. BOX 340
LAKE ARROWHEAD, CALIFORNIA 92352
(714) 337-1613

*Darrald P. Hert, Pastor*

November 16, 1987

The Honorable Bob N. Krug
Superior Court
San Bernardino, California

Dear Judge Krug:

I am aware that Robert Dalton Rush will be sentenced in your court on Tuesday, November 24, 1987, for the crime of murder in the second degree., I wish to share with you some of my feelings and perceptions about Rob, the crime he committed, and his future.

Rob has been a member of our parish in Lake Arrowhead for almost ten years. During that time he was a regular and positive participant in our youth program. He was part of a music group that participated regularly in our Sunday morning worship services and was most cooperative and helpful in any activity we asked him to lead. He even preached a very good sermon on youth Sunday one year.

When Rob moved to San Bernardino to go to college I did not have as frequent contact with him as in the past but did see him occasionally and felt the same warmth, charm, and friendliness we had shared in the past. In late 1985 Rob was involved in a serious traffic accident in which his friend was killed and Rob sustained serious head, back, hip, and leg injuries. The incapacity that resulted produced a withdrawal and sense of melancholy that I would describe as dramatic. The healing was very slow and Rob was essentially bedridden for several weeks.

When he was told that the screws in his ankle would probably never be removed and that his mobility would be permanently impaired, periods of deep depression ensued and I suggested some psychological help for Rob to assist him in coping with his situation.

His parents helped him move back to his house in San Bernardino before he was really physically able to cope with that situation. However, we all felt the psychological boost of being with his friends was a more significant factor than the physical impairment. He was still using a cane to walk and occasionally crutches for support. He could walk very slowly without support for short distances but certainly was unable to run and knew that he would probably never be able to run again. The events that followed Rob's return to San Bernardino are a sordid chapter in his history that we all regret.

I attended Rob's trial and heard him tell his story from the witness stand. I had talked with Rob at great length within three to four days following his arrest for the crime he had committed and he told me then essentially the same story he told from the stand. I believe his story and feel that he was truly acting in self-defense, particularly in light of his physical condition. What troubles me and makes the crime so despicable is, of course, the events that followed the actual scuffle and shooting. We all, particularly Rob, wish he had called the police rather than being persuaded to follow the course he did.

Rob is currently in a fairly positive state of mind and is ready to try to put his life back together in a positive and meaningful way, pay his debt to society for his poor judgment and impulsive behavior following the scuffle with John, and try to contribute in some helpful way to society following his release from prison.

Your compassionate consideration in this matter will be deeply appreciated.

Sincerely yours,

Darrald P. Hert

Box 1314

Blue Jay, CA 92317

November 15, 1987

The Honorable Bob N. Krug

Dept. 1, County Court

San Bernardino, CA

Dear Sir:

I am Robert Rush's father, and am presently employed as a manager of a small business, while in the process of completing the requirements for a teaching credential. After graduating from college twenty-seven years ago, I will be student teaching in January.

The purpose of this letter is to ask for your compassion and assistance in determining how Rob will spend his sentence. Prior to this tragedy, Rob had never been in any trouble. He is a person of warmth, empathy, and sensitivity, with a completely non-agressive nature.

An example of who Rob Rush really is occurred in July of 1985. A member of our church ( whom Rob did not know) underwent open heart surgery and needed to have the blood he used replaced at the Blood Bank. As I was leaving our home to donate some blood, Rob asked where I was going. When I told him, he asked to go along and he joined me in donating.

His family and friends are very concerned as to what will become of Rob in prison and I ask for your every consideration when you sentence him.

Sincerely yours,

Richard D. Rush

0389

Box 1314
Blue Jay, CA 92317
Nov. 15, 1987

The Honorable Bob N. Krug
Dept. 1, County Court
San Bernardino, CA

Dear Judge Krug:

My name is Ann Rush. I teach third grade at Lake Arrowhead
Elementary, and this is my sixth year of teaching here. In Sept.
you presided over the trial of my son, Robert Rush, and saw him
daily for about two weeks, but I deeply regret that no one in the
courtroom was able to really become acquainted with him. This is
not in any way a criticism of Mr. Porter. He is a fine attorney
and we were grateful for his expertise in defending my son; but,
as you know, circumstances were such that Mr. Porter was not
permitted to call any character witnesses. I feel that it is in
the interest of justice that you get to know a little about Rob
before you sentence him.

I still often have to remind myself that this is not just a
nightmare that I'm having because nothing in Rob's past has ever
indicated that such a tragedy would happen to him. He has always
been quiet, sensible, and responsible. I left him in charge of my
house and pets one summer when he was seventeen, and he threw no
wild parties in the two weeks in which his brother and I were gone.
He cared for the house, animals, and plants (inside and outside)
while also attending to his summer job, washing dishes at the yacht
club. He was a boy scout, played trombone in the band, and was
a member of his high school soccer team. He chose to take Geometry,
Chemistry, German, etc. in order to prepare for college. And he
became a member of the Lake Arrowhead Community Presbyterian
Church when he was sixteen.

