K

State of California                                                                    Department of Corrections

# Memorandum

Date  :  August 5, 2004

CC:     CDW'S
        AW'S
        FAC CAPTAINS
        C&PR (HANDLE)
        ASST C&PR
        CCRM
        ERO

To    :   Regional Administrators, Institutions Division
          Wardens
          Classification and Parole Representatives
          Correctional Counselor III/Reception Centers
          Correctional Case Records Managers

Subject:   TEMPORARY ELIMINATION OF THE RISK OF THREAT ASSESSMENT IN THE
           MODEL BOARD REPORT FORMAT

On November 14, 2002, Deputy Director Memorandum 114/02 was distributed to the field introducing the Model Board Report (MBR) Format currently in use for Life Prisoner Hearings scheduled on or after March 1, 2003. Section VI-A of the MBR requires the Correctional Counselor (CCs) to state any aggravating or mitigating circumstances regarding whether the prisoner is a threat to public safety and to provide an opinion of the prisoner's degree of risk to the public.

Currently, the policy regarding the risk assessment is being reviewed and alternative methods are being considered. Until further notice, effective immediately, CCs will no longer be required to complete Section VI-A of the MBR.

This authorization, however, is being granted on a temporary basis and only applies to those reports that have not been submitted for final review. Reports that have already been submitted for final review shall not require modification and should be processed per normal procedures.

If you should have any questions regarding this change in policy, please contact Linda Rianda, Chief, Classification Services Unit, at (916) 322-2544 or Janet Rodriquez, Chief, Correctional Case Records Services, at (916) 324-2422.

*Cheryl K. Pliler*

CHERYL K. PLILER
Deputy Director
Institutions Division

cc:   Marvin E. Speed II        J. S. Woodford        John Dovey
      Steven Moore              Renee Kanan, M. D.    Wendy Still
      Frank E. Renwick          Bill Des Voignes      Kathleen Keeshen
      Suzan L. Hubbard          Jan Sale              Ombudsmen's Office
      Jim L'Etoile              Linda Rianda          Janet Rodriquez

RECEIVED

2004 AUG 10  P 1: 45

WARDENS OFFICE
CTF SOLEDAD

0448

L

Case 3:07-cv-02990-CRB    Document 3-9    Filed 08/02/2007    Page 4 of 46
Source: All Sources News by Country & Region > United States > Western Region Stories
Terms: davis takes hard line on parole (Edit Search)

Select for FOCUS™ or Delivery

*Los Angeles Times April 9, 1999, Friday,*

Copyright 1999 Times Mirror Company
Los Angeles Times

April 9, 1999, Friday, Home Edition

SECTION: Part A; Page 3; Metro Desk

LENGTH: 1002 words

HEADLINE: CALIFORNIA AND THE WEST;
DAVIS TAKES HARD LINE ON PAROLE FOR KILLERS;
CRIME: GOVERNOR REJECTS STATE BOARD'S RECOMMENDATIONS IN FIVE CASES, SAYING MURDERERS SHOULD NOT BE FREED. HE REJECTS CRITICISM FROM FELLOW DEMOCRATS.

BYLINE: DAVE LESHER, TIMES STAFF WRITER

DATELINE: SACRAMENTO

BODY:
Taking at least as tough a stand on criminal sentencing as his Republican predecessor, Gov. Gray Davis has rejected parole requests made unanimously by the Board of Prison Terms in all five of the murder cases the panel has sent him.

Former Gov. Pete Wilson rejected only 20 parole recommendations during his eight-year tenure, said Denise Schmidt, spokeswoman for the prison board.

In addition, Democrat Davis has quietly sent three more unanimous parole recommendations, in kidnapping and attempted murder cases, back to the board for further review. Wilson made 47 such referrals as governor. Davis' little-known actions have raised concerns--so far private ones--among some Democrats who think they are too extreme. But in an interview, the governor was adamant that he believes murderers--even those with second-degree convictions--should serve at least a life sentence in prison.

Asked whether extenuating circumstances should be a factor in murder sentences, the governor was blunt: "No. Zero," he said.

"If you take a life, you rob many people of someone they love, depend upon emotionally, financially . . . or whatever," he said. "The reason that motivated you to do it matters less to me than recognizing the pain caused by your act."

Davis had already rejected the one clemency request from a death row inmate that he has received since taking office in January. The inmate, Jaturun Siripongs, was executed in February.

The governor, a political centrist, said he may surprise followers who expect him to be a more traditional Democrat.

"They must not have been listening when I was campaigning," Davis said. "If you take

The governor said he will take "a narrow view of clemency" decisions.

"I believe my role is not to substitute my judgment for the wisdom of the jury or for the many appellate courts . . . that have reviewed the very charges brought to my attention," said.

Davis said there was extensive communication between his lawyers and the counsel for Siripongs before he reached his decision. But he said he would consider clemency only if tl request was based on new information not considered by the courts.

The next death row inmate scheduled for execution could pose a particularly difficult decisi for Davis because the prisoner is a Vietnam veteran--like the governor--whose lawyers say suffers from post-traumatic stress syndrome caused by the war. Manuel Babbitt was convicted of killing a 78-year-old grandmother in Sacramento in 1980.

"I have great respect for anyone that served their country, but I feel very strongly that nobody should take another person's life," Davis said. "I think I can separate my regard for his sense of patriotism from any culpability that I determine he has for the act. That is all said hypothetically because I haven't seen the case."

