# EXHIBIT 2
# part 1 of 2

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )
Term Parole Consideration )
Hearing of: )     CDC Number D-73321
)
ROBERT RUSH )
)
_____)

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

OCTOBER 11, 2005

1:00 p.m

PANEL PRESENT:
Mr. Tom Sawyer, Presiding Commissioner
Mr. John Weaver, Deputy Commissioner

OTHERS PRESENT:
Mr. Robert Rush, Inmate
Mr. Steve Defilippis, Attorney for Inmate
Mr. Harold Wilson, Deputy District Attorney
Mr. Raymond Heinz, Father of victim
Ms. Helen Heinz, Mother of victim
Mr. Mark Perlite, Husband of Theresa
Ms. Theresa Perlite, Sister of victim
Ms. Maura Castaneza, Sister of victim

Correctional Officers Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____   No     See Review of Hearing
_____   Yes    Transcript Memorandum

**Jennyfer Osecheck, Peters Shorthand Reporting**

ii

## INDEX

|  | PAGE |
|---|---|
| Proceedings | 1 |
| Case Factors | 17 |
| Pre Conviction Factors | 18 |
| Post Conviction Factors | 35 |
| Parole Plans | 21 |
| Closing Statements | 57 |
| Recess | 84 |
| Decision | 85 |
| Transcriber Certification | 91 |

--oOo--

1

1      **P R O C E E D I N G S**

2         **PRESIDING COMMISSIONER SAWYER:**  Ok, this is

3      a Subsequent Parole Consideration Hearing for

4      Robert Rush, D-73321.  Today's date is Tuesday

5      October 11, 2005.  We are located at the

6      Correctional Training Facility in Soledad.  The

7      inmate was received on December 17, 1987 from

8      the county of San Bernadino.  Murder in the

9      second degree with use of a firearm, case number

10     CR44594, count one of 187 with 12022.5 Penal

11     Code Section as well.  17 years to life is the

12     term.  And the minimum eligible parole date is

13     November 30, 1997.  This hearing is being tape

14     recorded for the purpose of voice identification

15     each one of us is required to state our first

16     and last names, spelling our last name, when it

17     comes to your turn Mr. Rush if you would spell

18     your last name and also give us your CDC Number.

19     I'll start and go to my left, Tom Sawyer, S-A-W-

20     Y-E-R, Commissioner.

21         **DEPUTY COMMISSIONER WEAVER:**  John Weaver,

22     W-E-A-V-E-R, Deputy Commissioner.

23         **MS. HEINZ:**  Helen Heinz, H-E-I-N-Z, mother

24     of the victim.

25         **MR. HEINZ:**  Raymond Heinz, H-E-I-N-Z,

26     father of the victim.

27         **MR. PERLITE:**  Mark Perlite, P-E-R-L-I-T-E,

1   husband of Theresa.

2        **MS. CASTANEZA:**  Maura Castaneza, C-A-S-T-A-

3   N-E-Z-A, sister of the victim.

4        **MS. PERLITE:**  Theresa Perlite, P-E-R-L-I-T-

5   E, sister of the victim.

6        **DEPUTY DISTRICT ATTORNEY WILSON:**  Harold

7   Wilson, W-I-L-S-O-N, Deputy District Attorney

8   San Bernardino County.

9        **ATTORNEY DEFILIPPIS:**  Steve Defilippis, D-

10  E-F-I-L-I-P-P-I-S, I am the attorney for Mr.

11  Rush.

12       **INMATE RUSH:**  Robert Rush, R-U-S-H, D-

13  73321.

14       **PRESIDING COMMISSIONER SAWYER:**  Ok, thank

15  you.  Also let the record reflect that we have

16  three correctional peace officers in the room

17  for security purposes.  The record reflects that

18  you signed a BPT Form 1073 which is a reasonable

19  accommodations notice and request in accordance

20  with the provisions of the Americans

21  Disabilities Act.  You checked the box on this

22  form that says you do not have a disability.

23  And it is dated November 19, 2004.  I am going

24  to pass that to Mr. Defilippis if you will look

25  at that.  And I do notice that you are wearing

26  glasses sir.  Are those for reading purposes?

27       **INMATE RUSH:**  No.

3

1    **PRESIDING COMMISSIONER SAWYER:**    For

2    distance?

3    **INMATE RUSH:**    For distance.

4    **PRESIDING COMMISSIONER SAWYER:**    You can

5    read everything all right you don't have any

6    problems seeing anyone here or reading.    Any

7    other disabilities you may have that would

8    hinder you in this hearing?

9    **INMATE RUSH:**    None.

10    **PRESIDING COMMISSIONER SAWYER:**    Is

11    everything on that form correct and current?

12    **INMATE RUSH:**    Yes.

13    **PRESIDING COMMISSIONER SAWYER:**    Mr.

14    Defilippis can we waive reading the rest of the

15    reading of the ADA?

16    **ATTORNEY DEFILIPPIS:**    So waved.

17    **PRESIDING COMMISSIONER SAWYER:**    This

18    hearing is being conducted pursuant to Penal

19    Code Section 3041 and 3042 in the rules and the

20    regulations of the Board of Prison Terms

21    governing parole consideration hearings for life

22    inmates.    The purpose of today's hearing is to

23    consider your suitability for parole.    In doing

24    so we will consider the number and nature of

25    crimes you have been committed for you're your

26    prior criminal and social history, your behavior

27    and programming since your commitment.    We have

4

1    had an opportunity to review your Central File

2    and your prior hearing transcript. You will be

3    given an opportunity to correct and clarify the

4    record.  We will consider your progress since

5    your commitment and since your last hearing.

6    Your updated counselors report, psychological

7    report will also be considered.  Any change in

8    your parole plans should be brought to our

9    attention.  We will reach a decision today and

10   inform you whether or not we find you suitable

11   for parole and the reasons for our decision.  If

12   you are found suitable for parole, the length of

13   your confinement will be explained to you.  This

14   hearing will be conducted in two phases, I will

15   discuss with you the crime you are committed

16   for, prior criminal and social history, your

17   parole plans and any letters of support or

18   opposition that may be in your file.  Deputy

19   Commissioner Weaver, will discuss with you your

20   progress since your commitment, your counselor's

21   reports and your psychological evaluation.  Once

22   this is concluded the District Attorney, and

23   your attorney will be given an opportunity to

24   ask you questions.  Questions from the District

25   Attorney shall be answered back to this panel.

26   Do you understand?

27         **INMATE RUSH:**  Yes.

5

1      **PRESIDING COMMISSIONER SAWYER:**  Ok, before

2    we recess for deliberations the District

3    Attorney, your Attorney and you will be given an

4    opportunity to make a final statement regarding

5    your parole suitability.  Your statement should

6    be directed as to why you feel you are suitable

7    for parole.  The victim's next of kin will have

8    the opportunity to give a statement regarding

9    the crime and your responsibility.  We will then

10   recess clear the room and deliberate.  Once we

11   have completed our deliberations we will resume

12   the hearing and announce our decision.

