# EXHIBIT 2
# part 2 of 2

1   which occurred prior to life crime, you are

2   quoted as saying I was very depressed and in

3   constant pain.  I layed around the house,

4   watched television drank beer, and I gave up on

5   myself and felt very hopeless.  And this is in

6   the document that and a sentencing memorandum

7   that your attorney gave me.  Is that a true

8   statement?

9       **INMATE RUSH:**  Yes that refers to the period

10  between the accident and the crime.

11      **DEPUTY COMMISSIONER WEAVER:**  Yah it says I

12  was depressed and in constant pain, layed around

13  the house, watched television, and drank beer.

14  I give up on myself and felt hopeless.  Other

15  places in this document, it talks about

16  significant depression, regression, and physical

17  and mental state.  That you started back to

18  school (indiscernible) you got the first F you

19  had ever received in a college class.  Is that

20  correct?

21      **INMATE RUSH:**  That is true.

22      **DEPUTY COMMISSIONER WEAVER:**  Well I didn't

23  see anything in the report by Doctor Terini or

24  the other doctors that talked about the issue of

25  depression.  And did you ever talk to the doctor

26  about that?

27      **INMATE RUSH:**  Yah we spoke about it in the

46

1   interview.  But I think, you know it was a

2   temporary kind of thing that came about as a

3   result of the accident.  And I don't think that

4   qualifies as like a psychological disorder, of

5   course I am not a psychologist.  But it was a

6   temporary state during the recovery from the

7   accident.  If uh in the back of this report in

8   appendix A, there is a note from a report from

9   the psychologist who came to interview me in the

10  hospital.  And she refers to an interview she

11  made with me.  And concluded that I was going

12  through the normal grief and process after

13  loosing a friend in the accident and almost

14  being so badly hurt myself.  But she doesn't

15  refer to you know depression as a disorder or as

16  a you know psychological condition.  And she

17  says that after the one interview she says that

18  I could call her, I think it says here.  If

19  problems continued get back in contact with her.

20  But if I feel the need for additional

21  assistance, so I don't think she clearly thought

22  I didn't need any initial assistance.

23      **DEPUTY COMMISSIONER WEAVER:**  But when you

24  talked to Doctor Terini as well as other

25  clinicians since you have been incarcerated have

26  you fully discussed these changes you were going

27  through with the doctors?

47

1      **INMATE RUSH:**  Yes.

2      **DEPUTY COMMISSIONER WEAVER:**  Well Doctor

3   Bakeman you ran a program with Doctor Bakeman

4   and Doctor Bakeman did an evaluation in 1990 and

5   Doctor Bakeman says inmate Rush does not appear

6   to have any psychopathology which was

7   contributory to his offense.  And it goes on to

8   give some statements in support of that.  But in

9   the sentencing memorandum it repeatedly talks

10  about statements that you allegedly made, I

11  wasn't thinking straight, I was in a state of

12  shock, I was like watching TV I didn't feel a

13  part of it.  I went through a lot of mood

14  swings.  My mind couldn't take it anymore.

15     **INMATE RUSH:**  During the altercation and

16  the cover-up and the period prior to my arrest.

17     **ATTORNEY DEFILIPPIS:**  Also you left our a

18  portion of Doctor Bakeman's statement where he

19  talks about the inmate felt afraid an confused

20  at the time, his subsequent actions were a

21  result of that situational fear and confusion.

22  I think the same thing is being talked about in

23  that report.

24     **DEPUTY COMMISSIONER WEAVER:**  Well it may be

25  I don't know it doesn't specifically address

26  some of these issues in the sentencing

27  memorandum that you submitted to the panel

48

1  counsel.  And the one of the things I am

2  considering is that there was a significant

3  lapse of time between the time of the life crime

4  and when Mr. Rush was arrested for it.  And of

5  course you said he is not going to make any

6  statements today but I am a little bit concerned

7  about what was going on in his mind, between

8  when this happened and when he ultimately was

9  held accountable for it.  It is probably an

10  unanswered question.

11      **ATTORNEY DEFILIPPIS:**  Actually it has been

12  covered in the four prior board hearings.

13  Covered at length.  I have all those

14  transcripts.

15      **DEPUTY COMMISSIONER WEAVER:**  Yah I have

16  read some of the transcripts.  All right with

17  regards to post conviction aspects I think it

18  has been covered so I will ask you to return

19  your attention to the chair, Commissioner

20  Sawyer.

21      **PRESIDING COMMISSIONER SAWYER:**  Thank you.

22  Do you have any questions you would like to ask

23  the inmate?

24      **DEPUTY COMMISSIONER WEAVER:**  No.

25      **PRESIDING COMMISSIONER SAWYER:**  Mr. Wilson?

26      **DEPUTY DISTRICT ATTORNEY WILSON:**  I

27  understand the inmate is not speaking about the

49

1   life crime today?

2        **PRESIDING COMMISSIONER SAWYER:**   That is

3   correct.

4        **DEPUTY DISTRICT ATTORNEY WILSON:**   Then no

5   questions.

6        **PRESIDING COMMISSIONER SAWYER:**   Mr.

7   Defilippis?

8        **ATTORNEY DEFILIPPIS:**   Over the years you

9   started working in the education program is that

10  correct?

11       **INMATE RUSH:**   That is correct.

12       **ATTORNEY DEFILIPPIS:**   And you were involved

13  in tutoring inmates that were attempting to get

14  GED's?

15       **INMATE RUSH:**   Yes.

16       **ATTORNEY DEFILIPPIS:**   And then you went

17  into the drafting program you obtained, as I

18  understand it, two certificates in that program?

19       **INMATE RUSH:**   That is correct.

20       **ATTORNEY DEFILIPPIS:**   That would be the

21  mechanical curriculum and the architectural.

22  And that qualifies you to do what?

23       **DEPUTY COMMISSIONER WEAVER:**   Excuse me

24  counsel I believe that we are running out of

25  tape again.   This is side one tape two in the

26  case of Robert Rush.

27       **ATTORNEY DEFILIPPIS:**   In case we missed it

50

1   on the last tape you got the two certificates in

2   the drafting program, the mechanical curriculum

3   and the architectural curriculum?

4      **INMATE RUSH:**  That is correct.

5      **ATTORNEY DEFILIPPIS:**  And part of that

6   involves the use of therapy CAD software the

7   computer assisted drafting software?

8      **INMATE RUSH:**  Yes it does.

9      **ATTORNEY DEFILIPPIS:**  And that is the same

10  software that you were talking about that Walt

11  Escherich is still being used in the field?

12      **INMATE RUSH:**  Yes it is.

13      **ATTORNEY DEFILIPPIS:**  And you continued in

14  that program for a number of years working with

15  the students is that correct?

