# EXHIBIT 6
# part 1 of 2

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

# IN AND FOR THE COUNTY OF SAN BERNARDINO

SWHSS 9037

In re

ROBERT DALTON RUSH,

         Petitioner,

   On Habeas Corpus.

BOARD OF PAROLE HEARINGS,
ARNOLD SCHWARZENEGGER,
Governor,

    Real Parties In Interest.

CASE NO.

[Commitment Offense
San Bernardino Co. Sup.
Court No. SCR 44594]

REIMBURSABLE

F I L E D
SUPERIOR COURT
COUNTY OF SAN BERNARDINO
SAN BERNARDINO DISTRICT

NOV 0 3 2006

BY _____ DEPUTY

# PETITION FOR WRIT OF
# HABEAS CORPUS

STEVE M. DEFILIPPIS, Esq.
State Bar No. 117292
TRACI S. MASON, Esq.
State Bar No. 237663
PICONE & DEFILIPPIS
625 N. First Street
San Jose, California 95112
(408) 292-0441

Attorneys for Petitioner,
ROBERT DALTON RUSH

TABLE OF CONTENTS...................................................................................i

TABE OF AUTHORITES..............................................................................iii

PETITION...................................................................................................1

INTRODUCTION.........................................................................................1

STATEMENT OF FACTS.............................................................................5

REQUEST FOR EVIDENTIARY HEARING....................................................17

PRAYER....................................................................................................18

VERIFICATION...........................................................................................19

MEMORANDUM OF POINTS & AUTHORITIES ...........................................20

STATEMENT OF FACTS.............................................................................20

A. The Circumstances of the Offense............................................................21

B. Institutional Recognition For Accomplishments..........................................21

C. Social History.........................................................................................21

D. Advances During Incarceration................................................................21

   (1) Education............................................................................................22

   (2) Work/Vocation...................................................................................22

   (3) Self-Help Programs ............................................................................23

   (4) Disciplinary Record.............................................................................23


E. Parole Consideration History....................................................................24

       (a) 1996 Initial Through 2003 Parole Consideration Hearings [4 Hearings].............24

       (b) Fourth Subsequent Parole Consideration Hearing, October 11, 2005................24


LEGAL ARGUMENT....................................................................................26

       I.      THE BOARD'S APPLICATION OF THE RULING IN DANNENBERG
               IS CONTRARY TO CLEARLY ESTABLISHED SUPREME COURT
               LAW, AS IT RELIES ON REGULATORY LANGUAGE THAT IS
               UNCONSTITIONALLY VAGUE. .........................................27

       II.     STANDARD OF REVIEW...................................................34

i

III.    THE FAILURE OF THE PROSECUTION TO REQUEST THAT THE TRIAL COURT MAKE SPECIAL FINDING REGARDING THE ASPECTS OF THE CRIME PRECLUDES THOSE FINDINGS FROM NOW BEING USED TO JUSTIFY DEPARTING FROM THE "SHALL NORMALLY" FORMULATION OF PENAL CODE §3041.............41

V.    BY REPEATEDLY RELYING ON THE COMMITMENT OFFENSE IN THE FACE OF CLEAR EVIDENCE OF REHABILITATION, THE BOARD IS VIOLATING PETITIONER'S RIGHT TO DUE PROCESS OF LAW.................................................................................44

1. Martin v. Marshall ....................................................................46

2. Rosenkrantz v. Marshall..........................................................46

3. Scott II....................................................................................50

4. Irons v. Warden......................................................................52

IV.    THERE IS NO EVIDENCE TO SUPPORT A DENIAL UNDER § 3041............................................54

    A. The Commitment Offense.............................54

B. THE EVIDENCE FAILS TO SUPPORT ANY OF THE REMAINING UNSUITABILITY FACTORS................................59

C. PETITIONER IS SUITABLE FOR PAROLE UNDER EACH AND EVERY ONE OF THE REGULATORY FACTORS IN CAL. CODE REGS. TIT. 15 §2402(D).......................61

VI.    THE BOARD OF PRISON TERMS HAS IMPLEMENTED AN UNLAWFUL POLICY AND PRACTICE OF DENYING PAROLE TO VIRTUALLY ALL INDETERMINATE-TERM PRISONERS.............62

VII.    REQUEST FOR EVIDENTIARY HEARING......................................67

1

2  FEDERAL CASES

3  Apprendi v. New Jersey (2000) 530 U.S. 466 — 41, 60
   Biggs v. Terhune (9th Cir. 2003) 334 F.3d 901 — 27, 29
4  Blakely v. Washington (2004) 542 U.S. 296 — 41, 42, 60
   Board of Pardons v. Allen (1987) 482 U.S. 369 — 36
5  Brown v. Poole (9th Cir. 2003) 337 F.3d 1155 — 44
   Chrysler Corp. v. U.S. Environmental Protection Agency.(9th Cir. 1980) 631 F.2d 865 — 38
6  Evitts v. Lucey (1985) 469 U.S. 387 — 37
7  Godfrey v. State of Georgia (1980) 446 U.S. 420 — 33, 34
   Greenholtz v Nebraska Penal Inmates (1979) 442 U.S. 1 — 36
8  Griffin v. Illinois (1956) 351 U.S. 12 — 37
   Harris v. United States (2002) 536 U.S. 545 — 40
9  Irons v. Warden (E. Dist. Cal. 2005) 358 F.Supp.2d 936 — passim
   Johnson v. Finn (E. Dist. Cal. 2006) 2006 WL 195159 — 49, 50
10 Jones v. Smith (9th Cir. 2001) 231 F.3d 1227 — 41
11 Little v. Hadden (1980) 504 F. Supp. 558, 562 — 59
   Martin v. Marshall (N.D.Cal. 2006) 431 F.Supp.2d 1038 — passim
12 Maynard v. Cartwright (1988) 486 U.S. 356, 361-364 — 33
   McQuillion v. Duncan [McQuillion I] (2002) 306 F. 3d 896 — passim
13 Roper v. Simmons (2005) 543 U.S. 551 — 3, 4, 50
14 Rosenkrantz v. Marshall [Rosenkrantz VI] (C.D.Cal. 2006) 444 F.Supp.2d 1063 — passim
   Sass v. California Bd. of Prison Terms (9th Cir. 2006) 461 F.3d 1123 — 36
15 Schwartzmiller v. Gardner (9th Cir. 1984) 752 F.2d 1341 — 29
   Shell v. Mississippi (1990) 498 U.S. 1 — 33
16 Stirone v. United States (1960) 361 U.S. 212 — 41
   Superintendent v. Hill (1985) 472 U.S. 445 — passim
17 United States v. Doremus (9th Cir. 1989) 888 F.2d 630 — 29
18 United States v. Watts (1997) 519 U.S. 148 — 40

19 STATE CASES

20 Copper Mining Co. v. Industrial Acc. Com. (1920) 183 Cal. 714 — 36
   Ettinger v. Board of Medical Quality Assurance (1982) 135 Cal.App. 3d 853 — 35
21 Gardern v. Commission of Professional Competence (1985) 164 Cal.App.3d 1035 — 36
   Ghirardo v. Antonioli (1994) 8 Cal.4th 791, 800 — 44
22 In re Dannenberg (2005) 34 Cal.4th 1061 — passim
   In re DeLuna (2005) 126 Cal.App.4th 585 — 59
23 In re Ernest Smith (2003) 114 Cal.App.4th 343 — passim
24 In re Hogan (1986) 187 Cal. App. 3d 819 — 43
   In re Lowe (2005) 130 Cal.App.4th 1045 — 59
25 In re Mark Smith (2003) 109 Cal.App.4th 489 — 56, 57
   In re Minnis (1972) 7 Cal.3d 639 — 61
26 In re Powell (1988) 45 Cal.3d 894 — 38, 39
   In re Ramirez (2001) 94 Cal. App. 4th 549 — passim
27 In re Roberts (2005) 36 Cal.4th 575 — 40, 42, 43
28 In re Rosenkrantz [Rosenkrantz II] (2000) 80 Cal.App.4th 409 — 35

In re Rosenkrantz [Rosenkrantz IV] (2002) 95 Cal.App.4th 616                2
In re Scott [Scott I] (2004) 119 Cal.App.4th 871                      passim
In re Scott [Scott II] (2005) 133 Cal.App.4th 573                     passim
In re Sena (2001) 94 Cal.App.4th 836                            40, 41, 42
In re Sturm (1979) 11 Cal.3d 258                                    61
In re Van Houten (2004) 116 Cal.App.4th 339                          29
People v. Black (2005) 35 Cal.4th 1238                               43
People v. Lewis (1971) 19 Cal.App.3d 1019                            40
People v. Nelson (1978) 85 Cal.App.3d 99, 101                        40
People v. Rosenkrantz [Rosenkrantz I], 198 Cal.App.3d 1187            2
People v. Samuel (1981) 29 C.3d 489                                  40
Superior Court of Santa Clara County v. Engert (1982) 31 Cal.3d 797   33, 34

STATE STATUTES

Cal. Evid. Code §115                                              39, 40
Cal. Evid. Code §605                                              36, 37
Cal. Pen. Code §1369                                                 40
Cal. Pen. Code §3000                                                 54
Cal. Pen. Code §3041                                             passim
Cal. Pen. Code §3041(a)                                        30, 37, 44
Cal. Pen. Code §3041(b)                                              42
Cal. Pen. Code §3041.5                                            38, 43
Cal. Pen. Code §3041.5(b)(2)                                         36
Cal. Pen. Code §5075                                                 66

STATE RULES

Code of Civil Procedure §446                                     19, 21, 22

STATE REGULATIONS

Cal. Code Regs. tit. 15 §2402(c)(1)                                  57
Cal. Code Regs. tit. 15 §2403(c)                                     59

1  STEVE M. DEFILIPPIS, Esq.
2  State Bar No. 117292
   PICONE & DEFILIPPIS
3  625 N. First Street
   San Jose, CA 95112
4  (408) 292-0441

5

6  Attorneys for Petitioner,
   ROBERT DALTON RUSH

7

8

9          *SUPERIOR COURT OF THE STATE OF CALIFORNIA*

10         *IN AND FOR THE COUNTY OF SAN BERNARDINO*

11

12  In re                              CASE NO.

13  ROBERT DALTON RUSH,                [Commitment Offense-San Bernardino
                                       Co. Sup. Court No. SCR 44594]
14

15          Petitioner,                ***PETITION FOR WRIT OF***
                                       ***HABEAS CORPUS***
16          On Habeas Corpus.
                                    /
17  BOARD OF PAROLE HEARINGS,
    ARNOLD SCHWARZENEGGER,
18  Governor,

19          Real Parties In Interest.
20                                  /

21  **INTRODUCTION**

22          Petitioner, Robert Dalton Rush, a state prisoner inmate, has previously petitioned this

23  Honorable Court for a Writ of Habeas Corpus challenging the denial of parole at his 2003 parole

24  consideration hearing, and that petition was denied on April 4, 2005. At that point, he had been

    denied parole four (4) times, been incarcerated for sixteen (16) years, and was six (6) years beyond
25  his minimum eligible parole date.

26          Since the most recent filing, Petitioner had one (1) more subsequent parole consideration

27  hearing on October 11, 2005.  Originally, this hearing was scheduled for August 12, 2005.

