# EXHIBIT 6
# part 2 of 2

parole release date..." (Emphasis added.) That section goes on to mandate that the "release date *shall* be set in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public." (Emphasis added.) The only exception to this mandate that a release date shall be set is contained in subsection (b), which directs that the Board "shall set a release date unless it determines that the gravity of the current convicted offense... is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting." The reference to "this meeting" obviously refers back to the initial hearing discussed throughout subsection (a). Thus, when the public safety exception is not found, the setting of a date is mandatory. The Ninth Circuit, in *McQuillion I*, held that for Federal Due Process purposes, this statutory language creates a presumption of parole suitability, relying on the clearly established United States Supreme Court authority of *Greenholtz* and *Allen*.[34] (*McQuillion I, supra*, 308 F.3d at p. 902; see also *Sass v. California Bd. of Prison Terms* (9th Cir. 2006) 461 F.3d 1123, 1127-1128.)

*Rosenkrantz* and *Dannenberg* are likewise clear that the presumptive language in §3041 can be overcome only by a factually based concern that the inmate currently presents on unreasonable risk of danger to the public if released. (*Rosenkrantz V, supra*, 29 Cal. 4th at 683; *In re Dannenberg, supra*, 34 Cal.4[th] 1087; see also *Cal. Code Regs.*, tit. 15, §2402(a).) Here, the presumption is that a parole date will be set, absent a finding which must be supported by evidence and a statement of reasons establishing that the circumstances of the offense place it among the gravest of similar offenses so as to overcome the presumption and justify the denial of parole. (*McQuillion I, supra*, 306 F.3d at 901-902; *Rosenkrantz V, supra*, 29 Cal.4[th] at 655-656; *Ramirez, supra*, 94 Cal.App.4[th] at 560; see also *Pen. Code* §3041.5(b)(2).) As the majority noted in *Dannenberg, supra*, 34 Cal.4th at 1087-88, the public safety concerns of 3041(b) operates as an exception to the mandate that a parole date be set.

Evidence Code §605 provides as follows:

"A presumption affecting the burden of proof is a *presumption established to implement some public policy* other than to facilitate the determination of the particular action in which the presumption is applied, such as the policy in favor of establishment of a parent and child relationship, the validity of a marriage, the stability of titles to property, or the security of those who entrust

---

(1985) 164 Cal.App.3d 1035; *Copper Mining Co. v. Industrial Acc. Com.* (1920) 183 Cal. 714, 192.)

[34] *Greenholtz v Nebraska Penal Inmates*, 442 U.S. 1, 12 (1979) and *Board of Pardons v. Allen*, 482 U.S. 369, 376-78 (1987).

themselves or their property to the administration of others." (Emphasis added)

The stated purpose of the Legislature in creating the presumption under §3041 is to "provide uniform terms for offenses of similar gravity and magnitude" and not simply to facilitate the resolution of any particular Board hearing. For inmates serving an indeterminate sentence, the Legislature has commanded that the Board "shall normally set a parole release date. . . in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public." (*Pen. Code* §3041(a).) This language creates a presumption of parole suitability that is based on the public policy of achieving uniformity of terms served by prisoners. Of course, such a construction also serves federal due process considerations by placing the burden of establishing cause for continued loss of liberty on the confining authority. The presumption affects the burden of proof, since the requirement of setting a release date is in furtherance of an expressly stated public policy to ensure uniformity in sentencing. (*Evid. Code* §605.) Clearly established United States Supreme Court authority requires that when a state adopts certain procedures for a hearing, any person involved in that process is entitled to the benefit of those procedures. (*Evitts v. Lucey* (1985) 469 U.S. 387, 393 (1985); see also *Griffin v. Illinois* (1956) 351 U.S. 12, 20.) Thus, every inmate must be given the benefit of this presumption of suitability.

Here, the state procedure begins with *Penal Code* §3041 specifically restricting the Board by directing it to set a parole date at the initial hearing, absent a factually supported finding that the inmate currently presents an unreasonable risk of danger to the public if released. (*McQuillion I, supra,* 306 F.3d at p. 905; *Ramirez, supra,* 94 Cal.App.4[th] at p. 570; *Cal. Code Regs.*, tit. 15, §2402(a); see also *In re Dannenberg, supra*, 34 Cal. 4th at 1082.) Thus, the starting point in any evaluation of the Board's decision to reverse parole must be to determine if the Board honored the presumption of suitability. Only if the Board properly applied the presumption, and then considered the evidence opposing parole in the context of evaluating whether it meets an applicable level of proof, can it be said that the inmate's due process rights have been upheld by a uniform and fair application of the governing principles to the hearing. The Board is not free to apply whatever procedure they choose to an inmate, as the legislative directive in 3041 is unmistakable. (*Ramirez, supra,* 94 Cal. App. 4th at 560.) The statutes go on to further confine the Board's authority in how they proceed by directing a variety of procedural

37

safeguards in *Pen. Code* §3041.5, as well as including provisions in §3041(a), which specifically list the type of criteria that the Board must consider in setting appropriate terms. The matrix set out in *Cal. Code Regs.*, tit. 15, §2403 likewise defines the parameters within which the Board must set the date for parole. (*Cal. Code Regs.*, tit. 15 §2403(a).) As the *Dannenberg* Court noted, use of the matrix is mandatory on the Board, due to the legislative directive to ensure uniform terms. (*Dannenberg*, 34 Cal. 4th at 1079, fn 7.)

The application of the "some evidence" doctrine of *Hill*, 472 U.S. 445 is obviously not appropriate here when one considers the rationale as to why such a low level of review was imposed by the Court in that case. The findings to support the Board's decision to deny parole must be that the evidence before it establishes factually that the inmate ***currently*** poses an "unreasonable risk of" danger to the public. (*Cal. Code Regs.*, tit. 15, §2402(a); *Scott II, supra*, 133 Cal.App.3d 594-595.) That finding cannot be based on such flimsy evidence as to render it mere whim or caprice. (See *In re Powell* (1988) 45 Cal.3d 894; see also *In re Ramirez, supra*, 94 Cal.App.4th at 564.) The Board's decision must be made under a "preponderance of the evidence" standard, the minimum standard allowed in such proceedings. Since the Court review is the only appellate level review of a Board action, it should be conducted under a "substantial evidence" test, as is always utilized at a first level appeal.[35]

Prior to the 1980's, there was no standard known as the "some evidence standard." The "some evidence" standard relied upon by the courts in parole matters the past two decades evolved from the United States Supreme Court case of first impression, *Superintendent v. Hill*, *supra*, 472 U.S. 445. That case involved the standard of review to be applied by a court on a challenge to a finding of guilt in a routine disciplinary proceeding. The Supreme Court held that ***because no standard of proof was dictated*** by the Department of Corrections regulations in that case, the United States Constitutional guarantee of due process only required that the court reviewing the decision find "some evidence" be present to support the hearing officer's determinations. Hence, the "some evidence" standard was born into case law. Subsequent courts have applied the *Hill* "some evidence" standard to the parole consideration context, without further analysis or consideration of what the standard of proof is in a Board hearing or on

---

[35] There must be a level of adequate, quality evidence necessary for a court to affirm a decision of an administrative board. Under the substantial evidence standard, reviewing courts must determine whether there is substantial evidence upon which the agency could reasonably base its decision. It is more than a mere scintilla of evidence that is needed to support an agency's decision. (*Chrysler Corp. v. U.S. Environmental Protection Agency*.(9th Cir. 1980) 631 F.2d 865, 980.)

Governor's review. (See *McQuillion I., supra*, 306 F.3d 895, *In re Dannenberg, supra*, 34 Cal.4[th] 1061; *In re Ramirez*, supra, 94 Cal.App.4[th] 549; *In re Powell, supra*, 45 Cal.3d 894, and the progeny of cases following those rulings.) None of these courts have looked at the underlying rationale of *Hill* that led it to adopt this lower standard.

Unlike the circumstances in *Hill*, the statutory and regulatory scheme in California requires the application of a "preponderance of the evidence" standard. For example, CDC disciplinary matters require that the finding of guilt ***must be supported by a preponderance of the evidence.*** (See *Cal. Code Regs.*, tit. 15, §3320(l) ["***Any finding of guilt*** shall be based upon determination by the official(s) conducting the disciplinary hearing that a ***preponderance of evidence*** submitted at the hearing substantiates the charge..."]; *Cal. Code Regs.*, tit. 15, §3290(g) "...***a finding of guilty shall be based upon the preponderance of all evidence*** presented at the disciplinary hearing..."]; §3290(h) ["...***authorized disciplinary actions may be taken based on a preponderance of evidence*** and testimony"], emphasis added.)

The Supreme Court's decision in *Hill* was based ***solely*** upon the reasoning that the State had imposed no standard of proof upon a disciplinary hearing officer. Thus, the Court reasoned that federal due process only provides a reduced level of rights, limited to the "some evidence" standard. That is not the case in California. In the California Board of Prison Terms' regulations, while there is no specific standard of proof defined in the parole consideration hearing process, California law is explicit under *Evidence Code* §115 that if a burden of proof is not specified, the standard to be used by the trier of fact is "preponderance of the evidence." It is noteworthy that this same standard is used elsewhere in parole processes. For example, when the Board is extending an offender's incarceration by way of parole violation or rescission, they are explicitly directed to apply a preponderance standard. (*Cal. Code Regs.*, tit. 15, §2450 [rescission must be based on "***good cause***," defined in the regulations, §2000(b)(5), as "[a] finding by the board based ***upon a preponderance of the evidence*** ..."], emphasis added; see also CDC regulations, *Cal. Code Regs.*, tit. 15, §3000 [defining "good cause" to mean a "finding based upon a ***preponderance of the evidence*** ..."], emphasis added.)

