# EXHIBIT 8
# part 1 of 3

E042268

ORIGINAL

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FOURTH APPELLATE DISTRICT



FILED

JAN 3 1 2007

COURT OF APPEAL FOURTH DISTRICT

3:14pm

In re

ROBERT DALTON RUSH,

Petitioner

On Habeas Corpus

BOARD OF PAROLE HEARINGS
ARNOLD SCHWARZENEGGER,
Governor,

Real Parties In Interest

CASE NO.

[Commitment Offense:
San Bernardino Co. Sup
Court No. SCR 44594]

---

### PETITION FOR WRIT OF
### HABEAS CORPUS

---

STEVE M. DEFILIPPIS, Esq
State Bar No. 117292
KATIE R. YORK, Esq.
State Bar No. 244731
PICONE & DEFILIPPIS
625 N. First Street
San Jose, California 95112
(408) 292-0441

Attorneys for Petitioner
ROBERT DALTON RUSH

TABLE OF CONTENTS...................................................................i

TABLE OF AUTHORITIES..........................................................iii

INTRODUCTION.........................................................................1

STATEMENT OF FACTS.............................................................7

REQUEST FOR EVIDENTIARY HEARING......................................20

PRAYER....................................................................................21

VERIFICATION..........................................................................23

STATEMENT OF FACTS.............................................................25

A. The Circumstances of the Offense..........................................25

B. Institutional Recognition For Accomplishments...........................26

C. Social History........................................................................26

D. Advances During Incarceration...............................................27

   (1) Education.......................................................................27

   (2) Work/Vocation...............................................................28

   (3) Self-Help Programs .......................................................28

   (4) Disciplinary Record.........................................................29

E. Parole  Consideration History..................................................29

   **(a)** 1996 Initial Through 2003 Parole Consideration Hearings [4 Hearings]......29

   **(b)** Fourth Subsequent (5th overall) Parole Consideration Hearing, October 11, 2005...............................................................................29

   F. State Court Litigation-Superior Court Proceedings.................32

LEGAL ARGUMENT...................................................................35

    I.    THE BOARD'S APPLICATION OF THE RULING IN DANNENBERG IS CONTRARY TO CLEARLY ESTABLISHED SUPREME COURT LAW, AS IT RELIES ON REGULATORY LANGUAGE THAT IS UNCONSTITIONALLY VAGUE. .......36

    II.    STANDARD OF REVIEW......................................45

    III.    THE FAILURE OF THE PROSECUTION TO REQUEST THAT THE TRIAL COURT MAKE SPECIAL FINDING REGARDING

THE ASPECTS OF THE CRIME PRECLUDES THOSE FINDINGS FROM NOW BEING USED TO JUSTIFY DEPARTING FROM THE "SHALL NORMALLY" FORMULATION OF PENAL CODE §3041.........................53

V.  BY REPEATEDLY RELYING ON THE COMMITMENT OFFENSE IN THE FACE OF CLEAR EVIDENCE OF REHABILITATION, THE BOARD IS VIOLATING PETITIONER'S RIGHT TO DUE PROCESS OF LAW............57

  1.  Scott II................................................................59

  2.  Irons v. Warden.....................................................61

  3.  Martin v. Marshall..................................................64

  4.  Sanchez v. Kane.....................................................65

  5.  Rosenkrantz v. Marshall............................................67

  6.  In re Lee ............................................................70

  7.  In re Elkins.........................................................74

  8.  Summary.............................................................77

  IV.  THERE IS NO EVIDENCE TO SUPPORT A DENIAL UNDER § 3041..............................77

  A.  The Commitment Offense..........................................78

  B.  THE EVIDENCE FAILS TO SUPPORT ANY OF THE REMAINING UNSUITABILITY FACTORS.................84

  C.  PETITIONER IS SUITABLE FOR PAROLE UNDER EACH AND EVERY ONE OF THE REGULATORY FACTORS IN CAL. CODE REGS. TIT. 15 §2402(D)......................................................85

  D.  THE OTHER REASONS CITED BY THE BOARD WERE OUTSIDE THE RELEVANT UNSUITABILITY FACTORS AND PROVIDE NO SUPPORT FOR THE CONCLUSION THAT MR. RUSH IS A CURRENT AND UNREASONABLE THREAT TO SOCIETY...........................................87

VI.  THE BOARD OF PRISON TERMS HAS IMPLEMENTED AN UNLAWFUL POLICY AND PRACTICE OF DENYING PAROLE TO VIRTUALLY ALL INDETERMINATE-TERM PRISONERS..89

VII.  REQUEST FOR EVIDENTIARY HEARING...............................94

i

## FEDERAL CASES

Apprendi v. New Jersey (2000) 530 U.S. 466 — 51, 83
Biggs v. Terhune (9th Cir. 2003) 334 F.3d 910 — passim
Blakely v. Washington (2004) 542 U.S. 296 — 51, 52, 83
Board of Pardons v. Allen (1987) 482 U.S. 369 — 45
Brown v. Poole (9th Cir. 2003) 337 F.3d 1155 — 54
Chrysler Corp. v. U.S. Environmental Protection Agency (9th Cir. 1980) 631 F.2d 865 — 47
Evitts v. Lucey (1985) 469 U.S. 387 — 46
Godfrey v. State of Georgia (1980) 446 U.S. 420 — 41, 42
Greenholtz v Nebraska Penal Inmates (1979) 442 U.S. 1 — 45
Griffin v. Illinois (1956) 351 U.S. 12 — 46
Harris v. United States (2002) 536 U.S. 545 — 50
Irons v. Warden (E.D. Cal. 2005) 358 F.Supp.2d 936 — passim
Johnson v. Finn (E.D. Cal. 2006) 2006 WL 195159 — 67
Jones v. Smith (9th Cir. 2001) 231 F.3d 1227 — 51
Little v. Hadden (1980) 504 F.Supp. 558 — 81
Martin v. Marshall (N.D. Cal. 2006) 431 F.Supp.2d 1038 — passim
Maynard v. Cartwright (1988) 486 U.S. 356 — 41
McQuillion v. Duncan (2002) 306 F. 3d 896 — passim
Roper v. Simmons (2005) 543 U.S. 551 — 4, 5, 67
Rosenkrantz v. Marshall [Rosenkrantz VI] (C.D. Cal. 2006) 444 F. Supp.2d 1063 — passim
Sanchez v. Kane (C.D. Cal. 2006) 444 F.Supp.2d 1049 — passim
Sass v. California Bd. of Prison Terms (9th Cir. 2006) 461 F.3d 1123 — 45
Schwartzmiller v. Gardner (9th Cir. 1984) 752 F.2d 1341 — 37
Shell v. Mississippi (1990) 498 U.S. 1 — 41
Stirone v. United States (1960) 361 U.S. 212 — 51
Superintendent v. Hill (1985) 472 U.S. 445 — 43, 47, 50, 55
United States v. Doremus (9th Cir. 1989) 888 F.2d 630 — 37
United States v. Watts (1997) 519 U.S. 148 — 50

