# EXHIBIT 8
# part 2 of 3

STEVE M. DEFILIPPIS, Esq.
State Bar No. 117292
KATIE R. YORK, Esq.
PICONE & DEFILIPPIS
625 N. First Street
San Jose, CA 95112
(408) 292-0441

Attorneys for Petitioner,
ROBERT DALTON RUSH

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA
## FOURTH APPELLATE DISTRICT

In re                                                CASE NO.

ROBERT DALTON RUSH,                    [Commitment Offense – San Bernardino
                                                        Co. Sup. Ct. No. SCR 44594]
        Petitioner,

        On Habeas Corpus.                    *MEMORANDUM OF POINTS &*
                                                        *AUTHORITIES IN SUPPORT OF*   Page 24
                                                    /   *PETITION FOR WRIT OF*         missing in
ARNOLD SCHWARZENEGGER,            *HABEAS CORPUS*                 original !
Governor, BOARD OF PAROLE
HEARINGS,

        Real Parties In Interest.
                                                    /

## STATEMENT OF FACTS

### A.  *The Circumstances of the Offense*

        The facts of the commitment offense remain unchanged, and therefore, Petitioner

incorporates herein by reference the materials from section 1 of the Statement of Facts

contained in the Memorandum of Points and Authorities portion of the Petition filed on

May 13, 2005, at pages 27-29, as though set forth in full.  Those facts will not be restated

herein and the reader's attention is directed to that filing in the prior proceeding for this

information.

        While even the Board recognizes that he facts surrounding the commitment offense

have not changed since it occurred in 1986 and will never change, these same facts have been now used five (5) times to deny parole. With this mindset, no amount of outstanding programming will ever satisfy the Board, and obviously, absent court intervention, nothing ever will change.

## B. *Institutional Recognition For Accomplishments*

Since the 2003 hearing at issue in the prior petition , Mr. Rush's exceptional performance has continued to be recognized. Numerous chronos in Mr. Rush's file indicate he has continued to positively participate in Alcoholics Anonymous and has been since coming to prison, and that he is a contributing member that understands all aspects of the twelve step program.[22] (Exh. AAA, p. 39.) He received multiple chronos for his assistance with the Central Education Department's Graduation and Promotion Ceremony, where he was one of the original organizers and "dedicated considerable time and energy to the project." (Exh. BBB, pp. 339, 344.) Mr. Rush also received a chrono from G. Sansbury, an academic teacher, who described him as "a major component in the delivery of Basic Education to male felons." (Exh. BBB, p. 344.) In addition, this teacher stated Mr. Rush is often the "saving grace" for classroom participation and effective lesson plans. (*Id.*) Mr. Rush was commended for helping make questionnaires for the CTF Education Department's Distance Learning Center and also volunteers for the CTF Video Reports Program and is "greatly appreciated." (Exh. BBB, p. 335, 337.) He devotes a significant amount of his free time to various programs throughout the facility and has clearly been acknowledged for his hard work and dedication

## C. *Social History*

Mr. Rush's social history remains unchanged, and therefore, Petitioner incorporates herein by reference the material from section 2(a) and (b) of the Statement of Facts contained in the Memorandum of Points and Authorities portion of the Petition filed on May 13, 2005, at page 29-30, as though set forth in full. Those facts will not be restated herein and the reader's attention is directed to that filing in the prior proceeding for this information.

---

[22] Although Mr. Rush has been involved in AA since 1993, he has never had a drinking

26

### D. *Advances During Incarceration*

Mr. Rush's pre-2003 advances remain unchanged, and therefore, Petitioner incorporates herein by reference the material from section 3(a) through (d) of the Statement of Facts portion of the Memorandum of Points and Authorities portion of the Petition filed on May 13, 2005, at pages 30-35, as though set forth in full. Those facts will not be restated herein and the reader's attention is directed to that filing in the prior proceeding for this information.

### (1) Education

Since the 2003 hearing, Mr. Rush has continued to improve his already significant educational background. The 2005 Board even commended him for doing "very well educationally." (Exh. AAA, p. 89.) Even this is an extreme understatement, as he has received AA, BA and masters degrees, all with high honors, since coming to prison. Additionally, Mr. Rush continually stays up do date with the Computer Assisted Drafting (CAD) software. (Exh. AAA, pp. 52-53.) He made an arrangement with a teacher in the Educational Department so he could intermittently work with the CAD system a couple times a month. (Exh. AAA, pp. 52-53.) Mr. Rush has worked hard to keep his knowledge of CAD up to date because that program is used in the architectural and engineering fields. (Exh. AAA, p. 32.) Upon release, Mr. Rush intends to pursue a career as a cartographer, and as such, his proficiency with the CAD system will greatly increase his employment opportunities.

Additionally, Mr. Rush spends a significant amount of his time helping other inmates obtain an education. For example, he is involved with the CTF Video Reports Program. (Exh. BBB, p. 337.) This program broadcasts educational videos to the general population. (Exh. AAA, p. 59.) Specifically, Mr. Rush reviews the videos and formulates questionnaires so the inmates that do not have access to the Education Department can watch the videos, fill out the questionnaire, and still receive credit. (*Id.*) Further, Mr. Rush volunteered multiple times for the Central Education Department's Graduation and Promotion Ceremony. (Exh. BBB, pp. 339, 344.) He was even one of the original

---

problem. (Exh. A, p. 54-55.) He uses the program for his basic life skills. (Exh. A, p. 55.)

organizers of the commencement exercises. (Exh. BBB, p. 339.) Because of Mr. Rush's valuable work, he became a teacher's assistant for the drafting program and assisted students for several years after he completed his own certificates. (Exh. AAA, p. 52.) In the past, Mr. Rush also tutored students to help them obtain their GED's. (Exh. AAA, p. 51.) Thus, throughout Mr. Rush's twenty (20) years of incarceration, he has consistently and successfully improved his education and assisted other inmates to improve theirs as well.

### (2) Work/Vocation

After the 2003 hearing, Mr. Rush continued to work as a clerk in the Education Bridging Program. This program helps inmates that are eligible for work time credits get extra time off their sentence by participating in self-help and life skills study. (Exh. AAA, p. 58.) Basically, he helps inmates prepare for release. (Exh. AAA, p. 58.)[23] Mr. Rush always maintains exceptional work reports, obtaining above average ratings in all categories. (Exh. AAA, p. 37-38.) However, two weeks prior to the 2005 hearing, Mr. Rush changed jobs and is now a clerk in the library. (Exh. AAA, p. 43.)

### (3) Self-Help Programs

Since the 2003 hearing, Mr. Rush has continued to devour all available self-help courses in the institutional setting. He continues to actively attend and positively participate in Alcoholics Anonymous and Narcotics Anonymous which utilizes the twelve step model. (Exh. BBB, p. 335, 336.) Mr. Rush participated in Dr. Thomas Gordon's Family Effectiveness Training/Harmony in the Home self-help program. (Exh. AAA, p. 40.) This program consists of six two hour sessions including the following topics: A Credo for Your Relationships; Participative Rule-Setting; Solving Problems You Own; The Pitfalls of Punishments and Rewards; Helping Others Find Solutions to Their Own Problems; Resolving Conflicts Peacefully; Dealing with Values, Collusions, and Courage for Learning the Skills-Rewards for Using Them. (Exh. BBB, p. 332.) Mr. Rush also completed "How to Become a Father and Not Get Angry." (Exh. BBB, p. 334.)

---

[23] It is more than ironic that Mr. Rush prepares inmates by teaching them how to be successful when released, yet the Board claims he himself is an unreasonable risk of danger. Obviously the state's utilization of Mr. Rush's skills belies the Board's findings.

Additionally, he completed a course in the cause, prevention, treatment, and management of hepatitis. (Exh. AAA, p. 40-41.) At his previous hearing in 2003, the Board recommended Mr. Rush continue with self-help programs. (Exh. AAA, p. 39.) Consequently, the Board, in 2005, acknowledged that Mr. Rush had accomplished this goal and did not give a similar recommendation. (Exh. AAA, p. 39.)

### (4) Disciplinary Record

Since the 2003 hearing, Mr. Rush has continued to maintain his perfect disciplinary record, having not so much as a non-disciplinary CDC 128 A counseling chrono since his minor CDC 128 A in 1988 for showing up early to work.[24] Nonetheless, Mr. Rush is surrounded by potential for violence, but he makes a conscious effort to avoid putting himself in bad situations or when such situations occur he tries to diffuse them. (Exh. AAA, p. 56-57.) As a result, his unblemished disciplinary history now continuously spans the entirety of his incarceration, a period of twenty (20) years.

### E. *Parole Consideration History*

#### *(a) 1996 Initial Through 2003 Parole Consideration Hearings [4 Hearings]*

The details of these hearings are set out in section 4(a) through (d) of the Statement of Facts contained in the Memorandum of Points and Authorities portion of the Petition filed on May 13, 2005, at pages 35-53, and the same is incorporated herein by reference as though set forth in full. Those facts will not be restated herein and the reader's attention is directed to that filing in the prior proceeding for this information.

#### *(b) Fourth Subsequent (5th overall) Parole Consideration Hearing, October 11, 2005*

Initially, Mr. Rush's third subsequent (fifth actual) parole consideration hearing was scheduled for August 12, 2005.[25] (Exh. AAA, p. 37.) Although all relevant parties were present, the hearing was rescheduled because one of the board members had

---

[24] On November 10, 1988, Mr. Rush received a CDC 128 A because he showed up to work early and was technically out of bounds. Even Presiding Commissioner Sawyer indicated he did not understand the write-up, other than he was "technically" out of bounds. (Exh. A, p. 90.)

[25] The second subsequent (3rd actual) hearing was originally heard on August 19, 2002. However, because of a claim that two (2) separate and independent tapes malfunctioned and could not be transcribed the hearing was reheard on March 5, 2003. Thus, the most recent

scheduled a flight out of town too early to complete the hearings scheduled for that week. Thus, the hearing was held two months later on October 11, 2005. (See generally Exh. AAA.) At that point, it was seven (7) months late, measured from the March 2003 hearing, and fourteen (14) months late, measured from the August 2002 hearing.

