# EXHIBIT 8
# part 3 of 3

carried through with *Scott II*, *Sanchez*, *Rosenkrantz VI*, *Lee*, *Elkins*, and *Martin*. As the *Irons* court saw it,

> To a point, it is true, the circumstances of the crime and motivation for it may indicate a petitioner's instability, cruelty, impulsiveness, violent tendencies and the like. However, *after fifteen or so years in the caldron of prison life*, not exactly an ideal therapeutic environment to say the least, and after repeated demonstrations that despite the recognized hardships of prison, this petitioner does not possess those attributes, *the predictive ability of the circumstances of the crime is near zero.*

(*Irons*, 358 F. Supp. 2d at 947, n. 2.) (Emphasis added.) Since *Penal Code* §3041 requires assessing a parole applicant's current threat to the community (*Cal. Code Regs.*, tit. 15 §2402(a)), the logic of *Irons* is inescapable: the unchanging facts of the crime or other pre-incarceration circumstances from years' past become incapable of supplying any evidence of a current threat because their predictive value has so drastically diminished, eventually diminishing entirely. As *Irons* also stressed, this is particularly true when the inmate maintains exemplary behavior within the toxic environment of prison. Accordingly, the court found that there was no evidence to support the Panel's finding that Irons was unsuitable for parole.

No matter how the underlying offense is viewed, the present crime does not have the callousness of the offense committed by Irons who seemed to take pleasure in the suffering of his victim. Petitioner has been incarcerated for over twenty (20) years, more than three (3) years longer than Irons had been at the time of his hearing. Irons had received CDC 115s for minor misconduct, unlike Mr. Rush, who has remained completely disciplinary free for nearly twenty-one (21) years. Of course, neither has any history of institutional violence. Both made use of the self-help and therapy available in prison. In addition, Mr. Rush has tremendous educational achievements and psychological evaluations which are extremely supportive of release. An honest appraisal of the Board's parole denial compels a finding that their reliance on the commitment offense no longer has any probative value in predicting Mr. Rush's current dangerousness. As such, there was no evidence to support the Board's decision, and like *Irons*, relief must be granted.

### 3. *Martin v. Marshall*

In *Martin v. Marshall* (N.D. Cal. 2006) 431 F.Supp.2d 1038, a double murder case, parole applicant Martin was convicted of second degree murder for shooting to death Acosta, a person with whom he shared a prior drug dealing relationship, killing one innocent bystander and injuring another innocent bystander with the gunfire. (*Id.* at 1040.) Fearing that he would be harmed as Acosta approached him in a restaurant, Martin shot Acosta seven times, and continued firing the gun after he "lost it," resulting in the death and injury to the bystanders. (*Id.*) He was sentenced to fifteen (15) years-to-life, plus a five (5) year enhancement. (*Id.*) At his fifth parole hearing, twenty-three (23) years later, the Board granted Martin parole. (*Id.* at 1041.) Governor Gray Davis reversed the grant of parole, stressing in part the gravity of the offense that he found demonstrated a callous disregard for human life and lack of remorse. (*Id.*) To support this assertion, Governor Davis cited Martin's flight from the scene without securing medical help, and his involvement with drugs at the time he committed the offense. (*Id.* at 1046.)

The court found that the Governor's reliance on the unchanging circumstances of the crime and pre-prison conduct as grounds to reverse the Board's decision violated Martin's right to due process. The court reasoned that Martin's offense was impulsive in part, he had exceeded his sentence by approximately six years, and he had exemplary behavior and evidence of rehabilitation. (*Id.* at 1047.) Given the static nature of the offense compared against the evidence of Martin's rehabilitation and behavior that indicated no present threat, the court found the commitment offense provided no evidence to support the Governor's reversal. Implicit in the court's reasoning was a theme expressed in other similar decisions: the commitment offense no longer possessed a predictive value of Martin's current threat to the community if released. Instead, like the other cases discussed herein, the court looked beyond the vacuum of the commitment offense to the length of time since the crime, the number of denials, and the parole applicant's behavior while in prison.

In the instant matter, Mr. Rush has exceeded his minimum term by nine (9) years,

64

three (3) more than Martin. In addition, Mr. Rush far exceeds Martin in terms of his behavior during incarceration, due to his unprecedented institutional behavior, programming and rehabilitation throughout his twenty (20) years of incarceration. For example, Martin had a minor history of misconduct while in prison, whereas Mr. Rush has remained completely discipline free. Mr. Rush also has participated in all available self-help and therapy programs, has excellent psychological evaluations, has continuously improved his education, obtaining Associate's, Bachelor's and Master's degrees, all with high honors, he has excellent parole plans, familial and community support, and other than the commitment offense, which was committed under severe stress, he has absolutely no history of violence, or even minor criminality. Thus, the predictive value of the offense as an indicator of Mr. Rush's present threat to the community if he was paroled is now non-existent and under the standards enunciated in *Martin*, Mr. Rush is entitled to the requested relief.

### 4. Sanchez v. Kane

In *Sanchez v. Kane* (C.D. Cal. 2006) 444 F.Supp.2d 1049, parole applicant Sanchez was convicted of one count of second degree murder in 1989 and sentenced to sixteen (16) years-to-life. (*Id.* at 1051.) On May 5, 1988, Sanchez was involved in an argument with Gonzalez Ruiz, a member of "The Magicians Club" (the TMC gang), after Sanchez honked at Ruiz's girlfriend to get her attention. (*Id.*) After arguing with Sanchez, Ruiz got a steel bat and swung it at Sanchez, shattering his car window. (*Id.*) Later that evening, while at a Crazy Rider gang hangout, Sanchez stated he wanted revenge against the TMC gang. (*Id.*) Upon leaving, Sanchez got into his car with "Lazy" and drove to an apartment where another Crazy Rider lived. (*Id.*) Upon leaving the apartment they had a bag containing a cut off 30/30 Winchester rifle. (*Id.*) Twenty (20) to thirty (30) minutes after Ruiz assaulted Sanchez, two shots were fired from Sanchez's car, near the scene of the prior assault, with the sawed off rifle. (*Id.* at 1052.) The victim, who was not a TMC gang member, was sitting in the car when he was shot in the head. (*Id.*)

On December 2, 2002, at his fourth parole consideration hearing after only fourteen (14) years of incarceration, the Board concluded that Sanchez "would not pose an unreasonable risk of danger to society or a threat to public safety if released from prison." (*Id.* at 1052-1053.) However, on May 2, 2003, former Governor Gray Davis reversed the Board's decision. (*Id.* at 1054.) In reversing the Board's decision, the Governor gave several reasons: "(1) the callous nature and circumstances surrounding the commission of the crime; (2) petitioner demonstrates a lack of any remorse; (3) petitioner's continued minimization of his role in the murder; and (4) the Board's Investigations Unit lack of confirmation of petitioner's parole plans in the event he is paroled into California rather than deported to Guatemala." (*Id.* at 1061.) First, the Superior Court made a factual finding that the Board Investigation Units report was not part of the record presented to the Board at the hearing. (*Id.*) That finding was not rebutted by clear and convincing evidence, and as such, the Governor's reliance on that report was improper. (*Id.*) Additionally, the Governor's finding that Sanchez minimized his role in the murder and denied gang involvement was taken from a 1989 Probation Report, rather than his statements at the hearing. (*Id.*) As a result, the court concluded "some evidence" did not exist to support that finding. (*Id.*)

Similarly, the court concluded the Governor's reliance on Sanchez's "lack of remorse" did not provide "some evidence" to support his finding. (*Id.* at 1062.) In coming to this conclusion, the court reasoned that the Governor relied on the fact that Sanchez painted his car after the offense to evade apprehension, however, the Board relied on the fact that Sanchez made statements taking responsibility and indicating he was sorry. (*Id.*) The Governor's conclusion was drawn from immutable factors from fifteen (15) years earlier, whereas, remorse should be mutable over time. (*Id.*) Thus, "some evidence" did not support his conclusion. (*Id.*)

Finally, the Governor relied on the "callous nature and circumstances of the crime." (*Id.*) He stated, "[the crime] was a planned and calculated and cold-blooded murder demonstrating exceptionally callous disregard for human suffering...and it involved particularly egregious acts beyond the minimum necessary to sustain a

conviction of second-degree murder." (*Id.*) The court, however, concluded that the nature of the offense was not "some evidence" of Sanchez's suitability, and as such, the Governor's reversal was a due process violation. (*Id.* at 1063.) In rendering its decision, the court extensively discussed the reasoning in *Biggs, supra.* (*Id.* at 1062-1063.) The Board, in determining Sanchez was suitable for parole, concluded that the circumstances surrounding the crime were "unchanging." (*Id.* at 1062.) Accordingly, the court explained that "the Board or Governor is 'initially justified' in relying on the gravity of an inmate's offense in denying parole," however, continued reliance on unchanging factors, such as the commitment offense and conduct prior to imprisonment, "runs contrary to the rehabilitation goals espoused by the prison system and could result in a due process violation." (*Id.*, citing *Biggs, supra*, 334 F.3d at 916-917; *Irons v. Warden, supra*, 358 F.Supp.2d at 947.)

