**EXHIBIT 10**

RRC'D CLS DOCKETING

NOEMI

# IN THE SUPREME COURT
## OF THE STATE OF CALIFORNIA

In re

ROBERT DALTON RUSH

        Petitioner,

        On Habeas Corpus

_____/
BOARD OF PAROLE HEARINGS,
ARNOLD SCHWARZENEGGER,
Governor,

        Real Parties in Interest.

_____/

Case No.

[San Bernardino Co. Sup. Court Nos.
SCR 44594 &  SWHSS9037; Fourth
District Court of Appeal No. E042268]

---

## PETITION FOR REVIEW

---

STEVE M. DEFILIPPIS
State Bar No. 117292
PICONE & DEFILIPPIS
625 N. First Street
San Jose CA 95112
(408) 292-0441

Attorneys for Petitioner,
ROBERT DALTON RUSH

TABLE OF CONTENTS............................................................i

TABLE OF AUTHORITIES......................................................iii

ISSUES PRESENTED FOR REVIEW............................................1

NECESSITY FOR REVIEW......................................................2

STATEMENT OF THE CASE....................................................3

LEGAL ARGUMENT............................................................6

I.  THE SOME EVIDENCE STANDARD IS CONTRARY TO CLEARLY ESTABLISHED U.S. SUPREME COURT LAW.....6

II.  THIS COURT SHOULD REVIEW THE ADEQUACY OF THE REGULATORY CRITERIA, AS IMPACTED BY THE DANNENBERG DECISION, AS THE BOARD IS BASING ITS RULINGS ON UNCONSTITIONALLY VAGUE LANGUAGE. .7

III.  THE BOARD'S CONCLUSION THAT MR. RUSH POSES AN UNREASONABLE RISK OF DANGER TO THE PUBLIC DUE TO THE NATURE OF HIS COMMITMENT OFFENSE IS NOT SUPPORTED BY SOME RELIABLE EVIDENCE AND VIOLATES MR. RUSH'S FIFTH AND FOURTEENTH AMENDMENT DUE PROCESS RIGHTS.......................12

A.  THE COMMITMENT OFFENSE LACKS ANY INDICIA OF RELIABILITY IN ESTABLISHING CURRENT DANGEROUSNESS UNDER THE RECENT INTERPRETATIONS OF THE BIGGS STANDARD....12

B.  THE BOARD'S CONCLUSION THAT MR. RUSH POSES AN UNREASONABLE RISK OF DANGER TO THE PUBLIC DUE TO THE NATURE OF HIS COMMITMENT OFFENSE IS NOT SUPPORTED BY SOME RELIABLE EVIDENCE...............16

C. MR. RUSH'S PAROLE DENIAL IS NOT SUPPORTED BY ANY NON-OFFENSE FACTOR....................18

D. PETITIONER IS SUITABLE FOR PAROLE UNDER EACH AND EVERY ONE OF THE REGULATORY FACTORS IN CAL. CODE REGS. TIT. 15 §2402(d)....................................................20

IV.    DENYING MR. RUSH PAROLE OFFENDS THE RULES ANNOUNCED BY THE US SUPREME COURT IN APPRENDI, BLAKELY AND CUNNINGHAM. ...................................21

V.    THE BOARD OF PRISON TERMS HAS IMPLEMENTED AN UNLAWFUL POLICY AND PRACTICE OF DENYING PAROLE TO VIRTUALLY ALL INDETERMINATE-TERM PRISONERS AND THEREFORE HAVE DENIED MR. RUSH HIS FEDERALLY PROTECTED LIBERTY INTEREST IN PAROLE...................................................................................23

CONCLUSION...............................................................................25

CERTIFICATE OF WORD COUNT.........................................................26

STEVE M. DEFILIPPIS
State Bar No. 117292
PICONE & DEFILIPPIS
625 N. First Street
San Jose CA 95112
(408) 292-0441

Attorneys for Petitioner,
ROBERT DALTON RUSH

## IN THE SUPREME COURT
## OF THE STATE OF CALIFORNIA

In re

ROBERT DALTON RUSH,

      Petitioner,

      On Habeas Corpus.

_____/

BOARD OF PAROLE HEARINGS,
ARNOLD SCHWARZENEGGER,
Governor,

      Real Parties in Interest.

_____/

Case No.

***PETITION FOR REVIEW***

      Petitioner, Robert Dalton Rush, a state prison inmate, by and through his attorney, Steve M. Defilippis, hereby petitions this Honorable Court for review, and respectfully alleges the following:

### ISSUES PRESENTED FOR REVIEW

  I.   DOES THE ABSENCE OF ANY AVAILABLE ADMINISTRATIVE APPEAL REQUIRE A HEIGHTENED LEVEL OF REVIEW BY COURTS OF PAROLE DENIALS?

  II.  SHOULD PAROLE DENIALS BE REVIEWED UNDER THE "SOME EVIDENCE" OR "SUBSTANTIAL EVIDENCE"

STANDARD?

III. IS THE BOARD'S "ESPECIALLY HEINOUS, ATROCIOUS, AND CRUEL" LANGUAGE OF THE REGULATIONS GOVERNING PAROLE UNCONSTITUTIONALLY VAGUE, EITHER ON ITS FACE OR AS APPLIED THROUGH THE "MORE THAN MINIMALLY NECESSARY TO CONVICT" LANGUAGE?

IV. AFTER THE PASSAGE OF TWENTY (20) YEARS, DOES THE MERE FACT OF THE CRIME PROVIDE ANY FACTUAL SUPPORT FOR THE BOARD'S FINDING THAT MR. RUSH CURRENTLY POSES AN UNREASONABLE RISK OF COMMITTING FUTURE VIOLENT ACTS, WHEN ALL NON-CRIME EVIDENCE INDISPUTABLY SHOWS THAT HE PRESENT NO APPRECIABLE RISK ON PAROLE?

V. EVEN IF THERE EXISTS "SOME EVIDENCE" THAT THE CRIME CAN BE CHARACTERIZED AS "PARTICULARLY EGREGIOUS," AT WHAT POINT DOES THE REPEATED RELIANCE ON THE COMMITMENT OFFENSE VIOLATE DUE PROCESS?

VI. CAN THIS UNCOMPLICATED SECOND DEGREE MURDER FAIRLY BE FOUND TO CONSTITUTE A PARTICULARLY EGREGIOUS OFFENSE?

VII. WHERE THE UNCONTRADICTED EVIDENCE FAILS TO SUPPORT ANY OF THE REMAINING NON-CRIME UNSUITABILITY FACTORS, CAN A REFUSAL TO SET A DATE STAND?

VIII. WHERE THE UNCONTRADICTED EVIDENCE SHOWS PETITIONER TO BE SUITABLE FOR PAROLE UNDER EACH AND EVERY ONE OF THE SUITABILITY FACTORS IN CAL. CODE REGS, TIT. 15 §2402(d), CAN PAROLE BE REPEATEDLY DENIED BASED ON THE CRIME?

IX. DO THE FINDINGS THAT THE BOARD MADE REGARDING MR. RUSH'S CRIME VIOLATE THE RIGHT TO A JURY TRIAL UNDER THE *APPRENDI-BLAKELY-CUNNINGHAM*[1] RULE [FINDINGS WHICH TAKE A CASE OUT OF THE ORDINARY SENTENCE RANGE MUST BE PROVEN OR ADMITTED]?

