*IN THE UNITED STATES DISTRICT COURT*
*NORTHERN DISTRICT OF CALIFORNIA*

| | |
|---|---|
| ROBERT DALTON RUSH, | **CASE NO.** CV 07-03990 CRB |
| Petitioner, | [San Bernardino Co. Sup. Ct. # SCR 44594; Cal. Ct. of App. Case #E042268; Cal. Supreme Ct. Case #S150438] |
| -vs- | |
| BEN CURRY, Acting Warden | |
| Respondent, | |
| On Habeas Corpus. | |
| _____/ | |
| BOARD OF PRISON TERMS, ARNOLD SCHWARZENEGGER, Governor, | |
| Real Parties In Interest | |
| _____/ | |

---

## *TRAVERSE TO RESPONDENT'S ANSWER*

---

STEVE M. DEFILIPPIS
State Bar #117292
PICONE & DEFILIPPIS, A P.L.C.
625 N. First St.
San Jose CA 95112
(408) 292-0441

Attorneys for Petitioner
ROBERT DALTON RUSH

TABLE OF CONTENTS

TABLE OF CONTENTS...................................................................................i

TABLE OF AUTHORITIES..........................................................................ii

INTRODUCTION..............................................................................................1

TRAVERSE TO RESPONDENTS' ANSWER.......................................6

REMEDY...........................................................................................................20

PRAYER.............................................................................................................21

1

2                                    TABLE OF AUTHORITIES

3       **Federal Cases**

4       Biggs v. Terhune, 334 F.3d 910, 914 (9th Cir. 2003)                                    13, 14, 16
        Blakely v. Washington 542 U.S. 296 (2004)                                                       19
5       Hayward v. Marshall ___ F.3d ___, 2008 WL 43716                                            passim
        Irons v. Carey, 479 F.3d 658, 662 (9th Cir. 2007)                                      13, 14, 16
6       Marbury v. Madison, 5 U.S. (1 Cranch) 137, 161-163 (1803)                                       21
        Martin v. Marshall, 431 F.Supp.2d 1038 (N.D. Cal. 2006)                                     16, 21
7       McQuillion v. Duncan, 306 F.3d 895, 903 (9th Cir. 2002.)                               13, 14, 21
        Rosenkrantz VI] , 444 F.Supp.2d 1063, at 1085 (C.D. Cal. 2006)                              16, 21
8       Sanchez v. Kane, 444 F.Supp.2d 1049 (C.D. Cal. 2006)                                        16, 21
        Sass v. Calif. Bd. Of Prison Terms, 461 F.3d 1123, 1128 (9th Cir. 2006)                     13, 14
9       Superintendent v. Hill, 472 U.S. 445, 457 (1985)                                       14, 15, 17

10      **State Cases**

11      95 Cal.App.4th 358 (2002)                                                                       16
        In re Barker 151 Cal.App.4th 346 (2007)                                                         17
12      In re Capistran, 107 Cal.App.4th 1299 (2003)                                                    21
        In re Dannenberg [Dannenberg II], 156 Cal.App.4th 1387, 68 Cal.Rptr.3d 188 (2007)           16, 21
13      In re De Luna, 126 Cal.App.4th 585 (2005)                                                       21
        In re Elkins, 144 Cal.App.4th 475, at 518 (2006)                                           passim
14      In re Ernest Smith, 114 Cal. App. 4th 343, at ___ (2003)                             5, 8, 18, 21
        In re Gray 151 Cal.App4th 379 (2007)                                                        17, 21
15      In re Lee, 143 Cal.App.4th 1400, at 1408 (2006)                                         10, 17, 21
        In re Mark Smith, 109 Cal.App.4th 489, at 504-505 (2003)                                    16, 21
16      In re Montgomery, 156 Cal.App.4th 930 (2007)                                                10, 21
        In re Ramirez, 94 Cal.App.4th 549 (2001)                                                        21
17      In re Roberts (2005) 36 Cal. 4th 575, at 589-590                                                  7
        In re Rosenkrantz [Rosenkrantz II], 80 Cal. App. 4th 409, 428 (2000)                            22
18      In re Sena (2003) 94 Cal.App.4th 836, at 839                                                      7
        People v. Rosenkrantz, (1988) 198 Cal.App.3d 1187                                               16
19      Rosenkrantz IV), In re Rosenkrantz, 29 Cal.4th 616 (2002)                                       16
        Scott I, supra, 119 Cal.App.4th 871 (2004)                                                      21
20      Scott II] , 133 Cal.App.4th 573, at 594-595                                                 17, 21
        Weider, 145 Cal.App.4th 570, at 590 (2006)                                              10, 17, 21
21

22      **Federal Statutes**

23      Penal Code § 3041                                                                               14
        Penal Code §1487                                                                                22
24      Penal Code §1487(2)                                                                             22

25      **State Statutes**

26      California Evidence Code section 115                                                            15

27

28

1

2  STEVE M. DEFILIPPIS
   State Bar #117292
3  PICONE & DEFILIPPIS, A P.L.C.
   625 N. First St.
4  San Jose CA 95112
   (408) 292-0441
5
   Attorneys for Petitioner,
6  ROBERT DALTON RUSH

7

8               *IN THE UNITED STATES DISTRICT COURT*
                *FOR THE NORTHERN DISTRICT OF CALIFORNIA*
9                     *SAN FRANCISCO DIVISION*

10  ROBERT DALTON RUSH,                Case # CV 07-03990 CRB

11        Petitioner,                  ***TRAVERSE TO RESPONDENT'S***
                                       ***ANSWER TO PETITION FOR***
12        -vs-                         ***WRIT OF HABEAS CORPUS***

13

14  BEN CURRY, Warden,

15        Respondent.

16        On Habeas Corpus.
                                    /
17  ARNOLD SCHWARZENEGGER,
    Governor, BOARD OF PAROLE
18  HEARINGS,

19        Real Parties in Interest.

20  _____/

21

22        Petitioner, Robert Dalton Rush, respectfully submits the following traverse to the

23  Respondent's Answer in the above-entitled case. In support thereof, Mr. Rush admits, denies,
    and alleges as follows:

24                            ***INTRODUCTION***

25        In the realm of litigation challenging denials of parole, there are a number of petitioners

26  who present with strong programming, generally good behavior in prison, and an overall

27  showing of rehabilitation. However, Robert Dalton Rush presents a most unusual case, coming

28  before this Court with a literally perfect record, one which not only shows full and complete

                                        1

rehabilitation, and but with a situational crime that cannot fairly be characterized as particularly egregious, and two (2) decades of proving his lack of dangerousness, it is a record that resoundingly shows that he can safely be released into society. However, the Board continues to act in complete disregard for his due process rights through a history of multiple crime based denials of parole, despite having no evidence of ongoing behavior or conduct that shows current dangerousness. As will be seen, there is *no evidence* to suggest that Mr. Rush, after over two decades in prison, currently presents a danger to society. Neither the Board, nor the state courts, made any attempt to establish a nexus between the two identified factors cited by the Board and whether Mr. Rush currently presents a danger to society. The state courts' failure to address this issue was an unreasonable application of federal law and an unreasonable determination of the facts before the courts.

