*IN THE UNITED STATES DISTRICT COURT*
*NORTHERN DISTRICT OF CALIFORNIA*

ROBERT DALTON RUSH,

     Petitioner,

     -vs-

BEN CURRY, Acting Warden

     Respondent,

     On Habeas Corpus.

_____/

BOARD OF PRISON TERMS,
ARNOLD SCHWARZENEGGER,
Governor,

     Real Parties In Interest

_____/

**CASE NO.** CV 07-03990 CRB

[San Bernardino Co. Sup. Ct.
# SCR 44594; Cal. Ct. of App. Case
#E042268; Cal. Supreme Ct. Case
#S150438]

---

*POINTS AND AUTHORITIES IN SUPPORT OF*
*TRAVERSE TO RESPONDENT'S ANSWER*

---

STEVE M. DEFILIPPIS
State Bar #117292
PICONE & DEFILIPPIS, A P.L.C.
625 N. First St.
San Jose CA 95112
(408) 292-0441

Attorneys for Petitioner
ROBERT DALTON RUSH

TABLE OF CONTENTS

TABLE OF CONTENTS...................................................................................i

TABLE OF AUTHORITIES..........................................................................iii

INTRODUCTION............................................................................................1

FACTUAL ISSUES..........................................................................................2

LEGAL ARGUMENT.......................................................................................3

     I.     PETITIONER IS ENTITLED TO FEDERAL HABEAS CORPUS
            RELIEF BECAUSE THE DENIAL OF PAROLE WAS
            INCONSISTENT WITH CLEARLY ESTABLISHED FEDERAL
            LAW......................................................................................3

            A.     THE "SOME EVIDENCE" STANDARD APPLIES...3

            B.     CLEARLY ESTABLISHED SUPREME COURT LAW
                    PROVIDES THAT A REVIEWING COURT MUST
                    APPLY THE "SOME EVIDENCE" STANDARD TO
                    PAROLE DECISIONS.....................................5

            C.     AS NINTH CIRCUIT PRECEDENT SHOWS,
                    MUSLADIN IS INAPPLICABLE HERE...............7

     II.    CONTINUED RELIANCE ON THE COMMITMENT OFFENSE TO
            DENY PAROLE IS A DUE PROCESS VIOLATION BECAUSE THE
            UNCHANGING FACTS OF THE CRIME NO LONGER YIELDS
            PREDICTIVE INFORMATION AS TO PETITIONER'S CURRENT
            THREAT TO THE COMMUNITY.....................................8

            A.     THE STANDARD OF REVIEW IN PAROLE
                    SUITABILITY REQUIRES THE COURT TO FOCUS
                    SOLELY ON CURRENT DANGEROUSNESS...........8

            B.     AFTER FIVE PAROLE HEARINGS, SERVING NEARLY
                    TWENTY-TWO YEARS OF INCARCERATION, BEHAVING
                    EXCEPTIONALLY & PROGRAMMING POSITIVELY, THE
                    COMMITMENT OFFENSE YIELDS NO PREDICTIVE VALUE
                    OF A CURRENT THREAT TO THE COMMUNITY...........14

                      1.   Service Of The Minimum Term........................18
                    2.   The Irons And Sass Decisions.........................19
                      3.   The Hayward Decision...................................20
                      4.   Recent Cases.................................................22

1

2           C.     THE OFFENSE FACTORS RELIED ON BY THE
                      BOARD ARE INADEQUATE TO SHOW THE CRIME
3                      WAS PARTICULARLY EGREGIOUS...................24

4

5      III.     THE BOARD IS APPLYING THE REGULATORY CRITERIA IN
                   A MANNER THAT RENDERS THE LANGUAGE
6                   UNCONSTITIONALLY VAGUE.................................28

7      IV.     RESPONDENT'S ARGUMENTS IN SECTIONS D(1), (2) & (3) HAVE
                   NO APPLICATION TO ANY THEORY RAISED IN THE
8                   PETITION...............................................................30

9   CONCLUSION.................................................................................31

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

TABLE OF AUTHORITIES

**Federal Cases**

16, lns. 22-24 — 28
20, lns. 23-24 — 11
Biggs v. Terhune, 334 F.3d 901, 916-917 (2003) — 11, 17
Biggs v. Terhune, 334 F.3d, 910, 915 (9th Cir. 2003) — 7, 17, 19
Blankenship v. Kane, ____F.Supp.___[2007 WL 1113798] — 6
Blankenship, 2007 WL 1113798 — 6, 11, 19
Board of Pardons v. Allen, 482 U.S. 369-377-78 (1987) — 5
Carey v. Musladin, _U.S._, 127 S. Ct. 649 (2006) — 8, 9
Ellis v. District of Columbia, 84 F.3d 1413, 1418 (D.C. Cir. 1996) — 5
Godfrey v. State of Georgia, 446 U.S. 420, 428-429 (1980) — 30
Greenholtz v. Inmates of Neb. Penal & Corr. Complex, 442 U.S. 1 (1979) — 5
Hayward v. Marshall, 2008 WL 43716 — passim
Irons II v. Carey, 505 F.3d 846 (9th Cir. 2007) — 7, 9, 27
Irons II], 479 F.3d 658 (9th Cir. 2007) — 5
Irons v. Carey [Irons II], 476 F.3d 658, at 665 (9th Cir. 2007) — 18, 19, 24
Jancsek v. Oregon Bd. Of Parole, 833 F.2d 1389 (9th Cir. 1987) — 7, 9
Martin v. Marshall, 431 F.Supp.2d 1038, 1042-1043 (N.D. Cal., 2006) — passim
Maynard v. Cartwright, 486 U.S. 356, 361-364 (1988) — 30
McQuillion v. Duncan, 306 F.3d 895, 902 (9th Cir. 2002) — 5, 7, 31
Michael v. Ghee, 498 F.3d 372, 378 (6th Cir. 2007) — 5
N.D. Cal. 2006), Brown v. Kane, ___ F.Supp.2nd ___, 2007 WL 1288448 — 11, 19
Panetti v. Quarterman, ___ U.S.___, 127 S.Ct. 2842 (2007) — 9
Rosenkrantz v. Marshall, (Rosenkrantz VI) 444 F.Sup.2d 1063,1079 (C.D. Cal., 2006) — passim
Sanchez v. Kane, 444 F.Supp.2d 1049, 1058 (C.D. Cal., 2006) — 6, 11, 14, 19
Sandin v. Conner, 515 U.S. 472 (1995) — 5
Sass v. Board of Prison Terms, 461 F.3d 1123, 1128 (9th Cir. 2006) — passim
Shell v. Mississippi, 498 U.S. 1, 3 (1990) — 30
Superintendent v. Hill, 472 U.S. 445, 457 (1985) — 7
Thomas v. Brown, ___F.Supp.___, 2006 WL 3783555 — 11

**State Cases**

150 Cal.App.4th 1151, 1562] (2007) — 10
153 Cal.App.4th 1053] (2007) — 10
154 CA4th 849] (2007) — 14
Elkins, supra 144 Cal.App.4th 499 — 15, 28
In re Dannenberg [Dannenberg I] 36 Cal. 4th 1061 (2005) — 10
In re Dannenberg [Dannenberg II] , 156 Cal.App.4th 1387, 68 Cal.Rptr.3d 188, 196-197 (2007) — passim
In re Dannenberg, 34 Cal.4th 1061 (2005) — 5, 12, 16, 30
In re Elkins, 144 Cal.App.4th 475, at 518 (2006) — 4, 10, 14, 19
In re Ernest Smith, 114 Cal.App.4th 343, at 367 — 27, 28, 31
In re Gray, 151 Cal.App.4th 379, 383 (2007) — 10, 19, 20
In re Jacobson, 65 Cal.Rptr.3rd 222 — 10
In re Lee, 143 Cal.App.4th 1400, 1408-1409 (2006) — 10, 11, 14

1

2    In re Mark Smith, 109 Cal.App.4th 489, at 509-505 (2003)                    15, 27
     In re Montgomery, 156 Cal.App.4th 930, at 946 (2007)                         passim
3    In re Ramirez, 94 Cal.App.4th 549, at 571                                        16
     In re Rosenkrantz [Rosenkrantz V], 29 Cal.4th 616, 683 (2002)                     5
4    In re Scott  [Scott II], 133 Cal.App.4th 573, at 594-595 (2005)              passim
     In re Scott [Scott I] 119 Cal.App.4th 871 at 890-892 (2004)                      27
5    In re Scott, 119 Cal.App.4th 898 (2004)                                           6
6    In re Weider, 145 Cal.App.4th 570, at 589-590 (2006)                 10, 14, 15, 16
     In re Weider, 45 Cal.App.4th 570, 589 (2006)                                     11
7    Lee, supra, 143, Cal.App.4th 1408                                     15, 16, 19, 28
     man 12                                                                       22, 23
8    S147840], In re Barker, 151  Cal.App.4th, 346, 365 (2007)                    10, 19
9    Superior Court of Santa Clara County v. Engert, 31 Cal.3d 797, 805 (1982)        30

10   Federal Statutes
     28 U.S.C. §2254                                                                  24
11   Penal Code §§2932                                                       20, 22, 23

12   State Statutes
     Cal. Rules of Court 28                                                           10

13   Federal Rules
     9th Cir. 1/3/08                                                                  27
14

15   State Regulations
     Cal. Code Regs. §2402(c)(1)(D)                                                   26
     Cal. Code Regs. tit. 15                                                          26
16

17

18

19

20

21

22

23

24

25

26

27

28

1

2    STEVE M. DEFILIPPIS
     State Bar #117292
3    PICONE & DEFILIPPIS, A P.L.C.
     625 N. First St.
4    San Jose CA 95112
     (408) 292-0441
5
     Attorneys for Petitioner,
6    ROBERT DALTON RUSH

7

8              *IN THE UNITED STATES DISTRICT COURT*
           *FOR THE NORTHERN DISTRICT OF CALIFORNIA*
9                  *SAN FRANCISCO DIVISION*

10   ROBERT DALTONRUSH,                Case # CV 07-03990 CRB

11        Petitioner,                  *POINTS AND AUTHORITIES IN*
                                       *SUPPORT OF TRAVERSE TO*
12                                     *RESPONDENT'S RETURN*
          -vs-
13
     BEN CURRY, Warden,
14
          Respondent.
15
          On Habeas Corpus.
16    _____/
17   ARNOLD SCHWARZENEGGER,
     Governor, BOARD OF PAROLE
18   HEARINGS,
19
          Real Parties in Interest.
20    _____/

21
                      *INTRODUCTION*
22
          On November 19, 2007, this Court entered an order denying the first petition for writ of
23
     habeas corpus filed by Mr. Rush, which was a challenge to his March 5, 2003 denial of parole, *In*
24
     *re Robert Dalton Rush*, Case No. CV 05-04143 CRB. This second petition challenges the denial
25
     of parole at his next subsequent hearing, held two and one half years later, on October 11, 2005.
26
     This is now the fifth time the Board has denied Mr. Rush parole. As will be seen, unlike the
27
     prior petition, all the circumstances are exclusively in favor of Mr. Rush being granted relief.
28
     With twenty two years of literally perfect behavior and programming, the completion of every

                                        1

conceivable self help program, attaining three college degrees and strong vocational skills, and years of long hours volunteering time to the various educational programs for other inmates, and considering the lack of any prior or subsequent violent behavior and the situational nature of the crime, this is a perfect case for the application of the Biggs-Sass-Irons II-Hayward line of decisions. This denial of parole simply failed to address the sole issue of current dangerousness, which the state's own experts have unanimously assigned to the lowest possible level since he came into prison. As such, this case cries out for relief.

## *FACTUAL ISSUES*

In discussing the commitment offense in the return, respondent fails to note the substantial factual background underlying the commitment offense. First of all, Mr. Rush was in the process of recovering from an extremely serious motorcycle accident that had left him convalescing for months, involving severe injuries to his back, hips and head. Exh. E, pp. 301-302, Exh. D pp. 184-185. The accident was an extremely serious one, in which Petitioner's best friend, the operator of the motorcycle, was killed, and Mr. Rush severely injured. Thus, he was in a weakened physical condition at the time he was attacked by his much larger and physically stronger roommate, John Heinz, as well as being in a very fragile emotional condition due to the death of his friend. Secondly, although the *verbal* argument had *started* over bickering about household matters, Heinz escalated the dispute, and started a substantial *physical altercation* by attacking Mr. Rush. Mr. Rush was unable to fight back because of his compromised physical condition, and was clearly the losing party in the physical altercation. He received a bloody nose and bloody lip, and his head was slammed into the wall hard enough that it left a large indentation in the plaster. Thereafter, Heinz walked up and down the hallway taunting and threatening Mr. Rush, as the latter sat on the bed in his room nursing his injuries. It was when Mr. Rush went to the bathroom to wash up that he took the rifle, which had been stored under his bed, as protection to insure that Mr. Heinz would not once again attack him. When Heinz started to approach, he pointed the gun at him, and when he did not stop, Mr. Rush "flinched" and fired off the first shot. That shot did not stop Heinz, and Rush panicked, repeatedly firing the gun until Heinz went down. As the jury verdict rejecting the first degree murder charge evidences, this was not a calculated decision to kill Heinz for having attacked him, but an excessive overreaction to the perceived threat of physical violence from Heinz. Had the jury believed that

2

he made the decision to kill when he took the rifle out and left his bedroom, they would have convicted him of first degree, premeditated murder.

Third, although it is not expressly stated as such, the reference to stopping at a bar "to have a few drinks with Heinz' money" seems to suggest a heightened level of callousness which only exists if the boys were celebrating the death of Heinz, something that is entirely inconsistent with the characterization of all the relevant witnesses regarding the state of mind of Mr. Rush after the killing. He is repeatedly described as extremely distraught and unable to handle himself emotionally after the crime. The evidence at trial was that his roommate, Hoy, essentially took control when he arrived, suggesting the course of action to dispose of the body. Hoy had to help Petitioner pull it together, as Rush was extremely emotionally distraught, and it was clear that the later decision to stop at a bar was in order to get drunk and forget what had just happened. Thus, while this may indicate that the post-mortem theft of money was callous, it does not reflect an exceptional level of callousness as to the commitment offense of murder. See *e.g.*, *In re Elkins*, 144 Cal.App.4[th] 475, at 518 (2006).

## *LEGAL ARGUMENT*

**I.    *PETITIONER IS ENTITLED TO FEDERAL HABEAS CORPUS RELIEF BECAUSE THE DENIAL OF PAROLE WAS INCONSISTENT WITH CLEARLY ESTABLISHED FEDERAL LAW.***

**A.    *THE "SOME EVIDENCE" STANDARD APPLIES***

First, contrary to Respondent's assertions in §§I (A) and (B) of the Return, federal law has clearly established that Mr. Rush has a liberty interest in parole. In *Board of Pardons v. Allen*, 482 U.S. 369-377-78 (1987), a case decided *after Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1 (1979), the Supreme Court stated that a liberty interest could arise out of the state's use of mandatory language in their parole statute. *Allen*, 482 U.S. at 377-78. Thereafter, the 9th Circuit specifically found that the Supreme Court's language in *Sandin v. Conner*, 515 U.S. 472 (1995) did not hold that the reasoning in *Allen* was inapplicable to the parole system, and thus had no effect on the law governing parole in this circuit. *McQuillion v. Duncan*, 306 F.3d 895, 902 (9th Cir. 2002); *see also, Michael v. Ghee*, 498 F.3d 372, 378 (6th Cir. 2007) (The court noted that *Sandin* was decided only in the context of prison conditions, not parole eligibility, and declined to apply *Sandin's* reasoning in a parole context.); *Ellis v. District of Columbia*, 84 F.3d 1413, 1418 (D.C. Cir. 1996) (The court declined to follow *Sandin's* reasoning because, *Greenholtz* and *Allen*, unlike *Sandin*, were directly on point as they both dealt

with a prisoner's liberty interest in parole – *Sandin* did not.)

Furthermore, the 9th Circuit addressed the applicability of *In re Dannenberg*, 34 Cal.4th 1061 (2005) to the question of whether or not California inmates have a liberty interest in parole. The Court stated, "*Dannenberg* addressed the narrow question whether the Board must engage in comparative proportionality analysis in setting parole dates pursuant to section 3041(b) before determining whether an inmate is suitable for parole .... *Dannenberg* [did] not explicitly or implicitly hold that there is no constitutionally protected liberty interest in parole."[1]   *Sass v. Board of Prison Terms*, 461 F.3d 1123, 1128 (9th Cir. 2006).   The Court then went on to explicitly hold that California inmates do have a liberty interest in parole. *Id*, see also, *Irons v. Carey* [hereinafter *Irons II*], 479 F.3d 658 (9th Cir. 2007), and *McQuillion*, 306 F.3d at 904. Therefore, it is beyond dispute that Mr. Rush has a liberty interest is parole.

Thus, once a liberty interest in parole has been established and interference in that interest has occurred, the question becomes, what procedural requirements must be met to satisfy due process.   In order to comply with the due process clause, the decision to deny an inmate parole must be supported by "some evidence" of unsuitability for parole under the applicable regulatory factors. *Superintendent v. Hill*, 472 U.S. (1985) 445, 457; *Sass*, 461 F.3d at 1128; *Blankenship v. Kane*, ____F.Supp.___[2007 WL 1113798] (2007 N.D. Cal); *Rosenkrantz v. Marshall, (Rosenkrantz VI)* 444 F.Sup.2d 1063,1079 (C.D. Cal., 2006); *Martin v. Marshall*, 431 F.Supp.2d 1038, 1042-1043 (N.D. Cal., 2006); *Sanchez v. Kane*, 444 F.Supp.2d 1049, 1058 (C.D. Cal., 2006). Therefore, when an inmate challenges the Board's decision to deny parole, the reviewing court *must* determine if there is any evidence that could support the Board's conclusion that the inmate remains currently dangerous. *Blankenship*, 2007 WL 1113798 at *5.

The 9th Circuit recently reaffirmed that the "some evidence" standard applies. In deciding the case of *Hayward v. Marshall*, 2008 WL 43716 (C.A.9 (Cal.)), the Court stated that:

> "We have held that 'The Supreme Court ha[s] clearly established that a parole
> board's decision deprives a prisoner of due process with respect to this [liberty]
> interest if the board's decision is not supported by 'some evidence in the record,'

---

[1]   In fact, in *Dannenberg* the court stated "we cautioned, sole reliance on the commitment offense might, in particular cases, violate section 3041, subdivision (a)'s provision that a parole date "shall normally be set" under "uniform term" principles, and might thus also contravene the *inmate's constitutionally protected expectation of parole*." *Dannenberg*, 34 Cal.4th at 1094, *citing, In re Rosenkrantz [Rosenkrantz VI]*, 29 Cal.4th 616, 683 (2002).

or is 'otherwise arbitrary.' When we assess whether a state parole board's suitability determination was supported by 'some evidence' in a habeas case, our analysis is framed by the statutes and regulations governing parole suitability determinations in the relevant state.' [citations omitted].... Then 'we must review the record in order to determine whether the state court decision holding that these findings were supported by 'some evidence' ...constituted an unreasonable application of the 'some evidence' principal articulated in *Hill* [citations omitted].'" *Id.* at 5.

Despite this clear law, Respondent argues that the Court may not review the sufficiency of the evidence to any extent. Justice Reinhardt, in his dissenting opinion in *Sass*, made astute comments, not only affirming *the applicability of the "some evidence"standard,* but warning that "'[t]he exceedingly deferential nature of the 'some evidence' standard of judicial review...does not convert a court reviewing the denial of parole into a potted plant.'" *Sass* at 1140, quoting *In re Scott*, 119 Cal.App.4th 898 (2004). Clearly, based on recent case law handed down by the Court and by the United States' Supreme Court in *Hill*, the AEDPA standard of review is "some evidence"; therefore, Respondent's argument is without merit.