If there was a contributing factor to his tragedy, it was another tragedy - a motorcycle accident that killed his best friend (Russel Weatherly, the driver of the motorcycle) and seriously injured Rob. He had always been very healthy, and the month he spent in the hospital and the loss of his friend sent him into a real depression. He spent another month in a hospital bed in our living room and he was a very changed young man. He was very, very thin for one thing, and I wanted so much to see him put on some weight, but he just didn't have any appetite. Model building was a favorite hobby of his, but he just never tried to put together any of the models his friends brought him. He complained about not being able to sleep for months. He would relive the accident in his dreams, and wake up very upset. He was in constant pain from his fractured ankle and pelvis, and so took pain pills regularly, while his doctor constantly pressured him to cut down on their use. I allowed him to move back to the house he shared with his friends in San Bernardino long before I felt he was really ready, but it meant so much to him to get things "back to normal", as he put it. He wanted to turn back the clock and forget his pain and loss.

As you know, six months after the accident, he was beaten and in fear of being put back into the hospital, he - well, you know the rest.

Judge Krug, unlike the other inmates of the prisons, Rob has never been in any other trouble - never even in a fist fight to my knowledge. And I am so terrified of what will happen to him when he is at the mercy of streetwise, jailwise criminals. He is a reader of books, a lover of music, and a gentle person. Please have compassion for him and do what you can to spare him experiences that would cost him his self-respect.

Sincerely,

Ann Rush

0391

Honorable Bob N. Krug

Your Honor,

    This letter is written on behalf of a long time friend and former student, Rob Rush.

    I have taught at Rim of the World High School for the past sixteen years and in that capacity I became well acquainted with Rob.

    Rob served capably as my student aid as well as being an above average student, and a stallwart member of the extracurricular club I sponsor.

    In the four years that I had the opportunity to observe him on a daily basis I found Rob to be a quiet, polite, perhaps shy individual.

    At no time did I ever observe Rob Rush in a confrontational situation with either an adult or fellow student.  I never overheard him belittle a younger student or ever engage in any agressive or arguementative behavior.  Of the nearly three thousand students I've encountered in my career, Rob would be one of the very least I would suspect had the potential for violence.

    I sencerely feel the crime of which he has been convicted is so very out of character for Rob.  I urge you to take into consideration the basic good nature and non-violent background when determining his sentence.

                         Yours Sincerely,

                         Martin A. Nicholas

November, 16, 1987

Walter M. Escherich
1297 E. Lynwood #39
San Bernardino, Ca
                92404

Honorable Bob N. Krug
Laurie Anderson
c/o MCIA
527 W. 7th St.
Los Angeles, Ca
            90014

Your Honor, Judge Krug,
     Allow me to introduce myself. My name is Walt Escherich.  I am
writing to you at the request of a very close friend.  My friend is
scheduled to stand before you for sentencing on November 24, 1987,
and his name is Robert Dalton Rush. Unfortunately, Rob, as I shall
henceforth refer to him, has been convicted of second degree murder
for the death of a man named John Heinz.  John Heinz was also a very
close, personal friend of mine, as is Rob, but John never seemed to
learn when was enough.
     This letter was drawn in hopes that it might bring to your
attention, the qualities which I find in Rob, that have somehow
brought him to be one of my extraordinarily close friends in my daily
life.  His confinement to San Bernardino County Jail has been a great
distress to me as a person.  I tell you this because Rob and I, when
we were together, became as close as only true brothers can.  I have
missed him a lot since he has been gone.
     Our friendship began at California State University, San
Bernardino.  We both lived in the same dormitory, and we both
followed the same course of study, majoring in geography.  After one
year together in the dorms, we moved into a house off campus in order
to cut the outright cost of getting a bachelor's degree in the
1980's.  While living off campus, we still managed to attend classes
on a regular basis, and we also maintained respectable grades.  I
found in Rob, someone with a goal to actively pursue his individual
life in order to attain the knowledge necessary to complete the task
of making his own life better in terms of any situation.  I deeply
regret that his actions took course as they have.  I was shocked when
first told the story of what happened to John Heinz, because it did
not fit my perception of Rob that he would ever commit such an act.
Events of this nature do not seem to fit Rob's individual character.
     If I had ever once thought that Rob was an evil person within
himself, I never would have allowed myself to become friends with
him.  This is because I have devoted a great deal of time to the
philosophical arguments posed by Epicurus and Socrates, concerning
what is truly virtuous in life, and how to best attain it.  My

personal feelings are also strengthened by the not so glorious fact that I myself have also been convicted of a felony, (DUI). I believe that I do now know the difference between good and bad, due to my personal experiences and thoughtful studies. I am currently on legal probation, and I dislike people who go out looking to cause trouble. I love Rob because he never tried to make waves where waves were not necessary. So many others I have met in my last few years seem to thrive on causing trouble, whether they know it or not. Unfortunately, I think Rob had no idea as to how much trouble he has gotten into because he never took the same philosophy course as me, or got caught breaking the law.