GRAPHIC: PHOTO: 'They must not have been listening when I was campaigning. If you tak someone else's life, forget it.' Gov. Gray Davis. PHOTOGRAPHER: Los Angeles Times

LOAD-DATE: April 9, 1999

Source: All Sources > News > By Country & Region > United States > Western Region Stories 🖢
Terms: davis takes hard line on parole  (Edit Search)
View: Full
Date/Time: Tuesday, October 16, 2001 - 7:23 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2001 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

.../retrieve?_m=15dc555a822aec7171a9de5dba848d73&docnum=2&_fmtstr=FULL&_startdoc 10/16/0



# JOINT LEGISLATIVE COMMITTEE ON PRISON CONSTRUCTION & OPERATIONS

## SENATOR RICHARD G. POLANCO, CHAIR

### INFORMATIONAL HEARING:

# "PAROLE, PUBLIC SAFETY, AND PROPORTIONALITY"



STATE CAPITOL
ROOM 112
SACRAMENTO, CALIFORNIA

APRIL 29, 1999
10:00 AM

E-256

0451

# Table of Contents



Page

## Opening Statements:

Senator Richard Polanco, Chair . . . . . . . . . . . . . . . . .   1

Senator John Vasconcellos . . . . . . . . . . . . . . . . . . . .   2

Assembly Member Carl Washington, Vice Chair. . . . .   2

Assembly Member John Longville . . . . . . . . . . . . . .   3

## Board of Prison Terms

Following <u>two</u> members of BPT will discuss whom the Commissioners and Deputy Commissioners are – their backgrounds and qualifications; what their mission is; what the law requires of them; what statutes and regulations govern their actions; the parole hearing process, including decision review and the Governor's review; the criteria they use to determine suitability, including mitigating and aggravating factors; and explain the matrix in Title 15:

- JIM NIELSEN, Chairman . . . . . . . . . . . . . . . . . . . . . . .   3
- LEWIS CHARTRAND, Executive Director . . . . . . . . . . .   15

## Speakers:

Following <u>four</u> witnesses will each speak about their experiences with the Board, and provide background statistics on the rate of recidivism of indeterminately sentenced inmates:

0452

- **ALBERT M. LEDDY** . . . . . . . . . . . . . . . . . . . . . . . . . . . .
  Former BPT Commissioner (appointed by
  Gov. Deukmejian) and a former Kern County District
  Attorney will speak about his experience as a
  Commissioner on the Board for several years

- **ALAN CRANSTON** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    33
  Former United States Senator

- **CRUZ REYNOSO** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    39
  Former California Supreme Court Justice
  and current Professor at UCLA Law School

- **THOMAS J. GRAY** . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    51
  Former Special Assistant to the
  U.S. Commission on Civil Rights

Following <u>three</u> witnesses will talk about their
experiences in representing clients before the
Board, including a recent Court decision:

- **ROWAN KLEIN**, Attorney . . . . . . . . . . . . . . . . . . . . . . .    57

- **GARY DIAMOND**, Attorney . . . . . . . . . . . . . . . . . . . . .    62

- **MARILEE MARSHALL**, Attorney . . . . . . . . . . . . . . . . . .    70

Following <u>two</u> witnesses will speak about
LSPC's cases involving Battered Women Syndrome
and life term inmates:

- **KAREN SHAIN** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    78
  Legal Services for Prisoners with Children

- **DORSEY NUNN**
  Director of Legal Services for Prisoners with Children .    83

0453



Following five witnesses will speak about their observations dealing with life-term inmates and about Board hearings:

- ROBERT STORMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90
  Case records analyst, CSP-Folsom

- TOM SWIHART . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95
  Correctional Counselor, CSP-Chino

- CLAUDIA SMITH . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103
  Psychiatric Social Worker, CSP-Folsom

- PETER B. COLLINS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117
  Small business owner Marin County

- JOHN STERNBERG . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 124
  Attorney

## BLIC COMMENT PERIOD

- Dorothy McClary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128
  Mother of Lorrie Sue McClary, who had
  her parole date revoked.

- Lewis Homan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 130
  Uncle of Lorrie Sue McClary

- Richard Goodman . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133
  Re: Board of Prison Terms, its process and costs

- Maggie Elvey . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 135
  Crime Victims United of California

- Clementine Singleton . . . . . . . . . . . . . . . . . . . . . . . . . . 137
  Los Angeles Lifers Support Group

0454

* * *

## WRITTEN TESTIMONY from those unable to attend:

**Hon. John Phillips,** Superior Court Judge, Monterey County and former Deputy District Attorney, Monterey County

**June Dunbar**
Los Angeles County Commission on Wonen

**Cathy Bethel**
25-year veteran of CDC, peace officer employee at CMC


## OTHER RELEVANT LETTERS:

**David Ritchie,** Attorney

**Linda Buchalter,** Attorney

**James C. Knight,** Attorney

**Reverend Sarah M. Lugo**

**Laurel Nelson Smith,** Attorney


## NEWSPAPER ARTICLES

Misc. articles

33

<u>SENATOR RICHARD POLANCO, CHAIR</u>: I want to welcome and thank you for coming. This is an informational hearing on the public policy considerations involved in finding a life-term inmate suitable for parole. I want to acknowledge at this point in time, that this is "Victims Week" here at the Capitol. I want to acknowledge the pain and the suffering endured by those in the state who are victims of serious and violent crimes. Your voices do not go unheard here in Sacramento.

The timing of this hearing is very important. I want to be very, very, very clear. This hearing is not about early releases for violent offenders. This hearing is about fairness in the process that the Board of Prison Terms uses when looking at any given case. This hearing is about public safety with clear standards. Everyone knows what the expectations are. If there are no standards, everyone is potentially at risk. By that I mean someone might be held beyond his or her term, and on the other hand, someone may be released too early if there are no clear standards.

There are many people here today who wish to talk about their individual cases, their individual loved ones, whether the loved one was a victim, or the loved one is an inmate. You're welcome to do so during the public comment period at the end of the hearing. We did not schedule any

inmate families or victim families on the agenda because we did not want this hearing to be about any specific cases. This hearing is about the process that the Board uses to determine suitability for parole. Is it appropriate given the statutory mandate? Is it consistent with the Legislature and the courts in terms of sentencing, and does it promote public safety?

Let me be clear about another point. This hearing is only about inmates who were given a term-to-life sentence by the courts. We will not be discussing inmates who were given a sentence of life without the possibility of parole. Nor will we be discussing inmates who were given a death sentence. Those types of inmates are not subject to this process of parole suitability.

With that I want to welcome and acknowledge the members who are here. It is appropriate at this point in time for opening comments. Let me begin with Senator Vasconcellos.