13   California code of regulations states that

14   regardless of time served a life inmate shall be

15   found unsuitable for parole and denied parole if

16   in the judgment of the panel the inmate would

17   pose an unreasonable risk of danger to society

18   if released from prison.  You have certain

19   rights those rights include a timely notice of

20   this hearing a right to review your Central

21   File, the right to present relevant documents.

22   Has the inmates rights been met, counsel?

23      **ATTORNEY DEFILIPPIS:**  Yes they have.

24      **PRESIDING COMMISSIONER SAWYER:**  Thank you,

25   you also have a right to be heard by an

26   impartial panel.  Is there any objection to this

27   panel?

6

1       **INMATE RUSH:**  No.

2       **PRESIDING COMMISSIONER SAWYER:**  You will

3    receive a copy of the written tentative decision

4    today that decision is subject to review by the

5    decision review unit and by the entire board

6    meeting as a body.  It will become effective

7    within 120 days.  It is subject to review by the

8    governor.  A copy of the tentative decision and

9    a copy of the transcript will be sent to you.

10   As of May 1, 2004 there were major changes

11   limiting your former right to appeal board

12   decisions or actions directly to the board.  The

13   old board regulations were repealed the current

14   policy is entitled administrative appeals

15   correspondence and grievances concerning prison

16   board term decisions. It is available at the

17   prison law library.  You are not required to

18   admit your offense or discuss your offense if

19   you do not wish to do so.  However this panel

20   does accept as true the findings of the court

21   and you are invited to discuss the facts and

22   circumstances of this offense if you desire.

23   The board will review and consider any prior

24   statements you have made regarding the offense

25   in determining your suitability for parole.  Is

26   there any confidential material that will be

27   used in this hearing today Commissioner?

7

1      **DEPUTY COMMISSIONER WEAVER:**  There is a

2   number of documents that are considered

3   confidential some are due to the fact that there

4   were addresses of the authors of that report.  I

5   haven't seen any confidential documents that I

6   feel would have a bearing on suitability or

7   unsuitability.

8      **PRESIDING COMMISSIONER SAWYER:**  Ok, thank

9   you, so none will be used?

10      **DEPUTY COMMISSIONER WEAVER:**  Not as far as

11   I am concerned at this point and time.

12      **PRESIDING COMMISSIONER SAWYER:**  Now what

13   Commissioner Weaver is talking about is we have

14   got some petitions and those petitions had

15   addresses on them, I will not be using those

16   addresses.  We will certainly use the petition

17   or parts of the petitions but the addresses is

18   the confidential information that he is talking

19   about.

20      **ATTORNEY DEFILIPPIS:**  Are we, are these the

21   petitions I was provided with this afternoon?

22      **PRESIDING COMMISSIONER SAWYER:**  I believe

23   so.

24      **ATTORNEY DEFILIPPIS:**  Ok so there are no

25   materials that are in the confidential section

26   of the file that I have not received.

27      **PRESIDING COMMISSIONER SAWYER:**  In fact you

8

1   did not receive the ones I am talking about, you

2   received them but you will notice that some of

3   them that had addresses like that one.

4       **ATTORNEY DEFILIPPIS:**  Right, those are

5   blacked out.  And I have no problem with that I

6   just want to make sure that I have copies of all

7   the documents that are being utilized.  I have a

8   series of seven petitions.

9       **PRESIDING COMMISSIONER SAWYER:**  Seven

10  petitions and whatever was in the board report.

11  There were petitions in that as well.

12      **ATTORNEY DEFILIPPIS:**  Oh I am sorry in the

13  lifer-hearing packet?

14      **PRESIDING COMMISSIONER SAWYER:**  Yes, there

15  was two packets.  Did you not receive, I got to

16  this is one.

17      **ATTORNEY DEFILIPPIS:**  I received one

18  packet.  And it has got all seven sections.  And

19  it looks like my one is not even the size of

20  your one.

21      **PRESIDING COMMISSIONER SAWYER:**  Ok I am

22  going to call a recess right now and I am going

23  to afford you the opportunity to compare our

24  packets and see what extraneous information I

25  have in my packet, and Commissioner Weaver has

26  got what appears to be the same packet I have.

27  And you have a smaller packet.  So lets do that,

9

1    go off the record the time is 1:45.  Ok,

2    everyone has returned to the room it is 1:55,

3    the reason we went of the record was to compare

4    notes and make sure that everyone has the same

5    information.  Apparently Mr. Defilippis inmate

6    counsel did not have some of the letters and let

7    the record reflect they have been supplied.  I

8    have a hearing checklist.  If I could have this

9    passed over to the attorney's.  If you could

10   check those against your records.

11       **ATTORNEY DEFILIPPIS:**  Apparently there are

12   opposition letters but there are none listed on

13   this.  But I have now been provided that stack

14   of about an inch thick of opposition letters for

15   the first time.  Which most of them appear to

16   have been submitted in connection with the

17   originally scheduled date of August 12, I don't

18   know why the board or the facility did not

19   provide those to me.  There are support letters

20   and I did verify those are in your file.  And I

21   have copies of those as well.  But they are not

22   checked here.  There are letters offering

23   employment that is not checked here.  The

24   appellate decision is contained within the file

25   that's not checked here.  There is a notice of

26   motion apparently in the file, it wasn't put

27   into my file.  It ahs to do with a civil case it

10

1  doesn't appear to be relevant to these

2  proceedings and I am not sure why they put it in

3  there.  Mostly I am not sure why they put it in

4  order to deny petition in writ of habeas corpus

5  either.  Since it has nothing to do with

6  suitability, there are some certificates of

7  completion of self-help programs, but I think

8  that is probably covered in the chronos for

9  self-help.  And I am not sure what other non

10 specific pertinent information developed since

11 the date of the last hearing is, if you could --

12      **PRESIDING COMMISSIONER SAWYER:**  Your guess

13 is as good as mine.

14      **ATTORNEY DEFILIPPIS:**  Well in my file I do

15 not have any nonspecific but pertinent

16 information developed since the last hearing.

17      **PRESIDING COMMISSIONER SAWYER:**  Ok.

18      **DEPUTY COMMISSIONER WEAVER:**  Excuse me I

19 did put a folder in your place counsel that was

20 indicated of updated material.

21      **ATTORNEY DEFILIPPIS:**  That only has seven

22 of the petitions there is probably I would

23 venture a guess that there is at least a 150 to

24 200 documents in the stack I was just provided.

25      **PRESIDING COMMISSIONER SAWYER:**  Well I am

26 guessing because it is not specific in the

27 checklist that we gave you an addendum in terms

11

1  of his the addendum that updates his placement

2  custody, academic work, vocation, group

3  activities, treatment, prison behavior and

4  others dated December 22, 2004 to September 16,

5  2005.  That should be in the packet that you

6  received today.

7      **ATTORNEY DEFILIPPIS:**  What's the date on

8  that?

9      **PRESIDING COMMISSIONER SAWYER:**  December

10  22, 2004 to September 16, 2005.

11      **ATTORNEY DEFILIPPIS:**  Nope.

12      **PRESIDING COMMISSIONER SAWYER:**  That should

13  be in that packet right there.