16      **INMATE RUSH:**  That is correct.

17      **ATTORNEY DEFILIPPIS:**  As a teachers

18  assistant?

19      **INMATE RUSH:**  That is right.

20      **ATTORNEY DEFILIPPIS:**  And then during that

21  time period you also did work yourself on the

22  CAD program to keep yourself up to date on that?

23      **INMATE RUSH:**  Yes I did.

24      **ATTORNEY DEFILIPPIS:**  And then since that

25  time because you have still been connected to

26  the educational department you have made some

27  arrangements with the teacher to be able to go

51

1  back and refresh yourself with the use of that

2  program?

3      **INMATE RUSH:**  Yes I have.

4      **ATTORNEY DEFILIPPIS:**  So you have done that

5  on an intermittent couple of times a month

6  basis?

7      **INMATE RUSH:**  Yes.

8      **ATTORNEY DEFILIPPIS:**  So that keeps you up

9  to date on the use of that software?

10      **INMATE RUSH:**  Yah I keep my skills current.

11      **ATTORNEY DEFILIPPIS:**  And since that time

12  you have gotten involved in the pre release

13  program, is that correct?

14      **INMATE RUSH:**  That is correct.

15      **ATTORNEY DEFILIPPIS:**  And part of that, you

16  did an overhaul of the parenting course?

17      **INMATE RUSH:**  Right.

18      **ATTORNEY DEFILIPPIS:**  Rewrote the

19  curriculum for that?

20      **INMATE RUSH:**  That's right.

21      **ATTORNEY DEFILIPPIS:**  And that is

22  documented in the chronos that are in your

23  files?

24      **INMATE RUSH:**  That is correct.

25      **ATTORNEY DEFILIPPIS:**  Ok and we talked

26  about a number of the self-help programs that

27  you have done, and I just wanted to clear

52

1    something up.  There was a mention in that

2    report of drinking beer during the time sitting

3    around drinking beer how frequently were you

4    drinking?

5        INMATE RUSH:  I was drinking weekends,

6    basically that refers to the fact that being

7    immobile from that accident.  Instead of going

8    out and partying with friends and things like

9    that I would stay home on Saturday night, Friday

10   night, and drink and occasionally drink after

11   school or work.  And times like that.

12       ATTORNEY DEFILIPPIS:  And was it ever

13   something that created a problem in your life?

14       INMATE RUSH:  No.

15       ATTORNEY DEFILIPPIS:  Was it anything that

16   was atypical for the college atmosphere you were

17   in?

18       INMATE RUSH:  No.

19       ATTORNEY DEFILIPPIS:  Did you ever have

20   blackouts, or problems like that?

21       INMATE RUSH:  No.

22       ATTORNEY DEFILIPPIS:  Drinking in the

23   morning anything like that?

24       INMATE RUSH:  No.

25       ATTORNEY DEFILIPPIS:  But you have

26   participated for quite a number of years in the

27   AA program, is that correct?

53

1        **INMATE RUSH:**  Yah.

2        **ATTORNEY DEFILIPPIS:**  How many years have

3   you been involved in that?

4        **INMATE RUSH:**  Since 1993 I believe, so that

5   will be 12 years.

6        **ATTORNEY DEFILIPPIS:**  Ok, and you use that

7   for just helping you with basic life skills?

8        **INMATE RUSH:**  Yah.

9        **ATTORNEY DEFILIPPIS:**  A lot of the step

10  work involves how to basically be a better

11  person correct?

12       **INMATE RUSH:**  That is correct.

13       **ATTORNEY DEFILIPPIS:**  And in the strike

14  that.  When you came to prison we are talking

15  about the level two, level three, when an inmate

16  comes in on a life crime, the regular assignment

17  you get is a level four institution to start

18  with.  You did not go to a level four

19  institution.

20       **INMATE RUSH:**  No I didn't.

21       **ATTORNEY DEFILIPPIS:**  In fact you had level

22  four points but you were given and override to

23  go to a level three institution.

24       **INMATE RUSH:**  Yes I was.

25       **ATTORNEY DEFILIPPIS:**  And you have never

26  spent any time in a level four institution?

27       **INMATE RUSH:**  No I haven't.

54

1      **ATTORNEY DEFILIPPIS:**  And as I understood

2   that was an assessment based on your lack of

3   dangerousness determined that you were able to

4   go to a level three to start with?

5      **INMATE RUSH:**  Yah the counselor at the

6   reception center said that I wasn't level four

7   material.  And recommended that I be sent to

8   medium security.

9      **ATTORNEY DEFILIPPIS:**  And then when did you

10  move from level three to level two?

11     **INMATE RUSH:**  In 1993 at the time this

12  facility transitioned from a level three to a

13  level two.  My points dropped so I remained in

14  here.

15     **ATTORNEY DEFILIPPIS:**  And so you have been

16  in a level two institution now for 12 years?

17     **INMATE RUSH:**  Yes I have.

18     **ATTORNEY DEFILIPPIS:**  And throughout the

19  time you have been in prison you have never had

20  a CDC 115?

21     **INMATE RUSH:**  No.

22     **ATTORNEY DEFILIPPIS:**  Have you ever had

23  situations where there has been a potential for

24  violence?

25     **INMATE RUSH:**  Certainly this is prison I am

26  surrounded with it.  But I have made a conscious

27  effort to avoid putting myself in situations

1  when situations are happening to diffuse them.

2  And to every lifer here has to walk a tightrope

3  between not looking week or not backing down but

4  at the same time not getting into fights or

5  altercations.  And I think I have worked very

6  hard to walk that tightrope.

7      **ATTORNEY DEFILIPPIS:**  And you have done a

8  number of self-help courses and has that helped

9  you to understand basically yourself and why you

10 committed this crime?

11     **INMATE RUSH:**  Yes it has.

12     **ATTORNEY DEFILIPPIS:**  And what is different

13 about you today from what you were when you came

14 into prison?

15     **INMATE RUSH:**  Well 19 years ago I was

16 immature, shortsighted, kind of an

17 underachiever.  Didn't really apply myself.  And

18 since that time I think I have grown up a lot, I

19 have been forced to grow up.  And I think that I

20 have kept my eyes on the prize, so to speak.

21 Focused on the future, and rather than letting

22 what is happening in front of me get the best of

23 me, and I have also learned to apply myself and

24 that I can excel when I really apply myself.

25 Which is something I never did before.

26     **ATTORNEY DEFILIPPIS:**  I noticed that in

27 your transcripts, I think they were attached to

56

1    the private probation report that you were

2    basically a B and C student at San Bernadino

3    College?

4        INMATE RUSH:  Yes I was.

5        ATTORNEY DEFILIPPIS:  And since you have

6    been in prison in the AA program, the BS program

7    and the Masters program you have maintained

8    close to a A- A average, correct?