28  Although all the necessary parties were present, the hearing could not take place because one of the

                                       1

board members wanted to "catch a plane flight" out of town. Instead of a hearing, two (2) of the victim's family members gave statements on the record, but nothing else of substance occurred. Two months later, on October 11, 2005, Mr. Rush's fifth actual hearing took place.[1] Once again, at this hearing, Mr. Rush was denied parole based solely upon the immutable factors surrounding the commitment offense. At this point, the parole consideration process has become a sham for Mr. Rush, who has worked extraordinarily hard to turn his life around in unprecedented fashion, yet his unparalleled accomplishments are being repeatedly ignored and parole denied based on the unchangeable facts of his crime.[2]

Furthermore, new cases have come down in both the state courts and in the federal system that expands on the concept that repeated parole denials violated federal due process. (See *Rosenkrantz v. Marshall*[3] [hereinafter "*Rosenkrantz VI*"] (C.D.Cal. 2006) 444 F.Supp.2d 1063; *Martin v. Marshall* (N.D.Cal. 2006) 431 F.Supp.2d 1038; In re Scott [Scott II] (2005) 133 Cal. App. 4th 573.) Additionally, despite the California Supreme Court's analysis in the case of *In re Rosenkrantz* [hereinafter "*Rosenkrantz V*"] (2002) 29 Cal.4th 616 of the proof submitted by that petitioner, two federal courts have now found, based on additional proof, that the Executive Branch in fact does have an institutional bias and an unlawful blanket policy against parole for inmates convicted of life term offenses. (See Exh. FFF[4], *Coleman v. Board of Prison Terms*[5], Eastern Dist. CA, Case No. CIV S-96-0783 LKK, May 19, 2005; Exh. GGG, *Martin v. Marshall* (N.D.Cal. 2006) 431 F.Supp.2d 1038; There are two "*Scott*" decisions. The first was the reversal of the

---

[1] The second subsequent (3rd actual) hearing was originally heard on August 19, 2002. However, because of a claim that two (2) separate and independent tapes malfunctioned and could not be transcribed the hearing was reheard on March 5, 2003. Thus, the most recent hearing was actually the fifth time Mr. Rush's parole eligibility was brought before the Board.

[2] Although the Board did not explicitly state sole reliance was on the commitment offense, it did not give any justification, other than the facts of the offense, for denying parole.

[3] The *Rosenkrantz* petitioner has been involved in six (6) decisions. *People v. Rosenkrantz* [*Rosenkrantz I*], 198 Cal.App.3d 1187, *In re Rosenkrantz* [*Rosenkrantz II*] (2000) 80 Cal.App.4th 409, *Davis v. Superior Court* (*Rosenkrantz*) [*Rosenkrantz III*], (Feb. 22, 2001, B146421) [non pub. opn.], *In re Rosenkrantz* [*Rosenkrantz IV*] (2002) 95 Cal.App.4th 358, *In re Rosenkrantz* [*Rosenkrantz V*] (2002) 29 Cal.4th 616, and the recent federal district court decision in *Rosenkrantz v. Marshall* [*Rosenkrantz VI*] (C.Dist. Cal. 2006) 444 F.Supp.2d 1063.

[4] Petitioner has filed an Appendix concurrently herewith containing all of the relevant materials from the 2005 hearing, and the materials necessary to address the claims in this petition. However, previous Appendices were filed in connection with the prior proceeding, and thus, Petitioner will utilize a somewhat different numbering scheme herein. Exhibits "A" through "Z" and "AA" through "AO" were submitted with the previous Petition, filed on September 9, 2004, Petitioner has separately requested judicial notice be taken of said documents. Further exhibits will continue in the same alphabetical sequence, commencing with AAA. References to Exhibits A through Z and AA through AO are to the exhibits to the original petition.

[5] *Coleman* is not cited as precedent, but for its factual showing of the Executive Branch's unlawful policy.

2

Board's denial of parole, *In re Scott [Scott I]* (2004) 119 Cal.App.4th 871. The second was the reversal of the Governor's action taking Scott's parole date granted at the hearing after the decision in *Scott I.   In re Scott [Scott II]*, 133 Cal. App.4th 573 (2005).    They will be differentiated herein by the roman numeral designations I & II.) This petition is to provide this Court with the information regarding Petitioner's most recent [October 11, 2005] hearing for purposes of evaluating Mr. Rush's entitlement to relief, and to address the recent developments regarding the Executive Branch's policies.

Despite having programmed in a perfect manner throughout the last twenty (20) years of incarceration, his having received extensive support for being paroled, and having been confined for nearly nine (9) years past his minimum term, Mr. Rush has now been denied a parole date at each of his five (5) consecutive parole hearings, a result that is directly contrary to the facts of his case, and violates his due process rights in light of his unquestionable rehabilitation. More to the point, Mr. Rush has been incarcerated longer than would be appropriate for any second degree murder.    These denials of parole have put the state in breach of its legal and constitutional obligations.

Additionally, what seems to be repeatedly ignored in this case is the fact that Mr. Rush was only twenty-one (21) years of age at the time of the commitment offense.  Recently, in *Roper v. Simmons* (2005) 543 U.S. 551, the Supreme Court went through a comprehensive analysis of why juveniles who commit crimes should be treated in a much more lenient fashion than adults, with a focus on rehabilitation rather than punishment.  In fact, the court in the recent decision, *Rosenkrantz v. Marshall* [hereafter *"Rosenkrantz VI"*] (C. Dist. Cal. 2006) 444 F. Supp.2d 1063, 1085, applied the concepts from *Roper* to an eighteen (18) year old murder defendant, like Mr. Rush, who had served just under twenty (20) years for his crime.  The court, in *Rosenkrantz VI*, concluded the defendant's age at the time of the offense further diminished the reliability of the facts of the crime as a predictor of his current dangerousness. *Id.* at 1085.  Clearly, these concepts apply to Mr. Rush herein.

The purpose of this Petition is to provide the Court with the additional circumstances occurring at the last subsequent parole hearing, so that those facts may be considered in connection with the accompanying request for judicial notice of the prior proceedings on Petitioner's application for relief herein.  Although this petition challenges a new parole hearing, the October 2005 hearing, many of the issues will be the same as with the 2002 and 2003 hearings, with the

3

primary difference being that Mr. Rush had another two and a half (2 ½) to three (3) years of exemplary programming. In other words, extensive further briefing will not be necessary. The differences raised by this current petition include the following:

1.  At the 2005 hearing, unlike previous hearings, the commissioner stated Mr. Rush has done a "great job" since incarceration and he has "certainly prove[n] [him]self." (Exh. AAA, p. 91.). However, immediately thereafter, the presiding commissioner rationalized their denial by pointing out a lot of people had been victimized (i.e. victim's family), Mr. Rush had remedies other than pulling out a gun, and then he stated to Mr. Rush "you were convicted of second degree murder, sir" (each of these comments concern immutable factors that do not relate to the egregiousness of the offense or Mr. Rush's current dangerousness to the public).

2.  Since Mr. Rush filed his previous petition on September 9, 2004, *Rosenkrantz VI* was decided, applying the Supreme Court's recent decision, *Roper v. Simmons* (2005) 543 U.S. 551, which was also published after the petition was filed. *Ropers* gave a comprehensive analysis of why juveniles who commit crimes should be treated in a much more lenient fashion than adults, with a focus on rehabilitation rather than punishment. (See *Rosenkrantz VI, supra*, 444 F.Supp.2d at p. 1085, citing *Ropers, supra*, 453 U.S. at pp. 561-562.) Although the defendant in *Rosenkrantz VI* was not legally a minor, the court still concluded that the evidentiary and predictive value of his conduct was diminished because he was eighteen (18). Like the defendant in *Rosenkrantz VI*, Mr. Jay young at the time of the offense, barely twenty-one (21). As such, the evidentiary and predictive value of his conduct is diminished due to his age at the time of the offense.

3.  The Board's 2005 crime-based findings did not include a "finding" that the offense was "dispassionate and calculated" as it did for the first time in 2003. Instead, the Board stated it was "dispassionate and didn't have to happen." (Exh. AAA, p. 88.);

4.  The 2005 Board did not rely on the claim that the motive for the crime was trivial and inexplicable as the 2003 Board did. Instead, the Board stated the motive was an argument and "that just doesn't cut it." (Exh. AAA, p. 88.) No explanation was given why it did not "cut it" or whether any motive for murder could "cut it";

5.  Unlike all the previous hearings, the 2005 Board gave no recommendations for further therapy or self-help. In 2003, the Board recommended that Mr. Rush "continue to participate in self-help in order to face, discuss, understand and cope with stress in a nondestructive manner," otherwise he would be an unpredictable threat to others. (Exh. BBB, p. 173-174.) However, at the 2005 hearing, the Board acknowledged that Mr. Rush accomplished the aforementioned recommendation and gave no similar recommendations. (Exh. AAA, p. 38-39.);

4

6.  Unlike all the previous hearings, the 2005 Board did not conclude Mr. Rush was an "unpredictable" threat. For example, in 2003 the Board relied upon a correctional counselor's report to conclude Mr. Rush would pose an "unpredictable degree of threat to the public," therefore requiring more observation and evaluation of him before he could be suitable for parole.[6] (Exh. BBB, p. 176.)    Conversely, in 2005, the Board made no such determinations. Not only did they make no recommendations regarding self-help or therapy, when denying parole the commissioner merely stated "I don't know what you would be like on the outside" and then denied parole for another two (2) years. (Exh. AAA, p. 91.);

7.  There was an additional two (2) and one half to three (3) years of exclusively positive programming; and

8.  Since Mr. Rush filed his previous petition on September 9, 2004, many courts have reverse parole denials that repeatedly rely on the commitment offense. For example, in *Rosenkrantz VI* the court concluded seven (7) parole denials and nearly twenty (20) years of incarceration was too much, in *Martin* five (5) denials and twenty-three (23) years of incarceration was too much, in *Scott II* five (5) denials and eighteen (18) years of incarceration was too much, and in *Irons* five (5) denials and sixteen (16) years of incarceration was too much. Mr. Rush has been denied more times and incarcerated longer than nearly every one of those cases. Currently, he has been denied parole five (5) times and has been incarcerated for over twenty (20) years.

Of course, all of the same excellent programming, discipline free behavior, comprehensive self-help courses, unparalleled educational and vocational achievements, and extensive support for parole by institutional and custodial staff, as well as family and friends in the community, with solid parole plans, that existed for the 2003 hearing were likewise part of the record at the 2005 hearing. There was absolutely no evidence submitted that would support a finding of unsuitability.

In support of this verified petition, Mr. Rush respectfully alleges the following:

## STATEMENT OF FACTS

### I.

Petitioner, Robert Dalton Rush previously filed a Petition for Writ of Habeas Corpus, in which he challenged the legality of his continued confinement for the previous sixteen (16) years on a seventeen (17) year to life sentence for Second Degree Murder. Since incarceration, Mr. Rush has

---

[6]  A counselor's risk assessment can no longer be relied upon by the Board or Governor. See Exhibit H, *In re Javier Cortez* (Los Angeles Sup. Ct. 2003) Case No. BH001953, where the court prohibited counselors from opining about an inmate's "risk of threat" because the Department of Operations Manual required such evaluations be performed by either a psychologist or psychiatrist. See also Exhibit I, an August 5, 2004 internal memorandum from

undertaken the enormous task of turning his life around and has programmed in a perfect manner. Despite his dramatic and unprecedented turnaround, and in the face of having received extensive support for being paroled, at the time of filing the prior petition, Mr. Rush had been denied a parole date at each of four (4)[7] consecutive hearings. Since the denial of the original Petition, on April 4, 2005, Mr. Rush received his third (3rd) subsequent (5th actual) hearing. He has again been denied a parole date for two years.

## II.

Since the 2003 hearing, Mr. Rush continues to be housed at the California Correctional Training Facility in Soledad, part of the State of California Department of Corrections (CDC). Mr. Rush has continued to be housed at CTF in the general population with Medium custody. (Exh. AAA, p. 37.) Based upon an assessment of Mr. Rush's lack of dangerousness, he has never spent any time in a level four institution and since 1993 he has been housed in the lowest level he could be housed in, a level two institution. This aspect of how the state is classifying and housing Mr. Rush constitutes a direct admission by the state that he does not present an unreasonable risk of danger to society if paroled. (*Cal. Code Regs.*, tit. 15, §2402(a).) He has also continued his unblemished disciplinary record that now spans the last twenty (20) years while incarcerated. The only write-up Mr. Rush has ever received during his twenty (20) years of incarceration was a 128 A on November 10, 1988, for showing up early for work. He was only given this write-up because he was "technically" out of bounds.[8] Since then, Mr. Rush has avoided even the slightest write-up. His programming has been impeccable, being entirely disciplinary free and immersing himself in self-help courses and volunteer work where he not only betters himself, but helps to better the plight of those around him.[9]

---

the CDC that removed a counselor's requirement to assess an inmate's threat.