Thus, because neither the *Penal Code* nor the *Cal. Code Regs.*, tit. 15, Div. 2, directly prescribes a standard of review for parole consideration hearings for indeterminate-term offenders, California law is explicit that the correct standard applicable under *Evid. Code* §115 is a preponderance of the evidence. Certainly, if that standard is applicable in the disciplinary

39

context, for violations of parole, or for rescission or delay of a parole date, principles of due process, equal protection and fundamental fairness dictate that the same standard apply to decisions rendered by the Board which result in the denial of the inmate's constitutionally protected liberty interest, pursuant to the direct language of *Evid. Code* §115.  A disciplinary action results in the extended incarceration of a prisoner in the same class as Petitioner for no more than one (1) year, whereas a parole denial or reversal extends incarceration for an indefinite period of at least one to five years, or conceivably delays release for the rest of the inmate's life. (*Pen. Code* §3041.)

Furthermore, a preponderance of the evidence standard is required because parole decisions are an extension of the sentencing process.  In *In re Roberts* (2005) 36 Cal.4th 575, 586, the court concluded a parole decision is related to sentencing because "parole eligibility is considered an integral part of any sentence." (*Id.* [citing *In re Sena* (2001) 94 Cal.App.4th 836, 839].)  A habeas corpus petition that attacks parole denial is a challenge to the length of the sentence. (*Id.*)  In fact, a sentence contemplates a period of parole, and as such, the sentencing process is not complete until a term is set and the inmate is released.  (*Id.* at 589-590.) Accordingly, because a parole hearing is an extension of the sentencing process, the same standard of proof should be required for a parole hearing as is required for sentencing.   In sentencing, the preponderance of the evidence standard is required.[36]  As a result, preponderance of the evidence is the same standard of proof required for the Board at a parole hearing.

Thus, since the Board's burden of proof is a preponderance of the evidence, and the "some evidence" review is only used where a court is analyzing an administrative decision that has no underlying standard of proof (see *Hill, supra*), the "some evidence" rule should not be applied here.  Instead, the traditional "substantial evidence" review should be utilized.[37]  Here,

---

[36]   See *People v. Nelson* (1978) 85 Cal.App.3d 99, 101 [preponderance of evidence standard for aggravating circumstances is constitutional]; *United States v. Watts* (1997) 519 U.S. 148, 157 [sentencing court may consider conduct underlying charges of which defendant was acquitted, so long as that conduct is proved by preponderance of the evidence]; *Harris v. United States* (2002) 536 U.S. 545, 567 [a fact increasing the mandatory minimum sentence for an offense not beyond the statutory maximum is a sentencing factor, rather than an element of the offense, and may constitutionally be found by the judge rather than by the jury and by a preponderance of the evidence].)

[37]   Traditionally, sentencing issues that involve factual determinations must be sustained on appeal only if supported by "substantial evidence." (See *People v. Lewis* (1971) 19 Cal.App.3d 1019, 1024 [determining indigency is a fact, therefore, on appeal it will be reversed if unsupported by substantial evidence.)  Appellate review of a decision made with a preponderance of the evidence standard of proof will be reversed if not supported by substantial evidence. (See *Pen. Code* § 1369, subd. (f) ["It shall be presumed that the defendant is mentally competent unless it is proved by a ***preponderance of the evidence*** that the defendant is mentally incompetent"]; *People v. Samuel* (1981) 29 C.3d 489, 506 [a finding of competence will be reversed where unsupported by ***substantial evidence***].)

40

the Board's denial of parole *cannot* survive scrutiny under this level of analysis, since as is discussed more fully *infra*, there is no evidence to sustain the Board's findings. Furthermore, as described *supra*, the Board utilized a standard that is wholly inadequate, and did not give Mr. Rush's case the level of review required. Under the appropriate "substantial evidence" test, the theory that Mr. Rush *currently* poses a danger if released is *seriously* lacking in evidentiary support, and can in no way survive such a review. As such, the Board's decision must be set aside as it is contrary to clearly established Supreme Court law.

### III. THE FAILURE OF THE PROSECUTION TO REQUEST THAT THE TRIAL COURT MAKE SPECIAL FINDING REGARDING THE ASPECTS OF THE CRIME PRECLUDES THOSE FINDINGS FROM NOW BEING USED TO JUSTIFY DEPARTING FROM THE "SHALL NORMALLY" FORMULATION OF PENAL CODE §3041.

In two recent United States Supreme Court decisions, our High Court has stated that the constitutional right to due process, and the right to a jury trial, requires that each and every fact used to increase the penalty for a crime *must be alleged and found true by the trier of fact*, be it by jury or a defendant's own admission of facts in a plea of guilty. (*Apprendi v. New Jersey* (2000) 530 U.S. 466; *Blakely v. Washington* (2004) 542 U.S. 296.) As will be discussed herein, these principles bar the Board from making findings that take the Mr. Rush's case outside the normal sentencing scheme, here, the matrix of uniform terms, as the Board's "findings" that support the denial of parole suitability act as both a literal and effective change in the crime for which Mr. Rush was convicted. Such a change is a constructive amendment and is prejudicial per se. (*Jones v. Smith* (9th Cir. 2001) 231 F.3d 1227, 1232-33.)[38] As stated by the U.S. Supreme Court:

> "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." (*Apprendi, supra*, 530 U.S. at 490.)

If a person is convicted at trial, the facts are determined by the jury, and the defendant is

---

[38]  As the Supreme Court indicated in *Stirone v. United States* (1960) 361 U.S. 212, 218, where a defendant is convicted of a crime and where the grand jury never charges the defendant with an essential element of the crime, a constructive amendment has occurred and reversal is warranted. Since the ruling in *Apprendi, supra*, the Court has made it clear that any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt. As such, *Apprendi* expands the range of discrepancies that will amount to constructive amendments.

41

entitled to rely on those determinations as defining the nature of the crime. What is occurring repeatedly at Mr. Rush's Board hearings is that, despite his lower level of conviction, the Board is relying on unsubstantiated allegations to elevate his crime to the equivalent of a first degree murder. This negates the jury's determinations, including the express acquittal of that charge, because he is now being punished as if the crime were of a higher degree. At the time of the hearing at issue, Mr. Rush was eight (8) years beyond his minimum eligible parole date and surpassed the term for even the most egregious of second degree murders. The findings relied on by the Board to support this result are being made without the benefit of any factual determinations by either a jury or a court at plea.

Any argument by Respondents that the denial of parole does not increase Mr. Rush's sentence beyond the statutory maximum of life and thus, does not violate the *Apprendi-Blakely* rule, must be rejected. In *Blakely*, the trial judge had sentenced the defendant to 37 months higher than the presumptive, or normal, term, based on a the sentencing judge's finding of an aggravating circumstance, but was still under the ten (10) year maximum term under the Washington statute. In response to the state's argument that there was no *Apprendi* violation since the ten (10) year maximum was not exceeded, Justice Scalia cleared this point up, stating, 'the statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the Defendant." (*Blakely v. Washington, supra,* 542 U.S. 296, at 36.)

In *Rosenkrantz V*, the California Supreme Court made it clear that the public safety exception in *Pen. Code* §3041(b) is just that, an exception. This point was also acknowledged in *Dannenberg*. (See *Dannenberg, supra,* 34 Cal.4th at 1080.) Absent findings that fit the crime within that exception, the Board is required to follow the "shall normally" formulation and find the inmate suitable. Once that occurs, the Court concluded in *Dannenberg* that the use of the matrix is mandatory. (*Id.* at 1078.) Thus, the matrix constitutes the "normal" or "standard" sentencing range for *Apprendi-Blakely* purposes, despite the fact that the overall maximum sentence of life is not exceeded. In the case of *In re Roberts* (2005) 36 Cal. 4th 575, at 589-590, the Court ruled that parole is an integral part of the overall process of sentencing. (See also *In re Sena* (2003) 94 Cal.App.4th 836, at 839.) Under California law, the sentencing process is not complete until the term is set and the inmate released. (*Roberts, supra,* 36 Cal. 4th at 589-590; *Sena, supra,* 94 Cal. App. 4th at 839.) As such, the Board is an entity that wears two (2) hats,

42

serving as part of the executive branch, but discharging certain judicial functions as an extension of the sentencing process. This was precisely the conclusion of the court of appeal in the case of *In re Hogan* (1986) 187 Cal. App. 3d 819, 824 ["The Board, in setting a release date for an indeterminate sentence, performs the same function as does the trial court in ordering a determinate sentence – it fixes a term of definite duration.].