## STATE CASES

Copper Mining Co. v. Industrial Acc. Com. (1920) 183 Cal. 714 — 45
Ettinger v. Board of Medical Quality Assurance (1982) 135 Cal.App.3d 853 — 44
Gardern v. Commission of Professional Competence (1985) 164 Cal.App.3d 1035 — 45
Ghirardo v. Antonioli (1994) 8 Cal.4th 791 — 54
In re Burns (2006) 136 Cal.App.4th 1318 — 69
In re Dannenberg (2005) 34 Cal.4th 1061 — passim
In re DeLuna (2005) 126 Cal.App.4th 585 — 81
In re Elkins (2006) 144 Cal.App.4th 475 — passim
In re Ernest Smith (2003) 114 Cal.App.4th 343 — passim
In re Hogan (1986) 187 Cal.App.3d 819 — 52, 53
In re Lee (2006) 143 Cal.App.4th 1400 — passim
In re Lowe (2005) 130 Cal.App.4th 1045 — 81
In re Lowe (2005) 130 Cal.App.4th 1405 — 69
In re Mark Smith (2003) 109 Cal.App.4th 489 — 78

In re McClendon (2003) 113 Cal.App.4th 315 — 69
In re Minnis (1972) 7 Cal.3d 639 — 83
In re Morrall (2002) 130 Cal.App.4th  391 — 69
In re Powell (1988) 45 Cal.3d 894 — 47, 48
In re Ramirez (2001) 94 Cal. App. 4th 549 — passim
In re Roberts (2005) 36 Cal.4th 575 — 49, 52, 53
In re Rosenkrantz [Rosenkrantz II] (2000) 80 Cal.App.4th 409 — 44
In re Rosenkrantz [Rosenkrantz IV] (2002) 95 Cal.App.4th 358 — 2, 32
In re Rosenkrantz [Rosenkrantz V] (2002) 29 Cal.4th 616 — passim
In re Scott [Scott I] (2004) 119 Cal.App.4th 871 — passim
In re Scott [Scott II] (2005) 133 Cal. App.4th 573 — passim
In re Sena (2001) 94 Cal.App.4th 836 — 49, 50, 52
In re Sturm (1979) 11 Cal.3d 258 — 83
In re Van Houten (2004) 116 Cal.App.4th 339 — 37, 69
In re Weider (2006) 145 Cal.App.4th 570 — passim
People v. Black (2005) 35 Cal.4th 1238 — 53
People v. Lewis (1971) 19 Cal.App.3d 1019 — 50
People v. Nelson (1978) 85 Cal.App.3d 99 — 50
People v. Rosenkrantz [Rosenkrantz I] (1988) 198 Cal.App.3d 1187 — 2, 32
People v. Samuel (1981) 29 C.3d 489 — 51
Superior Court of Santa Clara County v. Engert (1982) 31 Cal.3d 797 — 41, 43

STATE STATUTES

Cal. Evid. Code §115 — 48, 49
Cal. Evid. Code §605 — 45, 46
Cal. Pen. Code §1369 — 50
Cal. Pen. Code §3000 — 76
Cal. Pen. Code §3041 — passim
Cal. Pen. Code §3041(a) — 38, 46, 53
Cal. Pen. Code §3041(b) — 52
Cal. Pen. Code §3041.5 — 47, 53
Cal. Pen. Code §3041.5(b)(2) — 45
Cal. Pen. Code §3042 — 86, 87
Cal. Pen. Code §3042(a) — 86
Cal. Pen. Code §3043 — 86
Cal. Pen. Code §5075 — 91

STATE RULES

Code of Civil Procedure §446 — 22, 24, 25

STATE REGULATIONS

Cal. Code Regs. tit. 15 §2403(c) — 80

STEVE M. DEFILIPPIS, Esq.
State Bar No. 117292
KATIE R. YORK, Esq.
State Bar No. 244731
PICONE & DEFILIPPIS
625 N. First Street
San Jose, CA 95112
(408) 292-0441

Attorneys for Petitioner,
ROBERT DALTON RUSH

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA
### FOURTH APPELLATE DISTRICT

| | |
|---|---|
| In re | CASE NO. |
| ROBERT DALTON RUSH, | [Commitment Offense-San Bernardino Co. Sup. Court No. SCR 44594] |
| Petitioner, | ***PETITION FOR WRIT OF HABEAS CORPUS*** |
| On Habeas Corpus. | |

BOARD OF PAROLE HEARINGS,
ARNOLD SCHWARZENEGGER,
Governor,

      Real Parties In Interest.

_____/

### INTRODUCTION

Petitioner, Robert Dalton Rush, a state prison inmate, has previously petitioned this Honorable Court for a Writ of Habeas Corpus challenging the denial of parole at his 2003 parole consideration hearing, and that petition was denied on June 1, 2005. At that point, he had been denied parole four (4) times, been incarcerated for sixteen (16) years, and was six (6) years beyond his minimum eligible parole date.

Since the most recent filing, Petitioner had one (1) more subsequent parole

1

consideration hearing on October 11, 2005, which is the subject of these proceedings. Originally, this hearing was scheduled for August 12, 2005. Although all the necessary parties were present, the hearing could not take place because one of the board members wanted to "catch a plane flight" out of town. Instead of a hearing, two (2) of the victim's family members gave statements on the record, but nothing else of substance occurred. Two months later, on October 11, 2005, Mr. Rush's fifth actual hearing took place.[1] Once again, at this hearing, Mr. Rush was denied parole based solely upon the immutable factors surrounding the commitment offense. Mr. Rush filed a Petition for Writ of Habeas Corpus in the San Bernardino County Superior Court on November 8, 2006. (Exh. QQQ.) His petition was subsequently denied on November 30, 2006. In denying Mr. Rush's petition, the court failed to address the arguments made by Petitioner and simply denied the petition by reciting the circumstances of the offense, without any further explanation or evaluation of his exemplary rehabilitation. (Exh. QQQ.)[2]   At this point, the parole consideration process has become a sham for Mr. Rush, who has worked extraordinarily hard to turn his life around in unprecedented fashion, yet his unparalleled accomplishments are being repeatedly ignored and parole denied based on the unchangeable facts of his crime.[3]

Furthermore, new cases have come down in the state and federal courts that expand upon the concept that repeated parole denials violate federal due process. (See *Rosenkrantz v. Marshall* [hereafter "*Rosenkrantz VI*"][4] (C.D. Cal. 2006) 444 F. Supp.2d 1063, *Sanchez v. Kane* (C.D. Cal. 2006) 444 F.Supp.2d 1049, *Martin v. Marshall* (N.D.

---

[1]   The second subsequent (3rd actual) hearing was originally heard on August 19, 2002. However, because of a claim that two (2) separate and independent tapes malfunctioned and could not be transcribed the hearing was reheard on March 5, 2003. Thus, the most recent hearing was actually the fifth time Mr. Rush's parole eligibility was brought before the Board.

[2]   The order is an interesting one, where the lower court seems to be intent on insulting both Petitioner and his counsel, rather then focusing on a proper analysis of the correct legal principles. Obviously, such statements have no proper place in a court order.

[3]   Although the Board did not explicitly state sole reliance was on the commitment offense, it did not give any justification, other than the facts of the offense, for denying parole.