Once again, the Board concluded Mr. Rush was an unreasonable risk of danger to society, and as such, unsuitable for parole. In relying solely on the commitment offense for their conclusion, the Board characterized the crime as "particularly cruel and callous." (Exh. AAA, p. 88.) Presiding Commissioner Sawyer then stated the crime was "certainly dispassionate and didn't have to happen." (Exh. AAA, p. 88.) He went on to briefly describe the offense and conclude there was a "callous disregard for human suffering." (Exh. AAA, p. 88.) Immediately thereafter, the Board went on to acknowledge Mr. Rush's success during incarceration.

First, the Board acknowledged he had absolutely no record prior to the commitment offense, juvenile or adult. (Exh. AAA, p. 88.) The presiding commissioner admitted Mr. Rush has "done very well since he has been in custody," and is at the "lowest classification level." (*Id.*) He went on to acknowledge the importance of the Bridging Program and the "exceptional" reports Mr. Rush has received while clerking there. (Exh. AAA, p. 88-89.) The commissioner also noted some of Mr. Rush's marketable skills, mechanical drafting and architectural drawing, and stated he has "done very well educationally." (Exh. AAA, p. 89.) He went on to note Mr. Rush's AA from Hartnell, BA from San Jose State and his Masters in Humanities from Dominguez Hills, all of which were completed during his incarceration. (*Id.*) The commissioner then acknowledged the numerous self-help programs he has been involved in, including, Alcoholics Anonymous, anger management, fatherhood training, a health program, the Hepatitis C health program, and the CTF Video Reports Program. (*Id.*) The Board then congratulated Mr. Rush because he has "clearly behaved since he has been in custody." (*Id.*) He has had only one 128 A in 1988, because he was early to work and "technically" out of bounds, and absolutely no 115's in his twenty (20) year disciplinary history. (*Id.*)

---

hearing was actually the fifth time Mr. Rush's parole eligibility was brought before the Board.

The Board then addressed Mr. Rush's psychological reports. (Exh. AAA, p. 90.) His latest doctor was Dr. Talbott who did an update on August 28, 2005. (*Id.*) He adopted most of Dr. Terrini's 1999 psychiatric report. (*Id.*) As with the previous doctors, he concluded Mr. Rush's "violence potential is less than that of the average level II inmate" and his "potential for violence within the free community is no more than that of the average citizen." (Exh. BBB, p. 156.)    Upon release, Mr. Rush plans to live with his father in San Bernardino County.   (Exh. AAA, p. 90.)   His father has written a very supportive letter indicating he is able to assist him with any financial requirements he has upon release, including a home, food, clothing, medical and dental care, a car, and any other financial assistance he needs during the transition into the workforce. (Exh. BBB, p. 235.)   In addition, Mr. Rush has been offered a position at the Mellinger Construction Company in Lake Arrowhead. (Exh. BBB, p. 284.)   He plans to work there and then pursue a career as a cartographer, where his knowledge the CAD system will be extremely beneficial. (Exh. AAA, p. 90.) The Board acknowledged he has marketable skills and an acceptable employment plan upon release. (*Id.*)

The presiding commissioner then stated Mr. Rush has done "a great job since [he has] been in custody for the last 19 years" and has "certainly prove[n] [him]self." (Exh. AAA, p. 91.)   However, the commissioner then referred to the commitment offense in stating he had victimized a lot of people, he had remedies other than using a gun, and stated "[y]ou were convicted of second-degree murder, sir." (*Id.*)   After another brief synopsis of the crime he was complimented again for his accomplishments during incarceration. (*Id.*) The Board even concluded Mr. Rush was a "good role model" while in custody. (*Id.*) Immediately thereafter, the commissioner inexplicably stated, "I don't know what you would be like on the outside" and denied his parole for another two (2) years. (*Id.*)

Thus, the Board acknowledged Mr. Rush's numerous accomplishments and his exceptional behavior during his twenty (20) years of incarceration simply to ignore his progress, and once again, rely solely upon the unchanged facts of the commitment offense to deny parole for another two (2) years.

*F. State Court Litigation-Superior Court Proceedings*

On November 8, 2006, Mr. Rush's Petition for Writ of Habeas Corpus was filed in the Superior Court of California for the County of San Bernardino. (Exh. QQQ, p. 474.) His petition was subsequently denied on November 20, 2006. (*Id.*) In rendering its decision, the Court directly insulted Petitioner's education and his counsel's ability to attend to the applicable law, misstated Petitioner's arguments, and then offered no explanation for its decision other than a brief recitation of the circumstances of the offense.

After wholly misstating one of Petitioner's arguments the Court stated,

"[t]he Petitioner desires that the Court intervene and assume the duties and responsibilities of the parole officials and the Executive Branch of the State government. Apparently Petitioner did not attend to his civic classes nor has Petitioner's counsel attended to the applicable law." (Exh. QQQ, p. 474.)

This condescending statement by the Court is not only wholly inappropriate in a court filing, but it lacks any legal authority for several reasons. First, the Court wholly ignores the fact that it is the judiciary's responsibility to intervene when a citizen's constitutional rights have been violated by another branch of the government, as Mr. Rush's due process rights have been violated by the Board in the present case. Despite the Court's contention, this is precisely what would have been taught in someone's "civic classes." Petitioner does not request that the court assume the duties and responsibilities of the Executive Branch. Instead, he requests that the court ensure the Board, an arm of the Executive Branch, upholds the due process rights required by the United States Constitution. Without such a check on the Executive Branch, the Board can continually deny parole, despite denying inmates their federally protected liberty interest in parole. Second, directly insulting the education of man who, despite having been incarcerated for twenty (20) years, has obtained three degrees neither explains the Court's denial nor serves any purpose other than to attack the dignity of a man who has worked diligently

throughout his twenty (20) years of incarceration to rehabilitate himself. In fact, in doing so, Mr. Rush has, by the Board's own admission, "done very well educationally," achieving an AA from Hartnell, a BA from San Jose State and his Masters in Humanities from Dominguez Hills. (Exh. AAA, p. 89.) Finally, in stating that Petitioner's counsel did not attend to the applicable law, the Court failed to cite or even mention any law that should have been addressed in the petition. As will be shown herein, the Court cited only one case and offered no explanation, other than a brief recitation of the facts, as to why the petition was denied or how the Board's characterization of the offense supported a conclusion that Mr. Rush was a current and unreasonable threat to society.

The Court also misstated several of Petitioner's arguments. For example, in an attempt to summarize Petitioner's argument that the parole hearing was improper the Court stated, "[h]e has been incarcerated too long than would be appropriate for a second degree murder." (Exh. QQQ, p. 474.) Assuming the Court was attempting to say the Petitioner's argument is that he has been incarcerated longer than is appropriate for a second degree murder, the Court wholly misstates Petitioner's contention. Instead, Petitioner contends that given the circumstances of *his* offense, not just any second degree murder, and *his* exemplary behavior during his twenty (20) years of incarceration, he is not an unreasonable threat to society, and as such, is required to be found suitable for parole. The issue concerns his dangerousness, twenty (20) years after the offense, not the length of his punishment for second degree murder, because he has already been sentenced and that sentence includes the possibility of parole, so long as he is not a current and unreasonable threat to society. (*Cal. Code Regs.*, tit.15, § 2402(a); see also *Rosenkrantz VI, supra*, 444 F. Supp.2d 1063, *Sanchez, supra*, 444 F.Supp.2d 1049, *Martin, supra*, 431 F.Supp.2d 1038, *Lee, supra*, 143 Cal.App.4th 1400, *Elkins, supra*, 144 Cal.App.4th 475, and *In re Weider* (2006) 145 Cal.App.4th 570.) Thus, the sole issue is whether the Board properly concluded he was a *current* and unreasonable threat to society. That conclusion is what Petitioner contends is improper.

The only case the Court cited in its denial was *In re Rosenkrantz* (2002) 29 Cal.4th 616. The Board used this case as support for the conclusion that its only inquiry was

33

whether "some evidence" in the record before the Board supported the parole denial, based upon factors specified by statute and regulation. (Exh. QQQ, p. 475.) However, the lower court seemed to focus on whether the evidence supported the findings, rather than supporting a rational conclusion that the inmate is currently dangerous, as current case law requires. (*In re Lee* (2006) 143 Cal.App.4[th] 1400, 1408-1409.) The Court also alleged that Petitioner requested that the court "reweigh" the evidence. Although Petitioner argues that the preponderance of evidence standard is the appropriate standard of review, reweighing the evidence before the Board is not necessary to establish there was a due process violation, because no evidence supports the Board's conclusion that Mr. Rush is a current and unreasonable threat to society. Petitioner only argued that there was no supporting evidence, and merely requests that the Court examine the Board's denial for a due process violation.

The Court then tersely summarized the remainder of Petitioner's arguments. As far as an explanation for the Court's denial, it hastily acknowledged Petitioner's argument that repeated denials, based solely on the commitment offense, after clear evidence of rehabilitation is a due process violation. In doing so, the Court merely stated, "[i]t is clearly the law that the gravity of the commitment offense alone may justify a denial of parole. By 'gravity of the offense' is meant particularly egregious." (Exh. QQQ, p. 475.) Of course, the Court did not cite any authority for how this "clearly" established law can override the rule against repeated parole denials, nor did it address how the predictive value of the gravity of the offense is impacted after twenty (20) years of exemplary behavior and proof of rehabilitation. (See *Biggs v. Terhune* (2003) 334 F.3d 910, *Irons v. Warden* (E.D. Cal. 2005) 358 F.Supp.2d 936, *In re Scott* [hereinafter "*Scott II*"][26] (2005) 133 Cal.App.4th 573, *Rosenkrantz v. Marshall* [hereafter "*Rosenkrantz VI*"][27] (C.D.

---

[26] There are two "*Scott*" decisions. The first was the reversal of the Board's denial of parole, *In re Scott [Scott I]* (2004) 119 Cal.App.4th 871. The second was the reversal of the Governor's action taking Scott's parole date granted at the hearing after the decision in *Scott I*. *In re Scott [Scott II]* (2005) 133 Cal. App.4[th] 573. They will be differentiated herein by the roman numeral designations I & II. It should be noted that *Scott II* was subsequent to *Dannenberg*, and the Supreme Court not only denied review, but they refused the Governor's request to depublish that opinion.