In sum, the court concluded that after just four (4) parole hearings, and in the face of his continuous demonstrations of "exemplary behavior and evidence of rehabilitation," "positive institutional behavior," and "significant and proven self-control," the predictive value of his commitment offense was near zero. (*Id.*, citing *Irons, supra*, 358 F.Supp.2d at 947, n. 2.) Here, Mr. Rush presents even more compelling grounds for relief. While both Sanchez and Mr. Rush were convicted of second degree murder, Sanchez had a history as a gang involved youth, and the crime was gang related, whereas Mr. Rush had no record, was a college student and the offense was the product of his the mental state, his level of stress and fear of the victim. Mr. Rush has also had exemplary institutional behavior, positive programming and displayed clear evidence of rehabilitation. Furthermore, Mr. Rush has been incarcerated for twenty (20) years, whereas Sanchez had only been incarcerated for fourteen (14) when the Board deemed him suitable. Additionally, Mr. Rush has been denied parole at five (5) consecutive hearings, one (1) more than Sanchez. Thus, like Sanchez, reliance on the commitment offense after multiple parole denials and twenty (20) years of incarceration provides no predictive value, and as such, he is entitled to release.

### 5. *Rosenkrantz v. Marshall*

67

In *Rosenkrantz VI, supra*, 444 F.Supp.2d 1063, the petitioner was sentenced to fifteen (15) years to life plus a two (2) year gun use enhancement for second degree murder committed when he was eighteen (18) years old in 1985. (*Rosenkrantz VI, supra*, 444 F.Supp.2d at 1065-1071.) Rosenkrantz, a homosexual, was confronted by his brother and his brother's friend, Redmond, who wished to prove that Rosenkrantz was gay. (*Id.*) While Rosenkrantz was at the family beach house on Friday with friends, his brother and Redmond, kicked in the door, calling the occupants "faggots," struck Rosenkrantz with a flashlight breaking his nose, and burned his hands with a stun gun. (*Id.*) Rosenkrantz's father was then told that he was homosexual, causing the father to kick him out of the house. (*Id.*) Three days after the incident at the beach house, Rosenkrantz went to a shooting range where he rented an Uzi semiautomatic, nine-millimeter carbine gun, and contemplated committing suicide. (*Id.* at 1072) He ordered an Uzi from a sporting goods store on Monday that would be ready for pick-up on Wednesday.

On Tuesday, Rosenkrantz went to work, where he informed one coworker that he had purchased a gun and planned to kill his brother. (*Id.*) He also told another coworker that his brother and Redman had humiliated Rosenkrantz, and that he was obtaining a gun. (*Id.*) Rosenkrantz picked up the gun on Wednesday, where he also purchased 250 rounds of ammunition. (*Id.*) On Thursday night, Rosenkrantz went to the condominium complex where Redmond lived, and attempted to locate his car. (*Id.*) Unable to locate his car, Rosenkrantz slept in his car overnight near the complex, waiting for Redmond to exit the premises. (*Id.*) When Redmond was exiting the complex the next morning, Rosenkrantz blocked him with his own car. (*Id.*) After a brief exchange where Redmond refused to recant his statements that he made to Rosenkrantz's father, he shot him at least ten (10) times, including six (6) wounds to the victim's head. (*Id.*) Rosenkrantz fled for approximately one month before turning himself in. (*Id.* at 1073.)

After several previous denials, under court order, he was granted parole in 2000, only to have it reversed by the Governor. (*Id.* at 1069-1070.) The superior court granted Rosenkrantz' subsequent writ of habeas corpus, which was affirmed by the court of appeal, but reversed by the California Supreme Court that ultimately found that there was

68

"some evidence" to support the Governor's reversal. (*Id.*) Rosenkrantz' habeas challenge in the United States District Court was based on his subsequent 2004 parole suitability hearing, where the Board found him unsuitable solely on the gravity of his commitment offense. (*Id.* at 1070-1071.) Rosenkrantz had served just under twenty (20) years in prison, had not committed any violent acts while in custody, earned a B.S. in computer science, completed a number of the all therapy and self-help programs that were available, received excellent work reports and opinions from correctional counselors that he presented no more of a risk to the community than the average person. (*Id.* at 1065-1066.) He had realistic parole plans, familial and community support, and the trial judge, various legislators, the arresting officer and the victim's only living relative all supported his release. (*Id.*)

Relying on *Biggs*, *Irons*, and *Scott II*, the *Rosenkrantz VI* court made two points. "First, continued reliance upon the unchanging facts of petitioner's crime makes a sham of California's parole system and amounts to an arbitrary denial of petitioner's liberty interest." (*Id.* at 1082.) Following the *Irons* doctrine, *Rosenkrantz* held that the Board's choice to ignore two decades of positive programming in favor of immutable facts was an arbitrary and capricious method of converting a minimum term into a life sentence. Mr. Rush has every bit as strong a background of programming as Rosenkrantz achieved. Both Rosenkrantz and Mr. Rush share many of the same features: far exceeding their minimum terms, remaining discipline free, receiving multiple parole denials, and, by all accounts, presenting no current threat to the community. Likewise, upholding the Board's denial here will result in a *de facto* life sentence.

Second, the court concluded the predictive values of the crime was so diminished that it could not serve as "some evidence" to support the Board's finding of parole unsuitability. As the Court noted,

> While relying upon petitioner's crime as an indicator of his dangerousness may be reasonable for some period of time, in this case, continued reliance on such unchanging circumstances-after nearly two decades of incarceration and half a dozen parole suitability hearings-violates due process because petitioner's commitment offense has become such an unreliable predictor of his present and future dangerousness that it does not satisfy the "some

evidence" standard. *After nearly twenty years of rehabilitation, the ability to predict a prisoner's future dangerousness based simply on the circumstances of his or her crime is nil.*

(*Id.* at 15 citing *Johnson v. Finn* (E.D. Cal. 2006) 2006 WL 195159 ["[T]he seriousness of the crime had predictive value for the dangerousness of petitioner's release for the first, second, perhaps third suitability hearing. But as the years go by, this factor loses its predictive value in light of the growing experience to the contrary (assuming petitioner's record in prison is exemplary)], emphasis added.

Additionally, the court concluded that the defendant's age at the time of the offense further diminished the reliability of the facts of his crime as a predictor for his current dangerousness. (*Id.* at 1085.) At the time of the offense, the defendant in *Rosekrantz VI* was barely eighteen (18), it was only one month after his birthday. (*Id.*) Accordingly, the court concluded that less culpability should be attached to juveniles, and someone who was only eighteen at the time of the offense deserves the same deference. (*Id.*, citing *Roper v. Simmons* (2005) 543 U.S. 551, 561-562.) This is because they are more susceptible to immature and irresponsible behavior, that is not as morally reprehensible, and a greater possibility exists for a younger person to reform his or her character deficiencies. (*Id.*, citations omitted) That is precisely what Mr. Rush has done here. Mr. Rush has programmed successfully for over twenty (20) years while incarcerated. He has achieved exactly what the prison system espouses as its goal: rehabilitation. Furthermore, Mr. Rush, like the defendant in *Rosenkrantz VI*, was young, barely twenty-one (21) at the time of the commitment offense. Therefore, the predictive value of the commitment offense, similarly, should be diminished due to his age. Thus, in the face of Mr. Rush's age and his unprecedented rehabilitation, the commitment offense utterly fails to indicate Mr. Rush's dangerousness over two (2) decades later. Accordingly, the Board's denial is a due process violation.