X. HAS THE BOARD OF PAROLE HEARINGS IMPLEMENTED AN UNLAWFUL POLICY OF DENYING PAROLE TO VIRTUALLY ALL INDETERMINATE-TERM PRISONERS, THEREBY DEPRIVING THEM OF THEIR FEDERALLY PROTECTED LIBERTY INTEREST IN PAROLE?

## *NECESSITY FOR REVIEW*

The issues raised by this petition fall squarely under California Rule of the Court 29(a)(1) in that they are of statewide import, in a rapidly evolving area of law, raising significant constitutional issues that are applicable to the large number of habeas corpus proceedings that are currently pending in the courts throughout the state challenging denials

---

[1] *Apprendi v. New Jersey* (2000) 530 U.S. 466; *Blakely v. Washington* (2004) 542 U.S. 296; *Cunningham v. California* (2007) 127 S.Ct. 856.

of parole. For the reasons discussed it is respectfully submitted that the questions presented herein need to be resolved in order to assist trial courts in deciding future habeas petitions in the parole context.

## STATEMENT OF THE CASE

Despite having programmed in a perfect manner throughout the last twenty (20) years of incarceration, his having received extensive support for being paroled, and having been confined for nine (9) years past his minimum term, Mr. Rush has now been denied a parole date at each of his five (5) consecutive parole hearings,[2] a result that is directly contrary to the facts of his case, and violates his due process rights in light of his unquestionable rehabilitation. More to the point, Mr. Rush has been incarcerated longer than would be appropriate for any second degree murder. These denials of parole have put the state in breach of its legal and constitutional obligations.

The Board's reliance on the nature of the commitment offense to deny parole is grossly unfounded. The commitment offense is a second degree murder, and Mr. Rush's actions were indisputably the result of significant stress in his life. Shortly before the offense, he was a passenger in a fatal motorcycle accident, where he was severely injured and his friend was killed. (Exh. DDD, p. 361.) Mr. Rush was thrown from the motorcycle when it was hit after a semi-truck drove through a stop sign. (*Id.*) He sustained a severe concussion, dislocated ankle, broken ribs, punctured/collapsed lung, fractured right tibia and fibula, neurological injuries, contusions, abrasions, and a chipped tooth. (*Id.*) He was in the hospital for over two weeks and then confined to a bed for an additional month. (*Id.*) The stress from this accident had an enormous impact on Mr. Rush's life, he experienced depression and nervousness and was unable to function independently due to his injuries. At the time of the offense, Mr. Rush had not fully recovered from his weakened physical and mental state when he was assaulted by his larger and far more fit roommate. These

---

[2] The second subsequent (3rd actual) hearing was originally heard on August 19, 2002. However, because of a claim that two (2) separate and independent tapes malfunctioned and could not be transcribed the hearing was reheard on March 5, 2003. Thus, the delay in hearing effectively gave Mr. Rush a three (3) year parole denial even though the prior Board only gave him a two (2) year denial.

circumstances of the life term offense must be considered, and it must be done in a way that meaningfully addresses whether he continues to present an unreasonable risk of danger to society if paroled. (*In re Scott [Scott II]* (2005) 133 Cal.App.4th 573, at 594-595; *In re Ernest Smith* (2003) 114 Cal.App.4th 343.) Under this type of evaluation, the conclusion is inescapable that this life offense is not "particularly egregious" or among the "gravest" of such offenses, especially when viewed from the standpoint of Mr. Rush's mental state at the time of the crime, and considering his dramatic transformation the last twenty (20) years.

Additionally, what seems to be repeatedly ignored in this case is the fact that Mr. Rush was only twenty-one (21) years of age at the time of the commitment offense. Recently, in *Roper v. Simmons* (2005) 543 U.S. 551, the Supreme Court went through a comprehensive analysis of why juveniles who commit crimes should be treated in a much more lenient fashion than adults, with a focus on rehabilitation rather than punishment. In fact, the court in the recent decision, *Rosenkrantz v. Marshall* [hereafter "*Rosenkrantz VI*"][3] (C.D. Cal. 2006) 444 F. Supp.2d 1063, 1085, applied the concepts from *Roper* to an eighteen (18) year old murder defendant, like Mr. Rush, who had served just under twenty (20) years for his crime. The court, in *Rosenkrantz VI*, concluded the defendant's age at the time of the offense further diminished the reliability of the facts of the crime as a predictor of his current dangerousness. (*Id.* at 1085.) Clearly, these concepts apply to Mr. Rush herein.

This case also presents as one of the clearest examples of a violation of the rule announced by the Ninth Circuit in *Biggs v. Terhune* (9th Cir. 2003) 334 F.3d 910 that the Board of Prison Terms cannot continuously rely on the unchanging facts of the commitment offense to deny parole in the face of clear evidence of rehabilitation. As in

---

[3] The *Rosenkrantz* petitioner has been involved in six (6) decisions. *People v. Rosenkrantz* [*Rosenkrantz I*], 198 Cal.App.3d 1187, *In re Rosenkrantz* [*Rosenkrantz II*] (2000) 80 Cal.App.4th 409, *Davis v. Superior Court (Rosenkrantz)* [*Rosenkrantz III*], (Feb. 22, 2001, B146421) [non pub. opn.], *In re Rosenkrantz* [*Rosenkrantz IV*] (2002) 95 Cal.App.4th 358, *In re Rosenkrantz* [*Rosenkrantz V*] (2002) 29 Cal.4th 616, and the recent federal district court decision in *Rosenkrantz v. Marshall* [*Rosenkrantz VI*] (C.D. Cal. 2006) 444 F.Supp.2d 1063.

the *Biggs* case, and the subsequent published decisions of *Irons v. Warden*[4] (2005) 358 F.Supp.2d 936, *Rosenkrantz VI, supra,* 444 F.Supp.2d 1063 and *Martin v. Marshall* (N.D. Cal. 2006) 431 F.Supp.2d 1038, the courts have pointed out the continued use of immutable factors to deny parole (e.g. the commitment offense itself and pre-incarceration factors), without real evidence of current dangerousness, violates due process.    As recently determined by the California Court of Appeal, First District, "[r]eliance on such an immutable factor 'without regard to or consideration of subsequent circumstances' may be unfair." (*In re Scott* (2005) 133 Cal.App.4th 573, 594 [hereinafter "*Scott II*"] [citing *In re Smith* (2003) 114 Cal.App.4th 343, 372.]) Like *Scott II, supra,* the federal decisions of *Irons, supra, Martin, supra,* and *Rosenkrantz VI* show how the unchanging facts of the commitment offense progressively decline in probative value over the years, until eventually, in 19 and 23 years respectively, they no longer can rationally establish the sole issue of current dangerousness.

In short, there is not a scintilla of evidence to support a finding that Mr. Rush poses any kind of threat to the public as is required to support a denial of parole by the Board.    The Board's position is a scenario in which Mr. Rush's endeavor for freedom is futile and will forever be circumvented by the Kafkaesque logic presented by State representatives and upheld by the trial court.    *Penal Code* §3041 creates a presumption that a prisoner will have a parole release date set at his first hearing and that presumption can only be overridden by a finding of evidence that the prisoner poses a *real*, not merely perceived, and current danger to the public. (*Scott II, supra,* 133 Cal. App. 4th at 594-595; *In re Lee* (2006) 143 Cal.App.4th 1400, 1409; *In re Elkins* (2006) 144 Cal. App. 4th 475; See also *McQuillion v. Duncan* (2002) 306 F.3d 895, 901 [hereafter "*McQuillion I*"] ["The scheme creates a presumption that parole release will be granted."])[5] The Board is required

---

[4]  The *Irons* case is currently pending appeal in the Ninth Circuit.  However, the District Court decision remains published.