Respondent's return understandably speaks only to the crime. Not once does respondent even acknowledge that Mr. Rush has spent nearly twenty two (22) years incarcerated, never being disciplined[1] for any adverse behavior, obtaining his AA, BA and masters degrees with honors, completing the comprehensive vocational drafting program, specializing in the Architectural area and Computer Assisted Drafting (CAD), and spending extraordinary amounts of time helping less fortunate inmates through a variety of tutoring programs that he has consistently been involved in since the early 1990's. This is understandable, since Mr. Rush comes from a strong, intact family, had no juvenile or adult record before the commitment offense, and has stayed free from any form of trouble both before and after the crime. The crime itself is described by every professional that has evaluated this case as a situational event, one which is unlikely to recur. Nor does respondent ever mention that Mr. Rush has had exceptionally positive psychological reports throughout his time in custody, starting with the initial evaluation in the early 1990's. For example, the 2005 psychological evaluation of Dr. Talbot concluded that Mr. Rush "*is a good candidate for parole,*" found no clinical or personality disorder, determined that Mr. Rush was no more dangerous than the average free citizen, and found Mr. Rush's remorse to be "quite sincere." Exh. BBB, p. 156, emphasis added. The previous report in 1999 by Dr. Terrini also found no clinical or personality disorders, an extremely positive GAF score of 90, appropriate and genuine remorse for his crime, a situational

---

[1] Mr. Rush did receive one non-disciplinary write-up, a CDC 128A for being out of bounds. This occurred because he showed up for his job assignment early one morning, behavior that in reality deserves a commendation, not a write-up.

2

commitment offense motivated in significant part by his fear of the victim, and a violence potential within a controlled setting that is "significantly below average, relative to Level II inmate population," and if released, is no more than that of the average citizen. Exh., BBB, pp. 160-161. In short, respondent ignores these facts because they resoundingly refute every finding of the Board and the superior court, since there is simply no evidence that Mr. Rush is in any way currently dangerous.

While incarcerated, Mr. Rush has received his AA, BA and masters degrees, all with high honors. He continually stays up do date with the Computer Assisted Drafting (CAD) software, making arrangements with a teacher in the Educational Department so he could intermittently work with the CAD system a couple times a month. Exh. AAA, pp. 32, 52-53. Additionally, he is heavily involved with volunteer activities, assisting disadvantaged inmates. One of the prison teachers described him as "a major component in the delivery of Basic Education to male felons" where he is a "saving grace" for classroom participation and effective lesson plans. Exh. BBB, p. 344. Mr. Rush has also worked extensively for the CTF Education Department's Distance Learning Center, and also volunteers for the CTF Video Reports Program, which broadcasts educational videos to the general population which broadcasts educational videos to the general population, where his efforts are "greatly appreciated." Exh. BBB, p. 335, 337; Exh. AAA, p. 59. Specifically, Mr. Rush reviews the videos and formulates questionnaires so the inmates that do not have access to the Education Department can watch the videos, fill out the questionnaire, and still receive credit. *Id.* Further, Mr. Rush volunteered multiple times for the Central Education Department's Graduation and Promotion Ceremony, and was even one of the original organizers of the commencement exercises. Exh. BBB, pp. 339, 344. Even in his work as a clerk in the Education Bridging Program he helps inmates that are eligible for work time credits get extra time off their sentence by participating in self-help and life skills study, basically assisting in preparing inmates for release. Exh. AAA, p. 58. Because of Mr. Rush's value in the drafting program, where he has completed that vocational training, he was asked to become a teacher's assistant, helping students for several years after he completed his own certification. Exh. AAA, p. 52. In the past, Mr. Rush also tutored students to help them obtain their GED's. Exh. AAA, p. 51. Thus, throughout Mr. Rush's twenty one (21) years of incarceration, he has consistently and successfully improved his education and assisted other inmates to improve theirs as well.

3

In addition to all the self help he has been involved in historically[2], just since his 2003 hearing, he has continued to actively attend and positively participate in Alcoholics Anonymous and Narcotics Anonymous (Exh. BBB, p. 335, 336), participated in Dr. Thomas Gordon's Family Effectiveness Training/Harmony in the Home self-help program  consisting of six two hour sessions including the following topics:  A Credo for Your Relationships; Participative Rule-Setting; Solving Problems You Own; The Pitfalls of Punishments and Rewards; Helping Others Find Solutions to Their Own Problems; Resolving Conflicts Peacefully; Dealing with Values, Collusions, and Courage for Learning the Skills-Rewards for Using Them (Exh. BBB, p. 332, Exh. AAA, p. 40), completed "How to Become a Father and Not Get Angry" (Exh. BBB, p. 334), and completed a course in the cause, prevention, treatment, and management of hepatitis (Exh. AAA, p. 40-41).  Thus, although the 2003 panel had recommended that Mr. Rush continue with self-help programs (Exh. AAA, p. 39), the Board in 2005 acknowledged that he had accomplished this goal and did not give a similar recommendation.  Exh. AAA, p. 39

Despite these facts, the Board issued a denial of parole for two (2) years, claiming that the commitment offense, by itself, rendered Mr. Rush a danger to society.  The findings of the Board included the crime being "particularly callous and cruel," "dispassionate," that the crime "didn't have to happen" and that the motive was an argument which "just doesn't cut it." However, as Petitioner did nothing to torment or terrorize the victim, or cause extended or untoward suffering beyond the act of murder (see *In re Ernest Smith*, 114 Cal. App. 4th 343, at 366 (2003)), his crime does not fit within the definition of exceptional callousness.  The fact that it occurred in the heat of an argument, by itself, negates the finding that the crime was "dispassionate."  Clearly, the statement that the crime "didn't have to happen" is not a regulatory factor, and is irrelevant, as no murder "ha[s] to happen."  See *In re Elkins*, 144 Cal.App.4th 475, at 518 (2006) [fact that petitioner could have avoided the murder does not make the crime egregious].  The finding that committing a murder because of an argument "just doesn't cut it" is both factually inaccurate and does not invoke any regulatory factor of unsuitability.   As is discussed herein, the killing followed a physical altercation, where petitioner was severely beaten by a larger and more physically aggressive roommate, then taunted and threatened, resulting in

---

[2]  Mr. Rush has previously requested this Court to take judicial notice of the pleadings and appendix in the previous habeas proceeding challenging his 2003 denial of parole, *Rush v. Kane*, Case # CV 05-04143 CRB.  Those materials give the full background of Mr. Rush's extensive self help programming, as well as giving much of the background regarding the case in general.  Thus, the reader's attention is directed to those materials.