> ## B.    CLEARLY ESTABLISHED SUPREME COURT LAW PROVIDES THAT A REVIEWING COURT MUST APPLY THE "SOME EVIDENCE" STANDARD TO PAROLE DECISIONS.

The United States Supreme Court in *Superintendent v. Hill*, 472 U.S. 445, 457 (1985), ruled that due process requires court review of the sufficiency of the evidence when a liberty interest is invoked, and in that context applied the "some evidence" standard to prison disciplinary hearings. *Hill* was cited in *Sass, Irons II, McQuillion* and *Hayward* as a basis for applying the "some evidence" standard to parole hearings. In fact, in *Sass* the Court specifically stated,

> To hold that less than the some evidence standard is required would violate clearly established federal law because it would mean that a state could interfere with a liberty interest-that in parole-without support or in an otherwise arbitrary manner. We therefore reject the state's contention that the some evidence standard is not clearly established in the parole context. *Sass*, 461 F.3d at 1129.

In *Irons II v. Carey*, 505 F.3d 846 (9th Cir. 2007), the 9th Circuit invoked *Hill, Sass, Biggs and McQuillion* in making the point that at the time Irons' petition was reviewed by the state courts, the Supreme Court had "clearly established that the parole board's decision deprives a

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

prisoner of due process with respect to this interest if the board's decision is not supported by 'some evidence in the record.'" *Id. at* 850-851, citing *Superintendent v. Hill,* 472 U.S. 445, 457; *Sass, supra,* 461 F.3d at 1128-20; *Biggs v. Terhune,* 334 F.3d, 910, 915 (9th Cir. 2003) and *McQuillion,* 306 F.3d 895, 904 (9th Cir. 2002). In *McQuillion,* the 9th Circuit specifically stated that the same standard, "some evidence," applied in the case of prison disciplinary proceedings addressed by the Supreme Court, has been determined to apply in the case of parole rescission. *McQuillion* at 904, citing *Jancsek v. Oregon Bd. Of Parole*, 833 F.2d 1389 (9th Cir. 1987). The Court continued to affirm the application of the standard, stating, "thus, in reviewing the parole rescission determination in this case, we ask only if the determination has been supported by "some evidence" having "some indicia of reliability." *Id* at 904; *Jancsek v. Oregon Bd. Of Parole,* 833 F.2d 1389 (9th Cir. 1987) (adopting the "some evidence" standard set forth by the Supreme Court in *Superintendent v. Hill,* 472 U.S. 445, 456 (1985).

Finally, in *Hayward*, a case similar to the one at bar, the Court affirmed the application of the "some evidence" standard finding that the state court "unreasonably applied the some evidence standard when it concluded that the Governor's reversal of the Board's grant of parole to Hayward was justified." *Hayward,* 2008 WL 43716 (C.A.9 (Cal.), slip opn. at *5-7. Hayward was found unsuitable for parole by Governor Davis based on, among several factors, his unstable social history, including an extensive history of alcohol and substance abuse. *Id.* The Court, applying the some evidence standard, found that the record contained *no evidence* that Mr. Hayward *currently poses a threat to society. Id.* at 5. The Court cited to the facts that the crime had been committed decades ago, that Mr. Hayward had demonstrated educational and spiritual rehabilitation, that his record showed an absence of any recent discipline and that he had strong community support in finding that the Governor's reversal lacked record evidence. *Id.* at 6.

Mr. Rush's compares favorably to the inmate in *Hayward* in every respect. The only difference is that Hayward had twenty seven (27) years in custody. However, Mr. Rush's rehabilitative process started long before Hayward, as he exhibited perfect behavior, and strong programming, since the day he was arrested in 1986, while Hayward continued to have serious disciplines until the late 1980's and even had minor write-ups as late as 1997. Mr. Rush's impressive rehabilitation record puts him head and shoulders above Hayward, with an unblemished disciplinary history, an extensive list of self-help programs, and far better psychological reports than Hayward, being assigned an even lower risk of dangerousness. Rush

has no criminal history or gang involvement, both of which applied to Hayward. In short, unlike Hayward, who had some prior and subsequent events that lent credence to a finding of dangerousness, which then were found attenuated by the 9th Circuit, Mr. Rush has nothing adverse anywhere in his history, before or after the crime. Thus, not only is Mr. Rush entitled to the application of the "some evidence" standard, the Court should also find that this standard was unreasonably applied by the Superior Court.

## C.    AS   NINTH   CIRCUIT   PRECEDENT   SHOWS, MUSLADIN IS INAPPLICABLE HERE.

Respondent attempts to sidestep binding 9th Circuit precedent by claiming that because there is no Supreme Court holding involving the exact same fact pattern-- parole hearings-- that required judicial review using the "some evidence" standard, AEDPA does not allow the Court to follow *Hill*. See *Carey v. Musladin*, _U.S._, 127 S. Ct. 649 (2006).

In *Musladin*, the Court concluded that the state court's decision was not contrary to or an unreasonable application of clearly established federal law because the Supreme Court had never addressed the potentially prejudicial effect of spectator's conduct in any prior decision. *Id.* The Supreme Court cases cited by the petitioner in *Musladin* dealt with the potentially prejudicial conduct of the state, a situation far different in a constitutional context than the scenario presented to the Court, where the conduct was by a civilian spectator, not a state actor. Furthermore, the Supreme Court recently explained the role of federal review of state court decisions and impact of AEDPA in *Panetti v. Quarterman*, ___ U.S.___, 127 S.Ct. 2842 (2007). In *Panetti*, the Supreme Court explained,

> AEDPA does not 'require state and federal courts to wait for some nearly identical fact pattern before a legal rule must be applied.' *Carey v. Musladin*, 549 US ---,---, 127 S.CT 649, 656 (2006) (slip op., at 2)(Kennedy, J., concurring in judgment.) Nor does AEDPA prohibit a federal court from finding an application of a principle unreasonable when it involves a set of facts different from those of the case in which the principle was announced. [citation omitted] The statute recognizes that, to the contrary, even a general standard may be applied in an unreasonable manner.

*Panetti*, 127 S.Ct. 2842, 2858. In *Panetti*, the majority was adopting the reasoning used by Justice Kennedy in his concurring opinion in *Musladin* wherein he stated that lower courts need not wait an exact fact pattern before they review a state court's application of a general

standard. Here, the "general standard" announced by the Supreme Court in *Hill*, that some evidence must support a deprivation of a liberty interest, was unreasonably applied by the superior court when it failed to recognize that there was no evidence to support the conclusion that Petitioner was currently dangerous.

Also, unlike *Musladin,* and the cases cited therein, the present case does not pose a completely different scenario than what the Supreme Court faced in *Hill. Hill* involved prison disciplinary hearings and the present case concerns prison parole hearings, both conducted by the state and both "directly affect the duration of the prison term." *Sass,* 461 F.3d at 1128, *citing, Jancsek v. Or. Bd. Parole,* 833 F.2d 1389, 1390 (9th Cir. 1987.) Because both hearings are given by the same entity within the state, the Department of Corrections, the 9th Circuit has repeatedly used the standard espoused in *Hill* as clearly established Supreme Court authority to apply the "some evidence" test in the parole context. See, *Irons II, supra, Sass, supra, McQuillion I, supra.* Thus, as explained by the Supreme Court in *Panetti, Musladin* does not prohibit the use of *Hill* as clearly established federal law, and does not prohibit Mr. Rush from pursuing his due process claims. *Panetti,* 127 S.Ct. at 2858.

II.   **CONTINUED RELIANCE ON THE COMMITMENT OFFENSE TO DENY PAROLE IS A DUE PROCESS VIOLATION BECAUSE THE UNCHANGING FACTS OF THE CRIME NO LONGER YIELDS PREDICTIVE INFORMATION AS TO PETITIONER'S CURRENT THREAT TO THE COMMUNITY.**

A.   *THE STANDARD OF REVIEW IN PAROLE SUITABILITY REQUIRES THE COURT TO FOCUS SOLELY ON CURRENT DANGEROUSNESS.*

The current case law is now unanimous that a reviewing court must reverse a denial of parole by the Board or Governor when there is no reliable evidence which rationally shows that the inmate is currently dangerous. The decisions adopting this rule are unanimous, with no published case now in existence[2] that rejects this rule. Not only does this include the state court cases of *In re Dannenberg [Dannenberg II]* [3], 156 Cal.App.4th 1387, 68 Cal.Rptr.3d 188, 196-

---

[2]  The only case to ever take issue with this rule is *In re Jacobson,* 65 Cal.Rptr.3rd 222 [formerly at 154 Cal.App.4th 849] (2007), but the California Supreme Court recently accepted review of *Jacobson,* at S156416, and that decision is no longer citable authority. (*Cal. Rules of Court* 28, 976, 977, 979.) By accepting review, the Supreme Court removed the conflict among the California appellate courts, and now, all the published state decisions reflect the requirement of focusing on current danger.

[3]  There are now two "*Dannenberg*" decisions. On November 16, 2007, the Court of Appeal reversed the Governor's finding of unsuitability based on the crime, affirming that the sole focus in parole suitability must be on current dangerousness. Even with a crime that initially satisfies that showing, with the passage of time, and in the

197 (2007), *In re Scott [Scott II]*, 133 Cal.App.4th 573, at 594-595 (2005) [request for stay of inmate's release & request for depublication denied by Cal. Supr. Ct. at #S138430], *In re Lee*, 143 Cal.App.4th 1400, 1408-1409 (2006) [req. for depubl. denied at S149411], *In re Elkins*, 144 Cal.App.4th 475, at 499, 521 (2006) [pet'n for rev. & req. for depubl. denied at S148058; applic. for stay of inmate's release denied, at S147840], *In re Barker*, 151 Cal.App.4th, 346, 365 (2007) [no pet. for rev. filed], *In re Weider*, 145 Cal.App.4th 570, at 589-590 (2006) [no pet. for rev. filed], and *In re Gray*, 151 Cal.App.4th 379, 383 (2007) [depubl. request denied at S153831], but this has now been adopted as the federal rule as well. (*Hayward v. Marshall*, ___ F.3d ___, 2008 WL 43716 (9th Cir. 1/3/08).[4] *Hayward* follows in the wake of numerous Federal cases adopting this rule, including *Sanchez v. Kane*, 444 F.Supp.2d 1049 (C.D. Cal. 2006), *Rosenkrantz v. Marshall* [hereinafter *Rosenkrantz VI*], 444 F.Supp.2d 1063, at 1085 (C.D. Cal. 2006), *Thomas v. Brown*, ___F.Supp.___, 2006 WL 3783555, slip opn. at *3 (N.D. Cal. 2006), *Brown v. Kane*, ___ F.Supp.2nd ___, 2007 WL 1288448 slip opn. at *6 (N.Dist. Cal. 2007), *Blankenship v. Kane*, ___F.Supp.___, 2007 WL 1113798 (2007 N.D. Cal) and *Martin v. Marshall*, 431 F.Supp.2d 1038 (N.D. Cal. 2006). In adopting this rule, the 9th Circuit specifically cited approvingly to the state court decisions in *Dannenberg II, Lee, Elkins, Scott II*, as well as the District Court decision in *Rosenkrantz VI. Hayward, supra*, slip opn. at *5. The *Hayward* court also made it clear that it was adopting the analysis that was initially stated in *Biggs v. Terhune*, 334 F.3d 901, 916-917 (2003). *Id*. at *7. This now clearly refutes the typical claim of respondent that the statements in *Biggs* are dicta. See *e.g.*, Return, p. 20, lns. 23-24.

These decisions are clear that the sole inquiry for a court reviewing a denial of parole should be whether or not there is "some evidence" that the inmate remains currently dangerous; "[t]he test is not whether some evidence supports the *reasons* the [Board] cites for denying parole, but whether some evidence indicates a parolee's release *unreasonably endangers public safety*." *In re Lee*, 143 Cal.App.4th 1400, 1408-1409 (2006), emphasis in original; See also, *In*

---

face of clear evidence of rehabilitation, the commitment offense loses its probative value on the issue of current dangerousness. Since this the second decision regarding inmate Dannenberg (see *In re Dannenberg [Dannenberg I]* 36 Cal. 4th 1061 (2005)), these decisions will be differentiated by the Roman numeral designations I and II.
[4] Additionally, the California Supreme Court has recently granted review in two other cases on this issue. In the first, *In re Lawrence* [rev. granted, previously at 150 Cal.App.4th 1151, 1562] (2007), the Court granted review after having already previously denied the request for stay of the inmate's release at S154018. In the second, *In re Cooper* [rev. granted, previously at 153 Cal.App.4th 1053] (2007), the Court had also previously denied the request for stay of that inmate's release as well, at S155130. Thus, while granting review of the legal issues, the Supreme Court was clearly agreeable with the ultimate result, a finding of a violation of due process by the Board's repeated denials of parole and felt that those inmates should be released.

*re Weider*, 45 Cal.App.4[th] 570, 589 (2006) ["[T]he overarching consideration in the suitability determination is whether the inmate is currently a threat to public safety"] and *Dannenberg II, supra*, 156 Cal.App.4th 1387 [68 Cal.Rptr.3d at 196-197].)

In *Dannenberg II*, the Court of Appeal again revisited Mr. Dannenberg's case in light of the Board's, then the Governor's, continued denial of parole to Mr. Dannenberg and considering that the Supreme Court had previously found that there was "some evidence" that the crime showed "an exceptionally callous disregard for human suffering." *Id.* at *195. The court stated that their obligation to uphold this finding of "egregiousness" did not require that they uphold the Governor's decision to deny the petitioner parole based on the offense. The court noted,

> Our deferential standard of review, which requires us to credit the Governor's findings if they are supported by a modicum of evidence, does not mean that the fact that there is a modicum of evidence that the commitment offense was "especially heinous" will *eternally* provide adequate support for a decision that the prisoner is unsuitable for parole.

*Id.* at 195, emphasis in original; *see also, In re Montgomery*, 156 Cal.App.4[th] 930, at 946 (2007). In reaching this decision, the Sixth District noted that since the decision in *In re Dannenberg [Dannenberg I]*, 34 Cal.4th 1061 (2005), "the Courts of Appeal have elaborated on the critical distinction between the *finding* that the commitment offense was "especially heinous" and the *nexus* that links that *finding* to the [Board's] *conclusion* that the prisoner currently poses an unreasonable risk of danger to society if released." *Dannenberg II*, 68 Cal.Rptr.3[rd] at 195. The court found that "[w]hile Danneberg's commitment offense was grave, the record that was before the Governor lacks *any* evidence that now, more than two decades after his offense, the nature of ... the offense alone *continues* to support a conclusion that he poses an unreasonable risk of danger to society if released." *Id.* at 198.

In recent litigation on these issues, Respondent has been arguing that the foregoing state cases are wrongly decided by each of those courts. Notably, in making that argument, Respondent fails to even address the multiple federal decisions on this same point, ignoring a significant batch of federal district court decisions, and now, the recent decision of the 9th Circuit in *Hayward*, that each follow the teachings of *Scott II*, and which apply the same principles applied by the Courts in *Weider, Lee, Elkins, Montgomery* and *Dannenberg II*. Of course, the *Hayward* decision is binding on this Court. Even if it were necessary to attempt to discern what direction the California Supreme Court is headed on this issue, which the above cases obviously

10

have already concluded requires a focus on current dangerousness, that exercise would lead to the same result. The Court's direction is now clear from how they have been handling the cases coming before them in recent months.   While not yet speaking directly on the point, the California Supreme Court has by its actions tacitly approved nearly every one[5] of the state court decisions, refusing to hear, depublish or block the release of the inmates in each of them, and each of the federal cases are exclusively following the doctrine that was first stated in *Scott II*.

In *Scott II*, the First District announced the rule that the focal issue is current dangerousness, and with the passage of time, the probative value of the crime based evidence declines until it can no longer show the inmate remains a danger to society. *Scott II, supra*, at 594-595. As that court put it, the "circumstances of the crime reliably established by evidence in the record [must] rationally indicate that the offender will present an unreasonable public safety risk if released from prison." *Scott II, supra*, 133 Cal.App.4[th] at 595. Since then, this trend has been unanimously supported by the currently published case law, as cited above, including *Scott II, Barker, Gray, Elkins, Lee, Weider, Martin, Sanchez, Rosenkrantz VI, Thomas, Brown, Blankenship*, and now by *Dannenberg II* and the 9th Circuit decision in *Hayward*.[6]  As in *Scott II*, Respondent filed a petition for review in *Elkins*, along with a request for a stay of the decision in order to stop the release of that inmate. Both the petition for review and the stay were denied by the California Supreme Court in Case #S147840, obviously showing the Court's acceptance of its doctrine. In the most recent of the series of decisions involving inmate Robert Rosenkrantz, in reversing a denial by the Board, the Federal District Court ordered Rosenkrantz immediately released. *Rosenkrantz v. Marshall [Rosenkrantz VI]*, 444 F.Supp.2d 1063 (C.D. Cal., 2006). Concurrently with that decision, the Los Angeles County Superior Court came to the same conclusion, on nearly the same date, ordering Mr. Rosenkrantz released, and the 2nd District and the California Supreme Court each refused to block the order granting his release.  (2nd DCA case # B192676; Cal. Supr. Ct. case #S145504.)

The *Lee* decision is even more directly indicative of the Supreme Court's acceptance of the rules it states.  In *Lee*, the Court of Appeal had originally denied the habeas petition. The petitioner filed for review in the California Supreme Court, and after briefing, the Court granted

---

[5]  Note that in two (2) of the cases, no petition for review, stay or depublication was filed by Respondent. As previously noted, in the two (2) cases where review was granted, *Lawrence* and *Cooper*, the request for a stay of the orders of release were denied by the Court, and those inmates were released. Thus, in none of the cases has the Supreme Court taken any action evidencing displeasure with the analyses of the appellate courts.

[6]  Note also that none of the above listed federal decisions have been reversed by the 9th Circuit.

review and remanded the case back to the court of appeal, directing that they issue an order to show cause, and reconsider the denial. *In re Lee*, Case #S142267. The above cited published decision followed that remand. Then, on February 7, 2007 the California Supreme Court denied the Governor's request to depublish the *Lee* decision. (Cal. Supr. Ct. Case #S149411.)    Even in the recent cases where review has been granted, such as *Lawrence* and *Cooper*, the Supreme Court has refused to stay the orders of the appellate courts directing the immediate release of those inmates.    (*Lawrence*, Cal. Supr. Ct. Case #S154018; *Cooper*, Cal. Supr. Ct. Case #S155130.)    In another example of the Supreme Court's acceptance of this doctrine, in the case of *In re Ross*, case #S149228, the Court granted review and remanded the case with directions that the Court of Appeal issue the OSC and reconsider the issue of "whether the inmate remains dangerous" in light of *Scott II*, *Lee* and *Elkins*.[7]

Thus, these cases exist as valid authority, with the obvious approval of the California Supreme Court. As previously indicated, there are now no contrary decisions since the Supreme Court granted review in the case of *In re Jacobson*, [formerly at 154 CA4th 849] (2007), an isolated case that expressed disagreement with the above line of decisions. The Supreme Court obviously realized that they were eliminating the conflict among the Courts of Appeal on this issue, and by taking up *Jacobson*, the only rule they left in the published cases is the requirement that the focus be on current dangerousness. If that was not the correct focus, there would be no need to take up *Jacobson*, since a ruling that the courts can ignore the lack of a nexus to current dangerousness would not effect the outcome for the inmate in *Jacobson*, and any such ruling could be reached through any of the other cases pending in the Supreme Court. In other words, the release of the inmates in *Lawrence* and *Cooper*, coupled with the grant of review in *Jacobson*, itself shows the trend by the Supreme Court to adopt the current dangerousness standard.