Nevertheless, I ask you to please consider Rob's case carefully. He is one of the few people that I have met through my ongoing college experience whose friendship deserves a quality rating equitable to friendships that I made back in kindergarten. The friendships that I made in kindergarten are the ones that I currently judge all others against because they are the very best in all regards. I am 22 years old now, and I have known Rob for four years. I love him very much. He has always stood by me when I really needed a friend, and through this letter, I hope that I might somehow be able to stand by him.

Sincerely yours,

*Walter Mason Escherich*

Walter Mason Escherich

PO Box 2187
Lake Arrowhead, CA
923__

To the Honorable Bob N. Krug,

    As I was unable to be a character witness for Robert Push in his recent trial, I am writing to you now to provide a little information on him before his sentencing.

    I am presently a junior at Cal. State San Bernardino and I have known Rob for just over six years now. We met in High school when I was a freshman and he was a junior. We were both members of a gaming club and later shared a German class together. In a short time we had become good friends, with each of us going over to the others home and becoming friends with the others family.

    Even after his graduation from Rim High, we stayed close. We went to movies, conventions and to our friends' houses together. When I went to college, I went to CSUSB, where Rob was majoring in Geography. His idea was, after receiving his degree, to get a job with a lot of travel — a photographer or writer for National Geographic was often mentioned as his career of choice.

    When he had his motorcycle accident, in which his friend Russell was killed, I was very worried for him. Physically he was quite broken up and he was obviously in pain — he did not like the idea of being an invalid. Who would? Mentally he was bearing up very well, keeping his sense of humor and continuously talking about when he would be up and around again. We knew he was upset about Russell's death, though he rarely mentioned him to me.

    Even when he was in a cast and on crutches, he managed to come over to my house. Since we usually

got together on the bottom floor of our house, in a rather cramped little room, Rob had to go to an outside door and then be lifted by his friends into an available chair!

In the last few months that he was out of jail, I remember how was still in a lot of pain. He would hobble around campus (having badly broken his foot in the accident), sometimes looking pained but never complaining.

In all the six years I have known Rob, I have never seen him lose his temper. He is a very easygoing person and I would be hard-pressed to remember him becoming truly mad at someone. He has always kept bad situations humorous and I've certainly seen him go through numerous bad situations.

I have heard from numerous friends who attended his trial as to what happened (the only reason I couldn't attend was that I was out of the country). I believe Rob's testimony completely and was naturally shocked by the jury's decision. I was infuriated! But the next time I heard from Rob, he was very disappointed but still feeling optimistic. He was planning out what he was going to do in prison; reading books, doing some drawing, finish his degree.

I feel that he killed John King out of a fear for his own life or the fear of being crippled. I can't say I wouldn't have done the same thing after receiving such a beating and then having the guy come at me again.

What I can tell you is that wherever I am when Rob is eventually released, I will invite him over to my house. He is still my friend.

Respectfully yours,

Cuw Bauman

0396

Blue Jay, CA. 9231
Nov. 18, 1987

Hon. Bob N. Krug
Dear Sir:

We are writing to you on behalf of Robert Rush, who is scheduled to come before you for sentencing for his conviction of murder. We have known this young man since boyhood and have always thought of him as having good character. Our concern is that the time he must serve might be in a facility where he may experience full rehabilitation and be able to return to society in a positive way.

Thank you for your consideration.

Sincerely,

Mr. & Mrs. Clarence A. Long
P. O. Box 3163
Blue Jay, CA 92317

0397

Bob M. King                                            November 16, 19
Honorable Judge,

        I would like to comment briefly regarding
sentencing of Robert Rush.
        Rob worked for me for 3 years at the
Presbyterian Conference Center which I manage. In
addition to our employer-employee relationship, we
became friends, sharing similiar interests and hobbies.
        I have never known Rob to be a violent or
aggressive person in any way. On the contrary, Rob's
nature is very shy, passive, and mild-mannered. He
has had no previous arrest, or any legal trouble, and
was doing well in college prior to this event.
        The jury's verdict was, in my opinion,
unjustified. I feel deeply that to send Rob to a
maximum security prison would be further
injustice. Because of his small stature, quiet
manner, and complete lack of "street-wise" or
criminal background, he would be vulnerable to the
abuses well-known of prison societies.
        Rob is determined to do his best while
incarcerated. Please make that easier for him --
don't let him become part of the high recidivism
statistics -- and consider leniency in your decision.
        Thank you.

                        Dennis Roddy

EXHIBIT D

# Crimes Commited by Male Homicide Offenders During Three Years Following Their Release on Parole from State Institutions in 1969, 1970, 1972 and 1973, Respectively

## (Data Based on 6835 Paroled)

SOURCE: U.S. Department of Justice, *Sourcebook of Criminal Justice Statistics, 1975-78* (Washington, DC: U.S. Government Printing Office, 1976-79)