SENATOR JOHN VASCONCELLOS: Just simply want to concur in Senator Polanco's comments and hope we can find out how the system operates, and whether it's operating in accordance with what I think is the only legitimate purpose of the whole system, that is public safety. And what kinds of rules and equities and appreciations and balances are in place. And what the history is until we can figure out some way to assure the public safety is served fairly and not stupidly and not in a biased way by anybody especially the Board itself.

SENATOR POLANCO: Thank you Senator.

To my right, your left, we will hear from the vice-chair of this joint legislative committee, Carl Washington.

ASSEMBLYMEMBER CARL WASHINGTON: Thank you, Senator, for the opportunity to be here on what I consider one of the most important

2

questions, and certainly an issue that is of concern —
that is what's happening with our system and what direction is our system
going in. And I hope that the testimonies and the comments that are made
day will certainly stick to those issues that would help us better determine
which direction this committee want to move forward in. And I have no
doubt that our chairman is focused and our job is to make sure that we assist
him in every effort to doing that that he sees fit that we might move forward.
Thank you, Mr. Chair, for the opportunity to be here today, and I look
forward to hearing from our witnesses.

SENATOR POLANCO: Thank you.

To the right of Assemblyman Carl Washington, we have with us a
newly elected member from the Inland Empire area, Assemblyman Longville.
Opening remarks?

ASSEMBLYMAN JOHN LONGVILLE: I'm not only newly elected,
but my ignorance is broad and deep, so I hope to try and get some of that
filled through this committee. The area I represent is surrounded by
correctional facilities, so it's of great interest to me and to the constituents
that I represent. And I hope to learn from both the witnesses and my senior
colleagues, thank you.

SENATOR POLANCO: Also want to acknowledge a representative
from Cathie Wright's office, Carrie Nevens is with us. Thank you for being
here. Carrie.

We're going to begin. I'm going to ask the Chairman of the Board of
Prison Terms, Mr. Jim Nielsen. and the Executive Director to please come
forward.

MR. JIM NIELSEN: Good morning.

MR. NIELSEN: It has not, but Senator, we'll be able to provide those for you.

SENATOR VASCONCELLOS: And the rationale for the revocation in each case.

MR. NIELSEN: Yes, Sir.

SENATOR VASCONCELLOS: Thank you. Let me, because I want to -- I'm not sure how long I can stay for. I'm heading for my district. In the staff booklet it says the Penal Code 3041, which has the authority for the Board, says, "The Board shall normally set a release date unless etc., etc., etc." So is there a presumption that a release date should be set unless there is a reason not to set it? Is it the bias of the law or not the bias of the law?

MR. NIELSEN: Senator, as I read the determinate sentence law, you have aptly characterized it.

SENATOR VASCONCELLOS: Okay. Then let me ask this question. There's one that I haven't heard asked before and it keeps bothering me. I am a lawyer although I haven't practiced for 30 years. But even in conversations, every word has a meaning and in law always has a particular meaning. So if a judge gives a sentence of 10-to-life, usually 10 has a meaning and life has a meaning and the dash has a meaning in between. So how does the Board interpret the 10-to-life? As 10 is the minimum and life is the maximum and it's in between what -- the way the Governor has now pontificated, it's life. period. That to me, makes the law silly, or meaningless, because 10-to-life means there's some range. Is there a Board policy or attitude about what the x-to-x means when it comes to the Board? My question -- I'm not quite saying it quite clearly but you know what I'm after?

MR. NIELSEN: Senator, let me try.

86

992-S

Additional copies of this publication may be purchased for $6.00 per copy
(includes shipping and handling)
plus current California sales tax.

Senate Publications
1020 N Street, B-53
Sacramento, CA 95814
(916) 327-2155

Make checks payable to SENATE RULES COMMITTEE.
Please include Stock Number 992-S when ordering.

## DECLARATION OF ALBERT M. LEDDY

I, ALBERT M. LEDDY, hereby declare:

1) I was an attorney at law, currently retired. After graduating from Boalt Hall, University of California at Berkeley, I practiced law until 1983 including serving as Deputy District Attorney and then District Attorney of Kern County, California, from 1952 to 1965 and again from 1970 to 1983.

2) Between 1983 to 1992 I served as a Commissioner and then as Chairman of the Board of Prison Terms (BPT) pursuant to my appointment and re-appointments to those positions by Governor George Deukmejian.

3) During approximately 9 years of service as BPT Chairman and Commissioner, parole hearings were conducted as now for "life" prisoners (with a <u>maximum</u> prison term of life and a minimum of between 7 and 25 years, reduced for work and good behavior), by 3-member BPT panels at intervals prescribed by the California Penal Code statutes and the parole regulations in the Code of Regulations, Title 15, Division 2, Board of Prison Terms, §§ 2000 et seq.

4) From 1983 to 1990 BPT panels became more reluctant to grant paroles in accordance with Penal Code § 3041(a) (which requires that at the initial hearing a parole date "shall normally" be set), resulting in a substantial, steady decline in the percentage of parole dates granted at hearings. This decline was caused by increasing political pressure and new BPT Commissioner appointees who disfavored paroling life prisoners.

5) After Governor Wilson's election in 1990, he substantially intervened to reduce parole grants; in actual effect his policy practically eliminated paroles. He accomplished this, first, by appointing and re-appointing BPT Commissioners known to disfavor parole or to favor a "no-parole" policy. These appointees were all crime victims, former law enforcement personnel or Republican legislators who had been defeated in elections and needed a job.

6) Governor Wilson made his "no-parole" policy known in several ways including, I believe, through statements quoted by the media and possibly through the Youth and Adult Correctional Agency Secretary, although I can't say I know this to be fact. I am aware that he wanted previously set parole dates rescinded.



7) The new BPT appointments by Governor Wilson violated Penal Code § 5075 which required that "[t]he selection of persons and their appointment by the Governor and confirmation by the Senate shall reflect as nearly as possible a cross-section of the racial, sexual, economic, and geographical features of the population of the state." Governor Wilson's appointments have been mostly from his home area of San Diego. Most are not qualified by training or experience for the position of BPT Commissioner, and they do not fulfill the statutory cross-section requirements of racial, sexual, economic or geographical proportion.