14      **ATTORNEY DEFILIPPIS:**  Nope it is not.  All

15  I have in here is petitions.

16      **PRESIDING COMMISSIONER SAWYER:**  Do you have

17  one?

18      **DEPUTY COMMISSIONER WEAVER:**  Yes I do.

19      **PRESIDING COMMISSIONER SAWYER:**  Why don't I

20  give, this is the area you are going to be

21  dealing with.

22      **DEPUTY COMMISSIONER WEAVER:**  I can give him

23  mine that is fine.

24      **PRESIDING COMMISSIONER SAWYER:**  No I will

25  give him mine, cause you are going to be using

26  that more than I will and then in deliberations

27  we will share.  Mr. Wilson do you have that

12

1    information?

2        **DEPUTY DISTRICT ATTORNEY WILSON:**    No

3    Commissioner.

4        **PRESIDING COMMISSIONER SAWYER:**    There isn't

5    a lot of information in it but it is a document.

6        **ATTORNEY DEFILIPPIS:**    I will share it with

7    him.

8        **PRESIDING COMMISSIONER SAWYER:**    Ok, thank

9    you.    I am just trying to find where the

10    unspecific, the pertinent information developed

11    at the last, since the date of the last hearing.

12    I am guessing is that document.

13        **ATTORNEY DEFILIPPIS:**    Ok.

14        **PRESIDING COMMISSIONER SAWYER:**    And if we

15    happen to stumble upon anything else, I am sure

16    you will bring it to my attention.    Are there

17    any additional documents to be submitted Mr.

18    Defilippis?

19        **ATTORNEY DEFILIPPIS:**    I did provide a copy

20    of the private probation report that was

21    submitted, I think that already should be in the

22    Central File anyway, and a number of chronos

23    which should be in the Central File just so you

24    would have those handy.    Those would be all the

25    chronos since the last hearing.    There was a few

26    irrelevant documents that apparently my

27    secretary copied or tacked to the end of that,

13

1  what I meant to provide you was just the

2  chronos.

3      **PRESIDING COMMISSIONER SAWYER:**  We wont

4  consider the irrelevant documents in our

5  deliberations.

6      **ATTORNEY DEFILIPPIS:**  Ok.

7      **PRESIDING COMMISSIONER SAWYER:**  Are there

8  any preliminary objections?

9      **ATTORNEY DEFILIPPIS:**  On the March 2005 CC1

10 report the summary, section six A, there is a

11 statement in there that is clearly inappropriate

12 for a CC1 to be making.

13     **PRESIDING COMMISSIONER SAWYER:**  Which page

14 is that?

15     **ATTORNEY DEFILIPPIS:**  Page three of the

16 report.  The summary, section A of the summary.

17     **PRESIDING COMMISSIONER SAWYER:**  Ok.

18     **ATTORNEY DEFILIPPIS:**  He is talking about

19 what appears to be his psychological opinion.  I

20 would move to strike that from the record.

21     **PRESIDING COMMISSIONER SAWYER:**  I will

22 strike it.  They can't recommend, and

23 particularly they can't recommend therapy

24 programs.

25     **ATTORNEY DEFILIPPIS:**  The other is simply

26 as to these opposition letters, these all appear

27 to be letters that should have been provided

14

1   well in advance of the August 12th hearing when
2   we showed up for that, and ready to go.  And
3   they have not been provided to me, they were not
4   contained in the lifer-hearing packet that I
5   received.  I would object to them on the grounds
6   of untimely ness, I would also object to them on
7   the grounds that what we have is, and they are
8   just to voluminous to go through.  But the vast
9   majority of these are petitions, they are all in
10  a virtual identical format.  It appears to be
11  somewhat of a preprinted form that has
12  circulated throughout the country.  They are
13  coming from Houston Texas, Michigan, from Ohio,
14  there is numerous areas throughout New
15  Hampshire, Arizona, Texas, and they are just all
16  over the place.  And first of all, persons other
17  than the victim's next of kin should not be
18  providing commentary regarding the situation
19  that they just don't have any of the factual
20  knowledge to, to give comments upon.  So we
21  don't have nothing showing a foundation for them
22  or knowledge to be giving an opinion in this one
23  way or the other.  Furthermore citizens from
24  outside the, if they are citizens we don't know
25  that, individuals from outside the state of
26  California certainly don't have any standing on
27  commenting upon a preceding within the state of

15

1    California.  It is a matter of state law, not

2    something of a nationwide concern.  So I would

3    object to all these letters being considered.

4        **PRESIDING COMMISSIONER SAWYER:**  Are you

5    specifically objecting to the petitions or

6    because they are if you notice in your file

7    there.

8        **ATTORNEY DEFILIPPIS:**  There are a couple of

9    personal letters, I saw a letter from the

10   parents of John Heinz, which would appear to be

11   appropriate and they are also here to speak.

12   Charles Holtz which would appear to be a cousin

13   of John Heinz.  Family friend I am not objecting

14   to that.

15       **PRESIDING COMMISSIONER SAWYER:**  And I have

16   a nephew, a letter from a nephew.

17       **ATTORNEY DEFILIPPIS:**  But as far as the

18   petitions are what troubles me.  And there is

19   just literally appears to be hundreds of them.

20       **PRESIDING COMMISSIONER SAWYER:**  Ok, since

21   you have already noted the petitions are in the

22   file, I will sustain that part of the objection

23   and on the petitions only.  I will however enter

24   into the record as many of the opposition

25   letters that are of more of a personal nature.

26       **ATTORNEY DEFILIPPIS:**  Thank you.

27       **PRESIDING COMMISSIONER SAWYER:**  Ok,

16

1  anything else?

2      **ATTORNEY DEFILIPPIS:**  Not at this time.

3      **PRESIDING COMMISSIONER SAWYER:**  Ok, will

4  the inmate be speaking with the panel today?

5      **ATTORNEY DEFILIPPIS:**  Yes he will, he will

6  not be discussing the commitment offense but he

7  will be discussing all other issues.

8      **PRESIDING COMMISSIONER SAWYER:**  Ok.

9      **ATTORNEY DEFILIPPIS:**  We will submit the

10  issue on the commitment offense based on his

11  prior testimony at the prior hearings and to all

12  the counselors and psychologists.

13      **PRESIDING COMMISSIONER SAWYER:**  Ok, raise

14  your right hand, Mr. Rush.  Do you solemnly

15  swear or affirm the testimony you are about to

16  give at this hearing will be the truth, the

17  whole truth and nothing but the truth?

18      **INMATE RUSH:**  I do.

19      **PRESIDING COMMISSIONER SAWYER:**  Thank you.

20  I am going to be reading from the July 2002

21  because the subsequent reports were just

22  updates.

23      **ATTORNEY DEFILIPPIS:**  Will you be including

24  the prisoner's version as well?

25      **PRESIDING COMMISSIONER SAWYER:**  Yes.

26      **ATTORNEY DEFILIPPIS:**  Thank you.

27      **PRESIDING COMMISSIONER SAWYER:**  At sometime

17

1    before July 1, 1986, at their residence John

2    Heinz, victim, and his roommate Robert Rush,

3    subject, had an argument and a physical

4    altercation over household responsibilities.