9        INMATE RUSH:  Yes I have.

10       ATTORNEY DEFILIPPIS:  Honors in almost

11   everyone of those programs?

12       INMATE RUSH:  Yes I have.

13       ATTORNEY DEFILIPPIS:  What is the, what

14   does a bridging clerk do?

15       INMATE RUSH:  The bridging program is to

16   help those inmates that are eligible for work

17   time credits.  And can get extra time off of

18   their sentence.  Earn that credit by doing self-

19   help study is basically on a life skills getting

20   them ready for release.  That kind of

21   curriculum.

22       ATTORNEY DEFILIPPIS:  And is this the video

23   program I have seen some chronos that show that

24   you have been assisting in running that program

25   in the prison?

26       INMATE RUSH:  No that is a separate program

27   that I just volunteer for.  That program is just

57

1   for broadcasting educational videos for the

2   general population.  For those who don't have

3   access to the educational department.  They can

4   watch educational videos and fill out

5   questionnaires and send them in and get credit

6   for that.  And I have been reviewing the videos,

7   and formulating the questionnaire.

8       **ATTORNEY DEFILIPPIS:**  So it sounds like a

9   significant aspect of what you have been doing

10  during the time you have been in prison is to

11  facilitate or help other inmates that are trying

12  to get education?

13      **INMATE RUSH:**  Yes.

14      **ATTORNEY DEFILIPPIS:**  That is all I have.

15      **PRESIDING COMMISSIONER SAWYER:**  Thank you.

16  Mr. Wilson would you like to close?

17      **DEPUTY DISTRICT ATTORNEY WILSON:**

18  Commissioner I have had an opportunity to review

19  this file on separate occasions.  At the August

20  hearing and at that time I reviewed the file

21  fully including the police reports.  And again

22  prior to today's hearing.  And the reason I

23  bring this up is I really can't make heads or

24  tails out of this case.  Most cases I am not

25  sure how the Commissioners do a case, but you

26  look for a motive or a reason why a crime

27  occurred.  Why the murder occurred.  Because

58

```
 1   once you can figure out what the motive was or
 2   the reason then you can take those next steps
 3   and say has that aspect of that individuals life
 4   been corrected.  Has self-help been given to
 5   that individual so that if released into the
 6   community they no longer pose a significant risk
 7   or an unreasonable risk to the community at
 8   large?  And I think that is where we are at, at
 9   this point.  The burden this board has is does
10   this inmate pose a unreasonable risk of harm to
11   this community at large.  And it is the District
12   Attorney position that this inmate still does
13   pose a very real and significant unreasonable
14   risk to the community.  I will start off first
15   with just the crime itself.  The inmate didn't
16   talk about the crime today, and I am somewhat
17   troubled why the version that has been presented
18   in the prisons version to the board.  And sense
19   that it doesn't match and it is not credible, if
20   I could just segway for a second, Commissioner
21   Weaver brought up the point about drinking.
22   Through a prior psychological report and the
23   reason I think that is important is, it is how
24   this inmate has through time minimized or
25   softened the reality of what has occurred.  The
26   inmate indicated that yah it was after his
27   motorcycle accident that he was drinking beer,
```

59

1   on further questioning, but it was like yah on

2   the couch, on weekends, after work, if you look

3   at the 2005 psychological report by Doctor

4   Talbott under substance abuse he says, inmate

5   Rush said he used alcohol at 18 drinking

6   socially at some parties in college.  Again he

7   is not talking about drinking on weekends, after

8   work, drinking of the couch if he is bored, I

9   only bring it up because credibility is an issue

10  here.  Because if we cant believe the inmate at

11  this time, what he is saying, then we cant

12  believe him in the future, what he would do out

13  in the community.  And that is going through the

14  crime itself.  The flavor of how this inmate

15  relays a crime is one of self-defense.  In

16  essence this was a very cold, calculated and

17  brutal crime, which complete disregard for an

18  individuals life.  And this person the one we

19  are talking about John Heinz.  John Heinz was a

20  roommate along with several other individuals

21  who lived in this house up by Cal State.  At

22  some point it is agreed upon there was some kind

23  of disagreement between John Heinz and the

24  inmate.  But I think what this board needs to

25  pay particular attention to as this disagreement

26  was going on the other roommates were present.

27  But for some reason this inmate felt threatened

60

1  by Mr. Heinz.  He went to his bedroom and under
2  his bed he had a 22 rifle.  The inmate claims he
3  had that rifle, was familiar with that rifle
4  because he involved himself in target practice.
5  I think what the logical conclusion is that the
6  inmate is familiar with that weapon.  Somehow we
7  go from the loaded weapon being loaded, the
8  inmate stepping out of the safety of his
9  bedroom, confronting the victim.  The evidence
10  that is thought the file is the victim was
11  confronted after he was lying in his bed in his
12  bedroom.  But taking the prisoners version I
13  might just refer to one part here it says Rush
14  was carrying a rifle and cocked it and told the
15  victim quote back off.  Heinz then lunged
16  towards him and Rush flinched and the gun went
17  off.  I will tell you why that is not credible.
18  Because the gun went off at least nine times.
19  Ok, this is not mere self-defense, as this
20  inmate is trying to portray here.  He flinched
21  and the gun went off, well that is no insight
22  into what happened in this case.  This inmate
23  unloaded a ten round clip or nine rounds emptied
24  his weapon, why nine shots.  And the autopsy was
25  (indiscernible) on John Heinz, the wounds
26  weren't to the leg or to the arm, they were to
27  the vital organs of the body.  To the liver, to

61

 1    the heart, and to the head.  If this inmate was
 2    truly going out there just to scare off or
 3    frighten John Heinz, there would have been
 4    different actions.  And the reason I bring this
 5    up is it hasn't been explained.  There is no
 6    insight as to what happened.  And until this
 7    board understands or believes this inmate has
 8    insight as to why he acted, why he murdered
 9    John, then he cant be trusted.  Because you are
10    putting him back into the same situation.  And
11    again getting to the callousness of this crime,
12    after the murder, the inmate involved his other
13    roommates to take John out, dump him out into
14    the mountains.  The basically bury him, steal
15    from him they take money from his wallet they
16    take his wallet and bury it in a separate
17    location, they take a ring off of his finger,
18    and they later his crime partner later pawns
19    that ring and at a later date, which shows kind
20    of the lack of remorse, they pawn that ring and
21    split the money together.  After they dump
22    John's body that night, what do they do?  They
23    took Johns car which they transported John in to
24    the dumpsite, they went out to Riverside and
25    then they partied, drank again getting back to
26    drinking, they drank and partied on Johns money.
27    Ok and how that is remorseful shows a complete

1    disregard and again it goes back to what was

2    this individual's motivation.  What was his

3    insight, he hasn't touched upon that at all.