[7] The second subsequent (3rd actual) hearing was originally heard on August 19, 2002. However, because of a claim that two (2) separate and independent tapes malfunctioned and could not be transcribed the hearing was reheard on March 5, 2003. Thus, the delay in hearing effectively gave Mr. Rush a three (3) year parole denial even though the prior Board only gave him a two (2) year denial.

[8] The court in *In re Mark Smith* (2003) 109 Cal.App.4th 489, 501 fn. 5, concluded "counseling chronos" and "discipline" are two entirely different things. The court cited *Cal. Code Regs.*, tit. 15, §§ 3000, 3312, subd. (a)(2) indicating a "counseling chrono [is] used for 'minor misconduct' only and entails no discipline, only counseling" and it also cited § 3312, subd. (a)(3) emphasizing that "disciplinary procedures [are] for 'serious misconduct.'" (*Id.*) Thus, Mr. Rush's counseling chrono, for arriving early to work, would not constitute disciplinary action, and as such, he has remained discipline free for the entire duration of his incarceration, twenty (20) years.

[9] Mr. Rush has worked as a clerk for the Bridging Program, which helps inmates with their basic life skills to prepare them for release. (Exh. A, p. 58.) He also volunteers for the CTF Video Reports Program that broadcasts educational videos for the general population. (Exh. A, p. 59.) Mr. Rush reviews the videos and prepares questionnaires so that inmates that do not have access to the education department can watch the videos, fill out the

6

## III.

On October 11, 2005, Petitioner attended his third (3rd) Subsequent Parole Consideration Hearing. Including his initial parole consideration hearing, and the two (2) hearings of the second (2nd) subsequent, this is the fifth (5th) time the Board has considered the issue of Mr. Rush's suitability for parole.[10]  Since the hearing at issue in the petition, he has continued to program positively. He actively attends and positively participates in Alcoholics Anonymous and Narcotics Anonymous, both being Twelve Step based Programs.[11]  (Exh. BBB, p. 335-336.)  Mr. Rush participated in Dr. Thomas Gordon's Family Effectiveness Training/Harmony in the Home self-help program. (Exh. AAA, p. 40.) This program consists of six two hour sessions including the following topics:  A Credo for Your Relationships; Participative Rule-Setting; Solving Problems You Own; The Pitfalls of Punishments and Rewards; Helping Others Find Solutions to Their Own Problems; Resolving Conflicts Peacefully; Dealing with Values, Collusions, and Courage for Learning the Skills-Rewards for Using Them.  (Exh. BBB, p. 332.)  Mr. Rush also completed "How to Become a Father and Not Get Angry." (Exh. BBB, p.334.)  Additionally, he completed a course in the cause, prevention, treatment, and management of hepatitis. (Exh. AAA, p. 40-41.) Mr. Rush has continued to receive numerous positive work/performance evaluations since the last hearing, consistently getting above average to exceptional ratings. (Exh. AAA., p. 42.)

In short, Mr. Rush has continued to both excel in the work environment, and spends his free time participating in all available self-help programs at the institution that are applicable to him, and additionally volunteering his time to help out less fortunate inmates. For example, he works as a clerk for the Bridging Program. This program helps inmates prepare for release, by improving their basic life skills. (Exh. AAA, p. 58.) He was also commended for volunteering for the CTF Video Reports Program, a program that broadcasts educational videos for the general population. (Exh. AAA, p. 59; Exh. BBB, p. 337.)  Mr. Rush reviews the videos and prepares questionnaires so that inmates that do not have access to the Education Department can watch the videos, fill out the questionnaire, and still obtain credit for it. (*Id.*) He also volunteered his time and organizational skills to provide support for the Central Education Department's Graduation and Promotion

---

questionnaire, and obtain credit for it. (*Id.*)  In addition, he has tutored other inmates to help them receive their GED's (Exh. A, p. 51.)

[10]  See footnote 1.

[11]  Although Mr. Rush was a casual drinker, he has never had a drug or alcohol problem. (Exh. A, p. 54.) He participates in AA and NA because the Twelve Step Program helps with his basic life skills and helps him to be a better person. (Exh. A, pp. 54-55.)

7

Ceremony on multiple occasions. (Exh. BBB, p. 339, 344.) In fact, at his 2005 hearing, the Board commended Mr. Rush for being a "good role model," despite finding that this role model whose behaviors other inmates should emulate, presents an "unreasonable risk of danger" to society if paroled. (Exh. AAA, p. 91.) At this point, Mr. Rush has extended his now twenty (20) year perfect disciplinary record by another two (2) years.

### IV.

Throughout his incarceration, Mr. Rush has proven to be a low threat of dangerousness. The CDC has rated his security threat as low since his reception, starting him by giving a Level III override to avoid placing him with criminally sophisticated individuals. His initial counselor's recommendation summary stated that "...in view of his age and not being systems-sophisticated, he may fall easy prey to his more sophisticated delinquent peers." (Exh. BBB, p. 99.) Thereafter, he was quickly moved to lower custody levels. Since 1993, he has been housed in a Level II facility, which is not allowed for a lifer if the crime involves "unusual violence." (*Cal. Code Regs.*, tit. 15 §3375.2(a)(7)(A).) The Department has dropped his classification points every year by the maximum allowable amount, and since January of 1996, he has remained at the lowest possible score of zero, until the CDC revised the policy and raised all lifers to a score of nineteen (19).[12] (Exh. AAA, p. 45.) Mr. Rush has not had any serious disciplines (CDC 115's) at any time during his incarceration, and his only minor non-disciplinary write-up (CDC 128-A, minor counseling chrono) was for being out of bounds, in November of 1988, because he showed up early for work. (Exh. AAA, pp. 89-90.) Thus, he has remained disciplinary free for his entire twenty (20) year incarceration and has programmed perfectly throughout that time. He has never been involved in an act of violence other than the commitment offense. He has made dramatic strides educationally, earning his AA degree in 1989 from Hartnell College, making the President's Honor Roll both semesters and maintaining a GPA of 3.826. (Exh. AAA, p.39.) He then began taking college courses at San Jose State University, completing his Bachelor of Arts degree in 1991, with a 3.9 GPA. (*Id.*) He even completed a Masters of Science degree in Humanities at California State University, Dominguez Hills, earning a 3.68 GPA. (*Id.*) He has consistently stayed active in all of the available self-help

---

[12] The CDC's "classification score" is a measure of the security risk attributed to a prisoner by the CDC. Every prisoner is received into the CDC with a score determined by offense and certain other statistics and then is either raised or lowered depending upon the prisoner's incarceration history. The lowest and most favorable classification was previously zero (0), and now is nineteen (19), due to a CDC policy change applicable to all life and term to life prisoners.

programs that apply to him while incarcerated, taking Dr. Bakeman's Life Skills Program and the Entrepreneurial Development class, and despite not even having a drug or alcohol problem, he has regularly participated in Alcoholics Anonymous since 1993. (Exh. AAA, p. 44, 55.) He has also excelled in acquiring work skills, successfully completing the vocational drafting programs, and spending additional time in that trade teaching new entrants. (Exh. AAA, p. 52.) Because Mr. Rush's work was so valuable he assisted with the program as a teacher's assistant for several years. (Exh. AAA, p. 52.) His work participation ratings have consistently been strongly positive, always receiving the highest available marks, such as "exceptional" or A's when grades are given. (Exh. AAA, p. 42.) Mr. Rush's improvement and suitability for parole has remained clear throughout his incarceration, and is even more apparent today, despite the Board's repeated denials of parole.

## V.

While in custody, Mr. Rush's behavior has been exemplary. His disciplinary history has been virtually nonexistent, and his psychological evaluations have been consistently favorable, all indicating that he has programmed well, has no current mental illness or serious psychological problems, and poses a low threat of danger to the public if released on parole. (Exh. BBB, pp. 154-155.) Despite having repeated positive psychiatric evaluations beginning with his 1996 initial life prisoner parole hearing before the Board, Mr. Rush has been continually denied parole. However, this has not discouraged Mr. Rush, who has continued his positive programming and represents the quintessential model inmate. At his most recent parole hearing, on October 11, 2005, no adverse evidence was presented and an additional favorable psychological evaluation by Dr. Talbott was provided, but parole was again denied. (See generally Exh. BBB, pp. 154-155.) However, unlike previous hearings, the Board did not attempt to base its decision on Mr. Rush's "need" for more therapy and/or psychological analysis. They did not even recommend more therapy or self help programming. Instead, the Board referenced the recommendations, given to him on March 2, 2003. First, in 2003, the Board recommended Mr. Rush continue to remain discipline free, and second, that he continue participating in self-help programs in order to "face, discuss, understand and cope with stress in a nondestructive manner," otherwise he would be an "unpredictable" threat to others. (Exh. AAA, p. 38-39; Exh. BBB, p. 174-175.) Conversely, at the most recent hearing in 2005, the Board simply acknowledged that Mr. Rush accomplished both of the recommendations given to him in 2003 and did not make any further

9

recommendations. (Exh. AAA, p. 38-39.) In fact, the Board admitted Mr. Rush has "certainly prove[n] [him]self." (Exh. AAA, p. 91.) Nonetheless, despite Mr. Rush's "great job" since incarceration, his status as a "good role model," and his accomplishing all previous recommendations given by the Board, he was again denied parole for two (2) years, based on a finding that he allegedly presents an "unreasonable risk of danger" to society if released. (*Id.*) The Board, therefore, used solely the commitment offense, not necessarily its egregiousness, to not only deny parole, but did so for another two (2) years.

### VII.

The 2005 denial was based solely on the commitment offense. This decision was made despite the fact that the most recent and his previous psychiatric evaluations concluded Mr. Rush was a "very good candidate for parole." (Exh. BBB, p. 156.) On June 28, 2005, a psychological report was completed by Dr. Talbott. (Exh. AAA, p. 44.) Dr. Talbott primarily referred to the previous report completed by Dr. Terrini in 1999. (*Id.*) The 1999 psychological evaluation by Dr. Steven Terrini found no history of a drug or alcohol problem, found that his parole plans are "quite viable and his prognosis for community living is very positive," found no clinical disorder or personality disorder, described his judgment as "sound," and stated that he had "good insight into his commitment offense." (Exh. BBB, pp. 158-161.) Dr. Terrini also found that Mr. Rush was remorseful in a way that was "quite appropriate and genuine," and concluded that his lack of criminal history and "greater maturity and greater education" make his "violence potential within a controlled setting...to be significantly below average relative to this Level II inmate population." (*Id.*, emphasis added.) Dr. Terrini further opined that Mr. Rush was a "very good candidate for parole." (*Id.*, emphasis added.) In fact, he stated, "I do not believe [Mr. Rush] would ever commit a violent act again." (Exh. BBB, p. 161.) The same viewpoint goes all the way back to his first psychological evaluation in 1990 by Dr. Bruce Bakeman, who found absolutely no psychopathology, felt he needed no mental health treatment before or after release, and described the commitment offense as being the result of situational stress. (Exh. BBB, p. 168-169.) Likewise, in 1993, Dr. Ronald Kitt found no mental disorder, noted increased psychiatric maturity, and below average violence potential in the community. (Exh. BBB, p. 166-167.) Dr. Kitt even recommended Mr. Rush's removal from special psychiatric evaluation calendars (i.e., Category X) because "psychopathology is not significantly related to future criminal behavior and psychiatric opinion will not contribute towards a release decision." (*Id.*) Dr. Kitt noted that Mr. Rush now had

10

two reports that were "favorable for release" and expressed his agreement with the prior report. (*Id.*)[13] Dr. Bakeman again saw him in 1996, noting ongoing improvement, and confirming his previous opinions. (Exh. BBB, pp. 164-165.)