As such, since the Board is performing part of the sentencing function, the same rules must apply to the same extent a judge cannot unilaterally increase the nature of a defendant's crime without the findings of a jury or an admission by the defendant, the Board is also not allowed to make findings that were not submitted to the jury, to the court, or admitted as part of a plea in order to take the case out of the presumptive or normal range for *Apprendi-Blakely* purposes. To allow this would violate the due process protections enunciated in *Apprendi* and *Blakely*. Such violations occur any time the Board makes rulings about the crime being "callous and cruel," or "especially heinous, atrocious and cruel," or "dispassionate," or as having a "callous disregard for human suffering" (*Cal. Code Regs.*, tit. 15, §2402(c)(1)), as they did here, since the facts underlying those claimed circumstances were not tried to the jury at the time of the conviction or admitted by the defendant, yet are now being used to remove the case from the presumptive or normal sentencing range under the matrix.[39]

In short, the parole process serves as an extension of the sentencing function, and the Board's obligations have been set up in a way that is identical to a court's sentencing obligations in determinate cases. In addition to being supported by the California Supreme Court's direct ruling on this point in *Roberts, supra*, as likewise found in *Hogan, supra*, this clearly also follows logically from how the Board's functions are defined under the relevant statutory and regulatory criteria. The Board's responsibility in setting terms for an indeterminate sentenced prisoner is tightly regulated and is structured in the same fashion as the duties of a trial judge in pronouncing sentence. The Board is required to give written statements of reasons for its denials (*Pen. Code* §3041.5), when setting a date must use the prescribed framework of the matrix (*Cal. Code Regs.*, tit. 15, §2403(a)), must set the middle term, unless circumstances in aggravation or

---

[39]    Petitioner is aware of the California Supreme Court's recent decision in *People v. Black* (2005) 35 Cal.4th 1238. However, the issues presented in that case are distinguishable from those presented herein. In *Black*, the petitioner argued that a defendant is constitutionally entitled to a jury trial on the aggravating factors that justify an upper term sentence or a consecutive sentence. Here, Petitioner is not contending that the *Apprendi-Blakely* rule applies to which of the 3 terms to select, or even which of the various triads of terms within the matrix applies to the case. Instead, it is Petitioner's contention that the Board cannot make findings regarding the crime to *altogether take it out of the prescribed matrix* which applies based on the facts already determined by a jury.

43

mitigation have been found (*Cal. Code Regs.*, tit. 15, §2403(a)), and must follow the sentencing rules of the Judicial Council (*Calif. Rules of Court*, Div IV, Rule 4.421), just as does a trial judge pronouncing sentence. (*Pen. Code* §3041(a).)    In short, the term setting function of the Board has been set up in a way that is identical to the court's sentencing obligations in determinate cases, further supporting the Supreme Court's ruling in *Roberts*.

Thus, since a judge cannot unilaterally increase a defendant's sentence beyond the normal range by utilizing factual findings not made by the jury, when the Board is performing its part of the sentencing function, it is also not allowed to make findings that were not submitted to the jury, or admitted.   To allow this would violate the due process protections enunciated in *Apprendi* and *Blakely*.  Such violations occur any time the Board makes rulings about the crime being "cruel and callous," or "especially heinous, atrocious and cruel," or "dispassionate," or as having a "callous disregard for human suffering," as the Board did here, since the facts underlying those claimed circumstances were not tried to the jury at the time of the conviction or admitted by the defendant.   As stated in *Apprendi* and *Blakely*, such actions are wholly unconstitutional as they infringe on the defendant's Fifth and Sixth Amendment rights. Thus, the holding in *Blakely* is quite applicable and has been clearly violated here.

Because this violation by the Board involves misinterpretation of statutory law and the violation of due process, a non-deferential *de novo* review standard applies and this court is not constrained to the "some evidence" standard. (*Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 800 [questions of law are reviewed *de novo*]; *Brown v. Poole* (9th Cir. 2003) 337 F.3d 1155.)

## V.    BY REPEATEDLY RELYING ON THE COMMITMENT OFFENSE IN THE FACE OF CLEAR EVIDENCE OF REHABILITATION, THE BOARD IS VIOLATING PETITIONER'S RIGHT TO DUE PROCESS OF LAW.

Regarding the commitment offense, assuming arguendo, some evidence existed to support a finding that the commitment offense, alone, was sufficient for denial, due process still prohibits repeated reliance on those unchanging circumstances as grounds for finding an inmate unsuitable for parole. Accordingly, the Board in this case failed to address the appropriate legal concepts governing parole decisions under the United States Constitution. The assertion that a finding is supported by "some evidence" is not necessarily sufficient, and does not end the inquiry. As the *Ramirez* court concluded,

"The United States Supreme Court had made it clear the 'some evidence' standard discussed in *Hill, supra,* 472 U.S. 445, is *only one aspect of judicial*

44

*review for compliance* with minimum standards of due process. [Citation] … The court explained that the 'some evidence' standard applied only to questions of evidentiary sufficiency. It is *an additional requirement of due process, not a substitute for other established due process requirements*. [Citation.]"

"Accordingly, were the Board to determine whether inmates are suitable for parole by flipping a coin, it could not insulate its proceedings from judicial correction simply by identifying 'some evidence' in the record to support each result." (*Id.* pp. 563-564 [emphasis added].)

In circumstances similar to the case at bar, the *Ramirez* court dealt with this precise issue, and held that more is required than to simply create the appearance of satisfying due process. There, that Court rejected the Board's contention that due process is satisfied by the mere fact that the hearing panel goes through the right litany of phrases and buzz words, divides the hearing into the relevant statutory and regulatory categories, and discusses the evidence relating to the individual inmate. The *Ramirez* court described the Board's argument as follows:

"The Board … claims that 'due consideration' of [Ramirez's parole] application is demonstrated by the [Board's] references in its decision to the nature of Ramirez's crimes, his previous criminal record, his failure to correct his criminality …, his unstable social history, his need for therapy, and his 'institutional programming.' The Board argues that 'some evidence' supported its findings, because the record before it was replete with evidence relating to the factors relied on in the decision." (*Id.* at 568.)

However, in the face of the claim, the court concluded that the Board's decision "…was arbitrary in the sense that the Board failed to apply the controlling legal principles to the facts before it" and that the lack of support for the findings "supports Ramirez's claim that his parole hearing was a sham." (*Id.* at 571.) *Penal Code* §3041 requires that the factors relied upon, and supported by some evidence, must be factors that indicate a legitimate concern that the prisoner currently poses a threat to public safety if released. *See In re Ernest Smith*, 114 Cal. App. 4th 343 (2003) [40]; see also *In re Scott, supra,* 119 Cal. App. 4th at 890-892. The *Ramirez* Court acknowledged that there will always be "some evidence" to support a finding that a prisoner committed the underlying offense. Those facts alone, however, do not justify the denial of parole. Thus, while finding that there was factual support for the findings as to the crime and priors, the *Ramirez* Court still found the Board's decision arbitrary since there had been multiple hearings, nine (9) years had passed beyond the minimum term, and it was 17 years after entering

---

[40] There are two "Smith" decisions, the first being *In re Mark Smith*, 109 Cal. App. 4th 489 (2003), and the second being *In re Ernest Smith*, 114 Cal. App. 4th 343 (2003). Thus, references to those cases will include the first name of the petitioner.

45

prison. (*Id.* at 571.) Likewise, as the Ninth Circuit recently said, despite the fact that there may remain evidence to support a finding of egregiousness of the crime:

> "A continued reliance in the future on an unchanging factor, the circumstances of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." (*Biggs, supra,* at 916-917.)

The recent case law interpreting the rule in *Biggs*, coming out after the filing of the prior habeas proceedings, shows that the Board cannot continuously rely upon unchanging facts such as the commitment offense or conduct prior to imprisonment as the basis for denying parole. These cases, *Martin v. Marshall* (No. Dist. Cal. 2006) 431 F. Supp. 2nd 1038 and *Rosenkrantz v. Marshall* [hereafter "*Rosenkrantz VI*"] (C. Dist. Cal. 2006) 444 F. Supp. 2nd 1063, are directly on point, involving multiple denials of parole, five (5) in *Martin* and seven (7) in *Rosenkrantz VI*, and nearly twenty (20) or more years in prison. Of course, Mr. Rush has now been before the Board five (5) times with over twenty (20) years in custody, and a far more mitigated crime than in either case. Those cases, and the decisions underlying the rules they state (*Scott II, supra,* and *Irons v. Warden* (E. Dist. Cal. 2005) 358 F. Supp. 2nd 936), will each be separately discussed herein. As will be seen, the court in these cases, on far more egregious facts than what are present here, concluded that immutable characteristics, such as those being relied upon by the Board in this case, cannot be repeatedly utilized without violating federal due process principles. Thus, for the reasons outlined above, and upon these authorities, Petitioner is entitled to relief herein.

### 1. *Martin v. Marshall*

In *Martin v. Marshall* (N.D. Cal. 2006) 431 F.Supp.2d 1038, a double murder case, parole applicant Martin was convicted of second degree murder for shooting to death Acosta, a person with whom he shared a prior drug dealing relationship, killing one innocent bystander and injuring another innocent bystander with the gunfire. (*Id.* at 1040.) Fearing that he would be harmed as Acosta approached him in a restaurant, Martin shot Acosta seven times, and continued firing the gun after he "lost it," resulting in the death and injury to the bystanders. (*Id.*) He was sentenced to fifteen (15) years-to-life, plus a five (5) year enhancement. (*Id.*) At his fifth parole hearing, twenty-three (23) years later, the Board granted Martin parole. (*Id.* at 1041.) Governor Gray Davis reversed the grant of parole, stressing in part the gravity of the offense that he found demonstrated a callous disregard for human life and lack of remorse. (*Id.*) To support this

46

assertion, Governor Davis cited Martin's flight from the scene without securing medical help, and his involvement with drugs at the time he committed the offense. (*Id.* at 1046.)