[4]   The *Rosenkrantz* petitioner has been involved in six (6) decisions. *People v. Rosenkrantz* [*Rosenkrantz I*], 198 Cal.App.3d 1187, *In re Rosenkrantz* [*Rosenkrantz II*] (2000) 80 Cal.App.4th 409, *Davis v. Superior Court (Rosenkrantz)* [*Rosenkrantz III*], (Feb. 22, 2001, B146421) [non pub. opn.], *In re Rosenkrantz* [*Rosenkrantz IV*] (2002) 95 Cal.App.4th 358, *In re Rosenkrantz* [*Rosenkrantz V*] (2002) 29 Cal.4th 616, and the recent federal district court decision in

Cal. 2006) 431 F.Supp.2d 1038, *In re Lee* (2006) 143 Cal.App.4th 1400, and *In re Elkins* (2006) 144 Cal.App.4th 475.) These Courts have also made it clear that the focus is on whether the inmate is currently dangerous, not simply on whether it supports the Board's findings. (*Lee, supra*, 143 Cal.App.4th at 1408-1409.) Additionally, despite the California Supreme Court's analysis in the case of *In re Rosenkrantz* [hereinafter "*Rosenkrantz V*"] (2002) 29 Cal.4th 616 of the proof submitted by that petitioner, two federal courts have now found, based on additional proof, that the Executive Branch in fact does have an institutional bias and an unlawful blanket policy against parole for inmates convicted of life term offenses. (See Exh. FFF[5], *Coleman v. Board of Prison Terms*[6], Eastern Dist. CA, Case No. CIV S-96-0783 LKK, May 19, 2005; Exh. GGG, *Martin v. Marshall* (N.D.Cal. 2006) 431 F.Supp.2d 1038; There are two "*Scott*" decisions. The first was the reversal of the Board's denial of parole, *In re Scott [Scott I]* (2004) 119 Cal.App.4th 871. The second was the reversal of the Governor's action taking Scott's parole date granted at the hearing after the decision in *Scott I*. *In re Scott [Scott II]*, 133 Cal. App.4th 573 (2005). They will be differentiated herein by the roman numeral designations I & II.) This petition is to provide this Court with the information regarding Petitioner's most recent [October 11, 2005] hearing for purposes of evaluating Mr. Rush's entitlement to relief, and to address the recent developments regarding the Executive Branch's policies.

Despite having programmed in a perfect manner throughout the last twenty (20) years of incarceration, his having received extensive support for being paroled, and having been confined for nine (9) years past his minimum term, Mr. Rush has now been denied a parole date at each of his five (5) consecutive parole hearings, a result that is directly

---

*Rosenkrantz v. Marshall [Rosenkrantz VI]* (C.Dist. Cal. 2006) 444 F.Supp.2d 1063.

[5] Petitioner has filed an Appendix concurrently herewith containing all of the relevant materials from the 2005 hearing, and the materials necessary to address the claims in this petition. However, previous Appendices were filed in connection with the prior proceeding, and thus, Petitioner will utilize a somewhat different numbering scheme herein. Exhibits "A" through "Z" and "AA" through "AO" were submitted with the previous Petition, filed on May 13, 2005, Petitioner has separately requested judicial notice be taken of said documents. Further exhibits will continue in the same alphabetical sequence, commencing with AAA. References to Exhibits A through Z and AA through AO are to the exhibits to the original petition.

[6] *Coleman* is not cited as precedent, but for its factual showing of the Executive Branch's unlawful policy.

contrary to the facts of his case, and violates his due process rights in light of his unquestionable rehabilitation. More to the point, Mr. Rush has been incarcerated longer than would be appropriate for any second degree murder. These denials of parole have put the state in breach of its legal and constitutional obligations.

Additionally, what seems to be repeatedly ignored in this case is the fact that Mr. Rush was only twenty-one (21) years of age at the time of the commitment offense. Recently, in *Roper v. Simmons* (2005) 543 U.S. 551, the Supreme Court went through a comprehensive analysis of why juveniles who commit crimes should be treated in a much more lenient fashion than adults, with a focus on rehabilitation rather than punishment. In fact, the court in the recent decision, *Rosenkrantz v. Marshall* [hereafter "*Rosenkrantz VI*"] (C. Dist. Cal. 2006) 444 F. Supp.2d 1063, 1085, applied the concepts from *Roper* to an eighteen (18) year old murder defendant, like Mr. Rush, who had served just under twenty (20) years for his crime. The court, in *Rosenkrantz VI*, concluded the defendant's age at the time of the offense further diminished the reliability of the facts of the crime as a predictor of his current dangerousness. (*Id.* at 1085.) Clearly, these concepts apply to Mr. Rush herein.

The purpose of this Petition is to provide the Court with the additional circumstances occurring at the last subsequent parole hearing, so that those facts may be considered in connection with the accompanying request for judicial notice of the prior proceedings on Petitioner's application for relief herein. Although this petition challenges a new parole hearing, the October 2005 hearing, many of the issues will be the same as with the 2002 and 2003 hearings, with the primary difference being that Mr. Rush had another two and a half (2 ½) to three (3) years of exemplary programming. In other words, extensive further briefing will not be necessary. The differences raised by this current petition include the following:

    1.    At the 2005 hearing, unlike previous hearings, the commissioner stated Mr. Rush has done a "great job" since incarceration and he has "certainly prove[n] [him]self." (Exh. AAA, p. 91.). However, immediately thereafter, the presiding commissioner rationalized their denial by pointing out a lot of people had been victimized (i.e.

victim's family), Mr. Rush had remedies other than pulling out a gun,[7] and then he stated to Mr. Rush "you were convicted of second degree murder, sir" (each of these comments concern immutable factors that do not relate to the egregiousness of the offense or Mr. Rush's current dangerousness to the public).

2.  Since Mr. Rush filed his previous petition on May 13, 2005, *Rosenkrantz VI* was decided, applying the Supreme Court's recent decision, *Roper v. Simmons* (2005) 543 U.S. 551, which was also published after the petition was filed. *Ropers* gave a comprehensive analysis of why juveniles who commit crimes should be treated in a much more lenient fashion than adults, with a focus on rehabilitation rather than punishment. (See *Rosenkrantz VI, supra,* 444 F.Supp.2d at p. 1085, citing *Ropers, supra,* 453 U.S. at pp. 561-562.) Although the defendant in *Rosenkrantz VI* was not legally a minor, the court still concluded that the evidentiary and predictive value of his conduct was diminished because he was eighteen (18). Like the defendant in *Rosenkrantz VI,* Mr. Rush young at the time of the offense, barely twenty-one (21). As such, the evidentiary and predictive value of his conduct is diminished due to his age at the time of the offense.