[27] The *Rosenkrantz* petitioner has been involved in six (6) decisions. *People v. Rosenkrantz*

Cal. 2006) 444 F. Supp.2d 1063, *Sanchez v. Kane* (C.D. Cal. 2006) 444 F.Supp.2d 1049, *Martin v. Marshall* (N.D. Cal. 2006) 431 F.Supp.2d 1038, *In re Lee* (2006) 143 Cal.App.4[th] 1400, and *In re Elkins* (2006) 144 Cal.App.4[th] 475.) Once again, all that was given by the Court was a brief recitation of the circumstances of the offense. (Exh. QQQ, pp. 475-476.) The Court seemed to reweigh the evidence by making additional findings, such as Mr. Rush showing a "lack of remorse," which was never cited by the Board as a purported justification for denying parole.

In concluding that sufficient evidence existed to justify a finding of unsuitability, the Court did not acknowledge Mr. Rush's exemplary programming, educational achievements, twenty (20) year record of discipline free behavior, or his unprecedented rehabilitation. In fact, although the Court stated it was required to inquire whether "some evidence" supported the Board's denial based upon "the factors specified by statute and regulation," the only factor mentioned by the Court was the commitment offense. The Court did not reference, in any way, the fact that no other unsuitability factors applied to Mr. Rush, nor did it acknowledge the many suitability factors that do apply to his case. As a result, the Court simply denied Mr. Rush's petition.

### *LEGAL ARGUMENT*

The primary legal arguments raised in the May 13, 2005 petition and the in the prior habeas proceedings apply here. Thus, Petitioner has separately filed a request for judicial notice, and is requesting this Court to take judicial notice of the pleadings and files in the prior habeas proceedings. Petitioner incorporates herein by reference the legal arguments from the Memorandum of Points and Authorities in Support of the Petition filed on May 13, 2005, in case #44594, *In re Robert Dalton Rush,* on habeas corpus, as though set forth in full.

Additionally, several new cases came down recently in both the federal and state courts, addressing similar situations. (*Scott II, supra,* 133 Cal.App.4th 573, *Rosenkrantz*

---

[*Rosenkrantz I*], 198 Cal.App.3d 1187, *In re Rosenkrantz* [*Rosenkrantz II*] (2000) 80 Cal.App.4th 409, *Davis v. Superior Court (Rosenkrantz)* [*Rosenkrantz III*], (Feb. 22, 2001, B146421) [non pub. opn.], *In re Rosenkrantz* [*Rosenkrantz IV*] (2002) 95 Cal.App.4th 358, *In re Rosenkrantz* [*Rosenkrantz V*] (2002) 29 Cal.4th 616, and the recent federal district court decision in *Rosenkrantz v. Marshall* [*Rosenkrantz VI*] (C.Dist. Cal. 2006) 444 F.Supp.2d 1063.

*VI, supra,* 444 F. Supp.2d 1063, *Sanchez, supra,* 444 F.Supp.2d 1049, *Martin, supra,* 431 F.Supp.2d 1038, *Lee, supra,* 143 Cal.App.4[th] 1400, *Elkins, supra,* 144 Cal.App.4[th] 475, and *In re Weider* (2006) 145 Cal.App.4[th] 570.) *In Martin,* the federal district court found that the inmate's due process rights were violated by repeated denials of parole. Like Mr. Rush, Martin had been in prison for many years, having five (5) hearings like Mr. Rush, and had shot his victim multiple times (a total of 7 in Martin's case). He too had been subjected to multiple denials of parole, and was more than six years over his matrix term at the time of the hearing. However, Martin had an extensive disciplinary history, and had only been free of discipline since 1995, wheras Mr. Rush has twenty years discipline free. Thus, unlike Martin, Mr. Rush has never been a disciplinary problem during incarceration. In the face of these facts, the *Martin* court found that the Governor's reversal was not supported by any evidence. In analyzing the *Biggs\Irons*[28] issue, the district court found it significant that Martin's crime "was less serious than the petitioner's in *Biggs,*" and had served well beyond his minimum term, whereas Biggs had not. The Court also found that Martin compared favorably to the inmate in *Irons, supra,* who had been denied five (5) times, again focusing on the fact that he had exceeded his minimum term. These same points apply equally to Mr. Rush's case, as *Martin* was a double murder, which an innocent by stander being killed by the spray of bullets and another being seriously injured. Likewise, Mr. Rush compares favorably with the inmates in *Scott II, Sanchez, Rosenkrantz VI, Elkins, Lee,* and *Weider.*

The following arguments are matters not addressed in the previous habeas proceedings or which address the subsequently occurring facts or legal authorities not previously covered therein.

## I.    THE BOARD'S APPLICATION OF THE RULING IN DANNENBERG IS CONTRARY TO CLEARLY ESTABLISHED SUPREME COURT LAW, AS IT RELIES ON REGULATORY LANGUAGE THAT IS UNCONSTITITONALLY VAGUE.

In evaluating an inmate's suitability for parole, the Board is only permitted to come to a finding of unsuitability if the inmate currently presents an unreasonable risk of

---

[28]  *Biggs v. Terhune* (2003) 334 F.3d 910, at 917;  *Irons v. Warden* (E. Dist. Cal. 2005) 358

danger to society if paroled. (*Cal. Code Regs.*, tit. 15, §2402(a); *In re Scott [Scott II]* [29] (2005) 133 Cal.App.4th 573, at 594-595.) The regulations only permit such a finding to be based on the crime if the offense is "especially heinous, atrocious or cruel." (*Cal. Code Regs.*, tit. 15, §2402(c)(1).) That phrase, as defined by the regulatory criteria, applies only when the murder is of a "particularly egregious" type, fitting certain defining principles set out in the regulations.[30] As will be discussed, as applied by the Board, these criteria are overly vague, leaving inmates unable to determine if the criteria should properly apply to their particular offense. However, in defending its actions in these cases, the Board takes the position that the standard enunciated in the case of *In re Dannenberg* (2005) 34 Cal.4th 1061 somehow allows them to ignore even these rules, authorizing the denial of parole based solely on the commitment offense if the facts surrounding the offense are "more than minimally necessary to convict" the inmate of the offense in question, irrespective of whether the offense actually meets the regulatory criteria for particularly egregious murders under section 2402 subdivision (c)(1). Such an interpretation, if adopted, would render the regulatory criteria so unconstitutionally vague as to literally read them right out of the books. Of course, as the appellate court noted in *Scott II, supra,* 133 Cal.App.4th at pp. 594-595, not only must the Board's finding fit within the regulatory criteria, but they must rationally and reliably show that the inmate is currently dangerous. Here, there was no factual support for any of the Board's crime based findings, yet the Board's decision attempts to rationalize a fifth denial of parole

---

F.Supp.2d 936, 947.

[29] There are two "*Scott*" decisions. The first was the reversal of the Board's denial of parole, *In re Scott [Scott I]*, 119 Cal.App.4th 871 (2004). The second was the reversal of the Governor's action taking Scott's parole date granted at the hearing after the decision in *Scott I. In re Scott [Scott II]*, 133 Cal. App.4th 573 (2005). They will be differentiated herein by the roman numeral designations I & II. It should be noted that *Scott II* was subsequent to *Dannenberg*, and the Supreme Court not only denied review, but they refused the Governor's request to depublish that opinion.

[30] Section 2402(c) goes on to define the categories of sufficiently egregious offenses as being ones where "(A) multiple victims were attacked, injured or killed in the same or separate incidents. (B) the offense was carried out in a dispassionate and calculated manner, such as an execution-style murder. (C) The victim was abused, defiled or mutilated during or after the offense. (D) The offense was carried out in a manner, which demonstrates an exceptionally callous disregard for human suffering. (E) The motive for the crime is inexplicable or very trivial

based on the crime, under the theory that the offense involved facts which were more than the "minimum necessary to sustain a conviction" for second degree murder.

In the present case, the Board denied Mr. Rush parole at his 2005 hearing based solely upon the commitment offense, characterizing it as, "particularly cruel and callous," "dispassionate" with a "callous disregard for human suffering." (Exh. AAA, p. 88.) While purporting to be "findings" about the crime, the use of these phrases without explanation shows that the Board was doing nothing more than reading off of the denial from, BPT 1000a, rather than coming to some definitive conclusion about the pertinent offense factors. (See Exh. KKK.) Note that the second finding, that of a "dispassionate" manner, fails to accurately apply the full regulatory criteria.[31] Even if the regulatory criteria was properly modified in that fashion, in the face of a crime that was clearly committed under significant stress, while perhaps not sufficient to reduce it to a manslaughter, the use of the term "dispassionate" simply has no application, and no inmate in Mr. Rush's position would expect that this criteria would apply to him. Nor is the first criteria in the actual regulatory terms, and the third is simply the defining principle for what constitute an offense that is "especially...cruel." (See *Cal. Code Regs.,* tit. 15, §2402(c)(1)(D).) As such, no inmate would anticipate the application of the first or third stated criteria, particularly in these circumstances and in light of the applicable rules defining what it means for a crime to be "especially...cruel." (*In re Ernest Smith* (2003) 114 Cal.App.4th 343 ["There is no evidence that Smith acted with cold, calculated, dispassion; or that he tormented, terrorized, or injured (the victim) before deciding to shoot her; or that he gratuitously increased or unnecessarily prolonged her pain and suffering"].) As will be discussed below, this characterization by the Board of the crime to support the denial of parole, relies on wholly vague and amorphous terms, and the decision is therefore contrary to clearly established United States Supreme Court law and violative of fundamental due process.[32]

---

in relation to the offense."

[31] See *Cal. Code Regs.,* tit. 15, §2402(c)(1)(B) ["The offense was carried out in a dispassionate *and calculated manner, such as an execution-style murder.*"] Emphasis added.