### 6. *In re Lee*

In *In re Lee* (2006) 143 Cal.App.4[th] 1400, the petitioner pled guilty to second degree murder and attempted premeditated murder in 1989 and was sentenced to

70

seventeen (17) years to life with the possibility of parole. (*Id.* at 1404.) The petitioner, Wen Lee, sold his restaurant to Johnny Soong in return for Soong's promise to make periodic payments. (*Id.*) Soong repeatedly failed to make his payments, which caused Lee hardship because he planned to support his retirement with the sale proceeds. (*Id.*) As a result, Lee was forced to renegotiate Soong's debt on several occasions in meetings that were very heated. (*Id.*) On the night of the commitment offense, Lee went to the restaurant armed with a gun and a box of ammunition. He decided to kill Soong and then himself if he refused to pay. (*Id.*) When Soong did refuse to pay, Lee shot five times. (*Id.*) Soong was hit twice and survived, but his wife was killed by one of the bullets. (*Id.*)

In 2005, at Lee's sixth (6th) parole hearing and after nearly sixteen (16) years of incarceration, the Board concluded he would "not pose an unreasonable risk of danger to public safety if he were released," and as such found him suitable for parole. (*Id.*) However, the Governor reversed the Board's decision in 2005. (*Id.* at 1405.) He concluded Lee was unsuitable for parole for two (2) reasons. First, he viewed the offense as "'atrocious' and beyond 'the minimum necessary to sustain' his convictions," and second, Lee's acceptance of responsibility for the offense, less than a year earlier, was too recent. (*Id.*) Subsequently, the court determined that the Governor had erred. (*Id.* at 1408.) In rendering its decision, the court explained that the test for analyzing the Governor's reversal is "not whether some evidence supports the *reasons* the Governor cites for denying parole, but whether some evidence indicates a parolee's release *unreasonably endangers public safety.*" (*Id.*, emphasis in original.) Some evidence of a particular factor does not necessarily equate to some evidence that the parolee's release poses an unreasonable risk to public safety. (*Id.* at 1408, fn 4.)

Accordingly, the court examined the Governor's two reasons in the context of all the suitability factors that must be considered to determine whether the inmate posed an unreasonable risk to public safety. (*Id.* at 1409.) First, the court noted that, other than the commitment offense, Lee had led a crime-free life, the offense occurred almost twenty (20) years ago, and Lee was eighty-two (82) years old and in a poor health. Second, the

71

court analyzed the Governor's two reasons for reversal. His first cited reason was the nature of Lee's crimes. (*Id.*) To determine what constituted an "especially heinous, atrocious, or cruel" offense, the court compared the facts of Lee's offense to that of recent case law to decipher whether the nature of Lee's crime was "atrocious," as claimed by the Governor. (*Id.* at 1409-1411.)[46] In making its comparison, the court concluded the circumstances in Lee's case were "no more atrocious than whenever one human being kills another-and were not committed 'in an especially heinous, atrocious or cruel manner.'" (*Id.* at 1409 (citing *Scott I, supra,* 119 Cal.App.4th at 891.) "The measure of atrociousness is not general notions of common decency or social norms, for by that yardstick all murders are atrocious," and therefore, the court concluded the facts of Lee's offense were "more commonplace than egregious." (*Id.,* citing *Scott I, supra,* 119 Cal.App.4th at 891.)

In coming to this conclusion the court noted that the commitment offense in *Lee,* like Rush's offense, was a result of "significant stress," which tends to show suitability. (*Id.* at 1412.) Additionally, although Lee had a fifteen (15) minute drive to ponder the offense and he brought an extra box of ammunition, the court noted that "[p]ondering what one is about to do is the essence of premeditation, and Lee's premeditation was not elaborate or prolonged." (*Id.*) Accordingly, Lee's conduct "involved no more than was necessary to commit his crimes. (*Id.,* citing *Rosenkrantz V, supra,* 29 Cal.4th at 683.) Furthermore, the court rejected the Attorney General's contention that the People could have prosecuted Lee for first degree murder under the doctrine of transferred intent, but instead he was sentenced to second degree murder only because of a plea bargain, therefore the circumstances were more than the bare minimum needed to commit second degree murder. (*Id.* at 1413.) In rejecting that argument, the court first noted that the Board and Governor must focus on whether the prisoner poses an unreasonable risk to

---

[46] The court compared the offense to the facts in *Rosenkrantz V; Dannenberg; In re McClendon,* 113 Cal.App.4th 315 (2003); *In re Burns,* 136 Cal.App.4th 13118 (2006); *In re Van Houten,* 116 Cal.App.4th 339 (2004); *In re DeLuna,* 126 Cal.App.4th 585 (2005); *In re Lowe,* 130 Cal. App.4th 1405 (2005); and *In re Morrall,* 130 Cal.App.4th 391 (2002) and concluded the facts from *Lee* were less egregious. The court concluded the facts were more comparable to those in *In re Ernest Smith, supra,* 114 Cal.App.4th 343, and as such, warranted the same relief, release.

society and a legal construct, such as transferred intent, has no obvious intersection with such a practical inquiry. (*Id.*) The court next noted that "focusing on how the People could have pled a crime, instead of how Lee committed it, risks potentially odd results."[47] (*Id.*) As such, the bare minimum test must be applied to how the inmate "actually committed his crimes, not to how the People could have pleaded them." (*Id.*) Not only did the court conclude the crime was not "especially atrocious, heinous, or callous," it also concluded the crime had "little, if any, predictive value." (*Id.* at 1412.) "Simply from the passing of time, Lee's crimes almost 20 years ago have lost much of their usefulness in foreseeing the likelihood of future offenses." (*Id.*, citing *Scott II, supra*, 133 Cal. App.4th 573, 595.)

The Governor's second reason for denying parole, that his acceptance of responsibility was too recent, was similarly rejected by the court. (*Id.* at 1414.) It noted that Lee had necessarily acknowledged his guilt when he pled guilty. (*Id.*) Additionally, his years of stating he was not responsible referred to the accidental nature of the death of Soong's wife. (*Id.*) Irregardless, his acceptance of responsibility for his crimes was complete by his last parole hearing. (*Id.*) The timing of an acceptance of responsibility, longstanding or recent, does not matter as long as that acceptance is genuine. (*Id.*) Thus, because the Governor only cited the timing of the acceptance, not the genuineness, the Governor's claim provided no evidence of Lee's current threat to public safety. (*Id.*)

In the instant case, Mr. Rush's offense similarly has no predictive value concerning his current dangerousness. The court in *Lee* concluded simply the passage of time diminishes the predictive value of the commitment offense. That conclusion is equally as applicable to Mr. Rush. Lee, like Mr. Rush, was incarcerated for nearly twenty (20) years. Additionally, Mr. Rush has participated in every possible self-help program and has effectively rehabilitated himself during his incarceration. Mr. Rush was under

---

[47] As an example, the court stated, "if Lee had killed, instead of wounded, Soong with no more premeditation or other conduct than he exhibited here, the People could have properly charged him with two counts of first degree murder-plainly, a worse set of crimes than what he committed. Yet, against two first degree murder charges, his argument that his conduct involved no more than the minimum acts needed to commit his offenses would strengthen. As such, he would have a stronger, not weaker, claim to parole on two murder charges than he would for his

significant stress at the time of offense due the serious accident that killed his close friend and left Mr. Rush with significant injuries and a feeling of helplessness. Under the standard espoused in *Lee*, this offense could not be considered more atrocious than most, as it was the result of a uniquely stressful situation in Mr. Rush's life. Since then, Mr. Rush has diligently worked to deal with the causative factors of the offense and now knows how to deal with stress in his life. He is also extremely remorseful about his actions, evidenced by his dedication to improving himself and to ensuring he will not react to stress in a violent manner. Mr. Rush's progress has been tremendous, as shown by his twenty (20) year discipline free record in an institution full of opportunities to act violently. Thus, continued reliance on immutable factors, despite many years of positive programming, provides absolutely no support for parole denial, and as such, the Board's denial is a due process violation.

### 7. *In re Elkins*

In *In re Elkins* (2006) 144 Cal.App.4th 475, the petitioner was convicted of first degree murder and robbery, with use of a deadly weapon and was sentenced to twenty-five (25) years to life. (*Id.* at 504.) Elkins and the victim were high school classmates and drug dealing associates. (*Id.* at 505.) The victim was having difficulty paying Elkins for some drugs he purchased. (*Id.*) Therefore, at a party in July 1979, Elkins entered a room where the victim was sleeping, intending to rob him. (*Id.*) When he entered the room he hit the victim with a baseball bat once, but continued to hit him, until he was dead, simply because the victim kept moving. (*Id.* at 505-506.) After the murder, Elkins took the victim's wallet, money and drugs, dumped his body down a steep grade, continued to steal from the victim's storage unit and his girlfriend's home over several days and then fled the state. (*Id.* at 505.)