[5]  *McQuillion* involved a double murder, both in the first degree, committed execution style, occurring at the culmination of a spree of robberies.  Despite the egregious nature of his crimes, McQuillion was granted a release date at his initial hearing. Ultimately, the Ninth Circuit ruled that the crime was not a sufficient basis to take away his parole date.

to follow statutory guidelines regarding its authority to grant or deny parole and therefore must comply with the dictates of *Penal Code* §3041.

## *LEGAL ARGUMENT*

### I.    *THE SOME EVIDENCE STANDARD IS CONTRARY TO CLEARLY ESTABLISHED U.S. SUPREME COURT LAW.*

The lower courts have applied the wrong level of evidentiary review, based on a fundamental misunderstanding of the doctrine in *Superintendent v. Hill* (1985) 472 U.S. 445. That case held that ***because no standard of proof was dictated*** by the state of Massachusetts Department of Corrections regulations to support a finding of guilt in a disciplinary proceeding, due process only required the reviewing court find "some evidence" in the record to support the hearing officer's determinations. Thus, when evaluating what the judicial standard of review for parole denial decisions by the California Board of Prison Terms should be, the courts seemed to adopt, without much legal analysis, the "some evidence" standard of *Hill*. (*In re Rosenkrantz [Rosenkrantz II]* (2000) 80 Cal.App.4th 409, 427; *In re Ramirez* (2001) 94 Cal.App.4th 549, 564; *In re Rosenkrantz [Rosenkrantz V]* (2002) 29 Cal.4th 616.) However, the underlying premise on which *Hill* based the decision to apply a "some evidence" level of analysis, that no standard of proof is specified for those hearings, does not apply in California's parole hearing process.[6] Instead, under Federal Due Process principles, as enunciated in *McQuillion I, supra*, 306 F.3d at 901-902, the statutory language of *Cal. Pen. Code* §3041 creates a presumption of parole suitability, which then shifts the burden to the state to prove by a preponderance of the evidence that the inmate fits within the §3041(b) "public safety" exception to the mandatory duty to set a parole date. (*Cal. Evid. Code* §115.)[7]

---

[6] Note also that there is no longer an administrative (BPT 1040) appeal process and thus, even less checks on the Board's actions exist. That fact alone compels a heightened level of review.

[7] As a general rule, under California law, the comparative degree of proof by which a case must be established is the same before an administrative agency as in a judicial proceeding, which in the absence of a contrary rule is a preponderance of the evidence. (*Cal. Evid. Code* §115; 2 Cal. Jur. 3rd §526; *Ettinger v. Board of Medical Quality Assurance* (1982) 135 Cal.App.3d 853;

Thus, the reason upon which the rule of *Hill* was based does not even exist, and the "some evidence" standard is therefore inappropriate and results in the total erosion of the due process rights of inmates who have clearly earned the right to parole by their exemplary behavior in prison. As such, this Court should hear the issue of what the correct standard of review should be in a parole denial case, and re-evaluate the rules stated in *Rosenkrantz V* and *Dannenberg*.

## II. THIS COURT SHOULD REVIEW THE ADEQUACY OF THE REGULATORY CRITERIA, AS IMPACTED BY THE DANNENBERG DECISION, AS THE BOARD IS BASING ITS RULINGS ON UNCONSTITIONALLY VAGUE LANGUAGE.

In evaluating an inmate's suitability for parole, the Board is only permitted to come to a finding of unsuitability if the inmate currently presents an unreasonable risk of danger to society if paroled. (*Cal. Code Regs.*, tit. 15, §2281 (a); *Scott II, supra*, 133 Cal.App.4[th] at 594-595.) The regulations only permit such a finding to be based on the crime if the offense is "especially heinous, atrocious or cruel." (*Cal. Code Regs.*, tit. 15, §2402 (c)(1).) That term is further defined by the regulatory criteria as applying only when the murder is of a particularly egregious type, fitting certain defining principles set out in the regulations. However, as applied by the Board, these criteria are overly vague, leaving inmates unable to determine if the criteria should properly apply to their particular offense.

Furthermore, the standard enunciated by this Court in *Dannenberg* worsened the problem, as it permitted parole denials based solely upon the crime so long as facts exist that are "more than minimally necessary to convict" the inmate of the offense in question, irrespective of whether the offense meets the regulatory criteria for particularly egregious murders under 2402(c)(1). Here, the Board denied Mr. Rush's parole at his hearing, based solely upon the crime, stating that his crime was "particularly callous and cruel," "dispassionate and [it] didn't have to happen," and it was carried out with a "callous

---

*Gardern v. Commission of Professional Competence* (1985) 164 Cal.App.3d 1035 (1985); *Copper Mining Co. V. Industrial Acc. Com.* (1920) 183 Cal. 714, 192.)

disregard for human suffering." (Exh. AAA, p. 88.) None of these findings are even based on the actual regulatory language.

A statute (or regulation) is void for vagueness "if it fails to give adequate notice to people of ordinary intelligence concerning the conduct it proscribes, or if it invites arbitrary and discriminatory enforcement." (*United States v. Doremus* (9th Cir. 1989) 888 F.2d 630, 634.) In addressing a vagueness challenge, the first question is "whether to scrutinize the statute for intolerable vagueness on its face or whether to do so only as the statute is applied in a particular case." (*Schwartzmiller v. Gardner* (9th Cir. 1984) 752 F.2d 1341, 1346. As will be discussed herein, the factors set forth in *Cal. Code Regs.*, tit. 15 §2402(c) to determine whether the crime was an "especially heinous, atrocious or cruel," as applied, are purely subjective, and are unconstitutionally vague. As such, these factors are not easily understood or explained, and thus, Mr. Rush did not have notice that they would apply to him.[8]

This Court in two (2) separate opinions discussed the standards the Board may use in finding a prisoner unsuitable for parole based on the circumstances of his commitment offense. (See *Rosenkrantz V, supra*, Cal.4th 616; *In re Dannenberg, supra*, 34 Cal.4th 1061.) In *Rosenkrantz V*, this Court held that "the nature of the prisoner's offense, alone, *can* constitute a sufficient basis for denying parole." (*Rosenkrantz V, supra*, 29 Cal.4th at 682, emphasis added.) The *Rosenkrantz V* decision employed conditional language that the offense "can" constitute such a basis, but only if the crime could reasonably be considered *more* aggravated or violent than the minimum necessary to sustain a conviction for that offense, meaning the crime had to be particularly egregious compared to other murders so that the exception of 3041(b) would not "swallow the rule" that parole "shall normally" be granted. (*Id.* at 683, emphasis added.) Although the *Rosenkrantz V* language itself can lead to the regulations being interpreted in a manner that would render them unconstitutionally vague, the Court in that decision did at least

---

[8] This Court has determined in cases involving the death penalty or life without the possibility of parole, that the terms "especially heinous, atrocious, or cruel, manifesting exceptional depravity" are unconstitutionally vague, in violation of fundamental due process. (*The Superior Court of Santa Clara v. Engert* (1982) 31 Cal.3d 797, 805.)

state a directive that sole reliance on the commitment offense will violate the prisoners' due process rights pursuant to *Penal Code* §3041(a) in situations where the offense "could [not] be considered *more* aggravated or violent than the minimum necessary to sustain a conviction for that offense" and was therefore "particularly egregious." (*Rosenkrantz V, supra*, 29 Cal.4[th] at 683.) The language requiring that the offense be "particularly egregious" was understood to mean that the offense stood out among second degree murders as being dramatically more violent.  (See *e.g., In re Ernest Smith, supra*, 114 Cal.App.4[th] 343.)