4

the eventual overreaction.   Of course, what the Board is looking for is a motive that is a justification for the killing, which can never occur, as the conviction bars any claim that there was a justifiable reason for killing.   Then, the superior court based its ruling on the wrong standards, and a misunderstanding of the facts.   That court went off on a claimed lack of remorse, which the Board never even relied on, and which is contrary to the facts.   As every professional examining Mr. Rush has found, he has a sincere and genuine remorse.   See Exh. BBB, p. 98, 166, 160, 156. Amazingly, the superior court seemed troubled that Mr. Rush did not "act[] responsibly and without criminal intent."   This is beyond explanation, as no person who commits a murder is "acting responsibly and without criminal intent."   Finally, the superior court criticized Petitioner for not confessing his involvement to the police, apparently unaware that a criminal defendant has a constitutional right not to incriminate himself.   Thus, the superior court simply failed to apply the correct standard, and did not even consider the issue of whether Mr. Rush was currently dangerous.

As will be seen, this case is now controlled by the doctrine announced by the Ninth Circuit in *Hayward v. Marshall* ___ F.3d ___, 2008 WL 43716 9th Cir. (2008).   As a result of that case, two (2) points are perfectly clear, which together control the resolution of this matter. First, in evaluating whether a state court has unreasonably applied clearly established Supreme Court authority, the District Courts are now directed to focus solely on whether, in light of the passage of time, the naturally declining probative value of static facts, and the strength of the evidence of rehabilitation, the crime continues to satisfy the "some evidence" standard by rationally establishing that the inmate currently remains dangerous. *Hayward*, slip opn. at *7-9. Secondly, in making this determination, the District Court is to be guided by the California statutes and regulations, as the California courts have interpreted that they are to apply, determining whether in light of those rules, the evidence supports the regulatory factors relied on by the Board, and furthermore, whether the factor so established shows the inmate to remain currently dangerous.   *Hayward*, slip opn., at *7-8.   Of course, Mr. Rush's programming, behavior, and psychological evaluations place him head and shoulders above any other inmate seeking an order compelling their release.   Thus, under these standards, it is beyond dispute that Mr. Rush has conducted himself as a model inmate, achieving full and complete rehabilitation, and is entitled to relief.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### *TRAVERSE TO RESPONDENTS' ANSWER*

#### I.

Petitioner admits the portions of the allegations of paragraph 1 regarding the nature and validity of his underlying conviction and the *initially imposed* sentence, and acknowledges that he is in the actual custody of the California Department of Corrections and Rehabilitation (CDCR). However, Mr. Rush denies generally and specifically that he is serving a seventeen (17) year to life sentence. While frequently referred to as such informally, under California law, the two (2) year determinate term for use of a firearm is served first, followed by a consecutive fifteen year to life term. When he arrived in prison on December 17, 1987, Mr. Rush had twenty five (25) months of pre-prison credits. Those credits are first applied to the determinate term, and resulted in twenty four (24) of the twenty five (25) months being used to satisfy the two (2) year determinate sentence. See Exh. BBB, p. 96 [noting the start date for the life term to be on December 17, 1987]. Thus, as of December 17, 1987, Mr. Rush had just under one (1) month of credit towards his fifteen (15) year minimum term, and thus, had fourteen (14) years and eleven (11) months left to serve on that term. This results in the minimum term having been completed in full, without consideration of post-commitment conduct credits, as of November 30, 2002. With those credits, the minimum term was satisfied on November 30, 1997, ten (10) years ago. Exh. BBB, pp. 96, 114.

Mr. Rush denies generally and specifically the allegation in paragraph 1 that he is currently "lawfully" or properly in the custody of the CDCR, for the reasons alleged in the petition and herein. Contrary to the implications of respondent's contention, while Petitioner does not challenge his conviction as such, he is in fact challenging his sentence to the extent that the Board has failed to fulfill its duty to set his term. See *In re Roberts* (2005) 36 Cal. 4th 575, at 589-590 [parole is an integral part of the overall process of sentencing, and that process is not complete until the term is set and the inmate released]; see also *In re Sena* (2003) 94 Cal.App.4th 836, at 839. Thus, a challenge to the denial of parole is a challenge to the sentence imposed. However, it is the execution of the sentence, rather than the initial imposition, that is at issue herein. Except as expressly admitted herein, Petitioner generally and specifically denies each and every remaining allegation in paragraph 1.

6

## II.

Petitioner admits the allegations contained in paragraph 2. However, as discussed further herein, these facts are irrelevant to the issue of whether due process was satisfied in this case.

## III.

Petitioner admits the allegations contained in paragraphs 3 and 4 insofar as they accurately describe the recitals by the Board in denying Petitioner parole. However, Petitioner affirmatively alleges that the Board's reliance on the commitment offense or DA\victim next of kin opposition as a basis for denial is a violation of his due process rights and in contravention to clearly established federal law articulated by the Supreme Court, as those matters lack any probative value on the issue of current dangerousness, and therefore cannot satisfy the "some evidence" test. See *Hayward v. Marshall*, ___ F.3d ___, 2008 WL43716 (9th Cir. 1/3/08). Furthermore, as Petitioner did nothing to torment or terrorize the victim, or cause extended or untoward suffering beyond the act of murder (see *In re Ernest Smith*, 114 Cal. App. 4th 343, at 366 (2003)), his crime does not fit with the finding of being "particularly callous and cruel." The fact that it occurred in the heat of an argument, by itself, negates the finding that the crime was "dispassionate." The Board's statement that the crime "didn't have to happen" is not a regulatory factor, and is irrelevant, as no murder "ha[s] to happen." See *In re Elkins*, 144 Cal.App.4[th] 475, at 518 (2006) [fact that petitioner could have avoided the murder does not make the crime egregious]. Finally, the finding that committing a murder because of an argument "just doesn't cut it" is both factually inaccurate and does not invoke any regulatory factor of unsuitability. The motive for any murder can always be characterized in that fashion, as the conviction bars any claim that the killing was for a justifiable reason. Furthermore, the killing occurred after losing a fist fight, under heated emotions and fear of a further assault, and not in the midst of simply a verbal argument. Thus, the Board's findings are not supported by any evidence. Petitioner generally and specifically denies all remaining allegations contained in paragraph 3 and 4. Petitioner further affirmatively alleges that a complete rendition of the factual background of the case has been presented in the Statement of Facts which is found in the Memorandum of Points and Authorities filed in support of the petition and the same is incorporated herein by reference as though set forth in full. That statement accurately describes all of the relevant facts, and to the extent that Respondent's version differs, those allegations are generally and specifically denied.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## IV.