Furthermore, *Jacobson* is based on a misunderstanding of the foregoing decisions, characterizing them as re-weighing the evidence before the Board. As noted by the 6th Division of the same court in the case of *In re Montgomery, supra,* 156 Cal.App.4th at 946-947, this is simply incorrect. What the above cases hold is that the "some evidence" analysis must occur in context, focusing on whether there is any reliable evidence that the Board could have rationally

---

[7] All of the foregoing references to unpublished decisions of the California Supreme Court can be found at http://appellatecases.courtinfo.ca.gov.

based a decision on to determine the only the question that is before them in a parole suitability hearing, whether the inmate is presently dangerous.  This focus on current dangerousness directly follows from the Board's own regulations, *Cal. Code Regs.*, tit. 15, §§2281(a) and 2402(a), which only permit the denial of parole when the inmate "presents an unreasonable risk of danger" to the public if released.  This is the finding the Board must make to deny parole, and is the ruling that must be supported by some evidence. *Dannenberg II, supra,* 68 Cal. Rptr.3d at 197.  Thus, the review court does not focus on simply whether "some evidence" exists to support the *reasons* given by the Board in making its determination. *Lee, supra,* 143 Cal.App.4[th] at 1408.  In other words, not just the bare findings (i.e., multiple victims, victim opposition, etc.) are viewed, but the Court is to evaluate if those findings rationally provide evidentiary support for concluding that the inmate is currently dangerous. *Lee, supra,* 143 Cal.App.4[th] at 1408, *Weider, supra,* 145 Cal.App.4[th] at 589-590; See also *Scott II, supra,* 133 Cal.App.4[th] at 595; *Elkins, supra,* 144 Cal.App.4[th] at 499; *Sanchez, supra,* 444 F.Supp.2d 1049; *Rosenkrantz VI, supra,* 444 F.Supp.2d 1063; *Martin, supra,,* 431 F.Supp.2d 1038.  Here, no such connection can be made.

Thus, the analysis is a two (2) step approach.  First, as the court stated in the case of *In re Mark Smith,* 109 Cal.App.4th 489, at 509-505 (2003), the evidence must relate to a regulatory factor.  The Court must first evaluate whether the regulatory factor is reliably established, and if so, consider whether the existence of that regulatory factor rationally provides evidentiary support for the Board's conclusion that the inmate remains currently dangerous. *Weider, supra,* 145 Cal.App.4th at 589-590; *Lee, supra,* 143, Cal.App.4th 1408; *Elkins, supra* 144 Cal.App.4th 499; *Scott II, supra,* 133 Cal.App.4th at 595.  Even if the crime is one that can be considered "particularly egregious" within the meaning of *Rosenkrantz V,* the inquiry does not end, and the Court must then analyze whether, in light of the passage of time, the number of parole suitability hearings, and in the face of overwhelming evidence of rehabilitation, the crime based regulatory factors can any longer provide evidentiary support for the conclusion that the inmate is currently dangerous. *Id.* See also *Montgomery, supra,* 156 Cal.App.4[th] 930, at 946-947.  Thus, subsection (B) will analyze the effect of the passage of time on the ability of the Board to rely on the crime based findings after the passage of nearly twenty two (22) years.

After nearly twenty two (22) years of incarceration, attendance in all of the relevant self-help programs, the receipt of exclusively positive psychological reports, and the attainment of

13

strong work skills and viable parole plans, the Board should have reached the only reasonable conclusions based on the facts: Mr. Rush does not present a current threat to the community, and must be granted parole. As discussed below, however, the commitment offense cannot be considered in a vacuum, at the expense of other recent and more relevant factors. As the courts are now consistently holding, due process cannot ignore that repeated reliance on the offense as grounds for denying parole violated due process, as the crime will diminish to the point that the offense cannot serve as evidence of a current threat. *Dannenberg II,* 68 Cal.Rptr.3rd at 195, 196-197, 198; *Scott II, supra,* 133 Cal. App. 4th 573; *Hayward, supra,* 2008 WL 43716, slip opn. at 7-9; *Rosenkrantz VI, supra,* 444 F.Supp.2d 1063; *Martin, supra,* 431 F.Supp.2d 1038.

### B. AFTER FIVE PAROLE HEARINGS, SERVING NEARLY TWENTY-TWO YEARS OF INCARCERATION, BEHAVING EXCEPTIONALLY & PROGRAMMING POSITIVELY, THE COMMITMENT OFFENSE YIELDS NO PREDICTIVE VALUE OF A CURRENT THREAT TO THE COMMUNITY.

The case law is now clear that even assuming *arguendo* some evidence exists to support a finding that the commitment offense is "especially heinous, atrocious or cruel" within the meaning of §2402(c)(1), due process still prohibits repeated reliance on those unchanging circumstances as grounds for finding an inmate unsuitable for parole in the face of evidence of rehabilitation. (*Montgomery, supra,* 156 Cal.App.4th 930, at 946-947; *Dannenberg II, supra,* 68 Cal.Rptr.3rd at 195; *Hayward, supra,* 2008 WL 43716, slip opn. at *5-7.) Accordingly, the Board in this case failed to address the appropriate legal concepts governing parole decisions under the United States Constitution, as they failed to acknowledge the complete lack of evidence of current dangerousness. *Lee, supra,* 143 Cal.App.4th at 1408-1409; *Weider, supra,* 145 Cal.App.4th at 589-590 [the "overarching consideration in parole suitability is current dangerousness]; *Dannenberg II, supra,* 68 Cal.Rptr.3rd at 196-197. Mr. Rush's denial of parole by the Board falls squarely within these cases, since the crime was a situational one time act of violence, which is now juxtaposed against over two (2) decades of incarceration with literally perfect behavior. With nearly twenty two (22) years in prison, more than ten (10) years beyond his minimum term, and after five (5)[8] hearings, due process is violated by the continued reliance on the outdated fact of the commitment offense to deny parole.

---

[8] Although Mr. Rush has only had five (5) hearings, his time in custody equals or exceeds that of the inmates in *Dannenberg II, Montgomery, Lee, Sanchez, Rosenkrantz VI,* and is not far behind *Hayward.* Because of victim

14

Thus, the assertion that a regulatory finding is supported by "some evidence" does not end the inquiry. *Montgomery, supra*, 156 Cal.App.4[th] 930, at 946. The *Ramirez* court was the first to conclude that even though there was factual support for the findings as to the crime and priors, the Board's decision was still arbitrary since there had been multiple hearings, nine (9) years had passed beyond the minimum term, and it was seventeen (17) years after entering prison. *In re Ramirez,* 94 Cal.App.4[th] 549, at 571. Prior to *Ramirez,* no court had held that a finding could violate due process even though supported by "some evidence" in the record.[9]

The Ninth Circuit was next, when it noted that, despite the fact that there may remain evidence to support a finding of egregiousness of the crime:

> A continued reliance in the future on an unchanging factor, the circumstances of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation.

(*Biggs, supra,* at 916-917.) The denial by the Board of Mr. Rush's parole grant is precisely what *Biggs* warned of. Unlike Biggs, Mr. Rush faced his fifth parole hearing, not his first. Unlike Biggs, Mr. Rush was convicted of second degree murder, not first degree murder. Biggs served only fourteen (14) years of his sentence for first degree murder before being denied parole, whereas Mr. Rush has now served nearly twenty two (22) years for second degree murder. Here, the only commonality between Biggs and Rush is exemplary behavior while incarcerated, and even on that score, Mr. Rush's impeccable record stands out. Recently, the 9th Circuit has clarified that the caution in *Biggs v. Terhune, supra,* 334 F.3d at 917, is in fact the standard. *Hayward, supra,* 2008 WL 43716, slip opn. at 8-9. In *Hayward,* the Court adopted this rule, using the analysis which first began to develop from *Ramirez,* and which was clearly announced in *Scott II,* that the passage of time depletes the probative value of the crime based evidence to establish current dangerousness when weighed against years of positive in prison behavior, until the predictive value of the crime is nonexistent. In doing so, *Hayward* cited

---

opposition, Mr. Rush always has received multiple year denials at every one of his hearings, despite bringing to each of the next hearings at least two to three more years of exclusively positive behavior, programming and support for parole. In fact, when he was denied for two (2) years at the 2002 hearing, the Board claimed that 2 independent recorders "malfunctioned" and then reheard his case in March of 2003, and again denied parole for two (2) years, and although a rehearing, refused to make the effective date of the denial August of 2002, when it was originally denied. Then, the Panel members left themselves insufficient time to hear Mr. Rush's case in August of 2005, continuing the hearing over his objection so they could catch a plane out of town. Thus, three years and two months elapsed between the two (2) year denial in 2002 and the 2005 hearing.

[9] The California Supreme Court has never disputed these aspects of the Ramirez decision, only criticizing it to the extent that it required a comparison with other crimes *for proportionality purposes. Dannenberg I, supra,* 34 Cal.4[th] at 1100.

15

approvingly the decisions in *Dannenberg II, supra, Lee, supra, Elkins, supra, Scott II, supra*, and *Rosenkrantz VI, supra. Hayward, supra*, 2008 WL 43716, slip opn. at *5, 7.

Here, even assuming *arguendo* that there was "some evidence" that the commitment offense was sufficiently "heinous, atrocious or cruel" as intended by section 2402(c)(1), the analysis required by these cases is not complete. [10]    Instead, the Court must look at how much time has passed, along with the interplay of the many other relevant factors that have intervened during Mr. Rush's incarceration, all of which effectively nullifying the predictive value of this clearly situational offense to show current dangerousness. Thus, while the commitment offense may have indicated Mr. Rush's present dangerousness for a period of time – and in the past fulfilled the "some evidence" requirement – that is no longer true. What *Hayward, Montgomery, Dannenberg II* and the series of other recent cases addressing this point teach is that the reality of the rehabilitative process must be considered, and the Board and the Governor cannot blindly rely on the crime as an ongoing basis for continuously denying parole.

Here, the Board's unsuitability determination falls squarely within these cases. What those cases show is that there is no set amount of time that must pass before the crime loses its probative value, no litmus test as to the number of hearings that must occur before relief is appropriate, and no set pattern of behavior that must be met by the inmate to show rehabilitation, beyond the inmate serving his or her minimum term and showing positive evidence of rehabilitation. *Irons v. Carey [Irons II]*, 476 F.3d 658, at 665 (9th Cir. 2007); *Hayward, supra*, 2008 WL 43716, slip opn. at *5-7. Instead, it is the dramatic nature of the change undergone by the inmate that distances them from the crime, not just temporally, but in the sense of no longer being the person who committed the offense, and no longer being subject to the issues that led to its commission. However, the one point that simply cannot be disputed here is that Mr. Rush has not just distanced himself from the crime temporally, but he has so effectively dealt with every underlying issue that led him to commit the offense that the fact of its commission no longer has any meaning in assessing his current dangerousness, a rating that every professional assigns to the lowest possible level. This is particularly the case in light of the situational nature of the offense, the stress he was undergoing in light of the injuries he received from the previous motorcycle accident, his fragile emotional condition from having his friend killed in that

---

[10]    As set forth previously, Mr. Rush maintains his argument that the commitment offense does not satisfy the finding that the crime was "heinous, atrocious or cruel," and concedes this point only for this argument.

1

2   accident, and the fear caused by having been assaulted and beat up, along with continued

3   taunting and physical intimidation of him by the victim just prior to the homicide. Of course, the

4   crime must be weighed against the years of exclusively positive behavior since that time,

5   showing that his behavioral issues are effectively resolved, and the act committed was a one time

6   event, unlikely to recur. Accordingly, an examination of the rules announced in *Hayward*,

7   *Biggs*, *Sass*, and *Irons II*[11] clarifies the connection between continued reliance on the commitment

8   offense to deny parole and an inmate's current dangerousness, and highlights the lack of such a

    connection here.

9       In *Irons II*, the Ninth Circuit stated, "[a]ll we held in those cases [*Biggs* and *Sass*] and all

10  we hold today, therefore, is that, given the particular circumstances of the offenses in these cases,

11  due process was not violated when these prisoners were deemed unsuitable for parole prior to

12  the expiration of their minimum term." *Irons v. Carey [Irons II]*, 476 F.3d 658, at 665 (9th Cir.

13  2007). Thus, although the Ninth Circuit concluded the petitioner in *Irons II* was not entitled to

14  relief, they did so based on the severity of that particular offense and the fact that he had not

15  reached the end of his minimum term, factors that clearly would not apply here. *Id.*

    Immediately thereafter, the court specifically noted that

16      [I]n *Sass* [*v. California Bd. of Prison Terms*, 461 F.3d 1123 (9th Cir. 2006)] and
17      in the case before us there was substantial evidence in the record demonstrating
        rehabilitation. In both cases, the California Board of Prison Terms appeared to
18      give little or no weight to this evidence in reaching its conclusion that Sass and
        Irons presently constituted a danger to society and thus were unsuitable for parole.
19      We hope that the Board will come to recognize that in some cases, indefinite
        detention based solely on an inmate's commitment offense, regardless of the
20      extent of his rehabilitation, will at some point violate due process, given the
        liberty interest in parole that flows from the relevant California statutes.

21  *Id.*, citing *Biggs, supra*, 334 F.3d at 917.

22      Therefore, the 9th Circuit made it clear that once the inmate has passed his minimum

23  term, as Petitioner has here, continued reliance on the commitment offense, despite clear

24  evidence of rehabilitation can still violate an inmate's due process rights. The published

25  opinions between *Biggs* and *Hayward* then elaborated on this rule. See *Brown v. Kane*, ___

26  F.Supp.2d ___ [2007 WL 1288448] slip opn., at *6 (N.D. Cal. 2007), *Rosenkrantz VI, supra*, 444

27  F.Supp.2d 1063; *Martin v. Marshall*, 431 F.Supp.2d 1038 (N.D. Cal. 2006), *Thomas, supra;*

---

28  [11] *Sass v. California Bd. of Prison Terms*, 461 F.3d 1123 (9th Cir. 2006); *Irons v. Carey [Irons II]*, 476 F.3d 658 (9th Cir. 2007).

*Blankenship, supra; Sanchez, supra,* 444 F.Supp.2d 1049, *Scott II, supra,* 133 Cal.App.4th 573, 594-595; *Lee, supra,* 143 Cal.App.4th at 1409; *Elkins, supra,* 144 Cal.App.4th 475; *In re Barker,* 151 Cal.App.4th 346 (2007); *In re Gray,* 151 Cal.App.4th 379 (2007); *Dannenberg II, supra;* and *Montgomery, supra.* Each of these decisions states the rule to be that due process prohibits the denial in the face of overwhelming evidence of rehabilitation, where due to the passage of time such as in this case, there is no longer a nexus established between the crime and the inmate's current level of dangerousness. Additionally, each of these cases involves multiple denials of parole, from a low of four (4) and a high of eleven (11), with most in the five to six range, and fourteen (14) or more years in prison. Of course, Mr. Rush has now been before the Board five (5) times with nearly twenty two (22) actual years in custody.

### 1. Service Of The Minimum Term

The Return refers to Petitioner having received a sentence of seventeen (17) years to life. However, although this is a slang reference sometimes used, it is not technically correct. Petitioner received a two (2) year determinate term for the use of a firearm, and a consecutive fifteen (15) year to life sentence for second degree murder. See Exh. BBB, p. 96 [noting that life term starts on December 17, 1987]. When he arrived in prison on December 17, 1987, Mr. Rush had almost twenty five (25) months of pre-prison credits. *Id.* Those credits are first applied to the determinate term, and resulted in twenty four (24) of the twenty five (25) months being used to satisfy the two (2) year determinate sentence. As of December 17, 1987, Mr. Rush had just under one (1) month of credit towards his fifteen (15) year minimum term, and thus, had approximately fourteen (14) years and eleven (11) months left to serve on that term. This results in the minimum term having been completed in full, without consideration of post-commitment conduct credits, as of November 30, 2002 Exh. BBB, p. 96. Thus, he completed the service of his minimum term more than (5) years ago. However, it should be noted that the actual minimum term in a second degree murder is ten (10) years, since the fifteen (15) year minimum is further reduced by one third for good time and work time credits under *Penal Code* §§2932 and 2933.2. As shown in CDC's calculation of Mr. Rush's minimum eligible parole date, his minimum term was satisfied on November 30, 1997, more than ten (10) years ago. Exh. BBB, pp. 96, 114.

Because an inmate who has completed his full minimum term, without consideration for conduct credits, has actually served a hundred and fifty (150) percent of the actual minimum

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

term, cases such as *Hayward*, *Sass* and *Irons* are viewing the completion of that full term as a "bright line" rule for when and where due process is violated by the continued reliance on the commitment offense in the face of overwhelming evidence of rehabilitation. See *Hayward, supra*, at *9.

### 2.    The Irons And Sass Decisions

Respondent attempts to make a comparison to the recent Ninth Circuit decisions in *Irons v. Warden* and *Sass*. However, a close look at these cases show that there is no factual resemblance to the case at hand. In *Irons*, the inmate and the victim were tenants at the same house. The couple who owned the home told Irons that they suspected the victim had stolen various items from the home. Irons confronted the victim regarding this theft, then obtained a twenty two caliber rifle from his room, and without any provocation or aggressive behavior on the part of the victim, shot the victim twelve (12) times. These shots did not kill the victim. As the victim continued to suffer from the wounds inflicted by the inmate, Irons announced that he was going to simply let him bleed to death. At some point thereafter, Irons stabbed the victim twice in the back. Thus, Irons was the aggressor from the inception, and unlike Mr. Rush, was never attached, threatened or intimidated by the victim. There was no element of fear on Irons' part. Later, after he was dead, Irons wrapped up the victim's body and locked it in the room for ten (10) days. Eventually, he took the body out to the surf and disposed of it in an isolated coastal location. In doing so, Irons acted alone, and was not advised, encouraged or assisted in disposing of the body. These facts only resemble the present case in two respects. First, there were multiple shots from a twenty two caliber rifle in both cases, and secondly, the bodies were ultimately disposed of.

However, the balance of the facts of *Irons* are remarkably different than here. The victim presented no danger to Irons, and did nothing to in any way provoke Irons or caused Irons to be in fear of physical harm from the victim. Irons did not merely kill the victim, but instead shot him multiple times, then deliberately prolonged the victim's suffering, callously telling him that he was going to allow him to bleed to death. He then used a separate, second means of attacking the victim, ultimately stabbing the victim twice in the back. After killing him, Irons acted alone in wrapping up the body, and first kept the body in the home for ten (10) days, an action which by itself sets this crime apart from the offense committed by Mr. Rush. He also appeared to act in a very calculated fashion in respect to the disposal of the body. To the contrary, Mr. Rush is

described by everyone concerned as an emotional basket case, who essentially had to be helped along by Mr. Hoy as he was emotionally incapable of making the decision of what to do after having killed Mr. Heinz. In short, there is nothing about the *Irons* case factually that puts it on a par with Mr. Rush's offense.

In *Sass*, the Ninth Circuit was evaluating the ***combined evidentiary value*** of a murder in the course of a drunken driving accident that was committed by an individual with a high number of prior convictions for identical conduct. This factual background gave rise to a concern that the repeated behavior by Sass of the very same conduct the resulted in the murder gave that evidence a higher level of probative value than if the crime was an isolated incident. Here, there is no such evidence, as the crime was in fact an extremely isolated incident, one that was wholly out of character for Mr. Rush. Thus, the fact that Sass' prior convictions, in combination with the nature of the commitment offense, was sufficient to deny him parole prior to the expiration to his minimum term, says nothing about whether Mr. Rush's offense any longer has a probative value on the issue of current dangerousness five (5) years after he has completed his service of his minimum term.