8) My knowledge of these facts is based on publication and my awareness of said appointments, my daily dealings with them as panel members at BPT hearings at which paroles were denied contrary to the laws and regulations, and Mr. Wilson's public statements disavowing parole policy as set forth in the statutes and regulations, and proclaiming during his campaigns that he would not have "another Willie Horton episode." On one occasion Joe Sandoval, former Secretary of YACA (a cabinet level appointment) personally warned the Commissioners to be careful about granting paroles. Chairman John Gillis told two Commissioners "Stop giving these dates."

9) Governor Wilson also accomplished his "no-parole" policy by having the BPT use a previously unused law to void practically all grants of parole by BPT's panels, while not using it to overturn any decision denying parole. This law was Penal Code § 3041.2.

10) Governor Wilson also had the BPT use a seldom-used regulation, 15 CCR § 2451(c), to rescind nearly all of its previous grants of parole to prisoners awaiting their release. This regulation, known as the "improvident grant" clause, became routinely used to rescind those previously set dates. On one occasion, after I refused to recommend rescission on a panel, I was told by Ted Rich, BPT's Executive Officer, to recommend rescission when it is the Governor's desire. It was obvious to myself and other Commissioners that we would not be re-appointed if we did not comply.

11) At one point I became concerned enough about the "no-parole" policy that I wrote a 9-page brief about how we were not complying with the laws. I gave a copy to each Board member, pointing out that we could be sued. I asked that this brief be a topic on the Board's agenda. Ted Rich, as Executive Officer, said, "That's not going to be on the agenda. You can't have it on the agenda."

expressed my dissatisfaction verbally and in my brief, I'm sure that my objections helped me not to get re-appointed.

12) Accordingly, the effect that Governor Wilson has exerted upon BPT personally, through his politically-based policy, by his BPT appointments, and by his intervention to rescind and reverse parole grants, has been to remove any reasonable possibility of parole for practically all of the thousands of California prisoners serving terms of life _with_ the possibility of parole.

13) Such a "no-parole" policy is contrary to Penal Code § 3041 which requires that BPT "shall normally" set a parole date _in_ _most_ _cases_, i.e., _unless_ the prisoner is shown to pose a threat to public safety, and that BPT panels shall declare prisoners "suitable" for a future release date and set that release date unless a preponderance of the evidence presented at the hearing demonstrates that the prisoner "will pose an unreasonable risk of danger to society if released from prison."

14) Although the reluctance to grant parole began in the early 80's, under Governor Wilson's regime BPT panels denied parole in over 99% of cases by employing procedures that violate the parole statutes and regulations. Primarily used are offense factors. BPT panels find prisoners "unsuitable" for parole based mainly or entirely on the facts and circumstances of their offense instead of their level of dangerousness, as reflected by performance, rehabilitation and expert evaluation in their prison records. Because the facts and circumstances of crimes do not change, the procedure effectively increases all such sentences from life with possibility of parole to life without any possibility of parole. Despite contrary regulations and statutes, BPT's chief counsel and Executive Officer urged me and the other Commissioners to deny paroles based on the prisoners' offenses.

15) The procedure also eliminates BPT's duty to set parole dates because parole can't be granted for those found "unsuitable." This renders illusory BPT's term-setting obligation and lifers' opportunity to parole. Even the most deserving prisoners shown overwhelmingly not to pose an unreasonable risk (or any) risk of danger to the public if released have not, cannot and will never receive parole under such a policy.

16) After 1992, when my final term as BPT Commissioner expired, I re-entered the private practice of law. I represented an inmate at his BPT hearing. Although the inmate had a statutory right to call witnesses, who could have refuted the allegations the panel used to deny

343

parole, the BPT denied the witness. Additionally, the BPT substituted Commissioner Carol Bentley, a former Assemblyperson who was appointed after she was not re-elected. I had never known Ms. Bentley to grant parole to any lifer. She was the panel chairperson. She was rude, her hostility was obvious and it was evident she was pre-determined to oppose parole.

17) Prior to the commencement of his parole hearing, I personally heard Ron Koenig, a Commissioner on the hearing panel and former BPT Chairman, inform Rick Erwood, the Riverside County District Attorney attending the hearing, "don't worry" because "we won't parole this guy," in those approximate words. This is consistent with my experience described above in which BPT's hearing panels often made decisions to deny parole prior to the hearings.

18) It has been clear to me that there is a general conspiracy to prevent life prisoners from paroling, especially those whose offenses include murder. Obviously, such a "no-parole" policy means that no murder offender can get a fair hearing as the law requires. If you can deny a prisoner "suitability" solely on the basis of the crime, you can deny him forever. The crime won't change. The parole law is based on the idea that prisoners do change, and become no danger to public safety. Statistically the murder offender rarely repeats at crime once released.

19) As a taxpayer, I believe it is a waste of perhaps millions of dollars each year to incarcerate those life prisoners whose prison records adequately demonstrate they are no longer a threat to public safety. The correctional system spends millions on programs to teach them trades and marketable skills, to give them a general education, and until its discontinuation, psychological therapy to help them change their lives. I believe the law must be followed, that the Governor cannot create his own set of punishments in defiance of the clear legislative intent. Every man is entitled to a fair hearing where the burden of proof is set and adhered to, and the results are not just what is politically expedient for one person, the sitting governor.

20) I am informed that Governor Gray Davis has expressed his policy that no murder offender will be paroled on his watch. As a former Commissioner and as a lawyer, such a policy is clearly contrary to the statutes and

344

regulations governing the parole process. Such a policy will exacerbate an already unacceptable situation which is backlogging hundreds, perhaps more, of life prisoners who are already beyond the term they would normally have served but for the "no-parole" policy.

I declare, under penalty of perjury, that the facts I have stated are true and correct. My expressions of belief as to each specified facts are based on the reasons I have given as to each such fact. I would be willing to testify to same in a court of law. I so swear, this _____ day of _____ 1999, at Los Osos, California.

Albert M. Leddy
Declarant

0465

*0*

1   reasons previously stated with respect to Commissioner Hepburn

2   and former Attorney General Lungren.