5    Robert Rush shot John Heinz numerous times with

6    a 22-caliber rifle.  Following the murder

7    another roommate Marcus Hoy, codefendant,

8    arrived at the residence.  Rush and Hoy cleaned

9    the house of incriminating evidence and placed

10   the victims body in plastic bags in a sleeping

11   bag.  Rush and Hoy drove the body to Dover

12   Canyon area where they buried the victim.  The

13   buried victims wallet and identification in a

14   separate location.  Rush and Hoy later took and

15   left the victims truck in Riverside.  Rush and

16   Hoy used the victim's money to go drinking.  The

17   source of this was the probation officers report

18   pages one through three.  The prisoner's version

19   Rush states that he and the victim were

20   roommates along with a couple of other college

21   students.  On the day of the incident Rush and

22   Heinz got into an argument over the household

23   issues.  Heinz then physically attacked Rush by

24   pushing him to the ground and beating, kicking

25   and verbally mocking him.  Rush felt scared and

26   helpless and went looking for a weapon to

27   protect himself.  Rush grabbed a 22 rifle from

18

1   underneath his bed.  Rush then stepped into the

2   hallway on the way to the bathroom to clean up

3   his bloody nose.  Rush was carrying the rifle

4   and cocked it and told Heinz to back off.  Heinz

5   then lunged towards him, Rush flinched and the

6   gun went off.  Rush state that he was shocked at

7   what had occurred and didn't know what to do.

8   Just as then his roommate Hoy came and told him

9   what had happened, and asked him what to do.

10   Hoy suggested they hide the body, so that no one

11   would ever know what happened.  Rush states that

12   he was frightened and ashamed for what he has

13   done.  He also went along with the plan to hide

14   the body, they buried the body, Rush did his

15   best to go on as if nothing happened.  Rush

16   states that he did tell his other roommate

17   Galloway what happened.  Several weeks after

18   that he was arrested after Galloway turned him

19   in.  Rush does not blame Galloway but wishes he

20   had come forward immediately after the incident.

21   Ok, Mr. Rush I am going to talk about first of

22   all according to our board report you don't have

23   any convictions or any arrests?

24       **INMATE RUSH:**  That's true.

25       **PRESIDING COMMISSIONER SAWYER:**  As a

26   juvenile or an adult?

27       **INMATE RUSH:**  That's true.

19

1        **PRESIDING COMMISSIONER SAWYER:**  Could we

2    pull that mike a little bit up to him he is

3    somewhat soft spoken and I don't want to, thank

4    you.  You graduated from Rim of the World High

5    school in 1983?

6        **INMATE RUSH:**  Yes.

7        **PRESIDING COMMISSIONER SAWYER:**  That is a

8    school that is right up on top of by Arrowhead?

9        **INMATE RUSH:**  Right.

10       **PRESIDING COMMISSIONER SAWYER:**  Between

11   Arrowhead and Big Bear?

12       **INMATE RUSH:**  Right.

13       **PRESIDING COMMISSIONER SAWYER:**  I know

14   where that is.  Can't get much taller than that

15   can you?

16       **INMATE RUSH:**  No.

17       **PRESIDING COMMISSIONER SAWYER:**  You also

18   attended the California State University San

19   Bernadino for a time, at the time of the

20   offense.  And noted you had a certificate of

21   completion of vocational drafting and

22   architectural courses at that school?

23       **INMATE RUSH:**  Uh no, I got that from the

24   vocational program here at Soledad.  I had

25   majored in geography at Cal State but I had not

26   obtained a degree yet.

27       **PRESIDING COMMISSIONER SAWYER:**  And what is

1   your, do you have a degree now?

2       INMATE RUSH:  Yes I got a degree in social

3   science from San Jose State, and a masters in

4   humanity from Cal State Dominguez Hills, while

5   incarcerated.

6       PRESIDING COMMISSIONER SAWYER:  Ok, that is

7   all by mail?

8       INMATE RUSH:  Yah, the program for San Jose

9   State the professors actually came here to the

10  prison and lectured and had a course.  But the

11  master's degree was by correspondence.

12      PRESIDING COMMISSIONER SAWYER:  How many

13  units did you earn while you were in prison?

14      INMATE RUSH:  I earned 30 units at

15  Hartnell, 60 at San Jose, to complete my

16  bachelors.  And then another 30 from Cal State

17  Dominguez Hills for my masters.

18      PRESIDING COMMISSIONER SAWYER:  And was

19  your masters on correspondence?

20      INMATE RUSH:  Yes it was.

21      PRESIDING COMMISSIONER SAWYER:  How did you

22  pay for that?

23      INMATE RUSH:  My parents did.

24      PRESIDING COMMISSIONER SAWYER:  Ok, it says

25  here that you had worked at Stickles, as a

26  painter until the time of your arrest.  Prior

27  employment also consisted of working at Wyle

1  Woods conference center as a maintenance
2  employee.  Ok, did you have any other jobs while
3  you were going to school or after you graduated
4  from high school?

5      **INMATE RUSH:**  I worked summers as a
6  dishwasher at the yacht club in Lake Arrowhead.
7  After high school I worked for three years at
8  Wyle Woods which is right on the rim, a ways
9  away from the high school.  And the summer of
10  this incident I had just got a job as a painter.

11      **PRESIDING COMMISSIONER SAWYER:**  Was that a
12  house painter?

13      **INMATE RUSH:**  Yah as a house painter.

14      **PRESIDING COMMISSIONER SAWYER:**  Ok, it says
15  here your future plans have remained the same as
16  in previous reports with the exception that the
17  inmate's father changed addresses.  How old is
18  your father now?

19      **INMATE RUSH:**  He is 64, I think.

20      **PRESIDING COMMISSIONER SAWYER:**  And you
21  mothers --

22      **INMATE RUSH:**  My mother passed away four
23  years ago.

24      **PRESIDING COMMISSIONER SAWYER:**  Ok, and he
25  lives in Grass Valley in Lake Arrowhead?

26      **INMATE RUSH:**  Yes.

27      **PRESIDING COMMISSIONER SAWYER:**  Ok, tell me

22

1    about your job offers?

2        **INMATE RUSH:**  I have a letter from the

3    Melengers who are family friends who run their

4    own home construction business and they have

5    offered me a position working with them in

6    whatever capacity they have at the time.  That

7    is the only concrete job offer I am able to get

8    at this time.  I also have a letter from Walter

9    Esrick who is a friend from college, a fellow

10   geography major and he assures me that there are

11   jobs available using my drafting skills in the

12   cartographic field that he works in.  And he

13   will take me around and help me find a job,

14   which is what I want to pursue as a career.

15       **PRESIDING COMMISSIONER SAWYER:**  As a

16   Cardiographer?

17       **INMATE RUSH:**  Cartographer, mapmaker

18   basically.

19    .  **PRESIDING COMMISSIONER SAWYER:**  And what

20   was his name?

21       **INMATE RUSH:**  Walt Eschrich.