4    There are many elements in this but it is that

5    one.  I think I just want to leave the board

6    with just the coldness and the callousness that

7    leaving this victims family for 30 days to

8    wonder what happened to their son and their

9    brother.  This inmate actively concealed the

10   location, (indiscernible) told his family I

11   don't know where he is.  He took off maybe he is

12   in Mexico.  All the while he knew what had

13   happened.  He knew where John was buried.

14   Counsel asked his client how is he different

15   today than 19 years ago when he committed this

16   murder, I think that is the key question here.

17   Because you need to see a difference you need to

18   feel a level of trust, does this inmate deserve

19   parole can we trust him out there.  Is he a

20   risk.  And the answer is he is not worth that

21   risk.  His answer to am I different and this is

22   how he answered, I know I was immature, I am no

23   longer shortsighted, and I am not an

24   underachiever.  I don't know how that relates to

25   committing murder.  I mean this man 19 years ago

26   he was above average.  He had a good family, he

27   didn't have the normal things we see with the

63

1    life inmates here. He didn't have a narcotics

2    problem, doing drugs, he wasn't a raging drunk,

3    he didn't have social issues, he was from an

4    intact family. He was in school, he was a

5    college student. He is not one of these guys we

6    seen inside here (indiscernible) and say hey get

7    an education. Hey try to better yourself. He

8    has everything going for him. So when he sits

9    here today and says he has a Masters degree now

10   or I am in touch with people, I have a potential

11   job. Out of all of those things he had back 19

12   years ago. So I ask how is he different? He is

13   not different. He is still that average type

14   person, an average type person that committed a

15   murder. And I am looking at the psychological

16   report and excuse me, where the closing line is

17   we believe the inmates potential for violence

18   within the community is no more than that of an

19   average citizen. I don't know how the

20   psychologist comes across this because I would

21   bet the psychologist clinician looked at this

22   inmate 19 years ago when he was an average

23   person, when he was a student, when he had

24   roommates, when he had a job, and a caring

25   family. They would have said the same thing,

26   that he is no more dangerous than the average

27   person in the community. But Commissioner he is

64

1   not the average person in the community because

2   he is a cold blooded murderer and he cannot be

3   trusted to be put back into the community.  And

4   based upon that I believe a multi year denial is

5   appropriate at this time.

6      PRESIDING COMMISSIONER SAWYER:   Thank you.

7   Mr. Defilippis?

8      ATTORNEY DEFILIPPIS:   Mr. Commissioner I

9   would ask that I be allowed to speak after the

10  victims give their statements.   In order that I

11  can address the issues relevant to the

12  proceedings.

13     PRESIDING COMMISSIONER SAWYER:   I will

14  overrule you one that.   We have a process, and

15  this process is the same and we try to be fair

16  to everyone.

17     DEPUTY DISTRICT ATTORNEY WILSON:   I would

18  (indiscernible) to 343.6 which gives the next of

19  kin that last right.

20     ATTORNEY DEFILIPPIS:   I would object to the

21  statements of counsel, because counsel is

22  specifically precluding by law from giving legal

23  advice to the board.

24     PRESIDING COMMISSIONER SAWYER:   Yes I

25  understand that.   I will sustain that objection.

26     ATTORNEY DEFILIPPIS:   And I understand the

27  board's protocol but what I am urging is that we

65

```
1   don't go with that protocol, I have always
2   objected that protocol.  I don't think it is an
3   appropriate one considering that purpose of
4   presentation of counsel is to address all the
5   issues and not knowing what the next of kin are
6   going to say I don't have the ability to do that
7   in the proceeding.  Well it appears that counsel
8   has taken issue with not just the last
9   psychological report but also the report of
10  Doctor Bakeman which is a favorable report.  He
11  has taken issue with the report of Doctor Kit in
12  1993 also a favorable report.  Second report of
13  Doctor Bakeman in 1996 the report of Doctor
14  Terini in 1999 as well as the report of Doctor
15  Talbott in 2005.  So we have had a total of five
16  reports that have been prepared on this inmate.
17  He has been evaluated from every psychological
18  standpoint that he can be evaluated.  The issue
19  of does he understands the causes of the
20  commitment offense does he have insight into
21  that commitment offense, which has been
22  addressed over and over by the psychologists.
23  Each and every one of them have stated that he
24  has excellent insight into the commitment
25  offense that he has a full understanding of the
26  causative factors, and this goes back to the
27  inception where he talked about how he is doing
```

66

1    things to better himself.  How he is making

2    gains during his incarceration and he should be

3    able to maintain these gains.  This is back in

4    1990.  His insight and judgment are good.  He

5    has obviously thought about this crime a great

6    deal and was fairly candid about the fear and

7    confusion that he felt at the time.  Going on to

8    1993 he's already being considered to having a

9    violence potential of less than the inmate

10   population that he is put in with.  Now as of

11   1993 if he had been put into the institution

12   with his normal point score the way that it was

13   he would have gone into a level four

14   institution.  He instead was at a level three

15   institution then down to a level two institution

16   by 1993.  So he is being compared at that point

17   with the least, the least dangerous of

18   individuals that are in prison and he is showing

19   favorably as to them as of 12 to 15 years ago.

20   There are no psychological issues that are found

21   and I understand what Mr. Weaver was saying

22   earlier about the depression.  And this is an

23   issue that often has gotten into because of the

24   fact that people throw around the word

25   depression and that report is not written by a

26   psychologist.  It is written by a correctional

27   specialist.  And they are using the term

67

1   depression in there to talk about a situational

2   type of feeling blue of feeling down of having

3   difficulty dealing with the loss of a friend

4   that sort of thing.  That is different from a

5   DSM IV diagnosis of clinical depression that has

6   a certain number of criteria that has to be met.

7   And it doesn't sound like from anything I have

8   read anywhere that Mr. Rush ever had what would

9   be deemed a diagnosis of clinical depression.

10  And that is clear as of 1990 when he sees Doctor

11  Bakeman there is no diagnosis of depression made

12  at that time, 1993 no diagnosis made, 1996 no

13  diagnosis, 1999 no diagnosis, and in 2005 no

14  diagnosis.  So it appears that, that was a

15  situational incident that was involving the time

16  frame following the motorcycle accident.  The

17  reports that I provided, the reason I provided

18  that is that it gives and excellent scenario of

19  background and helps to understand the factors

20  that lead to the life crime.  The scenario that

21  needs to be understood and there is some fairly

22  significant documentation that I provided to the

23  board as well.  That includes a lot of

24  transcripts of you will see some transcripts and

25  things you have of prior hearings.  The

26  preliminary hearings of the trial.  All of that

27  material was provided for fairly specific

68

1    reasons.  There is discussion about you know how

2    the crime occurred.  Counsel said that Mr. Heinz

3    was lying down in the bedroom when it happened.