Thus, the reality of the "findings," from previous hearings, was that a vicious cycle was created, since the Board would not parole Petitioner without "treatment" and CDC would not give the treatment since not only was it psychologically unnecessary in Petitioner's case, but CDC does not even offer it to general population lifers such as Mr. Rush. (See Exh. BBB, p. 90.) Those "findings" therefore appear to be, at best, another effort to direct psychological treatment of inmates, and at worst, is an insidious method of preventing a well deserved parole. The practice of directing psychiatric treatment is one that the Board has been repeatedly told by the CDC mental health staff is inappropriate, and which they have previously agreed to cease doing.[14] However, the Board in Mr. Rush's most recent hearing, in 2005, made no such "finding." No recommendation for further "therapy" was given. In fact, the Board seemed to concede therapy was no longer necessary by stating Mr. Rush had "certainly prove[n] [him]self." (Exh. AAA, p. 91.) However, in the face of this concession and facts clearly showing Mr. Rush's suitability, the Board again denied parole. This action was taken despite a complete absence of evidence in the record to support the decision. The result of that decision is that Mr. Rush has now served beyond even the most aggravated amount of time that the matrix has established for his subject offense.

## VIII.

At his fifth (5th) hearing, on October 11, 2005, the Board acknowledged Mr. Rush's numerous letters of support (Exh. BBB, pp. 223-284), his lack of prior adult or juvenile criminal history, his vocational training for drafting, the Bachelors and Masters degrees he earned during incarceration, his realistic parole plans, his marketable skills, his exceptional programming, and his discipline free record while incarcerated.[15] However, when the Board delivered their decision,

---

[13]    Pursuant to the standards set by the Mental Health Department of CDC, as agreed to by the Board, an inmate is to be removed from the Category X psychiatric evaluation process if they have two (2) consecutive reports that are favorable for release.

[14]    See the attached letters from CDC staff psychologists, Dr. Steven Terrini and Dr. Lyons, Exhibit AL pp. 783-787, which refer to the notice given to the Board that they may not direct psychological treatment of lifers. This issue also came up in the case of *In re Rosenkrantz* (2000) 80 Cal.App.4th 409, 426-427, where the Court noted that the Board cannot ignore the psychological evidence and substitute their own opinions as to what is best for the inmate's psychological care. Likewise, in *Ramirez*, the Board was chastised for ignoring the psychological evidence and suggesting that the inmate "needs therapy." (*In re Edward Ramirez* (2001) 94 Cal.App.4th 549, 571.)

[15]    The only disciplinary action taken against Mr. Rush was the 128A for being early to work in 1988. Presiding Commissioner Sawyer admitted he did not understand it other than he was "technically" out of bounds. (Exh. A, p.

11

Presiding Commissioner Sawyer, once again, stated Mr. Rush would pose an "unreasonable risk of danger to society." (Exh. AAA, p. 87.) To justify their decision, the presiding commissioner gave a brief recitation of the facts of the commitment offense. (*Id.*)  These facts have remained unchanged for twenty (20) years. The Board, next, characterized the offense as "particularly callous and cruel," "dispassionate and [it] didn't have to happen," and it was carried out with a "callous disregard for human suffering." (Exh. AAA, p. 88.)  The Board gave no explanation why the offense was characterized in this manner.  Likewise, no explanation was given as to why Mr. Rush's numerous accomplishments during incarceration did not outweigh the immutable factors surrounding the commitment offense.  The presiding commissioner simply told Mr. Rush he had done a "great job" since incarceration and he has "certainly prove[n] [him]self." (Exh. AAA, pp. 90-91.)

Immediately thereafter, Commissioner Sawyer pointed out that many people had been victimized, Mr. Rush had remedies other than using a gun, and stated "you were convicted of second-degree murder, sir." (Exh. AAA, p. 91.)  None of these facts have changed since the commitment offense and none of these facts explain why the offense was exceptionally egregious.  In fact, absent a finding that the crime was "especially, heinous, atrocious or cruel," Mr. Rush's conviction for second degree murder, alone, cannot be used to continually deny his parole.  As such, a blanket statement that Mr. Rush was convicted should not affect the Board's suitability determination.  However, it clearly did.  The Board gave no further explanation for their conclusion.  They simply relied on the commitment offense without providing any support for its conclusion that the offense was so egregious that the facts, alone, could render Mr. Rush a current and unreasonable risk. This conclusion was made despite twenty (20) years of contrary behavior. Mr. Rush has behaved exceptionally since his incarceration, and as such, not a scintilla of evidence corroborated the Board's decision that he was still an unreasonable risk to society today. Nonetheless, the presiding commissioner listed a few immutable facts about the offense, he concluded by again complementing Mr. Rush on what he has accomplished since incarceration, acknowledging that he is a "good role model," but then stating "I don't know what you would be like on the outside" and then denied parole for another two (2) years. (Exh. AAA, p. 91.)

## IX.

At the 2005 hearing, Mr. Rush fully and accepted responsibility for his conduct in the

90.)

12

offense, exhibited appropriate levels of remorse, and showed appropriate insight into the causes of his behaviors and a recognition of how to respond positively to forces in his life in the future. Likewise, the various reports submitted found full acceptance of responsibility and appropriate and sincere remorse. No facts were submitted to the Board that would justify the denial of a parole date. However, the Board still found Mr. Rush unsuitable. Not one of these alleged justifications for the Board's decision speaks to Mr. Rush's current suitability. The Board's characterization of the crime does not, in any way, indicate it was so egregious as to render Mr. Rush a current risk to society. Furthermore, the fact people were victimized, namely the victim's family, also does not speak to his current dangerousness, nor does the fact Mr. Rush had remedies other than the use of a gun, since not committing the offense is always an available option. One thing is true, Mr. Rush was convicted of second degree murder. However, the Board failed to acknowledge the fact that he was already sentenced for that offense. That sentence was a parole eligible sentence, not life without the possibility of parole. As such, the mere fact Mr. Rush was convicted is not a permissible justification for lengthening his sentence to life without possibility of parole by continuous and arbitrary denials of parole.

## X.

The Board's reliance on the nature of the commitment offense to deny parole, is grossly unfounded. The commitment offense is a second degree murder, and Mr. Rush's actions were a result of significant stress in his life. Shortly before the offense, he was a passenger in a fatal motorcycle accident, where he was severely injured and his friend was killed. (Exh. DDD, p. 361.) Mr. Rush was thrown from the motorcycle when it was hit after a semi-truck drove through a stop sign. (*Id.*) He sustained a severe concussion, dislocated ankle, broken ribs, punctured/collapsed lung, fractured right tibia and fibula, neurological injuries, contusions, abrasions, and a chipped tooth. (*Id.*) He was in the hospital for over two weeks and then confined to a bed for an additional month. (*Id.*) The stress from this accident had an enormous impact on Mr. Rush's life, he experienced depression and nervousness and was unable to function independently due to his injuries. At the time of the offense, Mr. Rush had not fully recovered from his weakened physical and mental state when he was assaulted by his larger and far more fit roommate. These circumstances of the life term offense must be considered, and it must be done in a way that meaningfully addresses whether he continues to present an unreasonable risk of danger to society if paroled. (*In re Scott [Scott II]* (2005) 133 Cal.App.4[th] 573, at 594-595; *In re Ernest Smith* (2003)

13

114 Cal.App.4[th] 343.) Under this type of evaluation, the conclusion is inescapable that this life offense is not "particularly egregious" or among the "gravest" of such offenses, especially when viewed from the standpoint of Mr. Rush's mental state at the time of the crime, and considering his dramatic transformation the last twenty (20) years. No evidence supports the conclusion that the crime, alone, makes Mr. Rush a current danger to society if paroled. (*Scott II, supra.*) Thus, the Board has failed to tie the facts of the offense to proof of current dangerousness. (*Scott II, supra.*) In this case, the Code of Regulations Matrix shows that Mr. Rush should receive a date of between seventeen (17) and nineteen (19) years, before reduction for post-conviction custody credits under *Cal. Code Regs*, tit. 15, §2410. It has now been twenty (20) actual years, and Mr. Rush credits surpass the top end of the second degree murder matrix, yet the Board has not even set a *future* parole date. By giving another two year denial, they are once again ignoring the presumption of suitability, and shirking their responsibility to set a date. (*McQuillion v. Duncan* (2002) 306 F. 3d 896, at 901-902; *In re Ramirez* (2001) 94 Cal. App. 4th 549.)

## XI.

For at least the past ten (10) years, the Board has received informal mandates from the current and former Governors, to severely restrict, and ultimately eliminate, the granting of parole to persons convicted of parole eligible murders, even second degree murders. (See Exh. FFF to JJJ inclusive.) The result is a de facto system whereby inmates who have received an indeterminate term such as life or fifteen (15) or twenty five (25) years to life have their sentences unconstitutionally converted to a term of life without the possibility of parole by the executive branch, through the auspices of the Board and Governor. This unconstitutional, illegal policy was just recently recognized by the Federal Courts in both the Eastern and Northern Districts of California. (See Exh. FFF, *Coleman v. Board of Prison Terms*[16], Eastern Dist. CA, Case No. CIV S-96-0783 LKK PAN, May 19, 2005; Exh. GGG, *Martin v. Marshall* (N.D.Cal. 2006) 431 F.Supp.2d 1038.)[17]    The unlawful system of sentence conversions occurs despite the state legislature's express statutory scheme which requires the Board to set a term for each parole eligible murder conviction. The de facto policy of the executive branch has been unconstitutionally used by

---

[16] The evidence relied on by the District Court in *Coleman* is in the possession of Petitioner's counsel, but is quite extensive, and thus has not been provided at this time. However, it is available and can be submitted supplementally should the Court desire.

[17] Petitioner is requesting that this Court take Judicial Notice of the *Coleman* decision, which is being cited as factual proof of this illegal policy, and not as legal precedent. Petitioner is also requesting that judicial notice be taken of the facts developed in *Martin*. However, *Martin* is a published decision, and thus, is being cited as legal precedent as well.

14

the Board to virtually eliminate the setting of parole dates for persons convicted of murder. As a result, the Board's parole hearings have become meaningless shams. The Board has been criticized in this regard in published decisions of the California Courts of Appeals. (e.g. *In Re Ramirez*, *supra*, at 571 ["The board's readiness to make a finding so at odds with the record supports Ramirez's claim that his parole hearing was a sham."]; see also *Irons v. Warden* (E. Dist. Cal. 2005) 358 F.Supp.2d 936, at 947 [Board reliance on unchanging factors leave inmate with "no hope for ever obtaining parole except perhaps that a panel in the future will arbitrarily hold that the circumstances were not that serious…"].)

## XII.

The Board's denial of a parole date to Petitioner is part of an unlawful pattern and practice of the Board to deny parole to virtually all life and term to life inmates, irrespective of their accomplishments and efforts at rehabilitation in the prison, and to frustrate the legislative mandate in *Penal Code* § 3041 that parole "shall normally" be granted. The former Chief Executive of this state, Governor Gray Davis, explicitly declared the policy of the executive branch of government that those inmates serving life sentences, should not be paroled, stating:

> "'They must not have been listening when I was campaigning,' Davis said. 'If you take someone else's life, forget it. I just think people dismiss what I said in the campaign as either political hyperbole or something that I would back away from . . .We are doing exactly what we said we were going to do'." (Exh. MMM.)