The court found that the Governor's reliance on the unchanging circumstances of the crime and pre-prison conduct as grounds to reverse the Board's decision violated Martin's right to due process. The court reasoned that Martin's offense was impulsive in part, he had exceeded his sentence by approximately six years, and he had exemplary behavior and evidence of rehabilitation. (*Id.* at 1047.) Given the static nature of the offense compared against the evidence of Martin's rehabilitation and behavior that indicated no present threat, the court found the commitment offense provided no evidence to support the Governor's reversal. Implicit in the court's reasoning was a theme expressed in other similar decisions: the commitment offense no longer possessed a predictive value of Martin's current threat to the community if released. Instead, like the other cases discussed herein, the court looked beyond the vacuum of the commitment offense to the number of denials, and the parole applicant's behavior while in prison.

In the instant matter, Mr. Rush has exceeded his minimum term by nearly nine (9) years, three (3) more than Martin. In addition, Mr. Rush far exceeds Martin in terms of his behavior during incarceration, due to his unprecedented institutional behavior, programming and rehabilitation throughout his twenty (20) years of incarceration. For example, Martin had a minor history of misconduct while in prison, whereas Mr. Rush has remained completely discipline free. Mr. Rush also has participated in all available self-help and therapy programs, has excellent psychological evaluations, has continuously improved his education, obtaining Associate's Bachelors and Masters degrees, all with high honors, he has excellent parole plans, familial and community support, and other than the commitment offense, which was committed under severe stress, he has absolutely no history of violence, or even minor criminality. Thus, the predictive value of the offense as an indicator of Mr. Rush's present threat to the community if he was paroled is now non-existent and under the standards enunciated in *Martin*, Mr. Rush is entitled to the requested relief.

### 2. *Rosenkrantz v. Marshall*

In *Rosenkrantz VI, supra,* 444 F.Supp.2d 1063, the petitioner was sentenced to fifteen (15) years to life plus a two (2) year gun use enhancement for second degree murder committed when he was eighteen (18) years old in 1985. (*Rosenkrantz VI, supra,* 444 F.Supp.2d at 1065-

1071.) Rosenkrantz, a homosexual, was confronted by his brother and his brother's friend, Redmond, who wished to prove that Rosenkrantz was gay. (*Id.*) While Rosenkrantz was at the family beach house on Friday with friends, his brother and Redmond, kicked in the door, calling the occupants "faggots," struck Rosenkrantz with a flashlight breaking his nose, and burned his hands with a stun gun. (*Id.*) Rosenkrantz's father was then told that he was homosexual, causing the father to kick him out of the house. (*Id.*) Three days after the incident at the beach house, Rosenkrantz went to a shooting range where he rented an Uzi semiautomatic, nine-millimeter carbine gun, and contemplated committing suicide. (*Id.* at 1072) He ordered an Uzi from a sporting goods store on Monday that would be ready for pick-up on Wednesday.

On Tuesday, Rosenkrantz went to work, where he informed one coworker that he had purchased a gun and planned to kill his brother. (*Id.*) He also told another coworker that his brother and Redman had humiliated Rosenkrantz, and that he was obtaining a gun. (*Id.*) Rosenkrantz picked up the gun on Wednesday, where he also purchased 250 rounds of ammunition. (*Id.*) On Thursday night, Rosenkrantz went to the condominium complex where Redmond lived, and attempted to locate his car. (*Id.*) Unable to locate his car, Rosenkrantz slept in his car overnight near the complex, waiting for Redmond to exit the premises. (*Id.*) When Redmond was exiting the complex the next morning, Rosenkrantz blocked him with his own car. (*Id.*) After a brief exchange where Redmond refused to recant his statements that he made to Rosenkrantz's father, he shot him at least ten (10) times, including six (6) wounds to the victim's head. (*Id.*) Rosenkrantz fled for approximately one month before turning himself in. (*Id.* at 1073.)

After several previous denials, under court order, he was granted parole in 2000, only to have it reversed by the Governor. (*Id.* at 1069-1070.) The superior court granted Rosenkrantz' subsequent writ of habeas corpus, which was affirmed by the court of appeal, but reversed by the California Supreme Court that ultimately found that there was "some evidence" to support the Governor's reversal. (*Id.*) Rosenkrantz' habeas challenge in the United States District Court was based on his subsequent 2004 parole suitability hearing, where the Board found him unsuitable solely on the gravity of his commitment offense. (*Id.* at 1070-1071.) Rosenkrantz had served just under twenty (20) years in prison, had not committed any violent acts while in custody, earned a B.S. in computer science, completed all therapy and self-help programs that were available, received excellent work reports and opinions from correctional counselors that he

presented no more of a risk to the community than the average person. (*Id.* at 1065-1066.) He had realistic parole plans, familial and community support, and the trial judge, various legislators, the arresting officer and the victim's only living relative all supported his release. (*Id.*)

Relying on *Biggs*, *Irons*, and *Scott II*, the *Rosenkrantz VI* court made two points. "First, continued reliance upon the unchanging facts of petitioner's crime makes a sham of California's parole system and amounts to an arbitrary denial of petitioner's liberty interest." (*Id.* at 1082.) Following the *Irons* doctrine, *Rosenkrantz* held that the Board's choice to ignore two decades of positive programming in favor of immutable facts was an arbitrary and capricious method of converting a minimum term into a life sentence. Mr. Rush has every bit as strong a background of programming as Rosenkrantz achieved. Both Rosenkrantz and Mr. Rush share many of the same features: far exceeding their minimum terms, remaining discipline free, receiving multiple parole denials, and, by all accounts, presenting no current threat to the community. Likewise, upholding the Board's denial here will result in a *de facto* life sentence.

Second, the court concluded the predictive values of the crime was so diminished that it could not serve as "some evidence" to support the Board's finding of parole unsuitability. As the Court noted,

> While relying upon petitioner's crime as an indicator of his dangerousness may be reasonable for some period of time, in this case, continued reliance on such unchanging circumstances-after nearly two decades of incarceration and half a dozen parole suitability hearings-violates due process because petitioner's commitment offense has become such an unreliable predictor of his present and future dangerousness that it does not satisfy the "some evidence" standard. *After nearly twenty years of rehabilitation, the ability to predict a prisoner's future dangerousness based simply on the circumstances of his or her crime is nil.*

(*Id.* at 15 citing *Johnson v. Finn* (E.D. Cal. 2006) 2006 WL 195159 ["[T]he seriousness of the crime had predictive value for the dangerousness of petitioner's release for the first, second, perhaps third suitability hearing. But as the years go by, this factor loses its predictive value in light of the growing experience to the contrary (assuming petitioner's record in prison is exemplary)], emphasis added.

Additionally, the court concluded that the defendant's age at the time of the offense further diminished the reliability of the facts of his crime as a predictor for his current dangerousness. (*Id.* at 1085.) At the time of the offense, the defendant in *Rosekrantz VI* was

barely eighteen (18), it was only one month after his birthday. (*Id.*) Accordingly, the court concluded that less culpability should be attached to juveniles, and someone who was only eighteen at the time of the offense deserves the same deference. (*Id.*, citing *Roper v. Simmons* (2005) 543 U.S. 551, 561-562.) This is because they are more susceptible to immature and irresponsible behavior, that is not as morally reprehensible, and a greater possibility exists for a younger person to reform his or her character deficiencies. (*Id.*, citations omitted) That is precisely what Mr. Rush has done here. Mr. Rush has programmed successfully for over twenty (20) years while incarcerated. He has achieved exactly what the prison system espouses as its goal: rehabilitation. Furthermore, Mr. Rush, like the defendant in *Rosenkrantz VI*, was young, barely twenty-one (21) at the time of the commitment offense. Therefore, the predictive value of the commitment offense, similarly, should be diminished due to his age. Thus, in the face of Mr. Rush's age and his unprecedented rehabilitation, the commitment offense utterly fails to indicate Mr. Rush's dangerousness over two (2) decades later. Accordingly, the Board's denial is a due process violation.

### 3. *Scott II*

Several cases were noted as underlying the rationale in *Martin* and *Rosenkrantz VI*, including the case of *In re Scott [Scott II]* (2005) 133 Cal. App. 4th 573. The court in *Scott II* was mindful of the due process problems of relying on the commitment offense to deny parole. Scott was convicted of second degree murder in 1986 and sentenced to fifteen (15) years to life plus two (2) years for use of a firearm. Suspecting that his wife was with an individual named Bradford with whom she confessed to having an affair, Scott confronted them in the street in front of Bradford's residence. (*Id.* at 579.) As Scott approached them with a .22 caliber handgun, Bradford pushed Scott's wife away to confront Scott. (*Id.*) Scott told Bradford, "Get away. I'm going to shoot you." (*Id.*) He then fired two or three rounds, striking Bradford in the head and thigh, killing him. (*Id.* at 579-580.)