3.  The Board's 2005 crime-based findings did not include a "finding" that the offense was "dispassionate and calculated" as it did for the first time in 2003. Instead, the Board stated it was "dispassionate and didn't have to happen." (Exh. AAA, p. 88.) Although, calling it "dispassionate" in the decision, the panel immediately recognized that it occurred in the course of a heated argument. (*Id..*);

4.  The 2005 Board did not rely on the claim that the motive for the crime was trivial and inexplicable as the 2003 Board did. Instead, the Board stated the motive was an argument and "that just doesn't cut it." (Exh. AAA, p. 88.) No explanation was given why it did not "cut it" or whether any motive for murder could "cut it";

5.  Unlike all the previous hearings, the 2005 Board gave no recommendations for further therapy or self-help. In 2003, the Board recommended that Mr. Rush "continue to participate in self-help in order to face, discuss, understand and cope with stress in a nondestructive manner," otherwise he would be an unpredictable threat to others. (Exh. BBB, p. 173-174.) However, at the 2005 hearing, the Board acknowledged that Mr. Rush accomplished the aforementioned

---

[7]  Recent case law has made it clear that the fact there is an option of not committing the crime does not make the offense more egregious. (*Elkins, supra,* 144 Cal.App.4th at 519.)

recommendation and gave no similar recommendations. (Exh. AAA, p. 38-39.);

6.   Unlike all the previous hearings, the 2005 Board did not conclude Mr. Rush was an "unpredictable" threat. For example, in 2003 the Board relied upon a correctional counselor's report to conclude Mr. Rush would pose an "unpredictable degree of threat to the public," therefore requiring more observation and evaluation of him before he could be suitable for parole.[8]  (Exh. BBB, p. 176.)  Conversely, in 2005, the Board made no such determinations.  Not only did they make no recommendations regarding self-help or therapy, when denying parole the commissioner merely stated "I don't know what you would be like on the outside" and then denied parole for another two (2) years. (Exh. AAA, p. 91.);

7.   There was an additional two (2) and one half to three (3) years of exclusively positive programming; and

8.   Since Mr. Rush filed his previous petition on May 13, 2005, many courts have reversed parole denials that repeatedly rely on the commitment offense.  For example, in *Rosenkrantz VI* the court concluded seven (7) parole denials and nearly twenty (20) years of incarceration was too much, in *Martin* five (5) denials and twenty-three (23) years of incarceration was too much, in *Scott II* five (5) denials and eighteen (18) years of incarceration was too much, in *Sanchez* four (4) denials and fourteen (14) years of incarceration was  too much, in *Lee* six (6) denials and almost twenty (20) years was too much, and in *Irons* five (5) denials and sixteen (16) years of incarceration was too much. Mr. Rush has been denied more times and incarcerated longer than nearly every one of those cases.  Currently, he has been denied parole five (5) times and has been incarcerated for over twenty (20) years.

Of course, all of the same excellent programming, discipline free behavior, comprehensive self-help courses, unparalleled educational and vocational achievements, and extensive support for parole by institutional and custodial staff, as well as family and friends in the community, with solid parole plans, that existed for the 2003 hearing were

---

[8]   A counselor's risk assessment can no longer be relied upon by the Board or Governor.  See Exhibit H, *In re Javier Cortez* (Los Angeles Sup. Ct. 2003) Case No. BH001953, where the court prohibited counselors from opining about an inmate's "risk of threat" because the Department of Operations Manual required such evaluations be performed by either a psychologist or psychiatrist.  See also Exhibit I, an August 5, 2004 internal memorandum from the CDC that removed a counselor's requirement to assess an inmate's threat.

likewise part of the record at the 2005 hearing. There was absolutely no evidence submitted that would support a finding of unsuitability.

In support of this verified petition, Mr. Rush respectfully alleges the following:

### STATEMENT OF FACTS

### I.

Petitioner, Robert Dalton Rush previously filed a Petition for Writ of Habeas Corpus, in which he challenged the legality of his continued confinement for the previous sixteen (16) years on a seventeen (17) year to life sentence for Second Degree Murder. Since incarceration, Mr. Rush has undertaken the enormous task of turning his life around and has programmed in a perfect manner. Despite his dramatic and unprecedented turnaround, and in the face of having received extensive support for being paroled, at the time of filing the prior petition, Mr. Rush had been denied a parole date at each of four (4)[9] consecutive hearings. Since the denial of the original Petition, on June 1, 2005, Mr. Rush received his third (3rd) subsequent (5th actual) hearing. He has again been denied a parole date for two years.

### II.

On November 8, 2006, Petitioner filed a petitioner for writ of habeas corpus, Case No. SWHSS-9037, with the County of San Bernardino Superior Court, in which he alleged the same claims raised herein. On November 30, 2006, that court denied any relief, finding that the Board's denial of parole was appropriate. (Exh. QQQ.) For all of the reasons stated herein, Petitioner alleges that the Superior Court's ruling was erroneous and failed to comply with statutory and case law as stated herein.

### III.

Since the 2003 hearing, Mr. Rush continues to be housed at the California Correctional Training Facility in Soledad, part of the State of California Department of Corrections (CDC). Mr. Rush has continued to be housed at CTF in the general

---

[9] The second subsequent (3rd actual) hearing was originally heard on August 19, 2002. However, because of a claim that two (2) separate and independent tapes malfunctioned and could not be transcribed the hearing was reheard on March 5, 2003. Thus, the delay in hearing effectively gave Mr. Rush a three (3) year parole denial even though the prior Board only gave him a two (2) year denial.

population with Medium custody. (Exh. AAA, p. 37.)  Based upon an assessment of Mr. Rush's lack of dangerousness, he has never spent any time in a level four institution and since 1993 he has been housed in the lowest level he could be housed in, a level two institution.  This aspect of how the state is classifying and housing Mr. Rush constitutes a direct admission by the state that he does not present an unreasonable risk of danger to society if paroled.  (*Cal. Code Regs.*, tit. 15, §2402(a).)  He has also continued his unblemished disciplinary record that now spans the last twenty (20) years while incarcerated.  The only write-up Mr. Rush has ever received during his twenty (20) years of incarceration was a 128 A on November 10, 1988, for showing up early for work.  He was only given this write-up because he was "technically" out of bounds.[10]  Since then, Mr. Rush has avoided even the slightest write-up.  His programming has been impeccable, being entirely disciplinary free and immersing himself in self-help courses and volunteer work where he not only betters himself, but helps to better the plight of those around him.[11]

## IV.

On October 11, 2005, Petitioner attended his third (3rd) Subsequent Parole Consideration Hearing.  Including his initial parole consideration hearing, and the two (2) hearings of the second (2nd) subsequent, this is the fifth (5th) time the Board has considered the issue of Mr. Rush's suitability for parole.[12]  Since the hearing at issue in the petition, he has continued to program positively.  He actively attends and positively participates in

---

[10]  The court in *In re Mark Smith* (2003) 109 Cal.App.4th 489, 501 fn. 5, concluded "counseling chronos" and "discipline" are two entirely different things.  The court cited *Cal. Code Regs.*, tit. 15, §§ 3000, 3312, subd. (a)(2) indicating a "counseling chrono [is] used for 'minor misconduct' only and entails no discipline, only counseling" and it also cited § 3312, subd. (a)(3) emphasizing that "disciplinary procedures [are] for 'serious misconduct.'" (*Id.*)  Thus, Mr. Rush's counseling chrono, for arriving early to work, would not constitute disciplinary action, and as such, he has remained discipline free for the entire duration of his incarceration, twenty (20) years.

[11]  Mr. Rush has worked as a clerk for the Bridging Program, which helps inmates with their basic life skills to prepare them for release.  (Exh. A, p. 58.)  He also volunteers for the CTF Video Reports Program that broadcasts educational videos for the general population.  (Exh. A, p. 59.)  Mr. Rush reviews the videos and prepares questionnaires so that inmates that do not have access to the education department can watch the videos, fill out the questionnaire, and obtain credit for it.  (*Id.*)  In addition, he has tutored other inmates to help them receive their GED's (Exh. A, p. 51.)