[32] This should come as no surprise, as the Board continuously falls back on the immutable and unchanging facts of the crime in every case where parole is denied. The Board consistently

A statute (or regulation) is void for vagueness "if it fails to give adequate notice to people of ordinary intelligence concerning the conduct it proscribes, or if it invites arbitrary and discriminatory enforcement." (*United States v. Doremus* (9th Cir. 1989) 888 F.2d 630, 634.) In addressing a vagueness challenge, the first question is "whether to scrutinize the statute for intolerable vagueness on its face or whether to do so only as the statute is applied in a particular case." (*Schwartzmiller v. Gardner* (9th Cir. 1984) 752 F.2d 1341, 1346.) As will be discussed herein, the factors set forth in *Cal. Code Regs.*, tit. 15, § 2402(c) used by the Board to determine whether the crime was committed in an especially heinous, atrocious or cruel manner, as applied both generally and as to Mr. Rush, are purely subjective, and are unconstitutionally vague. As such, these factors are not easily understood or explained, and thus, Mr. Rush did not have notice that they would apply to his crime, which was committed under the effects of extremely highly charged emotions, and in response to being physically assaulted and tormented by his much larger and more aggressive roommate, ultimately resulting in an overreaction to those circumstances.[33]

---

ignores the rule stated in *Biggs v. Terhune, supra,* 334 F.3d at 916-917 that repeated reliance on unchanging facts in the face of uncontradicted evidence of rehabilitation violates due process. (See also *Scott II, supra,* 133 Cal.App.4[th] at 594-595. Here, as is discussed more fully *supra,* Petitioner's crime is not sufficiently egregious factually when evaluated in light of the applicable authorities, such as *In re Ernest Smith* (2003) 114 Cal.App.4th 343 [unchanging history of drug and spousal abuse not sufficient to deny parole, and while shooting victim three times in the head is "callous;" it is not necessarily "particularly egregious" compared to similar life crimes], *In re Mark Smith* (2003) 109 Cal.App.4th 489 [crime not egregious despite facts that victim was shot twice by inmate, before inmate ordered copart to drown the victim], *Scott I, supra,* 119 Cal.App.4th at 890-892 [crime is not particularly egregious, despite facts of shooting victim in the presence of child], and *McQuillion I, supra* [double murder, with father-son proprietors tied up and executed during culmination of spree of robberies, not sufficiently egregious to justify rescission]. The holdings of these cases, compared with the factually unsupported "findings" of the Board in this case, clearly demonstrate their arbitrariness. (See also *In re Van Houten* (2004) 116 Cal.App.4th 339 [the existence of death penalty eligible special circumstances in Van Houten's particular offense, one of the Manson Clan killings, demonstrates what is sufficiently egregious to provide " 'some evidence' that the horrible [violence] potential may still be within her."].) No such evidence was present here.

[33] It is important to note at the outset that the California Supreme Court has determined in cases involving the death penalty or life without the possibility of parole, the virtually identical terms to those found in §2402(c)(1), "especially heinous, atrocious, or cruel, manifesting exceptional depravity," are unconstitutionally vague and violative of fundamental due process. (*Superior*

Here, the Board found, that Mr. Rush's crime was cruel and callous, dispassionate, and showed a callous disregard for the suffering of the victim, apparently invoking *Cal. Code Regs.*, tit. 15, §2402(c)(1)(B) & (D). The Court in the matter of *In re Rosenkrantz [Rosenkrantz V]* (2002) 29 Cal.4th 616 held that "the nature of the prisoner's offense, alone, **can** constitute a sufficient basis for denying parole." (*Rosenkrantz V, supra*, 29 Cal.4th at 682, emphasis added.) The *Rosenkrantz V* decision employed conditional language that the offense "can" constitute such a basis, but only if the crime could reasonably be considered **more** aggravated or violent than the minimum necessary to sustain a conviction for that offense, meaning the crime had to be particularly egregious compared to other murders so that the exception of 3041(b) would not "swallow the rule" that parole "shall normally" be granted. (*Id.* at 683, emphasis added.) Although the *Rosenkrantz V* language itself, if not properly tempered by the rules addressed in *Scott II, supra*, 133 Cal.App.4th at 594-595, can lead to the regulations being interpreted in a manner that would render them unconstitutionally vague, the Court in that decision did at least state a directive that sole reliance on the commitment offense will violate the prisoners' due process rights pursuant to *Penal Code* §3041(a) in situations where the offense "could [not] be considered **more** aggravated or violent than the minimum necessary to sustain a conviction for that offense" and therefore was not "particularly egregious." (*Rosenkrantz V, supra*, 29 Cal.4th at 683.) The language requiring that the offense be "particularly egregious" was understood to mean that the offense stood out among second degree murders as being significantly more violent. (See *e.g., In re Ernest Smith, supra*.)

However, under the Board's interpretation of *Dannenberg*, the standard set forth in *Rosenkrantz V* is dramatically changed, allowing the Board to deny parole based on the commitment offense, without regard for its comparative egregiousness, solely because they can "point to some evidence" that the crime was merely "more than minimally necessary to convict him of the offense for which he is confined." (*In re Dannenberg,*

---

*Court of Santa Clara v. Engert* (1982) 31 Cal.3d 797, 805.)

*supra*, 34 Cal.4[th] at 1095.)[34]  Of course, the *Dannenberg* majority made it explicitly clear that they were not overruling *Rosenkrantz V* or watering down its rules.  This interpretation urged by the Board would fundamentally alter the standard by removing the focus from determining whether the crime was "especially heinous, atrocious and cruel" so long as there is simply more evidence than "minimally necessary to convict."  This formulation would then take the place of determining whether the crime was egregious under the regulatory standards of *Cal. Code Regs.*, tit. 15, §2402(c)(1), on which inmates routinely rely to evaluate whether their particular crime could potentially take them outside the regulatory standards of suitability, which the Court expressly required the Board to base its decision on in *Rosenkrantz V, supra*, 29 Cal.4[th] at 653, 654 and 658. This requirement of relying on the regulatory standards has been routinely ignored by the Board. In fact, as has been argued by the Board in other cases, their decision must be upheld under this standard, ***even if the evidence does not show that the inmate currently presents an unreasonable risk of danger*** if released, as is expressly required by *Cal.Code Regs.*, tit.15, §2402(a).  (See *Scott II, supra,* 133 Cal.App.4[th] at 594-595.) Obviously addressing this very argument, *Scott II, supra*, clarified the basic holding in *Dannenberg*, concluding that the crime "***can***" justify a parole denial, but only where it rationally shows current dangerousness, in light of the reduced probative value that the crime based evidence naturally has after the passage of time.  (See also *Rosenkrantz v. Marshall* [*Rosenkrantz VI*] (C.D. Cal. 2006) 444 F. Supp. 2d 1063, 1081; *Martin v. Marshall* (N.D. Cal. 2006) 431 F. Supp. 2d 1038, 1046-1047.)  Of course, the Board did not extend to Mr. Rush the benefit of the wisdom of *Scott II* or the recent federal decisions.

As noted by the dissent in *Dannenberg*, utilizing this standard in the way suggested by the Board, without the caveat of *Scott II*, makes the Board's decision ***completely*** unreviewable.  (*Id.* at 1102.)  The result is a definition, or standard, that like the Greek god Proteus, constantly changes shapes, is never consistent and is incapable of being defined or pinned down.  What may be callous or heinous, under this view of the

---

[34]  As the dissent in *Dannenberg* pointed out, viewing the standard in this light makes it

standard, to one Board member may not be such to another. However, the Court made it clear in *Dannenberg* that they were not intending to alter the standard of *Rosenkrantz V.* (*Dannenberg, supra,* 34 Cal.4th at 1094.)    *Scott II* helped to clarify that crime based denials still needed to be closely monitored, and that the law still retained the fundamental requirement that the focus be on the regulatory standards and their ability to show, despite the passage of time, that the inmate is **currently** still presenting an unreasonable risk of danger to society if paroled. (*Scott II, supra,* 133 Cal.App.4th at 594-595.) The Board's narrow view of the basic holding in *Dannenberg* sees it as effectively amending the standard in a way where every murder could fit into the category of "more than minimally necessary to convict" by virtue of the simple fact that the inmate was convicted and thus the evidence is presumptively greater than the "minimum necessary to convict." This application is wholly arbitrary and depends on the subjective, personal opinions and whims of the Board members. Of course, the Board has fully adopted this stance, thus abusing its position by treating *Dannenberg* as carte blanche language to repeatedly deny parole based **solely** on the nature of the commitment offense, by simply mouthing the words "especially heinous, atrocious, and cruel." This position permits a conclusion that can easily be reached by those Board members who want to claim that the facts of any murder are more than those minimally necessary for conviction. Since the *Dannenberg* Court dispensed with the requirement that the offense be compared to other murders **for proportionality purposes**, the Board seizes on that language to avoid comparisons for **any** purpose, even evaluating whether the crime fits under the indisputably comparative language of the regulations, §2402(c)(1) ("**especially** heinous…" or "**exceptionally** callous disregard…," etc., emphasis added). Thus, under their view, the standard can be said to fit any murder, including accomplice liability, DUI based car accident, non-intentional (implied malice) killings, and the like.

An example can easily illustrate the unworkability of this view of the *Dannenberg* standard, where the caveat of *Scott II* is ignored. Assume two separate murders committed in an identical fashion by first time offenders. In each case, the perpetrator

---

completely unreviewable. (*Dannenberg, supra,* 34 Cal.4th at 1102.)

contemplates the idea of killing just long enough to satisfy the element of premeditation and deliberation, and both harbor express malice, i.e., intent to kill. However, the jury in defendant A's case decides to credit some psychological evidence on mental state and finds only a second degree murder, while the jury in defendant B's case rejects the identical evidence and convicts of first degree. Under the Board's view of the *Dannenberg* formulation, only defendant A's crime, the second degree murder, exhibits evidence that is "more than minimally necessary" to convict, since premeditation is a required element of defendant B's first degree murder offense. Thus, defendant B would be entitled to have his parole date fixed at his initial hearing, absent adverse in-prison behavior, as the evidence of premeditation is simply one of the elements of his crime. However, under the Board's view of *Dannenberg*, they would be free to repeatedly deny parole to defendant A, based on the evidence of premeditation that was rejected by the jury.[35] In other words, all other facts being equal, the Board's view of the *Dannenberg* formulation results in the second degree murder being treated as more serious than the identical first degree offense, committed by an identical offender. Such a rule flies in the face of due process.

Applying the rule explained by the United States Supreme Court, there is nothing in the language and descriptions used in § 2402(c)(1) ["exceptionally heinous, atrocious and cruel"] that standing alone "implies any inherent restraint on the arbitrary and capricious" denial of parole suitability. (*Godfrey v. State of Georgia* (1980) 446 U.S. 420, 428.) That Court found that a "person of ordinary sensibility could fairly characterize almost every murder as [exceptionally heinous, atrocious, cruel or callous]," and for death penalty purposes, are unconstitutionally vague. (*Id*, at 428-429; *Maynard v. Cartwright* (1988) 486 U.S. 356, 361-364.) As applied to death penalty cases, the Supreme Court felt that terms such as "heinous" and "atrocious" could be used by any reasonable person to characterize every murder so as to fall into those categories. (*Shell*

---

[35] The constitutionality under federal law of the California Supreme Court's allowance of this in *Rosenkrantz V*, where the offense was *de facto* treated as a first degree murder, despite an express acquittal of that charge by the jury, is not at issue here, as there is indisputably no evidence of premeditation. Should the Court deem that to be an issue herein, leave is requested to further brief that point.