In 2005, at his eleventh (11th) parole hearing, the Board concluded Elkins did "not pose an unreasonable risk of danger to society or public safety if released from prison." (*Id.* at 507.) Although the Board stated it was an "extremely vicious crime," they concluded the suitability factors outweighed the commitment offense. (*Id.*) Nonetheless,

---

actual crimes of attempted premeditated murder and murder." (*Id.* at 1413.)

the Governor subsequently reversed the Board's decision. (*Id.*)  In rendering his decision, the Governor characterized the offense as "atrocious" and Elkins's actions after the murder as "cold and calculated." (*Id.* 509-510.)  The Governor then claimed the gravity of the offense, alone, was sufficient for him to conclude Elkins was an unreasonable risk to public safety.  Although Elkins had been incarcerated for twenty-six (26) years and made "creditable gains," the Governor decided the offense outweighed all the positive factors supporting his release. (*Id.*)

The Governor's decision relied on two (2) factors. *Id.* at 515-516.  First, he stated that Elkins's acceptance of full responsibility, over a decade ago, was too recent. (*Id.* at 517.)  The court, however, concluded no minimum time requirement existed. (*Id.*)  Instead, acceptance of responsibility works in favor of release "'no matter how longstanding or recent it is,' so long as the inmate 'genuinely accepts responsibility.'" (*Id.*, quoting *Lee, supra*, 143 Cal.App.4[th] 1400.)  Since the Governor did not express any concern about the sincerity of the acceptance, no rational support existed to show Elkins's acceptance did not weigh in favor of parole. (*Id.* at 518.)

Second, the Governor relied on the gravity of the commitment offense to reverse the Board's decision. *Id.*  He characterized it as "atrocious" or "especially brutal," noting that the offense "alone" was sufficient support for denial. (*Id.*)  Initially, the court noted that Elkins's ability to rob the victim without hitting him or hitting him just once does not shed any light on whether the murder was "especially brutal." (*Id.*)  Such action may show an especially brutal robbery, but not necessarily an especially brutal *first degree murder*. (*Id.*, emphasis in original.)  Accordingly, the court concluded the Governor could not rely on the fact that Elkins could have avoided the killing to show the murder was especially brutal, because such action could not be considered "more aggravated or violent than the minimum necessary to sustain a conviction for that offense." (*Id.*, citing *Scott II, supra*, 133 Cal.App.4[th] at 598.)

Furthermore, the court determined robbery was the motive and there was never a plot to kill the victim, things just "had gotten out of hand." (*Id.* at 519.)  The court, thus, concluded it would be irrational to conclude murder, rather than the robbery, was carried

75

out in a calculated manner. (*Id.* at 519.) The court also rejected the Governor's rationale that Elkins's actions *after* the murder demonstrated those of a cold-blooded, dispassionate killer and thus he was an unreasonable risk to society. (*Id.* at 520.) Ultimately, the court concluded "[g]iven the lapse of 26 years and the exemplary rehabilitative gains made by Elkins over that time, continued reliance on these aggravating facts of the crime no longer amount to 'some evidence' supporting denial of parole." (*Id.*) In delivering its decision, the court discussed extensively *Rosenkrantz VI*, *Martin*, and *Irons*, focusing on the fact that continued reliance on unchanging circumstances, to deny parole, despite years of positive institutional behavior, has no predictive value, and thus, such reliance is a due process violation. (*Id.* at 521-523.) Thus, the Board's denial lacked "some evidence" that Elkins posed "an unreasonable risk of danger to society." (*Id.* at 523, citations omitted.)

Here, Mr. Rush's case poses an even more compelling need for relief. First, Elkins was convicted of first degree murder, whereas Mr. Rush was convicted of second degree. Second, Elkins, unlike Mr. Rush, received violations for serious and minor misconduct. (*Elkins, supra*, 144 Cal.App.4[th] at 509.) In fact, other than the commitment offense Mr. Rush has had absolutely no history of violence. He has not received any CDC 115s and only one (1) CDC 128A for "technically" being out of bounds during his entire twenty (20) years of incarceration. Most importantly, the use of Mr. Rush's offense, as a predictor of dangerousness, like *Elkins*, has no value. The facts in *Elkins* are far more egregious than the present case. Elkins savagely beat his victim to death. The victim was initially asleep in his bed when Elkins began beating him with a baseball bat, so he could take his drugs and money. However, after the victim began to wake, Elkins continued to beat him until he was dead. After the victim's death Elkins dumped his body and then continued to steal from his storage room and his girlfriend for days before he left the state. Clearly, the offense in the present case is not nearly as egregious, as it was the result of significant stress. Nonetheless, Mr. Rush has been incarcerated for twenty (20) years, he is nine (9) years past his minimum term, and he was denied parole at five (5) consecutive hearings. Thus, reliance on immutable factors to continually deny parole, at this point, is a clear due process violation.

### 8. Summary

The courts are no longer permitting the Board to deny parole based solely on the commitment offense when it is stale and can no longer indicate a present dangerousness, especially when juxtaposed against the factual reality of the subsequent years of incarceration. It simply offers no evidence of current dangerousness. Although no bright line rule exists specifying the exact number of hearings or exactly how much time must pass before the commitment offense is no longer an effective predictor of future dangerousness, a greater proof of rehabilitation decreases the number of hearings and passage of time required to draw such a conclusion. Mr. Rush's commitment offense happened twenty (20) years ago. Since then, he has rehabilitated himself in every way possible within the confines of prison. As such, it is disingenuous for the Board to deny Mr. Rush's parole on the grounds that his commitment offense somehow evidences a current danger to the community. Thus, the commitment offense does not satisfy the "some evidence" standard.

### IV. THERE IS NO EVIDENCE TO SUPPORT A DENIAL UNDER § 3041.

According to *Penal Code* §3041 and the *California Code of Regulations*, parole shall be set unless the inmate "poses an unreasonable risk of danger to society." (*Cal. Code Regs.*, tit. §2402(a).) However, when reviewing the Board's parole denial, "[t]he test is not whether some evidence supports the *reasons* the [Board] cites for denying parole, but whether some evidence indicates a parolee's release *unreasonably endangers public safety*." (*In re Lee*, 143 Cal.App.4th 1400, 1408, emphasis in original.) Some evidence of the existence of a particular unsuitablility factor does not necessarily equate to some evidence that the inmate's release currently poses an unreasonable danger to public safety. (*Id.* at 1409.) Thus, "some evidence" which merely supports the *reasons* cited by the Board in denying parole, cannot be the basis for affirming the denial. (*Id.* at 1408, emphasis in original.) Instead, the reasons given by the Board must be viewed "within the context of the other [suitability] factors" to determine whether the inmate is a current and unreasonable risk to society. (*Id.* at 1409, citing *Scott II, supra*, 133 Cal.App.4th at pp. 594-595.) The Board "must remain focused not on the circumstances

77

that may be aggravating in the abstract, but, rather, on facts indicating that release currently poses 'an unreasonable risk of danger to society.'" (*Elkins, supra*, 144 Cal.App.4th 475, 521.) Accordingly, "the overarching consideration in the suitability determination is whether the inmate is currently a threat to public safety." (*In re Weider* (2006) 145 Cal.App.4[th] 570, 589.) Here, the Board cited circumstances that could be aggravating in the abstract, without adequately considering whether those facts actually do render Mr. Rush an unreasonable danger to society, *today*. However, when honestly examining those circumstances in terms of current dangerousness, it is apparent that no evidence exists to support the conclusion that Mr. Rush is a current and unreasonable risk to society.

### A. The Commitment Offense.

While "the gravity of the commitment offense or offenses alone *may* be a sufficient basis for denying a parole application," that can only be the case where the Board considers all other relevant factors. (*In re Ramirez, supra*, 94 Cal.App.4[th] at p. 549[48] [citing *In re Seabock* (1983) 140 Cal.App.3d 29 at 37-38]; see also *In re Rosenkrantz [Rosenkrantz V]* (2002) 29 Cal.4[th] 616.) The *Ramirez* court emphasized that, while the gravity of the offense *may* be enough, that must be the *exception* to the rule, and the Board cannot *normally* deny parole based on the gravity of the offense. (*Id.,* see *Rosenkrantz V, supra*. at 683.) As the *Ramirez* court noted, "a life term offense or any other offenses underlying an indeterminate sentence **must be particularly egregious to justify the denial of a parole date**." (*Ramirez, supra,* 94 Cal.App.4[th] at 570, emphasis added.) These principles were affirmed in *Rosenkrantz V, supra,* 29 Cal.4[th] at 683. The *Ramirez* court explained the legislative policy of parole for violent offenses, stating,

> "[T]he circumstances of **any** past offense, even any murder, are not
> necessarily a sufficient ground for the Board to refuse to set a parole release

---

[48] The California Supreme Court disapproved only of that portion of the *Ramirez* decision that requires a comparative, proportionality analysis of the crime with other similar offenses. The balance of the *Ramirez* decision was not overruled. However, it is Petitioner's contention that, under principles of Federal Due Process, the analysis in *Ramirez* is the correct one, but even if not on the proportionality issue, a general level of comparative analysis on the issue of egregiousness of the crime is not only proper, but is required by the Constitution to avoid the regulatory language being unconstitutionally vague.

date. All violent crime demonstrates the perpetrator's potential for posing a grave risk to public safety, yet parole is mandatory for violent felons serving determinate sentences. (Penal Code, §3000, subd. (b)(1).) And the Legislature has clearly expressed its intent that when murderers who are the *great majority* of inmates serving indeterminate sentences approach their minimum eligible parole date, the Board '*shall normally set a parole release date.*' (Penal Code §3041, subd. (a).) The Board's authority to make an exception based on the gravity of a life term inmate's current or past offenses *should not operate so as to swallow the rule that parole is 'normally' to be granted.*" (*Id.* at p. 570, emphasis added.)