However, under respondent's interpretation of *Dannenberg*, the standard set forth in *Rosenkrantz V* is dramatically changed, allowing the Board to deny parole based on the commitment offense, without regard for its comparative egregiousness, solely because they can "point to some evidence" that the crime was merely "more than minimally necessary to convict him of the offense for which he is confined." (*In re Dannenberg, supra*, 34 Cal.4[th] at 1095.)[9]  This would fundamentally alter the standard by removing the focus from determining whether the crime was "especially heinous, atrocious and cruel"  and rationally shows current dangerousness, so long as there is simply more evidence than "minimally necessary to convict."  This formulation would then take the place of determining whether the crime was egregious under the regulatory standards of *Cal. Code Regs.*, tit. 15, §2402(c)(1), on which inmates routinely rely to evaluate whether their particular crime could potentially take them outside the standards of suitability.  *Scott II, supra*, clarified the basic holding in *Dannenberg*, concluding that the crime "*can*" justify a parole denial, but only where it rationally shows current dangerousness, in light of the reduced probative value that the crime naturally has after the passage of time.  All of the recent case law has followed this reasoning. (*Martin, supra*, 431 F.Supp.2d at 1047-1048; *Rosenkrantz VI, supra*, 444 F.Supp.2d at 1047-1048.; *Lee, supra*, 143 Cal.App.4[th] at 1409 and *Elkins, supra*, 144 Cal.App.4[th] at 519.) Of

---

[9]  As the dissent in *Dannenberg* pointed out, viewing the standard in this light makes it completely unreviewable. (*Dannenberg, supra*, 34 Cal.4[th] at 1102.)

course, the Board did not extend to Mr. Rush the benefit of the wisdom of *Scott II* and its progeny.

As noted by the dissent in *Dannenberg*, utilizing this standard in the way currently being applied by the Board, without the caveat of *Scott II* and the cases following its rule, makes the Board's decision *completely* unreviewable. (*Id.* at 1102, emphasis added.) The result is a definition, or standard, that like the Greek god Proteus, constantly changes shapes, is never consistent and is incapable of being defined. What is callous or heinous, under this view of the standard, to one Board member may not be such to another. However, this Court made it clear in *Dannenberg* that there was no intent to alter the *Rosenkrantz V* (*Dannenberg, supra,* 34 Cal.4[th] at 1094), and *Scott II* helped to clarify that crime based denials still needed to be closely monitored, and that the law still retained the fundamental requirement that the focus be on the regulatory standards and their ability to show, despite the passage of time, that the inmate is *currently* still presenting an unreasonable risk of danger to society if paroled. (*Scott II, supra,* 133 Cal.App.4[th] at 594-595; *Lee, supra,* 143 Cal.App.4[th] at 1409.) While this Court in *Dannenberg* held that the offense need not be compared to other murders *for proportionality purposes*, the Board seizes on that language to avoid comparisons for *any* purpose, even evaluating whether the crime fits under the indisputably comparative language of the regulations, §2402(c)(1) ("*especially* heinous..." or "*exceptionally* callous disregard...," etc., emphasis added). Thus, under their view, the standard can be said to fit any murder, including accomplice liability, DUI based car accident, non-intentional (implied malice) killings, and the like.

Applying the rule announced by the United States Supreme Court, there is nothing in the language and descriptions used in § 2402(c)(1) ["especially heinous, atrocious and cruel"] that standing alone "implies any inherent restraint on the arbitrary and capricious" denial of parole suitability, and that a "person of ordinary sensibility could fairly characterize almost every murder as [especially heinous, atrocious, cruel or callous]." (*Godfrey v. State of Georgia* (1980) 446 U.S. 420, 428-429.) The Court thus determined that for death penalty purposes, the terms "especially heinous, atrocious or cruel" are

unconstitutionally vague. (*Maynard v. Cartwright* (1988) 486 U.S. 356, 361-364; *Shell v. Mississippi* (1990) 498 U.S. 1, 3; *Godfrey, supra*, 446 U.S. 420, 428-429.) As previously discussed, this Court has also found that these terms are unconstitutionally vague in **both** death penalty cases and life without the possibility of parole (LWOP). (*Superior Court of Santa Clara County v. Engert* (1982) 31 Cal.3d 797, 805.) However, the paroling authority is using those terms to repeatedly deny parole, effectively converting parole eligible sentences into an LWOP. Thus, the use of those terms here is even more insidious. Mr. Rush's sentence is indisputably parole eligible, yet the use of the unconstitutionally vague terms repeatedly to deny parole based solely upon the commitment offense is effectively increasing his sentence to LWOP, a parole ineligible sentence. In other words, the same result occurs without the same protections.

Thus, the analysis must start from the premise that the regulatory language is already unconstitutionally vague, by its reliance on the phrase "especially heinous, atrocious and cruel." (*Cal. Code Regs*. tit. 15, §2402(c)(1).) However, rather than attempting to establish a definition that would serve to correct, or at least mitigate, the problem, respondent seeks to eviscerate the standard altogether, proffering an unworkable definition and substituting it for the regulatory criteria of "especially heinous, atrocious and cruel." Respondent urges, under *Dannenberg*, that the regulatory criteria are satisfied merely by the Board "point[ing] to some evidence." As previously discussed, any murder can fit this standard, and if adopted, the regulatory terms will entirely lose their ability to distinguish the more egregious murders from those of a comparatively lesser seriousness. Furthermore, respondent's version of the standard does not make any effort to discern whether the presence of evidence that is "more than minimally necessary to convict" has any tendency in reason to establish the sole focal question in parole suitability: does the inmate currently present an unreasonable risk of danger if paroled? (*Cal.Code Regs*., tit.15, §2402(a); *Scott II, supra*, at 594-595.) As such, adopting this view of the *Dannenberg* formulation renders the regulatory standards unconstitutionally vague. Thus, this Court should review the power of the Board to rely on such criteria.

11

### III.    THE BOARD'S CONCLUSION THAT MR. RUSH POSES AN UNREASONABLE RISK OF DANGER TO THE PUBLIC DUE TO THE NATURE OF HIS COMMITMENT OFFENSE IS NOT SUPPORTED BY SOME RELIABLE EVIDENCE AND VIOLATES MR. RUSH'S FIFTH AND FOURTEENTH AMENDMENT DUE PROCESS RIGHTS.

An indeterminately sentenced prisoner can only be denied parole when sufficient, reliable evidence establishes that one or more of the Board's regulatory provisions, *Cal. Code Regs.*, tit. 15, §2402(c) shows unsuitability. (*Scott II*, *supra*, 133 Cal.App.4th at 594-595.) The use of non-regulatory factors, or their unsupported use, to deny parole would violate the inmate's rights under the Due Process Clause of the Federal Constitution, as is occurring in this case.

### A.    THE COMMITMENT OFFENSE LACKS ANY INDICIA OF RELIABILITY IN ESTABLISHING CURRENT DANGEROUSNESS UNDER THE RECENT INTERPRETATIONS OF THE BIGGS STANDARD.