Petitioner affirmatively alleges that the facts are significantly different than suggested by respondent on a number of material points. First, Mr. Rush was in the process of recovering from an extremely serious motorcycle accident that had left him convalescing for months, involving severe injuries to his back, hips and head. Exh. E, pp. 301-302, Exh. D pp. 184-185.[3] Thus, he was in a weakened physical condition at the time he was attacked by his much larger and physically stronger roommate, John Heinz. Secondly, although the verbal argument had started over bickering about household matters, the physical altercation occurred because Mr. Heinz attacked Mr. Rush. Mr. Rush was unable to fight back because of his compromised physical condition, and was clearly the losing party in the physical altercation. Thereafter, Heinz walked up and down the hallway taunting and threatening Mr. Rush, as the latter sat in his room nursing his injuries. It was when Mr. Rush went to the bathroom to wash up that he took the rifle, which had been stored under his bed, as protection to insure that Mr. Heinz would not once again attack him. As the jury verdict rejecting the first degree murder charge evidences, this was not a calculated decision to kill Heinz for having attacked him, but an excessive overreaction to the perceived threat of physical violence from Heinz. Third, the reference to stopping at a bar "to use John's money to go drinking" or that they "partied with the victim's money" (Return, p.2, ln. 23, p. 3, ln. 5), seems to suggest a heightened level of callousness which only exists if the boys were celebrating the death of Heinz, something that is entirely inconsistent with the characterization of all the relevant witnesses regarding the state of mind of Mr. Rush after the killing. Petitioner is repeatedly described as extremely distraught and unable to handle himself emotionally after the crime. The evidence at trial was clear that the decision to stop at a bar was in order to get drunk and forget what had just happened. Thus, while this may indicate that the theft of money was callous, it does not reflect an exceptional level of callousness as to the commitment offense of murder. See *e.g.*, *Elkins, supra*, 144 Cal.App.4[th] at 518.

## V.

Petitioner admits in part the allegations in paragraph 5, inasmuch as at the October 11, 2005, hearing, the Board considered opposition to parole from the San Bernardino County District Attorney and four (4) family next of kin, but generally and specifically denies that the Board actually relied on this opposition as factual support for the finding of unsuitability. It is

---

[3] References to Exhibits A-Z and AA to OO are to the exhibits in the prior proceeding, case #CV 05-04143 CRB.

affirmatively alleged that opposition by the District Attorney and the victim's next of kin do not constitute evidence of Mr. Rush's current dangerousness and therefore cannot provide an evidentiary basis for a finding of unsuitability for parole. See *Weider*, 145 Cal.App.4[th] 570, at 590 (2006); *In re Montgomery*, 156 Cal.App.4[th] 930 (2007). The court must examine whether "some evidence" exists to support the Board's conclusion that the inmate currently *unreasonably endangers public safety*, not whether "some evidence" supports the *reasons* stated by the Board. *In re Lee*, 143 Cal.App.4[th] 1400, at 1408 (2006), emphasis in original. The Board did not actually state that it relied on this opposition, nor did it discuss, or even mention, how that opposition could possibly support a determination that Mr. Rush is currently unreasonably dangerous. Petitioner generally and specifically denies each and every remaining allegation in paragraph 5.

## VI.

Petitioner admits in part the allegations in paragraph 6 inasmuch as the Board denied parole at his October 11, 2005 hearing, but then issued "compliments" to Mr. Rush for the dramatic achievements he has attained while in prison, as they have at each of his previous hearings. However, Petitioner generally and specifically denies that these commendations were in any way meaningful, or showed that the Board gave due consideration of the facts showing Petitioner's suitability for parole. In fact, every past and subsequent panel has issued similar "compliments" to Mr. Rush, while at the same time brushing them aside in favor of relying on the static facts of the commitment offense as overcoming all other facts.

In particular, Petitioner generally and specifically denies that due consideration was given to his participation in self-help programs, his discipline free record, his extraordinary educational and vocational achievement, his exclusively positive psychological evaluations showing a complete lack of current dangerousness, his realistic parole plans, and extensive support, as exemplified by an extensive set of multiple letters of support. It is affirmatively alleged that before it on October 11, 2005, the Board had the most recent CDC psychological evaluation, prepared on June 28, 2005 by Dr. R. Talbot, who concluded that Mr. Rush "*is a good candidate for parole.*" Exh. BBB, p. 156, emphasis added. Dr. Talbot found no clinical or personality disorder, and determined that Mr. Rush was no more dangerous than the average free citizen. *Id.* The doctor likewise found Mr. Rush's remorse to be "quite sincere." *Id.* Dr. Talbot agreed with all of the assessments contained in the previous psychological report, dated 1999, authored by Dr. Steven Terrini. In that report, Dr. Terrini also found no clinical or personality disorders, an

9

extremely positive GAF score of 90, and appropriate and genuine remorse for his crime. Dr. Terrini also noted that the commitment offense was motivated in significant part by his fear of the victim. According to Dr. Terrini, "[Mr. Rush's] violence potential within a controlled setting is estimated to be significantly below average, relative to Level II inmate population," and if released, is no more than that of the average citizen. Exh., BBB, pp. 160-161. Petitioner generally and specifically denies that this decision comports with current law, considering the actual evidence before the Board. *Hayward, supra,* at \*5-7. Petitioner generally and specifically denies each and every remaining allegation in paragraph 6.