### 3. The Hayward Decision

Finally, in *Hayward, supra*, ____ F.3d ____, 2008 WL 43716, the 9th Circuit tied all these cases together and clearly announced the governing rule, consistent with the warnings given in the *Biggs* decision, and adopting the rules stated in Scott II, supra, 133 Cal.App.4[th] at 594-595, and cited approvingly the decisions in *Dannenberg II, supra, Lee, supra, Elkins, supra, Scott II, supra*, and *Rosenkrantz VI. supra. Hayward, supra*, 2008 WL 43716, slip opn. at *5-7. Thus, the rules in this regard are now crystal clear. In *Hayward*, the 9th Circuit affirmed the standard of review, finding that the state court "unreasonably applied the some evidence standard when it concluded that the Governor's reversal of the Board's grant of parole to Hayward was justified." *Hayward*, 2008 WL 43716 (C.A.9 (Cal.)), slip opn. at *6. The Court made it clear that "[w]hen we assess whether a state parole board's suitability determination was supported by 'some evidence' in a habeas case, our analysis is framed by the statutes and regulations governing parole suitability determinations in the relevant state...Accordingly, we first 'look to California law to determine the findings that are necessary..." *Hayward*, at *5.

Thus, the *Hayward* Court cited approvingly to *Scott II, Dannenberg II, Elkins, Lee* and *Rosenkrantz VI*, in its explanation of why a nexus between the commitment offense and the

inmate's current dangerousness must exist to avoid due process violations. The Court concluded that "the unchanging factor of the gravity of Hayward's commitment offense had no predictive value regarding his suitability for parole." Like this case, based on an absence of such a nexus, the Governor was found to have violated Hayward's due process rights by relying on "stale and static" factors. *Hayward,* 2008 WL 43716, at *8. Hayward was found unsuitable for parole by Governor Davis based on, among several factors, the commitment offense, and his unstable social history, including an extensive history of alcohol and substance abuse. *Id.* The Court, applying the some evidence standard, found that the record contained *no evidence* that Mr. Hayward *currently poses a threat to society. Id.* at *5.

In *Hayward*, the inmate, a member of a motorcycle gang, had stabbed a man 12 times in 1980 over a dispute about, according to conflicting accounts, whether the victim had slapped or attempted to rape Hayward's girlfriend. (Slip opn., at *1.) Hayward retired from the gang after going to prison, but still had serious disciplinaries up until 1989, and minor write ups until 1997. *Id*. He acknowledged using drugs in prison, including marijuana until 1985 and heroin for about a month. *Id*. The most recent psychological evaluation found that he would pose a low to moderate risk of violence if released. *Id.* at *6. The 9th Circuit cited to the facts that the crime had been committed decades ago, that Mr. Hayward had demonstrated educational and spiritual rehabilitation, that his record showed an absence of any recent discipline, and that he had strong community support, in finding that the Governor's reversal lacked record evidence. *Id.* at 6.

Specifically, the Court addressed the Governor's contention that Mr. Hayward's past substance abuse made him a current danger stating "…the Governor based his reversal of Hayward's parole on his finding that Hayward had an extensive record of alcohol and drug abuse. Hayward, however, has not used alcohol since 1974, much less abused it." *Id*. With regard to Hayward's experimentation with heroin shortly after he was incarcerated, the Court stated, "Hayward experimented with the drug for one month, while he was in prison and then immediately quit." And regarding the Governor's "finding" that Hayward had engaged in limited substance abuse counseling: "Hayward has participated in Yoke Fellows, Project Change, and other support and counseling programs for many years." *Id*. The Court specifically addressed reliance on an unchanging factor, in the context of drug or alcohol addiction, and the effect of the passage of time on the natural loss of predictive value of such evidence.

Specifically, the 9th Circuit said that Mr. Hayward, *after years of sobriety in prison, must be viewed as recovered and posing no danger to society.* *Hayward*, at *6.

In every conceivable way, Mr.Rush stands head and shoulders above Hayward. Although Hayward had twenty seven (27) years in custody, compared to twenty two (22), Mr. Rush's rehabilitative process started long before Hayward, as he exhibited perfect behavior, and strong programming, since the day he was arrested in 1986, while Hayward continued to have serious disciplines until 1989 and even had minor write-ups as late as 1997. Mr. Rush's unblemished disciplinary history is markedly better than Hayward, and his extensive list of self-help programs at least as good. His psychological reports are far better than those received by Hayward, which put him at a low to moderate risk of violence, whereas Mr. Rush has long been assigned the lowest risk of dangerousness. Rush has no criminal history, substance abuse problem or gang involvement, all of which applied to Hayward. Hayward had a history that included prior and subsequent crimes, drug use and gang involvement that would tend to lend credence to a finding of dangerousness. While those were quite old, and therefore found attenuated by the 9th Circuit, Mr. Rush has nothing adverse anywhere in his history, before or after the crime that would need to be discounted. Instead, his offense is clearly situational, out of character for him. Thus, matched against Hayward, he has much stronger facts. Of course, what is crucial is that both men participated strongly in self help programming, effectively achieving rehabilitation, and proving themselves to be changed persons who no longer present a danger to society. Thus, not only is Mr. Rush entitled to the application of the "some evidence" standard, the Court should also find that this standard was unreasonably applied by the Superior Court.

### 4. Recent Cases

The courts are no longer permitting the Board to deny parole based solely on the commitment offense when it is stale and can no longer indicate a present dangerousness, especially when juxtaposed against the factual reality of the subsequent years of incarceration. It simply offers no evidence of current dangerousness. Although no bright line rule exists specifying the exact number of hearings or exactly how much time must pass before the commitment offense is no longer an effective predictor of future dangerousness, a greater proof of rehabilitation decreases the number of hearings and passage of time required to draw such a conclusion. In the federal system, because of the overlay of the Antiterrorism & Effective Death Penalty Act (AEDPA), 28 *U.S.C.* §2254, those courts must evaluate whether the state court

decision is an unreasonable application of clearly established federal law as announced by the United States Supreme Court. In this context, the rule has developed in federal habeas that the inmate must be beyond his or her minimum term for a due process violation to occur. (*Irons II, supra*, 476 F.3d at 665; *Hayward, supra*, at *9.)

That missing nexus to current dangerousness exists in Mr. Rush's case as well. Clearly, the crime was situational, a one time act of violence precipitated by the unique circumstances that Mr. Rush was in a severely compromised physical and emotional condition, due to the serious motorcycle accident he was in where his roommate was killed and he was seriously injured. In that fragile condition, he was attacked physically by a larger and more aggressive person, Mr. Heinz. After beating Mr. Rush physically, Heinz walked up and down the hall taunting and threatening him. Fearing further reprisals, Mr. Rush armed himself when he went into the bathroom to wash the blood from his face. While clearly an overreaction to Heinz approaching him, this was a scenario that played out because of the circumstances then existing, not because of an underlying dangerousness on Mr. Rush's part. Mr. Rush has no prior acts of violence, and has been completely violence free since being incarcerated. He has done everything he can since committing this offense to rehabilitate himself, getting three college degrees, attaining strong vocational skills, devouring the self help programs in the institution, and giving back to society by spending long hours tutoring other inmates and helping the facility to provide educational programs to inmates. The Panel failed to recognize that the commitment offense took place nearly twenty two (22) years ago, and every aspect of his prior and subsequent history show this to have been a one time, situational event that is unlikely to recur. Throughout his time in custody, Mr. Rush has proven himself to be effectively rehabilitated, has received not just favorable psychological reports, but strongly worded reports finding that he "*is a good candidate for parole.*" Exh. BBB, p. 156, emphasis added. Of course, it bears mentioning that he has conducted himself in a literally perfect fashion while in custody, showing excellent behavioral controls.

With no evidence of current dangerousness, coupled with ample evidence of rehabilitation, the Panel had no choice but to grant parole to Mr. Rush. To allow the denial to stand, is to allow parole denials that are entirely politically motivated, pretextual and punitive in nature. In Mr. Rush's case, the crime based factors recited by the Board were just that, mere recitals of the regulatory language, rather than findings that focused on establishing the required

23

nexus to current danger. Even the state's own experts support Mr. Rush's release. Here, there is simply no support for the Board to deny Mr. Rush's parole on the grounds that his commitment offense evidences a current danger to the community.

Mr. Rush's commitment offense happened just under twenty-two (22) years ago. Since then, he has rehabilitated himself in every way possible within the confines of prison. Therefore, as discussed in the petition, he compares favorably with every inmate who has been found entitled to habeas relief. See *e.g.*, *Scott II, supra, Dannenberg II, supra, Lee, supra, Elkins, supra, Barker, supra, Gray, supra, Martin, supra, Sanchez, supra, Rosenkrantz VI*, just to name a few. Just as in each of the cases listed above, as well as in *Hayward*, there is no connection between Mr. Rush's offense, and his present dangerousness, particularly in light of the intervening twenty two (22) years. Likewise, in the cases where relief was denied, such as *Sass, Irons II* and *Biggs*, Petitioner has all the criteria that those inmates were missing. That is, the offense no longer yields any predictive value of current dangerousness. As such, the Board's decision to deny Mr. Rush's parole at his fifth parole hearing on the grounds that his commitment offense somehow evidences a current danger to the community is ill-founded. The commitment offense simply does not any longer satisfy the "some evidence" standard. *Dannenberg II, supra; Hayward, supra.*

### C.   THE OFFENSE FACTORS RELIED ON BY THE BOARD ARE INADEQUATE TO SHOW THE CRIME WAS PARTICULARLY EGREGIOUS.

The three (3) crime factors relied upon the board in its denial include findings that the crime was "callous and cruel," that it was "dispassionate and didn't have to happen," and that the motive was an argument and that "just doesn't cut it." Respondent treats these "factors" as constituting findings under the regulations, which is simply not accurate. There is no regulatory factor for the crime being "callous and cruel" unless it is carried out in a manner that exhibits an "exceptionally callous disregard for human suffering." *Cal. Code Regs, tit.* 15, §2402(c)(1)(D). Likewise, the finding of a crime being "dispassionate" is not, by itself, a regulatory factor. Under *Cal. Code Regs. tit.* 15, §2402(c)(1)(B) such a finding requires a determination that "offense was carried out in a dispassionate and calculated manner, *such as an execution style murder.*" Emphasis added. Nor is there a regulatory factor to evaluate motives by the whether it "just doesn't cut it." The Superior Court failed to even look at the Board's actual findings, instead going off on a discussion of lack of remorse, which the Board never found and which

24

was contrary to the evidence, a conclusion that Mr. Rush acted with criminal intent, which applies to any murder, and criticism of Petitioner for not confessing his crime to the police, apparently unaware that criminal Defendants have a privilege against self incrimination. Of course, this was simply reflective of that particular judge's bias against parole challenges. See Exh. TTT, p. 487, wherein the judge shows his clear aversion to these cases, stating "Once again, we have a Petitioner who has been given a sentence to [sic] life for the killing of others and such a killer believes that it is somehow 'unfair' for him to remain in prison while his victims have no life at all." Exh.TTT, p. 487.

The finding that the offense was "callous and cruel" does not provide a lawful basis for the denial of parole. All murders involve a level of cruelty and callousness in the sense that the inmate acted in a manner directly intended to take a human life, or with a conscious disregard of the likelihood that his actions would result in death. It is only when the crime involves an *exceptionally* callous disregard for human suffering, within the meaning of *Cal. Code Regs*. §2402(c)(1)(D), that a denial parole could be potentially justified, and even then, only if the crime based evidence rationally shows that the inmate currently remains dangerous. In reviewing the board's denial of parole, the federal court analysis is "framed" by state law. *Hayward v. Marshall*, ___ F3d. ___, 2008 WL43716, at *5 (9th Cir. 1/3/08); *Irons v. Carey*, 505 F.3rd 846, 2007 WL 2027359 at *3; see also *Sass*, 461 F.3rd at 1135, Reinhardt, J., dissenting ["when we assess whether a state parole board suitability determination is supported by "some evidence" in a habeas case, our analysis is framed by state law."]. This particular provision of the regulation has been consistently interpreted to require that the inmate deliberately take actions which prolongs the victim's suffering, or which torments or terrorizes the victim in connection with the act of killing. See *In re Ernest Smith*, 114 Cal.App.4th 343, at 367; *In re Scott* [Scott I] 119 Cal.App.4th 871 at 890-892 (2004); *In re Mark Smith*, 109 Cal. App.4th 489, at 504, 506 (2003).

The reference to "dispassionate and calculated" is simply an erroneous use of the regulatory factor by the board, since this crime in no way was committed in a manner consistent with an "execution style murder." Even if the mere finding of "dispassionate" would be enough, this crime was anything but dispassionate. The killing occurred in a midst of a fight, with highly charged emotions, intense fear engendered by Mr. Rush's weakened physical condition, the heightened level of stress that he was under as a result thereof, and an overreaction to his

25

perceived threat of danger from Mr. Heinz.    This crime was in every sense of the word an emotionally charged event, one fueled by passion, rather than committed in the absence of high levels of emotion.  As to the finding regarding the motive for the crime, the board never made a finding under the regulation that it was inexplicable or very trivial in the relation to the offense. Instead, the Board appears to be requiring the inmate to have a motive that justifies or excuses the crime, a scenario that never is the case when the inmate was convicted of murder.  As noted by the court in *Scott I*, 119 Cal.App.4[th] at 892-893, a motive that is inexplicable is one that cannot be articulated.  Here, there is no dispute but that an argument started, and the victim turned it into a physical altercation where Petitioner was beat up.  Mr. Rush, in a weakened physical condition, in fear of further reprisal from his larger, physically aggressive roommate, armed himself, then overreacted when Heinz came towards him.  Motives of fear, anger, being humiliated are easily discerned here.  Likewise, the *Scott I* decision also defines a motive that is trivial, holding that it is one which is "materially less significant" than the type of motive that typically underlies a murder.  *Scott I, supra,* 119 Cal.App.4[th] at 892-893.

Here, the motive can easily be articulated, not as being based on a disagreement over household items, but one that is grounded in the fear of the physical harm that would befall him if Mr. Heinz further continued his assaultive actions toward Mr. Rush.  This combination of fear and anger was underlying the decision to take the rifle with him for protection, and thus, resulted in the shooting death of Heinz, and is clearly one that is a common motive to murder, and therefore it is not legally trivial for purposes of determining parole suitability.    In the circumstances here, the fact that the crime "didn't have to happen" is exactly what made this a murder, rather than a manslaughter or a justifiable homicide.  In every crime, the defendant has the opportunity, as well as the legal duty, to not commit the crime.  However, as noted by the court in *Elkins, supra,* 144 *Cal.App.*4th at 518, ability to rob the victim without hitting him or hitting him just once does not shed any light on whether the murder was "especially brutal." Thus, the court held that the governor simply could not rely on the fact that the inmate could have avoided the killing to show that the crime was "especially heinous, atrocious or cruel." Obviously, a contrary rule would mean that the mere fact of committing the offense, and not avoiding its commission, would make the inmate unsuitable for parole.  This would be contrary to the law that makes the very commission of the offense parole eligible.

Thus, although respondent *claims* that the Board's findings were supported by "some evidence," they make no showing of what that evidence was, nor do they establish how it shows a nexus to current dangerousness. Return, p. 16, lns. 22-24. As discussed herein, the facts do not show a dispassionate killing or one where Mr. Rush acted with a deliberate intent to cause untoward suffering beyond the act of killing. *Ernest Smith, supra*, 114 Cal.App.4th at 367. In evaluating this case, the superior court simply failed to apply the correct standard, never once focusing on current dangerousness. Instead, that court went off on issues that were not even the basis for the Board's decision, reaching a factually unsupported finding of a lack of remorse, which is refuted by every psychological report in the file. See Exh. BBB, p. 98, 166, 160, 156. Of course, the court was focusing on the question of remorse at the time of the killing, and the case law is clear that remorse is a mutable fact, which can change over time, and whether longstanding or recent, is a factor in favor of suitability. *Lee, supra*, at 1408, 1414; *Elkins, supra*, at 518. Here, as shown in the psychological findings cited to above, the remorse has been longstanding, consistent and sincere. The superior court's other issues of focus, a criticism of petitioner for not acting "without criminal intent" and for failing to confess to the police before the body was discovered, simply have nothing to do with either the regulatory factors of suitability or what the Board relied on in this case to deny parole. These findings are patently unreasonable and wrong, as every murder defendant acts with criminal intent, or they would not have been convicted. Likewise, it appeared that the superior court had no idea that a defendant has a constitutional right not to incriminate himself, and the crime is not elevated in stature or egregiousness by virtue of the fact that the inmate did not waive that right before being arrested for the offense in question. In other words, the superior court feels that it is appropriate to punish Mr. Rush for exercising a right extended to him under the federal constitution.[12] Such a determination is contrary to clearly established federal law, and thus entitles Mr. Rush to the requested relief.

---

[12] Recall that this is the judge who, in the case of In re Steven Escandon, stated that "Once again, we have a Petitioner who has been given a sentence to [sic] life for the killing of others and such a killer believes that it is somehow 'unfair' for him to remain in prison while his victims have no life at all." Exh.TTT, p. 487. This clear statement of bias against these types of cases seems to explain the unusual tone and rulings of the superior court.

### III.    THE BOARD IS APPLYING THE REGULATORY CRITERIA IN A MANNER THAT RENDERS THE LANGUAGE UNCONSTITUTIONALLY VAGUE.

Here, respondent misconstrues the argument relied upon. It is not the mere phrase "especially heinous, atrocious and cruel" that offends constitutional principles, but the manner in which the Board applies that phrase, literally using it to describe every single murder offense occurring in the state of California on which they sit in judgment. Since the filing of the petition, the Santa Clara County Superior Court came to that precise conclusion in the consolidated cases of *In re Arthur Criscione, Case # 71614, In re Jamieson, Case # 71194 and In re Viet "Mike" Ngo, Case # 127611*. Attached as Exhibit VVV is a true and accurate copy of the *Criscione* decision, which is virtually identical to the *Jamieson* and *Ngo* decisions. Although those cases are on appeal, they provide an example of what the evidence shows how the Board, in actual practice, applies the regulatory factors in such an overbroad fashion that no murder offense escapes their reach.

The *Criscione* court took random samples consisting of all of the decisions by the parole Board during the ninety (90) days before and after the inmate's hearing, along with the Governor's decisions regarding any case where parole was granted by the Board (or en banc decision or rulings by the Decision Review Unit as to any case that was subsequently reversed or modified), and as to any inmate that was actually released, any prior decisions of the Board denying parole as to that inmate. The evidence was then evaluated by statisticians, and the respondent was allowed to conduct similar random sampling for a control. The court found that this evidence showed that in 100% of all murder cases, the crime has been found to be "especially heinous, atrocious, or cruel" at some point. In the small percentage of cases where the Board had granted parole, either the Governor had reversed the grant by invoking the "especially heinous, atrocious or cruel" language, or the inmate had previously been denied parole based on a finding that his or her crime was "especially heinous, atrocious or cruel." In other words, in practice, every murder case that is heard by the Board gets characterized at least once as being "especially heinous, atrocious or cruel."