3          If you would like to call Mr. Leddy, go ahead.

4          And if there are objections, Mr. Mandelbaum, with

5   respect to the relevance or admissibility of the testimony, I

6   will deal with them if, as and when we're ready.

7          MR. MANDELBAUM:  Okay.

8          MR. DANNENBERG:  Petitioner calls Mr. Albert Leddy.

9          THE COURT:  Step forward, sir.

10         THE CLERK:  Behind the court reporter, please, where

11  the microphone is.

12         THE COURT:  Right there.

13         THE CLERK:  Could you please raise your right hand?

14                    ALBERT M. LEDDY,

15  called as a witness on behalf of the Petitioner, having been

16  first duly sworn, testified as follows:

17         THE CLERK:  Please be seated.

18         Would you state your name and spell your last name,

19  please?

20         THE WITNESS:  Albert M. Leddy, L-e-d-d-y.

21         THE CLERK:  Thank you.

22         THE COURT:  Go ahead, Mr. Dannenberg.

23         MR. DANNENBERG:  Thank you, your Honor.

24                    DIRECT EXAMINATION

25  BY MR. DANNENBERG:

26    Q.   Good morning, Mr. Leddy.

27         Mr. Leddy, can you just briefly tell us your

28  professional background, sir?

0466

1    A.    I attended Boalt Hall and graduated Class of '49,

2   was admitted to the Bar, went to work for my dad in

3   Bakersfield for about six months, was asked by the Assistant

4   District Attorney to join that staff and I did join the staff

5   and I stayed there for 13 years.  I went into private practice

6   with Bradley, Rigley, Bunkhurst and Givens in 1963.  And I ran

7   for District Attorney in 1970 and took office in 1971, and I

8   was District Attorney for Kern County from 1971 until January

9   of 1983.

10           I was appointed to the Board of Prison Terms by

11  Governor Deukmejian and I served as a member of the Board of

12  Prison Terms for a couple of years, and then I was Chairman

13  for one year, and then I was -- returned to become a

14  Commissioner, which is the same as a member but by a better

15  name, and was a Commissioner until May of 1992.

16      Q.    Thank you.  And you've covered some of my other,

17  next questions with that.

18           Mr. Leddy, I'm going to show you a document -- for

19  the record, your Honor, this is a copy of Petitioner's Exhibit

20  Q, I believe.

21           THE COURT:  Okay.  Q?

22           MR. DANNENBERG:  Yes, your Honor.

23           THE COURT:  Oh, yes, Q.

24           MR. DANNENBERG:  Q.  Mr. Leddy, do you recognize

25  that document?

26      A.    Yes, sir.

27      Q.    Can you tell the Court what the document is?

28      A.    Well, basically it's a declaration under penalty of

1  perjury, and it recites my background, my history with the

2  Board of Prison Terms, and the changes that took effect after

3  Governor Wilson's election, and some of the -- not -- I'm sure

4  the Court has read this so I'm not going to -- I'm just going

5  to state that there are a number of changes which I have

6  recited, and the results were that -- more or less a policy of

7  granting no parole was effectuated by Governor Wilson and

8  followed rigorously by Governor Davis.

9       Q.   And Mr. Leddy --

10      A.   And the result has been --

11      Q.   Oh, I'm sorry.

12      A.   -- has been that very, very few people have gotten

13  out on the streets at all since 1992.

14      Q.   Mr. Leddy, and that is your signature on the last

15  page, sir?

16      A.   Yes, that's my signature.

17      Q.   One thesis in your declaration, sir, is that Penal

18  Code Section 3041, which deals with the granting of paroles,

19  imports a statutory presumption of suitability for parole; is

20  that correct?

21      A.   I'm sorry, I'm not hearing very well and I didn't

22  bring my hearing aid.

23      Q.   I'll try to speak up, sir.  Thank you.

24           I say, one thesis in your declaration is that Penal

25  Code Section 3041, which deals with the granting of paroles,

26  imports a statutory presumption of suitability for parole;

27  that's one thesis in your declaration, is that correct?

28      A.   Yes, and that is pretty nearly accurate, though the

1  phrasing is not that -- in the language of the statute. The

2  language of the statute says unless there is a showing that

3  the present -- the prisoner is a unreasonable risk of danger

4  to the public at the present -- at the time of the hearing,

5  that ordinarily parole dates should be set.

6      Q.   And what is your understanding of the meaning "shall

7  normally fix a parole term" as used in Penal Code 3041

8  Subdivision (a)?

9      A.   Well, I would say in the absence of a -- a showing

10 of present danger to the public -- reasonable danger to the

11 public, that a date should be set.

12     Q.   As a percentage, in general terms, does this imply

13 normally -- I'm using the wrong word -- does this imply that

14 an expectation exists for parole subject to a rebuttal of --

15 in the case of dangerousness?

16     A.   Well, actually, you'll have to rephrase that

17 question, I'm having a little trouble understanding what

18 you're saying.

19     Q.   Okay.  Let me try that again.

20          What was your understanding -- I'm sorry, as a

21 percentage of all candidates coming before the Board, does

22 "shall normally" import that more than half, let's say, should

23 expect to receive a parole date?

24     A.   Well, that's a reasonable inference from the

25 language.

26     Q.   Thank you.

27          Was this widely known by the Board at the time that

28 you served on the Board?

0469

1    A.    I don't think it was widely known by the Board, I

2    think the Board members felt that they had almost unlimited

3    discretion and they did not pay too much attention to that.

4    No, we granted, under Deukmejian, about four, five percent.

5        Q.    So the Board did not normally give parole dates in

6    the sense of the general --

7        A.    You -- I don't know what we did -- if we ever did

8    anything normal at all, I would have some doubt about it, but

9    I do think that there was a -- let me -- if I can go back a

10   little bit.

11       Q.    Yes, sir.

12       A.    There was a time when everybody was considered --

13   when Procunier was the head of the Youth and Adult Correction

14   Agency, was the secretary to the Governor on the criminal

15   field, everybody was supposed to get a date, that was -- that

16   was the then Governor's position, I guess, because Procunier

17   announced that and virtually enforced it, and then when

18   Deukmejian came in, there was a sharp decline in the granting

19   of dates.