22       **PRESIDING COMMISSIONER SAWYER:**  And where

23   is his business located?

24       **INMATE RUSH:**  In the Redlands I believe.

25       **PRESIDING COMMISSIONER SAWYER:**  And the

26   Mellingers where do they have their place?

27       **INMATE RUSH:**  In Lake Arrow Head.

23

1     **ATTORNEY DEFILIPPIS:**  Just for the record

2   that is Mellinger, there should be in the

3   support letters a copy of the letters from both

4   Mellingers and Mr. Eschrich.

5     **PRESIDING COMMISSIONER SAWYER:**  Thank you.

6   And has there been any talked with either of

7   these two job offers as to what kind of money

8   you will be making?

9     **INMATE RUSH:**  Walt assures me that within

10   the field, within a couple of years once I prove

11   my skills, I can be making up to 40,000 dollars

12   a year.  The Mellingers I haven't spoken with

13   them directly about how much they will pay.

14   That's basically just a short-term job until I

15   can get my foot in the door somewhere else.

16     **PRESIDING COMMISSIONER SAWYER:**  So that

17   would be more manual labor than skilled labor?

18     **INMATE RUSH:**  Yah they do their own

19   drafting so I would do some drafting for them,

20   but a lot of it would be manual labor or

21   whatever jobs they have available.

22     **PRESIDING COMMISSIONER SAWYER:**  When did

23   you receive your certification for drafting?

24     **INMATE RUSH:**  I believe it was in 1995 or

25   1994.

26     **PRESIDING COMMISSIONER SAWYER:**  Have you

27   gone back for any updates?

24

1     **INMATE RUSH:**  I continued to go back

2  whenever I had the opportunity and brush up on

3  my skills.  Working within the education

4  department but I speak by phone with Walt as I

5  believe he mentions in his letter.  And they

6  still use the same software called AutoCAD for

7  drafting programs on the street, so it would not

8  be a big stretch for me.

9     **PRESIDING COMMISSIONER SAWYER:**  It hasn't

10  changed much through the years?

11     **INMATE RUSH:**  No it hasn't.

12     **PRESIDING COMMISSIONER SAWYER:**  Ok.

13     **ATTORNEY DEFILIPPIS:**  Just so you know he

14  actually stayed a few years extra in the program

15  being on obtaining the certification.

16     **INMATE RUSH:**  Yah I worked in the drafting

17  as a teacher's aide, teaching other students

18  drafting until 1999.

19     **PRESIDING COMMISSIONER SAWYER:**  Ok, it

20  appears that we have a large volume of letters

21  and I am going to do my very best to summarize

22  on both sides.  It appears to be a letter-

23  writing contest here.  With over an inch of both

24  opposition letters and letters of support.  And

25  I am going to try and be fair with everyone

26  because of, we will get to the essence I will

27  deal with the essence as opposed to reading

25

1  every letter in.  If there was only two or three

2  letters on each side we would certainly deal

3  with that.  I have a letter from Connie Chamlee

4  and she has known your family for over 20 years.

5  Do you know who Connie Chamlee is?

6      INMATE RUSH:  Yes, I believe she is a

7  friend of my mothers.

8      PRESIDING COMMISSIONER SAWYER:  Ok, I have

9  a letter from July 5, 2005 from Kevin M.

10 Chantry.

11     INMATE RUSH:  Canty I don't believe there

12 is an R.

13     PRESIDING COMMISSIONER SAWYER:  And do you

14 know this person?

15     INMATE RUSH:  The Canty's are my father's

16 cousins.

17     PRESIDING COMMISSIONER SAWYER:  So your

18 second cousins?

19     INMATE RUSH:  Yes.

20     PRESIDING COMMISSIONER SAWYER:  And I have

21 a letter from July 6, 2005 and this is from John

22 Warnecke, captain in the U.S. Navy.  Do you know

23 that person?

24     INMATE RUSH:  Also my fathers family.

25     PRESIDING COMMISSIONER SAWYER:  Ok another

26 letter of support.  And I have a letter from a

27 Presbyterian pastor and a navy chaplain, Robert

1   E. Williams from Walnut Creek on July 8, 2002 of

2   support.  June 29, 2005 a letter from Martha

3   Hansen.  She is a friend of your mother?

4        **INMATE RUSH:**  Yes.

5        **PRESIDING COMMISSIONER SAWYER:**  Another

6   letter of support from June 28, 2005 another

7   letter from Paul E. Canty, another friend.  I

8   have a letter from Martin A. Nicholas in Bend

9   Oregon.  He knew you when you were at the Rim of

10  the World High school.

11       **INMATE RUSH:**  He was one of my teachers.

12       **PRESIDING COMMISSIONER SAWYER:**  A letter of

13  support a letter from your father obviously

14  supportive dated June 28, 2005 it talks about

15  what you have been doing while you have been in

16  custody.  He indicates family support, a place

17  to live.  A letter from Doctor William Stanley

18  the III, from June 28, 2005, a letter of

19  support.  A letter dated June 27, 2005 from

20  Luann Landgraf, says she knows your father. Do

21  you know her?

22       **INMATE RUSH:**  She is dating my father

23  currently, she has written to me several times.

24       **PRESIDING COMMISSIONER SAWYER:**  Have you

25  ever met her?

26       **INMATE RUSH:**  Not yet.

27       **PRESIDING COMMISSIONER SAWYER:**  Ok, a

27

1    letter of support then I have a letter from

2    Wendy Landham, residence of San Bernadino this

3    is dated June 2002 and there is a note on the

4    bottom of it this information has not changed

5    signed Wendy Landham.  She knows your parents?

6        **INMATE RUSH:**  Yes.

7        **PRESIDING COMMISSIONER SAWYER:**  And then I

8    have a letter of job offers from June 24, 2005

9    from Mellinger, L. Mellinger from

10   (indiscernible) Forest California.  It is up

11   near Arrow Head and Big Bear?

12       **INMATE RUSH:**  Yes.

13       **PRESIDING COMMISSIONER SAWYER:**  And updated

14   letter from 2002 to 2005 continued support for

15   your release and this is signed by Terry Moore.

16   A letter from Blue Jay from June 24, 2005 from

17   Charlene Wells.  Another one from Daryl and

18   Patricia or rather Daryl and Lucille Steelwell,

19   a note on that letter of support.  Diane Poarch,

20   again noted on here updated letter from 2002 of

21   support.  Evan Ross (indiscernible) from the

22   First Presbyterian Church in Burbank.  And it is

23   a letter of support.  Angie Rush--

24       **INMATE RUSH:**  My sister in law.

25       **PRESIDING COMMISSIONER SAWYER:**  Stafford

26   Virginia and who is she married to?

27       **INMATE RUSH:**  My brother, I believe there

1  is a letter from his also.

2      **PRESIDING COMMISSIONER SAWYER:**  And Billy
3  Weiss, June 22, 2005 has known you since you
4  were 15 a letter of support.  And another letter
5  of support from Darlyne Hopkins, June 19, 2005 a
6  friend of your father and mother.

7      **INMATE RUSH:**  Yes.