4    The is not the way it happened.  You have the

5    coroner testimony in there that talks about the

6    fact that Mr. Heinz had to be up and moving

7    around to have the shots occur in the pattern

8    that they happened.  So it was not a situation

9    where he we was lying down at the time.  The

10   background of this is you have a young man who

11   gets in a very serious motorcycle accident and

12   he also had a car accident I think it was a year

13   or two earlier.  Where he was very seriously

14   injured.  And his buddy in that was also very

15   seriously injured.  And then both of them

16   recovered.  And then he ahs the motorcycle

17   accident where he was on the back of a

18   motorcycle with his friend and then roommate at

19   the time.  They get hit by a truck he is very

20   seriously injured and his roommate is actually

21   killed.  So he goes through a very long period

22   of depression as a result of that, it is also

23   the first time in his life that he has

24   essentially had his physical abilities

25   significantly impaired.  He has always been a

26   physically active youngster always had the

27   physical abilities and suddenly that is taken

69

1  away from him.  He is, he is in the hospital I

2  think for about 30 plus days, he goes home he is

3  essentially in home nursing care for up to two

4  months.  He finally goes back to school and goes

5  back to his roommates but what he does at that

6  time he takes off, he bites off a little more

7  than he can chew.  He is going back to school he

8  is still physically hurting, he is depressed, he

9  is having to work because his financial

10  situation is such that he needs the money so he

11  is working a lot of hours trying to make enough

12  money to support himself, he has now taken on

13  the responsibility of the house, where he has to

14  do work around the house.  Where he has to take

15  care of things and he is not always able to do

16  that.  And so altercations start to develop

17  between the new roommate which has come in,

18  which is John Heinz.  And apparently Mr. Heinz

19  gets upset with him on a number of occasions

20  over what he perceives as Mr. Rush being quote

21  on quote lazy.  Because he is not doing enough

22  work around the place.  There is apparently a

23  long history that is documented in the records

24  of Mr. Heinz badgering Mr. Rush over that time

25  frame.  There is a physical size discrepancy

26  between the two.  About a 185 pounds is what has

27  been documented in the file previously on Mr.

1   Heinz.  150 pounds Mr. Rush.  I believe 6'1 for
2   Mr. Heinz and 5'8 or 5'9 for Mr. Rush.
3   Significant size discrepancy that exists there.
4   On the day in question there apparently was some
5   information from one of the other roommates
6   telling Mr. Rush that his dog has been attacked,
7   by Mr. Heinz dog, and that Mr. Heinz had
8   actually sicked the dog on Mr. Rush dog.  There
9   was problems with other items around the house
10  that created an argument.  And at what happened
11  with that argument was that it started off with
12  Mr. Heinz pushing Mr. Rush to the floor.  Now at
13  that point Mr. Rush was having severe back
14  problems as a result of the accident he had,
15  had, he is in a depressed condition he is not
16  physically up to the task to begin with.  If he
17  was facing somebody his own size.  But now he is
18  facing somebody who has him by 35 or 40 pounds
19  and he is getting pushed around.  He gets pushed
20  around several times he gets grabbed on one
21  occasion and essentially rammed into a wall.
22  Significant enough that it breaks the plaster in
23  the wall.  That is documented in the file that
24  the other roommates saw that indentation in the
25  wall.  He gets hit a number of times in the face
26  he ends up with a bloody nose and a bloody lip.
27  And then Mr. Heinz lets him go and he goes back

1   into his room.  And he retreats into his room.

2   Now during the next period of time, there is

3   some taunting that goes on where Mr. Heinz is

4   essentially taunting him and chastising him and

5   telling him if this happens anymore you are

6   going to get more of this.  And this goes on for

7   a period of time.  Mr. Rush then picks up the

8   gun because he is going to the bathroom to wash

9   up.  And this is where he makes the stupid

10  decision.  The counsel talks about this as self-

11  defense.  You wont hear self-defense come out of

12  my mouth you are not going to hear it come out

13  of Mr. Rush's mouth.  We are not talking about

14  self-defense he was convicted of second-degree

15  murder.  What we are talking about here is

16  putting the crime in its true perspective.  Not

17  putting the crime into a perspective counsel

18  intends to utilize of trying to mischaracterize

19  it as something more than what occurred.  Mr.

20  Rush was acquitted of first-degree murder, he

21  wasn't convicted of first-degree murder.  He was

22  convicted of second-degree murder.  And the

23  circumstances of that were that he took the gun

24  with him, the absolutely most foolish decision

25  he could make, to arm himself.  Thinking it will

26  just scare this guy and he will back down.  But

27  what his statement is that it didn't scare and

1  it didn't back him down.  And that is when Mr.

2  Heinz came at him and he flinched and fired the

3  first shot.  He didn't fire nine shots or ten

4  shots with that one flinch.  No he continued to

5  shoot after that.  Because what he had done and

6  it talks about that in the report he essentially

7  backed himself into a corner.  He had taken a

8  gun and when you use a gun like that you put

9  yourself in a situation where if an incident

10  like this happens what do you do.  Now you have

11  created the killer be killed situation. And it

12  is his fault, because he created that situation

13  by taking the gun into the bathroom with him

14  like that.  And he is responsible for the

15  resulting actions of what happened.  And he has

16  never since after this happened he certainly

17  took the steps to cover up the crime, there is

18  no question about that.  And he has, since he

19  ahs been arrested for this he has admitted that

20  he took those steps to cover it up.  He hasn't

21  attempted to blame Mr. Hoy even though if you

22  look factually at what happened and including

23  all the testimony at the trial, Mr. Hoy was the

24  one who actually suggested the disposal of Mr.