Former Board Commissioner Al Leddy, and others, testified at a Joint Legislative Committee on Prison Construction and Operations on April 29, 1999. The subject of that hearing was parole, public safety and proportionality in the parole process.[18] (Exh. NNN; See also the declaration of former Board Commissioner, Albert Leddy, Exh. OOO.) Numerous individuals testified at the legislative subcommittee hearing including former Board Commissioner Leddy, former United States Senator Alan Cranston, former California Supreme Court Justice Cruz Reynoso, and former Special Assistant to the U.S. Commission on Civil Rights Thomas Grey, along with a variety of attorneys and related professionals. They discussed numerous instances of unreasonable and unlawful refusals by the Board to grant parole. (Exh. NN.) Each of these individuals noted numerous instances where the Board had unreasonably refused parole, or had used multiple rescission hearings in order to take a set parole date away from an otherwise deserving inmate. (*Id.*) These facts show that the parole process is unfair,

---

[18] The transcripts of that hearing are available and can be submitted supplementally should the Court desire.

arbitrary and capricious, and should not be afforded the protection of any presumption of correctness, or the findings given any deference, in the proceedings in this Court. Mr. Leddy also testified in the Marin County Superior Court proceedings regarding *In re John Dannenberg*, as part of the evidentiary hearing in that case.[19] (Exh. PPP.) Mr. Leddy testified to the existence of an unwritten policy started by Governor Wilson, and "followed rigorously" by Governor Davis. (*Id.*, pp. 468-469.)    The policy actually started to form with Governor Deukmejian, when paroles went down to 4 or 5 percent, then was solidified by the following chief executives. (*Id.* pp. 470-471.)    Mr. Leddy acknowledged that the Board uses the preprinted BPT 1000a form to recite purported justifications for denying parole, and that rather than tailoring them to the individual inmate, they simply read them verbatim off the form, even in situations where they do not apply. (Id., pp. 471-473.)

## XIII.

Petitioner has no plain, speedy or adequate remedy in the ordinary course of the law. It is Petitioner's contention that further participation in hearings or any aspect of the administrative process of parole consideration will be futile in that he has been denied parole at five (5) consecutive hearings, always for reasons that are unsupported by the evidence contained in his Central File, which evidence has always been before the Board for the hearing. Each such denial has been repeatedly upheld by the Board's Decision Review Committee following the hearings. The Governor has never reviewed any of these denials. Thus, the only available avenue for relief is through the court system by way of the instant Petition for Writ of Habeas Corpus. Petitioner's continued confinement is unlawful, in that he is entitled to be paroled, but has been wrongfully denied that right. Said confinement violates the United States Constitution's Eighth Amendment proscription against cruel and unusual punishment, and the Fourteenth Amendment's due process clause, as well as the comparable provisions of the California Constitution. Additionally, the Board has now abolished the BPT 1040 administrative appeal process as of May 1, 2004, and therefore, there is no further administrative remedy available to Mr. Rush.

## XIV.

A transcript of the October 11, 2005 subsequent parole consideration hearing has been prepared by the Board, and a true and accurate copy thereof is contained in the accompanying Appendix as Exhibit A, and the various other materials considered by the Board are attached and

---

[19] Again, that testimony is available and can be submitted supplementally should the Court desire.

16

numbered as alleged above, and constitute the relevant record of the 2005 hearing. Additionally, Petitioner has separately requested that this Court take judicial notice of the petition and supporting exhibits [A through Z and AA through AO] from the prior habeas proceedings, and incorporates those herein by reference as though set forth in full. Petitioner will rely on all the foregoing allegations, arguments and evidence in connection with the request for relief herein. Petitioner also incorporates herein by reference the Memorandum of Points and Authorities served and filed herewith the totality of these various pleadings will supply the factual and legal basis for Petitioner's claims herein.

## REQUEST FOR EVIDENTIARY HEARING

### XV.

Petitioner is in possession of the extensive exhibits utilized to support the finding of the District Court in the *Coleman* case (Exh. FFF) and which likewise relied on in *Martin, supra*, but has not submitted those as they span more than 1500 pages, and include numerous depositions of past Board members. Petitioner is also in possession of the testimony of Albert Leddy, former Board Commissioner, from the evidentiary hearing in the Marin County Superior Court in the case of In re John Dannenberg, case # SC112688A, addressing the "no parole" policy of the Executive Branch. Petitioner is also in possession of all of the Governor's reports of reviews conducted since 2000. Finally, Petitioner has a set of over 200 declarations showing a pattern of crime based denials, and is informed and believes that further discovery has been ordered in other cases that will bear upon the patterns and practices of the Executive Branch to refuse to grant parole. Petitioner will have all of this material available for submission to the Court at a duly scheduled evidentiary hearing, and therefore requests that one be set forthwith.

17

*PRAYER*

Wherefore, Petitioner respectfully requests that this Court:

1.    Issue a writ of habeas corpus or order to show cause to the Warden of the California Men's Colony, the Director of the Department of Corrections, the Governor and the Board of Parole Hearings to inquire into the legality of the Petitioner's incarceration;

2.    Order the immediate release of the Petitioner, or alternatively, order the Board to hold a new parole hearing within forty five (45) days at which Mr. Rush shall be found suitable and to set a date for release or alternatively, conduct a hearing and if no new information is presented that establishes that Petitioner poses a present threat of future violence, to find petitioner suitable for parole and set a release date;

3.    Conduct an evidentiary hearing if necessary to resolve any disputed factual issues, and after the hearing, issue an order directing the Board to act as set forth in paragraph 2, above;

4.    Discharge Petitioner free from both actual and constructive custody, or alternatively, apply any excess time in custody beyond the proper term for his offense against his maximum period of parole; and

5.    Grant such other and further relief as justice may require.

Dated:                                    Respectfully Submitted,

                                    LAW OFFICE OF PICONE & DEFILIPPIS

                                    By: _____
                                          STEVE M. DEFILIPPIS
                                          Attorneys for Petitioner,
                                          ROBERT DALTON RUSH

18

1

2

## VERIFICATION

3        I, STEVE M. DEFILIPPIS, declare as follows:

4        I am the attorney for Petitioner in the above-entitled matter, and my practice is located in

5    Santa Clara County.   Petitioner ROBERT DALTON RUSH is currently in custody in Monterey

6    County.   Additionally, I am personally familiar with the facts and circumstances underlying the

7    present Supplemental Petition, as I was present at the subject hearing, and for that reason, I am

8    providing this Verification in accordance with Code of Civil Procedure §446.   I have read the

9    foregoing Petition for Writ of Habeas Corpus and know the contents thereof.   The same is true of

10   my own personal knowledge, except as to those matters stated upon my information and belief, and

11   as to those matters I believe them to be true.

12        I declare under of perjury that the foregoing is true and correct, executed this 6th day of

13   November, 2006, in the City of San Jose, County of Santa Clara, State of California.

14

15

16                                STEVE M. DEFILIPPIS

17

18

19

20

21

22

23

24

25

26

27

28

                                      19

1 │ STEVE M. DEFILIPPIS, Esq.
2 │ State Bar No. 117292
   │ PICONE & DEFILIPPIS
3 │ 625 N. First Street
   │ San Jose, CA 95112
4 │ (408) 292-0441
5 │
   │ Attorneys for Petitioner,
6 │ ROBERT DALTON RUSH
7 │
8 │
   │       ## SUPERIOR COURT OF THE STATE OF CALIFORNIA
9 │
   │          ## IN AND FOR THE COUNTY OF SAN BERNARDINO
10│
11│   In re                              CASE NO.
12│
   │   ROBERT DALTON RUSH,                [Commitment Offense – San Bernardino
13│                                       Co. Sup. Ct. No. SCR 44594]
14│         Petitioner,
   │                                      ***MEMORANDUM OF POINTS &***
15│       On Habeas Corpus.              ***AUTHORITIES IN SUPPORT OF***
   │                                      ***PETITION FOR WRIT OF***
16│   _____/        ***HABEAS CORPUS***
   │   ARNOLD SCHWARZENEGGER,
17│   Governor, BOARD OF PAROLE
   │   HEARINGS,
18│
19│         Real Parties In Interest.
   │   _____/
20│                              ***STATEMENT OF FACTS***
21│   **A.   _The Circumstances of the Offense_**
22│         The facts of the commitment offense remain unchanged, and therefore, Petitioner
23│   incorporates herein by reference the materials from section 1 of the Statement of Facts contained
   │   in the Memorandum of Points and Authorities portion of the Petition filed on September 9, 2004,
24│   at pages 28-30, as though set forth in full. Those facts will not be restated herein and the reader's
25│   attention is directed to that filing in the prior proceeding for this information.
26│         While even the Board recognizes that he facts surrounding the commitment offense have
27│   not changed since it occurred in 1986 and will never change, these same facts have been now
28│   used five (5) times to deny parole. With this mindset, no amount of outstanding programming

                                        20

will ever satisfy the Board, and obviously, absent court intervention, nothing ever will change.

**B.** *Institutional Recognition For Accomplishments*

Since the 2003 hearing, Mr. Rush's exceptional performance has continued to be recognized. Numerous chronos in Mr. Rush's file indicate he has continued to positively participate in Alcoholics Anonymous and has been since coming to prison, and that he is a contributing member that understands all aspects of the twelve step program.[20] (Exh. AAA, p. 39.) He received multiple chronos for his assistance with the Central Education Department's Graduation and Promotion Ceremony, where he was one of the original organizers and "dedicated considerable time and energy to the project." (Exh. BBB, pp. 339, 344.) Mr. Rush also received a chrono from G. Sansbury, an academic teacher, who described him as "a major component in the delivery of Basic Education to male felons." (Exh. BBB, p. 344.) In addition, this teacher stated Mr. Rush is often the "saving grace" for classroom participation and effective lesson plans. (*Id.*) Mr. Rush was commended for helping make questionnaires for the CTF Education Department's Distance Learning Center and also volunteers for the CTF Video Reports Program and is "greatly appreciated." (Exh. BBB, p. 335, 337.) He devotes a significant amount of his free time to various programs throughout the facility and has clearly been acknowledged for his hard work and dedication

**C.** *Social History*

Mr. Rush's social history remains unchanged, and therefore, Petitioner incorporates herein by reference the material from section 2(a) and (b) of the Statement of Facts contained in the Memorandum of Points and Authorities portion of the Petition filed on September 9, 2004, at page 30-31, as though set forth in full. Those facts will not be restated herein and the reader's attention is directed to that filing in the prior proceeding for this information.

**D.** *Advances During Incarceration*

Mr. Rush's pre-2003 advances remain unchanged, and therefore, Petitioner incorporates herein by reference the material from section 3(a) through (d) of the Statement of Facts portion of the Memorandum of Points and Authorities portion of the Petition filed on September 9, 2004, at pages 31-36, as though set forth in full. Those facts will not be restated herein and the reader's attention is directed to that filing in the prior proceeding for this information.

---

[20] Although Mr. Rush has been involved in AA since 1993, he has never had a drinking problem. (Exh. A, p. 54-55.) He uses the program for his basic life skills. (Exh. A, p. 55.)

21

**(1) Education**

Since the 2003 hearing, Mr. Rush has continued to improve his already significant educational background. The 2005 Board even commended him for doing "very well educationally." (Exh. AAA, p. 89.) Even this is an extreme understatement, as he has received AA, BA and masters degrees, all with high honers, since coming to prison. Additionally, Mr. Rush continually stays up do date with the Computer Assisted Drafting (CAD) software. (Exh. AAA, pp. 52-53.) He made an arrangement with a teacher in the Educational Department so he could intermittently work with the CAD system a couple times a month. (Exh. AAA, pp. 52-53.) Mr. Rush has worked hard to keep his knowledge of CAD up to date because that program is used in the architectural and engineering fields. (Exh. AAA, p. 32.) Upon release, Mr. Rush intends to pursue a career as a cartographer, and as such, his proficiency with the CAD system will greatly increase his employment opportunities.