During his incarceration, like Mr. Rush, Scott received pages of laudatory chronos for his work and behavior. (*Id.* at 582.) Again like Mr. Rush, the psychological evaluations agreed that his behavior was exemplary, that he presented no more than an average threat to the community, and his offense was the product of significant stress. (*Id.* at 582-585.) In 2004, the Board found Scott suitable for parole, but the Governor reversed, citing the nature of the offense. (*Scott, supra*, 133 Cal.App.4th at 586-588.)

50

The court granted Scott's petition for writ of habeas corpus. The court expressed concern that the Governor's reliance on the commitment offense failed to accurately indicate Scott's present danger. "Reliance on such an immutable factor 'without regard to or consideration of subsequent circumstances' may be unfair." (*Scott II, supra*, 133 Cal. App. 4th at 595 citing *In re Smith* (2003) 114 Cal. App. 4th 343, 372.) Accordingly "[t]he commitment offense can negate suitability only if circumstances of the crime reliably established by evidence in the record rationally indicate that the offender will present an unreasonable public safety risk if released from prison." (*Scott* II, 133 Cal. App. 4th at 595.) The Governor in *Scott II* failed to make any rational connection between the offense and Scott's danger to the community. In other words, the offense offered no predictive value to determine Scott's current threat to the community. Without that nexus, there was no evidence to support the Governor's conclusion.

That missing nexus exists in Mr. Rush's case as well. He has done everything he can, since incarceration, to rehabilitate himself. The commitment offense took place over twenty (20) years ago. In the mean time, Mr. Rush made tremendous gains toward rehabilitation, received favorable psychological reports, participated in all available self help programs, obtained strong vocational skills, and earned his Associates, Bachelors and Masters degrees. With no evidence of current dangerousness, the mitigating fact of his youthfulness at the time of the offense, weighed against the uncontradicted evidence of total rehabilitation, the Panel had no choice but to grant parole to Mr. Rush. Like *Scott II*, there is no longer any rational connection between Mr. Rush's offense, and his present dangerousness, particularly in light of the intervening two (2) decades. That is, the offense no longer yields any predictive value of current dangerousness. As such, there was no evidence to support the Board's denial of parole.

Furthermore, a disturbing corollary exists between *Scott II* and Mr. Rush. The Board concluded that the gravity of the murder alone was sufficient for the denial of parole, despite the exemplary efforts of Mr. Rush during his imprisonment. The *Scott II* court was faced with a nearly identical argument from then Governor Davis. "The Governor states in his decision that the gravity of Scott's offense is alone a sufficient basis 'on which to conclude that his release from prison *at this time* would pose an unreasonable public-safety risk.' (*Scott* II, 133 Cal. App. 4th at 595, n. 8.) (Italics in original.) Of course, the problem with such a position is "*[t]hat statement could be repeated annually until Scott dies or is rendered helpless by the infirmities*

51

*of sickness or age.*" (*Id.* [emphasis added].) Just as *Scott II* foreshadowed, Mr. Rush has in fact been subjected to annual statements of that same type.

### 4. *Irons v. Warden*[41]

The recent decisions also rely heavily on *Irons v. Warden* (E. Dist. Cal. 2005) 358 F.Supp.2d 936. Irons was convicted in 1985 of second degree murder and sentenced to seventeen (17) years to life, including a two (2) year enhancement for use of a firearm. (*Irons*, 358 F.Supp.2d at 939.) Petitioner filed for habeas relief after the Board denied him parole in 2001 at his fifth parole hearing. (*Id.*) Irons and the victim were tenants in the same house. (*Id.* at 940) After the couple who owned the home told Irons that they suspected the victim stole various items from the home, Irons confronted the victim. (*Id.* at 940-941.) Irons obtained a .22 caliber rifle from his room, entered the victim's room, and shot him twelve times. (*Id.*) Irons announced to the victim that he was going to let him bleed to death, but after the victim complained of the pain, Irons stabbed the victim twice in the back. (*Id.*) He rolled the victim into a sleeping bag, and locked the body in the room for ten days. (*Id.*) Irons then wrapped a plastic drop cloth and wire mesh around the body inside the sleeping bag, weighted it down with pieces of pipe, and disposed of the body in the surf at an isolated coastal location. (*Id.*)

The Panel found his behavior during incarceration was strong.

> [Irons] should be commended for a large number of things. He has participated in a number-to his credit, in a number of self-help programming, and I'll name just a few. The-The Alternatives to Violence, I think there are three different phases of it, the KAIROS Program, and also, he was -he was an active participant in the Gavel Club, a Toastmaster organization, and took part in Breaking Barriers, took part in the walkathon. He obtained his GED, I believe, while incarcerated. And he hasn't had any 115s-he's had one 115 during his incarceration and that was back in-on November 2nd, 1985, and has had no 128s.

Nevertheless, the Panel found him unsuitable due to the nature of the offense and Iron's past use of drugs. The court rejected the Board's reliance on the unchanging facts of the crime and Iron's use of drugs prior to incarceration. As the court noted,

> [C]ontinuous reliance on unchanging circumstances transforms an offense for which California law provides eligibility for parole into a de facto life imprisonment without the possibility of parole. The court asks rhetorically-what is it about the circumstances of petitioner's crime or motivation which are going to change? The answer is nothing. The circumstances of the **crimes will always**

---

[41]    The *Irons* case is currently pending appeal in the Ninth Circuit. That case is currently pending decision, but the district court decision remains published.

**be what they were, and petitioner's motive for committing them will always be trivial. Petitioner has no hope for ever obtaining parole except perhaps that a panel in the future will arbitrarily hold that the circumstances were not that serious or the motive was more than trivial.** Given that *no one* seriously contends lack of seriousness or lack of triviality at the present time, the potential for parole in this case is remote to the point of non-existence. Petitioner's liberty interest should not be determined by such an arbitrary, remote possibility.

(*Irons*, 358 F. Supp. 2d at 947, bold added; italics in original.) While this observation by *Irons* touches upon the ultimate problem of parole eligible and worthy inmates receiving de facto life without parole sentences, it is the legal analysis that is relevant here. The due process analysis of parole denial challenges requires looking at whether there was "some evidence" to support the Governor's reversal of granting parole. *Irons* was the first of a series of federal cases to recognize that after so much time, the commitment offense and other facts prior to incarceration that will always remain immutable, will over time lose their predictive value as to whether the parole applicant is a current threat. This is the theme that carried through with *Scott II*, *Rosenkrantz VI*, and *Martin*. As the *Irons* court saw it,

> To a point, it is true, the circumstances of the crime and motivation for it may indicate a petitioner's instability, cruelty, impulsiveness, violent tendencies and the like. However, *after fifteen or so years in the caldron of prison life*, not exactly an ideal therapeutic environment to say the least, and after repeated demonstrations that despite the recognized hardships of prison, this petitioner does not possess those attributes, *the predictive ability of the circumstances of the crime is near zero.*

(*Irons*, 358 F. Supp. 2d at 947, n. 2.) (Emphasis added.) Since *Cal. Pen. Code* §3041 requires assessing a parole applicant's current threat to the community, the logic of *Irons* is inescapable: the unchanging facts of the crime or other pre-incarceration circumstances from years' past become incapable of supplying any evidence of a current threat because their predictive value has so drastically diminished, eventually diminishing entirely. As *Irons* also stressed, this is particularly true when the inmate maintains exemplary behavior within the toxic environment of prison. Accordingly, the court found that there was no evidence to support the Panel's finding that Irons was unsuitable for parole.

No matter how the underlying offense is viewed, the present crime does not have the callousness of the offense committed by Irons who seemed to take pleasure in the suffering of his victim. Petitioner has been incarcerated for over twenty (20) years, more than three (3) years

longer than Irons had been at the time of his hearing. Irons had received CDC 115s for minor misconduct, unlike Mr. Rush, who has remained completely disciplinary free for twenty-one (21) years. Of course, neither has any history of institutional violence. Both made use of the self-help and therapy available in prison. In addition, Mr. Rush has psychological evaluations which are extremely supportive of release. An honest appraisal of the Board's parole denial compels a finding that their reliance on the commitment offense no longer has any probative value in predicting Mr. Rush's current dangerousness. As such, there was no evidence to support the Board's decision, and like *Irons*, relief must be granted.