Alcoholics Anonymous and Narcotics Anonymous, both being Twelve Step based Programs.[13] (Exh. BBB, p. 335-336.) Mr. Rush participated in Dr. Thomas Gordon's Family Effectiveness Training/Harmony in the Home self-help program. (Exh. AAA, p. 40.) This program consists of six two hour sessions including the following topics: A Credo for Your Relationships; Participative Rule-Setting; Solving Problems You Own; The Pitfalls of Punishments and Rewards; Helping Others Find Solutions to Their Own Problems; Resolving Conflicts Peacefully; Dealing with Values, Collusions, and Courage for Learning the Skills-Rewards for Using Them. (Exh. BBB, p. 332.) Mr. Rush also completed "How to Become a Father and Not Get Angry." (Exh. BBB, p.334.) Additionally, he completed a course in the cause, prevention, treatment, and management of hepatitis. (Exh. AAA, p. 40-41.) Mr. Rush has continued to receive numerous positive work/performance evaluations since the last hearing, consistently getting above average to exceptional ratings. (Exh. AAA., p. 42.)

In short, Mr. Rush has continued to both excel in the work environment, and spends his free time participating in all available self-help programs at the institution that are applicable to him, and additionally volunteering his time to help out less fortunate inmates. For example, he works as a clerk for the Bridging Program. This program helps inmates prepare for release, by improving their basic life skills. (Exh. AAA, p. 58.) He was also commended for volunteering for the CTF Video Reports Program, a program that broadcasts educational videos for the general population. (Exh. AAA, p. 59; Exh. BBB, p. 337.) Mr. Rush reviews the videos and prepares questionnaires so that inmates that do not have access to the Education Department can watch the videos, fill out the questionnaire, and still obtain credit for it. (*Id.*) He also volunteered his time and organizational skills to provide support for the Central Education Department's Graduation and Promotion Ceremony on multiple occasions. (Exh. BBB, p. 339, 344.) In fact, at his 2005 hearing, the Board commended Mr. Rush for being a "good role model," despite finding that this role

---

[12] See footnote 1.

[13] Although Mr. Rush was a casual drinker, he has never had a drug or alcohol problem. (Exh. A, p. 54.) He participates in AA and NA because the Twelve Step Program helps with his basic life skills and helps him to be a better person. (Exh. A, pp. 54-55.)

model whose behaviors other inmates should emulate, presents an "unreasonable risk of danger" to society if paroled. (Exh. AAA, p. 91.) At this point, Mr. Rush has extended his now twenty (20) year perfect disciplinary record by another two (2) years.

## V.

Throughout his incarceration, Mr. Rush has proven to be a low threat of dangerousness. The CDC has rated his security threat as low since his reception, starting him by giving a Level III override to avoid placing him with criminally sophisticated individuals. His initial counselor's recommendation summary stated that "…in view of his age and not being systems-sophisticated, he may fall easy prey to his more sophisticated delinquent peers." (Exh. BBB, p. 99.) Thereafter, he was quickly moved to lower custody levels. Since 1993, he has been housed in a Level II facility, which is not allowed for a lifer if the crime involves "unusual violence." (*Cal. Code Regs.*, tit. 15 §3375.2(a)(7)(A).) The Department has dropped his classification points every year by the maximum allowable amount, and since January of 1996, he has remained at the lowest possible score of zero, until the CDC revised the policy and raised all lifers to a score of nineteen (19).[14] (Exh. AAA, p. 45.) Mr. Rush has not had any serious disciplines (CDC 115's) at any time during his incarceration, and his only minor non-disciplinary write-up (CDC 128-A, minor counseling chrono) was for being out of bounds, in November of 1988, because he showed up early for work. (Exh. AAA, pp. 89-90.) Thus, he has remained disciplinary free for his entire twenty (20) year incarceration and has programmed perfectly throughout that time. He has never been involved in an act of violence other than the commitment offense. He has made dramatic strides educationally, earning his AA degree in 1989 from Hartnell College, making the President's Honor Roll both semesters and maintaining a GPA of 3.826. (Exh. AAA, p.39.) He then began taking college courses at San Jose State University, completing his Bachelor of Arts degree in 1991, with a 3.9 GPA. (*Id.*) He even completed a Masters of Science degree in

---

[14] The CDC's "classification score" is a measure of the security risk attributed to a prisoner by the CDC. Every prisoner is received into the CDC with a score determined by offense and certain other statistics and then is either raised or lowered depending upon the prisoner's incarceration history. The lowest and most favorable classification was previously zero (0), and now is nineteen (19), due to a CDC policy change applicable to all life and term to life prisoners.

Humanities at California State University, Dominguez Hills, earning a 3.68 GPA. (*Id.*) He has consistently stayed active in all of the available self-help programs that apply to him while incarcerated, taking Dr. Bakeman's Life Skills Program and the Entrepreneurial Development class, and despite not even having a drug or alcohol problem, he has regularly participated in Alcoholics Anonymous since 1993. (Exh. AAA, p. 44, 55.)   He has also excelled in acquiring work skills, successfully completing the vocational drafting programs, and spending additional time in that trade teaching new entrants. (Exh. AAA, p. 52.)  Because Mr. Rush's work was so valuable he assisted with the program as a teacher's assistant for several years.  (Exh. AAA, p. 52.)  His work participation ratings have consistently been strongly positive, always receiving the highest available marks, such as "exceptional" or A's when grades are given. (Exh. AAA, p. 42.) Mr. Rush's improvement and suitability for parole has remained clear throughout his incarceration, and is even more apparent today, despite the Board's repeated denials of parole.

## VI.

While in custody, Mr. Rush's behavior has been exemplary.  His disciplinary history has been virtually nonexistent, and his psychological evaluations have been consistently favorable, all indicating that he has programmed well, has no current mental illness or serious psychological problems, and poses a low threat of danger to the public if released on parole.  (Exh. BBB, pp. 154-155.)   Despite having repeated positive psychiatric evaluations beginning with his 1996 initial life prisoner parole hearing before the Board, Mr. Rush has been continually denied parole. However, this has not discouraged Mr. Rush, who has continued his positive programming and represents the quintessential model inmate.  At his most recent parole hearing, on October 11, 2005, no adverse evidence was presented and an additional favorable psychological evaluation by Dr. Talbott was provided, but parole was again denied.  (See generally Exh. BBB, pp. 154-155.)  However, unlike previous hearings, the Board did not attempt to base its decision on Mr. Rush's "need" for more therapy and/or psychological analysis.  They did not even recommend more therapy or self help programming.   Instead, the Board

11

referenced the recommendations, given to him on March 2, 2003. First, in 2003, the Board recommended Mr. Rush continue to remain discipline free, and second, that he continue participating in self-help programs in order to "face, discuss, understand and cope with stress in a nondestructive manner," otherwise he would be an "unpredictable" threat to others. (Exh. AAA, p. 38-39; Exh. BBB, p. 174-175.) Conversely, at the most recent hearing in 2005, the Board simply acknowledged that Mr. Rush accomplished both of the recommendations given to him in 2003 and did not make any further recommendations. (Exh. AAA, p. 38-39.) In fact, the Board admitted Mr. Rush has "certainly prove[n] [him]self." (Exh. AAA, p. 91.) Nonetheless, despite Mr. Rush's "great job" since incarceration, his status as a "good role model," and his accomplishing all previous recommendations given by the Board, he was again denied parole for two (2) years, based on a finding that he allegedly presents an "unreasonable risk of danger" to society if released. (*Id.*) The Board, therefore, used solely the commitment offense, not necessarily its egregiousness, to not only deny parole, but did so for another two (2) years.