43

*v. Mississippi* (1990) 498 U.S. 1, 3; *Maynard v. Cartwright, supra*, 486 U.S. at 363; *Godfrey v. Georgia, supra*, 446 U.S. 420, 428-429.)    As previously discussed, the California Supreme Court has also found that in ***both*** death penalty or life imprisonment without possibility of parole, the terms "especially heinous, atrocious, or cruel, manifesting exceptional depravity" are unconstitutionally vague and violative of fundamental due process. (*Superior Court of Santa Clara County v. Engert* (1982) 31 Cal.3d 797, 805.) However, the paroling authority is using those terms to repeatedly deny parole, effectively converting parole eligible sentences into an LWOP. As such, the use of those terms here is even more insidious, as these offenses are indisputably parole eligible, and the repeated use is effectively allowing terms that are unconstitutional when used to impose an LWOP sentence to be used to achieve that same result, effectively turning these parole eligible cases into LWOP sentences. In other words, the same result occurs without the same protections.

Thus, the analysis must start from the premise that the regulatory language is already unconstitutionally vague, by its reliance on the phrase "especially heinous, atrocious and cruel." *Cal.Code Regs.*, tit.15, §2402(c)(1).    However, rather than attempting to establish a definition that would serve to correct, or at least mitigate, the problem, the Board seeks to eviscerate the standard altogether, proffering an unworkable definition and substituting it for the regulatory criteria of "especially heinous, atrocious and cruel." As respondent urges, under *Dannenberg*, the regulatory criterion are satisfied merely by the Board "point[ing] to some evidence," which here the Board described as a crime that was "cruel and callous," "dispassionate," and which showed disregard for the suffering of another. (Exh. AAA, p. 88.) As previously discussed, any murder can fit this standard, and if adopted, the regulatory terms will entirely lose their ability to distinguish the more egregious murders from those of a comparatively lesser seriousness. Furthermore, respondent's version of the standard does not make any effort to discern whether the presence of evidence that is "more than minimally necessary to convict" has any tendency in reason to establish the sole focal question in parole suitability: does the inmate currently present an unreasonable risk of danger if paroled? (*Cal.Code Regs.*,

44

tit.15, §2402(a); *Scott II, supra,* at 594-595.)   As such, adopting this view of the *Dannenberg* formulation renders the regulatory standards unconstitutionally vague.

Here, upholding the Board's crime based findings under this view of the standards, in effect, waters down even further the already vague terminology ("especially heinous, atrocious and cruel") by substituting an entirely different standard that could fit any murder related offense.   However, as explained by the United States Supreme Court, these terms were already constitutionally deficient, as they do not possess any inherent restraint to prevent an arbitrary or capricious application.   (*Godfrey v. State of Georgia, supra,* 446 U.S. at 428.)   Furthermore, by the California Supreme Court's own analysis, the terms used were unconstitutionally vague even before given the extremely broad veil that respondent urges under the "more than minimally necessary to convict" standard. (*Superior Court of Santa Clara County v. Engert, supra,* 31 Cal.3d at 805.)[36]   As such, the argument that Mr. Rush's crime was sufficient to justify the Board's denial of parole must be rejected.

## II.   STANDARD OF REVIEW

In evaluating the Board's denial of parole, recent case law has utilized the "some evidence" standard, as described in *In re Rosenkrantz* [*Rosenkrantz V*] (2002) 29 Cal.4th 616, at 658; *In re Dannenberg* (2005) 34 Cal.4th 1061.  The California Supreme Court in *Rosenkrantz V* stated that the "some evidence" review means that

> [T]he judicial branch is authorized to review the factual basis of a decision of the Board denying parole in order to ensure that the decision comports with the requirements of due process of law, but that in conducting such a review, the court may inquire only whether some evidence in the record before the Board supports the decision to deny parole, based upon the factors specified by statute and regulation. (*Rosenkrantz V, supra,* 29 Cal.4th at 658, emphasis added.)

The *Rosenkrantz V* court further explained "[a]s long as the Governor's decision reflects due consideration of the specified factors as applied to the individual prisoner in

---

[36]   The decision in *Engert* applied to death penalty and LWOP cases.  However, this creates a loop-hole through which, if not corrected, the Board and courts would be allowed to apply unconstitutionally vague concepts to parole eligible term to life sentences, in order to effectively turn the sentence into an LWOP by repeatedly using the crime to deny parole.

accordance with applicable legal standards, the court's review is limited to ascertaining whether there is some evidence in the record that supports the Governor's decision." (*Id.* at 677.) However, this is the wrong level of evidentiary review, based on a fundamental misunderstanding of the doctrine in *Superintendent v. Hill* (1985) 472 U.S. 445. That case held that ***because no standard of proof was dictated*** by the state of Massachusetts Department of Corrections regulations to support a finding of guilt in a disciplinary proceeding, due process only required the reviewing court find "some evidence" in the record to support the hearing officer's determinations. Thus, when evaluating what the judicial standard of review of parole denial decisions of the California Board of Parole Hearings should be, the courts seemed to adopt, without much legal analysis, the "some evidence" standard of *Hill.* (*In re Rosenkrantz* [*Rosenkrantz II*] (2000) 80 Cal.App.4th 409, 427; *In re Ramirez* (2001) 94 Cal.App.4th 549, 564; *In re Rosenkrantz* [*Rosenkrantz V*] (2002) 29 Cal.4th 616.)

However, the underlying premise on which *Hill* based the decision to apply a "some evidence" level of analysis, that no standard of proof is specified for those hearings, does not apply in California's parole hearing process. Instead, under Federal Due Process principles, as enunciated in *McQuillion v. Duncan* [*McQuillion I*] (2002) 306 F.3d 896, at 901-902, the statutory language of *Cal. Pen. Code* §3041 creates a presumption of parole suitability, which then shifts the burden to the state to prove by a preponderance of the evidence that the inmate fits within the §3041(b) "public safety" exception to the mandatory duty to set a parole date. Thus, the reason upon which the rule of *Hill* was based does not even exist, and the "some evidence" standard is therefore inappropriate. Furthermore, the "some evidence" rule, even if properly applicable, is for a reviewing court to apply, not the Board or the Governor. The Board must do more than just "point to some evidence." The Board must make its decision based on evidence that supports its conclusions by a preponderance of the evidence.[37] The Board is charged with making a determination of

---

[37] As a general rule, the comparative degree of proof by which a case must be established is the same before an administrative agency as in a judicial proceeding, which is a preponderance of the evidence. (*Ettinger v. Board of Medical Quality Assurance* (1982) 135 Cal.App. 3d 853; *Gardern v. Commission of Professional Competence* (1985) 164 Cal.App.3d 1035; *Copper Mining Co. v. Industrial Acc. Com.* (1920) 183 Cal. 714, 192.)

whether the inmate currently presents an unreasonable risk of danger to society under this standard. (*Cal. Code Regs.*, tit. 15, §2402(a).)

The standards for parole hearings must begin with an analysis of *Cal. Pen. Code* §3041. That section provides in subsection (a) that "one year prior to the inmate's minimum eligible parole release date...the Board...*shall* again meet with the inmate and *shall normally* set a parole release date..." (Emphasis added.) That section goes on to mandate that the "release date *shall* be set in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public." (Emphasis added.) The only exception to this mandate that a release date shall be set is contained in subsection (b), which directs that the Board "shall set a release date unless it determines that the gravity of the current convicted offense... is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting." The reference to "this meeting" obviously refers back to the initial hearing discussed throughout subsection (a).

Thus, when the public safety exception is not found, the setting of a date is mandatory. The Ninth Circuit, in *McQuillion I*, held that for Federal Due Process purposes, this statutory language creates a presumption of parole suitability, relying on the clearly established United States Supreme Court authority of *Greenholtz* and *Allen*.[38] (*McQuillion I, supra*, 308 F.3d at p. 902; see also *Sass v. California Bd. of Prison Terms* (9th Cir. 2006) 461 F.3d 1123, 1127-1128.)

*Rosenkrantz* and *Dannenberg* are likewise clear that the presumptive language in §3041 can be overcome only by a factually based concern that the inmate currently presents on unreasonable risk of danger to the public if released. (*Rosenkrantz V, supra*, 29 Cal. 4th at 683; *In re Dannenberg, supra*, 34 Cal.4th at 1087; see also *Cal. Code Regs.*, tit. 15, §2402(a).) Here, the presumption is that a parole date will be set, absent a finding which must be supported by evidence and a statement of reasons establishing that the circumstances of the offense place it among the gravest of similar offenses so as to overcome the presumption and justify the denial of parole. (*McQuillion I, supra*, 306

---

[38] *Greenholtz v Nebraska Penal Inmates*, 442 U.S. 1, 12 (1979) and *Board of Pardons v. Allen*,

F.3d at 901-902; *Rosenkrantz V, supra,* 29 Cal.4th at 655-656; *Ramirez, supra,* 94 Cal.App.4th at 560; see also *Pen. Code* §3041.5(b)(2).)   As the majority noted in *Dannenberg, supra,* 34 Cal.4th at 1087-88, the public safety concerns of 3041(b) operates as an exception to the mandate that a parole date be set.

      *Evidence Code* §605 provides as follows:

> "A presumption affecting the burden of proof is a *presumption established to implement some public policy* other than to facilitate the determination of the particular action in which the presumption is applied, such as the policy in favor of establishment of a parent and child relationship, the validity of a marriage, the stability of titles to property, or the security of those who entrust themselves or their property to the administration of others." (Emphasis added)

      The stated purpose of the Legislature in creating the presumption under §3041 is to "provide uniform terms for offenses of similar gravity and magnitude" and not simply to facilitate the resolution of any particular Board hearing.   For inmates serving an indeterminate sentence, the Legislature has commanded that the Board "shall normally set a parole release date. . . in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public." (*Pen. Code* §3041(a).)  This language creates a presumption of parole suitability that is based on the public policy of achieving uniformity of terms served by prisoners.  Of course, such a construction also serves federal due process considerations by placing the burden of establishing cause for continued loss of liberty on the confining authority.   The presumption affects the burden of proof, since the requirement of setting a release date is in furtherance of an expressly stated public policy to ensure uniformity in sentencing. (*Evid. Code* §605.)  Clearly established United States Supreme Court authority requires that when a state adopts certain procedures for a hearing, any person involved in that process is entitled to the benefit of those procedures. (*Evitts v. Lucey* (1985) 469 U.S. 387, 393 (1985); see also *Griffin v. Illinois* (1956) 351 U.S. 12, 20.)  Thus, every inmate must be given the benefit of this presumption of suitability.