(See also *Rosenkrantz V, supra,* 29 Cal.4th at 683, quoting the above language in relevant part, and specifically adopting these rules.) Therefore, it is simply fundamental that in order to overcome the rule that parole is "normally" to be granted, the Board must find that the commitment offense is among the gravest of offenses. The California Supreme Court's analysis in the case of *In re Dannenberg,* 34 Cal.4th 1061, at 1094, preserved these doctrines, stating that they were not overruling *Rosenkrantz V.*

Furthermore, under the regulatory criteria, in determining if the crime is "particularly egregious" under those standards, due process demands that a comparative analysis be done with other similar offenses in order to avoid the entire regulatory scheme becoming unconstitutionally vague. (See the discussion in §I, *supra.*) This is true because the entire regulatory setup uses comparative terminology, such as "*especially* heinous, atrocious and cruel" or an "*exceptionally* callous disregard" for human life. (*Cal. Code Regs.,* tit. 15, §2402(c)(1).) Similarly, the California Court of Appeal, First District, recently clarified the rules for applying the regulatory criteria of unsuitability. The Court explained:

"The commitment offense is one of only two factors indicative of unsuitability a prisoner cannot change (the other being his 'Previous Record of Violence'). Reliance on such an immutable factor 'without regard to or consideration of subsequent circumstances' may be unfair (citation omitted), and runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation."

"The commitment offense can negate suitability only if circumstances of the crime reliably established by the evidence in the record rationally indicate that the offender will present an unreasonable public safety risk if released from prison. Yet, the predictive value of the commitment offense may be

79

very questionable after a long period of time. [citing *Irons v. Warden* (E.D.Cal. 2005) 358 F.Supp.2d 936, 947, fn.2.] Thus, denial of release solely on the basis of the gravity of the commitment offense warrants especially close scrutiny." (*In re Scott* (2005) [*Scott II*], 133 Cal.App.4th 573, 584 [citing *Biggs v. Terhune, supra*, 334 F.3d at 917].)

As noted, in order to ensure that the exception does not swallow the rule, the commitment offense must be "***particularly egregious*** to justify the denial of a parole date." (*Ramirez, supra*, 94 Cal.App.4th at p. 570, emphasis added; *Rosenkrantz V, supra*, 29 Cal.4th at 683.) Accordingly, "the Board must weigh the inmate's criminal conduct not against ordinary social norms, but against other instances of the same crime or crimes." (*Id.*)[49] The case of *In re Ernest Smith*, a murder stemming from defendant shooting his spouse three times in the head, is instructive in this homicide. There, the court of appeal found that these facts did not render the offense a "particularly egregious" crime. (*In re Ernest Smith* (2003) 114 Cal.App.4th 343.) Particularly, the Court found it dispositive that Smith had not done anything to prolong the victim's suffering, or to cause untoward pain beyond the act of killing. Certainly, the same can be said about the murder in this case. Recently, in *Scott I, supra*, 119 Cal. App. 4th 871, the court found that a defendant who shot his wife's lover to death in front of her and their son did not constitute a "particularly egregious crime." (*Scott I, supra*, 119 Cal.App.4th at 890-92.) As the *Ernest Smith* court noted,

> "There is no evidence that Smith acted with cold, calculated, dispassion; or that he tormented, terrorized, or injured [victim] before deciding to shoot her; or that he gratuitously increased or unnecessarily prolonged her pain and suffering…Was the crime callous? Yes. However, are the facts of the crime some evidence that Smith acted with exceptionally callous disregard for [victim's] suffering; or do the facts distinguish this crime from other second degree murders as exceptionally callous? No." (*Id.* at 673 [citing *In re Mark Smith* (2003) 109 Cal.App.4th 489, 504, 506].)

---

[49]    As is discussed *infra*, the Supreme Court in *Dannenberg* only overruled the rule of *Ramirez* that a comparison is done for purposes of achieving proportionality of terms. However, on the question of egregiousness, as distinguished from proportionality, *Rosenkrantz V* preserved the need to compare the inmate's offense with other similar crimes to determine the pivotal questions of whether the crime is "especially heinous…," involves an "exceptionally callous disregard…," has a "trivial" motive, or is "particularly egregious." (*Rosenkrantz V, supra*, 29 Cal.4th at 682, 683.)

Therefore, a finding that the crime prevented the Board from setting a date at five (5) separate hearings over a twenty (20) year period of incarceration, and nine (9) years after Mr. Rush's minimum term, is legally unsupportable. At Mr. Rush's 2005 hearing, the Board claimed that he posed an unreasonable risk to society. (Exh. AA, p. 92.) To justify their decision, the Board simply characterized the offense as "particularly callous and cruel," "dispassionate and [it] didn't have to happen," and it was carried out with a "callous disregard for human suffering." (Exh. AAA, p. 88.) Not only, does the offense not constitute an offense that is so egregious as to render Mr. Rush an unreasonable risk to society, twenty (20) years later, the Board's own findings and explanations of their decision wholly contradict their claim that the commitment offense, alone, is sufficient to render Mr. Rush unsuitable for parole.

First, Mr. Rush's offense is immediately recognizable as being of a far lesser order than most murders, as he was acting under extreme stress, due to the circumstances of the incident. Mr. Rush did not plan the murder, and there was absolutely no evidence of premeditation or deliberation. It was actually the result of an argument, which became physical, between Mr. Rush and his roommate. At the time of the murder, Mr. Rush was recovering from a motorcycle accident where he was severely injured and his friend died. (Exh. DDD, p. 361.) His injuries left him in a weakened physical and mental state, and the fact that the victim was significantly bigger and stronger than he was left him with a feeling of helplessness. (*Id.*) When the argument became physical, Mr. Rush was fearful because his injuries would not allow him to withstand a physical fight. (*Id.*) Mr. Heinz had already slammed him against the wall. (*Id.*) Mr. Rush grabbed his gun for safety and when his roommate lunged at him, he shot without thinking. Obviously, these elements played a significant role in the life factors that led to the commitment offense. In context, the commitment offense must be viewed as being the result of these combined factors. Ultimately, Mr. Rush's role in this offense simply cannot be said to be dramatically more heinous than most other murders.

Second, the Board cannot ignore the indisputable evidence merely by asserting that the unchanging facts of the commitment offense makes Mr. Rush an unreasonable risk of

danger to the community if paroled, without making a connection to explain how the crime still shows a *current* propensity for violence. (*Scott II, supra,* 113 Cal.App.4[th] at 594-595.) While the commitment offense is tragic, in order for the Board to rely upon it as the sole reason for denying parole, it must be clear from the facts that the crime is "*especially* heinous, atrocious or cruel" in a way that sets it apart from the vast majority of other second degree murders as among the gravest of those offenses. (*Cal. Code Regs.,* tit. 15, §2402(c)(1), emphasis added; see *Ramirez, supra,* 94 Cal.App.4[th] at p. 570.)

This follows from the regulations own use of the word "especially" which connotes a heightened level *beyond* what normally is present in a finding of actual or implied malice. (*Cal. Code Regs.,* tit. 15, 2402(c)(1).) As the facts indicate, Mr. Rush's case does not fall under any of the factors provided by *Cal. Code Regs.,* tit. 15, §2402, indicating that he is unsuitable for parole. Nowhere does the Board attempt to describe how the crime is factually egregious under the regulatory factors, or point to actual, reliable evidence supporting any finding under an actual regulatory factor that rationally shows that Mr. Rush is currently an unreasonable risk of danger to society if paroled. Instead, they just state their "findings" in conclusory terms. As discussed in *Scott II, supra,* 133 Cal.App.4[th] at 594-595, the evidence must rationally show current dangerousness.