Repeated reliance by the Board or Governor on the unchanging circumstances of the crime as a reason for denying parole gives rise to a due process violation. (*Biggs v. Terhune* (9th Cir. 2003) 334 F.3d 910.) Several courts have now taken *Biggs* to its logical conclusion, finding that parole suitable inmates were receiving arbitrary *de facto* life sentences by the Board or Governor repeatedly denying suitable inmates parole based on the immutable facts of the offense or conduct prior to incarceration. For example, in the case of *In re Scott [Scott II]* (2005) 133 Cal.App.4th 573, the court concluded that "[t]he commitment offense can negate suitability only if circumstances of the crime reliably established by evidence in the record rationally indicate that the offender will present an unreasonable public safety risk if released from prison." (*Scott II*, 133 Cal.App.4th at 595.) The court went on to say that the Governor's statement that the gravity of Scott's offense is alone a sufficient basis to find him to be an unreasonable public-safety risk, "...***could be repeated annually until Scott dies or is rendered helpless by the infirmities of sickness or age.***" (*Scott II*, *supra*, 133 Cal.App.4th at 595, n. 8, emphasis added.) Thus the *Scott II* court concluded that the long passage of time resulted in the commitment offense no longer being a rational predictor of current dangerousness,

and therefore no longer "some evidence" of unsuitability. Finally, the case of *Irons v. Warden* (E.D. Cal. 2005) 358 F.Supp.2d 936 put it this way:

> "Petitioner has no hope for ever obtaining parole except perhaps that a panel in the future will arbitrarily hold that the circumstances were not that serious or the motive was more than trivial. Given that *no one* seriously contends lack of seriousness or lack of triviality at the present time, the potential for parole in this case is remote to the point of non-existence. Petitioner's liberty interest should not be determined by such an arbitrary, remote possibility." (*Irons*, 358 F.Supp.2d at 947, italics in original.)

The most recent pronouncements by the federal courts occurred in the last few months. In *Martin v. Marshall* (N.D. Cal. 2006) 431 F.Supp.2d 1038, parole applicant Martin was convicted of second degree murder for shooting to death Acosta, a person with whom he shared a prior drug dealing relationship, shooting him seven (7) times and then continuing to fire, killing one innocent bystander and injuring another innocent bystander with the excess gunfire. (*Id.* at 1040.) Fearing that he would be harmed as Acosta approached him in a restaurant, Martin shot Acosta seven times, and continued firing the gun after he "lost it," resulting in the death and injury to the bystanders. (*Id.*) He was sentenced to fifteen (15) years-to-life, plus a five (5) year enhancement. (*Id.*) At his fifth parole hearing, twenty-three (23) years later, the Board granted Martin parole. (*Id.* at 1041.) Governor Gray Davis reversed the grant of parole, stressing in part the gravity of the offense that he found demonstrated a callous disregard for human life and lack of remorse. (*Id.*) To support this assertion, Governor Davis cited Martin's flight from the scene without securing medical help, and his involvement with drugs at the time he committed the offense. (*Id.* at 1046.)

The court found that the Governor's reliance on the unchanging circumstances of the crime as grounds to reverse the Board's decision violated Martin's right to due process. The court reasoned that Martin's offense was impulsive in part, he had exceeded his sentence by approximately six years, and he had exemplary behavior and evidence of rehabilitation. (*Id.* at 1047.) Given the static nature of the offense compared against the evidence of Martin's rehabilitation and behavior that indicated no present threat, the court found the commitment offense provided no evidence to support the Governor's reversal.

Similarly, in *Rosenkrantz VI*, *supra*, 444 F.Supp.2d 1063, petitioner was sentenced to fifteen (15) years plus a two (2) year enhancement for second degree murder committed when he was eighteen (18) years old in 1985. (*Rosenkrantz VI* at 1065.) Petitioner, a homosexual, was confronted by his brother and his brother's friend, Redmond, who wished to prove that petitioner was gay. (*Id.*) While petitioner was at the family beach house on Friday with friends, his brother and Redmond, kicked in the door, calling the occupants "faggots," struck petitioner with a flashlight breaking his nose, and burned his hands with a stun gun. (*Id.*) Petitioner's father was then told that petitioner was homosexual, causing the father to kick petitioner out of the house. (*Id.*) Three days after the incident at the beach house, petitioner went to a shooting range where he rented an Uzi semiautomatic, nine-millimeter carbine gun, and contemplated committing suicide. (*Id.* at 1071-1072.) He ordered an Uzi from a sporting goods store on Monday that would be ready for pick-up on Wednesday.

On Tuesday, petitioner went to work, where he informed one coworker that he had purchased a gun and planned to kill his brother. (*Id.*) He also told another coworker that his brother and Redman had humiliated petitioner, and that he was obtaining a gun. (*Id.*) Petitioner picked up the gun on Wednesday, where he also purchased 250 rounds of ammunition. (*Id.*) On Thursday night, petitioner went to the condominium complex where Redmond lived, and attempted to locate his car. (*Id.*) Unable to locate his car, petitioner slept in his car overnight near the complex. (*Id.*) When Redmond was exiting the complex the next morning, petitioner blocked him with his own car. (*Id.*) After a brief exchange where Redmond refused to recant his statements that he made to Rosenkrantz's father, petitioner shot him at least ten (10) times, including six (6) wounds to the victim's head. (*Id.*) Petitioner fled for approximately one month before turning himself in. (*Id.*)

Relying on *Biggs*, *Irons*, and *Scott*, the *Rosenkrantz* court made two points in concluding Rosenkrantz was suitable for parole. "First, continued reliance upon the unchanging facts of petitioner's crime makes a sham of California's parole system and amounts to an arbitrary denial of petitioner's liberty interest." (*Id.* at 1081-1082.)

14

Following *Irons*, *Rosenkrantz* held that the Board's choice to ignore two decades of positive programming in favor of immutable facts was an arbitrary and capricious method of converting a minimum term into a life sentence. Both Rosenkrantz and Mr. Rush share many of the same features: far exceeding their minimum terms, remaining discipline-free, receiving multiple parole denials, and, by all accounts, presenting no current threat to the community. Upholding the Board's denial will result in a *de facto* life sentence.

The second due process violation comes from the court's finding that the predictive value of the crime was so diminished that it could not serve as "some evidence" to support the Board's finding of parole unsuitability. As the court put it,

> While relying upon petitioner's crime as an indicator of his dangerousness may be reasonable for some period of time, in this case, continued reliance on such unchanging circumstances-after nearly two decades of incarceration and half a dozen parole suitability hearings-violates due process because petitioner's commitment offense has become such an unreliable predictor of his present and future dangerousness that it does not satisfy the "some evidence" standard. ***After nearly twenty years of rehabilitation, the ability to predict a prisoner's future dangerousness based simply on the circumstances of his or her crime is nil.***

(*Id.* at 1082, emphasis added, citing *Johnson v. Finn* (E.D. Cal. 2006) 2006 WL 195159 ["[T]he seriousness of the crime had predictive value for the dangerousness of petitioner's release for the first, second, perhaps third suitability hearing. But as the years go by, this factor loses its predictive value in light of the growing experience to the contrary (assuming petitioner's record in prison is exemplary)"].)