## VII.

Petitioner admits the allegations in paragraph 7 that Petitioner sought relief in the state court prior to filing his federal petition. However, Petitioner generally and specifically denies the allegation that the decision issued by the San Bernardino County Superior Court on November 30, 2006, denying Petitioner habeas corpus relief, was in fact a reasoned decision. To the contrary, it not only lacked any element of reasonableness, but was effectively a summary denial of Petition's request for relief. Exh. PPP. As is clear from the decision, the judge spent more time improperly criticizing Petitioner and his counsel, rather than properly analyzing whether the Board had established a nexus to current dangerousness, as required in a parole suitability hearing, and as that court was required to do in conducting a due process analysis. *Hayward,* at \*5-7; *Dannenberg II, supra,* 68 Cal.Rptr.3d at 196-197. In fact, subsequent to the superior court denial, it was learned that the superior court judge, John P. Wade, is biased against parole challenges. In the case of *In re Steven Escandon* case #SWHSS-9100, Judge Wade stated, "Once again, we have a Petitioner who has been given a sentence to [sic] life for the killing of others and such a killer believes that it is somehow 'unfair' for him to remain in prison while his victims have no life at all." Exh.TTT, p. 487. Such a statement shows a clear bias of this judge against cases of this type, and an inclination to further a personal agenda of keeping any convicted murderer in jail, despite their legal entitlement to parole. Petitioner further submits that the Superior Court's decision was unreasonable, wrong and arbitrary, due to the fact there is no evidence to support a finding of unsuitability, as no nexus exists between the commitment offense and current dangerousness. The superior court deferred to the Board's sole reliance on the crime without relating it to conduct within the last twenty-one (21) years that would indicate that Mr. Rush continues to pose a current threat if released. Petitioner's minimum eligible parole

10

date was November 30, 1997. He completed service of the full minimum term, without reduction for credits, on December 17, 2002, over five (5) years ago. Petitioner has now been denied parole five (5) times overall, and is more than ten (10) years beyond his minimum term.[4]

Additionally, Petitioner affirmatively alleges that the superior court's findings were clearly unreasonable and wrong, applied the wrong standard, and failed to satisfy the necessary level of review required under a due process analysis. The conclusion that Petitioner was claiming that "numerous shots" were the result of a "flinch" is not based on the record. Petitioner has always contended that he pointed the gun at Heinz to get him to stop approaching, and *the first shot* was the result of a flinch. The rest of the shots were due to his realization that the first shot did not stop the victim, and he continued shooting until Heinz was down. At most, this establishes intent to kill, a necessary element of second degree murder. The assertion by the superior court that this shows lack of remorse is contrary to the facts, as every professional examining Mr. Rush has found sincere and genuine remorse. See Exh. BBB, p. 98, the 1/13/88 initial staff evaluation of Petitioner ["He indicates he is extremely sorry for taking another human life and causing emotional suffering of the victim's family as well as his own"]; p. 166, 9/3/93 psychological evaluation ["He expresses sincere remorse for the offense"]; p. 160, 10/18/99 psychological evaluation ["The remorse that he expressed was quite appropriate and genuine"]; p. 156, 6/28/05 psych. eval. ["His remorse over the terrible act he committed seemed quite sincere"].

The superior court also based its ruling on the claim that Mr. Rush did not "act[] responsibly and without criminal intent." It defies logic to understand how a person who is guilty of murder can be held to such a standard, and denied parole for not meeting it. No person convicted of murder can be said to have been "acting responsibly and without criminal intent" since they unlawfully killed another human being with malice aforethought. Finally, the superior court criticized Petitioner for not confessing his involvement to the police, apparently unaware that a criminal defendant has a constitutional right not to incriminate himself. Except as expressly admitted herein, Petitioner generally and specifically denies each and every remaining allegation in paragraph 7.

---

[4] In fact, Petitioner was again denied parole in 2007, based on the crime, bringing the total denials to six. A copy of the decision from that hearing is attached hereto as Exhibit UUU.

## VIII.

Petitioner admits the allegations contained in paragraph 8 that he has exhausted his claims in the California Court of Appeal and Supreme Court

## IX.

Petitioner admits the allegation in paragraph 9 that he has exhausted his cognizable claims in the instant petition but generally and specifically denies that his claims are not exhausted "to the extent they are more broadly interpreted to encompass any systematic issues beyond this particular parole consideration hearing."

## X.

Petitioner generally and specifically denies each and every allegation in paragraph 10. Petitioner denies that he has not shown that the state court's denial of habeas corpus was contrary to, or involved an unreasonable application of, clearly established Supreme Court law, or that the denial was based on an unreasonable determination of the facts in light of the evidence presented. For the reasons set forth herein and in the Petition, Petitioner affirmatively alleges that the allegedly "reasoned" state court decision is both contrary to and an unreasonable application of clearly established federal law thus establishing a prima facie case for relief. Petitioner further affirmatively alleges that continued reliance on the crime in the face of clear evidence of rehabilitation to deny parole violates Mr. Rush's right to due process.

## XI.

Petitioner generally and specifically denies each and every allegation in paragraph 11, and specifically denies that Mr. Rush does not have a federally protected liberty interest in parole. It is affirmatively alleged that contrary to Respondent's position, it is has now been made clear that California's parole scheme vests all "prisoners whose sentences provide for the possibility of parole with a constitutionally protected liberty interest in the receipt of a parole release date, a liberty interest that is protect by the procedural safeguards of the Due Process Clause." *Hayward v. Marshall*, __ F.3d __, 2008 WL 43716, at *4 (9th Cir. 1/3/08); *Irons v. Carey*, 479 F.3d 658, 662 (9th Cir. 2007) (citing *Sass v. Calif. Bd. Of Prison Terms*, 461 F.3d 1123, 1128 (9th Cir. 2006); *Biggs v. Terhune*, 334 F.3d 910, 914 (9th Cir. 2003); *McQuillion v. Duncan*, 306 F.3d 895, 903 (9th Cir. 2002.) Petitioner generally and specifically denies each and every remaining allegation in paragraphs 11, and affirmatively alleges that this claim by respondent, in the face of directly contrary governing law, is patently frivolous.

12

## XII.

Petitioner generally and specifically denies each and every allegation in paragraph 12. It is affirmatively alleged that under California's parole scheme, *Penal Code* § 3041, there is a cognizable liberty interest in release on parole. *Greenholtz, supra*, 442 U.S. at 7. To deny a prisoner this right *without evidence* violates due process. It is affirmatively alleged that the Board did not support their finding with any reliable evidence. Petitioner further generally and specifically denies that he received all the process he was due simply because he participated in the parole consideration hearing and the Board informed Mr. Rush of the reasons why they found him unsuitable for parole. It is affirmatively alleged that due process requires that a parole board or Governor premise the decision on "some evidence in the record" that rationally shows the inmate remains currently dangerous, such that it is not arbitrary. *Hayward, supra*, at *5-7; *Sass, supra*, 461 F.3d at 1128-29 (quoting *Superintendent v. Hill*, 472 U.S. 445, 457, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985.).) Due process requires that the "some evidence" underlying the denial have some indicia of reliability that the inmate currently poses a risk of danger to society if released. *Biggs, supra*, 334 F.3d at 915; *McQuillion, supra*, 306 F.3d at 904. It is further affirmatively alleged that there is *absolutely no evidence* to support the Board's denial of parole at the 2003 hearing.. The Board relied solely on the commitment offense to deny parole. It is affirmatively alleged that Mr. Rush's commitment offense, nineteen (19) years after the crime, and in the face of perfect programming, does not provide "some evidence" that he currently presents a risk of danger if released. As such, the Board's denial of a parole date does not comport with the "some evidence" standard and therefore violates Mr. Rush's right to due process.