Under the Board's interpretation of *Dannenberg*, they believe they are entitled to deny parole based on the commitment offense, without regard for either its comparative egregiousness, or the lack of a nexus to current dangerousness, solely because they can "point to

some evidence" that the crime was merely "more than minimally necessary to convict him of the offense for which he is confined." *In re Dannenberg, supra,* 34 Cal.4[th] at 1095. They attempt to do this by stretching the concepts in the regulatory factors to apply to any crime. See the discussion in the Memorandum of Points and Authorities in Support of the Petition, at pp. 51-58. This formulation is used by the Board to take the place of determining whether the crime was egregious under the regulatory standards of *Cal. Code Regs.,* tit. 15, §2402(c)(1), on which inmates routinely rely to evaluate whether their particular crime could potentially take them outside the regulatory standards of suitability, which the Court expressly required the Board to base its decision on in *Rosenkrantz V, supra,* 29 Cal.4[th] at 653, 654 and 658.

Thus, as a starting point we have a phrase, "exceptionally heinous, atrocious and cruel," which standing alone has nothing that "implies any inherent restraint on the arbitrary and capricious" denial of parole suitability. *Godfrey v. State of Georgia,* 446 U.S. 420, 428-429 (1980); *Maynard v. Cartwright,* 486 U.S. 356, 361-364 (1988); *Shell v. Mississippi,* 498 U.S. 1, 3 (1990); see also *Superior Court of Santa Clara County v. Engert,* 31 Cal.3d 797, 805 (1982) [same finding in *both* death penalty or life imprisonment without possibility of parole cases]. While the Board tries to claim that the sub-factors of *Cal.Code Regs.,* tit. 15, §2402(c)(1)-(5) serve to limit the scope of the phrase, when it suits them otherwise, they claim that the regulatory factors are just non-exhaustive, or "illustrative" examples, and do not limit the Board in any way in denying parole. See Return, p. 7, line 14. Thus, as the *Criscione* court did, it is more important to actually look at what the Board does, not simply listen to what they say. As that court discovered, the facts show that every murder is "especially heinous, atrocious or cruel."

In the present case, the Board denied Mr. Rush parole at his 2005 hearing based solely upon the commitment offense, characterizing it as, "particularly cruel and callous," "dispassionate" with a "callous disregard for human suffering." (Exh. AAA, p. 88.) However, contrary to the established law on callousness, Petitioner did not engage in acts of gratuitous violence, did nothing to prolong the victims suffering, and neither tortured or tormented his victim. *Ernest Smith, supra,* 114 Cal.App.4[th] at 367. Nor could the killing be fairly characterized as "dispassionate" when it follows the assailant being beaten up by the victim during a heated argument. As the court found in *Criscione,* the regulatory factors here are being applied in an overbroad and vague fashion, in ways that no inmate would anticipate they would be applied to his crime. Thus, as applied, the regulatory provisions offend the vagueness

1

2    standards under the due process clause, in that they are being used to fit any crime, and have lost

3    the ability to distinguish crimes that truly are particularly egregious.

4    **IV.    RESPONDENT'S ARGUMENTS IN SECTIONS D(1), (2) & (3) HAVE NO APPLICATION TO ANY THEORY RAISED IN THE PETITION**

5            Here, respondent argues several points that have nothing to do with any claim relied on

6    by Petitioner in these proceedings.  First, in section D(1), respondent answers a purported

7    argument that all inmates are entitled to be paroled at their MEPD.  Then, in section D(2),

8    respondent addresses a related theory that inmates are entitled to a proportionate release date

9    regardless of whether or not they are found suitable.  Respondent points to pp. 17-18 of the

10   petition as its source for these claims.  However, no such arguments appear in the petition.

11   Instead, Petitioner contends that there is a presumption of parole suitability, as required under 9th

12   Circuit authority in *McQuillion, supra*, and the inmate is to be found suitable absent a factually

13   supported finding that the inmate remains currently dangerous.  This is the argument addressed

14   in sections I(A) and II of this Memorandum of Points and Authorities.  Likewise, had respondent

15   actually read page 18 of the petition, it would have been apparent that the argument is that Mr.

16   Rush is in fact suitable, and *because he is suitable*, he is entitled to a proportionate release date.

17   Again, this is covered in sections I(A) and II of this brief.

18           The argument in section D(3) of the return is equally misplaced.  Petitioner does not

19   contend that the Board is barred from using static facts generally.  Instead, as addressed in

20   section I(B) of this brief, the rules of *Biggs, Sass, Irons II* and *Hayward* require that static facts

21   be viewed in a context, and acknowledge that with the passage of time, and in the face of

22   overwhelming evidence of suitability, the static facts lose their probative value in helping to

23   predict future dangerousness.

24           Thus, as sections D(1),(2) and (3) are based on a misunderstanding of the actual

25   arguments, and the actual arguments are addressed elsewhere, they will not be discussed further

26   herein.

///

///

///

///

///

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### CONCLUSION

Based on the foregoing, Petitioner respectfully requests that this Court issue a Writ of Habeas Corpus, directing that he be discharged from all custody, actual and constructive, or alternatively, order the Board of Prison Terms to conduct a new hearing[13] and absent any new evidence to show adverse change since the 2005 hearing, to find Mr. Rush suitable for parole and to set a parole date consistent with the matrix for second degree murders. *Cal. Code Regs.*, tit.15 §2403(d).

Dated:___ February 8, 2008 ___      Respectfully submitted,

LAW OFFICES OF PICONE & DEFILIPPIS

By:_____
STEVE DEFILIPPIS
Attorneys for Petitioner,
ROBERT RUSH

---

[13] It is submitted that like the 2005 and 2007 hearings in which the Board again found Mr. Rush unsuitable, it is doubtful the Board will follow a Court directive if Mr. Rush is sent back for another hearing.

31

# EXHIBIT "TTT"

1 | SUPERIOR COURT
COUNTY OF SAN BERNARDINO
2 | Department No. S-8
351 North Arrowhead Avenue
3 | San Bernardino, California 92415-0240

FILED- San Bernardino District
SUPERIOR COURT
SAN BERNARDINO COUNTY

JAN 1 0 2007

By _____ Deputy

4

5

6

7

8           **IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9               **FOR THE COUNTY OF SAN BERNARDINO**

10                   **SAN BERNARDINO DISTRICT**

11

12 | In re the Petition of                )   Case No. SWHSS-9100

13 |    STEVEN ESCANDON,          )   ORDER DENYING PETITION
                                              )   FOR WRIT OF HABEAS CORPUS
14 |                                          )
    For Writ of Habeas Corpus.    )
15 |                                          )

16

17     The Petition of STEVEN ESCANDON for Writ of Habeas Corpus was filed in this

18  Court on December 28, 2006.

19     Therein, Petitioner contends that:

20  1)  The denial of his parole on June 14, 2005 violated his right to due process;

21       because:

22       a.  The grounds recited by the parole board were not supported by the

23            evidence.

24       b.  The decision to deny parole was arbitrary.

25       c.  The circumstances of his crime are unchangeable factors which are no

26            longer relevant to his current parole eligibility.

27  2)  No rational panelist who reviewed the evidence of his current parole suitability

28       could have found a preponderance of unreasonable risk.

-1-

0485

3) In effect, the use of unchanging facts of his commitment offense results in a de facto sentence of life imprisonment without the possibility of parole.

4) The "some evidence" standard is the wrong standard.

5) The Governor and the Board have an anti-parole bias and are failing to comply with Penal Code § 5075.

6) A deferral of three years for another parole suitability hearing violates due process.

In support of these contentions Petitioner has supplied a transcript of the subject proceedings. From that transcript the following information is revealed:

1) Petitioner has been in prison since September, 1983 (twenty-three years). He was first eligible in March, 2002. He was 21 at the time of the commitment offense.

2) Petitioner had no juvenile record. He had no prior arrests.

3) The panel reviewed his history while in prison and concluded that it was an exceptional history of good work reports.

4) The panel considered the Petitioner's post parole plans.

5) The circumstances of the Petitioner's crime can be stated concisely as a double murder by firearm of two men to steal their money. After the murder the victim's bodies were mutilated, shot in the face to disguise their identity and left to rot in the desert. Then the bodies were set on fire. The Board found this crime to be especially cruel and callous, carried out in an exceptionally callous manner, demonstrating a disregard for suffering. The offense was found to be vicious, cruel and committed for a trivial purpose. No right thinking person could disagree with such conclusions.

Based upon the circumstances of the crime, the Petitioner's extensive use of drugs and alcohol, the record of criminality while in prison, the panel found that the Petitioner presented an unreasonable risk of danger to society if released from prison. Contrary to Petitioner's contention, the evidence supports the decision of the panel.

-2-

0486

1    Once again, we have a Petitioner who has been given a sentence to life for the

2  killing of others and such a killer believes that it is somehow "unfair" for him to remain in

3  prison while his victims have no life at all.

4    We direct the Petitioner to the case of In re Weider (2006) 2006 DJDAR 15795, filed

5  December 5, 2006 for an excellent discussion of the applicable law in this area.  The

6  court will not restate such law.

7    The court does not find that the decision to deny Petitioner parole was arbitrary,

8  unsupported by evidence or unconstitutional.

9    The Petition is denied.

10

11  Dated this  10th  day of January, 2007.

12

13                                     John P. Wade

14

15                                JOHN P. WADE
                                  Judge of the Superior Court

16

17

18

19

20

21

22

23

24

25

26

27

28

0487

# EXHIBIT "UUU"

1          CALIFORNIA BOARD OF PAROLE HEARINGS

2              D E C I S I O N

3          **DEPUTY COMMISSIONER MARTEL:**  Okay, we're back

4      on record.

5          **PRESIDING COMMISSIONER KUBOCHI:**  We're back on

6      record for the decision in Mr. Rush's case, and it's

7      11:51 p.m.  Mr. Rush, we are going to deny you parole

8      for a period of one year.  A period of one year was

9      selected as you have accomplished many things

10     throughout your incarceration, and we believe that

11     recognition should be given for your accomplishments;

12     however, we are finding that as of today's date, you

13     are not suitable as you would pose an unreasonable risk

14     of danger to society or a threat to public safety if

15     released from prison.  Before commenting on the

16     commitment offense, Title 15, Section 2281, Subdivision

17     D, has a list of circumstances tending to show

18     suitability.  And the same comment I'm about to read

19     applies to Subdivision C, circumstances tending to show

20     unsuitability.  The importance attached to any

21     circumstance or combination of circumstances in a

22     particular case is left to the judgment of the Panel.

23     In the factors of suitability under Subdivision D, no

24     juvenile record is in your favor, because you had none,

25     **ROBERT RUSH    D-73321    DECISION PAGE 1    9/25/07**

1    stable social history.  You were living as a

2    20-year-old college student with roommates, which was a

3    stable situation.  You come from a good home.

4    Subsection three is signs of remorse, and I'll get back

5    to that.  Four, motivations for the crime.  Five does

6    not apply because it's intimate partner battering

7    syndrome.  That's not relevant to this case.  Lack of

8    criminal history is in your favor.  Age is somewhat

9    problematical in that you're only 42-years-old or

10   thereabouts.  Understanding and plans for the future,

11   your parole plans are acceptable.  Nine, institution --

12   eight, actually, because the number five not applying.

13   Eight is institutional behavior.  So your behavior,

14   although remarkable, is just one of eight factors to

15   consider on the factors of suitability.  In this

16   particular case, the remaining factors of suitability,

17   as well as the factors of unsuitability, are being

18   discussed in our decision as follows insofar as the

19   information received from the public and the finding

20   that I just announced.  We have to go back to the

21   beginning of the fact pattern, Mr. Rush, and see the

22   context in which Mr. Heinz was killed by you, keeping

23   in mind the jurors have rejected self-defense, jurors

24   have rejected -- your peers have rejected accident in

25   **ROBERT RUSH    D-73321    DECISION PAGE 2**    9/25/07

1   self-defense.  This all started over an argument

2   involving dog food, buying dog food.  And there was a

3   fist fight.  In regard to the fist fight, it's

4   immaterial who started it, because fist fights do not

5   justify shooting a gun more than ten times.  As the

6   appellate record shows, 12 bullets or fragments, and

7   that's a comment from the appellate decision, not

8   something I drew out of thin air.  It was a fist fight

9   over buying dog food.  You went back within your room,

10   so there clearly was a cooling off period.  Although

11   you claim to have been beaten by Mr. Heinz, he went to

12   his room, as that's where he was shot.  You were in

13   your room, and there was ample opportunity to cool off,

14   think about what you were going to do, let it go,

15   leave, do a lot of other things other than to grab a

16   loaded rifle, go out in the hallway, pass his room, and

17   shoot him to death.  He was in the safety of his own

18   bedroom, and you were in the safety of your bedroom.

19   But more importantly, let's look at what happened after

20   Mr. Heinz was murdered.  His body was dumped in Dover

21   Canyon near the campus of San Bernardino.  His ring was

22   taken off, and it appears that that was done by

23   Mr. Hoy.  But nonetheless, it was pawned, and the

24   testimony at trial was that Mr. Hoy split the money

25   **ROBERT RUSH    D-73321    DECISION PAGE 3    9/25/07**

1      from that ring with you, meaning after the murder,
2      there were activities that concern this Panel to this
3      day in regard to your activities of concealing the body
4      and that there were different times, different places,
5      different locations, different sets of acts that are
6      all attributable to you that cause us great concern in
7      regard to whether or not you would have remorse,
8      whether you have developed adequate insight as to what
9      you did, and whether or not you have an appreciation
10     for the causation factors, both in regard -- In regard
11     to the shooting itself, Mr. Heinz' I.D. was taken from
12     his wallet, including all the cash that he had, and the
13     wallet was buried in a different location from the
14     body.  You and Mr. Hoy returned to the house.  You
15     cleaned it up, and Mr. Heinz' vehicle was driven and
16     abandoned in Riverside County.  In looking at all of
17     the statements that you've given, and we clearly did
18     not hold it against you the fact that you did not talk
19     about the life crime.  We honored that right.  But we
20     looked at prior psychological evaluations, all
21     information in the Board package.  And going back to a
22     Correctional Counselor's report in 1999, you indicate
23     -- you told staff the victim lunged at you, and then
24     you pulled the trigger.  Throughout all the
25     **ROBERT RUSH    D-73321    DECISION PAGE 4      9/25/07**

1     characterizations and explanations of how this man was

2     murdered, you basically have used words to the impact

3     and effect that this was either self-defense or

4     accidental.  And this causes the Panel tremendous

5     concern in regard to whether or not you have an

6     appreciation for the magnitude of what you did.  Your

7     explanations have not accounted for why you shot an

8     unarmed person while he was in his own room, why you

9     failed to call for assistance from emergency personnel,

10    why you shot him, why there were 12 bullets or bullet

11    fragments found in his body, why it was dumped after

12    removing the wallet and I.D., why you shared in the

13    money after the ring was taken from his finger and

14    pawned, why you shared in the splitting of the money

15    taken from him, why you went back to the house to clean

16    up, and why you drove and abandoned the victim's

17    vehicle in Riverside County, and more importantly, why

18    you lied to the family when there were subsequent

19    inquiries as to the whereabouts of their son and the

20    concern they expressed over their son and family

21    member's safety.  Specifically, the act of driving the

22    car to Riverside involved your agreement with somebody

23    else.  There could have been more than one other person

24    to help you conceal the car and make it look like it

25    **ROBERT RUSH    D-73321    DECISION PAGE 5     9/25/07**

1    had been abandoned by -- excuse me -- as if the victim

2    had gone to Riverside County and was just a missing

3    person. all of these factors enumerated in this

4    decision indicate to this Panel that you truly do not

5    have remorse for the acts that you have at this time as

6    you do not have an understanding or appreciation for

7    the acts that resulted in murder, including an

8    explanation for your causation factors, as well as your

9    personal motivations for all of the circumstances that

10   I have delineated.  It is difficult for this Panel to

11   conclude that you have accepted responsibility under

12   the totality of circumstances.  Your personal growth is

13   difficult to assess in view of your continued

14   minimization of your responsibility in the commission

15   of this murder.  The acts of the murder and the

16   subsequent concealment indicate deceitfulness, and as I

17   indicated, occurred over different times, different

18   places, different situations, required the assistance

19   of other people.  We continue to find that you need

20   therapy in order to face, discuss and understand and

21   cope with stress in a non-destructive manner.  Until

22   progress is made, you continue to be unpredictable and

23   a threat to others.  There area areas that we believe

24   you are deficient.  The acts involved with the homicide

25   **ROBERT RUSH    D-73321    DECISION PAGE 6      9/25/07**

1    clearly show anger, rage, and the use of deadly force
2    grossly out of proportion with what you perceive to be
3    the triggering mechanism, that your motivations to this
4    day are inexplicable by rational societal standards.
5    And, therefore, we believe that you need to continue
6    participation in group therapy. We're recommending
7    your consideration for other venues such as lifer
8    groups, anger management groups, or any other type of
9    group therapy available at this facility, as your
10   ability to work with others and interact with others is
11   an important factor in assessing your suitability for
12   parole. It's one thing to sit by yourself and study
13   academic subjects and pass tests that show your
14   intellectual capacity, but there's still a question in
15   this Panel's mind in regard to whether or not you have
16   developed the ability to cope with and interact with
17   other people in a non-destructive manner. And until
18   progress is made, we find that you are unpredictable.
19   Commissioner, do you have any further comments?

20        **DEPUTY COMMISSIONER MARTEL:** No, I feel that
21   you've covered it all. I'd just like to, as indicated,
22   see the inmate participate in more group therapy type
23   of programs and interact with more people, and also, as
24   you indicated, to look a little deeper into more
25   **ROBERT RUSH    D-73321    DECISION PAGE 7    9/25/07**

1  insight as to his commission of his crime.  Other than
2  that, nothing else.

3          **PRESIDING COMMISSIONER KUBOCHI:**  Thank you.  It
4  is now --

5          **ATTORNEY DEFILIPPIS:**  Mr. Kubochi, can I ask
6  just one clarifying question?  You indicated you'd like
7  to see some additional groups.  Are there any
8  particular ones in mind that you --

9          **PRESIDING COMMISSIONER KUBOCHI:**  I'm going to
10  leave it up to your client's choosing, because I found
11  in the past that if we tell him x, y, z, and he doesn't
12  think he's going to benefit by those groups, he's not
13  going to progress.  And this is a situation where there
14  are options, and he will have to choose what's going to
15  work for him.

16          **INMATE RUSH:**  May I respond briefly?  There are
17  no other programs available here.  I participated in
18  every available program.

19          **PRESIDING COMMISSIONER KUBOCHI:**  Then as a
20  college graduate, you should get books on anger
21  management and other issues that maybe have stemmed all
22  the way back to your childhood in regard to your
23  ability to relate to other people, and accept the
24  deficiencies that you perceive in other people so that
25  **ROBERT RUSH    D-73321    DECISION PAGE 8      9/25/07**

1    you're not triggered into any stress situation.  In
2    listening to you at this hearing, in describing all of
3    what you did to that young man, and all the acts of
4    concealment, this is some of what you said:  I'm
5    responsible for what I did.  I'm grown up now.  I know
6    how to handle confrontations.  I'm not a kid anymore,
7    and I'm responsible for the decisions that I make.  The
8    record should reflect that Mr. Rush said those
9    statements in a flat affect, with not a whole lot of
10   emotional commitment as far as this Panel member's
11   observations, and I believe he over-summarized and
12   over-simplifies the entire situation.  So you should
13   read and study as you see fit, sir, because you're the
14   only person in this room that knew what happened in
15   that house that day, and so it's up to you to identify
16   those issues that caused you to go in such an anger
17   rage situation where you took this young man's life.
18   This Panel is not going to delineate x, y, z, because
19   it's going to be up to you to pick, based upon your
20   life experience, what's suitable for you and what you
21   feel you're going to benefit the most.