20       Q.    Was the decline then strictly the cause -- was it

21   caused by the direction of the Governor?

22       A.    Not directly, I think it was caused by appointing

23   more people from law enforcement and by having a Youth and

24   Adult Correction Secretary who did not share Procunier's

25   views.

26       Q.    You state in your paragraph 5 that the Governor

27   implemented a no parole policy by selectively appointing

28   Commissioners predisposed to such a policy.  Was that widely

1 | and for the record, your Honor, this is a copy of Petitioner's

2 | Exhibit P.

3 |     A.    Oh, thank you.

4 |     Q.    And this document, for the record, is BPT Form

5 | 1000(a), it's a nine page form entitled Setting a Life

6 | Prisoner Term, Parole Denied.

7 |         Chairman Leddy -- I'll refer to you as Chairman from

8 | your past experience, sir.  The language "especially heinous,

9 | atrocious and cruel," was that language that was commonly

10 | taken from this document as a boilerplate form when writing

11 | the decisions for inmates that came before the Board and were

12 | denied -- I'll refer you especially to page 1, at the top of

13 | the page, it says "commitment offenses."

14 |     A.    Yeah, that's --

15 |     Q.    Do you recognize the form, sir?

16 |     A.    Oh, yeah, uh-huh.

17 |     Q.    And this form was essentially used as a template and

18 | was checked off for various language --

19 |     A.    Yes.

20 |     Q.    -- so that the language in the decision that a Court

21 | might review from time to time as to its arbitrariness, or

22 | whatever, is in fact language not from the individual

23 | Commissioner's head but a -- a check off of a precanned

24 | decision that is based on language that is unalterable?

25 |     A.    Well, it's alterable, anything's alterable, but, of

26 | course, it would take a little doing to do it, and I don't

27 | know anybody who does that.  Basically this was the form that

28 | you used for denial, and you had that with the packet and you

1    had a form for grants, you know, which was virtually the

2    opposite of the reasons for denial.

3         Q.    In looking at the document on page 5, I'll direct

4    your attention to item 6 in the middle of the page called

5    "remarks," and it talks about the panel making the following

6    findings, I'll read the first one into the record:   "The

7    prisoner needs therapy in order to face, discuss, understand

8    and cope with stress in a nondestructive manner.   Until

9    progress is made, the partic -- the prisoner continues to be

10   unpredictable and a threat to others."

11        A.    Yes.

12        Q.    In -- in making Board denials, are you familiar with

13   the use of that phraseology?

14        A.    Oh, yes.

15        Q.    In fact, was that phraseology used in almost all

16   Board denials?

17        A.    I don't know that to be the case.  I have heard that

18   in recent times that is frequently used, and also that no

19   therapy is currently available.

20        Q.    At any time that you were on the Board was any of

21   the full Commissioners a licensed mental health care

22   professional?

23        A.    No.

24        Q.    Are you aware -- if you are aware, are you aware

25   today if any current Commissioner is a licensed mental health

26   care professional?

27        A.    No, to my understanding they're all in law

28   enforcement.

0472

1    Q.   Okay.

2    A.   Let me add, though, that at that time, the time I

3    was on the Board, everybody had to have a psychiatric report

4    every year that they came before the Board.  That's not true

5    any more.  And so I believe -- my understanding is that now

6    that they get an initial workup when they first come into the

7    institution and that's it.

8    Q.   If the Board, in its decision on a hearing, made the

9    finding, "Mr. Prisoner has no psychiatric factors to

10   consider," and then turns around three lines later and says

11   the language that I just read to you about "get therapy" read

12   out of the denial form, do you believe that that is a

13   consistent and proper use of the "needs therapy" language of

14   the Board form?

15   A.   Well, I doubt it.

16   Q.   I'm going to show you one more document.

17        THE COURT:  Did you want to have this BPT 1000(a)

18   marked, Mr. Dannenberg?

19        MR. DANNENBERG:  Yes, I would, your Honor.  Thank

20   you.

21        THE COURT:  Could I have it, Mr. Leddy?

22        THE WITNESS:  Oh, sure.

23        MR. MANDELBAUM:  Well, Respondents object to the

24   admission of that as an exhibit, your Honor.

25        THE COURT:  We haven't talked about its admission, I

26   thought for good order take it would be good to have it

27   marked.

28        That will be Petitioner's Exhibit A.

0473

𝓟

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN BERNARDINO

San Bernardino Superior Court
351 N Arrowhead Ave
San Bernardino, CA 92415
--------------------------------------------------------------------
--------------------------------------------------------------------

                                        CASE NO: SWHSS9037

    PICONE & DEF ILIPPIS
    625 N FIRST ST
    SAN JOSE CA 95112



        I M P O R T A N T   C O R R E S P O N D E N C E

From the above entitled court, enclosed you will find:

                copy of order denying writ}


--------------------------------------------------------------------
--------------------------------------------------------------------
            CERTIFICATE OF SERVICE BY MAIL
I hereby declare that I am over the age of 18 years, a resident of San
Bernardino County, State of California, and not a party to nor
interested in the above-entitled case. I am a Deputy Court Executive
Officer of the said County and on the date shown below I served the
above named document by enclosing it in an envelope addressed to the
interested party, for collection and mailing this date, following
ordinary business practice.

Executed on 12/01/06 at San Bernardino, CA. By: OLIVIA MCDONALD

                                    *Olivia McDonald*


--------------------------------------------------------------------
        M A I L I N G   C O V E R   S H E E T    RECEIVED
                                                  DEC 9 6 2006
                                                 BY:

                                                              0474

1    SUPERIOR COURT
     COUNTY OF SAN BERNARDINO
2    Department No. S-8
     351 North Arrowhead Avenue
3    San Bernardino, California 92415-0240

                                                    F I L E D
                                                 SUPERIOR COURT
                                            COUNTY OF SAN BERNARDINO
                                             SAN BERNARDINO DISTRICT

4
5                                           NOV 3 0 2006

6                                        BY *Olivia McDonald*
                                                            DEPUTY

7

8           IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

9               FOR THE COUNTY OF SAN BERNARDINO

10                   SAN BERNARDINO DISTRICT

11

12   In re the Petition of               )    Case No. SWHSS- 9037
                                          )
13       ROBERT DALTON RUSH,              )    ORDER DENYING PETITION
                                          )    FOR WRIT OF HABEAS CORPUS
14                                        )
     For Writ of Habeas Corpus.          )
15   _____)

16

17       The Petition of ROBERT DALTON RUSH for Writ of Habeas Corpus was filed in this

18   Court on November 8, 2006.

19       Therein, Petitioner contends that:

20   1)  The denial of parole to him as of October 11, 2005, is a sham, and was improper.