8      **PRESIDING COMMISSIONER SAWYER:**  Talks about
9  what you have done in prison and is supportive.
10 A letter from Roy E. Holes June 17, 2005
11 supportive.  And this is your brother Brian?

12     **INMATE RUSH:**  Brian Rush yes.

13     **PRESIDING COMMISSIONER SAWYER:**  Brian Rush
14 who is a major in the U.S. Marine Corps.  A
15 letter of support.  Iris and Matt Riggs, Running
16 Springs California, in June 2005 a letter of
17 support.  And another letter from Joan, help me
18 on this one, Raese, from Wanachi Washington.

19     **INMATE RUSH:**  Yes that is my mother's
20 cousin.

21     **PRESIDING COMMISSIONER SAWYER:**  Ok, a
22 letter of support from Marjory Eide.  A letter
23 of support, a hand written letter from Thomas
24 Raese.

25     **INMATE RUSH:**  My mothers cousin.

26     **PRESIDING COMMISSIONER SAWYER:**  A letter
27 from Bruce and Carl Wagner, June 16, 2005.  A

1   letter of support from Linda West of Cedar land

2   in June 18, 2002.  With an update.  She now

3   lives in Hermosa Beach.  Lodeyk and Pamela

4   Zubko, and it is a letter of support.  Ionwraese

5   Boulder Colorado a letter of support.  Another

6   letter of support from Walter Raese an uncle.

7          **INMATE RUSH:**  From West Virginia.

8          **PRESIDING COMMISSIONER SAWYER:**  NO date on

9   that.  William Roberts, he retired and the boss

10  at Blue jay June 2005.  A letter of support Anna

11  and Ralph Bouer, June 15, 2005.  A support

12  letter from Catherine W. Long, on February 13,

13  2005.  A support letter from June 13, 2005

14  William Freuler.  A letter of support an updated

15  letter from 2002 from Cheryl Moxely-Shaw.  A

16  letter of support and Lee Bandenberg June 10,

17  2005.  A letter of support, Tom Ottoson, an

18  updated letter from 2000.  The only date on it

19  is updated June 9, 2005.  Another letter from

20  the Bandenbergs.  Margaret Dickson, retired

21  school teacher a letter from June 2005.  Another

22  2005 June letter is Monica Dam, (indiscernible).

23  Rowland Hoffman and Mary Hill Hoffman, June 7,

24  2005.  A letter of support, Patricia Ottoson, an

25  updated letter of June 9, 2005 from 2002.  A

26  letter of support John W. Raese, a letter of

27  support from 2002.  Now I am starting to run

30

1  into some duplicates.  Here is one from 2002
2  Acuna, Manuel and Barbara Acuna.  A letter of
3  support here is the one I was looking for.  This
4  is date March 6, 2005 Walter Escherich, he works
5  for a 100 year old civil engineering firm.  And
6  he is the program metric arm of the operation.
7  It says that he is 40 years old spend 40 hours a
8  week working for a 100-year-old civil
9  engineering firm.  And holds down the program
10  metric arm of the operation.
11      **INMATE RUSH:**  That is a typo, it is
12  photogramentor.
13      **PRESIDING COMMISSIONER SAWYER:**  Ok.
14      **INMATE RUSH:**  Essentially map making from
15  aerial photography.
16      **PRESIDING COMMISSIONER SAWYER:**  He first
17  met you as a college freshman and he talks about
18  how you have learned engineering and
19  architecture software package called AutoCAD.
20  You know it very well.  Has he been up to visit
21  with you?
22      **INMATE RUSH:**  I talk to him on the phone
23  regularly.
24      **PRESIDING COMMISSIONER SAWYER:**  He feels
25  that you have a valuable skill that would lend
26  itself heavily into the credential as a team
27  member in any architecture or engineering firm.

31

1   He says he as some pull in his office, he

2   doesn't own this company?

3        **INMATE RUSH:**  No he doesn't.

4        **PRESIDING COMMISSIONER SAWYER:**  In terms of

5   personnel, how many people do they hire or do

6   they have working?

7        **INMATE RUSH:**  I think they are a small firm

8   with maybe a dozen people working in the shop.

9        **PRESIDING COMMISSIONER SAWYER:**  Ok, he

10  feels you would fit well, fit in well, sees no

11  reason why you cant be employed as a CAD

12  operator draftsman.  (indiscernible).  A letter

13  from Roy E. Holes, from 2002 I am now seeing

14  duplications from 2002.  In the area of

15  opposition letters is as I discussed with the

16  inmates counsel we are not considering petitions

17  and there are a lot of petitions here.  Someone

18  went to a lot of work to get these petitions

19  done.  A letter of reference from a cousin to

20  John R. Heinz, Charles A.m. Holtz, this is

21  August 2005.  A letter of opposition it talks

22  about the crime.  A letter from Roland Estrada,

23  in opposition.  A letter from Martha S. Coker,

24  dated July 28, 2005 has known the mother of John

25  Raymond Heinz for 57 years, the father for 50.

26  And is opposed to a parole date.  A letter from

27  Jean and Joe Pascale, talks about the crime and

1   is strongly opposed to an early release.  I have
2   a letter from Raymond Heinz and Helen Heinz
3   mother and father who are represented here
4   today.  Opposed to an early release.  I have a
5   letter of opposition from Father Jerome Karcher,
6   from the St. Vincent Depaul Roman Catholic
7   Church on August 8, 2005.
8       **ATTORNEY DEFILIPPIS:**  Actually for the
9   record that does state an conditional opposition
10  unless there has been some serious and real
11  rehabilitation.
12      **PRESIDING COMMISSIONER SAWYER:**  My letter
13  says, I think it is important to support justice
14  for this crime and unless there has been some
15  real and serious rehabilitation he would be a
16  threat to society.
17      **ATTORNEY DEFILIPPIS:**  Correct.
18      **PRESIDING COMMISSIONER SAWYER:**  Is that
19  what you meant?
20      **ATTORNEY DEFILIPPIS:**  Yes.
21      **PRESIDING COMMISSIONER SAWYER:**  A letter
22  from July 24, 2005 from John Heinz's cousin,
23  Edith I. West.  Respectively requests Robert
24  Rush not be granted parole.  A letter received
25  on August 8th from John Eric Heinz, a cousin in
26  opposition.  A letter from July 19, 2005 from
27  Jim and Dorothy Weitzel, from Washington State,

33

1   they knew the family and Jim and Raymond Heinz
2   served together in the National Guard.  They
3   attended the same church in Mariposa.  A letter
4   from Marie Higgins, dated July 31, 2005 would be
5   opposed to parole.  A letter July 30, 2005
6   opposed to parole from Elaine it looks like it
7   is spelled Dabriuer, anybody know that name.
8   Ok, that is a aunt, that is an aunt.  A letter
9   from Cecelia Duckworth, this is July 26, 2005,
10  asking us to oppose deny parole of Robert Rush.
11  This is another aunt.  Ok August 3, 2005 a
12  handwritten note asking for a denial of parole
13  by Bob and Donna Azeveda.  And another
14  handwritten letter, July 25, 2005 asking us to
15  deny parole for Mr. Rush.  And this is by
16  Francis Fischbeck and family.  A letter from
17  Spencer Heinz, July 25, 2005, a cousin of the
18  victim John Heinz.  Says I strongly urge us to
19  consider denying parole.  Very strong opposition
20  for parole for Robert Rush by Catherine Holtz
21  that is dated July 24, 2005.  A letter from Paul
22  Weitzel, friends of the Heinz family, and please
23  do not ever release Robert Rush.  July 22, 2005
24  Janine Mills and Marian Mills asking for a
25  denial.  And a letter from July 21, 2005,
26  friends of the family, that is illegible I cant
27  read it, it is a copy.  A poor copy machine but