25  Heinz's body.  But Mr. Rush has always taken

26  responsibility for that and said this was my

27  crime I was responsible for what we did.  If you

```
 1   look at the circumstance of what he has done
 2   since then you see, what you see is a very
 3   dramatic turn around.  And I like counsels
 4   approach of saying basically well he had a good
 5   background and so because he had a good
 6   background that I am not sure exactly what he
 7   said but it somehow changes the crime in his
 8   mind.  And it makes it much worse and he is not
 9   like one of these guys that you normally see in
10   here that have a drug problem or come from a
11   disadvantaged background.  None of that matters
12   the situation happened as it did because of the
13   circumstances that surrounded it that lead up to
14   the occurrence of the fight and the altercation.
15   If you look just character logically at the
16   participants in this, the testimony at the trial
17   of Galloway, was that Galloway was the roommate
18   that brought forth this crime to the police.
19   The testimony of Galloway was on one or more
20   occasions he actually had to pull Heinz off of
21   another individual in a fight.  That it was
22   fairly common for Heinz to be in fights.  His
23   testimony about Rob Rush was that Mr. Rush is I
24   think he described him as the mellowest person
25   he has ever known.  Though clearly there was
26   something that happened in that situation as a
27   result of all the different circumstances that
```

74

1   occurred, that led to a break and caused him to

2   commit the crime.  That he did and I don't think

3   you will find anyone that is sorrier for what he

4   did than Rob Rush.  And his actions put him

5   here, his actions have caused him to be

6   incarcerated and he is the first one to admit

7   that.  But when you talk about what he has done

8   since then he has spent his entire time trying

9   to better himself and others.  And what more can

10  be done in an institutional setting than what

11  has been done over the last 19 years.  This man

12  has come to prison he has shown himself to be

13  the least dangerous of people that are in here.

14  He has been given overrides of going from level

15  four to level three.  He was given an override

16  from three to two and has constantly stayed in

17  the level two for the last 12 years.  I cant

18  imagine being in prison and not at least facing

19  some type of potential for confrontation on I

20  will be conservative how about a weekly basis.

21  You know we don't see it in our normal life out

22  in the street.  We don't have the type of

23  confrontation that you have inside the prison

24  walls.  But on a literally daily basis but at

25  least a weekly basis you are going to be faced

26  with confrontational types of situations.  And

27  this man has been able to spend the last 19

```
 1   years in prison without any problems whatsoever.
 2   I will take the guy working for me that picks up
 3   a 128 for showing up for work early.  That you
 4   know yah he was considered to be technically out
 5   of bounds for what he did, but what he was doing
 6   was he was showing enthusiasm for what he was
 7   trying to do.  The work he was doing in the
 8   educational program.  Everything he has done
 9   since he has been in prison has shown that this
10   man I doing what he can to rehabilitate himself.
11   That's the goal of this process.  That is what
12   an indeterminate sentence for is to look and see
13   have you achieved rehabilitation.  If you look
14   at 2402a and you look at the standard that is
15   stated in there, it is does he present an
16   unreasonable risk of danger to society if
17   released at this time.  You have multiple
18   psychological evaluations you have at least five
19   of them.  That in 1993, 1996, 1999, 2005 all of
20   which say that he presents less danger than the
21   average individual out in the streets.  And you
22   know I hear District Attorney's complain about
23   that characterization all of the time, but what
24   they don't understand or what they apparently
25   have blindfolded themselves to is that an
26   individual who has, that is why murder ahs the
27   least residuum rate of any of the crimes.  When
```

1    lifers are released there situational crimes and

2    they wont commit them again.  And one of the

3    reasons they don't is because unlike a lot of

4    people don't really understand their internal

5    workings and become violent on a particular

6    occasion.  That individual has had that happen

7    to them.  Has seen it has gone through it and

8    has learned from it.  That is what he has taken

9    into his life as a result of the last 19 years.

10   He has learned from the situation that he was

11   involved in, learned how that got out of

12   control, learned how to diffuse that so that it

13   doesn't happen to him again in the future.  And

14   he has been able to do that on a day-to-day

15   basis in a volatile environment.  Where violence

16   is just a standard form of day-to-day business

17   in here.  Yes the crime is serious yes it is a

18   second degree murder, but when you look at this

19   and you say to yourself is this the kind of guy

20   you want to be able to release to the community,

21   this is your potential success story.  The

22   people that get released on term to life crimes

23   these days have been success stories, if you

24   look at the individuals that have gone out in

25   the last few years they are doing great.  They

26   are succeeding out in the streets because so few

27   of them and it is the cream of the crop that is

77

1    getting released.  This is one of those guys.

2    This is one of the guys that top layer guys that

3    aren't going to be a trouble to society, that

4    aren't going to recommit offenses.  This is a

5    man who no longer has any issue of

6    dangerousness, there is nothing in his file that

7    shows that he will continue to be a kind of a

8    danger to society.  So I would urge the board to

9    grant parole at this time.  And I am not going

10   to discuss where he belongs in the matrix it

11   really doesn't matter.  You have a 21-year cap

12   on the matrix for second-degree murder and he

13   has served every one of those terms.  He now has

14   I think approximately 27 years of credits when

15   you give him is 2410 credits and his pre prison

16   credits with his 4019 time.  It comes out to I

17   think it is about 26 actually is where he falls.

18   He is actually into the first-degree murder

19   matrix at this point.  So it really doesn't

20   matter where you set him.  The appropriative

21   thing to do at this time is to give this man a

22   date.  He is suitable for parole you have had

23   that basically told to you since 1999.  Where

24   Doctor Terini says he is a very good candidate

25   for parole consideration and Doctor Talbott

26   reiterates that again saying he is a good

27   candidate for parole.  That is not a common

1   statement that you see among the psychologist.
2   This is man who deserves a parole date thank
3   you.
4         **PRESIDING COMMISSIONER SAWYER:**   Thank you.
5   Mr. Rush can you, would you like to tell us if
6   you feel you are suitable for parole and why?
7         **INMATE RUSH:**   I just would like to say I am
8   not the same person I was 19 years ago.   And
9   that I never believed I was capable of
10   committing an act like this.   And having done so
11   has been a very humiliating, humbling
12   experience.   I am very ashamed of what I have
13   done.   And I am very sorry for what I have did.
14   I am aware that I have irreparably harmed the
15   Heinz family I know there can be nothing worse
16   for a parent than the death of a child.   And I
17   know that their sisters miss their brother, that
18   he was nor just a brother to them but a friend
19   as well.   I also victimized my only family, my
20   mother died not knowing that I would ever get
21   out of prison.   My father ahs to deal with this
22   place to come up and visit me.   I am, I made up
23   my mind early on to do everything I could to
24   make something positive come of this and I have
25   spent my incarceration in the education
26   department.   Trying to use what gifts or
27   abilities I have to help the people around me.

1  To try to in some way make amends for what I

2  have done even though I know there is no way I

3  can ever take it back.  And there is no way I

4  can ever make it better.  I only ask that you

5  look at me for who I am now a forty-year-old man

6  and not a 21 year old kid who overreacted.  And

7  that I think I can still contribute to the

8  community in whatever capacity if I am released

9  and I am just very sorry for everything I have

10  done.  And I can assure you nothing like this

11  will ever happen again.  Thank you.

12      **PRESIDING COMMISSIONER SAWYER:**  Ok, thank

13  you.  The record shows that we have the Heinz

14  family here.  And you have the right to

15  adequately and reasonably express your views

16  concerning the crime and the person responsible.