Additionally, Mr. Rush spends a significant amount of his time helping other inmates obtain an education. For example, he is involved with the CTF Video Reports Program. (Exh. BBB, p. 337.) This program broadcasts educational videos to the general population. (Exh. AAA, p. 59.) Specifically, Mr. Rush reviews the videos and formulates questionnaires so the inmates that do not have access to the Education Department can watch the videos, fill out the questionnaire, and still receive credit. (Id.) Further, Mr. Rush volunteered multiple times for the Central Education Department's Graduation and Promotion Ceremony. (Exh. BBB, pp. 339, 344.) He was even one of the original organizers of the commencement exercises. (Exh. BBB, p. 339.) Because of Mr. Rush's valuable work, he became a teacher's assistant for the drafting program and assisted students for several years after he completed his own certificates. (Exh. AAA, p. 52.) In the past, Mr. Rush also tutored students to help them obtain their GED's. (Exh. AAA, p. 51.) Thus, throughout Mr. Rush's twenty (20) years of incarceration, he has consistently and successfully improved his education and assisted other inmates to improve theirs as well.

**(2) Work/Vocation**

After the 2003 hearing, Mr. Rush continued to work as a clerk in the Education Bridging Program. This program helps inmates that are eligible for work time credits get extra time off their sentence by participating in self-help and life skills study. (Exh. AAA, p. 58.) Basically, he helps inmates prepare for release. (Exh. AAA, p. 58.)[21] Mr. Rush always maintains exceptional

---

[21] It is more than ironic that Mr. Rush prepares inmates by teaching them how to be successful when released, yet

work reports, obtaining above average ratings in all categories. (Exh. AAA, p. 37-38.) However, two weeks prior to the 2005 hearing, Mr. Rush changed jobs and is now a clerk in the library. (Exh. AAA, p. 43.)

### (3) Self-Help Programs

Since the 2003 hearing, Mr. Rush has continued to devour all available self-help courses in the institutional setting. He continues to actively attend and positively participate in Alcoholics Anonymous and Narcotics Anonymous which utilizes the twelve step model. (Exh. BBB, p. 335, 336.) Mr. Rush participated in Dr. Thomas Gordon's Family Effectiveness Training/Harmony in the Home self-help program. (Exh. AAA, p. 40.) This program consists of six two hour sessions including the following topics: A Credo for Your Relationships; Participative Rule-Setting; Solving Problems You Own; The Pitfalls of Punishments and Rewards; Helping Others Find Solutions to Their Own Problems; Resolving Conflicts Peacefully; Dealing with Values, Collusions, and Courage for Learning the Skills-Rewards for Using Them. (Exh. BBB, p. 332.) Mr. Rush also completed "How to Become a Father and Not Get Angry." (Exh. BBB, p. 334.) Additionally, he completed a course in the cause, prevention, treatment, and management of hepatitis. (Exh. AAA, p. 40-41.) At his previous hearing in 2003, the Board recommended Mr. Rush continue with self-help programs. (Exh. AAA, p. 39.) Consequently, the Board, in 2005, acknowledged that Mr. Rush had accomplished this goal and did not give a similar recommendation. (Exh. AAA, p. 39.)

### (4) Disciplinary Record

Since the 2003 hearing, Mr. Rush has continued to maintain his perfect disciplinary record, having not so much as a non-disciplinary CDC 128 A counseling chrono since his minor CDC 128 A in 1988 for showing up early to work.[22] Nonetheless, Mr. Rush is surrounded by potential for violence, but he makes a conscious effort to avoid putting himself in bad situations or when such situations occur he tries to diffuse them. (Exh. AAA, p. 56-57.) As a result, his unblemished disciplinary history now continuously spans the entirety of his incarceration, a period of twenty (20) years.

---

the Board claims he himself is an unreasonable risk of danger. Obviously the state's utilization of Mr. Rush's skills belies the Board's findings.
[22] On November 10, 1988, Mr. Rush received a CDC 128 A because he showed up to work early and was technically out of bounds. Even Presiding Commissioner Sawyer indicated he did not understand the write-up, other than he was "technically" out of bounds. (Exh. A, p. 90.)

### E. *Parole Consideration History*

#### (a) *1996 Initial Through 2003 Parole Consideration Hearings [4 Hearings]*

The details of these hearings are set out in section 4(a) through (d) of the Statement of Facts contained in the Memorandum of Points and Authorities portion of the Petition filed on September 9, 2004, at pages 36-53, and the same is incorporated herein by reference as though set forth in full. Those facts will not be restated herein and the reader's attention is directed to that filing in the prior proceeding for this information.

#### (b) *Fourth Subsequent Parole Consideration Hearing, October 11, 2005*

Initially, Mr. Rush's third subsequent (fifth actual) parole consideration hearing was scheduled for August 12, 2005.[23] (Exh. AAA, p. 37.) Although all relevant parties were present, the hearing was rescheduled because one of the board members had scheduled a flight out of town too early to complete the hearings scheduled for that week. Thus, the hearing was held two months later on October 11, 2005. (See generally Exh. AAA.) At that point, it was seven (7) months late, measured from the March 2003 hearing, and fourteen (14) months late, measured from the August 2002 hearing.

Once again, the Board concluded Mr. Rush was an unreasonable risk of danger to society, and as such, unsuitable for parole. In relying solely on the commitment offense for their conclusion, the Board characterized the crime as "particularly cruel and callous." (Exh. AAA, p. 88.) Presiding Commissioner Sawyer then stated the crime was "certainly dispassionate and didn't have to happen." (Exh. AAA, p. 88.) He went on to briefly describe the offense and conclude there was a "callous disregard for human suffering." (Exh. AAA, p. 88.) Immediately thereafter, the Board went on to acknowledge Mr. Rush's success during incarceration.

First, the Board acknowledged he had absolutely no record prior to the commitment offense, juvenile or adult. (Exh. AAA, p. 88.) The presiding commissioner admitted Mr. Rush has "done very well since he has been in custody," and is at the "lowest classification level." (*Id.*) He went on to acknowledge the importance of the Bridging Program and the "exceptional" reports Mr. Rush has received while clerking there. (Exh. AAA, p. 88-89.) The commissioner also noted some of Mr. Rush's marketable skills, mechanical drafting and architectural drawing,

---

[23] The second subsequent (3rd actual) hearing was originally heard on August 19, 2002. However, because of a claim that two (2) separate and independent tapes malfunctioned and could not be transcribed the hearing was reheard on March 5, 2003. Thus, the most recent hearing was actually the fifth time Mr. Rush's parole eligibility

and stated he has "done very well educationally." (Exh. AAA, p. 89.) He went on to note Mr. Rush's AA from Hartnell, BA from San Jose State and his Masters in Humanities from Dominguez Hills, all of which were completed during his incarceration. (*Id.*) The commissioner then acknowledged the numerous self-help programs he has been involved in, including, Alcoholics Anonymous, anger management, fatherhood training, a health program, the Hepatitis C health program, and the CTF Video Reports Program. (*Id.*) The Board then congratulated Mr. Rush because he has "clearly behaved since he has been in custody." (*Id.*) He has had only one 128 A in 1988, because he was early to work and "technically" out of bounds, and absolutely no 115's in his twenty (20) year disciplinary history. (*Id.*)

The Board then addressed Mr. Rush's psychological reports. (Exh. AAA, p. 90.) His latest doctor was Dr. Talbott who did an update on August 28, 2005. (*Id.*) He adopted most of Dr. Terrini's 1999 psychiatric report. (*Id.*) As with the previous doctors, he concluded Mr. Rush's "violence potential is less than that of the average level II inmate" and his "potential for violence within the free community is no more than that of the average citizen." (Exh. BBB, p. 156.) Upon release, Mr. Rush plans to live with his father in San Bernardino County. (Exh. AAA, p. 90.) His father has written a very supportive letter indicating he is able to assist him with any financial requirements he has upon release, including a home, food, clothing, medical and dental care, a car, and any other financial assistance he needs during the transition into the workforce. (Exh. BBB, p. 235.) In addition, Mr. Rush has been offered a position at the Mellinger Construction Company in Lake Arrowhead. (Exh. BBB, p. 284.) He plans to work there and then pursue a career as a cartographer, where his knowledge the CAD system will be extremely beneficial. (Exh. AAA, p. 90.) The Board acknowledged he has marketable skills and an acceptable employment plan upon release. (*Id.*)

The presiding commissioner then stated Mr. Rush has done "a great job since [he has] been in custody for the last 19 years" and has "certainly prove[n] [him]self." (Exh. AAA, p. 91.) However, the commissioner then referred to the commitment offense in stating he had victimized a lot of people, he had remedies other than using a gun, and stated "[y]ou were convicted of second-degree murder, sir." (*Id.*) After another brief synopsis of the crime he was complimented again for his accomplishments during incarceration. (*Id.*) The Board even concluded Mr. Rush was a "good role model" while in custody. (*Id.*) Immediately thereafter, the

was brought before the Board.

25

commissioner inexplicably stated, "I don't know what you would be like on the outside" and denied his parole for another two (2) years. (*Id.*)

Thus, the Board acknowledged Mr. Rush's numerous accomplishments and his exceptional behavior during his twenty (20) years of incarceration simply to ignore his progress, and once again, rely solely upon the unchanged facts of the commitment offense to deny parole for another two (2) years.

### *LEGAL ARGUMENT*

The primary legal arguments raised in the September 9, 2004 petition and the in the prior habeas proceedings apply here. Thus, Petitioner has separately filed a request for judicial notice, and is requesting this Court to take judicial notice of the pleadings and files in the prior habeas proceedings. Petitioner incorporates herein by reference the legal arguments from the Memorandum of Points and Authorities in Support of the Petition filed on September 9, 2004, in case #44594, *In re Robert Dalton Rush,* on habeas corpus, as though set forth in full.

Additionally, several new cases came down recently in both the federal and state courts, addressing similar situations. (*Martin v. Marshall* (N.D.Cal. 2006) 431 F.Supp.2d 1038; *Rosenkrantz v. Marshall* (C. Dist. Cal. 2006) 444 F. Supp. 2d 1063; *In re Scott [Scott II]* (2005) 133 Cal. App. 4th 573.) *In Martin,* the federal district court found that the inmate's due process rights were violated by repeated denials of parole. Like Mr. Rush, Martin had been in prison for many years, having five (5) hearings like Mr. Rush, and had shot his victim multiple times (a total of 7 in Martin's case). He too had been subjected to multiple denials of parole, and was more than six years over his matrix term at the time of the hearing. However, Martin had an extensive disciplinary history, and had only been free of discipline since 1995, wheras Mr. Rush has twenty years discipline free. Thus, unlike Martin, Mr. Rush has never been a disciplinary problem during incarceration. In the face of these facts, the *Martin* court found that the Governor's reversal was not supported by any evidence. In analyzing the *Biggs\Irons*[24] issue, the district court found it significant that Martin's crime "was less serious than the petitioner's in *Biggs*," and had served well beyond his minimum term, whereas Biggs had not. The Court also found that Martin compared favorably to the inmate in *Irons, supra,* who had been denied five (5) times, again focusing on the fact that he had exceeded his minimum term. These same points apply equally to Mr. Rush's case, as *Martin* was a double murder, which an innocent by stander being killed by the spray of bullets

and another being seriously injured.  Likewise, Mr. Rush compares favorably with the inmates in *Scott II* and *Rosenkrantz VI.*

The following arguments are matters not addressed in the previous habeas proceedings or which address the subsequently occurring facts or legal authorities not previously covered therein.

### I.    THE BOARD'S APPLICATION OF THE RULING IN DANNENBERG IS CONTRARY TO CLEARLY ESTABLISHED SUPREME COURT LAW, AS IT RELIES ON REGULATORY LANGUAGE THAT IS UNCONSTITIONALLY VAGUE.