### IV.    THERE IS NO EVIDENCE TO SUPPORT A DENIAL UNDER § 3041.

#### A. The Commitment Offense.

While "the gravity of the commitment offense or offenses alone *may* be a sufficient basis for denying a parole application," that can only be the case where the Board considers all other relevant factors. (*In re Ramirez, supra,* 94 Cal.App.4th at p. 549[42] [citing *In re Seabock* (1983) 140 Cal.App.3d 29 at 37-38]; see also *In re Rosenkrantz [Rosenkrantz V]* (2002) 29 Cal.4th 616.) The *Ramirez* court emphasized that, while the gravity of the offense *may* be enough, that must be the *exception* to the rule, and the Board cannot *normally* deny parole based on the gravity of the offense. (*Id.,* see *Rosenkrantz V, supra.* at 683.) As the *Ramirez* court noted, "a life term offense or any other offenses underlying an indeterminate sentence *must be particularly egregious to justify the denial of a parole date.*" (*Ramirez, supra,* 94 Cal.App.4th at 570, emphasis added.) These principles were affirmed in *Rosenkrantz V, supra,* 29 Cal.4th at 683. The *Ramirez* court explained the legislative policy of parole for violent offenses, stating,

> "[T]he circumstances of *any* past offense, even any murder, are not necessarily a sufficient ground for the Board to refuse to set a parole release date. All violent crime demonstrates the perpetrator's potential for posing a grave risk to public safety, yet parole is mandatory for violent felons serving determinate sentences. (Penal Code, §3000, subd. (b)(1).) And the Legislature has clearly expressed its intent that when murderers who are the *great majority* of inmates serving indeterminate sentences approach their minimum eligible parole date, the Board *'shall normally set a parole release date.'* (Penal Code §3041, subd. (a).) The

---

[42] The California Supreme Court disapproved only of that portion of the *Ramirez* decision that requires a comparative, proportionality analysis of the crime with other similar offenses. The balance of the *Ramirez* decision was not overruled. However, it is Petitioner's contention that, under principles of Federal Due Process, the analysis in *Ramirez* is the correct one, but even if not on the proportionality issue, a general level of comparative analysis on the issue of egregiousness of the crime is not only proper, but is required by the Constitution to avoid the regulatory language being unconstitutionally vague.

Board's authority to make an exception based on the gravity of a life term inmate's current or past offenses *should not operate so as to swallow the rule that parole is 'normally' to be granted.*" (*Id.* at p. 570, emphasis added.)

(See also *Rosenkrantz V, supra,* 29 Cal.4th at 683, quoting the above language in relevant part, and specifically adopting these rules.) Therefore, it is simply fundamental that in order to overcome the rule that parole is "normally" to be granted, the Board must find that the commitment offense is among the gravest of offenses. The California Supreme Court's analysis in the case of *In re Dannenberg*, 34 Cal.4th 1061, at 1094, preserved these doctrines, stating that they were not overruling *Rosenkrantz V.*

Furthermore, under the regulatory criteria, in determining if the crime is "particularly egregious" under those standards, due process demands that a comparative analysis be done with other similar offenses in order to avoid the entire regulatory scheme becoming unconstitutionally vague. (See the discussion in §I, *supra.*) This is true because the entire regulatory setup uses comparative terminology, such as "*especially* heinous, atrocious and cruel" or an "*exceptionally* callous disregard" for human life. (*Cal. Code Regs.,* tit. 15, §2402(c)(1).) Similarly, the California Court of Appeal, First District, recently clarified the rules for applying the regulatory criteria of unsuitability. The Court explained:

> "The commitment offense is one of only two factors indicative of unsuitability a prisoner cannot change (the other being his 'Previous Record of Violence'). Reliance on such an immutable factor 'without regard to or consideration of subsequent circumstances' may be unfair (citation omitted), and runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation."

> "The commitment offense can negate suitability only if circumstances of the crime reliably established by the evidence in the record rationally indicate that the offender will present an unreasonable public safety risk if released from prison. Yet, the predictive value of the commitment offense may be very questionable after a long period of time. [citing *Irons v. Warden* (E.D.Cal. 2005) 358 F.Supp.2d 936, 947, fn.2.] Thus, denial of release solely on the basis of the gravity of the commitment offense warrants especially close scrutiny." (*In re Scott* (2005) [*Scott II*], 133 Cal.App.4th 573, 584 [citing *Biggs v. Terhune, supra,* 334 F.3d at 917].)

As noted, in order to ensure that the exception does not swallow the rule, the commitment offense must be "*particularly egregious* to justify the denial of a parole date." (*Ramirez, supra,* 94 Cal.App.4th at p. 570, emphasis added; *Rosenkrantz V, supra,* 29 Cal.4th at 683.) Accordingly, "the Board must weigh the inmate's criminal conduct not against ordinary social norms, but

against other instances of the same crime or crimes." (*Id.*)[43]  The case of *In re Ernest Smith,* a murder stemming from defendant shooting his spouse three times in the head, is instructive in this homicide.  There, the court of appeal found that these facts did not render the offense a "particularly egregious" crime.  (*In re Ernest Smith* (2003) 114 Cal.App.4th 343.)  Particularly, the Court found it dispositive that Smith had not done anything to prolong the victim's suffering, or to cause untoward pain beyond the act of killing.  Certainly, the same can be said about the murder in this case.  Recently, in *Scott I, supra,* 119 Cal. App. 4th 871, the court found that a defendant who shot his wife's lover to death in front of her and their son did not constitute a "particularly egregious crime."  (*Scott I, supra,* 119 Cal.App.4th at 890-92.)  As the *Ernest Smith* court noted,

> "There is no evidence that Smith acted with cold, calculated, dispassion; or that he tormented, terrorized, or injured [victim] before deciding to shoot her; or that he gratuitously increased or unnecessarily prolonged her pain and suffering...Was the crime callous?  Yes.  However, are the facts of the crime some evidence that Smith acted with exceptionally callous disregard for [victim's] suffering; or do the facts distinguish this crime from other second degree murders as exceptionally callous?  No." (*Id.* at 673 [citing *In re Mark Smith* (2003) 109 Cal.App.4th 489, 504, 506].)

Therefore, a finding that the crime prevented the Board from setting a date at five (5) separate hearings over a twenty (20) year period of incarceration, and nearly nine (9) years after Mr. Rush's minimum term, is legally unsupportable.  At Mr. Rush's 2005 hearing, the Board claimed that he posed an unreasonable risk to society.  (Exh. AA, p. 92.)  To justify their decision, the Board simply characterized the offense as "particularly callous and cruel," "dispassionate and [it] didn't have to happen," and it was carried out with a "callous disregard for human suffering."  (Exh. AAA, p. 88.)  Not only, does the offense not constitute an offense that is so egregious as to render Mr. Rush an unreasonable risk to society, twenty-one (21) years later, the Board's own findings and explanations of their decision wholly contradict their claim that the commitment offense, alone, is sufficient to render Mr. Rush unsuitable for parole.

First, Mr. Rush's offense is immediately recognizable as being of a far lesser order than most murders, as he was acting under extreme stress, due to the circumstances of the incident.

---

[43]  As is discussed *infra*, the Supreme Court in *Dannenberg* only overruled the rule of *Ramirez* that a comparison is done for purposes of achieving proportionality of terms.  However, on the question of egregiousness, as distinguished from proportionality, *Rosenkrantz V* preserved the need to compare the inmate's offense with other similar crimes to determine the pivotal questions of whether the crime is "especially heinous...," involves an "exceptionally callous disregard...," has a "trivial" motive, or is "particularly egregious." (*Rosenkrantz V, supra,* 29

Mr. Rush did not plan the murder, and there was absolutely no evidence of premeditation or deliberation. It was actually the result of an argument, which became physical, between Mr. Rush and his roommate. At the time of the murder, Mr. Rush was recovering from a motorcycle accident where he was severely injured and his friend died. (Exh. DDD, p. 361.) His injuries left him in a weakened physical and mental state, and the fact that the victim was significantly bigger and stronger than he was left him with a feeling of helplessness. (*Id.*) When the argument became physical, Mr. Rush was fearful because his injuries would not allow him to withstand a physical fight. (*Id.*) Mr. Heinz had already slammed him against the wall. (*Id.*) Mr. Rush grabbed his gun for safety and when his roommate lunged at him, he shot without thinking. Obviously, these elements played a significant role in the life factors that led to the commitment offense. In context, the commitment offense must be viewed as being the result of these combined factors. Ultimately, Mr. Rush's role in this offense simply cannot be said to be dramatically more heinous than most other murders.

Second, the Board cannot ignore the indisputable evidence merely by asserting that the unchanging facts of the commitment offense makes Mr. Rush an unreasonable risk of danger to the community if paroled, without making a connection to explain how the crime still shows a ***current*** propensity for violence. (*Scott II, supra,* 113 Cal.App.4[th] at 594-595.) While the commitment offense is tragic, in order for the Board to rely upon it as the sole reason for denying parole, it must be clear from the facts that the crime is "***especially*** heinous, atrocious or cruel" in a way that sets it apart from the vast majority of other second degree murders as among the gravest of those offenses. (*Cal. Code Regs.,* tit. 15, §2402(c)(1), emphasis added; see *Ramirez, supra,* 94 Cal.App.4[th] at p. 570.)

This follows from the regulations own use of the word "especially" which connotes a heightened level ***beyond*** what normally is present in a finding of actual or implied malice. (*Cal. Code Regs.,* tit. 15, 2402(c)(1).) As the facts indicate, Mr. Rush's case does not fall under any of the factors provided by *Cal. Code Regs.,* tit. 15, §2402, indicating that he is unsuitable for parole. Nowhere does the Board attempt to describe how the crime is factually egregious under the regulatory factors, or point to actual, reliable evidence supporting any finding under an actual regulatory factor that rationally shows that Mr. Rush is currently an unreasonable risk of danger to society if paroled. Instead, they just state their "findings" in conclusory terms. As discussed

---

Cal.4[th] at 682, 683.)

in *Scott II, supra,* 133 Cal.App.4[th] at 594-595, the evidence must rationally show current dangerousness.