## VII.

The 2005 denial was based solely on the commitment offense. This decision was made despite the fact that the most recent and his previous psychiatric evaluations concluded Mr. Rush was a "very good candidate for parole." (Exh. BBB, p. 156.) On June 28, 2005, a psychological report was completed by Dr. Talbott. (Exh. AAA, p. 44.) Dr. Talbott primarily referred to the previous report completed by Dr. Terrini in 1999. (*Id.*) The 1999 psychological evaluation by Dr. Steven Terrini found no history of a drug or alcohol problem, found that his parole plans are "quite viable and his prognosis for community living is very positive," found no clinical disorder or personality disorder, described his judgment as "sound," and stated that he had "good insight into his commitment offense." (Exh. BBB, pp. 158-161.) Dr. Terrini also found that Mr. Rush was remorseful in a way that was "quite appropriate and genuine," and concluded that his lack of criminal history and "greater maturity and greater education" make his "violence potential within a controlled setting…to be significantly below average relative to this Level

12

II inmate population." (*Id.*, emphasis added.)  Dr. Terrini further opined that Mr. Rush was a "very good candidate for parole." (*Id.*, emphasis added.)  In fact, he stated, "I do not believe [Mr. Rush] would ever commit a violent act again." (Exh. BBB, p. 161.)  The same viewpoint goes all the way back to his first psychological evaluation in 1990 by Dr. Bruce Bakeman, who found absolutely no psychopathology, felt he needed no mental health treatment before or after release, and described the commitment offense as being the result of situational stress. (Exh. BBB, p. 168-169.)  Likewise, in 1993, Dr. Ronald Kitt found no mental disorder, noted increased psychiatric maturity, and below average violence potential in the community.  (Exh. BBB, p. 166-167.)  Dr. Kitt even recommended Mr. Rush's removal from special psychiatric evaluation calendars (i.e., Category X) because "psychopathology is not significantly related to future criminal behavior and psychiatric opinion will not contribute towards a release decision." (*Id.*)  Dr. Kitt noted that Mr. Rush now had two reports that were "favorable for release" and expressed his agreement with the prior report. (*Id.*)[15]  Dr. Bakeman again saw him in 1996, noting ongoing improvement, and confirming his previous opinions. (Exh. BBB, pp. 164-165.)

Thus, the reality of the "findings," from previous hearings, was that a vicious cycle was created, since the Board would not parole Petitioner without "treatment" and CDC would not give the treatment since not only was it psychologically unnecessary in Petitioner's case, but CDC does not even offer it to general population lifers such as Mr. Rush. (See Exh. BBB, p. 90.)  Those "findings" therefore appear to be, at best, another effort to direct psychological treatment of inmates, and at worst, is an insidious method of preventing a well deserved parole.  The practice of directing psychiatric treatment is one that the Board has been repeatedly told by the CDC mental health staff is inappropriate, and which they have previously agreed to cease doing.[16]  However, the Board in Mr. Rush's

[15]  Pursuant to the standards set by the Mental Health Department of CDC, as agreed to by the Board, an inmate is to be removed from the Category X psychiatric evaluation process if they have two (2) consecutive reports that are favorable for release.

[16]  See the attached letters from CDC staff psychologists, Dr. Steven Terrini and Dr. Lyons, Exhibit AL pp. 783-787, which refer to the notice given to the Board that they may not direct psychological treatment of lifers. This issue also came up in the case of *In re Rosenkrantz* (2000) 80 Cal.App.4th 409, 426-427, where the Court noted that the Board cannot ignore the psychological evidence and substitute their own opinions as to what is best for the inmate's

most recent hearing, in 2005, made no such "finding." No recommendation for further "therapy" was given.    In fact, the Board seemed to concede therapy was no longer necessary by stating Mr. Rush had "certainly prove[n] [him]self." (Exh. AAA, p. 91.) However, in the face of this concession and facts clearly showing Mr. Rush's suitability, the Board again denied parole. This action was taken despite a complete absence of evidence in the record to support the decision. The result of that decision is that Mr. Rush has now served beyond even the most aggravated amount of time that the matrix has established for his subject offense.

## VIII.

At his fifth (5th) hearing, on October 11, 2005, the Board acknowledged Mr. Rush's numerous letters of support (Exh. BBB, pp. 223-284), his lack of prior adult or juvenile criminal history, his vocational training for drafting, the Bachelors and Masters degrees he earned during incarceration, his realistic parole plans, his marketable skills, his exceptional programming, and his discipline free record while incarcerated.[17]    However, when the Board delivered their decision, Presiding Commissioner Sawyer, once again, stated Mr. Rush would pose an "unreasonable risk of danger to society." (Exh. AAA, p. 87.) To justify their decision, the presiding commissioner gave a brief recitation of the facts of the commitment offense. (*Id.*) These facts have remained unchanged for twenty (20) years. The Board, next, characterized the offense as "particularly callous and cruel," "dispassionate and [it] didn't have to happen," and it was carried out with a "callous disregard for human suffering." (Exh. AAA, p. 88.) The Board gave no explanation why the offense was characterized in this manner. Likewise, no explanation was given as to why Mr. Rush's numerous accomplishments during incarceration did not outweigh the immutable factors surrounding the commitment offense. The presiding commissioner simply told Mr. Rush he had done a "great job" since incarceration and he has "certainly

---

psychological care.    Likewise, in *Ramirez*, the Board was chastised for ignoring the psychological evidence and suggesting that the inmate "needs therapy." (*In re Edward Ramirez* (2001) 94 Cal.App.4th 549, 571.)

[17]    The only disciplinary action taken against Mr. Rush was the 128A for being early to work in 1988. Presiding Commissioner Sawyer admitted he did not understand it other than he was "technically" out of bounds. (Exh. A, p. 90.)

prove[n] [him]self." (Exh. AAA, pp. 90-91.)

Immediately thereafter, Commissioner Sawyer pointed out that many people had been victimized, Mr. Rush had remedies other than using a gun, and stated "you were convicted of second-degree murder, sir." (Exh. AAA, p. 91.) None of these facts have changed since the commitment offense and none of these facts explain why the offense was exceptionally egregious. In fact, absent a finding that the crime was "especially, heinous, atrocious or cruel," Mr. Rush's conviction for second degree murder, alone, cannot be used to continually deny his parole. As such, a blanket statement that Mr. Rush was convicted should not affect the Board's suitability determination. However, it clearly did. The Board gave no further explanation for their conclusion. They simply relied on the commitment offense without providing any support for its conclusion that the offense was so egregious that the facts, alone, could render Mr. Rush a current and unreasonable risk. This conclusion was made despite twenty (20) years of contrary behavior. Mr. Rush has behaved exceptionally since his incarceration, and as such, not a scintilla of evidence corroborated the Board's decision that he was still an unreasonable risk to society today. Nonetheless, the presiding commissioner listed a few immutable facts about the offense, he concluded by again complementing Mr. Rush on what he has accomplished since incarceration, acknowledging that he is a "good role model," but then stating "I don't know what you would be like on the outside" and then denied parole for another two (2) years. (Exh. AAA, p. 91.)