      Here, the state procedure begins with *Penal Code* §3041 specifically restricting the

---

482 U.S. 369, 376-78 (1987).

Board by directing it to set a parole date at the initial hearing, absent a factually supported finding that the inmate currently presents an unreasonable risk of danger to the public if released. (*McQuillion I, supra,* 306 F.3d at p. 905; *Ramirez, supra,* 94 Cal.App.4[th] at p. 570; *Cal. Code Regs.,* tit. 15, §2402(a); see also *In re Dannenberg, supra,* 34 Cal. 4th at 1082.) Thus, the starting point in any evaluation of the Board's decision to reverse parole must be to determine if the Board honored the presumption of suitability. Only if the Board properly applied the presumption, and then considered the evidence opposing parole in the context of evaluating whether it meets an applicable level of proof, can it be said that the inmate's due process rights have been upheld by a uniform and fair application of the governing principles to the hearing. The Board is not free to apply whatever procedure they choose to an inmate, as the legislative directive in 3041 is unmistakable. (*Ramirez, supra,* 94 Cal. App. 4th at 560.) The statutes go on to further confine the Board's authority in how they proceed by directing a variety of procedural safeguards in *Pen. Code* §3041.5, as well as including provisions in §3041(a), which specifically list the type of criteria that the Board must consider in setting appropriate terms. The matrix set out in *Cal. Code Regs.,* tit. 15, §2403 likewise defines the parameters within which the Board must set the date for parole. (*Cal. Code Regs.,* tit. 15 §2403(a).) As the *Dannenberg* Court noted, use of the matrix is mandatory on the Board, due to the legislative directive to ensure uniform terms. (*Dannenberg,* 34 Cal. 4th at 1079, fn 7.)

The application of the "some evidence" doctrine of *Hill,* 472 U.S. 445 is obviously not appropriate here when one considers the rationale as to why such a low level of review was imposed by the Court in that case. The findings to support the Board's decision to deny parole must be that the evidence before it establishes factually that the inmate *currently* poses an "unreasonable risk of" danger to the public. (*Cal. Code Regs.,* tit. 15, §2402(a); *Scott II, supra,* 133 Cal.App.3d 594-595.) That finding cannot be based on such flimsy evidence as to render it mere whim or caprice. (See *In re Powell* (1988) 45 Cal.3d 894; see also *In re Ramirez, supra,* 94 Cal.App.4[th] at 564.) The Board's decision must be made under a "preponderance of the evidence" standard, the minimum

49

standard allowed in such proceedings. Since the Court review is the only appellate level review of a Board action, it should be conducted under a "substantial evidence" test, as is always utilized at a first level appeal.[39]

Prior to the 1980's, there was no standard known as the "some evidence standard." The "some evidence" standard relied upon by the courts in parole matters the past two decades evolved from the United States Supreme Court case of first impression, *Superintendent v. Hill, supra*, 472 U.S. 445. That case involved the standard of review to be applied by a court on a challenge to a finding of guilt in a routine disciplinary proceeding. The Supreme Court held that *because no standard of proof was dictated* by the Department of Corrections regulations in that case, the United States Constitutional guarantee of due process only required that the court reviewing the decision find "some evidence" be present to support the hearing officer's determinations. Hence, the "some evidence" standard was born into case law. Subsequent courts have applied the *Hill* "some evidence" standard to the parole consideration context, without further analysis or consideration of what the standard of proof is in a Board hearing or on Governor's review. (See *McQuillion I., supra*, 306 F.3d 895, *In re Dannenberg, supra*, 34 Cal.4th 1061; *In re Ramirez*, supra, 94 Cal.App.4th 549; *In re Powell, supra*, 45 Cal.3d 894, and the progeny of cases following those rulings.) None of these courts have looked at the underlying rationale of *Hill* that led it to adopt this lower standard.

Unlike the circumstances in *Hill*, the statutory and regulatory scheme in California requires the application of a "preponderance of the evidence" standard. For example, CDC disciplinary matters require that the finding of guilt *must be supported by a preponderance of the evidence.* (See *Cal. Code Regs.*, tit. 15, §3320(l) ["*Any finding of guilt* shall be based upon determination by the official(s) conducting the disciplinary hearing that a *preponderance of evidence* submitted at the hearing substantiates the

---

[39] There must be a level of adequate, quality evidence necessary for a court to affirm a decision of an administrative board. Under the substantial evidence standard, reviewing courts must determine whether there is substantial evidence upon which the agency could reasonably base its decision. It is more than a mere scintilla of evidence that is needed to support an agency's decision. (*Chrysler Corp. v. U.S. Environmental Protection Agency.*(9th Cir. 1980) 631 F.2d 865, 980.)

charge…"]; *Cal. Code Regs.,* tit. 15, §3290(g) "…*a finding of guilty shall be based upon the preponderance of all evidence* presented at the disciplinary hearing…"]; §3290(h) ["…*authorized disciplinary actions may be taken based on a preponderance of evidence and testimony*"], emphasis added.)

 The Supreme Court's decision in *Hill* was based *solely* upon the reasoning that the State had imposed no standard of proof upon a disciplinary hearing officer. Thus, the Court reasoned that federal due process only provides a reduced level of rights, limited to the "some evidence" standard. That is not the case in California. In the California Board of Prison Terms' regulations, while there is no specific standard of proof defined in the parole consideration hearing process, California law is explicit under *Evidence Code* §115 that if a burden of proof is not specified, the standard to be used by the trier of fact is "preponderance of the evidence." It is noteworthy that this same standard is used elsewhere in parole processes. For example, when the Board is extending an offender's incarceration by way of parole violation or rescission, they are explicitly directed to apply a preponderance standard. (*Cal. Code Regs.,* tit. 15, §2450 [rescission must be based on "*good cause,*" defined in the regulations, §2000(b)(5), as "[a] finding by the board based *upon a preponderance of the evidence*…"], emphasis added; see also CDC regulations, *Cal. Code Regs.,* tit. 15, §3000 [defining "good cause" to mean a "finding based upon a *preponderance of the evidence*…"], emphasis added.)

 Thus, because neither the *Penal Code* nor the *Cal. Code Regs.,* tit. 15, Div. 2, directly prescribes a standard of review for parole consideration hearings for indeterminate-term offenders, California law is explicit that the correct standard applicable under *Evid. Code* §115 is a preponderance of the evidence. Certainly, if that standard is applicable in the disciplinary context, for violations of parole, or for rescission or delay of a parole date, principles of due process, equal protection and fundamental fairness dictate that the same standard apply to decisions rendered by the Board which result in the denial of the inmate's constitutionally protected liberty interest, pursuant to the direct language of *Evid. Code* §115. A disciplinary action results in the extended incarceration of a prisoner in the same class as Petitioner for no more than one (1) year,

whereas a parole denial or reversal extends incarceration for an indefinite period of at least one to five years, or conceivably delays release for the rest of the inmate's life. (*Pen. Code* §3041.)

Furthermore, a preponderance of the evidence standard is required because parole decisions are an extension of the sentencing process. In *In re Roberts* (2005) 36 Cal.4th 575, 586, the court concluded a parole decision is related to sentencing because "parole eligibility is considered an integral part of any sentence." (*Id.* [citing *In re Sena* (2001) 94 Cal.App.4th 836, 839].) A habeas corpus petition that attacks parole denial is a challenge to the length of the sentence. (*Id.*) In fact, a sentence contemplates a period of parole, and as such, the sentencing process is not complete until a term is set and the inmate is released. (*Id.* at 589-590.) Accordingly, because a parole hearing is an extension of the sentencing process, the same standard of proof should be required for a parole hearing as is required for sentencing. In sentencing, the preponderance of the evidence standard is required.[40] As a result, preponderance of the evidence is the same standard of proof required for the Board at a parole hearing.

Thus, since the Board's burden of proof is a preponderance of the evidence, and the "some evidence" review is only used where a court is analyzing an administrative decision that has no underlying standard of proof (see *Hill, supra*), the "some evidence" rule should not be applied here. Instead, the traditional "substantial evidence" review should be utilized.[41] Here, the Board's denial of parole *cannot* survive scrutiny under this

---

[40] See *People v. Nelson* (1978) 85 Cal.App.3d 99, 101 [preponderance of evidence standard for aggravating circumstances is constitutional]; *United States v. Watts* (1997) 519 U.S. 148, 157 [sentencing court may consider conduct underlying charges of which defendant was acquitted, so long as that conduct is proved by preponderance of the evidence]; *Harris v. United States* (2002) 536 U.S. 545, 567 [a fact increasing the mandatory minimum sentence for an offense not beyond the statutory maximum is a sentencing factor, rather than an element of the offense, and may constitutionally be found by the judge rather than by the jury and by a preponderance of the evidence].)

[41] Traditionally, sentencing issues that involve factual determinations must be sustained on appeal only if supported by "substantial evidence." (See *People v. Lewis* (1971) 19 Cal.App.3d 1019, 1024 [determining indigency is a fact, therefore, on appeal it will be reversed if unsupported by substantial evidence.) Appellate review of a decision made with a preponderance of the evidence standard of proof will be reversed if not supported by substantial evidence. (See *Pen. Code* § 1369, subd. (f) ["It shall be presumed that the defendant is mentally competent

level of analysis, since as is discussed more fully *infra*, there is no evidence to sustain the Board's findings. Furthermore, as described *supra*, the Board utilized a standard that is wholly inadequate, and did not give Mr. Rush's case the level of review required. Under the appropriate "substantial evidence" test, the theory that Mr. Rush *currently* poses a danger if released is *seriously* lacking in evidentiary support, and can in no way survive such a review. As such, the Board's decision must be set aside as it is contrary to clearly established Supreme Court law.