Here, the Board made a finding that the crime was dispassionate. However, under *Cal. Code Regs.,* tit. 15, §2402(c)(1)(B), such a finding requires a determination that the "offense was carried out in a dispassionate and calculated manner, *such as an execution style murder.*" (Emphasis added.) That terminology has no application to a case such as this. Instead, it is designed for a murder that occurs in a distinct factual pattern, one showing a particular dangerousness on the part of the defendant who commits an act of executing a victim. Because the prisons have to implement Board regulations that use this identical terminology in their housing of inmates who have committed murders (see *Cal. Code Regs.,* tit. 15, §3375.2(a)(7)(A)), the term "execution style murder" has a particularized meaning in prison jargon, and a CDC memorandum was actually issued to define it as "those crimes wherein the victim was shot in the head after being bound or

cuffed, made to kneel, made to lie down, or made to face a wall." (See Exh. LLL.) No such actions occurred factually in this case. Accordingly, that finding was wholly unsupported by the evidence.

The finding that the crime was "cruel and callous" and committed with a callous disregard for human suffering (*Cal. Code Regs.*, tit. 15, §2402(c)(1)(A)), is equally unsupported, as an exceptional level of callousness was not present here. (See *In re Ernest Smith, supra*, 114 Cal. App. 4th at 366.) Clearly, this murder is not dramatically more heinous than most other murders. To the contrary, as discussed above, it is much closer to a self defense case, but without enough force to excuse Mr. Rush's actions. As compared with other second-degree murders, and in light of the rules announced in *Scott I, supra,* and *Ernest Smith, supra*, this crime is not "particularly egregious." As in the *Ernest Smith* case, nothing case done to prolong the victim's suffering or to cause untoward pain beyond that inherent in the act of any murder.

A distinction must be drawn here between a murder that is "aggravated" and one that is "particularly egregious" within the meaning of the parole statutes and regulations. The matrix already provides for "aggravated" offenses, giving a mitigated, middle and aggravated term for each type of murder covered thereunder. Aggravated circumstances are factors to consider in determining which of the three matrix terms to select as the appropriate sentence for the inmate. They would not be enough by themselves to support a finding of unsuitability. That finding would require a determination that the crime is "particularly egregious."

This approach is based upon common sense. Absent facts that make the offense "particularly egregious," it is simply irrational to use the circumstances of that crime to hold a prisoner beyond the term prescribed under the matrix. (See *Cal. Code Regs.* tit. 15 §2403(c).) This approach is logical since it is the circumstances of the offense that went into making that matrix in the first place. (See *Little v. Hadden* (1980) 504 F. Supp. 558, 562 ["'It is simply irrational for seriousness of the offense to be used first to determine the appropriate [matrix] period and then to be used again as the stated reason for confining a person beyond that guideline.'"].) The *Ramirez* decision stands for the

principle that the term served by an offender should not be more than the term prescribed for the offense for which he stands convicted. The Board's treatment of Mr. Rush ignores these principles. In fairly characterizing Mr. Rush's offense and comparing it with other second-degree murders, it simply cannot be said that the present case involves the type of *especially* callous disregard beyond that necessary in any conviction for second-degree murder, and certainly does not justify characterizing this offense as being more egregious than that found in cases of first-degree murder. As stated by the *Scott II* court, "[t]he circumstances of [Rush's] offense shown by the record, which bear no resemblance to the circumstances of the homicides in *Rosenkrantz, Lowe* and *DeLuna* cannot reasonably be considered more aggravated or violent than the minimum necessary to sustain a conviction of second degree murder." (*Scott II, supra*, 133 Cal.App.4[th] at 598; see also *In re Lowe* (2005) 130 Cal.App.4[th] 1045; *In re DeLuna* (2005) 126 Cal.App.4[th] 585.)

As such, there was no evidence to support any of the actual regulatory criteria. Thus, the crime simply does not support the Board's finding of unsuitability.

## B. THE EVIDENCE FAILS TO SUPPORT ANY OF THE REMAINING UNSUITABILITY FACTORS.

For the Board to deny Mr. Rush parole in this case, in addition to the commitment offense, the Board must be able to point to other circumstances defined in §2402(c) that tend to indicate Mr. Rush would pose an "unreasonable" degree of threat and danger to the public if released. (*Scott II, supra*, 133 Cal.App.4[th] at 595.) A legitimate, impartial review of those criteria reveals that none of the factors of unsuitability prescribed under *Cal. Code Regs.*, tit. 15 §2402(c) apply to Mr. Rush. As defined by the Regulations, other circumstances that tend to show unsuitability include:

> "(2) Previous record of violence. The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age (3) Unstable social history. The prisoner has a history of unstable or tumultuous relationships with others (4) sadistic sexual offenses...(5) Psychological factors. The prisoner has a lengthy history of severe mental problems related to the offense. (6) Institutional behavior. The prisoner has engaged in serious misconduct in prison or jail."

84

### C. PETITIONER IS SUITABLE FOR PAROLE UNDER EACH AND EVERY ONE OF THE REGULATORY FACTORS IN CAL. CODE REGS. TIT. 15 §2402(D).

Again, Mr. Rush fits under all of the relevant suitability factors in *Cal. Code Regs.* tit. 15 §2402(d). These factors include:

> "(1) No Juvenile Record...(2) Stable Social History. The prisoner has experienced reasonably stable relationships with others. (3) Signs of Remorse. The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or indicting that he understands the nature and magnitude of the offense. (4) Motivation of the Crime. The prisoner committed his crime as a result of significant stress in his life, especially if the stress has built over a long period of time. (5) Battered Woman Syndrome...(6) Lack of Criminal History...(7) Age. The prisoner's present age reduces the probability of recidivism. (8) Understanding and Plans for Future. The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release. (9) Institutional Behavior. Institutional activities indicate an enhanced ability to function within the law upon release."

First, Mr. Rush has absolutely no prior criminal record, juvenile or otherwise. He is currently at the lowest classification level. His doctors have consistently given Mr. Rush psychological clearance. In fact, Dr. Terrini stated he did "not believe he would ever commit a violent act again." (Exh. BBB, p.161.) These facts must be considered toward Mr. Rush's parole suitability, because the very purpose of indeterminate sentencing is to provide rehabilitation and reformation of prisoners to facilitate their safe return to society. (See *In re Minnis, supra*, 7 Cal.3d 639; *In re Sturm* (1979) 11 Cal.3d 258; *Rosenkrantz V, supra*, 29 Cal.4th p. 682; *Ramirez, supra*, 94 Cal.App.4th at p. 549.) Furthermore, Mr. Rush has sought and obtained therapy, fully developed his insight into the offense, and his psychological history is indisputably exemplary and supportive of parole.

Second, as discussed previously, Mr. Rush has a stable social history and comes from a very supportive family. His file is replete with evidence that he takes full responsibility for this tragic event and of his sincere and genuine remorse. Additionally,

as discussed *supra*, the offense was committed as result of significant stress in Mr. Rush's life. This stress was caused by a motorcycle accident he was involved in several months prior to the offense. In the accident, his close friend was fatally injured and Mr. Rush sustained severe injuries, which kept him in bed for two (2) months. The stress from losing his independence, because of his injuries, and the depression from losing his friend built up over several months prior to the offense. Mr. Rush's feelings of helplessness, caused by the accident, peaked when a physical struggle with his much larger roommate ensued the night of the offense. Mr. Rush was not physically able to protect himself. As a result, the severe stress Mr. Rush was under significantly contributed to the offense.

Third, as previously mentioned, Mr. Rush has absolutely no prior history of violence; convictions, arrests, disciplinary action, or otherwise. According to the Board, he has done a "great job" since he has been in custody. (Exh. AAA, p. 90.) Moreover, Mr. Rush is currently forty-one (41) years old, and was only twenty-one (21) years old when he was arrested. He has spent nearly half of his life in prison. His lack of current violence potential, coupled with his high level of maturity, makes recidivism highly unlikely. (*Cal. Code Regs.* tit. 15 §2402(d)(7).) Mr. Rush also has acceptable parole plans. He plans to live with his father in San Bernardino County and work in Lake Arrowhead for Mellinger Construction. He also intends to pursue a career as a cartographer, consistently updating himself on the CAD software system used for that field. Mr. Rush has an AA degree from Hartnell College, a BA from San Jose State University, and a Masters of Science degree in Humanities from California State University, Dominguez Hills. He has also completed vocational training for mechanical and architectural drafting. At his 2005 hearing, the Board acknowledged Mr. Rush has marketable skills and an acceptable parole plan. (Exh. AAA, p. 90.) Finally, Mr. Rush has had exceptional institutional behavior. The Board complemented Mr. Rush on what he has done since incarceration and even concluded he has been a "good role model" while in custody. (Exh. AAA, p, 91.)