As can be seen, the courts are no longer permitting the Board and Governor to deny parole based solely on the commitment offense when it is depleted in probative value by the passage of time, and can no longer indicate a present dangerousness, especially when juxtaposed against the factual reality of the positive evidence of rehabilitation shown during the subsequent years of incarceration. In those circumstances, the crime simply no longer constitutes evidence of current dangerousness. Petitioner clearly must prevail under these standards. He has been incarcerated longer

than Biggs, Irons, and Scott, and is on a par with Rosenkrantz. Although Martin has slightly more time in, he killed two (2) people. Mr. Rush has been incarcerated for over twenty (20) years, has exceeded his minimum term by nine (9) years, and has had multiple hearings like all of the aforementioned cases. His rehabilitation has also been proven to be as good as or better than the petitioners in those cases, yet he is continually denied parole based solely upon the commitment offense.

> **B.    THE BOARD'S CONCLUSION THAT MR. RUSH POSES AN UNREASONABLE RISK OF DANGER TO THE PUBLIC DUE TO THE NATURE OF HIS COMMITMENT OFFENSE IS NOT SUPPORTED BY SOME RELIABLE EVIDENCE.**

Even beyond the issue of the repeated reliance on the crime, there is an entire lack of any evidence to support the crime based findings. In order for a commitment offense to be "particularly egregious" and support parole denial, some relevant evidence must reliably show one or more of the factors listed in *Cal. Code Regs.*, tit. 15, section 2402(c)(1)(A)-(E) define its circumstances and show that Mr. Rush currently presents an unreasonable risk of harm if paroled. (*Scott II, supra,* 133 Cal.App.4[th] at 594-595.) Here, the Board attempted to support their conclusion by declaring that his crime was "particularly callous and cruel," "dispassionate and [it] didn't have to happen," and it was carried out with a "callous disregard for human suffering." (Exh. AAA, p. 88.) The Board did not even utilize the actual regulatory language ["carried out in a dispassionate and *calculated* manner, such as an *execution-style murder*," "carried out in a manner which demonstrates an *exceptionally callous* disregard for the life or suffering of another," and "[t]he motive for the crime is *inexplicable* or *very trivial* in relation to the offense]. (*Cal. Code Regs.*, tit. 15, §2403(c)(1)(B)(D)&(E), emphasis added.)

The law requires a two part determination to support a denial of parole. First, the evidence must consist of facts establishing the actual criteria set forth in the regulatory factor governing the finding at issue. Second, there must be a nexus between the finding, under the facts of the case, and the ultimate standard of parole suitability under *Cal Code Regs.*, tit. 15, §2402(a), *i.e.*, that the inmate currently presents an unreasonable risk of

danger to society if paroled. (*Scott II, supra,* 133 Cal.App.4th at 594-595; see also 143 Cal.App.4th at 1408.) It is on these two points that the evidence fails in this case. On the first issue, this Court stated in *Rosenkrantz V, supra,* at 654,

> "Accordingly, parole applicants in this state have an expectation that they will be granted parole unless the Board finds, in the exercise of its discretion, that they are unsuitable for parole *in light of circumstances specified by statute and by regulation*." (Emphasis added.)

This Court reiterated this point, noting that the decision to deny parole must be "*...based upon the factors specified by statute and regulation...[and upon] consideration of the specified factors*." (*Rosenkrantz V, supra,* at 658, emphasis added; see also *In re Mark Smith* (2003) 109 Cal.App.4th 489, at 504-505 ["there is nothing in the governing statutes or regulations to support the Governor's reliance on *Smith's* non-violent criminal record."]) Thus, the case law is clear that findings must fit within the regulatory criteria of unsuitability under *Cal. Code Regs.,* tit. 15, §2402(c). No decision has stated a contrary rule, and thus, there is no authority for the proposition that the Board is allowed to rely on factors outside the provisions of *Penal Code* §3041 or the regulations. If the various panels of the Board were allowed to simply make up new criteria as each panel saw fit, applying them to whichever inmates they choose, the entire regulatory scheme would be rendered unconstitutionally vague.[10] As such, the first inquiry is whether the evidence fits within an established unsuitability factor under the regulations.

Here, the Board's findings are improperly based upon the regulatory criteria, as their characterizations do not utilize the heightened level of egregiousness described in *Cal. Code Regs.,* tit. 15 § 2402(c). As the regulation indicates, there must be "an exceptionally callous disregard for human suffering." There was no such evidence. The

---

[10] "A statute must be definite enough to provide a standard of conduct for those who are proscribed as well as a standard for the ascertainment of guilt by the courts called upon to apply it." (*People v. McCaughan* (1957) 49 Cal.2d 409, relying on *Lanzetta v. New Jersey* (1939) 306 U.S. 451, 453, [83 L.Bd 888, 890, 59 S.Ct 618], holding, "No one may be required at peril of life, liberty, or property to speculate as to the meaning of penal statutes. All are entitled to be informed as to what the state commands or forbids.")

actions of Mr. Rush during the commission of the crime simply cannot support such a finding, particularly as compared with the decision in the *Ernest Smith* case. While certainly serious, the conduct that is fairly attributable to Mr. Rush certainly did not show an "exceptionally callous" disregard for suffering, as he did nothing to prolong the victim's suffering. (See *Ernest Smith, supra,* 114 Cal.App.4th 343 [shooting the victim three times in the head does not demonstrate exceptionally callous disregard for human suffering, absent deliberately extending a victims suffering, torture, or the like]; *Scott I, supra* [shooting wife's lover in front of child not exceptionally callous.] Thus, like *Smith,* Mr. Rush's crime is not one that stands out as an offense that still demonstrates current dangerousness. Clearly, this offense was not committed in a way to deliberately cause pain or anguish beyond that which is inherent in any killing. Accordingly, there is nothing about the crime facts that reliably establish that Mr. Rush remains dangerous twenty (20) years later. (*Scott II, supra,* 133 Cal.App.4th 594-595; see also *Lee, supra,* 143 Cal.App.4th 1400; *Elkins, supra,* (2006) 144 Cal. App. 4th 475.)

### C. MR. RUSH'S PAROLE DENIAL IS NOT SUPPORTED BY ANY NON-OFFENSE FACTOR.

Other than the commitment offense, the Board only mentioned one other factor in denying parole: opposition from the San Bernardino County District Attorney and the victim's next of kin. This warrants almost no discussion. Opposition by the District Attorney and the next of kin does not speak to Mr. Rush's current dangerousness. The Court must examine whether "some evidence" exists to support the Board's conclusion that the inmate currently *unreasonably endangers public safety,* not whether "some evidence" supports the *reasons* stated by the Board. (*In re Lee, supra,* 143 Cal.App.4th at 1408, emphasis in original.) Some evidence of the existence of victim next of kin or District Attorney's opposition, does not necessarily equate to some evidence that the inmate's release poses an unreasonable danger to public safety. (*Id.* at 1409.) Therefore, reliance on the aforementioned oppositions must be based solely upon their ability, if there in fact is any, to show Mr. Rush's current dangerousness, not simply upon "some evidence" that the oppositions in fact existed. The Board merely mentioned the

18

oppositions and did not discuss, or even mention, how that opposition supports a determination that Mr. Rush is currently unreasonably dangerous. In fact, no such conclusion could rationally flow from the evidence. Since the oppositions by the District Attorney and the next of kin do not lend any more insight into Mr. Rush's dangerousness than does the commitment offense, the Board's reliance on those oppositions to support their denial is a due process violation. (See also *In re Weider* (2006) 145 Cal.App.4th 570, 590.)