## XIII.

Petitioner generally and specifically denies each and every allegations in paragraph 13. It is affirmatively alleged that the Supreme Court has set a standard of review. *Superintendent v. Hill*, 472 U.S. 445, 457 (1985) is Supreme Court authority that provides the basis for the "some evidence" standard. See ¶XII, *supra*. This standard has been utilized by the Ninth Circuit in multiple published opinions, making it clear that under federal due process standards, California inmates are entitled to a standard of "some evidence." See *Hayward, supra*, at *4, *Sass, supra*, 461 F.3d 1123, *Irons, supra*, 479 F.3d 658, *Biggs, supra*, 334 F.3d at 914, *McQuillion, supra*, 306 F.3d at 903.

13

## XIV.

Petitioner generally and specifically denies each and every allegations in paragraph 14. Petitioner has never contended that the "preponderance of the evidence" standard applies to a court's review of a Board decision. Instead, that standard is the correct standard of proof at a Board hearing, and must be applied by the commissioners. Petitioner agrees that the "some evidence" standard, as announced in the recent decision of *Hayward, supra*, at *5-7, applies to this case.

## XV.

Petitioner generally and specifically denies each and every allegations in paragraph 15.

## XVI.

Petitioner generally and specifically denies each and every allegations in paragraph 16.

## XVII.

Petitioner generally and specifically denies each and every allegations in paragraphs 17. The case of *Superintendent v. Hill*, 472 U.S. 445 (1985) announced the "some evidence" standard of review by *courts*. The Supreme Court never announced a standard of proof for the administrative bodies that handle parole hearings, but provided a standard of review for the courts when the state regulatory scheme is silent as to what standard the administrative body is to apply. California's scheme is not silent. The Board of Prison Terms' regulations do not specify a standard of proof for parole consideration hearings. However, *California Evidence Code* section 115 fills the void by providing that where no burden of proof is specified, the trier of fact must use the "preponderance of the evidence" standard. This comports with the preponderance of the evidence test found throughout the *California Code of Regulations* parole disciplinary scheme. *Cal. Code Regs.*, tit. 15 §§ 2000(b)(5), 2450, 2451, and 3000. As such, the preponderance of the evidence is the standard that must be employed by the Board. As directed by the 9th Circuit in *Hayward, Biggs, Sass, Irons,* and *McQuillion,* courts must apply the "some evidence" standard.[5]

---

[5] While Petitioner has argued that a higher level of review is required under *Superintendent v. Hill*, that is merely to preserve the issue, as this Court is obviously bound by 9th Circuit precedent to apply the "some evidence" test.

1
2                                    **XVIII.**
3        Petitioner generally and specifically denies the allegations in paragraph 18.    The
4   regulations speak for themselves, and if interpreted as "general guidelines" as the Respondent
    claims, they would be rendered unconstitutionally vague.    Under the California regulatory
5   scheme, to which this Court must look in evaluating the Board's decision herein (see *Hayward,*
6   *supra,* at *5), the denial of parole must be based on actual regulatory factors. *Rosenkrantz V,*
7   *supra,* 29 Cal.4th at 654 ["...parole applicants in this state have an expectation that they will be
8   granted parole unless the Board finds...that they are unsuitable for parole *in light of*
9   *circumstances specified by statute and by regulation*"], emphasis added. As the Rosenkrantz V
10  Court held, the court "conducting [habeas] review...may inquire only whether some evidence in
    the record before the Board supports the decision to deny parole, *based upon the factors*
11  *specified by statute and regulation.* If the decision's *consideration of the specified factors* is
12  not supported..." *Rosenkrantz V, supra,* at 658, emphasis added. See also *In re Mark Smith,* 109
13  Cal.App.4th 489, at 504-505 (2003).
14                                   **XIX.**
15       Petitioner generally and specifically denies the allegations in paragraph 19.    Petitioner
16  affirmatively alleges that a rapidly growing body of case law clearly establishes that a Court
    must reverse the denial of parole by the Board or Governor when there is no evidence rationally
17  showing that the inmate is *currently* dangerous. Under the recent analysis and application of the
18  rule originally stated in *Biggs v. Terhune,* 334 F.3d 910 (9th Cir. 2003), now firmly adopted by
19  the 9th Circuit in *Hayward, supra,* at *7 and *Irons, supra,* 479 F.3d 658, as and applied in cases
20  such as *In re Dannenberg [Dannenberg II],* 156 Cal.App.4th 1387, 68 Cal.Rptr.3d 188 (2007),
21  *Sanchez v. Kane,* 444 F.Supp.2d 1049 (C.D. Cal. 2006), *Rosenkrantz v. Marshall* [hereinafter
22  *Rosenkrantz VI*][6], 444 F.Supp.2d 1063, at 1085 (C.D. Cal. 2006), *Martin v. Marshall,* 431
23  F.Supp.2d 1038 (N.D. Cal. 2006), *In re Scott* [hereinafter *Scott II*][7], 133 Cal.App.4th 573, at 594-
24
25  _____
    [6] The *Rosenkrantz* case has now resulted in six decisions. *People v. Rosenkrantz,* (1988) 198 Cal.App.3d 1187
26  (*Rosenkrantz I*), *In re* Rosenkrantz, 80 Cal.App.4th 409 (2000), (*Rosenkrantz II*), *Davis v. Superior Court*
    [*Rosenkrantz*] (Feb. 22, 2001, B146421) [non pub. opn.] (*Rosenkrantz III*), *In re Rosenkrantz,* formerly published at
26  95 Cal.App.4th 358 (2002) (*Rosenkrantz IV*), *In re Rosenkrantz,* 29 Cal.4th 616 (2002) (*Rosenkrantz V*), and
    *Rosenkrantz v. Marshall,* 444 F.Supp.2d 1063 (C.D.Cal. 2006) (*Rosenkrantz VI*).
27  [7] There are two "*Scott*" decisions. The first was the reversal of the Board's denial of parole, *In re Scott [Scott I],*
    119 Cal.App.4th 871 (2004). The second was the reversal of the Governor's action taking Scott's parole date
28  granted at the hearing after the decision in *Scott I. In re Scott [Scott II],* 133 Cal. App.4th 573 (2005). They will be
    differentiated herein by the roman numeral designations I & II. It should be noted that *Scott II* was subsequent to