22          **INMATE RUSH:**  I have just the one concern.  In
23   the past, Panels have recommended therapy to continue,
24   and I've tried to pursue it.  And there should be a
25   **ROBERT RUSH    D-73321    DECISION PAGE 9    9/25/07**

1   chrono in my C-File saying as such, where Dr. Tirini

2   (phonetic) says there is no therapy available in the

3   system, and if it was available, it would only be

4   available on the recommendation of the psychologist.

5           PRESIDING COMMISSIONER KUBOCHI:  I didn't say

6   one-on-one psychology.  I said self-study, self-help

7   through books as you see fit for your presentation.

8           INMATE RUSH: Okay, there's also a chrono in

9   there from previous hearings where I've done that as

10  well.  There's a program here where I read the book The

11  Road Less Traveled and wrote a book report on it. And

12  that was done previously.  And so I tried to comply

13  with all of these recommendations from past Boards,

14  and--

15          PRESIDING COMMISSIONER KUBOCHI:  These are

16  suggestions.

17          INMATE RUSH:  There's nothing left.

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ROBERT RUSH   D-73321   DECISION PAGE 10   9/25/07

```
 1          PRESIDING COMMISSIONER KUBOCHI:  I'll let you

 2    and your attorney what's left and what's not left.

 3    We've made our decision based on the information based

 4    on the information that we've gathered at today's

 5    hearing.  It's 12:05, and this matter is concluded.

 6                    A D J O U R N M E N T

 7                        --oOo--

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21    PAROLE DENIED ONE YEAR.

22    THIS DECISION WILL BE FINAL ON:___JAN 2 3 2008____

23    YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT

24    DATE, THE DECISION IS MODIFIED.

25    ROBERT RUSH   D-73321   DECISION PAGE 11    9/25/07
```

86

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, ELIZABETH SCOTT, a duly designated transcriber, do hereby declare and certify under penalty of perjury that I have transcribed one audio recording which covers a total of pages numbered 1 - 85, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of ROBERT RUSH, CDC Number D-73321, on September 25, 2007, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned audio recording to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated October 24, 2007 at Sacramento, California.

*Elizabeth A. Scott*

ELIZABETH SCOTT, Transcriber
**Foothill Transcription Company, Inc.**

0499

# EXHIBIT "VVV"

1

2

3

SUPERIOR COURT OF CALIFORNIA

4

COUNTY OF SANTA CLARA

5

6

7  In re                                    No.: 71614

8     ARTHUR CRISCIONE,                      ORDER

9  On Habeas Corpus

10

11

12                        INTRODUCTION

13     Petitioner alleges that he has been denied due process of law

14  because the Board has used standards and criteria which are

15  unconstitutionally vague in order to find him unsuitable for parole.

16  Alternatively, he argues that those standards, even if

17  constitutionally sound, are nonetheless being applied in an arbitrary

18  and meaningless fashion by the Board.  He relies upon evidence that

19  in one hundred percent of 2690 randomly chosen cases, the Board found

20  the commitment offense to be "especially heinous, atrocious or

21  cruel", a factor tending to show unsuitability under Title 15

22  §2402(c)(1).

23     Are the Board Criteria Unconstitutionally Vague?

24     Our courts have long recognized that both state and federal due

25  process requirements dictate that the Board must apply detailed

26  standards when evaluating whether an individual inmate is unsuitable

27  for parole on public safety grounds.  (See *In re Dannenberg* (2005) 34

28

1.

0500

1  Cal.4th 1061 at p. 1096, footnote 16.). These standards are found in

2  15 CCR §2402(c) (Dannenberg, supra, 34 Cal.4th at p. 1080.) and do

3  include detailed criteria to be applied by the Board when considering

4  the commitment offense:

5      (c) Circumstances Tending to Show Unsuitability. The following
   circumstances each tend to indicate unsuitability for release.

6  These circumstances are set forth as general guidelines; the
   importance attached to any circumstance or combination of

7  circumstances in a particular case is left to the judgment of
   the panel. Circumstances tending to indicate unsuitability

8  include:

9      (1) Commitment Offense. The prisoner committed the offense in an
   especially heinous, atrocious or cruel manner. The factors to be

10  considered include:

11      (A) Multiple victims were attacked, injured or killed in
   the same or separate incidents.

12      (B) The offense was carried out in a dispassionate and

13  calculated manner, such as an execution-style murder.

14      (C) The victim was abused, defiled or mutilated during or
   after the offense.

15      (D) The offense was carried out in a manner which

16  demonstrates an exceptionally callous disregard for human
   suffering.

17      (E) The motive for the crime is inexplicable or very

18  trivial in relation to the offense.

19      In response to Petitioners claim that the regulations are

20  impermissibly vague, Respondent argues that while "especially

21  heinous, atrocious or cruel" might be vague in the abstract it is

22  limited by factors (A)-(E) of §2402(c)(1), and thus provides a

23  'principled basis' for distinguishing between those cases which are

24  contemplated in that section and those which are not.  An examination

25  of cases involving vagueness challenges to death penalty statutes is

26  instructive here and shows that Respondent's position has merit:

27      "Our precedents make clear that a State's capital sentencing

28

2

1    scheme also must genuinely narrow the class of persons eligible
     for the death penalty.  When the purpose of a statutory
2    aggravating circumstance is to enable the sentencer to
     distinguish those who deserve capital punishment from those who
3    do not, the circumstance must provide a principled basis for
     doing so.  If the sentencer fairly could conclude that an
4    aggravating circumstance applies to every defendant eligible for
     the death penalty, the circumstance is constitutionally infirm."
5    [Arave v. Creech (1993) 507 U.S. 463, 474, citing Maynard v.
     Cartwright (1988) 496 U.S. 356, 364; "invalidating aggravating
6    circumstance that 'an ordinary person could honestly believe'
     described every murder," and, Godfrey v. Georgia (1980) 446 U.S.
7    420, 428-429: "A person of ordinary sensibility could fairly
     characterize almost every murder as 'outrageously or wantonly
8    vile, horrible and inhuman.'"]

9        It cannot fairly be said that 'every murder' could be

10   categorized as "especially heinous, atrocious or cruel" under the

11   Board regulations, since the defining factors contained in

12   subdivisions (A)-(E) clearly narrow the group of cases to which it

13   applies.  Although Petitioner also argues that the "vague statutory

14   language is not rendered more precise by defining it in terms or

15   synonyms of equal or greater uncertainty" (People v. Superior Court

16   (Engert) (1982) 31 Cal.3d 797, 803, Pryor v. Municipal Court (1979)

17   25 Cal.3d 238, 249. See also Walton v. Arizona (1990) 497 U.S. 639,

18   654), the factors in those subdivisions are not themselves vague or

19   uncertain.  The mere fact that there may be some subjective component

20   (such as "exceptionally callous" disregard for human suffering) does

21   not render that factor unconstitutionally vague.   The proper degree

22   of definition of such factors is not susceptible of mathematical

23   precision, but will be constitutionally sufficient if it gives

24   meaningful guidance to the Board.

25       A law is void for vagueness if it "fails to provide adequate
         notice to those who must observe its strictures and
26       impermissibly delegates basic policy matters to policemen,
         judges, and juries for resolution on an ad hoc and subjective
27       basis, with the attendant dangers of arbitrary and

28

3

0502

1  discriminatory application." (People v. Rubalcava (2000) 23
   Cal.4th 322, 332, quoting People ex rel. Gallo v. Acuna (1997)
2  14 Cal. 4th 1090, 1116, quoting Grayned v. City of Rockford
   (1972) 408 U.S. 104, 108-109.)

3  A review of cases expressing approval of definitions to limit the
4  application of otherwise vague terms in death penalty statutes leads
5  inextricably to the conclusion that the limiting factors in §2402(c)
6  easily pass constitutional muster.  An Arizona statute was upheld
7  that provided a crime is committed in an 'especially cruel manner'
8  when the perpetrator inflicts mental anguish or physical abuse before
9  the victim's death," and that "mental anguish includes a victim's
10 uncertainty as to his ultimate fate."  (Walton v. Arizona (1990) 497
11 U.S. 639, 654.)  Similarly, the court in Maynard v. Cartwright, 486
12 U.S. at 364-365, approved a definition that would limit Oklahoma's
13 "especially heinous, atrocious, or cruel" aggravating circumstance to
14 murders involving "some kind of torture or physical abuse.  In
15 Florida, the statute authorizing the death penalty if the crime is
16 "especially heinous, atrocious, or cruel," satisfied due process
17 concerns where it was further defined as "the conscienceless or
18 pitiless crime which is unnecessarily torturous to the victim."
19 State v. Dixon (1973) 283 So. 2d 1 at p. 9.

20     Here, the factors in subdivisions (A)-(E) provide equally clear
21 limiting construction to the term "especially heinous, atrocious, or
22 cruel" in §2402(c).

23 <u>Has the Board Engaged in a Pattern of Arbitrary Application of the</u>
24 <u>Criteria?</u>

25     As previously noted, 15 CCR §2402 provides detailed criteria for
26 determining whether a crime is "exceptionally heinous, atrocious or
27 cruel" such that it tends to indicate unsuitability for parole.  Our
28

4

0503

1  courts have held that to fit within those criteria and thus serve as

2  a basis for a finding of unsuitability, the circumstances of the

3  crime must be more aggravated or violent than the minimum necessary

4  to sustain a conviction for that offense.  (In re Rosenkrantz (2002)

5  29 Cal.4th 616, 682-683.)  Where that is the case, the nature of the

6  prisoner's offense, alone, can constitute a sufficient basis for

7  denying parole.  (In re Dannenberg, supra, 34 Cal.4th at p. 1095.)

8          Petitioner claims that those criteria, even if constitutionally

9  sound, have been applied by the Board in an arbitrary and capricious

10  manner rendering them devoid of any meaning whatever.  The role of

11  the reviewing court under these circumstances has been addressed

12  previously in the specific context of Parole Board actions:

13          "[Courts have] an obligation, however, to look beyond the facial
        validity of a statute that is subject to possible
14      unconstitutional administration since a law though fair on its
        face and impartial in appearance may be open to serious abuses
15      in administration and courts may be imposed upon if the
        substantial rights of the persons charged are not adequately
16      safeguarded at every stage of the proceedings.  We have
        recognized that this court's obligation to oversee the execution
17      of the penal laws of California extends not only to judicial
        proceedings, but also to the administration of the Indeterminate
18      Sentence Law."  (In re Rodriguez (1975) 14 Cal.3d 639, 648,
        quoting Minnesota v. Probate Court (1940) 309 U.S. 270, 277.)

19

20          Similarly, in In re Minnis (1972) 7 Cal.3d 639, 645, the case

21  closest on point to the present situation, the California Supreme

22  Court stated: "This court has traditionally accepted its

23  responsibility to prevent an authority vested with discretion from

24  implementing a policy which would defeat the legislative motive for

25  enacting a system of laws."   Where, as here, the question is whether

26  determinations are being made in a manner that is arbitrary and

27  capricious, judicial oversight "must be extensive enough to protect

28

-5-

0504

1  limited right of parole applicants 'to be free from an arbitrary

2  parole decision ... and to something more than mere pro-forma

3  consideration.'" (In re Ramirez (2001) 94 Cal.App.4th 549 at p. 564,

4  quoting In re Sturm (1974) 11 Cal.3d 258 at p. 268.)

5      This Court, therefore, now examines Petitioner's "as applied"

6  void for vagueness challenge. ...

7

8                    The Evidence Presented

9      A similar claim to those raised here, involving allegations of

10 abuse of discretion by the Board in making parole decisions, was

11 presented to the Court of Appeal in In re Ramirez, supra. The court

12 there observed that such a "serious claim of abuse of discretion"

13 must be "adequately supported with evidence" which should be

14 "comprehensive." (Ramirez, supra, 94 Cal.App.4th at p. 564, fn. 5.)

15 The claim was rejected in that case because there was not "a

16 sufficient record to evaluate." (Ibid.) In these cases, however,

17 there is comprehensive evidence offered in support of Petitioner's

18 claims.

19     Discovery orders were issued in five different cases involving

20 life term inmates (Petitioners) who all presented identical claims.[1]

21

22 [1] This Court takes judicial notice of the several other cases currently
   pending (Lewis #68038, Jameison #71194, Bragg #108543, Ngo #127611.) which
23 raise this same issue and in which proof was presented on this same point.
   (Evidence Code § 452(d). See specifically, in the habeas corpus context,
24 In re Vargus (2000) 83 Cal.App.4th 1125, 1134-1136, 1143, in which judicial
   notice was taken of the evidence in four other cases and in which the court
25 noted: "Facts from other cases may assist petitioner in establishing a
   pattern." See generally McKell v. Washington Mutual, Inc. (2006) 142
26 Cal.App.4th 1457, 1491: "trial and appellate courts ... may properly take
   judicial notice of ... established facts from both the same case and other
27 cases." And see AB Group v. Wertin (1997) 59 Cal.App.4th 1022, 1036:
   Judicial notice taken of other cases when matters are "just as relevant to
28 the present [case] as they are to the others.")

6

0505

1    The purpose of the discovery was to bring before the Court a
2    comprehensive compilation and examination of Board decisions in a
3    statistically significant number of cases.  The Board decisions under
4    examination consisted of final decisions of the Board for life-term
5    inmates convicted of first or second degree murder and presently
6    eligible for parole.  Included were all such decisions issued in
7    certain months, chosen by virtue of their proximity in time to the
8    parole denials challenged in the pending petitions.  All Board
9    decisions in the months of August, September and October of 2002,
10   July, August, September, October, November, and December of 2003,
11   January and February of 2004, February of 2005, and January of 2006
12   were compiled.  This resulted in a review of 2690 cases decided in a
13   total of 13 months.
14       The purpose of the review was to determine how many inmates had
15   actually been denied parole based in whole or in part on the Board's
16   finding that their commitment offense fits the criteria set forth in
17   Title 15 §2402(c)(1) as "especially heinous, atrocious or cruel."  A
18   member of the research team conducting the review, Karen Rega,
19   testified that in its decisions the Board does not actually cite CCR
20   rule §2402(c), but consistently uses the specific words or phrases
21   ("verbiage from code") contained therein, so that it could easily be
22   determined when that criteria was being applied.  (For example,
23   finding "multiple victims" invokes §2402(c)(1)(A); finding the crime
24   "dispassionate" "calculated" or "execution style" invokes
25   §2402(c)(1)(B); that a victim was "abused" "mutilated" or "defiled"
26   invokes §2402(c)(1)(C);  a crime that is "exceptionally callous" or
27   demonstrated a "disregard for human suffering" fits criteria
28

                                   7

                                                              0506

1  §2402(c)(1)(D); and finding the motive for the crime "inexplicable"

2  or "trivial" invokes §2402(c)(1)(E).

3      Petitioners provided charts, summaries, declarations, and the

4  raw data establishing the above in the cases of Lewis #68038,

5  Jameison #71194, Bragg #108543, and Ngo #127611.  In this case

6  (Criscione #71614) the evidence was presented somewhat differently.

7  Both to spread the burden of the exhaustive examination, and to

8  provide a check on Petitioners' methods, this Court ordered

9  Respondent to undertake an examination of two randomly chosen months

10  in the same manner as Petitioner had been doing.  Respondent complied

11  and provided periodic updates in which they continued to report that

12  at all "the relevant hearings the Board relied on the commitment

13  offense as a basis for denying parole."  (See "Respondent's Final

14  Discovery Update" filed April 5, 2007.)  At the evidentiary hearing

15  on this matter counsel for Respondents stipulated that "in all of

16  those cases examined [by Respondent pursuant to the Criscione

17  discovery orders] the Board relied on the commitment offense as a

18  basis for denying parole."  (See pages 34-35 of the June 1, 2007,

19  evidentiary hearing transcript.)

20      The result of the initial examination was that in over 90

21  percent of cases the Board had found the commitment offense to be

22  "especially heinous, atrocious or cruel" as set forth in Title 15

23  §2402(c)(1).  In the remaining 10% of cases either parole had been

24  granted, or it was unclear whether §2402(c)(1) was a reason for the

25  parole denial.  For all such cases, the decisions in the prior

26  hearing for the inmate were obtained and examined.  In every case,

27  the Board had determined at some point in time that every inmates

28

1   crime was "especially heinous, atrocious or cruel" under Title 15

2   §2402(c)(1).

3       Thus, it was shown that 100% of commitment offenses reviewed by

4   the Board during the 13 months under examination were found to be

5   "especially heinous, atrocious or cruel" under Title 15 §2402(c)(1).

6       A further statistic of significance in this case is that there

7   are only 9,750 inmates total who are eligible for, and who are

8   currently receiving, parole consideration hearings as life term

9   inmates. (See "Respondent's Evidentiary Hearing Brief," at p. 4,

10  filed April 16, 2007.)

11

12                      USE OF STATISTICS

13      In *International Brotherhood of Teamsters v. United States*

14  (1977) 431 U.S. 324, 339-340, the United States Supreme Court

15  reaffirmed that statistical evidence, of sufficient "proportions,"

16  can be sound and compelling proof. As noted by the court in *Everett*

17  *v. Superior Court* (2002) 104 Cal.App.4th 388, 393, and the cases cited

18  therein, "courts regularly have employed statistics to support an

19  inference of intentional discrimination."

20      More recently, the United States Supreme Court, in *Miller-El v.*

21  *Cockrell* (2003) 537 U.S. 322, 154 L.Ed.2d 931, when examining a habeas

22  petitioner's allegations that the prosecutor was illegally using his

23  peremptory challenges to exclude African-Americans from the

24  petitioner's jury, noted that "the statistical evidence alone" was

25  compelling. The high court analyzed the numbers and concluded:

26  "Happenstance is unlikely to produce this disparity." (See also

27  *People v. Hofsheier* (2004) 117 Cal.App.4th 438 in which "statistical

28

                                    9

1 evidence" was noted as possibly being dispositive.  And see *People v.*
2 *Flores* (2006) 144 Cal.App.4th 625 in which a statistical survey and
3 analysis, combined into an "actuarial instrument" was substantial
4 proof.)
5       A statistical compilation and examination such as has been
6 presented in these cases is entirely appropriate and sufficient
7 evidence from which to draw sound conclusions about the Board's
8 overall methods and practices.

9
10                     THE EXPERT'S TESTIMONY
11       Petitioners provided expert testimony from Professor Mohammad
12 Kafai regarding the statistics and the conclusions that necessarily
13 follow from them.  Professor Kafai is the director of the statistics
14 program at San Francisco State University, he personally teaches
15 statistics and probabilities, and it was undisputed that he was
16 qualified to give the expert testimony that he did.  No evidence was
17 presented that conflicts or contradicts the testimony and conclusions
18 of Professor Kafai.  By stipulation of the parties, Professor Kafai's
19 testimony was to be admissible and considered in the cases of all
20 five petitioners.  (See page 35 of the June 1, 2007, evidentiary
21 hearing transcript.)
22       Professor Kafai testified that the samples in each case, which
23 consisted of two or three months of Board decisions, are
24 statistically sufficient to draw conclusions about the entire
25 population of life term inmates currently facing parole eligibility
26 hearings.  Given that every inmate within the statistically
27 significant samples had his or her crime labeled "'particularly
28

                                  10

1 egregious'" or "especially heinous, atrocious or cruel" under Title
2 15 §2402(c)(1), it can be mathematically concluded that the same
3 finding has been made for every inmate in the entire population of
4 9,750. Although he testified that statisticians never like to state
5 unequivocally that something is proven to a 100% certainty, (because
6 unforeseen anomalies are always theoretically possible,) he did
7 indicate the evidence he had thus far examined came as close to that
8 conclusion as could be allowed. Not surprisingly, Professor Kafai
9 also testified that "more than 50% can't by definition constitute an
10 exception."