21           a.  The denial of parole is a violation of his due process rights in light of his

22               demonstrated rehabilitation.

23           b.  He has been incarcerated too long than would be appropriate for a second

24               degree murder.

25       The Petitioner desires that the Court intervene and assume the duties and

26   responsibilities of the parole officials and the Executive Branch of the State government.

27   Apparently Petitioner did not attend to his civic classes nor has Petitioner's counsel

28   attended to the applicable law.

                                        -1-

                                                                              0475

1    In conducting our review this Court may inquire only whether some evidence in
2    the record before the Board supports the decision to deny parole, based upon the
3    factors specified by statute and regulation. (In re Rosenkrantz (2002) 29 Cal. 4th 616).

4        Petitioner would have this Court reweigh the evidence presented to the parole
5    officials and apply a preponderance of evidence standard to the review.  There is no
6    applicable authority for such an approach.

7        It matters not whether this Court would grant parole to the Petitioner.  This Court
8    does not have the authority to do that unless a violation of due process can be shown.

9        2)  Since the trial court did not make "special findings" as to circumstances of the
10           crime the parole officials are precluded from using such circumstance to deny
11           parole.

12       3)  By repeatedly relying on the commitment offense and ignoring evidence of
13           rehabilitation, the parole board is denying Petitioner due process of law.

14       It is clearly the law that the gravity of the commitment offense alone may justify a
15   denial of parole.  By "gravity of the offense" is meant particularly egregious.

16           a.  The commitment offense is not so egregious.

17       4)  No evidence supports any remaining unsuitability factors.

18       5)  Petitioner is suitable for parole under the factors stated in C.C.R. Title 15 §
19           2402(D).

20       6)  There is an unlawful policy and practice of denying parole to virtually all
21           indeterminate term prisoners.

22       Pursuant to the record of the parole suitability hearing the Board was presented with
23   these facts as to the circumstances of the crime; after a physical altercation with his
24   college roommate, Petitioner armed himself with a rifle, which he kept under his bed,
25   and shot the victim, his roommate, "numerous times".  He then, with the help of a friend,
26   buried the body in a remote location, buried the victim's wallet and identification, and
27   then went out drinking with the victim's money.

28       Obviously, such a crime displays an extreme degree of callousness on the part of

-2-

0476

1  Petitioner. Petitioner contends that he feared for his safety and the shooting was a

2  result of a "flinch". Such a depiction belies a lack of remorse. A "flinch" would not result

3  in numerous shots. Then, instead of acting responsibly and without criminal intent, the

4  Petitioner devised and carried out a plan to hide the evidence of the murder. He did this

5  in concert with a "friend". Then, instead of confessing to the police, Petitioner and his

6  friend proceed to "party" with the victim's money. Such lack of concern after such a

7  heinous crime manifests a callousness which is difficult to describe. Obviously, the

8  Board recognized this when they found; the crime was "callous and cruel"; the offense

9  was carried out in a "dispassionate manner" with "callous disregard for human

10  suffering", over a trivial matter. Such a finding is justified by the record.

11      This Court finds that there was sufficient evidence presented at the hearing to justify

12  a finding of unsuitability. Furthermore, the Court finds the Petitioner's remaining

13  contentions to be without merit.

14

15      The Petition is denied.

16

17  Dated this _____ day of November, 2006.

18

19

20                                    _____

21                                    JOHN P. WADE
                                      Judge of the Superior Court
22

23

24

25

26

27

28

0477

COUNTY OF SAN BERNARDINO SUPERIOR COURT
STATE OF CALIFORNIA
MINUTE ORDER

CASE NO:       SWHSS9037                    DATE:   11/30/06

CASE TITLE:    IN THE MATTER OF ROBERT DALTON RUSH

------------------------------------------------------------------------

DEPT: S8 11/30/06 TIME:  8:30
Hearing Re: PETITION FOR WRIT OF HABEAS CORPUS.
------------------------------------------------------------------------

COMPLAINT TYPE: WHC

JUDGE JOHN P WADE presiding.

Clerk: Olivia McDonald

Not reported

-

APPEARANCES:

No appearance.

-

PROCEEDINGS:

The Court has read and considered the Petition for Writ of Habeas
Corpus and rules as follows.

PETITION FOR WRIT OF HABEAS CORPUS of RUSH Denied

Please see written ruling for any findings.

Stage at Disposition: All other judgments before trial.

Case dispositioned by Judgment

Correspondence coversheet generated to mail copy of order denying
writ to counsel of record.

Notice given by Courtroom Clerk.

=== MINUTE ORDER END ===

=== MINUTE ORDER END ===



COURT OF APPEAL -- STATE OF CALIFORNIA
FOURTH DISTRICT
DIVISION TWO

## **ORDER**



FEB 1 4 2007

COURT OF APPEAL FOURTH DISTRICT

In re

ROBERT DALTON RUSH

on Habeas Corpus.

E042268

(Super.Ct.Nos. SCR44594 &
SWHSS9037)

The County of San Bernardino

THE COURT

The petition for writ of habeas corpus is DENIED.



_____
Acting P.J.

cc:    See attached list

COPY

0479

Court of Appeal, Fourth Appellate District, Div. 2 - No. E042268
S150438

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

In re ROBERT DALTON RUSH on Habeas Corpus

The petition for review is denied.