34

1   it is an opposition letter.  A letter from Eva
2   Brown dated July 20, 2005, second cousin to John
3   Raymond Heinz, Rush should not be paroled.
4   Another letter asking for request of parole be
5   denied at this time by Carl J. Heinz, July 20,
6   2005.  Carl M. Carcher, Carl's Junior asking
7   that he be denied parole.  And this letter is
8   dated July 18, 2005.  Another one on July 18,
9   2005 was Margaret M. Carcher, sister of Ray
10  Heinz.  Opposition hand written letter from aunt
11  to John Heinz, Lori is it Hainer, Hanes.  Thank
12  you.  This was July 17 opposed to parole.  Lucy
13  and Frank Carcher dated July 16, 2005 deny
14  parole.  Elvera Holtz, July 15, 2005, John Heinz
15  was her nephew and is opposing parole.  Another
16  opposition letter dated July 13, 2005 from James
17  and Carrie Anderson.  I have an undated letter
18  from Tommy Iebrit, Britan.  It is handwritten.
19  A letter of opposition uncle to John Raymond
20  Heinz, is it Clemen Heinz?  Clemence Heinz
21  opposition letter.  Joseph and Eleanor Heinz,
22  July 11, 2005 strongly request parole not be
23  given.  July 11, 2005 a letter urging or oppose
24  to parole for Robert D. Rush from Marie Patin.
25  Ok another letter from Helen and Ray Heinz this
26  one was dated July 6th.  And I get to the bottom
27  of the letters, thank you for bearing with me.

1    And we had a few letters in this case.  At this

2    time I will turn it over to Deputy Commissioner

3    Weaver.

4        **DEPUTY COMMISSIONER WEAVER:**  Thank you sir.

5    Mr. Rush you last appeared before the board on

6    March 5, 2003.  There was an attempt to a

7    hearing on August 12, 2005 but at that time

8    outside statements from the victims the hearing

9    was essentially continued and so consequently

10   the final decision of March 5, 2003 was the last

11   full hearing you participated in.  The board

12   report that was done for this hearing it was

13   (indiscernible) there was an addendum that was

14   completed dated September 16, 2005 by counselor

15   DeGuzman, and that just indicates that you

16   remain here at Soledad with custody in Medium A

17   and you are a clerk in the education bridging

18   program.  Prior to that a report was submitted

19   by a counselor Arno, Arno signed it of December

20   22, 2004 and it was dated, the report was dated

21   March of 2005.  And it indicates that with

22   regard to post conviction factors that you have

23   remained here at CTF and in the general

24   population with a Medium custody.  That you have

25   had exceptional work reports and in December of

26   2003 you were reassigned as the bridging program

27   clerk and received above average ratings in all

1    categories of work reports.  It also indicates

2    that you have been involved in AA´since the time

3    of the last report.  And that you have completed

4    Doctor Thomas Gordon's family effectiveness

5    training-harmony in the home self-help program.

6    And it says that you received laudatory chronos

7    for your assistance with the CTF video reports

8    program and that you were participating in the

9    anger management and fatherhood lecture series.

10   Under disciplinary history the, it says you have

11   been disciplinary free during this period,

12   however your record does not indicate any

13   disciplinaries in terms of 115's.  There is one

14   128 a in the record indicating that you

15   apparently went to an assignment early and you

16   were chastised for being at that assignment

17   early.

18        **ATTORNEY DEFILIPPIS:**  Excuse me sir what

19   was the date of that 128?

20        **DEPUTY COMMISSIONER WEAVER:**  For going to

21   work early, or going to his assignment early?

22   In November 10, 1988.  The record goes on the

23   say that the March 5, 2003 hearing that you were

24   denied parole for two years and in the

25   recommendations were to remain disciplinary

26   free, the counselor indicates that, that was

27   accomplished and that you were to continue to

37

1  participate in self-help programs, that was

2  accomplished.  The counselor, counselor Arno

3  indicates that there was a interview with you

4  that lasted approximately an hour and a half.

5  And a file review lasting three hours.  The

6  overall record indicates that you have been

7  involved in a number of programs at one point

8  and time I believe you worked for industries for

9  a short period of time.  On some type of

10 stitching machine.  However the primary area

11 that you functioned in is participating in the

12 drafting program, and you not only completed

13 that but you stayed on as a class tutor or

14 whatever to assist other students in that

15 particular program.  There are a number of

16 chronos in the file indicating that you have

17 participated a number of years in the AA program

18 and that you are a contributing member and that

19 you have positively participated and shown his

20 ability to understand and comprehend all aspect

21 of the 12 steps program.  And that is signed by

22 Mr. Rodriguez who has been a sponsor for a

23 lengthy period of time.  Did you learn the

24 steps?

25      **INMATE RUSH:**  Yes I did.

26      **DEPUTY COMMISSIONER WEAVER:**  What's the

27 fourth step?

38

1       **INMATE RUSH:**  The fourth step is to make a
2    searching and fearless moral inventory.

3       **DEPUTY COMMISSIONER WEAVER:**  Have you done
4    that?

5       **INMATE RUSH:**  Yes I have.

6       **DEPUTY COMMISSIONER WEAVER:**  Mr. Rodriguez
7    has numerous chronos in here going back for
8    many, many quarters of participation in AA.
9    There is also a laudatory chrono for June 24,
10   2004 for, as the counselor mentioned, your
11   participation with the CTF Video reports program
12   and self-study program, that involves the
13   broadcast of educational videos for the
14   (indiscernible) facility.  There is a chrono by
15   the senior librarian. Cauntay, indicating that
16   you have successfully completed Doctor Thomas
17   Gordon's family effectiveness training / harmony
18   in the home self-program.  That chrono is dated
19   February 7, 2004.  And it says it consists of
20   six two-hour sessions covering the following
21   topics.  And there is a number of topics listed
22   including resolving conflicts peacefully.  Then
23   it says the program is recognized by CTF
24   psychology staff as an beneficial limited
25   instruction self-help program.  There is a
26   chrono dated March 13, 2003 and that had to do
27   with completing a course in the cause prevention

39

1   treatment and management of hepatitis.  With

2   regard to academic endeavors, the record

3   indicates that you were an honor student at

4   Hartnell College?

5       **INMATE RUSH:**  Yes.

6       **DEPUTY COMMISSIONER WEAVER:**  Initially and

7   then you went on and received a Bachelors Degree

8   from San Jose State and you also received a

9   Masters degree from Cal State Dominguez Hills,

10   is that correct?