17  Who will speak first?

18      **ATTORNEY DEFILIPPIS:**  Commissioner just for

19  the record are we going to be limited to two.

20      **PRESIDING COMMISSIONER SAWYER:**  I will take

21  care of it, I will take care of it yah.  We have

22  already pre agreed on it.

23      **ATTORNEY DEFILIPPIS:**  All right thank you.

24      **PRESIDING COMMISSIONER SAWYER:**  Who will

25  speak first?

26      **MS. PERLITE:**  Me.

27      **PRESIDING COMMISSIONER SAWYER:**  Would you

1  identify yourself, first of all move the

2  microphone up close and would you identify

3  yourself.

4     **MS. PERLITE:**  Theresa Perlite John's oldest

5  sister.

6     **PRESIDING COMMISSIONER SAWYER:**  Ok.

7     **MS. PERLITE:**  My parents decided not to

8  speak today so my sister and I are going to.  I

9  usually talk about my three sons that they have

10  grown up without their uncle.  But today I have

11  decided to talk about my parents.  They are

12  wonderful people, and they opened their house to

13  all of John's friends, including you Rob.  My

14  father is a very strong and religious man who I

15  never saw cry until his son was taken away in a

16  vicious murder.  Why my brother was missing no

17  one knew where he was except for you Rob.  My

18  father would follow city busses thinking he

19  spotted a blond headed boy on the bus thinking

20  it was my brother.  But after everyone got off

21  my dad returned home once again broken hearted.

22  After the police found my dead brothers body in

23  a shallow grave, were animals deserve a better

24  grave than that, my dad found out this location

25  and of the grave and on a bright beautiful day

26  my dad blessed the shallow grave.  In the

27  mountains with holy water.  Sorry, my mother how

81

1  can you loose a child and survive, you have no
2  idea how strong my mother is. When John was
3  missing I would go over and spend the night with
4  them and I would wake up in the middle of the
5  night only to hear my mother sobbing and my
6  father trying to console her. There was times
7  my mother couldn't eat or drink or talk because
8  of her grief. My mother now wears a gold
9  bracelet on her left wrist where she has not
10  taken it off since my brother's death. You not
11  only murdered my brother you buried him in the
12  hot desert and then went and partied with his
13  money on beer. It is amazing how to me any
14  human can do such a sickening crime. I don't
15  care how sorry you are because if you were sorry
16  you would not have buried him and let him lay in
17  a hot desert for six weeks. While we begged you
18  and the roommates to help us find him. We would
19  go to the house where you and John were living
20  we would look around for anything that would
21  help us find him. You looked at us like a deer
22  in the headlights. You acted like you had no
23  clue. You murdered my brother, buried him in
24  the desert, and then let him sit in a plastic
25  bag where he rotted for six weeks. That six
26  weeks of agony, you stole his money, you hocked
27  his jewelry and then you partied. Amazing the

82

1  world has changed a lot since Rob has been in

2  Soledad.  We have cell phones, faxes, internet,

3  blackberries, palms, terrorism, war, gas prices,

4  all the stresses of everyday life we go through.

5  Is Rob ready for that?  Could he handle a

6  argument with, eh couldn't even handle an

7  argument with his roommate.  How is he going to

8  handle and argument with an employer, family,

9  spouse, children will he snap again?  With some

10  other victim a couple of classes here and there

11  can never get you ready for today's living.  I

12  often wonder what my brother felt, if he felt

13  any pain.  If he bleed to death or died

14  instantly.  What were my brother's last thoughts

15  was he asking you to stop shooting at him.  You

16  had an argument if you were afraid of my brother

17  why didn't you call one of the other roommates.

18  My brother went back to his room, Rob you went

19  to your room and got your gun.  And you shot him

20  at least nine times.  My brother had never had a

21  chance, he didn't have a gun he had nothing.

22  You shot my brother, you murdered him, you

23  murdered my brother in cold blood.  Thanks.

24        **PRESIDING COMMISSIONER SAWYER:**  Thank you.

25  Thank you very much move the mike up.  And

26  identify yourself.

27        **MS. CASTANEZA:**  I am Maura Castaneza John's

83

1  sister.  This never gets easier.  That is the
2  amazing thing.  A bloom so early gathered with
3  all of its beauty shown humbly presents himself
4  before gods thrown.  These are the words that my
5  dad carved on John's gravestone.  What a waste
6  he was so young, such a vibrant loving person.
7  Just starting his life.  I still can't
8  comprehend that my little brother is no longer
9  here and was brutally murdered in such a brutal
10 way.  His body disposed in such a way, in no
11 respect for human life or his loved ones.  I
12 only wish I could have been there that day.  I
13 would have protected him he was my little
14 brother.  I think of all the things we missed
15 out on in our lives without John here.  And all
16 the wonderful experiences in life that John
17 never had the opportunity to experience.
18 Completion of his education, to be a policeman,
19 marriage, our huge family reunions, of all the
20 kids, the ultimate gift in life having children.
21 He was amazing with children he never even got
22 to see my precious son Tyler.  He would have
23 been such a great uncle and friend to him.  Just
24 the overall sharing of his fun living and
25 inspiring self with all of his family and
26 friends.  We will never know what else John
27 could have given to this world.  He never had

84

1    the opportunity to acquire a bunch of degrees

2    but one things for sure he never would have had

3    the callous personality to murder someone.  If

4    only John could be here to give the scenario.  I

5    treasure forever the little time we did have

6    with him and our childhood memories.  Rob cannot

7    take that away.

8         **PRESIDING COMMISSIONER SAWYER:**  Hold it

9    please, excuse us.

10        **MS. CASTANEZA:**  I treasure forever the

11   little time we had with him and our childhood

12   memories.  Rob can't take that away.  I still

13   dream about John he just smiles and laughs.  As

14   if to say he is ok.  I miss him so I hope my

15   dreams never stop.  That's it.

16        **PRESIDING COMMISSIONER SAWYER:**  Ok, thank

17   you.  It is five minutes after 4:00 in the

18   afternoon.  And we will recess for

19   deliberations.