In evaluating an inmate's suitability for parole, the Board is only permitted to come to a finding of unsuitability if the inmate currently presents an unreasonable risk of danger to society if paroled.  (*Cal. Code Regs.*, tit. 15, §2402(a); *In re Scott [Scott II]* [25] (2005) 133 Cal.App.4th 573, at 594-595.)  The regulations only permit such a finding to be based on the crime if the offense is "especially heinous, atrocious or cruel."  (*Cal. Code Regs.*, tit. 15, §2402(c)(1).)  That phrase, as defined by the regulatory criteria, applies only when the murder is of a "particularly egregious" type, fitting certain defining principles set out in the regulations.[26]  As will be discussed, as applied by the Board, these criteria are overly vague, leaving inmates unable to determine if the criteria should properly apply to their particular offense.  However, in defending its actions in these cases, the Board takes the position that the standard enunciated in the case of *In re Dannenberg* (2005) 34 Cal.4th 1061 somehow allows them to ignore even these rules, authorizing the denial of parole based solely on the commitment offense if the facts surrounding the offense are "more than minimally necessary to convict" the inmate of the offense in question, irrespective of whether the offense actually meets the regulatory criteria for particularly egregious

---

[24]  *Biggs v. Terhune* (2003) 334 F.3d 901, at 917;  *Irons v. Warden* (E. Dist. Cal. 2005) 358 F.Supp.2d 936, 947.

[25]    There are two "*Scott*" decisions.  The first was the reversal of the Board's denial of parole, *In re Scott [Scott I]*, 119 Cal.App.4th 871 (2004).  The second was the reversal of the Governor's action taking Scott's parole date granted at the hearing after the decision in *Scott I*.  *In re Scott [Scott II]*, 133 Cal. App.4th 573 (2005).  They will be differentiated herein by the roman numeral designations I & II.  It should be noted that *Scott II* was subsequent to *Dannenberg*, and the Supreme Court not only denied review, but they refused the Governor's request to republish that opinion.

[26]  Section 2402(c) goes on to define the categories of sufficiently egregious offenses as being ones where "(A) multiple victims were attacked, injured or killed in the same or separate incidents. (B) the offense was carried out in a dispassionate and calculated manner, such as an execution-style murder. (C) The victim was abused, defiled or mutilated during or after the offense. (D) The offense was carried out in a manner, which demonstrates an exceptionally callous disregard for human suffering. (E) The motive for the crime is inexplicable or very trivial in relation to the offense."

27

murders under section 2402 subdivision (c)(1). Such an interpretation, if adopted, would render the regulatory criteria so unconstitutionally vague as to literally read them right out of the books. Of course, as the appellate court noted in *Scott II, supra,* 133 Cal.App.4[th] at pp. 594-595, not only must the Board's finding fit within the regulatory criteria, but they must rationally and reliably show that the inmate is currently dangerous. Here, there was no factual support for any of the Board's crime based findings, yet the Board's decision attempts to rationalize a fifth denial of parole based on the crime, under the theory that the offense involved facts which were more than the "minimum necessary to sustain a conviction" for second degree murder.

In the present case, the Board denied Mr. Rush parole at his 2005 hearing based solely upon the commitment offense, characterizing it as, "particularly cruel and callous," "dispassionate" with a "callous disregard for human suffering." (Exh. AAA, p. 88.) While purporting to be "findings" about the crime, the use of these phrases without explanation shows that the Board was doing nothing more than reading off of the denial from, BPT 1000a, rather than coming to some definitive conclusion about the pertinent offense factors. (See Exh. KKK.) Note that the second finding, that of a "dispassionate" manner, fails to accurately apply the full regulatory criteria.[27] Even if the regulatory criteria was properly modified in that fashion, in the face of a crime that was clearly committed under significant stress, while perhaps not sufficient to reduce it to a manslaughter, the use of the term "dispassionate" simply has no application, and no inmate in Mr. Rush's position would expect that this criteria would apply to him. Nor is the first criteria in the actual regulatory terms, and the third is simply the defining principle for what constitute an offense that is "especially...cruel." (See *Cal. Code Regs.,* tit. 15, §2402(c)(1)(D.) As such, no inmate would anticipate the application of the first or third stated criteria, particularly in these circumstances and in light of the applicable rules defining what it means for a crime to be "especially...cruel." (*In re Ernest Smith* (2003) 114 Cal.App.4[th] 343 ["There is no evidence that Smith acted with cold, calculated, dispassion; or that he tormented, terrorized, or injured (the victim) before deciding to shoot her; or that he gratuitously increased or unnecessarily prolonged her pain and suffering"].) As will be discussed below, this characterization by the Board of the crime to support the denial of parole, relies on wholly vague and amorphous terms, and the decision is therefore contrary to clearly established United States

---

[27]  See *Cal. Code Regs.,* tit. 15, §2402(c)(1)(B) ["The offense was carried out in a dispassionate *and calculated manner, such as an execution-style murder.*"] Emphasis added.

28

Supreme Court law and violative of fundamental due process.[28]

A statute (or regulation) is void for vagueness "if it fails to give adequate notice to people of ordinary intelligence concerning the conduct it proscribes, or if it invites arbitrary and discriminatory enforcement." (*United States v. Doremus* (9th Cir. 1989) 888 F.2d 630, 634.) In addressing a vagueness challenge, the first question is "whether to scrutinize the statute for intolerable vagueness on its face or whether to do so only as the statute is applied in a particular case." (*Schwartzmiller v. Gardner* (9th Cir. 1984) 752 F.2d 1341, 1346.) As will be discussed herein, the factors set forth in *Cal. Code Regs.*, tit. 15, § 2402(c) used by the Board to determine whether the crime was committed in an especially heinous, atrocious or cruel manner, as applied both generally and as to Mr. Rush, are purely subjective, and are unconstitutionally vague. As such, these factors are not easily understood or explained, and thus, Mr. Rush did not have notice that they would apply to his crime, which was committed under the effects of extremely highly charged emotions, and in response to being physically assaulted and tormented by his much larger and more aggressive roommate, ultimately resulting in an overreaction to those circumstances.[29]

Here, the Board found, that Mr. Rush's crime was cruel and callous, dispassionate, and showed a callous disregard for the suffering of the victim, apparently invoking *Cal. Code Regs.*, tit. 15, §2402(c)(1)(B) & (D). The Court in the matter of *In re Rosenkrantz [Rosenkrantz V]* (2002) 29 Cal.4[th] 616 held that "the nature of the prisoner's offense, alone, **can** constitute a

---

[28] This should come as no surprise, as the Board continuously falls back on the immutable and unchanging facts of the crime in every case where parole is denied. The Board consistently ignores the rule stated in *Biggs v. Terhune*, *supra*, 334 F.3d at 916-917 that repeated reliance on unchanging facts in the face of uncontradicted evidence of rehabilitation violates due process. (See also *Scott II*, *supra*, 133 Cal.App.4[th] at 594-595. Here, as is discussed more fully *supra*, Petitioner's crime is not sufficiently egregious factually when evaluated in light of the applicable authorities, such as *In re Ernest Smith* (2003) 114 Cal.App.4th 343 [unchanging history of drug and spousal abuse not sufficient to deny parole, and while shooting victim three times in the head is "callous," it is not necessarily "particularly egregious" compared to similar life crimes], *In re Mark Smith* (2003) 109 Cal.App.4th 489 [crime not egregious despite facts that victim was shot twice by inmate, before inmate ordered copart to drown the victim], *Scott I*, *supra*, 119 Cal.App.4th at 890-892 [crime is not particularly egregious, despite facts of shooting victim in the presence of child], and *McQuillion I*, *supra* [double murder, with father-son proprietors tied up and executed during culmination of spree of robberies, not sufficiently egregious to justify rescission]. The holdings of these cases, compared with the factually unsupported "findings" of the Board in this case, clearly demonstrate their arbitrariness. (See also *In re Van Houten* (2004) 116 Cal.App.4th 339 [the existence of death penalty eligible special circumstances in Van Houten's particular offense, one of the Manson Clan killings, demonstrates what is sufficiently egregious to provide " 'some evidence' that the horrible [violence] potential may still be within her."].) No such evidence was present here.

[29] It is important to note at the outset that the California Supreme Court has determined in cases involving the death penalty or life without the possibility of parole, the virtually identical terms to those found in §2402(c)(1), "especially heinous, atrocious, or cruel, manifesting exceptional depravity," are unconstitutionally vague and violative of fundamental due process. (*Superior Court of Santa Clara v. Engert* (1982) 31 Cal.3d 797, 805.)

29

sufficient basis for denying parole." (*Rosenkrantz V, supra*, 29 Cal.4th at 682, emphasis added.) The *Rosenkrantz V* decision employed conditional language that the offense "can" constitute such a basis, but only if the crime could reasonably be considered *more* aggravated or violent than the minimum necessary to sustain a conviction for that offense, meaning the crime had to be particularly egregious compared to other murders so that the exception of 3041(b) would not "swallow the rule" that parole "shall normally" be granted. (*Id.* at 683, emphasis added.) Although the *Rosenkrantz V* language itself, if not properly tempered by the rules addressed in *Scott II, supra*, 133 Cal.App.4th at 594-595, can lead to the regulations being interpreted in a manner that would render them unconstitutionally vague, the Court in that decision did at least state a directive that sole reliance on the commitment offense will violate the prisoners' due process rights pursuant to *Penal Code* §3041(a) in situations where the offense "could [not] be considered *more* aggravated or violent than the minimum necessary to sustain a conviction for that offense" and therefore was not "particularly egregious." (*Rosenkrantz V, supra*, 29 Cal.4th at 683.) The language requiring that the offense be "particularly egregious" was understood to mean that the offense stood out among second degree murders as being significantly more violent. (See *e.g., In re Ernest Smith, supra*.)

However, under the Board's interpretation of *Dannenberg*, the standard set forth in *Rosenkrantz V* is dramatically changed, allowing the Board to deny parole based on the commitment offense, without regard for its comparative egregiousness, solely because they can "point to some evidence" that the crime was merely "more than minimally necessary to convict him of the offense for which he is confined." (*In re Dannenberg, supra*, 34 Cal.4th at 1095.)[30] Of course, the *Dannenberg* majority made it explicitly clear that they were not overruling *Rosenkrantz V* or watering down its rules.  This interpretation urged by the Board would fundamentally alter the standard by removing the focus from determining whether the crime was "especially heinous, atrocious and cruel" so long as there is simply more evidence than "minimally necessary to convict."  This formulation would then take the place of determining whether the crime was egregious under the regulatory standards of *Cal. Code Regs.*, tit. 15, §2402(c)(1), on which inmates routinely rely to evaluate whether their particular crime could potentially take them outside the regulatory standards of suitability, which the Court expressly required the Board to base its decision on in *Rosenkrantz V, supra*, 29 Cal.4th at 653, 654 and

---

[30]  As the dissent in *Dannenberg* pointed out, viewing the standard in this light makes it completely unreviewable.

658. This requirement of relying on the regulatory standards has been routinely ignored by the Board. In fact, as has been argued by the Board in other cases, their decision must be upheld under this standard, ***even if the evidence does not show that the inmate currently presents an unreasonable risk of danger*** if released, as is expressly required by Cal.Code Regs., tit.15, §2402(a). (See *Scott II, supra,* 133 Cal.App.4[th] at 594-595.) Obviously addressing this very argument, *Scott II, supra,* clarified the basic holding in *Dannenberg,* concluding that the crime "*can*" justify a parole denial, but only where it rationally shows current dangerousness, in light of the reduced probative value that the crime based evidence naturally has after the passage of time. (See also *Rosenkrantz v. Marshall [Rosenkrantz VI]* (C.D. Cal. 2006) 444 F. Supp. 2d 1063, 1081; *Martin v. Marshall* (N.D. Cal. 2006) 431 F. Supp. 2d 1038, 1046-1047.) Of course, the Board did not extend to Mr. Rush the benefit of the wisdom of *Scott II* or the recent federal decisions.