Here, the Board made a finding that the crime was dispassionate. However, under *Cal. Code Regs.,* tit. 15, §2402(c)(1)(B), such a finding requires a determination that the "offense was carried out in a dispassionate and calculated manner, *such as an execution style murder.*" (Emphasis added.) That terminology has no application to a case such as this. Instead, it is designed for a murder that occurs in a distinct factual pattern, one showing a particular dangerousness on the part of the defendant who commits an act of executing a victim. Because the prisons have to implement Board regulations that use this identical terminology in their housing of inmates who have committed murders (see *Cal. Code Regs.,* tit. 15, §3375.2(a)(7)(A)), the term "execution style murder" has a particularized meaning in prison jargon, and a CDC memorandum was actually issued to define it as "those crimes wherein the victim was shot in the head after being bound or cuffed, made to kneel, made to lie down, or made to face a wall." (See Exh. LLL.) No such actions occurred factually in this case. Accordingly, that finding was wholly unsupported by the evidence.

The finding that the crime was "cruel and callous" and committed with a callous disregard for human suffering (*Cal. Code Regs.,* tit. 15, §2402(c)(1)(A)), is equally unsupported, as an exceptional level of callousness was not present here. (See *In re Ernest Smith, supra,* 114 Cal. App. 4th at 366.) Clearly, this murder is not dramatically more heinous than most other murders. To the contrary, as discussed above, it is much closer to a self defense case, but without enough force to excuse Mr. Rush's actions. As compared with other second-degree murders, and in light of the rules announced in *Scott I, supra,* and *Ernest Smith, supra,* this crime is not "particularly egregious." As in the *Ernest Smith* case, nothing case done to prolong the victim's suffering or to cause untoward pain beyond that inherent in the act of any murder.

A distinction must be drawn here between a murder that is "aggravated" and one that is "particularly egregious" within the meaning of the parole statutes and regulations. The matrix already provides for "aggravated" offenses, giving a mitigated, middle and aggravated term for each type of murder covered thereunder. Aggravated circumstances are factors to consider in determining which of the three matrix terms to select as the appropriate sentence for the inmate. They would not be enough by themselves to support a finding of unsuitability. That finding would require a determination that the crime is "particularly egregious."

58

This approach is based upon common sense.  Absent facts that make the offense "particularly egregious," it is simply irrational to use the circumstances of that crime to hold a prisoner beyond the term prescribed under the matrix.  (See *Cal. Code Regs*. tit. 15 §2403(c).) This approach is logical since it is the circumstances of the offense that went into making that matrix in the first place.  (See *Little v. Hadden* (1980) 504 F. Supp. 558, 562 ["'It is simply irrational for seriousness of the offense to be used first to determine the appropriate [matrix] period and then to be used again as the stated reason for confining a person beyond that guideline.'"].)  The *Ramirez* decision stands for the principle that the term served by an offender should not be more than the term prescribed for the offense for which he stands convicted.  The Board's treatment of Mr. Rush ignores these principles.  In fairly characterizing Mr. Rush's offense and comparing it with other second-degree murders, it simply cannot be said that the present case involves the type of *especially* callous disregard beyond that necessary in any conviction for second-degree murder, and certainly does not justify characterizing this offense as being more egregious than that found in cases of first-degree murder.  As stated by the *Scott II* court, "[t]he circumstances of [Rush's] offense shown by the record, which bear no resemblance to the circumstances of the homicides in *Rosenkrantz*, *Lowe* and *DeLuna* cannot reasonably be considered more aggravated or violent than the minimum necessary to sustain a conviction of second degree murder."  (*Scott II, supra*, 133 Cal.App.4th at 598; see also *In re Lowe* (2005) 130 Cal.App.4th 1045; *In re DeLuna* (2005) 126 Cal.App.4th 585.)

As such, there was no evidence to support any of the actual regulatory criteria.  Thus, the crime simply does not support the Board's finding of unsuitability.

## B. *THE EVIDENCE FAILS TO SUPPORT ANY OF THE REMAINING UNSUITABILITY FACTORS.*

For the Board to deny Mr. Rush parole in this case, in addition to the commitment offense, the Board must be able to point to other circumstances defined in §2402(c) that tend to indicate Mr. Rush would pose an "unreasonable" degree of threat and danger to the public if released.  (*Scott II, supra*, 133 Cal.App.4th at 595.)  A legitimate, impartial review of those criteria reveals that none of the factors of unsuitability prescribed under *Cal. Code Regs*., tit. 15 §2402(c) apply to Mr. Rush.  As defined by the Regulations, other circumstances that tend to show unsuitability include:

> "(2) Previous record of violence. The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner

for two (2) months. The stress from losing his independence, because of his injuries, and the depression from losing his friend built up over several months prior to the offense. Mr. Rush's feelings of helplessness, caused by the accident, peaked when a physical struggle with his much larger roommate ensued the night of the offense. Mr. Rush was not physically able to protect himself. As a result, the severe stress Mr. Rush was under significantly contributed to the offense.

Third, as previously mentioned, Mr. Rush has absolutely no prior history of violence; convictions, arrests, disciplinary action, or otherwise. According to the Board, he has done a "great job" since he has been in custody. (Exh. AAA, p. 90.) Moreover, Mr. Rush is currently forty-one (41) years old, and was only twenty-one (21) years old when he was arrested. He has spent nearly half of his life in prison. His lack of current violence potential, coupled with his high level of maturity, makes recidivism highly unlikely. (*Cal. Code Regs.* tit. 15 §2402(d)(7).) Mr. Rush also has acceptable parole plans. He plans to live with his father in San Bernardino County and work in Lake Arrowhead for Mellinger Construction. He also intends to pursue a career as a cartographer, consistently updating himself on the CAD software system used for that field. Mr. Rush has an AA degree from Hartnell College, a BA from San Jose State University, and a Masters of Science degree in Humanities from California State University, Dominguez Hills. He has also completed vocational training for mechanical and architectural drafting. At his 2005 hearing, the Board acknowledged Mr. Rush has marketable skills and an acceptable parole plan. (Exh. AAA, p. 90.) Finally, Mr. Rush has had exceptional institutional behavior. The Board complemented Mr. Rush on what he has done since incarceration and even concluded he has been a "good role model" while in custody. (Exh. AAA, p, 91.)

In sum, Mr. Rush has great support in every respect imaginable, including housing, transportation, and financial and emotional support. In denying parole, the Board has failed to give due consideration to the fact that Mr. Rush fits into each and every one of the suitability criteria. Mr. Rush has been free from discipline during incarceration, and the record reveals job, vocational, and community participation that can hardly be called anything less than remarkable since incarceration.

Despite this overwhelming evidence, the Board found Mr. Rush unsuitable for parole, solely on the facts of the commitment offense. Clearly, the Board has violated Petitioner's rights in failing to adequately review the factors in support of his suitability.

## VI.    THE BOARD OF PRISON TERMS HAS IMPLEMENTED AN

## UNLAWFUL POLICY AND PRACTICE OF DENYING PAROLE TO VIRTUALLY ALL INDETERMINATE-TERM PRISONERS.

The Board's decision in Mr. Rush's case is the result of a politically inspired categorical rejection of parole for virtually all inmates with indeterminate sentences. This unlawful policy has the objective of keeping as many indeterminate-term prisoners incarcerated for as long as possible, without regard to the appropriateness or lack thereof of the continued incarceration of the individual. The reason for this policy is simple: For the Board, appointed by the Governor, the purpose is to not appear "soft on crime," thus assuring their reappointment to a very lucrative job. As former Governor Pete Wilson was quick to point out to corrections officials and anyone else in the chain, nothing will destroy a politician's career faster than being labeled as soft on crime.[44]

The evidence has become overwhelming that the Board has adopted the former Governors' unlawful policy that denies virtually all life and term-to-life prisoners a fair hearing by failing to afford these inmates the presumption of parole suitability required under *Penal Code* §3041 and by ignoring the mandate of §3041 that parole "shall normally" be granted. (See *McQuillion I, supra,* 306 F.3d at pp. 901-902.) Under this policy, persons convicted of parole eligible murders are unable to get paroled in the manner required by law. On May 19, 2005, Judge Lawrence K. Karlton, Senior Judge of the United States District Court, Eastern Dist., California, adopted *in full* the December 21, 2004, findings and recommendations of Federal Magistrate Judge Peter Nowinski, declaring that the Respondent had presented no defense to the Petitioner's allegations that a no-parole policy is evidenced by the following:

1. The Governor appointing Board members less likely to grant parole and more willing to disregard their statutory duty;
2. The removal of Board members more likely to grant parole;
3. Reviewing decisions finding a prisoner suitable and setting a new hearing before a different panel;
4. Scheduling rescission hearings for prisoners who had been granted a parole date.
5. Re-hearing favorable rescission proceedings and hand-picking panels to ensure the desired outcome;
6. Panel members agreeing upon an outcome in advance of the hearing; and
7. gubernatorial reversal of favorable parole decisions.

(Exh. FFF, *Coleman v. Board of Prison Terms*, E. Dist. Cal., Case No. CIV S-96-0783 LKK, May

---

[44]    Pete Wilson was also quick to tell corrections and parole officials that he did not want a "Willie Horton" to destroy his political chances to become President. Michael Dukakis' chances of winning the presidency were destroyed when Willie Horton, a Massachusetts prisoner when Dukakis was Governor, committed another very serious crime while released on furlough.