## IX.

At the 2005 hearing, Mr. Rush fully and accepted responsibility for his conduct in the offense, exhibited appropriate levels of remorse, and showed appropriate insight into the causes of his behaviors and a recognition of how to respond positively to forces in his life in the future. Likewise, the various reports submitted found full acceptance of responsibility and appropriate and sincere remorse. No facts were submitted to the Board that would justify the denial of a parole date. However, the Board still found Mr. Rush unsuitable. Not one of these alleged justifications for the Board's decision speaks to Mr. Rush's current suitability. The Board's characterization of the crime does not, in any way,

indicate it was so egregious as to render Mr. Rush a current risk to society. Furthermore, the fact people were victimized, namely the victim's family, also does not speak to his current dangerousness, nor does the fact Mr. Rush had remedies other than the use of a gun, since not committing the offense is always an available option. One thing is true, Mr. Rush was convicted of second degree murder. However, the Board failed to acknowledge the fact that he was already sentenced for that offense. That sentence was a parole eligible sentence, not life without the possibility of parole. As such, the mere fact Mr. Rush was convicted is not a permissible justification for lengthening his sentence to life without possibility of parole by continuous and arbitrary denials of parole.

## X.

The Board's reliance on the nature of the commitment offense to deny parole is grossly unfounded. The commitment offense is a second degree murder, and Mr. Rush's actions were a result of significant stress in his life. Shortly before the offense, he was a passenger in a fatal motorcycle accident, where he was severely injured and his friend was killed. (Exh. DDD, p. 361.) Mr. Rush was thrown from the motorcycle when it was hit after a semi-truck drove through a stop sign. (*Id.*) He sustained a severe concussion, dislocated ankle, broken ribs, punctured/collapsed lung, fractured right tibia and fibula, neurological injuries, contusions, abrasions, and a chipped tooth. (*Id.*) He was in the hospital for over two weeks and then confined to a bed for an additional month. (*Id.*) The stress from this accident had an enormous impact on Mr. Rush's life, he experienced depression and nervousness and was unable to function independently due to his injuries. At the time of the offense, Mr. Rush had not fully recovered from his weakened physical and mental state when he was assaulted by his larger and far more fit roommate. These circumstances of the life term offense must be considered, and it must be done in a way that meaningfully addresses whether he continues to present an unreasonable risk of danger to society if paroled. (*Scott II, supra*, 133 Cal.App.4[th] at 594-595; *In re Ernest Smith* (2003) 114 Cal.App.4[th] 343; see also *Rosenkrantz VI, supra*, 444 F. Supp.2d 1063, *Sanchez, supra*, 444 F.Supp.2d 1049, *Martin, supra*, 431 F.Supp.2d 1038, *Lee, supra*, 143 Cal.App.4[th] 1400, *Elkins, supra*, 144 Cal.App.4[th] 475, and *In re Weider* (2006) 145 Cal.App.4[th] 570.)

16

Under this type of evaluation, the conclusion is inescapable that this life offense is not "particularly egregious" or among the "gravest" of such offenses, especially when viewed from the standpoint of Mr. Rush's mental state at the time of the crime, and considering his dramatic transformation the last twenty (20) years. No evidence supports the conclusion that the crime, alone, makes Mr. Rush a current danger to society if paroled. (*Scott II, supra.*) Thus, the Board has failed to tie the facts of the offense to proof of current dangerousness. (*Scott II, supra.*)    In this case, the Code of Regulations Matrix shows that Mr. Rush should receive a date of between seventeen (17) and nineteen (19) years, before reduction for post-conviction custody credits under *Cal. Code Regs*, tit. 15, §2410. It has now been twenty (20) actual years, and Mr. Rush credits surpass the top end of the second degree murder matrix, yet the Board has not even set a *future* parole date. By giving another two year denial, they are once again ignoring the presumption of suitability, and shirking their responsibility to set a date. (*McQuillion v. Duncan* (2002) 306 F. 3d 896, at 901-902; *In re Ramirez* (2001) 94 Cal. App. 4th 549.)

## XI.

For at least the past ten (10) years, the Board has received informal mandates from the current and former Governors, to severely restrict, and ultimately eliminate, the granting of parole to persons convicted of parole eligible murders, even second degree murders. (See Exh. FFF to JJJ inclusive.) The result is a de facto system whereby inmates who have received an indeterminate term such as life or fifteen (15) or twenty five (25) years to life have their sentences unconstitutionally converted to a term of life without the possibility of parole by the executive branch, through the auspices of the Board and Governor. This unconstitutional, illegal policy was just recently recognized by the Federal Courts in both the Eastern and Northern Districts of California. (See Exh. FFF, *Coleman v. Board of Prison Terms*[18], Eastern Dist. CA, Case No. CIV S-96-0783 LKK PAN, May 19, 2005; Exh. GGG, *Martin v. Marshall* (N.D.Cal. 2006) 431 F.Supp.2d 1038.)[19] The unlawful

---

[18] The evidence relied on by the District Court in *Coleman* is in the possession of Petitioner's counsel, but is quite extensive, and thus has not been provided at this time. However, it is available and can be submitted supplementally should the Court desire.

[19] Petitioner is requesting that this Court take Judicial Notice of the *Coleman* decision, which is being cited as factual proof of this illegal policy, and not as legal precedent. Petitioner is also

17

system of sentence conversions occurs despite the state legislature's express statutory scheme which requires the Board to set a term for each parole eligible murder conviction. The de facto policy of the executive branch has been unconstitutionally used by the Board to virtually eliminate the setting of parole dates for persons convicted of murder. As a result, the Board's parole hearings have become meaningless shams. The Board has been criticized in this regard in published decisions of the California Courts of Appeals. (e.g. *In Re Ramirez, supra,* at 571 ["The board's readiness to make a finding so at odds with the record supports Ramirez's claim that his parole hearing was a sham."]; see also *Irons v. Warden* (E.D. Cal. 2005) 358 F.Supp.2d 936, at 947 [Board reliance on unchanging factors leave inmate with "no hope for ever obtaining parole except perhaps that a panel in the future will arbitrarily hold that the circumstances were not that serious…"].)

## XII.

The Board's denial of a parole date to Petitioner is part of an unlawful pattern and practice of the Board to deny parole to virtually all life and term to life inmates, irrespective of their accomplishments and efforts at rehabilitation in the prison, and to frustrate the legislative mandate in *Penal Code* § 3041 that parole "shall normally" be granted. The former Chief Executive of this state, Governor Gray Davis, explicitly declared the policy of the executive branch of government that those inmates serving life sentences, should not be paroled, stating:

> "'They must not have been listening when I was campaigning,' Davis said. 'If you take someone else's life, forget it. I just think people dismiss what I said in the campaign as either political hyperbole or something that I would back away from . . .We are doing exactly what we said we were going to do'." (Exh. MMM.)