> ### III. THE FAILURE OF THE PROSECUTION TO REQUEST THAT THE TRIAL COURT MAKE SPECIAL FINDING REGARDING THE ASPECTS OF THE CRIME PRECLUDES THOSE FINDINGS FROM NOW BEING USED TO JUSTIFY DEPARTING FROM THE "SHALL NORMALLY" FORMULATION OF PENAL CODE §3041.

In two recent United States Supreme Court decisions, our High Court has stated that the constitutional right to due process, and the right to a jury trial, requires that each and every fact used to increase the penalty for a crime *must be alleged and found true by the trier of fact*, be it by jury or a defendant's own admission of facts in a plea of guilty. (*Apprendi v. New Jersey* (2000) 530 U.S. 466; *Blakely v. Washington* (2004) 542 U.S. 296.) As will be discussed herein, these principles bar the Board from making findings that take the Mr. Rush's case outside the normal sentencing scheme, here, the matrix of uniform terms, as the Board's "findings" that support the denial of parole suitability act as both a literal and effective change in the crime for which Mr. Rush was convicted. Such a change is a constructive amendment and is prejudicial per se. (*Jones v. Smith* (9th Cir. 2001) 231 F.3d 1227, 1232-33.)[42] As stated by the U.S. Supreme Court:

---

unless it is proved by a *preponderance of the evidence* that the defendant is mentally incompetent"]; *People v. Samuel* (1981) 29 C.3d 489, 506 [a finding of competence will be reversed where unsupported by *substantial evidence*].)

[42] As the Supreme Court indicated in *Stirone v. United States* (1960) 361 U.S. 212, 218, where a defendant is convicted of a crime and where the grand jury never charges the defendant with an essential element of the crime, a constructive amendment has occurred and reversal is warranted. Since the ruling in *Apprendi, supra*, the Court has made it clear that any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt. As such, *Apprendi* expands the range of discrepancies that

"Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." (*Apprendi, supra,* 530 U.S. at 490.)

If a person is convicted at trial, the facts are determined by the jury, and the defendant is entitled to rely on those determinations as defining the nature of the crime. What is occurring repeatedly at Mr. Rush's Board hearings is that, despite his lower level of conviction, the Board is relying on unsubstantiated allegations to elevate his crime to the equivalent of a first degree murder. This negates the jury's determinations, including the express acquittal of that charge, because he is now being punished as if the crime were of a higher degree. At the time of the hearing at issue, Mr. Rush was eight (8) years beyond his minimum eligible parole date and surpassed the term for even the most egregious of second degree murders. The findings relied on by the Board to support this result are being made without the benefit of any factual determinations by either a jury or a court at plea.

Any argument by Respondents that the denial of parole does not increase Mr. Rush's sentence beyond the statutory maximum of life and thus, does not violate the *Apprendi-Blakely* rule, must be rejected. In *Blakely,* the trial judge had sentenced the defendant to 37 months higher than the presumptive, or normal, term, based on a the sentencing judge's finding of an aggravating circumstance, but was still under the ten (10) year maximum term under the Washington statute. In response to the state's argument that there was no *Apprendi* violation since the ten (10) year maximum was not exceeded, Justice Scalia cleared this point up, stating, 'the statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the Defendant." (*Blakely v. Washington, supra,* 542 U.S. 296, at 36.)

In *Rosenkrantz V,* the California Supreme Court made it clear that the public safety exception in *Pen. Code* §3041(b) is just that, an exception. This point was also acknowledged in *Dannenberg.* (See *Dannenberg, supra,* 34 Cal.4[th] at 1080.) Absent

---

will amount to constructive amendments.

findings that fit the crime within that exception, the Board is required to follow the "shall normally" formulation and find the inmate suitable. Once that occurs, the Court concluded in *Dannenberg* that the use of the matrix is mandatory. (*Id.* at 1078.) Thus, the matrix constitutes the "normal" or "standard" sentencing range for *Apprendi-Blakely* purposes, despite the fact that the overall maximum sentence of life is not exceeded. In the case of *In re Roberts* (2005) 36 Cal. 4th 575, at 589-590, the Court ruled that parole is an integral part of the overall process of sentencing. (See also *In re Sena* (2003) 94 Cal.App.4th 836, at 839.) Under California law, the sentencing process is not complete until the term is set and the inmate released. (*Roberts, supra,* 36 Cal. 4th at 589-590; *Sena, supra,* 94 Cal. App. 4th at 839.) As such, the Board is an entity that wears two (2) hats, serving as part of the executive branch, but discharging certain judicial functions as an extension of the sentencing process. This was precisely the conclusion of the court of appeal in the case of *In re Hogan* (1986) 187 Cal. App. 3d 819, 824 ["The Board, in setting a release date for an indeterminate sentence, performs the same function as does the trial court in ordering a determinate sentence – it fixes a term of definite duration.].

As such, since the Board is performing part of the sentencing function, the same rules must apply to the same extent a judge cannot unilaterally increase the nature of a defendant's crime without the findings of a jury or an admission by the defendant, the Board is also not allowed to make findings that were not submitted to the jury, to the court, or admitted as part of a plea in order to take the case out of the presumptive or normal range for *Apprendi-Blakely* purposes. To allow this would violate the due process protections enunciated in *Apprendi* and *Blakely*. Such violations occur any time the Board makes rulings about the crime being "callous and cruel," or "especially heinous, atrocious and cruel," or "dispassionate," or as having a "callous disregard for human suffering" (*Cal. Code Regs.,* tit. 15, §2402(c)(1)), as they did here, since the facts underlying those claimed circumstances were not tried to the jury at the time of the conviction or admitted by the defendant, yet are now being used to remove the case from the presumptive or normal sentencing range under the matrix.[43]

---

[43]    Petitioner is aware of the California Supreme Court's recent decision in *People v. Black*

In short, the parole process serves as an extension of the sentencing function, and the Board's obligations have been set up in a way that is identical to a court's sentencing obligations in determinate cases. In addition to being supported by the California Supreme Court's direct ruling on this point in *Roberts, supra,* as likewise found in *Hogan, supra,* this clearly also follows logically from how the Board's functions are defined under the relevant statutory and regulatory criteria. The Board's responsibility in setting terms for an indeterminate sentenced prisoner is tightly regulated and is structured in the same fashion as the duties of a trial judge in pronouncing sentence. The Board is required to give written statements of reasons for its denials (*Pen. Code* §3041.5), when setting a date must use the prescribed framework of the matrix (*Cal. Code Regs.,* tit. 15, §2403(a)), must set the middle term, unless circumstances in aggravation or mitigation have been found (*Cal. Code Regs.,* tit. 15, §2403(a)), and must follow the sentencing rules of the Judicial Council (*Calif. Rules of Court,* Div IV, Rule 4.421), just as does a trial judge pronouncing sentence. (*Pen. Code* §3041(a).)   In short, the term setting function of the Board has been set up in a way that is identical to the court's sentencing obligations in determinate cases, further supporting the Supreme Court's ruling in *Roberts.*

Thus, since a judge cannot unilaterally increase a defendant's sentence beyond the normal range by utilizing factual findings not made by the jury, when the Board is performing its part of the sentencing function, it is also not allowed to make findings that were not submitted to the jury, or admitted. To allow this would violate the due process protections enunciated in *Apprendi* and *Blakely.* Such violations occur any time the Board makes rulings about the crime being "cruel and callous," or "especially heinous, atrocious and cruel," or "dispassionate," or as having a "callous disregard for human

---

(2005) 35 Cal.4[th] 1238. However, the issues presented in that case are distinguishable from those presented herein. In *Black,* the petitioner argued that a defendant is constitutionally entitled to a jury trial on the aggravating factors that justify an upper term sentence or a consecutive sentence. Here, Petitioner is not contending that the *Apprendi-Blakely* rule applies to which of the 3 terms to select, or even which of the various triads of terms within the matrix applies to the case. Instead, it is Petitioner's contention that the Board cannot make findings regarding the crime to **altogether take it out of the prescribed matrix** which applies based on the facts already determined by a jury.

suffering," as the Board did here, since the facts underlying those claimed circumstances were not tried to the jury at the time of the conviction or admitted by the defendant. As stated in *Apprendi* and *Blakely*, such actions are wholly unconstitutional as they infringe on the defendant's Fifth and Sixth Amendment rights. Thus, the holding in *Blakely* is quite applicable and has been clearly violated here.

Because this violation by the Board involves misinterpretation of statutory law and the violation of due process, a non-deferential *de novo* review standard applies and this court is not constrained to the "some evidence" standard. (*Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 800 [questions of law are reviewed *de novo*]; *Brown v. Poole* (9th Cir. 2003) 337 F.3d 1155.)

## V.    BY REPEATEDLY RELYING ON THE COMMITMENT OFFENSE IN THE FACE OF CLEAR EVIDENCE OF REHABILITATION, THE BOARD IS VIOLATING PETITIONER'S RIGHT TO DUE PROCESS OF LAW.

Regarding the commitment offense, assuming arguendo some evidence existed to support a finding that the commitment offense was sufficient[44] for denial, due process still prohibits repeated reliance on those unchanging circumstances as grounds for finding an inmate unsuitable for parole. Accordingly, the Board in this case failed to address the appropriate legal concepts governing parole decisions under the United States Constitution. The assertion that a finding is supported by "some evidence" is not necessarily sufficient, and does not end the inquiry. As the *Ramirez* court concluded,

> "The United States Supreme Court had made it clear the 'some evidence' standard discussed in *Hill, supra,* 472 U.S. 445, is **only one aspect of judicial review for compliance** with minimum standards of due process. [Citation] ... The court explained that the 'some evidence' standard applied only to questions of evidentiary sufficiency. It is **an additional requirement of due process, not a substitute for other established due process requirements**. [Citation.]"

> "Accordingly, were the Board to determine whether inmates are suitable for parole by flipping a coin, it could not insulate its proceedings from judicial correction simply by identifying 'some evidence' in the record to support

---

[44] Of course, this point is certainly not conceded here, as discussed *infra*, in §VI(A), since this is a second degree murder case, and the Board never pointed to evidence beyond the minimum necessary to sustain a second degree conviction.

57

each result." (*Id.* pp. 563-564 [emphasis added].)