In sum, Mr. Rush has great support in every respect imaginable, including housing, transportation, and financial and emotional support. In denying parole, the Board has

failed to give due consideration to the fact that Mr. Rush fits into each and every one of the suitability criteria. Mr. Rush has been free from discipline during incarceration, and the record reveals job, vocational, and community participation that can hardly be called anything less than remarkable since incarceration.

Despite this overwhelming evidence, the Board found Mr. Rush unsuitable for parole, solely on the facts of the commitment offense. Clearly, the Board has violated Petitioner's rights in failing to adequately review the factors in support of his suitability.

### D. THE OTHER REASONS CITED BY THE BOARD WERE OUTSIDE THE RELEVANT UNSUITABILITY FACTORS AND PROVIDE NO SUPPORT FOR THE CONCLUSION THAT MR. RUSH IS A CURRENT AND UNREASONABLE THREAT TO SOCIETY.

The Board mentioned the opposition from the San Bernardino County District Attorney and the victim's next of kin when it denied parole. This warrants almost no discussion. First, opposition by the District Attorney and the next of kin does not speak to Mr. Rush's current dangerousness. As discussed earlier, the Court must examine whether "some evidence" exists to support the Board's conclusion that the inmate currently *unreasonably endangers public safety*, not whether "some evidence" supports the *reasons* stated by the Board. (*In re Lee, supra*, 143 Cal.App.4th at 1408, emphasis in original.) Some evidence of the existence of victim next of kin or District Attorney's opposition, does not necessarily equate to some evidence that the inmate's release currently poses an unreasonable danger to public safety. (*Id.* at 1409.) Therefore, reliance on the aforementioned oppositions must be based solely upon their ability, if there in fact is any, to show Mr. Rush's current dangerousness, not simply upon "some evidence" that the oppositions in fact existed. The Board merely mentioned the oppositions and did not discuss, or even mention, how that opposition supports a determination that Mr. Rush is currently unreasonably dangerous. In fact, no such conclusion could rationally flow from the evidence. Thus, reliance on the fact that the opposition was made to support the Board's denial, is contrary to the standards espoused in *Lee* and *Elkins*, which are likewise supported by the focus on the current dangerousness in *Rosenkrantz VI* and *Martin*. Since the oppositions by the District

87

Attorney and the next of kin do not lend any more insight into Mr. Rush's dangerousness than does the commitment offense, the Board's reliance on those oppositions to support their denial is a due process violation.

Second, although *Penal Code* §3043 permits consideration of the opposition from the victim's family, those statements do not provide "evidence" of unsuitability. The statements given by the victim's families are not given under oath and therefore do not qualify as evidence, and thus, cannot reliably establish current dangerousness. The Board is required to consider those statements, but those statements are relevant to show circumstances such as whether the victim's family opposes the inmate living in their county or to show the effect of the crime. However, referring to the nature of the crime and how the then nineteen (19) year old offense had previously affected the family, again relies on immutable facts, and does not provide any evidence regarding the inmate's current dangerousness to society.

Similarly, *Penal Code* §3042(a) merely requires that notice be given to the District Attorney about the hearing. It does not enable the District Attorney to provide evidence against release, nor is any statement given by the District Attorney under oath or evidence of any sort. The Board did not give any explanation as to how the District Attorney's opposition is evidence of Mr. Rush's current dangerousness. Again, the District Attorney's opposition is in relation to the nature of the offense, and as such, reliance is on the commitment offense, not any separate evidence, to support denial. Furthermore, permission from either the District Attorney or victim next of kin is not a prerequisite to the Board granting parole. Accordingly, opposition by both the District Attorney and the next of kin does not provide any evidence that Mr. Rush is a current and unreasonable danger to society, and cannot supply an independent basis for the denial.

Furthermore, in *Weider*, the court specifically addressed this issue. (*Weider, supra*, 145 Cal.App.4th at 590.) It noted that the court is bound to consider such opposition (*Cal. Pen. Code* §§ 3042, 3043), however, the court concluded "the opposition cannot add weight where there is no evidence of unsuitability to place in the balance." (*Id.*) Thus, because the record provided no evidence of unsuitability, the opposition by

88

the District Attorney and the victim's next of kin provided no weight to that evidence. (*Id.*) Likewise, in the present case, the opposition given by the District Attorney and the victim's next of kin cannot provide any weight to justify parole, because no evidence exists to support Mr. Rush is a current and unreasonable danger to society.

### VI.    THE BOARD OF PRISON TERMS HAS IMPLEMENTED AN UNLAWFUL POLICY AND PRACTICE OF DENYING PAROLE TO VIRTUALLY ALL INDETERMINATE-TERM PRISONERS.

The Board's decision in Mr. Rush's case is the result of a politically inspired categorical rejection of parole for virtually all inmates with indeterminate sentences. This unlawful policy has the objective of keeping as many indeterminate-term prisoners incarcerated for as long as possible, without regard to the appropriateness or lack thereof of the continued incarceration of the individual. The reason for this policy is simple: For the Board, appointed by the Governor, the purpose is to not appear "soft on crime," thus assuring their reappointment to a very lucrative job. As former Governor Pete Wilson was quick to point out to corrections officials and anyone else in the chain, nothing will destroy a politician's career faster than being labeled as soft on crime.[50]

The evidence has become overwhelming that the Board has adopted the former Governors' unlawful policy that denies virtually all life and term-to-life prisoners a fair hearing by failing to afford these inmates the presumption of parole suitability required under *Penal Code* §3041 and by ignoring the mandate of §3041 that parole "shall normally" be granted. (See *McQuillion I, supra,* 306 F.3d at pp. 901-902.) Under this policy, persons convicted of parole eligible murders are unable to get paroled in the manner required by law. On May 19, 2005, Judge Lawrence K. Karlton, Senior Judge of the United States District Court, Eastern Dist., California, adopted *in full* the December 21, 2004, findings and recommendations of Federal Magistrate Judge Peter Nowinski, declaring that the Respondent had presented no defense to the Petitioner's allegations that a no-parole policy is evidenced by the following:

---

[50]    Pete Wilson was also quick to tell corrections and parole officials that he did not want a "Willie Horton" to destroy his political chances to become President. Michael Dukakis' chances of winning the presidency were destroyed when Willie Horton, a Massachusetts prisoner when Dukakis was Governor, committed another very serious crime while released on furlough.

1. The Governor appointing Board members less likely to grant parole and more willing to disregard their statutory duty;
2. The removal of Board members more likely to grant parole;
3. Reviewing decisions finding a prisoner suitable and setting a new hearing before a different panel;
4. Scheduling rescission hearings for prisoners who had been granted a parole date.
5. Re-hearing favorable rescission proceedings and hand-picking panels to ensure the desired outcome;
6. Panel members agreeing upon an outcome in advance of the hearing; and
7. gubernatorial reversal of favorable parole decisions.

(Exh. FFF, *Coleman v. Board of Prison Terms*, E. Dist. Cal., Case No. CIV S-96-0783 LKK, May 19, 2005; See also Exh. GGG, *Martin v. Marshall* (N.D.Cal. 2006) 431 F.Supp.2d 1038 [Adopting in full the findings in Coleman.)[51] Petitioner requests that this Court take judicial notice of the *Coleman* and *Martin* decisions and the findings made against the Executive Branch therein.

The *Coleman* court concluded "Petitioner presents a convincing case that a blanket policy against parole for murderers prevented him from obtaining a parole suitability determination made after a fair hearing. Respondent offers nothing to counter petitioner's showing." (Exh. FFF, at p. 372.) The evidence of the no-parole policy during the past 15 years is pervasive. As an example, in April 1999, former Governor Davis talked to a reporter who described the interview as follows:

> "The Governor was adamant that he believes murderers – even those with second-degree convictions – should serve at least a life sentence in prison. Asked whether extenuating circumstances should be a factor in murder sentences, the Governor was blunt: 'No. Zero,' he said . . . The Governor, a political centrist, said he may surprise followers who expect him to be a more traditional Democrat. 'They must not have been listening when I was campaigning,' Davis said. 'If you take someone else's life, forget it. I just think people dismiss what I said in the campaign as either political hyperbole or something that I would back away from ...We are doing exactly what we said we were going to do." (Exh. FFF, pp. 367-368; Exh. MMM, pp. 393-394.)