For the Board to deny Mr. Rush parole in this case, in addition to the commitment offense, the Board must be able to point to other circumstances defined in §2402(c) that tend to indicate Mr. Rush would pose an "unreasonable" degree of threat and danger to the public if released. (*Scott II, supra*, 133 Cal.App.4th at 595.) A legitimate, impartial review of those criteria reveals that none of the factors of unsuitability prescribed under *Cal. Code Regs.*, tit. 15 §2402(c) apply to Mr. Rush. As defined by the Regulations, other circumstances that tend to show unsuitability include:

> "(2) Previous record of violence. The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age (3) Unstable social history. The prisoner has a history of unstable or tumultuous relationships with others (4) sadistic sexual offenses…(5) Psychological factors. The prisoner has a lengthy history of severe mental problems related to the offense. (6) Institutional behavior. The prisoner has engaged in serious misconduct in prison or jail."

As shown by the record as discussed herein, none of these factors are applicable. In short, the real basis for the Board's denial, Mr. Rush's crime itself, if allowed to stand, would justify denying parole for the rest of his life, no matter how well he conducts himself during his continued incarceration and no matter how many years he remains incarcerated past the term deemed appropriate ("uniform") by the Legislature and Board's own rules. This is effectively allowing the Board to make a unilateral finding of guilt of a parole-ineligible offense, contrary to the actual conviction, which is a direct violation of Mr. Rush's Sixth Amendment right to a jury trial. (See *Blakely v. Washington, supra*, 542 U.S. 296; see also *Apprendi v. New Jersey* (2000) 530 U.S. 466; *Cunningham v. California* (2007) 127 S.Ct. 856.)

19

### D. PETITIONER IS SUITABLE FOR PAROLE UNDER EACH AND EVERY ONE OF THE REGULATORY FACTORS IN CAL. CODE REGS. TIT. 15 §2402(d).

Mr. Rush fits under each of the suitability factors in *Cal. Code Regs.* tit. 15 §2402(d). First, Mr. Rush has absolutely no prior criminal record, juvenile or otherwise. His doctors have consistently given Mr. Rush psychological clearance. In fact, Dr. Terrini stated he did "not believe he would ever commit a violent act again." (Exh. BBB, p.161.) Furthermore, Mr. Rush has sought and obtained therapy, fully developed his insight into the offense, and his psychological history is indisputably exemplary and supportive of parole.

Second, Mr. Rush has a stable social history and comes from a very supportive family. His file is replete with evidence that he takes full responsibility for this tragic event and of his sincere and genuine remorse. Additionally, the offense was committed as result of significant stress in Mr. Rush's life. This stress was caused by a motorcycle accident he was involved in several months prior to the offense. In the accident, his close friend was fatally injured and Mr. Rush sustained severe injuries, which kept him in bed for two (2) months. (Exh. DDD, p. 361.) The stress from losing his independence, because of his injuries, and the depression from losing his friend built up over several months prior to the offense. Mr. Rush's feelings of helplessness, caused by the accident, peaked when a physical struggle with his much larger roommate ensued the night of the offense. Mr. Rush was not physically able to protect himself. As a result, the severe stress Mr. Rush was under significantly contributed to the offense.

Third, Mr. Rush has absolutely no prior history of violence; convictions, arrests, disciplinary action, or otherwise. According to the Board, he has done a "great job" since he has been in custody. (Exh. AAA, p. 90.) Moreover, Mr. Rush is currently forty-one (41) years old, and was only twenty-one (21) years old when he was arrested. He has spent nearly half of his life in prison. His lack of current violence potential, coupled with his high level of maturity, makes recidivism highly unlikely. (*Cal. Code Regs.* tit. 15 §2402(d)(7).) At his 2005 hearing, the Board acknowledged Mr. Rush has marketable

skills and an acceptable parole plan. (Exh. AAA, p. 90.) He completed AA, BA, and MA degrees and has clearly established himself as an accomplished draftsman by his work in that vocational program. Finally, Mr. Rush has had exceptional institutional behavior. The Board complemented Mr. Rush on what he has done since incarceration and even concluded he has been a "good role model" while in custody. (Exh. AAA, p, 91.)

In sum, Mr. Rush has great support in every respect imaginable, including housing, transportation, and financial and emotional support. In denying parole, the Board has failed to give due consideration to the fact that Mr. Rush fits into each and every one of the suitability criteria.

## IV.   DENYING MR. RUSH PAROLE OFFENDS THE RULES ANNOUNCED BY THE US SUPREME COURT IN APPRENDI, BLAKELY AND CUNNINGHAM. [11]

The position typically taken by the Board is that fact finding by them is allowed, even under *Blakely*, as these are indeterminate sentencing cases, and in any event, since the top term is life, the fact finding will never cause the term to exceed the maximum. Petitioner notes that it is not the life term that is exceeded by the Board's actions, but the normal or presumptive range of sentence that must apply in the absence of certain special findings. Justice Scalia cleared up this point of what constitutes the relevant limit in *Blakely*, stating, "the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the Defendant." (*Blakely v. Washington* (2004) 542 U.S. 296, at 306.) In *Blakely,* the maximum sentence was ten (10) years, but the presumptive or normal range was up to 53 months. Thus, although the sentence was more than two (2) years below the statutory maximum, because it exceeded the presumptive range, it was held to violate the rule of *Apprendi*.

Similarly, in *Cunningham*, the United States Supreme Court specifically addressed California's Determinate Sentencing Law (DSL). The DSL gave trial judges the authority to "find facts that expose a defendant to an elevated 'upper term' sentence."

---

[11] *Apprendi v. New Jersey*, 530 U.S. 466 (2000); *Blakely v. Washington, supra*, 542 U.S. 296; *Cunningham v. California* (2007) 127 S.Ct. 856.

(*Cunningham, supra*, at 860.)   These facts were found by a preponderance of the evidence, rather than proof beyond a reasonable doubt.   (*Id.*)   Additionally, under the DSL, the sentencing court was supposed to give the middle term unless it found elements in aggravation or mitigation beyond the charged offense.   (*Id.* at 862.)   The Supreme Court, therefore, concluded "the middle term prescribed in California's statutes, not the upper term, is the relevant statutory maximum."   (*Id.* at 868, citing *Blakely, supra*, 542 U.S. at 303.)   In doing so, the Court specifically rejected this Court's conclusion in *People v. Black*, 35 Cal.4th 1238 (2005), that the upper term was the statutory maximum.   (*Id.* at 869-871.)   Thus, because the middle term is the statutory maximum and the DSL authorized the judge, not the jury, to find facts permitting the upper term, the Supreme Court concluded Cunningham's Sixth Amendment right to a jury trial was violated because he was given the sixteen (16) year upper term based upon facts found by the judge. (*Id.* at 860, 871.)

Two (2) decisions of this Court have defined aspects of the California sentencing scheme, as applicable to indeterminate sentences, which mandate the application of the *Apprendi-Blakely-Cunningham* rule when findings are made by the Board that remove the case from the matrix of proportional terms set up under *Cal. Code Regs.*, tit. 15, §2403. This is irrespective of the discussion in *Blakely* about how judicial fact-finding is ***ordinarily*** appropriate in indeterminate cases, as it does not affect a right to a certain sentence. As will be seen, under California's scheme, the fact finding here does effect a right to a set term under the matrix.