595, *In re Lee,* 143 Cal.App.4th 1400 (2006), *In re Elkins,* 144 Cal.App.4th 475 (2006), *In re Weider,* 145 Cal.App.4th 570 (2006), *In re Barker* 151 Cal.App.4th 346 (2007) [59 Cal.Rptr.3d 746, at 760]; and *In re Gray* 151 Cal.App4th 379 (2007) [59 Cal.Rptr.3d 724, 740-741] it is clear that the focus must be on current dangerousness. It is affirmatively alleged that the Board's 2005 denial is not supported by some evidence that Mr. Rush would present a risk of danger to society if released. Mr. Rush's programming has been literally perfect. In addition, all psychiatric evaluations state that Mr. Rush would ***not pose a risk of danger to society if released***. There is no contrary evidence. As such, the Board's decision to deny parole and the state's court's decision to uphold the decision does not comport with the 'some evidence' standard. *Hayward, supra,* at *5-7; *Brown v. Kane, supra,* WL 1288448, p. 6 (citing *Hill, supra,* 472 U.S. at 454-455, 457.)

## XX.

Petitioner generally and specifically denies the allegations of paragraphs 20, for all of the reasons set forth herein and in the petition, which are incorporated herein by reference as though set forth in full. As will be discussed more fully hereafter, any statistically relevant sampling of the Board hearings conducted in the last five (5) years will show that every inmate that has come before the Board has had his or her crime found to be especially heinous, atrocious or cruel at least one time, thereby establishing that there is no case in existence falling out of the exception to the rule of parole suitability. This shows that the California Supreme Court's concern that the exception not be interpreted in a manner so as to "swallow the rule" that parole dates "shall normally" be granted, has in fact occurred. *Rosenkrantz V, supra,* 29 Cal.4th at 683. Thus, as applied by the Board, the phrase violates federal due process, as it is being interpreted so as to fit any crime, and no longer serves to distinguish crimes that truly are particularly egregious.[8]

---

*Dannenberg,* and the Supreme Court not only denied review, but they refused the Governor's request to depublish the opinion.

[8] This is exactly what the Santa Clara County Superior Court found in the consolidated cases of *In re Criscione, In re Jameison,* and *In re Ngo.* A copy of the *Criscione* decision is attached hereto as Exhibit VVV. The *Jameison* and *Ngo* decisions are virtually identical in content, as they were decided together, and have not been attached.

## XXI.

Petitioner generally and specifically denies the allegations in paragraph 21. Petitioner will not be relying on a no parole policy herein, but will instead rely on the vagueness issue discussed in the preceding paragraph and *infra*.

## XXII.

Petitioner generally and specifically denies the allegations in paragraph 22. This issue is now clearly covered by *Hayward, supra*, as well as the cases cited herein which apply the rule of *Biggs* and *Scott II*. Petitioner is five (5) years past his minimum term, without considering conduct credits, ten (10) with those credits. His behavior, programming, self help activities, educational and vocational achievements and volunteer work tutoring other students, far surpasses the standards set in *Hayward*. Considering the nature of the crime and his perfect behavior and clear evidence of rehabilitation, Mr. Rush is indisputably entitled to the relief envisioned in *Hayward*.

## XXIII.

Petitioner denies the allegations in paragraph 23. Petitioner does not contend that a proportionality comparison is necessary in this case. To the contrary, the only comparative analysis that is done is for purposes of determining whether the crime is particularly egregious. See *e.g., Ernest Smith, supra*.

## XXIV.

Petitioner denies the allegations in paragraph 24 and affirmatively alleges that the Board's repeated decisions denying parole have rendered his right to a meaningful parole hearing useless. Under the Board's view, as long as there is "some evidence" of a regulatory factor, regardless of the lack of a nexus to current dangerousness, they can forever deny parole. Absent a future Board panel arbitrarily finding that the crime is not egregious, Petitioner will never be found suitable for parole.

## XXV.

Petitioner generally and specifically denies each and every allegation in paragraph 25. Respondent admits in Argument I(A) of the Return that, at a minimum, due process requires the Board to permit Petitioner to be present, and to give him a statement of the reasons why he falls short of being found suitable for parole. The obvious reason for this is so that the inmate can correct these shortfalls by the next hearing and presumably be found suitable, as the previous

impediments to parole no longer exist. However, this is never what occurs in practice, and clearly did not occur in Mr. Rush's case. What the Board does each time is commend him on his excellent behavior and programming, tell him to stay discipline free, and to come back in several years. When he returns, having fully complied with the Board's instructions, with continued excellent programming, with viable parole plans, strong support in the community, and full psychological clearance, the Board again denies him parole, based on the crime, and tells him to come back in several more years, with the same recommendations. This clearly shows a lack of good faith by the Board, and arbitrariness in their process.

### XXVI.

Petitioner admits the allegations in paragraph 26. See paragraph XVII, *supra*.

### XXVII.

Petitioner generally and specifically denies the allegations in paragraph 27. It is affirmatively alleged that the Board is precluded from making findings that take the case outside the normal sentencing structure, here the matrix, when those facts have not been charged and found true by the trier of fact at the time of the conviction, or admitted by the plea. *Blakely v. Washington* 542 U.S. 296 (2004). The Superior Court erroneously ruled that the Board's has a right to reach conclusions that were directly contrary to the jury's finding regarding the nature of Mr. Rush's crime and his level of participation, as it relates to shooting the victim. Petitioner generally and specifically denies each and every remaining allegation in paragraphs 27.

### XXVIII.

Petitioner generally and specifically denies each and every allegation of paragraphs 28 and 29. The petition speaks for itself, and the claims being pursued therein are incorporated herein by reference as though set forth in full. Petitioner affirmatively alleges that his due process rights were violated when the Board denied a grant of parole to Mr. Rush at his 2005 hearing, and the Superior Court's deference to that decision was unreasonable, wrong and arbitrary. It is further affirmatively alleged that Mr. Rush has presented a prima facie case for relief under the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA).

### XXIX.

Petitioner generally and specifically denies each and every allegation of paragraph 30.