11     Having found the data provided to the expert to be sound this
12 Court also finds the expert's conclusions to be sound. In each of
13 the five cases before the Court over 400 inmates were randomly chosen
14 for examination. That number was statistically significant and was
15 enough for the expert to draw conclusions about the entire population
16 of 9,750 parole eligible inmates. The fact that the approximately
17 2000 inmates examined in the other cases also had their parole denied
18 based entirely or in part on the crime itself (§2402(c)(1)), both
19 corroborates and validates the expert's conclusion in each individual
20 case and also provides an overwhelming and irrefutable sample size
21 from which even a non expert can confidently draw conclusions.

22
23                              DISCUSSION
24     Although the evidence establishes that the Board frequently says
25 parole is denied "first," "foremost," "primarily," or "mainly,"
26 because of the commitment offense, this statement of primacy or
27 weight is not relevant to the question now before the Court.
28

                                  11

0510

1 │ Petitioners acknowledge that the Board generally also cites other
2 │ reasons for its decision. The question before this Court, however,
3 │ is not whether the commitment offense is the primary or sole reason
4 │ why parole is denied -- the question is whether the commitment
5 │ offense is labeled "'particularly egregious'" and thus could be used,
6 │ under *Dannenberg*, primarily or exclusively to deny parole.
7 │     The evidence proves that in a relevant and statistically
8 │ significant period where the Board has considered life term offenses
9 │ in the context of a parole suitability determination, every such
10 │ offense has been found to be "particularly egregious" or "especially
11 │ heinous, atrocious or cruel."[2] This evidence conclusively
12 │ demonstrates that the Board completely disregards the detailed
13 │ standards and criteria of §2402(c). "Especially" means particularly,
14 │ or "to a distinctly greater extent or degree than is common."[3]  (EC §
15 │ 451(e).)  By simple definition the term "especially" as contained in
16 │ section 2402(C)(1) cannot possibly apply in 100% of cases, yet that
17 │ is precisely how it has been applied by the Board.  As pointed out by
18 │ the Second District Court of Appeal, not every murder can be found to
19 │ be "atrocious, heinous, or callous" or the equivalent without "doing

20 │ _____
   │ [2] In a single case out of the 2690 that were examined Petitioner has conceded that
21 │ the Board did not invoke §2402(c)(1). This Court finds that concession to be
   │ improvidently made and the result of over caution. When announcing the decision at
22 │ the initial hearing of S. Fletcher (H-10330) on 4/6/06, the commissioner did begin
   │ by stating "I don't believe this offense is particularly aggravated..."  However
23 │ the commissioner proceeds to describe the crime as a drug deal to which Fletcher
   │ brought a gun so "we could say there was some measure of calculation in that."  The
   │ commissioner continued by observing that the reason someone would bring a gun to a
24 │ drug transaction was to make sure things went according to their plan "so I guess
   │ we can say that that represents calculation and perhaps it's aggravated to that
25 │ extent."  As is the Board's standard practice, by using the word 'calculated' from
   │ §2402(c)(1)(b) the Board was invoking that regulation.  Certainly if Mr. Fletcher
26 │ had brought a habeas petition Respondent's position would be that there is 'some
   │ evidence' supporting this.  The ambiguity created by the commissioner's initial
27 │ statement was cleared up several pages later when he announces that "based upon the
   │ crime coupled with ..." parole was denied for four years.  (See *In re Burns* (2005)
   │ 136 Cal.App.4th 1318, 1326, holding §2402(c)(1) criteria are necessary for a multi-
   │ year denial.)
28 │

0511

1  violence" to the requirements of due process.  (In re Lawrence (2007)
2  150 Cal.App.4th 1511, 1557.)  This is precisely what has occurred
3  here, where the evidence shows that the determinations of the Board
4  in this regard are made not on the basis of detailed guidelines and
5  individualized consideration, but rather through the use of all
6  encompassing catch phrases gleaned from the regulations.

7
8                           THE BOARD'S METHODS
9      Because it makes no effort to distinguish the applicability of
10  the criteria between one case and another, the Board is able to force
11  every case of murder into one or more of the categories contained in
12  §2402(c).
13      For example, if the inmate's actions result in an instant death
14  the Board finds that it was done in a "dispassionate and calculated
15  manner, such as an execution-style murder."  At the same time the
16  Board finds that a murder not resulting in near instant death shows a
17  "callous disregard for human suffering" without any further analysis
18  or articulation of facts which justify that conclusion.  If a knife
19  or blunt object was used, the victim was "abused, defiled, or
20  mutilated."  If a gun was used the murder was performed in a
21  "dispassionate and calculated manner, such as an execution-style
22  murder."  If bare hands were used to extinguish another human life
23  then the crime is "particularly heinous and atrocious."
24      Similarly, if several acts, spanning some amount of time, were
25  necessary for the murder the Board may deny parole because the inmate
26  had "opportunities to stop" but did not.  However if the murder was

27
    ---
    [3] Princeton University World Net Dictionary (2006).
28

                              13

1  accomplished quickly parole will be denied because it was done in a
2  dispassionate and calculated manner and the victim never had a chance
3  to defend themselves or flee.  If the crime occurred in public, or
4  with other people in the vicinity, it has been said that the inmate
5  "showed a callous disregard" or "lack of respect" for the
6  "community."  However if the crime occurs when the victim is found
7  alone it could be said that the inmate's actions were aggravated
8  because the victim was isolated and more vulnerable.
9      In this manner, under the Board's cursory approach, every murder
10  has been found to fit within the unsuitability criteria.  What this
11  reduces to is nothing less than a denial of parole for the very
12  reason the inmates are present before the Board - i.e. they committed
13  murder.  It is circular reasoning, or in fact no reasoning at all,
14  for the Board to begin each hearing by stating the inmate is before
15  them for parole consideration, having passed the minimum eligible
16  parole date based on a murder conviction, and for the Board to then
17  conclude that parole will be denied because the inmate committed acts
18  that amount to nothing more than the minimum necessary to convict
19  them of that crime.  As stated quite plainly by the Sixth District:
20  "A conviction for murder does not automatically render one unsuitable
21  for parole." (Smith, supra, 114 Cal.App.4th at p. 366, citing
22  Rosenkrantz, supra, 29 Cal.4th at p. 683.)
23      In summary, when every single inmate is denied parole because
24  his or her crime qualifies as a §2402(c)(1) exception to the rule
25  that a parole date shall normally be set, then the exception has
26  clearly swallowed the rule and the rule is being illegally
27  interpreted and applied.  When every single life crime that the Board
28

14

0513

1  examines is "particularly egregious" and "especially heinous,
2  atrocious or cruel" it is obvious that the Board is operating without
3  any limits and with unfettered discretion.

4      Other examples of the failure to 'connect up' the facts of the
5  individual case with the criteria and the ultimate findings abound in
6  the decisions of the reviewing courts.  Some of the state cases to
7  have reversed Parole Board or Governor abuses of discretion in
8  denying parole include In re Roderick, In re Cooper, In re Lawrence,
9  In re Barker, In re Gray, In re Lee, In re Elkins, In re Weider, In
10 re Scott, In re Deluna, In re Ernest Smith, In re Mark Smith, and In
11 re Capistran.

12     When "the record provides no reasonable grounds to reject, or
13 even challenge, the findings and conclusions of the psychologist and
14 counselor concerning [the inmate's] dangerousness" the Board may not
15 do so.  (In re Smith (2003) 114 Cal.App.4th 343, 369.)

16     When an inmate, although only convicted of a second degree
17 murder, has been incarcerated for such time that, with custody
18 credits, he would have reached his MEPD if he had been convicted of a
19 first, the Board must point to evidence that his crime was aggravated
20 or exceptional even for a first degree murder if they are going to
21 use the crime as a basis for denying parole.  (In re Weider (2006)
22 145 Cal.App.4th 570, 582-583.)[4]

23
24 [4]   This rule, rooted in Justice Moreno's concurrence in Rosenkrantz, supra, is
particularly applicable in this case.  Petitioner was convicted of second degree,
but acquitted of first degree, murder over 25 years ago.  (People v. Criscione
25 (1981) 125 Cal.App.3d 275.)  With his custody credits he is beyond the matrix even
had he been convicted of a first.  In a currently pending habeas petition in which
26 he challenges his 2007 parole denial the first reason the Board gave was the crime
itself and the presiding commissioner explained; "His actions go well beyond the
minimum necessary for a conviction of murder in the second degree."  (Decision page
27 2 of 4/2/07 transcript.)  For the Board to penalize the Petitioner for the fact
that he was acquitted of first degree is further proof of their willfulness and
28

15

0514

1    A "petitioner's young age at the time of the offense" must be

2    considered. (*In re Elkins* (2006) 144 Cal.App.4th 475, 500, quoting

3    *Rosenkrantz v. Marshall* (C.D.Cal. 2006) 444 F. Supp. 2d 1063, 1065,

4    1085: "The reliability of the facts of the crime as a predictor for

5    his dangerousness was diminished further by his young age of 18, just

6    barely an adult. The susceptibility of juveniles to immature and

7    irresponsible behavior means their irresponsible conduct is not as

8    morally reprehensible as that of an adult.'")[5]

9    The Board's formulaic practice of stating §2402(c)(1) phrased in

10    a conclusory fashion, and then stating "this is derived from the

11    facts" without ever linking the two together, is insufficient. (*In

12    re Roderick*, (2007) ___ Cal.App.4th ___ (A113370): "At minimum, the

13    Board is responsible for articulating the grounds for its findings

14    and for citing to evidence supporting those grounds." (See also *In

15    re Barker* (2007) 151 Cal.App.4th 346, 371, disapproving

16    "conclusorily" announced findings.)

17    After two decades, mundane "crimes have little, if any,

18    predictive value for future criminality. Simply from the passing of

19    time, [an inmate's] crimes almost 20 years ago have lost much of

20    their usefulness in foreseeing the likelihood of future offenses than

21    if he had committed them five or ten years ago." (*In re Lee* (2006)

22    143 Cal.App.4th 1400, 1412.) It should be noted that this rule

23    bias. The jury had a reasonable doubt that Petitioner committed first degree

24    murder but under the Board's 'reasoning' and 'analysis' this puts him in a worse

position than if they had not. Had the jury convicted him of the greater offense

25    Petitioner has served so much time that he would not have already be having subsequent

parole hearings on a first and the Board would not have been able to use the 'same

26    evidence' of first degree behavior against him. As observed previously, the

Board's position in this regard is "so ridiculous that simply to state it is to

refute it." (*Weider, supra*, 145 Cal.App.4th at p. 583.)

27    [5] This point is particularly significant in the case of Mike Ngo. Mr. Ngo was only

18 at the time of his crime. The impetus behind the shooting was youth group or

28

16

1   applies with even more force when the Board is relying on any

2   criminality that occurred before the crime.  In that situation, just

3   as with the crime itself, the Board must explain why such old events

4   have any relevance and especially when the inmate has spent a decade

5   as a model prisoner.

6        Murders situationally related to intimate relationships are

7   unfortunately commonplace because emotions are strongest in such

8   domestic settings.  When a murder occurs because of "stress unlikely

9   to be reproduced in the future" this is a factor that affirmatively

10  points towards suitability.  (In re Lawrence (2007) 150 Cal.App.4th

11  1511 and cases cited therein.)

12       "The evidence must substantiate the ultimate conclusion that the

13  prisoner's release currently poses an unreasonable risk of danger to

14  the public.  It violates a prisoner's right to due process when the

15  Board or Governor attaches significance to evidence that forewarns no

16  danger to the public."  (In re Tripp (2007) 150 Cal.App.4th 306,

17  313.)

18       The Board "cannot rely on the fact that the killing could have

19  been avoided to show the killing was especially brutal."  (In re

20  Cooper (2007) 153 Cal.App.4th 1043, 1064.)

21       . The Board's focus must be upon how the inmate "actually

22  committed his crimes" not the "incorporeal realm of legal

23  constructs."  (Lee, supra, 143 Cal.App.4th at p. 1413.)  This is

24  especially significant when the murder conviction is based on the

25  felony murder rule, provocative act doctrine, or accomplice liability

26  such that the inmate did not intend to kill or may not have even been

27  _____

    gang rivalries, posturing, and threats which mature adults would not have been

28

17

1    the actual killer.

2        The Board has ample guidance before it in the decisions of the

3    various reviewing courts to constrain its abuse, but has failed to

4    avail itself of the opportunity to do so.

5

6                    SEPARATION OF POWERS DOCTRINE

7        The evidence presented, as discussed above, has established a

8    void for vagueness "as applied" due process violation. That same

9    evidence also proves a separate but related Constitutional violation

10   -- an as applied separation of powers violation.

11       The separation of powers doctrine provides "that the legislative

12   power is the power to enact statutes, the executive power is the

13   power to execute or enforce statutes, and the judicial power is the

14   power to interpret statutes and to determine their

15   constitutionality." (Lockyer v. City and County of San Francisco

16   (2004) 33 Cal.4th 1055, 1068.) Because the evidence has proven the

17   Board is not executing/enforcing the legislature's statutes as

18   intended it is this Court's duty to intervene. The question here is

19   whether the Board is violating the separation of powers doctrine by

20   appropriating to itself absolute power over parole matters and

21   disregarding the limits and guidelines placed by the statute.[6]

22       "Government Code section 11342.2 provides: 'Whenever by the

23

24   caught up in.
     [6] "It is settled that Administrative regulations that violate acts of the
     Legislature are void and no protestations that they are merely an exercise of
25   administrative discretion can sanctify them. They must conform to the legislative
     will if we are to preserve an orderly system of government. Nor is the motivation
26   of the agency relevant: It is fundamental that an administrative agency may not
     usurp the legislative function, no matter how altruistic its motives are."
27   (Agricultural Labor Relations Board v. Superior Court of Tulare County (1976) 16
     Cal.3d 392, 419 quoting Morris v. Williams (1967) 67 Cal.2d 733, 737, and City of
     San Joaquin v. State Bd. of Equalization (1970) 9 Cal.App.3d 365, 374.)

28

                                     18

                                                                                    0517

1   express or implied terms of any statute a state agency has authority

2   to adopt regulations to implement, interpret, make specific or

3   otherwise carry out the provisions of the statute, no regulation

4   adopted is valid or effective unless consistent and not in conflict

5   with the statute and reasonably necessary to effectuate the purpose

6   of the statute.' Administrative regulations that alter or amend the

7   statute or enlarge or impair its scope are void and courts not only

8   may, but it is their obligation to strike down such regulations."

9   (*Pulaski v. Occupational Safety & Health Stds. Bd.* (1999) 75

10  Cal.App.4th 1315, 1341, citations omitted.)

11      The vice of overbroad and vague regulations such as are at issue

12  here is that they can be manipulated, or 'interpreted,' by executive

13  agencies as a source of unfettered discretion to apply the law

14  without regard to the intend of the people as expressed by the

15  legislature's enabling statutes. In short, agencies usurp unlimited

16  authority from vague regulations and become super-legislatures that

17  are unaccountable to the people. As it has sometimes been framed and

18  addressed in the case law, a vague or all encompassing standard runs

19  the risk of "violat[ing] the separation of powers doctrine by

20  'transforming every [executive decisionmaker] into a "mini-

21  legislature" with the power to determine on an ad hoc basis what

22  types of behavior [satisfy their jurisdiction].'" (*People v. Ellison*

23  (1998) 68 Cal.App.4th 203, 211, quoting *People v. Superior Court*

24  *(Caswell)* (1988) 46 Cal.3d 381, 402.)

25      "It is concern about 'encroachment and aggrandizement,' the

26  [United States Supreme Court] reiterated, that has animated its

27  separation of powers jurisprudence. 'Accordingly, we have not

28

19

1  hesitated to strike down provisions of law that either accrete to a
2  single branch powers more appropriately diffused among separate
3  Branches or that undermine the authority and independence of one or
4  another coordinate Branch.'" (*Kasler v. Lockyer* (2000) 23 Cal.4th
5  472, 493, quoting *Mistretta v. United States* (1989) 488 U.S. 361,
6  382.) This articulation of the principle speaks directly to the
7  situation at hand. The Board, by its enactment and interpretation of
8  Title 15, §2402, has appropriated to itself absolute power over
9  'lifer' matters. Overreaching beyond the letter and spirit of the
10 Penal Code provisions, Title 15, §2402(c)(1) has been interpreted by
11 the Board to supply the power to declare every crime enough to deny
12 parole forever. The fact that Title 15, §2402, has been invoked in
13 every case, but then sometime later not invoked, tends to show either
14 completely arbitrary and capricious behavior or that unwritten
15 standards are what really determine outcomes. In either event, all
16 pretenses of taking guidance from, or being limited by, the
17 legislature's statutes have been abandoned. "[I]t is an elementary
18 proposition that statutes control administrative interpretations."
19 (*Ohio Casualty Ins. Co. v. Garamendi* (2006) 137 Cal.App.4th 64, 78.)
20 Title 15 §2402 as applied, however, has no controls or limitations.
21      The PC § 3041(b) exception to the rule can only be invoked when
22 the "gravity of the current convicted offense or offenses, or the
23 timing and gravity of current or past convicted offense or offenses,
24 is such that consideration of the public safety requires a more
25 lengthy period of incarceration for this individual." The word
26 "gravity" is a directive for comparison just as "more lengthy"
27 indicates a deviation from the norm. While *Dannenberg* held there
28

0519

1  does not need to be intra case comparison for the purposes of term
2  uniformity or proportionality, there necessarily has to be some sort
3  of comparison for the purposes of adhering to the legislative mandate
4  that parole is available.  The Board employs no meaningful yardstick
5  in measuring parole suitability.  This is a violation of the
6  separation of powers doctrine.  (People v. Wright (1982) 30 Cal.3d
7  705; 712-713.  And see Terhune v. Superior Court (1998) 65
8  Cal.App.4th 864, 872-873.  Compare Whitman v. Am. Trucking Ass'ns
9  (2001) 531 U.S. 457, 472, describing a delegation challenge as
10 existing when the legislature fails to lay down "an intelligible
11 principle to which the person or body authorized to act is directed
12 to conform.")
13
14                          RESPONDENT'S POSITION
15     The Attorney General has suggested, without pointing to any
16 concrete examples, that it is possible that the Board, when invoking
17 the crime as a reason to deny parole, is not placing it within
18 §2402(c)(1) but instead using is as some sort of 'lesser factor'
19 which, only when combined with other unsuitability criteria, can
20 contribute to a valid parole denial.  The two problems with this
21 position are, first, there is no evidentiary support for this
22 assertion, and second, it would have no impact on the constitutional
23 infirmities outlined and proven above.
24     Even if Respondent had produced evidence that the Board was
25 utilizing the crime as a 'lesser factor' which needs others to fully
26 support a parole denial, the Board would then be admitting it was
27 denying parole, in part, for the very reason that the person is
28

0520

1  before the panel and eligible for parole in the first place - the
2  commitment offense.  Respondent's argument suggests that a crime that
3  only qualified as the *Dannenberg* "minimum necessary" could still be
4  invoked as a reason for denying parole.  Respondent argues that when
5  the crime is invoked "not in the *Dannenberg* sense," there must be
6  other reasons for the parole denial and the crime alone would not be
7  enough in this context.  This position is inconsistent with the law
8  and fundamental logic.