SUPREME COURT
**FILED**

MAY - 9 2007

Frederick K. Ohlrich Clerk

~~DEPUTY~~

_____
GEORGE
Chief Justice

0480

S

1

2

3

4

5

6

7          SUPERIOR COURT OF CALIFORNIA

8             COUNTY OF SANTA CLARA

9

10   _____ )
                                 )
11   In re                       )      No.: 127611
                                 )
12        VIET MIKE NGO,         )
                                 )      ORDER FOR FURTHER DISCOVERY
13   On Habeas Corpus            )      AND FOR EVIDENTIARY
                                 )      HEARING
14   _____ )

15        This court previously ordered that Respondent provide discovery

16   in relation to Petitioner's claim that the actions of the Parole

17   Board in his 2003 hearing violated his constitutional rights to due

18   process.  That discovery establishes the following: Parole hearings

19   for 545 life term inmates (whose commitment offense was first or

20   second degree murder) were held in the months of July, August,

21   September and October 2003.  Records of 543 of those cases were

22   provided[1]. In 500 of those cases the Board found that the commitment

23   offense was exceptional under Title 15 § 2402(c)(1) and parole was

24   denied.   In the remaining 43 cases parole had been denied in a

25   _____
     [1] (H20718 and C77630 are excluded from consideration because Petitioner was not
26   able to examine all of their hearings as outlined in the discovery orders.
     Respondent is invited to undertake an examination of all previous and subsequent
27   Board hearings for inmates H20718 and C77630, and if it appears Title 15 §
     2401(c)(1) has not been invoked in their case it would be in Respondent's interests
28   to present this information.)

                                      1                            0481

1  prior hearing in which the Board also found the offenses to be
2  exceptional under the guidelines.
3      Title 15 §2042(c)(1) is part of the Board regulations designed
4  to implement the provisions of Penal Code §3401 which require that
5  the Board "shall normally set a parole date". In this random
6  sample, the Board has classified the commitment offense of every
7  inmate as exceptional within the meaning of Title 15, §2402(c)(1),
8  thus establishing an 'exception' in 100 percent of those cases to
9  the rule that parole shall normally be set. Petitioner has thus
10 made a prima facie showing that either the regulations are
11 impermissibly vague, or that the Board has distorted those criteria,
12 acting outside the scope of its decision making powers and abusing
13 the discretion afforded to it. An evidentiary hearing is required
14 to resolve issues of fact essential to determination of this
15 question.
16     Petitioner also has pending before this Court a second habeas
17 corpus petition in which he alleges a violation of his constitutional
18 rights at his 2006 Parole Board hearing. Because both petitions
19 allege similar violations by the Board, it is appropriate to combine
20 them for purposes of rendering a final decision on this issue.
21     Assuming that petitioner will be able to demonstrate that the
22 number of cases examined is a statistically significant and
23 scientifically valid sample from which conclusions may be drawn for
24 the entire population of "lifer" inmates, the question remains as to
25 the validity of that sample for purposes of evaluating the Board's
26 application of the guidelines in 2006. Respondent has not suggested
27 what evidence would refute the conclusion that the Board, at least in
28

1  the year 2003, was giving the Title 15 § 2402(c)(1) criteria an
2  impermissibly vague and all encompassing interpretation. However it
3  could be argued that, given the time it has taken to bring this case
4  to this point, the statistics (and conclusions drawn from them,) are
5  not dispositive as to the patterns and practices of the Board at the
6  later hearing, with a different Governor appointing different
7  commissioners. An examination of those practices in the month of
8  April 2006 (the month of Petitioner's most recent parole denial) is
9  therefore warranted.

10      IT IS THEREFORE ORDERED that Respondent shall provide to
11  Petitioner on or before February 12, 2007, a list of life-term
12  inmates who had parole hearings during April, 2006, along with the
13  transcript of every hearing in which those inmates were denied
14  parole. For all the inmates who were granted parole, Respondent is
15  to provide the transcript of the most recent prior hearing at which
16  they were denied parole. If any inmate in the sample has never been
17  denied parole by the Board, Respondent shall provide all transcripts
18  for this individual in their own hearing brief.

19      IT IS FURTHER ORDERED that Petitioner shall compile the data in
20  the same format as previous data and provide what conclusions and
21  summaries are appropriate in a hearing brief to be filed by March 5,
22  2007. The evidentiary hearing shall be held in this matter on March
23  9, 2007, at 9:00 a.m. in Department 25.

24

25  DATED: _____, 2006        _____
                                        LINDA R. CONDRON
26                                      JUDGE OF THE SUPERIOR COURT

27  cc:  Petitioner's Counsel (Jacob Burland)
         Attorney General (Elizabeth Kim/Denise Yates)
28

3

0483

SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SANTA CLARA

PEOPLE OF THE STATE OF CALIFORNIA )
                            Plaintiff,   )          CASE NO. 127611
                                         )
              VS                         )
                                         )
                                         )
Viet Mike Ngo,                           )
_____ )

PROOF OF SERVICE BY MAIL OF:  ORDER

CLERKS CERTIFICATE OF MAILING;

I CERTIFY THAT I AM NOT A PARTY TO THIS CAUSE AND THAT A TRUE COPY OF
THIS DOCUMENT WAS MAILED FIRST CLASS POSTAGE PREPAID IN A SEALED
ENVELOPE ADDRESSED AS SHOWN BELOW AND THE DOCUMENT WAS MAILED
AT SAN JOSE, CALIFORNIA ON____JAN 2 6 2007.


Dated: JAN 2 6 2007                      KIRRI TORRE
                                         County Clerk

                                         By /s/ Lydia Gonzalez
                                               Lydia Gonzalez


Jacob Burland                            Deputy Attorney General
Law Offices of Jacob Burland            455 Golden Gate Ave Suite 11000
3790 Via de La Valle Suite 103 E        San Francisco, CA 94102-7004
Del Mar CA 92014                        Attn: Denise Yates D.A.G.

CJIC/Hall of Justice                    Research Attorney's/Hall of Justice
190 W. Hedding Street                   190 W. Hedding Street
San Jose, CA 95110                      San Jose, CA 95110
(placed in inter-office box)            (placed in inter-office box)


0484