11       **INMATE RUSH:**  That is correct.

12       **DEPUTY COMMISSIONER WEAVER:**  And you have

13   taken some other classes.  There are

14   certificates in the file, indicating that in

15   addition to the ones that I have mentioned you

16   have taken a HIV AIDS class in 2000.  You

17   completed an entraupanur development class in

18   1999.  The Masters degree is dated May 24, 1997.

19   Is that correct?

20       **INMATE RUSH:**  That is correct.

21       **DEPUTY COMMISSIONER WEAVER:**  And then there

22   is a certificate of completion for the

23   vocational drafting / mechanical drafting class

24   and I don't see a date on that.

25       **INMATE RUSH:**  There should be one on the

26   back.

27       **ATTORNEY DEFILIPPIS:**  April 2, 1997.

40

1      **DEPUTY COMMISSIONER WEAVER:**  Thank you.

2  And the Bachelors degree from San Jose State

3  which was dated December 28, 1990.  Impact

4  program certificate dated February 26, 2001.

5  And your Hartnell AA degree was dated August

6  1989.  It doesn't have a specific date on it I

7  believe.  And you were on the Presidents honor

8  role at Hartnell, correct?

9      **INMATE RUSH:**  That is correct.

10     **DEPUTY COMMISSIONER WEAVER:**  You have been

11  involved in some other programs, the children's

12  holiday festival you participated in and I

13  believe that there were some other endeavors

14  that were noted.  And I want to see if I can

15  locate that.  You've had work reports, CDC one-

16  work reports from Mr. Brombach, and that is a

17  (indiscernible) clerk with all exceptional to

18  average grades.  And that chrono is dated June

19  3, 2004.  Most all the work reports that have

20  been submitted, and I believe that your counsel

21  handed copies of these laudatory ones which are

22  validated in the Central File.  I will indicate

23  grades one or two which is exceptional or above

24  average.  Is there anything that I have failed

25  to mention regarding your endeavors?  Either at

26  Soledad?

27     **INMATE RUSH:**  I don't believe so, I think

1    you have covered everything.  For the record I

2    recently changed jobs and I am now a clerk in

3    the library.  This happened two weeks ago.

4       **DEPUTY COMMISSIONER WEAVER:**  Ok, the chrono

5    from Mr. Brombach, the CDC 101 was dated

6    December 1, 2004 is the most recent one that is

7    in the Central File so you may have some other--

8       **INMATE RUSH:**  There as one that was

9    completed when I changed jobs but I believe it

10   hasn't made it into the file yet.

11      **DEPUTY COMMISSIONER WEAVER:**  Ok, that is

12   often the case.

13      **ATTORNEY DEFILIPPIS:**  I think there was

14   also a couple of laudatories for participation

15   in the education department graduation programs

16   over the years.

17      **INMATE RUSH:**  Oh, yes that is correct.

18      **DEPUTY COMMISSIONER WEAVER:**  All right I

19   believe that I did see those.  Anything else

20   counsel?

21      **ATTORNEY DEFILIPPIS:**  Nothing I can think

22   of thank you.

23      **ATTORNEY DEFILIPPIS:**  Did you mention the

24   fatherhood and anger management course?

25      **DEPUTY COMMISSIONER WEAVER:**  Yes, with

26   regard to the most recent psychological report

27   that is in the file, the psychological report is

42

1   dated June 28, 2005.  And it was done by Doctor

2   Talbott, and Doctor Talbott primarily refers to

3   the previous report done by Doctor Terini.  That

4   was done in 1999.  How long did Doctor Talbott

5   interview you Mr. Rush?

6       INMATE RUSH:  I meet with him I believe

7   three or four times for maybe up to an hour.

8       DEPUTY COMMISSIONER WEAVER:  It doesn't

9   indicate in the report the length or the

10  frequency of interviews.  Doctor Talbott

11  repeatedly refers to Doctor Terini's 1999 report

12  and says there have been no changes.  Under

13  substance abuse history it says that he used

14  alcohol first at 18, drinking socially at some

15  parties in college.  Went on to say he had also

16  used marijuana but only about three times.  Have

17  you ever had an alcohol problem?

18      INMATE RUSH:  No.

19      DEPUTY COMMISSIONER WEAVER:  Did you drink

20  about the time this offense occurred?

21      INMATE RUSH:  No.

22      DEPUTY COMMISSIONER WEAVER:  What about

23  prior to the life crime had you been drinking

24  prior to that?

25      INMATE RUSH:  No.

26      DEPUTY COMMISSIONER WEAVER:  No, all right

27  under diagnostic impressions Doctor Talbott says

43

1   no contributory clinical disorder on AXIS I or

2   on and on AXIS II no contributory personality

3   disorder.  He gives you a GAF score of 85.  And

4   Doctor Talbott's indicates that I am in

5   agreement with Doctor Terini's his violence

6   potential (indiscernible) is less than that of

7   an average level two inmate.  I also agree with

8   Doctor Terini that the inmates potential for

9   violence within the free community is no more

10  than that of the average citizen.  You are not

11  level two are you?

12      **INMATE RUSH:**  Yes.

13      **DEPUTY COMMISSIONER WEAVER:**  And what is

14  your classification score right now, is zero.

15      **INMATE RUSH:**  Yes but you are not in a

16  institution with commensurate with the

17  classification score are you?

18      **INMATE RUSH:**  Yes, Central here is a level

19  two facility.

20      **ATTORNEY DEFILIPPIS:**  Lifers can't go to

21  level one, so even though he has a zero they now

22  give him a bottom score of 19 for housing

23  purposes.  So that they stay level two.  He has

24  been at zero since 1997.

25      **INMATE RUSH:**  I think so.

26      **ATTORNEY DEFILIPPIS:**  I think it is 1997.

27      **DEPUTY COMMISSIONER WEAVER:**  In looking at

44

1  the prior psychiatric report of Doctor Terini,

2  that Doctor Talbott referred to, Doctor Terini

3  in part said under current mental status

4  treatment needs that there was evidence of a

5  motor thought disorder.  And under review of

6  life crime Doctor Terini indicated that inmate

7  Rush described the circumstances surrounding his

8  commitment offense as his description was quite

9  similar to that given in past BPT psychological

10  evaluations.  He acknowledged showing poor

11  judgment in deciding to bury the victim's body.

12  He stated in past BPT reports that his fear of

13  the victim was a significant factor in his

14  crime.  Remorse that he expressed was quite

15  appropriate and genuine.  And also Doctor Terini

16  in under second 15 number three, it does not

17  appear that this man ever had a significant drug

18  or alcohol program and so there are no

19  recommendations in this area.

20      **ATTORNEY DEFILIPPIS:**  Problem.

21      **DEPUTY COMMISSIONER WEAVER:**  Pardon me?

22      **ATTORNEY DEFILIPPIS:**  Problem, you said

23  program.

24      **DEPUTY COMMISSIONER WEAVER:**  Alcohol

25  problem, so there are no recommendations in this

26  area in the documents that your attorney gave me

27  it indicates that after the motorcycle accident