20                     **R E C E S S**

21                       --oOo--

22

23

24

25

26

27

85

```
1              CALIFORNIA BOARD OF PAROLE HEARINGS
2                       D E C I S I O N
3         PRESIDING COMMISSIONER SAWYER:    Tapes back
4     on in the Rush matter.    The time is 4:36.    The
5     panel has reviewed all the information received
6     from the public and relied upon the following
7     circumstances in concluding that the prisoner is
8     not suitable for parole and would pose an
9     unreasonable risk of danger to society or threat
10    to public safety if he was released from prison.
11    A summery of the crime is read before sometime
12    before July 1, 1986 at their residence John
13    Heinz the victim and his roommate Robert Rush
14    had an argument and physical altercation over
15    the household responsibilities.    Robert Rush
16    shot John Heinz numerous times well I should say
17    nine times, with a 22 caliber rifle following
18    the murder.    Another roommate Marcus Hoy also
19    the codefendant arrived at the residence.    Rush
20    and Hoy cleaned the house of incriminating
21    evidence placed the victims body in a plastic
22    bags and a sleeping bag.    Rush and Hoy then
23    drove to the Dover canyon area where they buried
24    the victim.    The victim, they buried the
25    victim's wallet and identification in a separate
26    location.    Rush and Hoy later took and left the
27    ROBERT RUSH D-73321   DECISION PAGE 1   10/11/2005
```

1  victims truck in Riverside.  Rush and Hoy then

2  used the money, the victim's money to go

3  drinking.  I find this particularly callous and

4  cruel.  The man was, Mr. Rush created this whole

5  mess because he got his gun, he armed himself it

6  was loaded.  He shot him nine times the crime

7  itself was certainly dispassionate and didn't

8  have to happen.  There was an argument people

9  argue all the time.  But it doesn't result in

10 homicide.  We also feel that this offense was

11 carried out in a dispassionate manner knowing

12 what had happened but left the family suffer for

13 a month.  And had not Galloway come forth we

14 don't know what would have transpired in this

15 whether he would have ever been found or whether

16 there would have been a commitment offense.  We

17 find it also very dispassionate the fact that

18 the, they went out and partied with the victims

19 money.  With Mr. Heinz's money.  The motive in

20 this crime an argument.  That just doesn't cut

21 it.  It certainly was a callous disregard for

22 human suffering.  Rush does not have a previous

23 record.  And whether as an adult or juvenile.

24 He is also done very well since he has been in

25 custody.  He is at the lowest classification

26 level, has been a clerk in the bridging program

27 **ROBERT RUSH D-73321  DECISION PAGE 2  10/11/2005**

1  an important program.  He is now a library

2  clerk, with exceptional reports from the

3  Bridging program.  He has done his mechanical

4  drafting, his architectural drawing, he got

5  certified.  He has been certified in those.  He

6  has been done very well educationally.  1989

7  received, some units, is that your AA from

8  Hartnell?

9       **INMATE RUSH:**  Yes.

10      **PRESIDING COMMISSIONER SAWYER:**  His AA in

11 Hartnell, San Jose state he received his BA and

12 then his masters in humanity in 1997 from

13 Dominguez hills.  He has been in AA for 12 years

14 knew step four when Commissioner Weaver asked

15 him that question.  He knew it well.  He has

16 been in the family effectiveness program since

17 his last hearing.  Anger management, fatherhood,

18 health program the HIV or Hep C health programs.

19 CTF video program inside for inmates to do video

20 work and in impact.  He is clearly behaved since

21 he has been in custody.  His disciplinary

22 history is no 115's and you are to be

23 congratulated for that sir.

24      **INMATE RUSH:**  Thank you.

25      **PRESIDING COMMISSIONER SAWYER:**  128's one

26 in 1988.  And I agree with counsel that for

27 **ROBERT RUSH D-73321  DECISION PAGE 3  10/11/2005**

1  getting to work early.  I don't understand it

2  but he was technically out of bounds.

3  Psychological factors they are good, by Doctor

4  the latest by Doctor R. Talbott.  And he did an

5  update in August 28, 2005.  After Doctor

6  Terini's 1999 psychiatric report.  And they

7  indicate that he is no more dangerous in the

8  community.  His parole plans with his father to

9  go live with his father and back in San

10  Bernadino County.  Richard Rush, he has gotten a

11  Lake Arrowhead job in construction job from the

12  Mellinger family.  That would probably be just a

13  kind of laborer or minimum wage type of job.  He

14  has indicated that he would do that just to get

15  him on his feet but what he really wants is this

16  cartographer job with a civil engineering firm.

17  And he had a letter to the effect that they

18  would do what they could, although it is a small

19  firm.  It might take some time it certainly is a

20  marketable skill.  And certainly acceptable

21  employment plan.  His opposition from Mr.

22  Heinz's family was represented here today.  As

23  well as opposition from the San Bernadino

24  District Attorney office, Deputy District

25  Attorney Wilson represented the office.  And I

26  want to tell you, you are doing a great job

27  **ROBERT RUSH D-73321  DECISION PAGE 4  10/11/2005**

1  since you have been in custody for the last 19

2  years. You have certainly proved yourself but

3  you victimize an awful lot of people in this

4  crime. The crime was horrific. Like I said

5  before you know this man was shot nine times

6  over an argument about dog food or domestic

7  problems that roommates have with each other.

8  And if he is beating you up there is pick up the

9  phone and call the cops. I mean there was other

10  remedies to this other than you getting a loaded

11  22-caliber riffle and shooting him. You were

12  convicted of second-degree murder sir. But I

13  want to complement you again on what you have

14  done here. And being a good, from the sounds of

15  it you are even a good role model why you are

16  here in custody.

17      **INMATE RUSH:** Thank you.

18      **PRESIDING COMMISSIONER SAWYER:** What would

19  be, I don't know what you would be like on the

20  outside but at this time we are going to deny

21  your parole for two years. Do you have anything

22  you would like to say Commissioner?

23      **DEPUTY COMMISSIONER WEAVER:** No I think you

24  have covered it quite well.

25      **PRESIDING COMMISSIONER SAWYER:** Ok, good

26  luck to you sir. This concludes the hearing and

27  **ROBERT RUSH D-73321  DECISION PAGE 5  10/11/2005**

90

1  the time is 4:44.

2      **INMATE RUSH:**  Thank you.

3      **PRESIDING COMMISSIONER SAWYER:**  Thank you.

4                    --oOo--

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23  **PAROLE DENIED TWO YEARS:**

24  **THIS DECISION WILL BE FINAL ON:Feb. 8, 2006**

25  **YOU WILL BE PROMPLTY NOTIFIED IF, PRIOR TO THAT**

26  **DATE, THE DECISION IS MODIFIED**

27  **ROBERT RUSH D-73321  DECISION PAGE 6  10/11/2005**

91

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, JENNYFER OSECHECK, a duly designated transcriber, PETERS SHORTHAND REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 -90, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING OF ROBERT RUSH, CDC NO. D-73321, ON OCTOBER 11, 2005, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape to the best of my ability.

I hereby certify that I am a disinterested party in the above-mentioned matter and have no interest in the outcome of the hearing.

Dated  October 31, 2005, at Sacramento, California.


JENNYFER OSECHECK
TRANSCRIBER
**PETERS SHORTHAND REPORTING**