As noted by the dissent in *Dannenberg,* utilizing this standard in the way suggested by the Board, without the caveat of *Scott II,* makes the Board's decision ***completely*** unreviewable. (*Id.* at 1102.) The result is a definition, or standard, that like the Greek god Proteus, constantly changes shapes, is never consistent and is incapable of being defined or pinned down. What may be callous or heinous, under this view of the standard, to one Board member may not be such to another. However, the Court made it clear in *Dannenberg* that they were not intending to alter the standard of *Rosenkrantz V.* (*Dannenberg, supra,* 34 Cal.4[th] at 1094.) *Scott II* helped to clarify that crime based denials still needed to be closely monitored, and that the law still retained the fundamental requirement that the focus be on the regulatory standards and their ability to show, despite the passage of time, that the inmate is ***currently*** still presenting an unreasonable risk of danger to society if paroled. (*Scott II, supra,* 133 Cal.App.4[th] at 594-595.) The Board's narrow view of the basic holding in *Dannenberg* sees it as effectively amending the standard in a way where every murder could fit into the category of "more than minimally necessary to convict" by virtue of the simple fact that the inmate was convicted and thus the evidence is presumptively greater than the "minimum necessary to convict." This application is wholly arbitrary and depends on the subjective, personal opinions and whims of the Board members. Of course, the Board has fully adopted this stance, thus abusing its position by treating *Dannenberg* as carte blanche language to repeatedly deny parole based ***solely*** on the nature of the

(*Dannenberg, supra,* 34 Cal.4[th] at 1102.)

commitment offense, by simply mouthing the words "especially heinous, atrocious, and cruel." This position permits a conclusion that can easily be reached by those Board members who want to claim that the facts of any murder are more than those minimally necessary for conviction. Since the *Dannenberg* Court dispensed with the requirement that the offense be compared to other murders *for proportionality purposes*, the Board seizes on that language to avoid comparisons for *any* purpose, even evaluating whether the crime fits under the indisputably comparative language of the regulations, §2402(c)(1) ("*especially* heinous…" or "*exceptionally* callous disregard…," etc., emphasis added). Thus, under their view, the standard can be said to fit any murder, including accomplice liability, DUI based car accident, non-intentional (implied malice) killings, and the like.

An example can easily illustrate the unworkability of this view of the *Dannenberg* standard, where the caveat of *Scott II* is ignored. Assume two separate murders committed in an identical fashion by first time offenders. In each case, the perpetrator contemplates the idea of killing just long enough to satisfy the element of premeditation and deliberation, and both harbor express malice, i.e., intent to kill. However, the jury in defendant A's case decides to credit some psychological evidence on mental state and finds only a second degree murder, while the jury in defendant B's case rejects the identical evidence and convicts of first degree. Under the Board's view of the *Dannenberg* formulation, only defendant A's crime, the second degree murder, exhibits evidence that is "more than minimally necessary" to convict, since premeditation is a required element of defendant B's first degree murder offense. Thus, defendant B would be entitled to have his parole date fixed at his initial hearing, absent adverse in-prison behavior, as the evidence of premeditation is simply one of the elements of his crime. However, under the Board's view of *Dannenberg*, they would be free to repeatedly deny parole to defendant A, based on the evidence of premeditation that was rejected by the jury.[31] In other words, all other facts being equal, the Board's view of the *Dannenberg* formulation results in the second degree murder being treated as more serious than the identical first degree offense, committed by an identical offender. Such a rule flies in the face of due process.

Applying the rule explained by the United States Supreme Court, there is nothing in the language and descriptions used in § 2402(c)(1) ["exceptionally heinous, atrocious and cruel"]

---

[31] The constitutionality under federal law of the California Supreme Court's allowance of this in *Rosenkrantz V*, where the offense was *de facto* treated as a first degree murder, despite an express acquittal of that charge by the jury, is not at issue here, as there is indisputably no evidence of premeditation. Should the Court deem that to be an

that standing alone "implies any inherent restraint on the arbitrary and capricious" denial of parole suitability. (*Godfrey v. State of Georgia* (1980) 446 U.S. 420, 428.) That Court found that a "person of ordinary sensibility could fairly characterize almost every murder as [exceptionally heinous, atrocious, cruel or callous]," and for death penalty purposes, are unconstitutionally vague. (*Id*, at 428-429; *Maynard v. Cartwright* (1988) 486 U.S. 356, 361-364.) As applied to death penalty cases, the Supreme Court felt that terms such as "heinous" and "atrocious" could be used by any reasonable person to characterize every murder so as to fall into those categories. (*Shell v. Mississippi* (1990) 498 U.S. 1, 3; *Maynard v. Cartwright, supra*, 486 U.S. at 363; *Godfrey v. Georgia, supra*, 446 U.S. 420, 428-429.) As previously discussed, the California Supreme Court has also found that in **both** death penalty or life imprisonment without possibility of parole, the terms "especially heinous, atrocious, or cruel, manifesting exceptional depravity" are unconstitutionally vague and violative of fundamental due process. (*Superior Court of Santa Clara County v. Engert* (1982) 31 Cal.3d 797, 805.) However, the paroling authority is using those terms to repeatedly deny parole, effectively converting parole eligible sentences into an LWOP. As such, the use of those terms here is even more insidious, as these offenses are indisputably parole eligible, and the repeated use is effectively allowing terms that are unconstitutional when used to impose an LWOP sentence to be used to achieve that same result, effectively turning these parole eligible cases into LWOP sentences. In other words, the same result occurs without the same protections.

Thus, the analysis must start from the premise that the regulatory language is already unconstitutionally vague, by its reliance on the phrase "especially heinous, atrocious and cruel." *Cal.Code Regs.*, tit.15, §2402(c)(1). However, rather than attempting to establish a definition that would serve to correct, or at least mitigate, the problem, the Board seeks to eviscerate the standard altogether, proffering an unworkable definition and substituting it for the regulatory criteria of "especially heinous, atrocious and cruel." As respondent urges, under *Dannenberg*, the regulatory criterion are satisfied merely by the Board "point[ing] to some evidence," which here the Board described as a crime that was "cruel and callous," "dispassionate," and which showed disregard for the suffering of another. (Exh. AAA, p. 88.) As previously discussed, any murder can fit this standard, and if adopted, the regulatory terms will entirely lose their ability to distinguish the more egregious murders from those of a comparatively lesser seriousness.

---

issue herein, leave is requested to further brief that point.

1   Furthermore, respondent's version of the standard does not make any effort to discern whether

2   the presence of evidence that is "more than minimally necessary to convict" has any tendency in

3   reason to establish the sole focal question in parole suitability: does the inmate currently present

4   an unreasonable risk of danger if paroled? (*Cal.Code Regs.*, tit.15, §2402(a); *Scott II, supra,* at

5   594-595.)  As such, adopting this view of the *Dannenberg* formulation renders the regulatory

6   standards unconstitutionally vague.

7         Here, upholding the Board's crime based findings under this view of the standards, in

8   effect, waters down even further the already vague terminology ("especially heinous, atrocious

9   and cruel") by substituting an entirely different standard that could fit any murder related offense.

10  However, as explained by the United States Supreme Court, these terms were already

11  constitutionally deficient, as they do not possess any inherent restraint to prevent an arbitrary or

12  capricious application.  (*Godfrey v. State of Georgia, supra,* 446 U.S. at 428.)  Furthermore, by

13  the California Supreme Court's own analysis, the terms used were unconstitutionally vague even

14  before given the extremely broad veil that respondent urges under the "more than minimally

15  necessary to convict" standard.  (*Superior Court of Santa Clara County v. Engert, supra,* 31

16  Cal.3d at 805.)[32]   As such, the argument that Mr. Rush's crime was sufficient to justify the

17  Board's denial of parole must be rejected.

### II.    STANDARD OF REVIEW

18        In evaluating the Board's denial of parole, recent case law has utilized the "some evidence"

19  standard, as described in *In re Rosenkrantz* [*Rosenkrantz V*] (2002) 29 Cal.4th 616, at 658; *In re*

20  *Dannenberg* (2005) 34 Cal.4th 1061.  The California Supreme Court in *Rosenkrantz V* stated that

21  the "some evidence" review means that

> [T]he judicial branch is authorized to review the factual basis of a decision of the
> Board denying parole in order to ensure that the decision comports with the
> requirements of due process of law, but that in conducting such a review, the court
> may inquire only whether some evidence in the record before the Board supports the
> decision to deny parole, based upon the factors specified by statute and regulation.
> (*Rosenkrantz V, supra,* 29 Cal.4th at 658, emphasis added.)

The *Rosenkrantz V* court further explained "[a]s long as the Governor's decision reflects

due consideration of the specified factors as applied to the individual prisoner in accordance with

---

[32]   The decision in *Engert* applied to death penalty and LWOP cases.  However, this creates a loop-hole through
which, if not corrected, the Board and courts would be allowed to apply unconstitutionally vague concepts to parole
eligible term to life sentences, in order to effectively turn the sentence into an LWOP by repeatedly using the crime
to deny parole.

applicable legal standards, the court's review is limited to ascertaining whether there is some evidence in the record that supports the Governor's decision." (*Id.* at 677.) However, this is the wrong level of evidentiary review, based on a fundamental misunderstanding of the doctrine in *Superintendent v. Hill* (1985) 472 U.S. 445. That case held that ***because no standard of proof was dictated*** by the state of Massachusetts Department of Corrections regulations to support a finding of guilt in a disciplinary proceeding, due process only required the reviewing court find "some evidence" in the record to support the hearing officer's determinations. Thus, when evaluating what the judicial standard of review of parole denial decisions of the California Board of Parole Hearings should be, the courts seemed to adopt, without much legal analysis, the "some evidence" standard of *Hill*. (*In re Rosenkrantz* [*Rosenkrantz II*] (2000) 80 Cal.App.4th 409, 427; *In re Ramirez* (2001) 94 Cal.App.4th 549, 564; *In re Rosenkrantz* [*Rosenkrantz V*] (2002) 29 Cal.4th 616.)

However, the underlying premise on which *Hill* based the decision to apply a "some evidence" level of analysis, that no standard of proof is specified for those hearings, does not apply in California's parole hearing process. Instead, under Federal Due Process principles, as enunciated in *McQuillion v. Duncan* [*McQuillion I*] (2002) 306 F.3d 896, at 901-902, the statutory language of *Cal. Pen. Code* §3041 creates a presumption of parole suitability, which then shifts the burden to the state to prove by a preponderance of the evidence that the inmate fits within the §3041(b) "public safety" exception to the mandatory duty to set a parole date. Thus, the reason upon which the rule of *Hill* was based does not even exist, and the "some evidence" standard is therefore inappropriate. Furthermore, the "some evidence" rule, even if properly applicable, is for a reviewing court to apply, not the Board or the Governor. The Board must do more than just "point to some evidence." The Board must make its decision based on evidence that supports its conclusions by a preponderance of the evidence.[33] The Board is charged with making a determination of whether the inmate currently presents an unreasonable risk of danger to society under this standard. (*Cal. Code Regs.*, tit. 15, §2402(a).)

The standards for parole hearings must begin with an analysis of *Cal. Pen. Code* §3041. That section provides in subsection (a) that "one year prior to the inmate's minimum eligible parole release date...the Board...***shall*** again meet with the inmate and ***shall normally*** set a

---

[33] As a general rule, the comparative degree of proof by which a case must be established is the same before an administrative agency as in a judicial proceeding, which is a preponderance of the evidence. (*Ettinger v. Board of Medical Quality Assurance* (1982) 135 Cal.App. 3d 853; *Gardern v. Commission of Professional Competence*