19, 2005; See also Exh. GGG, *Martin v. Marshall* (N.D.Cal. 2006) 431 F.Supp.2d 1038 [Adopting in full the findings in Coleman.)[45]  Petitioner requests that this Court take judicial notice of the *Coleman* and *Martin* decisions and the findings made against the Executive Branch therein.

The *Coleman* court concluded "Petitioner presents a convincing case that a blanket policy against parole for murderers prevented him from obtaining a parole suitability determination made after a fair hearing.  Respondent offers nothing to counter petitioner's showing." (Exh. FFF, at p. 372.)  The evidence of the no-parole policy during the past 15 years is pervasive.  As an example, in April 1999, former Governor Davis talked to a reporter who described the interview as follows:

> "The Governor was adamant that he believes murderers – even those with second-degree convictions – should serve at least a life sentence in prison. Asked whether extenuating circumstances should be a factor in murder sentences, the Governor was blunt: 'No. Zero,' he said . . . The Governor, a political centrist, said he may surprise followers who expect him to be a more traditional Democrat.  'They must not have been listening when I was campaigning,' Davis said.  'If you take someone else's life, forget it.  I just think people dismiss what I said in the campaign as either political hyperbole or something that I would back away from ...We are doing exactly what we said we were going to do." (Exh. FFF, pp. 367-368; Exh. MMM, pp. 393-394.)

Former Governor Davis never denied making these statements, nor did he ever disavow them.  During Governor Davis' term as governor, the Board held over 15,000 parole hearings and granted parole to only 286 inmates serving indeterminate sentences for first or second degree murder.  Of those 286, all but eight (8) grants of parole were reversed by the former Governor.

The first one was the case of Rose Ann Parker, who had killed her boyfriend at a time when battered woman syndrome (BWS) was not a defense in California, and had it been a defense, the former Governor believed she would have been acquitted.  The former Governor's decision to allow Parker's release occurred in September 2000, long after the *Ramirez* and *Rosenkrantz* petitions were filed and long after the Governor's policy had become a subject of public scrutiny.  The second case, Cheryl Sellers, is also a case where a woman was convicted at a time when BWS was not available as a defense.  Similarly, the third case of Maria Suarez also involved BWS, however it could not be proven in court.  The governor noted this, but relied on a report by a BWS expert who said that Ms. Suarez was definitely a victim of BWS.  The fourth

---

[45]  As previously indicated, the evidence relied on by the District Court in *Coleman* is in the possession of Petitioner's counsel, but is quite extensive, and thus has not been provided at this time. However, it is available and can be submitted supplementally should the Court desire.

case was Chu Ly, who after being victimized by what was likely a hate-crime, killed a vandal who had been repeatedly terrorizing his neighborhood. The governor relied heavily on the unusual fact that all the original trial participants, including the presiding Superior Court Judge in the case, supported Mr. Ly's release.[46]

The fifth case was Richard Kemp, who after ingesting $3000 worth of cocaine bludgeoned his friend to death. While incarcerated in San Quentin, Mr. Kemp was one of the founders of IMPACT, a fatherhood awareness and accountability program that has since branched out to other prisons. Governor Davis was influenced by Mr. Kemp's parole plans which included establishing the much needed program in other prisons.[47] The sixth case was Gale Sawvell, an ex-police officer who, while in a drunken state, shot a man who was threatening him outside of his home. The Governor was persuaded by the unprecedented support Mr. Sawvell received from law enforcement agencies from other states which offered to supervise him upon release.[48]

The seventh case was Soila Gracia who was angry at her boyfriend and shot him in the leg. Ms. Gracia then transported her boyfriend to the hospital where his leg was amputated. A few days later, during a subsequent surgery to close the skin around the amputation site, the victim suffered a cardiac arrest and died. The Governor concluded that Ms. Gracia had programmed well, and that the death was the result of the "unique circumstances of the crime." The eighth case was Stephanie Allen, who pled guilty to the second degree murder of her father. Ms. Allen, at the multiple requests of her mother, hired a friend to kill her father. The Governor noted that "Ms. Allen was not the key player in this murder. By all accounts, that role belongs to her mother." Former Governor Davis further noted that the judge who presided over Ms. Allen's proceedings supports parole.

However, the fact that only these extremely select few have been granted parole clearly

---

[46] Of course, such support is not unprecedented, but using the support to justify a release is actually itself unusual. For example, in the 1976 Chowchilla kidnapping, a case where none of the victims were physically injured, both the trial judge and the appellate justices who wrote the two case opinions, have written to the Board on numerous occasions. Each have stated as early as 1985 that the defendant has served long enough in prison. Even the district attorney who prosecuted the case is supportive of release and has written to the Board to grant parole.

[47] One of the other founders was Edward Ramirez, of *In re Ramirez, supra,* 94 Cal.App.4th 549. Yet, Davis took Ramirez' date.

[48] The Governor found it "extraordinary" and persuasive that law enforcement personnel were willing to support and assist Mr. Sawvell. However, Edward Ramirez also had a similar offer from a thirty (30) year veteran of the San Francisco Police Department, which the governor did not find "extraordinary." The officer had worked with Eddie Ramirez in the S.Q.U.I.R.E.S. program and found him to be a remarkable person. The officer told the BPT that Eddie Ramirez could live with him and that he would look after him. (See generally *Ramirez, supra,* 94 Cal. App.

shows that the Executive Branch is not applying the statutory ***presumption*** of parole suitability and is further failing to follow the mandate of §3041 that parole ***"shall normally"*** be granted.

The no-parole policy does not begin and end at the Governor's office, however. Former Governor Davis made it clear that he expected his political appointees to carry out his policies, not necessarily the law. The unlawful policy was recognized in the following article:

> "At a recent Washington, D.C., breakfast with California reporters, [Gov.] Davis said judges' decisions should reflect his policies. And if that weren't enough, he said those who cannot do that *should resign*.
>
> "'They are not there to be independent agents,' he told reporters. 'They're there to reflect the sentiments that I expressed in the campaign.'" (See Exh. JJJ, p. 395.)

This statement readily applies to all BPT commissioners, who have quasi-judicial powers under the Executive Branch of government, and reflects the expectation that the Board Commissioners will render decisions consistent with their employer's political expediency in mind. This is not consistent, however, with the process due and guaranteed by the constitution. The evidence that the former Governor's no-parole policy is reflected in the actions of the Board is not hard to find. An examination of the make-up of the 12-Commissioner Board of Prison Terms and their political/employment history reveals a clear bias toward law enforcement and punishment, not the dictate of rehabilitation and reformation prescribed by law.

The composition of the Board fails to comply with the diversity dictated by *Penal Code* §5075 and has the appearance of reflecting a group of commissioners willing to comply with the governor's unlawful policy. In furtherance of the governor's policy, the Board Commissioners, who depend on the graces of the Governor for their $100,000 per year employment, have developed a policy that illegally denied Petitioner his constitutional right to due process and right to be free of arbitrary decision-making. (See *Ramirez, supra,* 94 Cal.App.4th at p. 549.)

Thus, the evidence will show that the Executive Branch has developed a policy that has illegally denied Petitioner his freedom. It is understandable that there would be a reluctance to find that the Board and former Governor are discharging their duties in an unlawful and unconstitutional manner. While the Executive Branch would like to pretend the problem does not exist, and avoid the fallout that such a finding would entail, it is important to note that neither Petitioner, nor the Legislature, nor the Courts have created this problem. The Board, and the past governors, created this problem. (See Exh. FFF, *Coleman v. Board of Prison Terms, supra.*)

---

4th 549.) A copy of the letter is available for any evidentiary hearing.

The courts now have a constitutional obligation to ensure compliance with Petitioner's right to due process of law.

### VII.   REQUEST FOR EVIDENTIARY HEARING

One potential issue exists for an evidentiary hearing.  If "some evidence" is found, a hearing is requested to establish the existence of an unlawful policy of the Executive Branch to deny parole, at which the Coleman Exhibits, Governor's decisions, declarations re crime based denials and statistical information regarding denials and the usage and reliance on crime based findings, can be submitted to the Court.

Dated:                                     Respectfully Submitted,

                                 LAW OFFICE OF PICONE & DEFILIPPIS


                           By:

                                 STEVE M. DEFILIPPIS
                                 Attorneys for Petitioner,
                                 ROBERT DALTON RUSH

PROOF OF SERVICE BY MAIL
(1013a) (2015.5 CCP)

STATE OF CALIFORNIA     )    In Re Robert Rush
                      )    Case No.
COUNTY OF SANTA CLARA )

      I am now and at times herein mentioned have been a citizen of the United States, over the age of eighteen years, employed in Santa Clara County, California, and not a party to the within action or cause; that my business address is 625 North First Street, San Jose, California 95112; that I served copies of the:

### PETITION FOR WRIT OF HABEAS CORPUS &
### *Appendix "A" Exhibits AAA-PPP*

by placing said copies in an envelope addressed to:

      Heather Armstrong
      Attorney General's Office
      P.O. Box 85266
      San Diego CA 92186

which envelope was then sealed and, with postage fully prepaid thereon, was on November 6, 2006, deposited in the United States mail at San Jose, California; that there is delivery service by the United States mail at the place so addressed, or that there is regular communication by mail between that place of mailing and the place so addressed.

      I declare under penalty of perjury that the foregoing is true and correct.

      Executed on November 6, 2006, at San Jose, California.

NAOMI CHAIREZ