Former Board Commissioner Al Leddy, and others, testified at a Joint Legislative Committee on Prison Construction and Operations on April 29, 1999. The subject of that hearing was parole, public safety and proportionality in the parole process.[20] (Exh. NNN; See also the declaration of former Board Commissioner, Albert Leddy, Exh. OOO.)

---

requesting that judicial notice be taken of the facts developed in *Martin*. However, *Martin* is a published decision, and thus, is being cited as legal precedent as well.

[20]  The transcripts of that hearing are available and can be submitted supplementally should the Court desire.

Numerous individuals testified at the legislative subcommittee hearing including former Board Commissioner Leddy, former United States Senator Alan Cranston, former California Supreme Court Justice Cruz Reynoso, and former Special Assistant to the U.S. Commission on Civil Rights Thomas Grey, along with a variety of attorneys and related professionals. They discussed numerous instances of unreasonable and unlawful refusals by the Board to grant parole. (Exh. NN.) Each of these individuals noted numerous instances where the Board had unreasonably refused parole, or had used multiple rescission hearings in order to take a set parole date away from an otherwise deserving inmate. (*Id.*) These facts show that the parole process is unfair, arbitrary and capricious, and should not be afforded the protection of any presumption of correctness, or the findings given any deference, in the proceedings in this Court. Mr. Leddy also testified in the Marin County Superior Court proceedings regarding *In re John Dannenberg*, as part of the evidentiary hearing in that case.[21] (Exh. PPP.) Mr. Leddy testified to the existence of an unwritten policy started by Governor Wilson, and "followed rigorously" by Governor Davis. (*Id.*, pp. 468-469.) The policy actually started to form with Governor Deukmejian, when paroles went down to 4 or 5 percent, then was solidified by the following chief executives. (*Id.* pp. 470-471.) Mr. Leddy acknowledged that the Board uses the preprinted BPT 1000a form to recite purported justifications for denying parole, and that rather than tailoring them to the individual inmate, they simply read them verbatim off the form, even in situations where they do not apply. (Id., pp. 471-473.)

## XIII.

Petitioner has no plain, speedy or adequate remedy in the ordinary course of the law. It is Petitioner's contention that further participation in hearings or any aspect of the administrative process of parole consideration will be futile in that he has been denied parole at five (5) consecutive hearings, always for reasons that are unsupported by the evidence contained in his Central File, which evidence has always been before the Board for the hearing. Each such denial has been repeatedly upheld by the Board's Decision

---

[21]    Again, that testimony is available and can be submitted supplementally should the Court desire.

Review Committee following the hearings. The Governor has never reviewed any of these denials. Thus, the only available avenue for relief is through the court system by way of the instant Petition for Writ of Habeas Corpus. Petitioner's continued confinement is unlawful, in that he is entitled to be paroled, but has been wrongfully denied that right. Said confinement violates the United States Constitution's Eighth Amendment proscription against cruel and unusual punishment, and the Fourteenth Amendment's due process clause, as well as the comparable provisions of the California Constitution. Additionally, the Board has now abolished the BPT 1040 administrative appeal process as of May 1, 2004, and therefore, there is no further administrative remedy available to Mr. Rush.

**XIV.**

A transcript of the October 11, 2005 subsequent parole consideration hearing has been prepared by the Board, and a true and accurate copy thereof is contained in the accompanying Appendix as Exhibit A, and the various other materials considered by the Board are attached and numbered as alleged above, and constitute the relevant record of the 2005 hearing. Additionally, Petitioner has separately requested that this Court take judicial notice of the petition and supporting exhibits [A through Z and AA through AO] from the prior habeas proceedings, and incorporates those herein by reference as though set forth in full. Petitioner will rely on all the foregoing allegations, arguments and evidence in connection with the request for relief herein. Petitioner also incorporates herein by reference the Memorandum of Points and Authorities served and filed herewith the totality of these various pleadings will supply the factual and legal basis for Petitioner's claims herein.

***REQUEST FOR EVIDENTIARY HEARING***

**XV.**

Petitioner is in possession of the extensive exhibits utilized to support the finding of the District Court in the *Coleman* case (Exh. FFF) and which likewise relied on in *Martin, supra*, but has not submitted those as they span more than 1500 pages, and include numerous depositions of past Board members. Petitioner is also in possession of the testimony of Albert Leddy, former Board Commissioner, from the evidentiary hearing in

the Marin County Superior Court in the case of In re John Dannenberg, case # SC112688A, addressing the "no parole" policy of the Executive Branch. Petitioner is also in possession of all of the Governor's reports of reviews conducted since 2000. Finally, Petitioner has a set of over 200 declarations showing a pattern of crime based denials, and is informed and believes that further discovery has been ordered in other cases that will bear upon the patterns and practices of the Executive Branch to refuse to grant parole. Petitioner will have all of this material available for submission to the Court at a duly scheduled evidentiary hearing, and therefore requests that one be set forthwith.

## PRAYER

Wherefore, Petitioner respectfully requests that this Court:

1.    Issue a writ of habeas corpus or order to show cause to the Warden of the Correctional Training Facility in Soledad, the Director of the Department of Corrections, the Governor and the Board of Parole Hearings to inquire into the legality of the Petitioner's incarceration;

2.    Order the immediate release of the Petitioner, or alternatively, order the Board to hold a new parole hearing within forty five (45) days at which Mr. Rush shall be found suitable and to set a date for release or alternatively, conduct a hearing and if no new information is presented that establishes that Petitioner poses a present threat of future violence, to find petitioner suitable for parole and set a release date;

3.    Conduct an evidentiary hearing if necessary to resolve any disputed factual issues, and after the hearing, issue an order directing the Board to act as set forth in paragraph 2, above;

4.    Discharge Petitioner free from both actual and constructive custody, or alternatively, apply any excess time in custody beyond the proper term for his offense against his maximum period of parole; and

//

//

21

5.    Grant such other and further relief as justice may require.

Dated: 1/30/07                    Respectfully Submitted,

LAW OFFICE OF PICONE & DEFILIPPIS

By: _____

STEVE M. DEFILIPPIS
Attorneys for Petitioner,
ROBERT DALTON RUSH

22

## VERIFICATION

I, STEVE M. DEFILIPPIS, declare as follows:

I am the attorney for Petitioner in the above-entitled matter, and my practice is located in Santa Clara County. Petitioner ROBERT DALTON RUSH is currently in custody in Monterey County. Additionally, I am personally familiar with the facts and circumstances underlying the present Supplemental Petition, as I was present at the subject hearing, and for that reason, I am providing this Verification in accordance with Code of Civil Procedure §446. I have read the foregoing Petition for Writ of Habeas Corpus and know the contents thereof. The same is true of my own personal knowledge, except as to those matters stated upon my information and belief, and as to those matters I believe them to be true.

I declare under of perjury that the foregoing is true and correct, executed this 30th day of January, 2007, in the City of San Jose, County of Santa Clara, State of California.

_____
STEVE M. DEFILIPPIS

23