In circumstances similar to the case at bar, the *Ramirez* court dealt with this precise issue, and held that more is required than to simply create the appearance of satisfying due process. There, that Court rejected the Board's contention that due process is satisfied by the mere fact that the hearing panel goes through the right litany of phrases and buzz words, divides the hearing into the relevant statutory and regulatory categories, and discusses the evidence relating to the individual inmate. The *Ramirez* court described the Board's argument as follows:

> "The Board ... claims that 'due consideration' of [Ramirez's parole] application is demonstrated by the [Board's] references in its decision to the nature of Ramirez's crimes, his previous criminal record, his failure to correct his criminality ..., his unstable social history, his need for therapy, and his 'institutional programming.' The Board argues that 'some evidence' supported its findings, because the record before it was replete with evidence relating to the factors relied on in the decision." (*Id.* at 568.)

However, in the face of the claim, the court concluded that the Board's decision "...was arbitrary in the sense that the Board failed to apply the controlling legal principles to the facts before it" and that the lack of support for the findings "supports Ramirez's claim that his parole hearing was a sham." (*Id.* at 571.) *Penal Code* §3041 requires that the factors relied upon, and supported by some evidence, must be factors that indicate a legitimate concern that the prisoner currently poses a threat to public safety if released. *See In re Ernest Smith*, 114 Cal. App. 4th 343 (2003); see also *In re Scott, supra,* 119 Cal. App. 4th at 890-892. The *Ramirez* Court acknowledged that there will always be "some evidence" to support a finding that a prisoner committed the underlying offense. Those facts alone, however, do not justify the denial of parole. Thus, while finding that there was factual support for the findings as to the crime and priors, the *Ramirez* Court still found the Board's decision arbitrary since there had been multiple hearings, nine (9) years had passed beyond the minimum term, and it was seventeen (17) years after entering prison. (*Id.* at 571.) Likewise, as the Ninth Circuit recently said, despite the fact that there may remain evidence to support a finding of egregiousness of the crime:

> "A continued reliance in the future on an unchanging factor, the

58

circumstances of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." (*Biggs, supra,* at 916-917.)

The recent case law interpreting the rule in *Biggs,* shows that the Board cannot continuously rely upon unchanging facts such as the commitment offense or conduct prior to imprisonment as the basis for denying parole. These cases, *Sanchez, supra,* 444 F.Supp.2d 1049, *Martin, supra,* 431 F.Supp.2d 1038, *Rosenkrantz VI, supra,* 444 F.Supp.2d 1063, *Lee, supra,* 143 Cal.App.4[th] 1400, and *Elkins, supra,* 144 Cal.App.4[th] 475 are directly on point, involving multiple denials of parole and fourteen (14) or more years in prison. Of course, Mr. Rush has now been before the Board five (5) times, with twenty (20) years in custody and a far more mitigated crime. Those cases, and the decisions underlying the rules they state (*Scott II, supra,* and *Irons v. Warden* (E.D. Cal. 2005) 358 F.Supp.2d 936), will each be separately discussed herein. As will be seen, the courts concluded that immutable characteristics, such as those being relied upon by the Board in this case, cannot be repeatedly utilized without violating federal due process principles. Thus, for the reasons outlined above, and upon these authorities, Petitioner is entitled to relief herein.

### 1. Scott II

Several cases were noted as underlying the rationale in *Martin* and *Rosenkrantz VI,* including the case of *In re Scott* [*Scott II*] (2005) 133 Cal. App. 4th 573. The court in *Scott II* was mindful of the due process problems of relying on the commitment offense to deny parole. Scott was convicted of second degree murder in 1986 and sentenced to fifteen (15) years to life plus two (2) years for use of a firearm. Suspecting that his wife was with an individual named Bradford with whom she confessed to having an affair, Scott confronted them in the street in front of Bradford's residence. (*Id.* at 579.) As Scott approached them with a .22 caliber handgun, Bradford pushed Scott's wife away to confront Scott. (*Id.*) Scott told Bradford, "Get away. I'm going to shoot you." (*Id.*) He then fired two or three rounds, striking Bradford in the head and thigh, killing him. (*Id.* at 579-580.)

During his incarceration, like Mr. Rush, Scott received pages of laudatory chronos for his work and behavior.  (*Id.* at 582.)  Again like Mr. Rush, the psychological evaluations agreed that his behavior was positive, that he presented no more than an average threat to the community, and his offense was the product of significant stress. (*Id.* at 582-585.)  In 2004, the Board found Scott suitable for parole, but the Governor reversed, citing the nature of the offense. (*Scott, supra*, 133 Cal.App.4th at 586-588.)

The court granted Scott's petition for writ of habeas corpus.  The court expressed concern that the Governor's reliance on the commitment offense failed to accurately indicate Scott's present danger.  "Reliance on such an immutable factor 'without regard to or consideration of subsequent circumstances' may be unfair." (*Scott II, supra*, 133 Cal. App. 4th at 595 citing *In re Smith* (2003) 114 Cal. App. 4th 343, 372.)  Accordingly "[t]he commitment offense can negate suitability only if circumstances of the crime reliably established by evidence in the record rationally indicate that the offender will present an unreasonable public safety risk if released from prison." (*Scott* II, 133 Cal. App. 4th at 595.)  The Governor in *Scott II* failed to make any rational connection between the offense and Scott's danger to the community.  In other words, the offense offered no predictive value to determine Scott's current threat to the community.  Without that nexus, there was no evidence to support the Governor's conclusion.

That missing nexus exists in Mr. Rush's case as well.  He has done everything he can, since incarceration, to rehabilitate himself.  The commitment offense took place over twenty (20) years ago.  In the mean time, Mr. Rush made tremendous gains toward rehabilitation, received favorable psychological reports, participated in all available self help programs, obtained strong vocational skills, and earned his Associates, Bachelors and Masters degrees.  With no evidence of current dangerousness, the mitigating fact of his youthfulness at the time of the offense, weighed against the uncontradicted evidence of total rehabilitation, the Panel had no choice but to grant parole to Mr. Rush.  Like *Scott II*, there is no longer any rational connection between Mr. Rush's offense, and his present dangerousness, particularly in light of the intervening two (2) decades.  That is, the

offense no longer yields any predictive value of current dangerousness. As such, there was no evidence to support the Board's denial of parole.

Furthermore, a disturbing corollary exists between *Scott II* and Mr. Rush. The Board concluded that the gravity of the murder alone was sufficient for the denial of parole, despite the exemplary efforts of Mr. Rush during his imprisonment. The *Scott II* court was faced with a nearly identical argument from then Governor Davis. "The Governor states in his decision that the gravity of Scott's offense is alone a sufficient basis 'on which to conclude that his release from prison *at this time* would pose an unreasonable public-safety risk.' (*Scott* II, 133 Cal. App. 4th at 595, n. 8.) (Italics in original.) Of course, the problem with such a position is "*[t]hat statement could be repeated annually until Scott dies or is rendered helpless by the infirmities of sickness or age.*" (*Id.* [emphasis added].) Just as *Scott II* foreshadowed, Mr. Rush has in fact been subjected to annual statements of that same type.

### 2. *Irons v. Warden*[45]

The recent decisions also rely heavily on *Irons v. Warden* (E.D. Cal. 2005) 358 F.Supp.2d 936. Irons was convicted in 1985 of second degree murder and sentenced to seventeen (17) years to life, including a two (2) year enhancement for use of a firearm. (*Irons*, 358 F.Supp.2d at 939.) Petitioner filed for habeas relief after the Board denied him parole in 2001 at his fifth parole hearing. (*Id.*) Irons and the victim were tenants in the same house. (*Id.* at 940) After the couple who owned the home told Irons that they suspected the victim stole various items from the home, Irons confronted the victim. (*Id.* at 940-941.) Irons obtained a .22 caliber rifle from his room, entered the victim's room, and shot him twelve times. (*Id.*) Irons announced to the victim that he was going to let him bleed to death, but after the victim complained of the pain, Irons stabbed him twice in the back. (*Id.*) He rolled the victim into a sleeping bag, and locked the body in the room for ten days. (*Id.*) Irons then wrapped a plastic drop cloth and wire mesh around the body inside the sleeping bag, weighted it down with pieces of pipe, and disposed of the body in the surf at an isolated coastal location. (*Id.*)

---

[45] The *Irons* case is currently pending appeal in the Ninth Circuit. The case has been briefed,

The Panel found his behavior during incarceration was strong.

[Irons] should be commended for a large number of things. He has participated in a number-to his credit, in a number of self-help programming, and I'll name just a few. The-The Alternatives to Violence, I think there are three different phases of it, the KAIROS Program, and also, he was -he was an active participant in the Gavel Club, a Toastmaster organization, and took part in Breaking Barriers, took part in the walkathon. He obtained his GED, I believe, while incarcerated. And he hasn't had any 115s-he's had one 115 during his incarceration and that was back in-on November 2nd, 1985, and has had no 128s.

Nevertheless, the Panel found him unsuitable due to the nature of the offense and Iron's past use of drugs. The court rejected the Board's reliance on the unchanging facts of the crime and Iron's use of drugs prior to incarceration. As the court noted,

[C]ontinuous reliance on unchanging circumstances transforms an offense for which California law provides eligibility for parole into a de facto life imprisonment without the possibility of parole. The court asks rhetorically-what is it about the circumstances of petitioner's crime or motivation which are going to change? The answer is nothing. The circumstances of the **crimes will always be what they were, and petitioner's motive for committing them will always be trivial. Petitioner has no hope for ever obtaining parole except perhaps that a panel in the future will arbitrarily hold that the circumstances were not that serious or the motive was more than trivial.** Given that *no one* seriously contends lack of seriousness or lack of triviality at the present time, the potential for parole in this case is remote to the point of non-existence. Petitioner's liberty interest should not be determined by such an arbitrary, remote possibility.

(*Irons*, 358 F. Supp. 2d at 947, bold added; italics in original.) While this observation by *Irons* touches upon the ultimate problem of parole eligible and worthy inmates receiving de facto life without parole sentences, it is the legal analysis that is relevant here. The due process analysis of parole denial challenges requires looking at whether there was "some evidence" to support the denial of parole. *Irons* was the first of a series of federal cases to recognize that after so much time, the commitment offense and other facts prior to incarceration that will always remain immutable, will over time lose their predictive value as to whether the parole applicant is a current threat. This is the theme that has

argued and is currently pending decision, but the district court decision remains published.