Former Governor Davis never denied making these statements, nor did he ever disavow them. During Governor Davis' term as governor, the Board held over 15,000

---

[51] As previously indicated, the evidence relied on by the District Court in *Coleman* is in the possession of Petitioner's counsel, but is quite extensive, and thus has not been provided at this time. However, it is available and can be submitted supplementally should the Court desire.

parole hearings and granted parole to only 286 inmates serving indeterminate sentences for first or second degree murder. Of those 286, all but eight (8) grants of parole were reversed by the former Governor.

The first one was the case of Rose Ann Parker, who had killed her boyfriend at a time when battered woman syndrome (BWS) was not a defense in California, and had it been a defense, the former Governor believed she would have been acquitted. The former Governor's decision to allow Parker's release occurred in September 2000, long after the *Ramirez* and *Rosenkrantz* petitions were filed and long after the Governor's policy had become a subject of public scrutiny. The second case, Cheryl Sellers, is also a case where a woman was convicted at a time when BWS was not available as a defense. Similarly, the third case of Maria Suarez also involved BWS, however it could not be proven in court. The governor noted this, but relied on a report by a BWS expert who said that Ms. Suarez was definitely a victim of BWS. The fourth case was Chu Ly, who after being victimized by what was likely a hate-crime, killed a vandal who had been repeatedly terrorizing his neighborhood. The governor relied heavily on the unusual fact that all the original trial participants, including the presiding Superior Court Judge in the case, supported Mr. Ly's release.[52]

The fifth case was Richard Kemp, who after ingesting $3000 worth of cocaine bludgeoned his friend to death. While incarcerated in San Quentin, Mr. Kemp was one of the founders of IMPACT, a fatherhood awareness and accountability program that has since branched out to other prisons. Governor Davis was influenced by Mr. Kemp's parole plans which included establishing the much needed program in other prisons.[53] The sixth case was Gale Sawvell, an ex-police officer who, while in a drunken state, shot a man who was threatening him outside of his home. The Governor was persuaded by the

---

[52] Of course, such support is not unprecedented, but using the support to justify a release is actually itself unusual. For example, in the 1976 Chowchilla kidnapping, a case where none of the victims were physically injured, both the trial judge and the appellate justices who wrote the two case opinions, have written to the Board on numerous occasions. Each have stated as early as 1985 that the defendant has served long enough in prison. Even the district attorney who prosecuted the case is supportive of release and has written to the Board to urge parole.

[53] One of the other founders was Edward Ramirez, of *In re Ramirez, supra,* 94 Cal.App.4th 549. Yet, Davis took Ramirez' date.

unprecedented support Mr. Sawvell received from law enforcement agencies from other states which offered to supervise him upon release.[54]

The seventh case was Soila Gracia who was angry at her boyfriend and shot him in the leg. Ms. Gracia then transported her boyfriend to the hospital where his leg was amputated. A few days later, during a subsequent surgery to close the skin around the amputation site, the victim suffered a cardiac arrest and died. The Governor concluded that Ms. Gracia had programmed well, and that the death was the result of the "unique circumstances of the crime." The eighth case was Stephanie Allen, who pled guilty to the second degree murder of her father. Ms. Allen, at the multiple requests of her mother, hired a friend to kill her father. The Governor noted that "Ms. Allen was not the key player in this murder. By all accounts, that role belongs to her mother." Former Governor Davis further noted that the judge who presided over Ms. Allen's proceedings supports parole.

However, the fact that only these extremely select few have been granted parole clearly shows that the Executive Branch is not applying the statutory *presumption* of parole suitability and is further failing to follow the mandate of §3041 that parole *"shall normally"* be granted.

The no-parole policy does not begin and end at the Governor's office, however. Former Governor Davis made it clear that he expected his political appointees to carry out his policies, not necessarily the law. The unlawful policy was recognized in the following article:

> "At a recent Washington, D.C., breakfast with California reporters, [Gov.] Davis said judges' decisions should reflect his policies. And if that weren't enough, he said those who cannot do that *should resign.*
>
> "'They are not there to be independent agents,' he told reporters. 'They're there to reflect the sentiments that I expressed in the

---

[54] The Governor found it "extraordinary" and persuasive that law enforcement personnel were willing to support and assist Mr. Sawvell. However, Edward Ramirez also had a similar offer from a thirty (30) year veteran of the San Francisco Police Department, which the governor did not find "extraordinary." The officer had worked with Eddie Ramirez in the S.Q.U.I.R.E.S. program and found him to be a remarkable person. The officer told the BPT that Eddie Ramirez could live with him and that he would look after him. (See generally *Ramirez, supra,* 94 Cal. App. 4th 549.) A copy of the letter is available for any evidentiary hearing.

campaign.'" (See Exh. JJJ, p. 395.)

This statement readily applies to all BPT commissioners, who have quasi-judicial powers under the Executive Branch of government, and reflects the expectation that the Board Commissioners will render decisions consistent with their employer's political expediency in mind. This is not consistent, however, with the process due and guaranteed by the constitution. The evidence that the former Governor's no-parole policy is reflected in the actions of the Board is not hard to find. An examination of the make-up of the 12-Commissioner Board of Prison Terms and their political/employment history reveals a clear bias toward law enforcement and punishment, not the dictate of rehabilitation and reformation prescribed by law.

The composition of the Board fails to comply with the diversity dictated by *Penal Code* §5075 and has the appearance of reflecting a group of commissioners willing to comply with the governor's unlawful policy. In furtherance of the governor's policy, the Board Commissioners, who depend on the graces of the Governor for their $100,000 per year employment, have developed a policy that illegally denied Petitioner his constitutional right to due process and right to be free of arbitrary decision-making. (See *Ramirez, supra,* 94 Cal.App.4[th] at p. 549.)

Thus, the evidence will show that the Executive Branch has developed a policy that has illegally denied Petitioner his freedom. It is understandable that there would be a reluctance to find that the Board and former Governor are discharging their duties in an unlawful and unconstitutional manner. While the Executive Branch would like to pretend the problem does not exist, and avoid the fallout that such a finding would entail, it is important to note that neither Petitioner, nor the Legislature, nor the Courts have created this problem. The Board, and the past governors, created this problem. (See Exh. FFF, *Coleman v. Board of Prison Terms, supra.*) The courts now have a constitutional obligation to ensure compliance with Petitioner's right to due process of law.

### VII.    REQUEST FOR EVIDENTIARY HEARING

One potential issue exists for an evidentiary hearing. If "some evidence" is found, a hearing is requested to establish the existence of an unlawful policy of the Executive Branch to deny parole, at which the Coleman Exhibits, Governor's decisions, declarations re crime based denials and statistical information regarding denials and the usage and reliance on crime based findings, can be submitted to the Court.

Dated: 1/30/07                              Respectfully Submitted,

LAW OFFICE OF PICONE & DEFILIPPIS


By:_____
STEVE M. DEFILIPPIS
Attorneys for Petitioner,
ROBERT DALTON RUSH

94

PROOF OF SERVICE BY MAIL
(1013a)  (2015.5 CCP)

| | | |
|---|---|---|
| STATE OF CALIFORNIA | ) | In Re Robert Rush |
| | ) | Case No. |
| COUNTY OF SANTA CLARA | ) | |

      I am now and at times herein mentioned have been a citizen of the United States, over the age of eighteen years, employed in Santa Clara County, California, and not a party to the within action or cause; that my business address is 625 North First Street, San Jose, California 95112; that I served copies of the:

### *PETITION FOR WRIT OF HABEAS CORPUS & APPENDIX*
### *IN SUPPORT OF PETITION VOL I & VOL II*

by placing said copies in an envelope addressed to:

      San Bernardino Superior Court
      Attn: Clerk's Office
      351 North Arrowhead
      San Bernardino CA 92415

      Heather Bushman
      Attorney General's Office
      P.O. Box 85266
      San Diego CA 92186

      Robert Rush D-73321
      P.O. Box 689 B-327
      Soledad, CA 93960-0689

which envelope was then sealed and, with postage fully prepaid thereon, was on January 30, 2007, deposited in the United States mail at San Jose, California; that there is delivery service by the United States mail at the place so addressed, or that there is regular communication by mail between that place of mailing and the place so addressed.

      I declare under penalty of perjury that the foregoing is true and correct.

      Executed on January 30, 2007, at San Jose, California.

                                      DARLENE HALICAN