First, in *In re Dannenberg* (2005) 34 Cal.4th 1061, this Court made it clear that the public safety exception in *Penal Code* §3041(b) is just that, an exception to the general rule that an inmate "shall normally" be found suitable. (See *Dannenberg, supra*, 34 Cal.4th at 1080.) Absent findings that fit the crime within that exception, the Board is required to follow the "shall normally" formulation and find the inmate suitable. If the Board does not find the case to fit under the public safety exception of §3041(b), this Court concluded in *Dannenberg* that the use of the matrix is mandatory. (*Id.* at 1078.) Thus, the matrix constitutes the "normal" or "presumptive" sentencing range for

*Apprendi-Blakely* purposes, despite the fact that the overall maximum sentence of life is not exceeded. The second important decision by this Court in this area is the case of *In re Roberts* (2005) 36 Cal. 4th 575, at 589-590, which ruled that parole is an integral part of the overall process of sentencing. (See also *In re Sena*, (2002) 94 Cal.App.4th 836, at 839.) As noted in *Roberts*, under California law, the sentencing process is not complete until the term is set and the inmate released. (*Roberts, supra,* 36 Cal. 4th at 589-590; *Sena, supra,* 94 Cal.App.4th at 839.) As such, the Board is an entity that wears two (2) hats, serving as part of the executive branch, but discharging certain judicial functions as an extension of the sentencing process. This was precisely the conclusion of the court of appeal in the case of *In re Hogan* (1986) 187 Cal. App. 3d 819, 824 (1986) ["The Board, in setting a release date for an indeterminate sentence, performs the same function as does the trial court in ordering a determinate sentence – it fixes a term of definite duration.].

The effect of these cases is to hold that the Board is still discharging part of the sentencing function, acting in the place of the trial court in determining parole suitability and\or setting a term, and has a duty to leave the case within the presumptive range of the matrix in the absence of the case falling within the "public safety" exception. When the Board engages in fact finding and makes a determination that the "public safety" exception of §3041(b) applies, it is using those facts it has determined to take the case outside the normal range for *Apprendi-Blakely-Cunningham* purposes. Thus, under California law, the fact-finding does impact a right to a term under the matrix. This is clearly the type of judicial fact finding beyond the jury verdict that Justice Scalia was addressing in *Blakely* and *Cunningham*, which was found to contravene the right to a jury trial. As such, it violates clearly established federal law by infringing on the constitutional right to due process and to a jury trial.

> **V. THE BOARD OF PRISON TERMS HAS IMPLEMENTED AN UNLAWFUL POLICY AND PRACTICE OF DENYING PAROLE TO VIRTUALLY ALL INDETERMINATE-TERM PRISONERS AND THEREFORE HAVE DENIED MR. RUSH HIS FEDERALLY PROTECTED LIBERTY INTEREST IN PAROLE.**

23

For at least the past ten (10) years, the Board has received informal mandates from the current and former Governors, to severely restrict, and ultimately eliminate, the granting of parole to persons convicted of parole eligible murders, even second degree murders. (See Exh. FFF to JJJ inclusive.) The result is a de facto system whereby inmates who have received an indeterminate term such as life or fifteen (15) or twenty five (25) years to life have their sentences unconstitutionally converted to a term of life without the possibility of parole by the executive branch, through the auspices of the Board and Governor. This unconstitutional, illegal policy was just recently recognized by the Federal Courts in both the Eastern and Northern Districts of California. (See Exh. FFF, *Coleman v. Board of Prison Terms[12]*, Eastern Dist. CA, Case No. CIV S-96-0783 LKK PAN, May 19, 2005; Exh. GGG, *Martin v. Marshall* (N.D.Cal. 2006) 431 F.Supp.2d 1038.)[13] The unlawful system of sentence conversions occurs despite the state legislature's express statutory scheme which requires the Board to set a term for each parole eligible murder conviction. The de facto policy of the executive branch has been unconstitutionally used by the Board to virtually eliminate the setting of parole dates for persons convicted of murder. As a result, the Board's parole hearings have become meaningless shams. The Board has been criticized in this regard in published decisions of the California Courts of Appeals. (e.g. *In Re Ramirez, supra,* at 571 ["The board's readiness to make a finding so at odds with the record supports Ramirez's claim that his parole hearing was a sham."]; see also *Irons v. Warden* (E.D. Cal. 2005) 358 F.Supp.2d 936, at 947 [Board reliance on unchanging factors leave inmate with "no hope for ever obtaining parole except perhaps that a panel in the future will arbitrarily hold that the circumstances were not that serious..."].) By denying parole in this manner the Board is unconstitutionally denying Mr. Rush his federally protected liberty interest in parole.

---

[12] The evidence relied on by the District Court in *Coleman* is in the possession of Petitioner's counsel, but is quite extensive, and thus has not been provided at this time. However, it is available and can be submitted supplementally should the Court desire.

[13] Petitioner is requesting that this Court take Judicial Notice of the *Coleman* decision, which is being cited as factual proof of this illegal policy, and not as legal precedent. Petitioner is also requesting that judicial notice be taken of the facts developed in *Martin*. However, *Martin* is a published decision, and thus, is being cited as legal precedent as well.

## *CONCLUSION*

Here, the Board's decision denying parole for the fifth time fails under the analysis of *Scott II, Rosenkrantz VI, Martin,* and *Biggs,* as well as being unsupported by the evidence in the record. For the foregoing reasons, this Court should review the standards applicable in such a case, as set forth above.

Dated: 2/21/07                    Respectfully submitted,


                              LAW OFFICES OF PICONE & DEFILIPPIS


                              By_____
                                 STEVE M. DEFILIPPIS,
                                 Attorneys for Petitioner,
                                 ROBERT DALTON RUSH

25

### *CERTIFICATE OF WORD COUNT*

This will certify that this document contains 8,378 words.

Dated: 2/21/07

STEVE M. DEPHILIPPIS, Attorney
For ROBERT RUSH

COURT OF APPEAL -- STATE OF CALIFORNIA
FOURTH DISTRICT
DIVISION TWO

**<u>ORDER</u>**

FILED

FEB 1 4 2007

COURT OF APPEAL FOURTH DISTRICT

In re                                                    E042268

ROBERT DALTON RUSH                     (Super.Ct.Nos. SCR44594 &
                                                           SWHSS9037)
on Habeas Corpus.
                                                          The County of San Bernardino

THE COURT

The petition for writ of habeas corpus is DENIED.

_____
MILLER
                                                                    Acting P.J.

cc:    See attached list



PROOF OF SERVICE BY MAIL
(1013a) (2015.5 CCP)

STATE OF CALIFORNIA     )    In Re Robert Rush
                         )    Case No.
COUNTY OF SANTA CLARA )

      I am now and at times herein mentioned have been a citizen of the United States, over the age of eighteen years, employed in Santa Clara County, California, and not a party to the within action or cause; that my business address is 625 North First Street, San Jose, California 95112; that I served copies of the:

### *PETITION FOR REVIEW*

by placing said copies in an envelope addressed to:

      Court of Appeals
      Division Two
      3389 12th Street
      Riverside CA 92501

      San Bernardino Superior Court
      Attn: Clerk's Office
      351 North Arrowhead
      San Bernardino CA 92415

      Heather Bushman
      Attorney General's Office
      P.O. Box 85266
      San Diego CA 92186

      Robert Rush D-73321
      P.O. Box 689 B-327
      Soledad, CA 93960-0689

which envelope was then sealed and, with postage fully prepaid thereon, was on February 22, 2007, deposited in the United States mail at San Jose, California; that there is delivery service by the United States mail at the place so addressed, or that there is regular communication by mail between that place of mailing and the place so addressed.

      I declare under penalty of perjury that the foregoing is true and correct.

      Executed on February 22, 2007, at San Jose, California.

                                  NAOMI CHAIREZ