### XXX.

Petitioner admits the allegations of paragraph 32 that there is no procedural bar applicable to this action.

### XXXI.

Petitioner generally and specifically denies each and every allegation of paragraphs 33 that no evidentiary hearing is required. It is affirmatively alleged that an evidentiary hearing is necessary to demonstrate that there are numerous examples, similar to the case here, where the Board has failed to act within the limitations imposed by statute and the strictures of due process, thus showing that the regulatory criteria are being applied in an overbroad, vague and ambiguous fashion, in violation of due process. Additionally, Petitioner affirmatively alleges that an evidentiary hearing may be necessary to resolve the factual disputes regarding the vagueness of the regulations as they are applied by the Board and governor, and that the existing state court record is not sufficient and should be properly be augmented. [9] Thus, the only proper action is for this Court to grant Mr. Rush an evidentiary hearing.

### XXXII.

Petitioner generally and specifically denies each and every allegation of paragraphs 34. For the reasons set forth in the petition and herein, Petitioner is entitled to the requested relief.

### XXXIII.

Mr. Rush re-alleges and incorporates herein by reference each and every allegation and all of his claims as presented in his Petition, and the factual showing in his exhibits, and

---

[9] A simple test can be done in connection with an evidentiary hearing to illustrate the vagueness of the regulations as they are currently being applied. This Court can order respondent to produce the decisions by the parole Board during the ninety (90) days before and after Mr. Rush's hearing, along with the Governor's decisions regarding any case where parole was granted by the Board (or en banc decision or rulings by the Decision Review Unit as to any case that was subsequently reversed or modified), and as to any inmate that was released, any prior decisions of the Board denying parole as to that inmate. Petitioner anticipates that this evidence would show that in 100% of all murder cases, the crime has been found to be "especially heinous, atrocious, or cruel" at some point. Thus, as applied, the phrase would be violative of federal due process, in that it can fit any crime, and has lost the ability to distinguish crimes that truly are particularly egregious. This is precisely what the Santa Clara County Superior Court found in the case of *In re Arthur Criscione*, a copy of which is attached hereto as Exhibit "VVV". See generally the discussion in the accompanying Points & Authorities.

affirmatively alleges that Respondent, in its Answer, has done nothing more than attempt to relitigate the offense itself, and restate the Board's decision, without establishing a lawful basis for the denial of parole, or offering any real explanation as to how or why the evidence supports a finding that Mr. Rush would *currently* pose an unreasonable risk of danger to the public if released. Likewise, Mr. Rush incorporates herein by reference the memorandum of points and authorities and exhibits submitted with the petition, and the memorandum of points and authorities and exhibits submitted herewith. The Court's attention is directed to those documents for a full understanding of the actual arguments relied upon herein. These documents provide the legal and factual basis for the claims raised herein.

### XXXIV.

Petitioner affirmatively alleges that there are numerous examples of the fact that the Board and Governor have failed to act within the limitations imposed by statute and the strictures of due process contained in the published decisions of this state, including but not limited to the cases of *McQuillion v. Duncan [McQuillion I]*, 306 F.3d 895 (9th Cir. 2002); *Hayward, supra; Dannenberg, supra; Montgomery, supra; In re Ramirez*, 94 Cal.App.4th 549 (2001); *Scott I, supra*, 119 Cal.App.4th 871 (2004); *In re Ernest Smith*, 114 Cal.App.4th 343 (2003); *In re Mark Smith*, 109 Cal.App.4th 489 (2003); *In re De Luna*, 126 Cal.App.4th 585 (2005); *In re Capistran*, 107 Cal.App.4th 1299 (2003); *Sanchez, supra*, 444 F.Supp.2d 1049; *Rosenkrantz VI, supra*, 444 F.Supp.2d 1063; *Martin, supra*, 431 F.Supp.2d 1038; *Scott II, supra*, 133 Cal.App.4th 573, *Lee, supra*, 143 Cal.App.4th 1400; *Elkins, supra*, 144 Cal.App.4th 475; *Weider, supra*, 145 Cal.App.4th 570, *Barker, supra*; and *Gray, supra*, just to name a few examples. Petitioner can provide numerous additional examples of such situations, as documented in both published and unpublished cases at both the California Superior Court and Court of Appeals level, as well as at the Federal District Court level, and reserves the right to do so at any evidentiary hearing in this matter.

### *REMEDY*

### XXXV.

Petitioner denies the allegations contained in paragraph 31 and affirmatively alleges that the appropriate remedy is an evidentiary hearing and release. Petitioner has appeared in front of the Board and been denied parole five (5) times. An additional parole consideration hearing before the Board cannot provide a remedy against the abrogation of Petitioner's due process

rights. As the court noted in *Ramirez*, *supra*, at 561, the existence of a right carries with it the corollary principle that there must "also exist [] a remedy against their abrogation [citing *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 161-163 (1803)]. The Court of Appeal in the case of *In re Rosenkrantz* [*Rosenkrantz II*], 80 Cal. App. 4th 409, 428 (2000), stated "we flatly reject the Board's contention that (a) *Rosenkrantz'* only remedy is the ***continuing charade of meaningless hearings***, and (b) that the Superior Court lacks the power to compel the Board to follow the law." emphasis added. Here, it would be irrational to keep sending the case back to the Board, since there are no new facts, except positive ones, as established at the most recent hearing, and they could not render a decision denying parole that would be supported by the evidence. Thus, the only proper action is for this Court to order Mr. Rush released from custody. The 2005 hearing was Mr. Rush's fifth hearing where he was denied parole. Since then, his 2007 hearing went forward, and despite an exclusively positive presentation, with two (2) more years of perfect behavior, exemplary programming, full psychological clearance, and excellent parole plans, he was again denied parole based on the crime. Thus, it is apparent that, absent intervention by this Court, the Board will continue to issue crime based denials indefinitely. Under *McQuillion I*, *supra*, and *Penal Code* §1487(2), this Court has the power to order a discharge from custody when a term of incarceration has become unlawful. That section allows a court to discharge an inmate from custody when his or her incarceration, although initially lawful, has become illegal due to subsequently occurring circumstances. *Penal Code* §1487, subd. (2). That has in fact occurred in this case.

### *PRAYER*

WHEREFORE, Mr. Rush respectfully submits that the petition for writ of habeas corpus should be granted, and that he is entitled to the relief requested in the petition.

Dated: February 8, 2008                    Respectfully submitted,


LAW OFFICES OF RICONE & DEFILIPPIS


By:
    STEVE M. DEFILIPPIS
    Attorneys for Petitioner
    ROBERT DALTON RUSH

21