9      A crime qualifies under *Dannenberg* when it is "particularly
10  egregious," or one where "no circumstances of the offense reasonably
11  could be considered more aggravated or violent than the minimum
12  necessary to sustain a conviction for that offense." (*Dannenberg*,
13  *supra*, 34 Cal.4th at pp. 1094-1095.)  These are the only two choices.
14  If a crime consists of only the bare elements then it is not
15  aggravated and it cannot, in and of itself, serve as a basis for
16  parole denials once the inmate becomes eligible for parole.  It is
17  the reason an inmate may be incarcerated initially for the equivalent
18  of 15 or 25 years, and then examined to determination rehabilitation
19  efforts when they come before the Board, but a crime that is no more
20  than the bare minimum cannot be factored into the equation pursuant
21  to PC § 3041(b) or any of the case law interpreting it.

22      In oral argument Respondent suggested a second way the
23  commitment offense can be used outside of §2402(c)(1).  If for
24  example a crime had its roots in gang allegiances or rivalries and
25  the inmate continued to associate with gangs while incarcerated, then
26  an aspect of the crime, even if the crime otherwise consisted of no
27  more than the minimum elements, could be combined with other behavior
28

22

0521

34

1  to support a parole denial.  Similarly, if a crime was rooted in an
2  inmate's then existing drug addiction, and the Board was to point to
3  a recent 115 involving drugs, the evidence that the inmate's drug
4  issues had not been resolved would justify a parole denial even if
5  the crime itself was not aggravated.  A finding that the inmate is
6  not suitable for release under these circumstances, however, is not
7  based on the facts of the commitment offense as tending to show
8  unsuitability.  It is based on the conclusion that can be drawn about
9  Petitioner's lack of rehabilitation or change since the offense, and
10  thus, his present dangerousness.
11      Respondent has not demonstrated any flaws in Petitioner's
12  methodology or analysis, nor provided any actual evidence of the
13  crime being invoked other than pursuant to §2402(c)(1).  Drawing
14  conclusions from the Board's direct statements, or its precise
15  recitations of the §2402(c)(1) language, logically indicates an
16  invocation of §2402(c)(1), and Respondent's suggestion otherwise is
17  insupportable.
18
19                    THE QUESTION OF BIAS
20      Because the issue has been squarely presented, and strenuously
21  argued by Petitioners, this Court is obligated to rule on the charge
22  that the Board's actions prove an overriding bias and deliberate
23  corruption of their lawful duties.
24      In the discrimination and bias case of USPS Bd. of Governors v.
25  Aikens (1983) 460 U.S. 711, the United States Supreme Court
26  acknowledged "there will seldom be 'eyewitness' testimony as to the
27  [] mental processes" of the allegedly biased decisionmaker.  Instead,
28

                              23

0522

1  an examination of other cases for trends or patterns can provide the

2  necessary circumstantial evidence. (See Aikens, supra, at footnote

3  2.) Reaffirming that such circumstantial evidence will be sufficient

4  the Court stated: "The law often obliges finders of fact to inquire

5  into a person's state of mind. As Lord Justice Bowen said in

6  treating this problem in an action for misrepresentation nearly a

7  century ago, 'The state of a man's mind is as much a fact as the

8  state of his digestion. It is true that it is very difficult to

9  prove what the state of a man's mind at a particular time is, but if

10  it can be ascertained it is as much a fact as anything else.'"

11  (Aikens, at pp. 716-717, quoting Edgington v. Fitzmaurice (1885) 29

12  Ch. Div. 459, 483.)[7]

13      The discovery in these cases was granted in part due to the

14  Petitioners' prima facie showing of bias and the necessity that it be

15  "adequately supported with evidence" if such evidence is available.

16  (Ramirez, supra, 94 Cal.App.4th at p. 564, fn. 5. See also Nasha v.

17  City of Los Angeles (2004) 125 Cal.App.4th 470, 483: "A party seeking

18  to show bias or prejudice on the part of an administrative decision

19  maker is required to prove the same 'with concrete facts.'" And see

20  State Water Resources Control Bd. Cases (2006) 136 Cal.App.4th 674,

21  841: "The challenge to the fairness of the adjudicator must set forth

22  concrete facts demonstrating bias or prejudice." See also Hobson v.

23

24  [7] As occurred in Aikens, supra, and as suggested in prior orders of this Court,

25  Respondent should have provided direct evidence from the decisionmakers. While the
fact that a Defendant does not explain his or her actions cannot be held against
him, (Griffin v. California (1965) 380 U.S. 609, Doyle v. Ohio (1976) 426 U.S.

26  610,) it is appropriate to give some weight to the consideration that the Board has
failed to offer any direct evidence or explanation on its own behalf. While the

27  case of Hornung v. Superior Court (2000) 81 Cal.App.4th 1095 stands for the
proposition that Petitioner may not inquire into the Board members mental
processes, Respondent is not precluded from offering such direct evidence if they

28  were able to testify as to their good faith and conscientious efforts.

24

1 │ *Hansen* (1967) 269 F.Supp. 401, 502, the watershed Washington D.C.

2 │ school desegregation case in which the court determined from a

3 │ statistical and factual analysis that racial bias was influencing

4 │ policy.)

5 │   In the case of *People v. Adams* (2004) 115 Cal.App.4th 243, 255,

6 │ a similar claim of biased decision making was asserted and it was

7 │ rejected because, although the defendant clearly articulated it, "he

8 │ has not demonstrated it. Therefore, he has failed to bear his burden

9 │ of showing a constitutional violation as a demonstrable reality, not

10 │ mere speculation." In the present cases Petitioners have provided

11 │ overwhelming concrete evidence. It is difficult to believe that the

12 │ Board's universal application of §2402(c)(1) has been an inadvertent

13 │ mistake or oversight on their part. It is hard to credit the Board's

14 │ position that it does not know its own patterns and practices reveal

15 │ a complete lack of standards or constraints on their power.

16 │ Respondent's protestations ring hollow, and it seems a statistical

17 │ impossibility, that the Board's use of "detailed" criteria in such a

18 │ fashion that they are rendered meaningless is a result of good faith

19 │ efforts on their part. That *every* murder is "especially heinous,

20 │ atrocious or cruel," and can therefore be an exception to the rule

21 │ that a parole date should be set, does not seem to be an accident on

22 │ their part.

23 │   Although no court has thus far agreed with the accusation that

24 │ the Board approaches its duties with a predetermination and a bias,

25 │ no court has previously been presented the comprehensive evidence

26 │ outlined herein. While this Court does not turn a blind eye to the

27 │ reasonable conclusion that the Board's unconstitutional practices are

28 │

25

1  willful, there is another possibility.  The pattern of errors
2  demonstrated by the discovery in this case, and the continuously
3  growing body of Court of Appeal opinions finding consistent and
4  persistent abuse of discretion, may instead be caused by the fact
5  that the Board is simply overworked and substantively untrained.  The
6  impossibility of the blanket applicability of §2402(c)(1) may be only
7  the result of sloppy preparation and inadvertent carelessness.
8       The Board must first be given an opportunity to comply with the
9  necessary remedy provided by this court before it is possible to
10 enter a finding of conscious bias and illegal sub rosa policy.  To do
11 otherwise would ignore the complexities and magnitude of the largely
12 discretionary duties with which that Board is vested.
13
14                          CONCLUSION
15      The conclusive nature of the proof in this case, and the
16 suggestion of institutional bias do not preclude formulation of an
17 remedy which will guarantee adequate restrictions on, and guidance
18 for, the Board's exercise of discretion in making parole suitability
19 determinations.  The Board can be made to lawfully perform its duties
20 if given explicit instructions.
21      As noted supra, a reason the proof in this case irrefutably
22 establishes constitutional violations is because the Board does not,
23 in actual fact, operate within the limiting construction of the
24 regulations.  The Board's expansive interpretation allows it to
25 operate without any true standards.  Although numerous rulings of
26 both state and federal courts of appeal have invalidated the Board's
27 application of the §2402(c) criteria to particular facts, the Board
28

                              26.

1  does not take guidance from these binding precedents and ignores them

2  for all other purposes.  In the most recent of these cases, *In re*

3  *Roderick*, (2007) ___ Cal.App.4th ___ (A113370) the First District

4  held four of five §2402 factors "found" by the Board to be

5  unsupported by any evidence.  At footnote 14 the court took the time

6  to criticize the Board for its repeated use of a "stock phrase"

7  "generically across the state."  The court also clarified that "at

8  minimum, the Board is responsible for articulating the grounds for

9  its findings and for citing to evidence supporting those grounds."

10      There is nothing in the evidence presented that would allow any

11  conclusion but that, without intervention of the Courts, the Board

12  will ignore the lessons of these rulings in the future and continue

13  to employ its formulaic approach of citing a criteria from

14  §2402(c)(1), repeating the facts of the crime, but never

15  demonstrating a logical connection between the two.  This is the

16  core problem with the Board's methodology -- they provide no

17  explanation or rationale for the findings regarding the crime itself.

18    This practice results in violence to the requirements of due

19  process and individualized consideration which are paramount to the

20  appropriate exercise of its broad discretion.

21      The only solution is one that compels the Board to identify the

22  logical connection between the facts upon which it relies and the

23  specific criteria found to apply in the individual case.  For

24  example, the Board often finds that an inmate's motive is "trivial"

25  without ever suggesting why, on these facts, that motive is not just

26  as trivial as the motive behind any other murder.  What motive is not

27  trivial?  By any definition "trivial" is a word of comparison and

28

27

1 | only has meaning when there can be examples that are not "trivial."

2 | Similarly, although the Sixth District made it plain four years

3 | ago that "all [] murders by definition involve some callousness," (*In*

4 | *re Smith* (2003) 114 Cal.App.4th 343, 345,) the Board has continued to

5 | deny countless paroles labeling the crime "callous" without ever

6 | suggesting what crime would not qualify as "callous" and without

7 | consistently explaining why the individual case before it

8 | demonstrates "exceptional" callousness.

9 | Respondent has consistently refused to suggest what possible

10 | instances of murder would *not* fit the Board's amorphous application

11 | of the §2402 criteria. Citing *Dannenberg*, Respondent insists such

12 | comparative analysis is unnecessary. Respondent fundamentally

13 | misunderstands the *Dannenberg* holding.

14 | The PC § 3041(b) exception to the rule can only be invoked when

15 | the "gravity of the current convicted offense or offenses, or the

16 | timing and gravity of current or past convicted offense or offenses,

17 | is such that consideration of the public safety requires a more

18 | lengthy period of incarceration for this individual." The word

19 | "gravity" is a directive for comparison just as "more lengthy"

20 | indicates a deviation from the norm. While *Dannenberg* held there

21 | does not need to be intra case comparison for the purposes of term

22 | uniformity or proportionality, there necessarily has to be some sort

23 | of comparison for the purposes of adhering to the legislative mandate

24 | that parole is available. This is implicit in §2402 because the

25 | qualifier "especially," in "especially heinous atrocious or cruel,"

26 | requires that some form of comparison be made. While the original

27 | drafters of §2402 seemed to have recognized this fact, the ongoing

28 |

0527

1  conduct of the Board has completely ignored it, and this is the

2  essence of the due process violation Petitioners have asserted.

3      As noted in his dissent in the recent case of *In re Roderick*,

4  *supra*, Justice Sepulveda would have deferred to the Board's

5  'exercise' of discretion because "Board members have both training

6  and vast experience in this field.  They conduct literally thousands

7  of parole suitability hearings each year.  The Board therefore has

8  the opportunity to evaluate the egregiousness of the facts of a great

9  number of commitment offenses. ...  The Board's training and

10  experience in evaluating these circumstances far exceeds that of

11  most, if not all, judges."  The evidence in this case, however,

12  suggests a flaw in granting such deference.  Since the Board

13  continues to place every murder in the category of offenses "tending

14  to show unsuitability," something is certainly wrong.  Since the

15  Board's vast experience is undeniable, the problem must be in the

16  Board's training and understanding of the distinguishing features of

17  the guidelines and criteria.  Although Justice Sepulveda presumes

18  that Board members receive substantive training, there is no evidence

19  before this court to suggest that it does, and substantial

20  circumstantial evidence to suggest that it does not.

21      In the vast numbers of Santa Clara County cases reviewed by this

22  Court, the Board's formulaic decisions regarding the commitment

23  offense do not contain any explanation or thoughtful reasoning.

24  Instead, the Board's conclusionary invocation of words from

25  §2402(c)(1) is linked to a repetition of the facts from the Board

26  report by the stock phrase: "These conclusions are drawn from the

27  statement of facts wherein ...."  Thereafter the inmate files a habeas

28

29

0528

1   corpus petition and Respondent, after requesting an extension of

2   time, files a boilerplate reply asserting the Board's power is

3   "great" and "almost unlimited" and thus any "modicum" of evidence

4   suffices. Respondent does not cite or distinguish the expanding body

5   of case law that is often directly on point as to specific findings

6   made. Thereafter, if the writ is granted, the Board is directed to

7   conduct a new hearing "in compliance with due process" and that order

8   is appealed by Respondent. On appeal the order is usually upheld

9   with modifications and in the end, after countless hours of attorney

10   and judicial time, the Board conducts a new two hour hearing at which

11   they abuse their discretion and violate due process in some different

12   way.

13         This system is malfunctioning and must be repaired. The

14   solution must begin with the source of the problem. The Board must

15   make efforts to comply with due process in the first instance. The

16   case law published over the last five years provides ample and

17   sufficient guidelines and must be followed. Although the Board

18   methods suggest it believes this to be optional, it is not.

19

20                       **THE REMEDY**

21         Thus; it is the order of this Court that the Board develop,

22   submit for approval, and then institute a training policy for its

23   members based on the current and expanding body of published state,

24   and federal, case law reviewing parole suitability decisions, and

25   specifically the application of §2402 criteria. In addition to

26   developing guidelines and further criteria for the substantive

27   application of §2402 the Board must develop rules, policies and

28

30

1 | procedures to ensure that the substantive guidelines are followed.

2 |     This Court finds its authority to impose this remedy to flow

3 | from the fundamental principles of judicial review announced over two

4 | centuries ago in *Marbury v. Madison* (1803) 5 U.S. (1 Cranch) 137.

5 | Citing that landmark case, the California Supreme Court has

6 | recognized "Under time-honored principles of the common law, these

7 | incidents of the parole applicant's right to 'due consideration'

8 | cannot exist in any practical sense unless there also exists a remedy

9 | against their abrogation." (*In re Sturm* (1974) 11 Cal.3d 258, 268.)

10 |     In *Strum* the court directed that the Board modify its rules and

11 | procedures so that thereafter "The Authority will be required [,]

12 | commencing with the finality of this opinion, to support all its

13 | denials of parole with a written, definitive statement of its reasons

14 | therefor and to communicate such statement to the inmate concerned."

15 | (*Sturm* at p. 273.)

16 |     Similarly, in the case of *Minnis, supra,* the California Supreme

17 | Court held the Board's policy of categorically denying parole to drug

18 | dealers was illegal. Based on its analysis the court there was

19 | clearly prepared to order that Board to modify its rules and

20 | procedures however such was unnecessary because the Board

21 | "voluntarily rescinded" the illegal policy. While the remedy in this

22 | case is of greater scope than that necessary in either *Strum* or

23 | *Minnis, supra,* so too has been the showing of a systematic abuse of

24 | discretion and distortion of process.

25 |     The most recent case to address the court's roles and duties in

26 | overseeing the parole suitability process has been *In re Rosenkrantz,*

27 | *supra,* 29 Cal.4th 616. In that case the court explained that

28 |

31

1  judicial review of a Governor's parole determination comports with,
2  and indeed furthers, separation of powers principles because the
3  courts are not exercising "complete power" over the executive branch
4  and do not "defeat or materially impair" the appropriate exercise or
5  scope of executive duties.  (*Rosenkrantz* at p. 662.)  Citing *Strum*,
6  *supra*, the court reaffirmed that a life term inmate's "due process
7  rights cannot exist in any practical sense without a remedy against
8  its abrogation." (*Rosenkrantz* at p. 664.)

9      The *Rosenkrantz* court also put forth what it believed was an
10 extreme example but which, unfortunately, has been shown to exist in
11 this case.  The court stated: "In the present context, for example,
12 judicial review could prevent a Governor from usurping the
13 legislative power, in the event a Governor failed to observe the
14 constitutionally specified limitations upon the parole review
15 authority imposed by the voters and the Legislature."  This is
16 exactly what the evidence in this case has proven.  As noted above
17 the Board has arrogated to itself absolute authority, despite
18 legislative limitations and presumptions, through the mechanism of a
19 vague and all inclusive, and thus truly meaningless, application of
20 standards.  The remedy this Court is imposing is narrowly tailored to
21 redress this constitutional violation.

22     The consequence of the Board's actions (of giving § 2402(c)(1)
23 such a broadly all encompassing and universal application) is that
24 they have unwittingly invalidated the basis of the California Supreme
25 Court's holding in *Dannenberg*.  The reason the four justice majority
26 in *Dannenberg* upheld the Board's standard operating procedures in the
27 face of the Court of Appeal and dissent position is because "the
28

0531

1  Board must apply detailed standards when evaluating whether an

2  individual inmate is unsuitable for parole on public safety grounds.

3  (Dannenberg at p. 1096, footnote 16. See also page 1080: "the

4  regulations do set detailed standards and criteria for determining

5  whether a murderer with an indeterminate life sentence is suitable

6  for parole.")  However, Petitioners in these cases have proven that

7  there are no "detailed standards" at all.  Instead the Board has

8  systematically reduced the "detailed standards" to empty words.  The

9  remedy this Court orders, that there truly be "detailed standards,"

10 requires the promulgation of further rules and procedures to

11 constrain and guide the Board's powers.  This remedy differs in

12 specifics, but not in kind, from what courts have previously imposed

13 and have always had the power to impose.

14      The Board must fashion a training program and further rules,

15 standards and regulations based on the opinions and decisions of the

16 state and federal court cases which provide a limiting construction

17 to the criteria which are applied.[8]  The Board must also make

18 provisions for the continuing education of its commissioners as new

19 case law is published and becomes binding authority.  This Court will

20 not, at this point, outline the requirements and lessons to be taken

21 from the above cases.  It is the Board's duty, in the first instance

22 to undertake this task.  The training program, and associated rules

23 and regulations, shall be served and submitted to this Court, in

24

25 [8]While the showing and analysis in this case was limited to § 2402(c)(1), the
   conclusions that the evidence compelled, that the Board has been carelessly
   distorting and misapplying the regulations, is not so limited.  Accordingly, the
26 training program that is necessary for the Board can not reasonably be limited to
   just § 2402(c)(1).  Thus, to the extent case law recognizes, clarifies and
27 establishes remedies for other due process violations they must also be
   incorporated into the necessary rules and training the Board is required to abide
   by.

28

33

0532

1    writing, within 90 days.  Counsel for Petitioners, and any other
2    interested parties, may submit briefs or comments within 30 days
3    thereafter.  After receipt and review of the materials this Court
4    will finalize the training program, and associated rules, and the
5    Petitioners in these cases shall receive a new hearing before a Board
6    that does not operate with the unfettered discretion and caprice
7    demonstrated by the evidence here presented.

8                                ORDER

9        For the above reasons the habeas corpus petition is granted and
10   it is hereby ordered that Petitioner be provide a new hearing which
11   shall comply with due process as outlined above.  Respondent shall
12   provide weekly updates to this Court on the progress of its
13   development of the new rules and regulations outlined above.

14
15
16
17   DATED:  _Aug 30_, 2007      _____
18                               LINDA R. CONDRON
                                 JUDGE OF THE SUPERIOR COURT
19
20   cc:  Petitioner's Attorney (Jacob Burland)
          Attorney General (Denise Yates, Scott Mather)
21
22
23
24
25
26
27
28

                              34

0533